1  Julian Hammond (SBN 268489)
   jhammond@hammondlawpc.com
2  Polina Brandler (SBN 269086)
   pbrandler@hammondlawpc.com
3  Ari Cherniak (SBN 290071)
   acherniak@hammondlaw.com
4  HAMMONDLAW, P.C.
   1829 Reisterstown Rd. Suite 410
5  Baltimore, MD 21208
   Tel:  (310) 601-6766
6  Fax:  (310) 295-2385

7  Laura L. Ho (SBN 173179)
   lho@gbdhlegal.com
8  GOLDSTEIN, BORGEN, DARDARIAN & HO
   300 Lakeside Drive, Suite 1000
9  Oakland, CA 94612
   Tel:  (510) 763-9800
10 Fax:  (510) 835-1417

11 Attorneys for Plaintiff and Putative Class

12

## IN THE UNITED STATES DISTRICT COURT

13

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15 STEVEN BREAUX, individually and on behalf of all other similar situated individuals,

Case No.: 3:19-cv-00717-TSH

16          Plaintiff,

**NOTICE OF ERRATA- COMPLAINT**

17 vs.

18

19 ACCREDITED SURETY AND CASUALTY COMPANY, AEGIS SECURITY INSURANCE

20 COMPANY, ALLEGHENY CASUALTY COMPANY, AMERICAN CONTRACTORS

21 INDEMNITY COMPANY, AMERICAN SURETY COMPANY, ASSOCIATED BOND AND INSURANCE AGENCY, INC., BANKERS

22 AGENCY, INC., BANKERS INSURANCE COMPANY, BOND SAFEGUARD INSURANCE

23 COMPANY, CRUM & FORSTER INDEMNITY COMPANY, DANIELSON NATIONAL

24 INSURANCE COMPANY, FINANCIAL CASUALTY & SURETY, INC., HARCO

25 NATIONAL INSURANCE COMPANY, INDIANA LUMBERMENS MUTUAL

26 INSURANCE COMPANY, INTERNATIONAL FIDELITY INSURANCE COMPANY,

27 LEXINGTON NATIONAL INSURANCE CORPORATION, LEXON INSURANCE

28 COMPANY, NATIONAL AMERICAN INSURANCE COMPANY, NORTH RIVER

INSURANCE COMPANY, PHILADELPHIA
REINSURANCE CORPORATION, SAFETY
FIRST INSURANCE COMPANY, SEAVIEW
INSURANCE COMPANY, SENECA
INSURANCE COMPANY, STILLWATER
PROPERTY AND CASUALTY INSURANCE
COMPANY, SUN SURETY INSURANCE
COMPANY, UNITED STATES FIRE
INSURANCE COMPANY, UNIVERSAL FIRE &
INSURANCE COMPANY, CONTINENTAL
HERITAGE INSURANCE COMPANY,
WILLIAMSBURG NATIONAL INSURANCE
COMPANY, TWO JINN, INC., AMERICAN
BAIL COALITION, INC., CALIFORNIA BAIL
AGENTS ASSOCIATION, AND GOLDEN
STATE BAIL AGENTS ASSOCIATION, AND
DOES 1-100,

    Defendants.

The following corrections have been made to the Complaint, a corrected version of which is attached hereto as Exhibit A.

Page/Line

| | |
|---|---|
| 1:6 | Edit "if" to "of" |
| 1:22 | Edit "is" to "are" |
| 1:27 | Remove "a" |
| 2:9 | Edit "allege" to "alleges" |
| 4:1 | Edit "office" to "offices" |
| 4:7 | Remove paragraph indentation |
| 4:10 | Remove paragraph indentation |
| 4:25 | Remove paragraph indentation, and edit "has" to "and has" |
| 5:4 | Remove paragraph indentation |
| 5:10 | Remove paragraph indentation |
| 5:17 | Edit "has" to "and has" |
| 6:17 | Edit "in" to "is in" |
| 6:21 | Edit "in" to "is in" |
| 6:25 | Edit "identifies" to "identities" |
| 7:7 | Edit "put" to "out" |
| 7:13 | Edit "insurance" to "an insurance" |
| 7:17 | Edit "provides" to "provide" |
| 7:23 | Edit "post" to "posts" |
| 7:26 | Edit "if" to "even if" |
| 9:2 | Edit "conclusion" to "one conclusion" |
| 9:3 | Edit "to keep to keep" to "to keep" |
| 9:7 | Edit "competitive" to "a competitive" |
| 9:13 | Edit "greed" to "agreed" |
| 9:14 | Remove "a" |
| 9:25 | Edit "evidence" to "evident" |

| | | |
|---|---|---|
| 1 | 9:27 | Edit "complete" to "compete" |
| 2 | 10:5 | Edit "even" to "event" |
| 3 | 10:9 | Edit "standards" to "standard" |
| 4 | 10:10 | Edit "advertises" to "advertises a" |
| 5 | 10:11 | Edit "vail" to "bail" |
| 6 | 10:28 | Remove "(Emphasis added.)" |
| 7 | 11:7 | Remove "(Emphasis added.)" |
| 8 | 11:26 | Remove paragraph indentation |
| 9 | 12:1 | Remove paragraph indentation |
| 10 | 12:4 | Remove paragraph indentation |
| 11 | 12:6 | Remove paragraph indentation |
| 12 | 13:24 | Remove paragraph indentation |
| 13 | 13:26 | Remove paragraph indentation |
| 14 | 14:1 | Remove paragraph indentation |
| 15 | 14:3 | Remove paragraph indentation |
| 16 | 14:5 | Remove paragraph indentation |
| 17 | 14:6 | Remove paragraph indentation |
| 18 | 14:19 | Remove paragraph indentation |
| 19 | 15:4 | Remove paragraph indentation |
| 20 | 15:6 | Remove paragraph indentation |
| 21 | 15:8 | Remove paragraph indentation |
| 22 | 15:10 | Remove paragraph indentation |
| 23 | 15:13 | Edit "government" to "government," |
| 24 | 15:19 | Remove paragraph indentation |
| 25 | 16:3 | Edit "forced" to "forces" |
| 26 | 16:4 | Edit "share" to "shares" |
| 27 | 16:5 | Edit "marked" to "market" |
| 28 | 16:15 | Remove paragraph indentation |

730295.1

16:17 Remove paragraph indentation

16:19 Remove paragraph indentation

18:22 Edit "Class" to "the Class"

19:2 Edit "retailed" to "retaliated"

19:14 Edit "damaged" to "be damaged"

20:24 Edit "enjoying" to "enjoining"

21:9 Edit "constitute" to "constitutes"

Dated: February 12, 2019

Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

*/s Laura L. Ho*
Laura L. Ho

Attorneys for Plaintiff and Putative Class

730295.1

Exhibit A

1  JULIAN HAMMOND (SBN 268489)
   jhammond@hammondlawpc.com
2  POLINA BRANDLER (SBN 269086)
   pbrandler@hammondlawpc.com
3  ARI CHERNIAK (SBN 290071)
   acherniak@hammondlaw.com
4  HAMMONDLAW, P.C.
   1829 Reisterstown Rd. Suite 410
5  Baltimore, MD 21208
   Tel:  (310) 601-6766
6  Fax: (310) 295-2385

7  LAURA L. HO (SBN 173179)
   lho@gbdhlegal.com
8  GOLDSTEIN, BORGEN, DARDARIAN & HO
   300 Lakeside Drive, Suite 1000
9  Oakland, CA 94612
   Tel: (510) 763-9800
10 Fax: (510) 835-1417

11 Attorneys for Plaintiff and Putative Class

12

## IN THE UNITED STATES DISTRICT COURT

13

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

14

15  STEVEN BREAUX, individually and on behalf of
    all other similar situated individuals,
16
              Plaintiff,
17
    vs.
18
    ACCREDITED SURETY AND CASUALTY
19  COMPANY, AEGIS SECURITY INSURANCE
    COMPANY, ALLEGHENY CASUALTY
20  COMPANY, AMERICAN CONTRACTORS
    INDEMNITY COMPANY, AMERICAN SURETY
21  COMPANY, ASSOCIATED BOND AND
    INSURANCE AGENCY, INC., BANKERS
22  AGENCY, INC., BANKERS INSURANCE
    COMPANY, BOND SAFEGUARD INSURANCE
23  COMPANY, CRUM & FORSTER INDEMNITY
    COMPANY, DANIELSON NATIONAL
24  INSURANCE COMPANY, FINANCIAL
    CASUALTY & SURETY, INC., HARCO
25  NATIONAL INSURANCE COMPANY,
    INDIANA LUMBERMENS MUTUAL
26  INSURANCE COMPANY, INTERNATIONAL
    FIDELITY INSURANCE COMPANY,
27  LEXINGTON NATIONAL INSURANCE
    CORPORATION, LEXON INSURANCE
28  COMPANY, NATIONAL AMERICAN

Case No.:

**CLASS ACTION COMPLAINT**

   **1. Violation of the Cartwright Act, Cal. Bus.
      & Prof. Code § 16720;**

   **2. Violation of California's Unfair
      Competition Law, Cal. Bus. & Prof. Code
      § 17200,** *et seq.*

**JURY TRIAL DEMANDED**

INSURANCE COMPANY, NORTH RIVER
INSURANCE COMPANY, PHILADELPHIA
REINSURANCE CORPORATION, SAFETY
FIRST INSURANCE COMPANY, SEAVIEW
INSURANCE COMPANY, SENECA
INSURANCE COMPANY, STILLWATER
PROPERTY AND CASUALTY INSURANCE
COMPANY, SUN SURETY INSURANCE
COMPANY, UNITED STATES FIRE
INSURANCE COMPANY, UNIVERSAL FIRE &
INSURANCE COMPANY, CONTINENTAL
HERITAGE INSURANCE COMPANY,
WILLIAMSBURG NATIONAL INSURANCE
COMPANY, TWO JINN, INC., AMERICAN
BAIL COALITION, INC., CALIFORNIA BAIL
AGENTS ASSOCIATION, AND GOLDEN
STATE BAIL AGENTS ASSOCIATION, AND
DOES 1-100,

     Defendants.

Plaintiff STEVEN BREAUX ("Plaintiff"), by and through his undersigned counsel, brings this action against Defendants, on behalf of himself and all others similarly situated, alleges as follows:

**INTRODUCTION**

1.      Approximately 1.2 million are arrested on suspicion of a crime in California each year. Many are able to secure pre-trial release on bail and get back to their families and jobs on the presumption of innocence until proven otherwise and because they are not considered a danger to society by the courts.  Bail is a constitutional right and is intended to strike a balance between protecting the accused from excessive detention while holding them accountable at the same time to attend court proceedings.  If bail is paid directly to the court, the entire amount is returned if the accused appears for all court proceedings.  However, California's bail schedules are among the highest in the nation and most people cannot afford to post bail, which often is in the thousands of dollars. Those who cannot afford to post bail out of pocket can buy a commercial bail bond by paying a premium.  What results is an exploitative arrangement with bail bond companies that typically charge a nonrefundable premium of 10% of the bail amount.  That premium is not refundable even if the accused attends all courts dates and even if the charges are dropped or the accused is found innocent.

2.      Commercial bail bonds are sold by bail bonds agents who are licensed by the California Department of Insurance ("CDI").  There are approximately 3,200 licensed bail bonds agents in California.  Approximately 175,000 bail bonds are written each year in California, and according to a study released by the state Judicial Council, California-licensed bail bond agents collect more than $308 million in nonrefundable premium fees each year.

3.      Although bail bonds are sold by bail bonds agents, these agents are appointed representatives of surety insurance companies, which underwrite the bail bonds.  There are only a handful of surety companies who control the market; according to a report by the ACLU and Color of Change, there are just 9 insurers who underwrite the majority of bail bonds in the United States (approximately $14 billion).  It is these handful of surety companies that ultimately control the premiums charged by dictating the premiums to their bail bonds agents.  These surety companies have been engaged in long-standing and ongoing collusive and anti-competitive conduct by conspiring to

keep bail bond premiums higher than they would be had the bail-bonds market in California functioned competitively.

4.     The accused are presumed innocent until proven guilty and deserve the same consumer protections as the rest of the population.

5.     This is a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of Plaintiff and all other individuals in California who, between February 2004 and the present ("Class Period"), paid, in full or in part, for a commercial bail bond to bail out him/herself or another in California ("Class Members").

6.     Plaintiff alleges that Defendants violated California's Cartwright Act, Cal. Bus. & Prof. Code § 16720 and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 and seek damages, exemplary damages, restitution, injunctive relief, as well as attorneys' fees and costs pursuant to California Code of Civil Procedure § 1021.5 and all other applicable law.

## JURISDICTION

7.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, filed under Rule 23 of the Federal Rules of Civil Procedure; there are many thousands of proposed Class Members; the aggregate amount in controversy exceeds the jurisdictional amount of $5,000,000, and at least one Defendant in this action is a citizen of a State different from that of Plaintiff and the members of the Class. This Court also has subject matter jurisdiction over Plaintiff's and the proposed Class' claims pursuant to 28 U.S.C. § 1367(a).

8.     This Court has jurisdiction over Defendants because they have intentionally availed themselves of the California consumer market through the advertisements, marketing, and sale of their bail bonds products to California residents. As a result, jurisdiction in this Court is proper and necessary. Moreover, their wrongful conduct, as described herein, foreseeably affects consumers in California and nationwide.

**VENUE**

9.      Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because, inter alia,

substantial parts of the events or omissions giving rise to the claims occurred in the District and/or a

substantial part of property that is the subject of the action is situated in the District.

**PLAINTIFF**

10.      Plaintiff Steven Breaux resides in Desert Hot Springs, California.  In 2014, Mr. Breaux

paid an unlawfully inflated bail bond premium to post bail on behalf of his mother, who had been

detained in Victorville City Jail.  All charges against his mother were subsequently dropped, and no

portion of the premium was refunded.

**DEFENDANTS**

**Surety Defendants**

11.      Defendant Accredited Surety and Casualty Company is incorporated in the state of

Florida, with its principal place of business in Orlando, Florida.  It is a wholly owned company of a

Bermuda based insurance investment conglomerate Randall & Quilter.

12.      Defendant Aegis Security Insurance Company is a member of the Aegis Group and is

incorporated in the state of Pennsylvania, with its principal place of business in Harrisburg,

Pennsylvania.

13.      Defendant Allegheny Casualty Company is incorporated in the state of New Jersey, and

has its principal place of business in New Jersey.  Allegheny Casualty is a member of AIA, the

nation's largest bail surety administrator, with offices in Calabasas, California.

14.      Defendant American Constructors Indemnity Company ("ACIC") is a member of the

HCC Surety Group.  ACIC is incorporated in the state of California, and has its principal place of

business in Los Angeles, California.

15.      Defendant American Surety Company ("ASC") is incorporated in the state of Indiana

with its principal place of business in Indianapolis, Indiana.

16.      Defendant Associated Bond and Insurance Agency, Inc. ("Associated Bond") is

incorporated in the state of California and has its principal place of business in Calabasas, California.

Associated Bond is a member of AIA, the nation's largest bail surety administrator, with offices in Calabasas, California.

17.     Defendant Bankers Insurance Company is incorporated in the state of Florida, and has its principal place of business in St. Petersburg, Florida.  Bankers Insurance is a member of the Bankers Insurance Group.

18.     Defendant Bond Safeguard Insurance Company incorporated in the state of Illinois, and has its principal place of business in Mount Juliet, Tennessee.  Bond Safeguard is a member of the J.A. Patterson Group.

19.     Defendant Continental Heritage Insurance Company is incorporated in the state of Florida, and has its principal place of business in Mayfield Heights, Ohio.

20.     Defendant Crum & Forster Indemnity Company is incorporated in the state of Delaware, and has its principal place of business in Morristown, New Jersey.  Crum & Forster Indemnity Company is a member of the Crum & Forster group.

21.     Defendant Danielson National Insurance Company and National American Insurance Company of California are members of the DHC Group and are incorporated in the state of California, and have their principal place of business in San Diego, California.

22.     Defendant Financial Casualty & Surety, Inc. is a member of the HCC Surety Group.  It is incorporated in the state of Texas, and has its principal place of business in Houston, Texas.

23.     Defendant Harco National Insurance Company is incorporated in the state of Illinois, and has its principal place of business in Raleigh, North Carolina.

24.     Defendant Indiana Lumbermens Mutual Insurance Company is a member of ILM Group and is incorporated in the state of Indiana, and has its principal place of business in Indianapolis, Indiana.

25.     Defendant International Fidelity Insurance Company is incorporated in the state of New Jersey, and has its principal place of business in Newark, New Jersey.  International Fidelity is a member of AJA, the nation's largest bail surety administrator, with offices in Calabasas, California.

26.     Defendant Lexington National Insurance Corporation is incorporated in the state of Maryland, and has its principal place of business in Cockeysville, Maryland.

27. Defendant Lexon Insurance Company is incorporated in the state of Texas, and has its principal place of business in Mount Juliet, Tennessee. Lexon Insurance is a member of the J.A. Patterson Group.

28. Defendant North River Insurance Company is incorporated in the state of New Jersey, and has its principal place of business in Morristown, New Jersey. North River is a member of the Crum & Forster group.

29. Defendant Philadelphia Reinsurance Corporation is incorporated in the state of Pennsylvania, and has its principal place of business in San Diego, California.

30. Defendant Safety First Insurance Company is a member of Delphi Financial Group, Inc., is incorporated in the state of Illinois, and has its principal place of business in Chicago, Illinois.

31. Defendant Seaview Insurance Company ("SIC") is incorporated in the state of California with its principal place of business located in Carlsbad, California. Seaview Insurance Company is the surety for Defendant Two Jinn, Inc.'s bail bonds, and is a wholly owned subsidiary of Seaview Surety Holdings, LLC.

32. Defendant Seneca Insurance Company is incorporated in the state of New York, and has its principal place of business in New York, New York. Seneca is a member of the Crum & Forster group.

33. Defendant Stillwater Property and Casualty Insurance Company is incorporated in the state of New York, and has its principal place of business in Jericho, New York. Stillwater is a member of the Bankers Insurance Group.

34. Defendant Sun Surety Insurance Company is incorporated in the state of South Dakota, and has its principal place of business in Rapid City, South Dakota.

35. Defendant United States Fire Insurance Company is incorporated in the state of Delaware, and has its principal place of business in Morristown, New Jersey. United States Fire is a member of the Crum & Forster group.

36. Defendant Universal Fire & Insurance Company is incorporated in the state of Indiana, and has its principal place of business in Hudsonville, Michigan.

1    37.    Defendant Williamsburg National Insurance Company is a member of the

2  Meadowbrook Insurance Group and is incorporated in the state of Michigan, and has its principal place

3  of business in Southfield, Michigan.

4  **Bail Bonds Agent Defendant**

5    38.    Defendant Two Jinn, Inc. is a California corporation, with its principal place of business

6  in Carlsbad, California.  It owns and operates the largest bail bond agency in California - Aladdin Bail

7  Bonds.  Its surety is Defendant SIC.

8  **Bail Agent Association Defendants**

9    39.    Defendant American Bail Coalition, Inc. ("ABC") is a nonprofit association organized

10  under § 501(c)(6) of the Internal Revenue Code, incorporated in the state of Pennsylvania.  Its

11  principal place of business is in Lancaster, Pennsylvania.  ABC is a trade association for the national

12  bail underwriting insurance industry.

13    40.    Defendant California Bail Agents Association ("CBAA") is a nonprofit corporation

14  organized under§ 501(c)(6) of the Internal Revenue Code, incorporated in the state of California.  Its

15  principal place of business is in Pomona, California.  CBAA is a trade association for bail agents in

16  California.

17    41.    Defendant Golden State Bail Agents Association ("GSBAA") is a nonprofit corporation

18  organized under § 501(c)(6) of the Internal Revenue Code, incorporated in the state of California with

19  its principal place of business is in Frenso, California.

20  **DOES 1-100 Defendants**

21    42.    DOES 1-100, inclusive, were co-conspirators with other Defendants in the violations

22  alleged herein, and performed acts and made statements in furtherance thereof.  Plaintiff is presently

23  unaware of the true names and identities of those defendants sued here as DOES 1-100.  Plaintiff will

24  amend the Complaint to allege the true names of the DOE defendants when they have been

25  ascertained.

26

27

28

# FACTUAL ALLEGATIONS

**A.      Bail Bonds Market in California**

43.      Many of the individuals who are arrested and charged with a crime may be able to get out of jail pre-trial by posting bail.  Those unable to pay the entire bail amount out of pocket are faced with a difficult choice.  They can either remain in jail or leave their loved ones in jail, which has been shown to threaten both physical and mental health of the accused, or they could purchase a commercial bail bond by paying a premium to the bail bond agent.  When someone is able to pay bail out of pocket, the full amount is returned once the case is over.  However, when dealing with a commercial bail bond, the bail bond premium is not refunded even if the charges are never filed, are dropped, or the accused is acquitted.  Many are also not able to afford to pay the entire premium up front, and bail bonds thus often leave families to pay loan installments and fees even after the case is resolved.

44.      Bail bonds function like insurance.  But, unlike a traditional insurance agreement between an insurance company and the insured, surety bonds are a three-party agreement involving the principal (the accused), the obligee (court/the State), and the surety (bail bond agent, backed by a surety company).  The bail bond agent is, at least in theory, responsible for "assuring" the court that the bond will be paid in full if the accused does not show up to court.  Bail agents in turn are backed by surety companies which provide insurance to the bail agents in the event they need to pay the full bond amount to the court.

45.      The bail bond agent pays an insurance company (i.e. a surety) a portion of the money to back the bond they have issued.  In addition to charging a fee, surety companies also mitigate their risk by requiring bail agents to contribute to a build-up fund ("BUF"), which is essentially a savings account controlled by the surety company that is supposed to cover potential liabilities.

46.      When an accused buys a commercial bail bond, the bail bond agency posts the bond with the Court in exchange for collecting the 10% premium from the accused.  If the accused attends all court dates, the bail bond agent and the surety companies are released from liability on the bond.  The accused, however, does not get the premium back even if charges are never filed, charges are dismissed or the accused is acquitted.

47.     In California, CDI's Rate Regulation Branch determines whether the bail premium rates charged to consumers in California are fair (i.e. not excessive, inadequate or unfairly discriminatory).

48.     CDI sets the maximum premium rates at 10%, and a bail bond agent may choose to negotiate a lower fee by offering a rebate, as permitted by Proposition 103.

49.     Sureties must file a rate application with the CDI stating the maximum premium rate that they may charge their consumers.  All Surety Defendants have filed a rate application setting forth their maximum premium rate, and have sold bail bonds products in California during the Class Period.

50.     But, while Proposition 103 permits sureties to charge less than the maximum allowable premium rate, and one would expect market forces to result in competitive premium rates to attract customers, Surety Defendants price bail bonds with near uniformity at 10% of the posted bond, with an 8% maximum for consumers who meet certain criteria (e.g. veterans, union members, home owners, government employees or certain accused represented by private lawyers).  This indicates that Surety companies, unlike other forms of insurance, does not link cost of insurance with the risk assumed by the insurer.

51.     In fact, Surety companies in California reap rewards while shouldering virtually no risk.  The expected need to pay out on a bail bond is very low because accused rarely "jump bail" and even when they do, 4 out of 5 times, bonds are not forfeited.  A review of 2012 financial records of 32 surety companies shows that they cumulatively paid less than 1 percent of bail losses, making bail bonds virtually risk-free.  For example, one large bail insurer has publicly boasted that it sustained no losses at all in 2014 or 2015, and another smaller bail insurer has publicly stated that it did not pay any losses for 17 years.

52.     At the same time, premium revenues are high as a result of both pricing and volume.  More commercial bail bonds are written in California than anywhere else in the country where they are legal.  Between 2011 and 2013, California sureties underwrote $4.4 billion in bail bonds per year, and collected more than $308 million in bail bond premiums per year.  The bail bonds industry overall brings in about $2 billion in profit per year.

53.     The unnatural discrepancy between the risk and profit margins in the bail bonds market leads to only one conclusion – that there has been a market failure in the bail bonds insurance market.

The market failure is Defendants' conspiracy to keep default premium bail bond rates fixed at 10%, and to prevent discounting by rebating as much as possible.

**B.     Surety Defendants' Anti-Competitive Conspiracy**

54.     In November 1988, California voters enacted Proposition 103, allowing insurers to offer rebates on their rates submitted to CDI so as to protect consumers and encourage a competitive insurance marketplace.  Since at least February 2004, the date of the decision in *Pacific Bonding Corporations v. John Geramendi*, Case No. GIC 815786 (San Diego Super. Cty. Ct.), which prevented CDI from enforcing pre-Proposition 103 anti-rebate statute, it has been clear that surety companies in the bail bond industry may offer prices below the maximum rate submitted to CDI.

55.     Despite being permitted to offer lower rates by offering rebates, and despite knowing this as of at least February 2004, Defendants have agreed to file the same maximum 10% rate with the CDI, advertise the same maximum 10% rate, and generally refrain from offering lower rates through rebates, as one would expect to naturally occur in a competitive market.

56.     In a free market economy, however, prices are dictated by supply and demand, and prices offered by provides of goods or services are competitive.

57.     Surety Defendants and their co-conspirators have misrepresented to consumers that their premium rates are required by law and have concealed their scheme to fix premiums.

58.     Defendants have also intimidated competitors to maintain the same premium rates across the board and not offer rebates or file for lower maximum rates with the CDI, and have retaliated against those competitors who did not cooperate.

59.      The Surety Defendants and their co-conspirators have conspired to fix bail bond premiums, at least since February 2004, to avoid price competitions.  Defendants' conspiracy is evident from the following actions and statements by Defendants.  Defendants have made statements indicating their agreement not to compete over premium prices; directed bail bond agents not to compete with other bail bonds agents; Defendants have used bail education courses to provide misleading information about the "fact" that 10% bail premiums are set by law and to enforce the conspiracy to fix premium rates; Defendants have made statements that suggest they have conspired to fix premiums and not compete over premium rates; and Defendants used industry associations to

enforce their price-fixing scheme; finally, Defendants have discouraged and intimidated competitors and retaliated against them in the event they did not cooperate.

60. Aladdin Bail Bonds, the largest bail agency in California and one from which Plaintiff purchased a bail bond, and its surety, Defendant SIC are at the center of the anti-competitive conspiracy.

61. Like other bail bonds agents, Aladdin claims that its fees are standard and non-negotiable. On its website, Aladdin advertises a "Standard Premium Rate" and provides that "[a]ll insurers who work with bail service providers are required to file their premium rates with the Department of Insurance. In California, Aladdin Bail Bonds is authorized to offer an 8% rate in addition to the standard 10%." These statements are misleading in that they conceal the fact that Aladdin and other bail bonds agents have the ability to offer discounts through rebates or may file for a lower maximum rate with the CDI.

62. Aladdin uses SAA as justification for setting its standard rate, and has said in its CDI filings that "[t]he standard rate is based on Surety Association of America (SAA) pricing."

63. Aladdin and SIC are not alone. Defendant American Surety Company is a national leader in the bail industry, and "devotes a tremendous amount of resources towards preserving the commercial bail industry." ASC staff have been vocal proponents of maintaining elevated prices through concerted action.

64. Defendant Carmichael, President and CEO of Defendant American Surety Company, and current Chairman and former President and CEO of Defendant American Bail Coalition, wrote:

> "In 1986, when Jack and I started we dreamt of an industry solidly united against its foes. National, State and Local associations well-versed in the vital roles they play in the protection and betterment of our markets …We wished for a cohesive band of agents and companies whose power, when combined, far exceeded the power of an unorganized group of single businesses … Our Company will continue to provide its resources, both financial and personnel, to any effort which can be demonstrated to be trying to grow the surety-backed agency channels."

65. Carmichael also wrote in an article in March 2005:

> "2005 will not be a year when we, as an industry, can sit passively by while competitive forces continue to encroach upon our markets …. Advocates argue that the market dictates that they charge and collect less than the filed rate …. [But] I can safely predict that if left unchecked,

rampant premium discounting will result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward. Simple economics dictates it …I urge all of us to recognize the serious nature of the threats to our industry and work collectively to repel them. Leaving profit on the table, in the form of discounts or uncollected accounts receivable, is a fool's game."

66. Thus, Carmichael expressly recognized that if the commercial bail bonds market were a truly competitive market, profitability would plummet. He recognized that the bail bonds market was not a model that properly reflects a proper balance of risk and reward, and overcompensates surety companies and bail bonds agents. Carmichael unabashedly called upon bail bonds agents to be "our industry's eyes, ears and mouths in recognizing and alerting all to the impending attack [on the industry]. When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response."

67. Defendants have also used professional associations to promote their conspiracy. For example, PBUS is a professional association representing 15,500 bail agents nationwide. Its board is comprised of bail bond agents and a representative of Accredited Surety and Casualty Company, Inc. It contains information on its website for bail bond agents and for consumers, and disseminates the following misleading and/or false statements:

a. "Make sure the bail agent charges you only legal rates. The premium charged for a bail bond varies from state to state."

b. "[t]he non-refundable premium paid to the bail agent is determined by law …"

c. "Bonds fees **and rates** are not determined by race, gender, or socio-economic status but by **strict bail schedules or as authorized by the court**." (emphasis added)

68. Industry associations, including, for example, Defendant California Bail Agents Association, Defendant Golden State Bail Agents Association, and Bail Agents Association of San Diego County, host meetings that provide opportunities for Defendants to maintain and enforce the conspiracy.

69. The California Bail Agents Association is the primary industry association of bail agents in California. CBAA hosts annual conventions every year. The 39th Annual Convention was held in Reno, Nevada on October 1, 2018. The CBAA provides material to the general public in

service of the conspiracy, falsely designed to hide the conspiracy behind misrepresentations of the governing law.

70. The CBAA's "How Bail Bonds Works" web page deliberately misleads consumers, but also ensures its members know the association-wide policy: "Are there any restrictions on how high my bail can be? Each surety company must file rates with the Department of Insurance. Bail agents representing a company must charge the same, filed rates." The "rates" here are the Maximum Rates. The CBAA does not disclose that agents are allowed to rebate appropriately based on market competition.

71. The CBAA also maintains information regarding premiums charged that Defendants and their agents can use to detect and prevent premium discounting.

72. The Golden State Bail Agents Association ("GSBAA"), founded in 2004 by "competitors, [who] discovered that they had a lot in common and formed GSBAA to pursue their common interest in promoting and propagating the California bail industry," functions similarly.

73. The trade associations cooperate with each other as well. According to ASC VP Whitlock's blog, "[a] bail industry meeting took place on the 2nd floor of the Crown Plaza Hotel down the street from LAX on November 2, 2011. The meeting was organized by the American Bail Coalition and included representatives of not only the members of ABC, but California's two bail agent associations, California Bail Agents Association and The Golden State Bail Agents Association and representatives of Aladdin Bail Bonds, the state's largest retailer. This cooperative was named the California Bail Coalition (CBC)."

74. The coordination extends to the national level, with the "ABC [] working with a large coalition that includes California's two state associations, CBAA and GSBAA," according to ASC VP Whitlock's blog written in 2017. In that same blog, Whitlock wrote that "[t]he cooperation among industry competitors at both the agency and surety level has been nothing short of inspiring."

75. The cartel or trust has also been reinforced by industry-sponsored, privately-run bail agent training courses where industry participants train other participants in implementing the conspiracy. For example, a course offered by the Bail Resource Center & Career Academy teaches the cartel line: "the right answer on the test: no rebates."

76.     Sean Cook, of Bail Bonds Universal California, Board Member At-Large of the CBAA, and author of the e-book "Bail Bonds 101" which the CBAA advises is an essential starting point for all bail agents, works to "educate" bail agents into the cartel.  In an article "Running a Bail Bond Business: Answering Calls," he advises:

> "[T]he caller may be shopping to see what fees you charge, but always keep in mind that your state DOI regulates the fees for bail bonds and if a competitor offers a lower percentage fee, they WILL make up the point or two somewhere in the transaction.  In California, the only time you might lower the fee to 8%, which is 2% less than the standard 10%, is if you are working with a referral from an attorney."

77.     Following Surety Defendants' instructions, bail bonds agents have implemented uniform bail bonds premiums and have made misrepresentations regarding the premiums by advertising them as non-negotiable.

78.     The sureties contractually dictate the rates for their associated bail agents, who then advertise these rates as nonnegotiable.

79.     Contractual agreements establishing the relationship between sureties and bail agents may include strictures like the following: "The premiums to be charged and collected" by the bail agent "shall be at such rates as may be approved by the Department of Insurance of the State of California or by statute, or in the absence of some such established rates, as may be prescribed by the [surety]." (Emphasis added.)

80.     Bail agents then advertise these dictated rates, misleading Class members into thinking they are mandated by law rather than by the sureties.

81.     For example, as of January 2019, the website for Aladdin Bail Bonds states: "To offer services in California, a bail service provider charges a premium – a percentage of the total bail amount, typically 10%."  "The bail service provider must charge the premium rate that it has filed with the Department of Insurance …" "All insurers who work with bail service providers are required to file their premium rates with the Department of Insurance.  In California, Aladdin Bail Bonds is authorized to offer an 8% rate in addition to the standard 10%.  (Emphasis added.)

82.     As of January 2019, the website for Quick Bail Bonds Covina states: "The Bail Bond agency in California (by California law) is not allowed to charge more or less than 10%."

83. As of January 2019, the website for Padilla Bail Bonds states, on behalf of its surety, Lexington National Insurance: "The California Law mandated bail bond fee (also called premium) is 10% of the bail. This is non-refundable, but can be lowered to 8% if you qualify for the discount-if you're a veteran, union member or have a lawyer retained."

84. As of January 2019, the website for 888 Bail Bonds (which operates under several license numbers) states on behalf of its sureties, including Defendants Allegheny Casualty Company and International Fidelity Insurance Company: "Can I find Cheap Bail? The cost of a bail bond in California is set with the Department of Insurance at 10% of the total bail amount. We often get the question from potential clients: 'Can you do it for less?' 'Would you take 5% if I pay cash?' Any agent offering bail at 5% in the State of California is simply acting illegally or deceptively ..." (Emphasis added.) Finally, the website states, "Do you Offer 5% Bail or Negotiate Premium? We do not negotiate bail premium. Some people may not care if paying an illegal 5% bail premium is against the law. However, we ask you to consider carefully the position in which unlawful bail puts you. If a bail agent is breaking the law by price-cutting, will the same agent return your collateral?"

85. As of January 2019, the website for Bad Boy Bail Bonds (License No. 1846634) says, on behalf of its surety: "The process of bail is regulated by the State of California. A Judge within the county of arrest sets the bail amount. Once bail is set, a Bad Boys Bail Bonds Agent charges 10%. (The State of California regulates this fee. All Bail Bonds companies charge the same rate.)."

86. Other websites of bail bonds agents make similar misleading and/or untruthful misrepresentations regarding bail bonds premiums, including leading consumers to believe that 10% premiums are standard, are set by the government, and that they are not permitted to charge less.

87. Some players in an attempt to gain competitive advantage have lowered their premium rates, either by filing lower rates with the CDI or by advertising rebates. But, they were retaliated against by the Defendants. As Dennis Bartlett, former Executive Director of Defendant ABC, has noted, higher bail amounts have "disadvantaged not only defendants but bail agents, some of whom have cut premium rates in order to write any bonds at all," and explained that in response, "[t]he bonding industry has worked hard to rectify this abuse." (Emphasis added.)

88.    For example, in a 2014 online post, bail agent Chad Conley (also known as "Chad the Bail Guy") explained the legal effect of Proposition 103 on bail agents' ability to give rebates to consumers: "bail bonds are regulated under Proposition 103, which provides for premium rebates as long as they are not unfairly discriminatory." In a response to a comment on this post, Mr. Conley stated that his efforts to provide lower prices for his bail bond clients resulted in pressure from a "good ol boys club," which "came after [his] license for trying to save clients' money." He further confirmed that other bond agents are aware of their ability to provide lower prices but have conspired to avoid this form of competition: "They prefer price fixing …"

89.    CDI has publicly stated that "to become more competitive, a bail agent may choose to negotiate a lower fee by rebating, as allowed by Proposition 103."

90.    Normal market forces would have created lower premiums as a result of bail bonds agents competing with each other to gain market shares. Yet, bail bonds agents maintain premiums at 10% because Defendants constructed market power over pricing through collusion. Near uniformity of bail bonds agents charging maximum allowable premiums is unnatural and can only be reasonable explained by conspiracy.

91.    That these sureties would have independently decided to keep premiums uniformly high is particularly inexplicable in light of the industry's shrinking size. With the onset of what is typically referred to in industrial-organization literature as "secular decline" - long-term reduction in demand for a product, rather than cyclical shifts the standard response in other industries has been vigorous price competition. Yet despite these changes, Defendants have managed to avoid competing on price.

92.    Presently, and throughout the Class period, substantially all (1) sureties in California have filed for the same Maximum Rate, offered under nearly identical conditions (including the standard Fully Earned Term), and (2) bail agents, to whom sureties dictate rates, have advertised those Maximum Rates as the required price, even though they could offer lower prices. That not only reflects the conspiracy's success, but as in other industries in which pricing is transparent facilitates identification and punishment of those industry participants who dare to deviate.

93.    Plaintiff and members of the Class have been injured as a result of Defendants' conspiracy to fix bail bonds premium rates.

94. Had Defendants allowed the market to naturally determine premium rates, premium rates would have been lower than the nearly uniform 10% charged by the bail bonds agents either as a result of rebates or lower maximum rates filed with the CDI. Plaintiff and Class Members would have paid less or would have been indebted for less money as a result.

**TOLLING OF THE STATUTE OF LIMITATIONS**

95. Plaintiff and the Class had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

96. Plaintiff and the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

97. Surety Defendants and their co-conspirators engaged in a secret scheme and did not reveal facts that would have put Plaintiff or the Class on inquiry notice that they were charging inflated bail bonds premiums and were allowed to offer discounted premiums through rebates or through filing for lower rates with the CDI.

98. Because Surety Defendants' and their co-conspirators' scheme was kept secret and because they made misleading statements, including in advertisements to the consumers, Plaintiff and the Class were unaware of Surety Defendants' and their co-conspirators' unlawful conduct alleged herein and did not know that they were paying artificially inflated premiums for bail bonds in California during the Class Period.

99. Surety Defendants' and their co-conspirators' affirmative acts alleged herein, including acts in furtherance of their unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

100. If Surety Defendants and their co-conspirators allowed the market to function freely, without colluding to maintain premiums at nearly uniform 10% rates, their scheme would never succeed and premium rates charged to consumers would be lower.

101. Plaintiff and the Class could not have discovered the alleged unlawful activities at an early date by the existence of reasonable diligence because Surety Defendant and their co-conspirators employed deceptive practice and techniques of secrecy, including misrepresentation about the premiums charged and permissibility of discounts, to avoid detection of their activities.

102.    Because Surety Defendants and their co-conspirators concealed their scheme, Plaintiff and the Class had no knowledge until recently of the alleged fraudulent activities or information which would have caused a reasonably diligent person to investigate whether they committed the actionable activities detailed herein.

103.    As a result of Surety Defendants' and their co-conspirators' concealment, the running of statute of limitations has been tolled with respect to any claims that Plaintiff and the Class have as a result of the unlawful conduct alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action on his own behalf and, pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of the following Class:

> Plaintiff and all other individuals in California who, between February 2004 and the present ("Class Period"), paid, in full or in part, for a commercial bail bond to bail out him/herself or another in California ("Class Members").

105.    The Class consists of many thousands of individuals, making joinder impractical, in satisfaction of Fed. R. Civ. P. 23(a)(1).  The exact size of the Class and the identifies of the individual members thereof are ascertainable though the records of Defendants, including but not limited to their billing and collection records, and records in form of bail bond agreements.

106.    Plaintiff's claims are typical of the claims of the Class.  The claims of the Plaintiff and the Class are based on the same legal theories and arise from the same unlawful conduct, resulting in the same injury to the Plaintiff and the Class.

107.    The Class has a well-defined community of interest.  Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the Class, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

108.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Plaintiff and the Class are the following

a.    Whether Defendants violated California Business and Professions Code § 16720 *et seq.*;

b. Whether Defendants conspired to artificially fix inflated bail bonds premium rates in California;

c. Whether Defendants omitted and concealed material facts from their advertisements, marketing and statements to consumers so as to mislead consumers about the laws governing premium rates for bail bonds;

d. Whether Defendants discouraged competition and retaliated against those agents who attempted to compete by offering lower premium rates through rebates or lower maximum rates filed with the CDI;

e. Whether Defendants took other affirmative steps to fix and inflate bail bond premiums and prevent competition;

f. Whether Defendants' acts or omissions resulted in inflated bail bond premiums in California;

g. Whether Defendants' acts and omissions constitute unfair/unlawful and/or fraudulent business practices in violation of California Business and Professions Code § 17200 *et seq.*;

h. Whether Plaintiff and the Class suffered injury as a result of Defendants' conduct; and

i. The measure of damages suffered by Plaintiff and the Class.

109. Class action treatment is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all Class Members is not practicable.

110. Each Class Member has been damaged and/or may be damaged in the future because of Defendants' unlawful, unfair and/or fraudulent, and/or deceptive practices described above. Certification of this case as a class action will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system and would prevent repetitious litigation relating to Defendants' wrongful actions and/or inactions. The expense and burden of litigation would substantially impair the ability of Plaintiff and Class Members to pursue individual lawsuits to vindicate their rights. Absent a class action, Defendants will retain the benefits of their wrongdoing despite their serious violation of the law.

**FIRST CAUSE OF ACTION**
**Violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720**

111. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

112. Plaintiff and members of the Class are "persons" within the meaning of the Cartwright Act as defined in section 16702.

113. Defendants, by and through their officers, directors, employees, agents or other representatives, have entered into an unlawful agreement, combination and conspiracy in restraint of trade, in violation of California Business and Professions Code § 16720.

114. Beginning no later than February 2004 and continuing to the present, Defendants engaged in continuing trusts in restraint of trade and commerce in violation of Cartwright Act.

115. The conspiracy consisted of a continuing agreement, understanding or concerned action between and among Defendants and their co-conspirators in furtherance of which Defendants fixed and inflated bail bonds premiums in California at 10% of the bail bond value, or 8% for a small number of consumers meeting certain criteria. Defendants conspiracy is an unlawful and unreasonable restraint of trade.

116. The acts and omissions done in furtherance of the conspiracy include, but are not limited to: agreeing to fix advertised premium bail bonds rates at meetings, industry events, and elsewhere; filing uniform maximum premium rates with the CDI; advertising that the premium bail bonds rates being charged are set by law or are standard rates, without disclosing that the rates could be discounted through rebates; advocating against reduction of premiums through articles and other means; dissuading competitors and retaliating against competitors.

117. The conspiracy had the purpose and effect of fixing bail bonds premiums in California and causing them to be inflated.

118. As a direct and proximate result of Defendant's unlawful conduct, Plaintiff and the Class Members have suffered injury by paying more and/or owing more than they would have in the absence of the conspiracy.

119.   Accordingly, Plaintiff, on behalf of himself, and the members of the Class seeks three times their damages cased by Defendants' violation of the Cartwright Act, the costs of bringing suit, reasonable attorneys' fees, and an injunction permanently enjoining Defendants from continuing to be a part of or entering into agreement(s) in violation of the Cartwright Act.  Plaintiff seeks money damages from Defendants jointly and severally.

## SECOND CAUSE OF ACTION
### Violation of California's Unfair Competition Law ("UCL")
### Cal. Bus. & Prof. Code § 17200, *et seq.*

120.   Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

121.   Defendants' and their co-conspirators' conduct of conspiring to fix bail bonds premiums and keep them inflated constitutes unfair and illegal and fraudulent business practices within the meaning of the California Business & Professions Code § 17200, *et seq.*

122.   Defendants' and their co-conspirators' conduct violated the Cartwright Act as alleged above and therefore constitutes unlawful conduct within the meaning of the California Business & Professions Code § 17200, *et seq.*

123.   Defendants' and their co-conspirators' conduct in engaging in combinations of capital, skill, and acts with others with the intent, purpose, and effect of restraining trade and fixing prices in the market for commercial bail bonds, including falsely advertising that they were required to charge the filed maximum premium rate with CDI, while concealing the fact that they could offer rebates, constitutes and they intended to constitute unfair competition and unlawful, unfair and/or fraudulent business acts and practices within the meaning of the California Business & Professions Code § 17200, *et seq.*

124.   As a result of Defendants' and their co-conspirators' acts and omissions, Defendants' and their co-conspirators have unjustly enriched themselves, and Plaintiff and the members of the Class, in turn, suffered injury in fact and lost property and money as a result.

125.   Defendants' and their co-conspirators' unfair, unlawful and/or fraudulent acts and omissions are continuing at present and have continued through the Class Period alleged herein.

1    126.    Plaintiff seeks restitution and injunctive relief on behalf of the Class.

2                              **PRAYER FOR RELIEF**

3        WHEREFORE, Plaintiff requests the following relief:

4        A.    That the Court determine that this action may be maintained as a class action under Fed.

5    R. Civ. P. 23, and define the Class as requested herein;

6        B.    That the Court appoint Plaintiff as Class Representative and his counsel of record as

7    Class Counsel;

8        C.    That the Court declare Defendants' and their co-conspirators' actions alleged in the

9    Complaint, are unlawful;

10        D.    That the Court issue a permanent injunction against Defendants and their co-

11    conspirators, to stop and prevent the violations alleged in the Complaint and require Defendants to

12    correct untruthful or misleading statements or omissions from their advertising and marketing

13    materials, and other materials or written postings related to the bail bonds premiums and maximum

14    rates;

15        E.    That the Court award Plaintiff and the Class actual, compensatory, and

16    punitive/exemplary damages, disgorgement, restitution;

17        F.    That the Court award Plaintiff and the Class pre- and post-judgment interest;

18        G.    That the Court award Plaintiff and the Class attorneys' fees and costs; and

19        H.    That the Court enter such additional orders or judgments as may be necessary to stop

20    these practices and prevent these practices in the future and to restore to any person in interest any

21    money or property which may have been acquired by means of the violations; and

22        I.    That the Court award such other, further and different relief as the Court may deem just

23    and proper.

24                                **JURY DEMAND**

25        Plaintiff hereby demands a trial by jury on all issues so triable.

26

27

28

Dated: February 8, 2019

Respectfully submitted,

HAMMONDLAW, P.C.

*s/ Julian Hammond*
Julian Hammond

Dated: February 8, 2019

GOLDSTEIN, BORGEN, DARDARIAN & HO

*s/ Laura L. Ho*
Laura L. Ho

Attorneys for Plaintiff and Putative Class