# EXHIBIT A

BY FAX

21122080

1  Dean M. Harvey (SBN 250298)
2  LIEFF CABRASER HEIMANN &
   BERNSTEIN, LLP
3  275 Battery Street, 29th Floor
   San Francisco, CA 94111
4  Telephone: (415) 956-1000
   dharvey@lchb.com
5
6  Stephanie Carroll (SBN 263698)
   PUBLIC COUNSEL
7  610 South Ardmore Avenue
   Los Angeles, California, 90005
8  Telephone:  (213) 385-2977
   Facsimile:  (213) 201-4722
9  scarroll@publiccounsel.org
10
11 Andrew Schmidt (*pro hac vice* motion
   forthcoming)
12 TOWARDS JUSTICE
   1410 High Street, Suite 300
   Denver, CO 80218
13 Telephone:  (720) 441-2236
   Facsimile:  (303) 957-2289
14 andy@towardsjustice.org

Benjamin David Elga (*pro hac vice* motion
forthcoming)
JUSTICE CATALYST LAW
25 Broadway, 9th Floor
New York, NY
Telephone: (518) 732-6703
belga@justicecatalyst.org

Stuart T. Rossman (*pro hac vice* motion
forthcoming)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110-1245
Telephone:  (617) 542-8010
Facsimile:  (617) 542-8028
srossman@nclc.org



FILED
ALAMEDA COUNTY

JAN 29 2019

CLERK OF THE SUPERIOR COURT
By _____
                                    Deputy

15  *(Additional counsel listed on signature page)*

16        SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                    COUNTY OF ALAMEDA

18                    NORTHERN DIVISION

19

20  SHONETTA CRAIN AND KIRA SERNA,          Case No.  **RG19004509**

21              Plaintiffs,                 **CLASS ACTION COMPLAINT**

22  v.                                       **JURY TRIAL DEMANDED**

23  ACCREDITED SURETY AND                    **(1) Business & Professions Code § 16720**
    CASUALTY COMPANY, AEGIS
24  SECURITY INSURANCE COMPANY,              **(2) Business & Professions Code § 17200**
    ALLEGHENY CASUALTY COMPANY,
25  AMERICAN CONTRACTORS
    INDEMNITY COMPANY, AMERICAN
26  SURETY COMPANY, ASSOCIATED
    BOND AND INSURANCE AGENCY,
27  INC., BANKERS INSURANCE
    COMPANY, BOND SAFEGUARD
28  INSURANCE COMPANY, CRUM &

| | |
|---|---|
| 1 | FORSTER INDEMNITY COMPANY, |
| | DANIELSON NATIONAL INSURANCE |
| 2 | COMPANY, FINANCIAL CASUALTY & |
| | SURETY, INC., HARCO NATIONAL |
| 3 | INSURANCE COMPANY, INDIANA |
| | LUMBERMENS MUTUAL INSURANCE |
| 4 | COMPANY, INTERNATIONAL |
| | FIDELITY INSURANCE COMPANY, |
| 5 | LEXINGTON NATIONAL INSURANCE |
| | CORPORATION, LEXON INSURANCE |
| 6 | COMPANY, NATIONAL AMERICAN |
| | INSURANCE COMPANY, NORTH |
| 7 | RIVER INSURANCE COMPANY, |
| | PHILADELPHIA REINSURANCE |
| 8 | CORPORATION, SAFETY FIRST |
| | INSURANCE COMPANY, SEAVIEW |
| 9 | INSURANCE COMPANY, SENECA |
| | INSURANCE COMPANY, |
| 10 | STILLWATER PROPERTY AND |
| | CASUALTY INSURANCE COMPANY, |
| 11 | SUN SURETY INSURANCE COMPANY, |
| | UNITED STATES FIRE INSURANCE |
| 12 | COMPANY, UNIVERSAL FIRE & |
| | INSURANCE COMPANY, |
| 13 | CONTINENTAL HERITAGE |
| | INSURANCE COMPANY, |
| 14 | WILLIAMSBURG NATIONAL |
| | INSURANCE COMPANY, ALL-PRO |
| 15 | BAIL BONDS INC., TWO JINN, INC., |
| | AMERICAN BAIL COALITION, INC., |
| 16 | CALIFORNIA BAIL AGENTS |
| | ASSOCIATION, AND GOLDEN STATE |
| 17 | BAIL AGENTS ASSOCIATION, JERRY |
| | WATSON, WILLIAM B. CARMICHAEL, |
| 18 | AND DOES 1-50, |
| 19 | Defendants. |

CLASS ACTION COMPLAINT
CASE NO.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................... 1

JURISDICTION AND VENUE ............................................................................. 2

THE PARTIES ...................................................................................................... 3

SURETY DEFENDANTS ...................................................................................... 3

BAIL AGENCY DEFENDANTS .......................................................................... 7

BAIL AGENT ASSOCIATION DEFENDANTS ................................................. 7

INDIVIDUALLY NAMED DEFENDANTS ......................................................... 8

CLASS ACTION ALLEGATIONS ...................................................................... 9

FACTUAL ALLEGATIONS ............................................................................... 11

I.     The California Market for Commercial Bail .................................... 11

II.    Defendants' Conspiracy ..................................................................... 13

     A.    Defendant Sureties Have Conspired to Fix Bail Premiums ................... 14

     B.    Defendants Have Enlisted or Created Industry Associations to Enforce Their Conspiracy ................................................................. 17

     C.    Defendants Have Used Bail Agent Training Courses to Enforce Cartel Pricing ................................................................................. 18

     D.    Bail Agents, Following Surety Instructions, Have Implemented Uniform Pricing and Made Misrepresentations Regarding Bail Bond Premiums ............... 19

     E.    Defendants Have Maintained Their Conspiracy by Punishing Undercutting ....... 21

     F.    The Industry Is Well Aware That the Law Encourages Price Competition, and Would Discount Absent Their Agreement ......................................... 21

PLAINTIFFS AND THE CLASS HAVE BEEN HARMED ............................... 24

FRAUDULENT CONCEALMENT, THE DISCOVERY RULE, AND EQUITABLE ESTOPPEL ........................................................................ 25

FIRST CLAIM FOR RELIEF VIOLATION OF THE CARTWRIGHT ACT, CAL. BUS. & PROF. CODE § 16720 ............................................................. 25

SECOND CLAIM FOR RELIEF UNFAIR COMPETITION IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, ET. SEQ. .............................................. 27

PRAYER FOR RELIEF ....................................................................................... 29

JURY DEMAND ................................................................................................... 30

Plaintiffs Shonetta Crain and Kira Serna, individually and on behalf of all others similarly situated (collectively referred to as "Class members"), hereby state and allege the following against Defendants:

## INTRODUCTION

1. Every year in California, nearly one million people are arrested and taken into custody. Many are released if they can post money bail, which will be returned to them as long as they appear for scheduled court dates. But the bail amounts that courts typically require far exceed what most people can pay out-of-pocket. Those people can remain in jail, away from their jobs and loved ones—and over 60% of people in California jails are there because they can't afford to pay bail—or they can purchase a commercial bail bond by paying a premium. That premium is non-refundable, even if the accused person attends all court dates, and even if the charges against them are dismissed.

2. Bail bonds are sold by thousands of bail agents, but these agents, and the premiums they charge, are ultimately controlled by a much smaller group of companies, referred to as sureties, who underwrite those bonds, much like insurers. The sureties, who dictate rates to their associated bail agents, have orchestrated a long-running anticompetitive conspiracy to keep bail bond premiums higher than they would be if the California bail-bonds market functioned competitively. They have done so with the assistance of certain bail agents who have also profited from the conspiracy.

3. Open competition over price is a bedrock principle of California state policy. Presumptively innocent Californians, even if charged with crimes, are no less deserving than any other consumer of a marketplace that drives competitors to offer lower prices. Because Defendants' conspiracy made bail bonds costlier for Californians, more people spent time in jail awaiting trial and separated from their families, jobs, and lives than otherwise would have been the case, simply because they could not afford to pay Defendants' supra-competitive premium rates.

4. In 2018, California passed SB 10, which, if enacted, would eliminate money bail in California. The bail reform effort that led to the passage of SB 10 centered on the common

1

1   practice of requiring criminal defendants to post bail amounts that they cannot afford to pay out-
2   of-pocket; this case, in contrast, targets a conspiracy to charge higher premiums on bonds to cover
3   those bail amounts. SB10 will not go into effect until November 2020 at the earliest. Even when
4   it does go into effect, it will do nothing to directly redress the injury to California's residents,
5   who, in exchange for their liberty, have been forced to pay inflated premiums to private bail
6   agents and the sureties that back them. And consumers will continue to suffer from Defendants'
7   anticompetitive conduct as sureties aggressively seek to recover debts for price-fixed premiums.
8   As a former bail consultant explained to the *Los Angeles Times*, "if bail goes away, the one thing
9   that will still be here a little longer is [debt] recovery, because surety companies will need to clear
10  all of their liabilities."

11      5.      This class action seeks damages for the hundreds of thousands of Californians who
12  have overpaid for unlawfully inflated bail bond premiums and injunctive relief to end the
13  overcharges going forward.

## JURISDICTION AND VENUE

15      6.      This Complaint is filed, and these proceedings are instituted, pursuant to California
16  Business & Professions Code sections 16750(a) and 17203 to recover damages and to obtain
17  other relief for harms that Plaintiffs and the members of the Class have sustained due to violations
18  by Defendants, as hereinafter alleged, of California Business and Professions Code sections
19  16720, *et seq.*, commonly known as the Cartwright Act, and California Business and Professions
20  Code sections 17200, *et seq.*, commonly known as the Unfair Competition Law.

21      7.      Venue as to the Defendants is proper in this judicial district pursuant to the
22  provisions of California Business and Professions Code section 16750(a) and California Code of
23  Civil Procedure sections 395(a) and 395.5. Defendants maintain an office, transact business, have
24  an agent, or are found in the County of Alameda. Plaintiffs' causes of action arose in part within
25  the County of Alameda, and the Defendants are within the jurisdiction of this Court for purposes
26  of service of process. The unlawful acts hereinafter alleged had a direct effect on persons who
27  paid premiums for bail bonds within the State of California and, more particularly, within the
28  County of Alameda. Furthermore, the Court has personal jurisdiction over each Defendant as co-

2

1  conspirators as a result of the acts of any of the co-conspirators occurring in California and in

2  connection with Defendants' violations of the Cartwright Act and/or the Unfair Competition Law.

3      8.    There is no federal jurisdiction over this case.  At least two-thirds of the proposed

4  Class members are citizens of California.  Significant relief is sought from at least one Defendant

5  who is a California citizen and whose conduct forms a significant basis for the claims asserted,

6  and principal injuries resulting from the alleged conduct were incurred in California. *See* 28

7  U.S.C. § 1332(d)(4).

8                              **THE PARTIES**

9      9.    Plaintiff Shonetta Crain resides in the County of Alameda.  In 2016, Ms. Crain

10  paid an unlawfully inflated bond premium to secure pre-trial release of a relative charged and

11  detained in Alameda County and against whom all criminal charges were subsequently dropped.

12  The bond was arranged through Defendant All-Pro Bail Bonds Inc. and underwritten by

13  Defendant Bankers Insurance Company.  Although charges were dropped against her relative,

14  Ms. Crain was not refunded or reimbursed for any portion of the bond premium.  She proceeds on

15  her own behalf and on behalf of a Class of similarly situated people subjected to Defendants'

16  scheme.

17      10.   Plaintiff Kira Serna resides in the County of Contra Costa.  In 2016, Ms. Serna

18  paid an unlawfully inflated bond premium to secure her own pre-trial release.  She was never

19  charged with an offense.  The bond was arranged through Defendant Two Jinn, Inc., d/b/a

20  Aladdin Bail Bonds and underwritten by Defendant Seaview Insurance Company.  Although she

21  was never charged, Ms. Serna was not refunded or reimbursed for any portion of the bond

22  premium.  She proceeds on her own behalf and on behalf of a Class of similarly situated people

23  subjected to Defendants' scheme.

24                            **SURETY DEFENDANTS**

25      11.   Defendant Accredited Surety and Casualty Company is incorporated in the state of

26  Florida, has its principal place of business in Orlando, Florida, and has a designated agent for

27  service of process in Sacramento, California.

28

1       12.     Defendant Aegis Security Insurance Company is a member of the Aegis Group

2 and is incorporated in the state of Pennsylvania, has its principal place of business in Harrisburg,

3 Pennsylvania, and has a designated agent for service of process in Los Angeles, California.

4       13.     Defendant Allegheny Casualty Company is incorporated in the state of New

5 Jersey, has its principal place of business in New Jersey, and has a designated agent for service of

6 process in Walnut Creek, California. Allegheny Casualty is a member of AIA, the nation's

7 largest bail surety administrator, with offices in Calabasas, California.

8       14.     Defendant American Contractors Indemnity Company ("ACIC") is a member of

9 the HCC Surety Group. ACIC is incorporated in the state of California, has its principal place of

10 business in Los Angeles, California, and has a designated agent for service of process in Los

11 Angeles, California.

12       15.     Defendant American Surety Company ("ASC") is incorporated in the state of

13 Indiana with its principal place of business in Indianapolis, Indiana. ASC has an agent for service

14 of process located in San Francisco, California.

15       16.     Defendant Associated Bond and Insurance Agency, Inc. ("Associated Bond") is

16 incorporated in the state of California and has its principal place of business in Calabasas,

17 California. Associated Bond is a member of AIA, the nation's largest bail surety administrator,

18 with offices in Calabasas, California.

19       17.     Defendant Bankers Insurance Company is incorporated in the state of Florida, has

20 its principal place of business in St. Petersburg, Florida, and has a designated agent for service of

21 process in Sacramento, California. Bankers Insurance is a member of the Bankers Insurance

22 Group.

23       18.     Defendant Bond Safeguard Insurance Company is incorporated in the state of

24 Illinois, has its principal place of business in Mount Juliet, Tennessee, and has a designated agent

25 for service of process in Sacramento, California. Bond Safeguard is a member of the J.A.

26 Patterson Group.

27

28

4

1    19.    Defendant Continental Heritage Insurance Company is incorporated in the state of
2    Florida, has its principal place of business in Mayfield Heights, Ohio, and has a designated agent
3    for service of process in Los Angeles, California.

4    20.    Defendant Crum & Forster Indemnity Company is incorporated in the state of
5    Delaware, has its principal place of business in Morristown, New Jersey, and has an agent for
6    service of process in Orange, California. Crum & Forster Indemnity Company is a member of the
7    Crum & Forster group.

8    21.    Defendants Danielson National Insurance Company and National American
9    Insurance Company of California are members of the DHC Group and are incorporated in the
10   state of California, have their principal place of business in San Diego, California, and have a
11   designated agent for service of process in Sacramento, California.

12   22.    Defendant Financial Casualty & Surety, Inc. is a member of the HCC Surety
13   Group. It is incorporated in the state of Texas, has its principal place of business in Houston,
14   Texas, and has a designated agent for service of process in Sacramento, California.

15   23.    Defendant Harco National Insurance Company is incorporated in the state of
16   Illinois, has its principal place of business in Raleigh, North Carolina, and has a designated agent
17   for service of process in Los Angeles, California.

18   24.    Defendant Indiana Lumbermens Mutual Insurance Company is a member of ILM
19   Group and is incorporated in the state of Indiana, has its principal place of business in
20   Indianapolis, Indiana, and has a designated agent for service of process in Sacramento, California.

21   25.    Defendant International Fidelity Insurance Company is incorporated in the state of
22   New Jersey, has its principal place of business in Newark, New Jersey, and has a designated agent
23   for service of process in Walnut Creek, California. International Fidelity is a member of AIA, the
24   nation's largest bail surety administrator, with offices in Calabasas, California.

25   26.    Defendant Lexington National Insurance Corporation is incorporated in the state
26   of Maryland, has its principal place of business in Cockeysville, Maryland, and has a designated
27   agent for service of process in Los Angeles, California.

28

1  27.  Defendant Lexon Insurance Company is incorporated in the state of Texas, has its

2 principal place of business in Mount Juliet, Tennessee, and has a designated agent for service of

3 process in Sacramento, California. Lexon Insurance is a member of the J.A. Patterson Group.

4  28.  Defendant North River Insurance Company is incorporated in the state of New

5 Jersey, has its principal place of business in Morristown, New Jersey, and has an agent for service

6 of process in Orange, California. North River is a member of the Crum & Forster group.

7  29.  Defendant Philadelphia Reinsurance Corporation is incorporated in the state of

8 Pennsylvania, has its principal place of business in San Diego, California, and has a designated

9 agent for service of process in San Diego, California.

10  30.  Defendant Safety First Insurance Company is a member of Delphi Financial

11 Group, Inc. and is incorporated in the state of Illinois, has its principal place of business in

12 Chicago, Illinois, and has a designated agent for service of process in Los Angeles, California.

13  31.  Defendant Seaview Insurance Company ("SIC") is incorporated in the state of

14 California with its principal place of business located in Carlsbad, California. Seaview Insurance

15 Company is the surety for Defendant Two Jinn, Inc.'s bail bonds, and is a wholly owned

16 subsidiary of Seaview Surety Holdings, LLC.

17  32.  Defendant Seneca Insurance Company is incorporated in the state of New York,

18 has its principal place of business in New York, New York, and has an agent for service of

19 process in La Jolla, California. Seneca is a member of the Crum & Forster group.

20  33.  Defendant Stillwater Property and Casualty Insurance Company is incorporated in

21 the state of New York, has its principal place of business in Jericho, New York, and has an agent

22 for service of process in Los Angeles, California. Stillwater is a member of the Bankers

23 Insurance Group.

24  34.  Defendant Sun Surety Insurance Company is incorporated in the state of South

25 Dakota, has its principal place of business in Rapid City, South Dakota, and has a designated

26 agent for service of process in Los Angeles, California.

27

28

1    35.    Defendant United States Fire Insurance Company is incorporated in the state of

2    Delaware, has its principal place of business in Morristown, New Jersey, and an agent for service

3    of process in Orange, California.  United States Fire is a member of the Crum & Forster group.

4    36.    Defendant Universal Fire & Insurance Company is incorporated in the state of

5    Indiana, has its principal place of business in Hudsonville, Michigan, and has a designated agent

6    for service of process in Lancaster, California.

7    37.    Defendant Williamsburg National Insurance Company is a member of the

8    Meadowbrook Insurance Group and is incorporated in the state of Michigan, has its principal

9    place of business in Southfield, Michigan, and has a designated agent for service of process in

10   Los Angeles, California.

11   38.    Collectively, the Defendants named in paragraphs 11-37 are referred to as the

12   "Surety Defendants."

### BAIL AGENCY DEFENDANTS

14   39.    Defendant All-Pro Bail Bonds Inc. is incorporated in the state of California with

15   its principal place of business in Solana Beach, California.  It operates as a bail bond agent in

16   California.

17   40.    Defendant Two Jinn, Inc. is incorporated in the state of California with its

18   principal place of business in Carlsbad, California.  It is an affiliate of Seaview Insurance

19   Company, and it does business as Aladdin Bail Bonds ("Aladdin"), Aladino Bail Bonds, AM/PM

20   Bail Bonds, Andy's Bail Bonds, and Express Bail Bonds, and is incorporated in the State of

21   California, with its principal place of business in Carlsbad, California.  Two Jinn, Inc. operates as

22   a bail bond agent in California.

23   41.    Collectively, the Defendants named in paragraphs 39-40 are referred to as the

24   "Bail Agency Defendants."

### BAIL AGENT ASSOCIATION DEFENDANTS

26   42.    Defendant American Bail Coalition, Inc. ("ABC") is a nonprofit association

27   organized under § 501(c)(6) of the Internal Revenue Code, incorporated in the state of

28

7

Pennsylvania with its principal place of business located in Lancaster, Pennsylvania. ABC is a trade association for the national bail underwriting insurance industry.

43.    Defendant California Bail Agents Association ("CBAA") is a nonprofit corporation organized under § 501(c)(6) of the Internal Revenue Code, incorporated in the state of California with its principal place of business in Pomona, California. CBAA is a trade association for bail agents in California.

44.    Defendant Golden State Bail Agents Association ("GSBAA") is a nonprofit corporation organized under § 501(c)(6) of the Internal Revenue Code, incorporated in the state of California with its principal place of business in Fresno, California.

45.    Collectively, the Defendants named in paragraphs 42-44 are referred to as the "Bail Agent Association Defendants."

## INDIVIDUALLY NAMED DEFENDANTS

46.    Defendant Jerry Watson is the Vice President of the AIA and Senior Counsel and Board Member of Defendant American Bail Coalition. Defendant Watson directly participated in the conspiracy alleged herein and approved and ratified the conduct of AIA's members (Defendants Allegheny Casualty Company, Associated Bond and Insurance Agency, and International Fidelity Insurance Company) and Defendant American Bail Coalition. Upon information and belief, Defendant Watson is a resident of Oxnard, California.

47.    Defendant William B. Carmichael is the President and CEO of Defendant American Surety Company and the former President and Executive Director of Defendant American Bail Coalition. He presently serves as the American Bail Coalition's Chairman. Defendant Carmichael directly participated in the conspiracy alleged herein and approved and ratified the conduct of Defendants American Surety Company and American Bail Coalition. Upon information and belief, Defendant Carmichael is a resident of Indianapolis, Indiana.

48.    DOES 1-50, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof. Plaintiffs are presently unaware of the true names and identities of those defendants sued

8

1  herein as DOES 1-50.  Plaintiffs will amend this Complaint to allege the true names of the DOE

2  defendants when they have been ascertained.

3  ## CLASS ACTION ALLEGATIONS

4       49.    Plaintiffs bring this action on behalf of themselves and all others similarly situated

5  (the "Class"), pursuant to section 382 of the California Code of Civil Procedure and California

6  Rule of Court 3.760, *et seq.*  The Class is defined as follows:

7            All persons who, between February 24, 2004 and present (the
          "Class Period"), paid for part or all of a commercial bail bond
8            premium in connection with a California state court criminal
          proceeding.  Specifically excluded from this Class are Defendants;
9            the officers, directors or employees of any Defendant; any entity in
          which any Defendant has a controlling interest; any affiliate, legal
10           representative, heir or assign of any Defendant and any person
          acting on their behalf; any person who acted as a bail agent during
11           the Class Period; any judicial officer presiding over this action and
          the members of his/her immediate family and judicial staff; and any
12           juror assigned to this action.

13      50.    Based upon the nature of the trade and commerce involved, there are at least

14 hundreds of thousands of Class members dispersed throughout the State of California.  According

15 to one report, approximately 27.8% of individuals booked on misdemeanors or felonies in

16 California from October 2011 to October 2015 (approximately 180,000 people) were released

17 pretrial on bail.  Nearly all rely on commercial surety bonds. Members of the class are

18 ascertainable through searches of either court records or of Defendants' business records.

19      51.    The questions of law and fact common to the Class include but are not limited to:

20          a.    Whether the conduct of Defendants and their co-conspirators violated

21 sections 16720, *et seq.*, of the California Business and Professions Code;

22          b.    Whether the conduct of Defendants and their co-conspirators violated

23 sections 17200, *et seq.*, of the California Business and Professions Code;

24          c.    Whether Defendants' acts, contracts, combinations and/or conspiracies

25 restrained trade, commerce, or competition for the sale of bail bonds and the associated setting of

26 bond premiums in the State of California;

27          d.    Whether Defendants conspired to fix advertised prices and inflate bail bond

28 premiums in California;

9

1          e.      Whether Defendants instructed bail agents to fix advertised prices;

2          f.      Whether Defendants engaged in additional acts to fix and inflate bail bond

3 premiums;

4          g.      Whether Defendants retaliated against agents or sureties that attempted to

5 drop prices;

6          h.      Whether Defendants deceived the public about the laws pertaining to bail

7 bond pricing;

8          i.      Whether Defendants otherwise fraudulently concealed their misconduct;

9          j.      Whether Plaintiffs and the Class they seek to represent have suffered

10 antitrust injury and/or have been threatened with antitrust injury;

11          k.      Whether the conspiracy resulted in inflated bail bond premiums in

12 California; and

13          l.      The type and measure of damages suffered by Plaintiffs and the Class.

14      52.      These and other questions of law and fact are common to the Class, and

15 predominate over any questions affecting only individual members of the Class.

16      53.      Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and members of

17 the Class sustained damages arising out of Defendants' common course of conduct in violation of

18 the laws alleged herein. The damages and injuries of each Class member were directly caused by

19 Defendants' wrongful conduct.

20      54.      There are no defenses of a unique nature that may be asserted against Plaintiffs

21 individually, as distinguished from the other members of the Class, and the relief sought is

22 common to the Class.

23      55.      Plaintiffs will fairly and adequately protect the interests of the members of the

24 Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of

25 the Class, and Plaintiffs have retained counsel competent and experienced in the prosecution of

26 antitrust class action litigation to represent themselves and the Class.

27      56.      Defendants have acted on grounds generally applicable to the Class, thereby

28 making final injunctive relief appropriate with respect to the Class as a whole.

10

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

## FACTUAL ALLEGATIONS

### I.     The California Market for Commercial Bail

58.     Most people arrested on suspicion of violating California's criminal laws have the right to seek and post bail for their release. An arrestee who cannot afford the posted bail can contract with a bail bond company to post bail in exchange for a non-refundable premium. At the time of arrest, during the booking process, the arrestee must be afforded an opportunity to call a bail bond company to initiate the process of obtaining a bail bond, and retains that right throughout any pretrial detention.

59.     These bail bonds practically function like insurance: they are underwritten by a small number of large surety companies that sell their bail bonds through thousands of commercial bail-bond agents.

60.     Consumers of commercial bail pay a premium in exchange for the bail bond companies' service of posting the bond. The transaction is carried out through a bail agent who posts a bond with the court that allows a defendant to leave custody pending trial. If the defendant attends all court dates, the posted bond is "exonerated," releasing the surety and bail agency from all liability. However, the consumer does not get his or her premium back. This is true even if a prosecutor never files charges, all charges are dismissed, the accused is acquitted, or the accused is returned to custody for some other reason.

61.     For bail bond services sold in California, sureties must file a rate application with the California Department of Insurance (CDI) stating a proposed maximum premium rate that the surety may charge its consumers (the "Maximum Rate"). All Surety Defendants have made the

11

requisite filing, received approval, and currently sell bail bond products in California or did so during the Class Period.

62.     Although California law bars sureties and agents from charging more than their Maximum Rate, they can charge less by offering rebates to consumers. Thus, in some respects the market for commercial bail bonds in California operates like the markets for insurance products.

63.     But, because of the conspiracy alleged herein, the California bail bonds market does not function like competitive insurance markets. Insurance premiums—from healthcare to life insurance to farmers' insurance for crops—are generally priced based on risk factors that predict the likelihood that the insurer will have to pay out, together with other actuarial practices that are frequently based on proprietary formulas and market competition.

64.     The Surety Defendants price bail bonds differently: they have nearly uniformly filed for a default premium rate of 10 percent of the posted bond, with an 8 percent maximum for consumers who meet enumerated and nearly identical criteria (e.g., veterans, homeowners, union members, government employees or certain arrestees represented by a private lawyer). They do not price their products based upon any risk analysis, and several have not changed their filing in nearly a decade.

65.     Gross profit margins also distinguish California bail bonds from traditional insurance markets, even though some Surety Defendants also sell insurance. In a competitive market, pricing will be driven down to the marginal cost of providing a good or service. Thus, in general, the lower the expected need to pay out on a claim, the lower the marginal cost of supplying insurance; and the lower marginal cost of supplying insurance, the lower the premium should be in a competitive market. Indeed, economists often assess the competitiveness of an insurance market by looking at the fraction of premium revenue that insurers pay out to cover claims (the "loss ratio"). The lower the loss ratio, the higher the profit margins, the less competitive the market is likely to be, other things equal.

66.     The California bail bonds market as a whole exhibits an extremely low loss ratio. On the one hand, costs are low: the expected need to pay out is minimal because criminal

12

defendants rarely "jump bail" and even when they do, the bond is rarely forfeited. Defendant AIA has been operating in the bail market for 107 years (now underwriting $700 million of bail annually), and its Vice President, Defendant Jerry Watson (also Senior Counsel and Board Member of Defendant American Bail Coalition) has admitted: "You know how many checks has this company written to pay a bail loss? *Not a single one*." Indeed, a report by the San Francisco Office of the Treasurer & Tax Collector observes that "bail bond agencies are rarely held accountable to the courts when an individual fails to appear;" in San Francisco, for example, bail bond agencies are released from their obligation to pay approximately 4 out of every 5 challenges they make to a bail forfeiture.

67. On the other hand, premium revenues are high, thanks to both pricing and volume. According to Defendant American Surety Company, "[w]ith the highest average bond in the nation at approximately $14,000, more commercial bail is written in [California] than in any other [state]." Every year between 2011 and 2013, California-licensed sureties underwrote bonds with a face value of more than $4.4 billion, and collected more than $308 million in nonrefundable premium fees per year, on average, from criminal defendants and their families. The CDI estimates that "[t]he business costs of a bail bond company are typically 20% of the bail fee to be paid to the surety company," meaning gross profit margins may be as high as 80%, and would still be substantial even if the bail agent kept the majority of the premium.

68. Simply put, in no competitive insurance market are loss ratios that low and gross profit margins that high. The premiums found in the California bail bonds market make no economic sense, and can be explained only by a market failure. The market failure here is Defendants' conspiracy to keep default premium rates fixed at 10%, and to prevent discounting or rebating as much as possible.

## II. Defendants' Conspiracy

69. In November 1988, California voters enacted the Insurance Rate Reduction and Reform Act ("Proposition 103"), which allowed insurers to charge consumers less than the rate they submitted to the CDI by offering rebates. The express purpose of Proposition 103 was,

13

among other things, "to protect consumers from arbitrary insurance rates and practices [and] to encourage a competitive insurance marketplace."

70.     It has been clear since at least February 2004 that Proposition 103 permits sureties in the bail bond industry to offer prices below the Maximum Rate submitted to the CDI by offering rebates. *See Pacific Bonding Corp. v. John Garamendi*, No. GIC815786 (Cal. Super. Ct. Feb. 24, 2004). Specifically, the trial court decision in *Pacific Bonding* enjoined the CDI from enforcing an anti-rebate statute pre-dating Proposition 103. The CDI provides a link to this decision on its website. Since then, the CDI explains, "to become more competitive, a bail agent may choose to negotiate a lower fee by rebating, as allowed by Proposition 103."

71.     Despite knowing no later than February 2004 that they can either (1) file for lower rates, or (2) offer prices below their filed Maximum Rate by rebating, Defendants have agreed to file for the same Maximum Rate, advertise only that default Maximum Rate, conceal their ability to charge a lower effective rate through rebating, and generally refrain from offering competitive rebates.

72.     Furthermore, the Surety Defendants and their coconspirators have concealed their scheme and dissuaded consumers from placing pressure on the industry to offer lower premium rates by misrepresenting that their self-imposed pricing scheme is required by law. In fact, they may file, and the CDI has the power to approve, lower Maximum Rates. Additionally, sureties and bond agents may charge less than the Maximum Rate by offering and advertising rebates.

73.     The anticompetitive cartel also intimidates competitors to toe the line. When competitors attempt to compete by offering lower rates or rebating, cartel members brand them as "break[ing] the law," despite knowing that to be false. The accusation dissuades competition and misleads consumers to believe that shopping around for better premium rates is futile because state law mandates uniform prices.

A.    **Defendant Sureties Have Conspired to Fix Bail Premiums**

74.     The Surety Defendants and their coconspirators, since at least February 2004, have conspired to fix bail premiums and avoid price competition. Defendants have:

14

a. Made statements indicating their agreement not to compete over premium prices;

b. Directed their agents not to compete with other agents over prices;

c. Used industry associations, including the Surety Association of America (SAA), the California Bail Bond Association, the American Bail Coalition, and Golden State Bail Agents Association, and bail education courses organized by industry leaders, as a conduit for enforcing their price-fixing cartel down to the bail-agent level; and

d. Singled out for punishment maverick bail agents who cut premium prices to attract consumers.

75. At the center of the conspiracy is Aladdin Bail Bonds, the largest bail agency in California, and its surety, Defendant SIC. The two companies are closely connected. As of 2012, two of the five members of SIC's Board of Directors were executives of Two Jinn, Inc. (which owns Aladdin), including the CEO of Two Jinn, Robert Hayes. As of 2012, Mr. Hayes owned 44.2% of Two Jinn, Inc. and 15.7% of SIC's holding company. The five individual shareholders who together own 100% of Two Jinn, Inc. own over 35% of SIC's holding company.

76. As detailed further below, like other bail agents, Aladdin claims that its fees are standard and non-negotiable. On its website under the heading "Standard Premium Rate," Aladdin claims that its prices are required by law: "All insurers who work with bail service providers are required to file their premium rates with the Department of Insurance. In California . . . Aladdin Bail Bonds is authorized to offer an 8% rate in addition to the standard 10%. Nobody has lower prices than Aladdin." These statements are misleading insofar as they conceal the ability of Aladdin—and its competitors—to offer lower prices with rebates.

77. Aladdin uses the SAA as a justification for setting its standard rate, and has said in its CDI filings that "[t]he standard rate is based on Surety Association of America (SAA) pricing."

78. Aladdin and SIC are not alone. Defendant Jerry Watson, acting on behalf of Defendant surety AIA, has publicly derided what he calls "price-cutting" as a "cancer" in an

15

1  article posted to AIA's website.  Watson and AIA have helped to organize the industry to prevent

2  price competition and maintain the cartel.

3      79.    Defendant American Surety Company is a national leader in the bail industry, and

4  "devotes a tremendous amount of resources towards preserving the commercial bail industry."

5  ASC staff have been vocal proponents of maintaining elevated prices through concerted action.

6      80.    Defendant Carmichael, President and CEO of Defendant American Surety

7  Company, and current Chairman and former President and CEO of Defendant American Bail

8  Coalition, has written:

9
> In 1986, when Jack and I started, we dreamt of an industry solidly
> united against its foes.  National, State and Local associations well-
10 > versed in the vital roles they play in the protection and betterment
> of our markets. . . . *We wished for a cohesive band of agents and*
11 > *companies whose power, when combined, far exceeded the power*
> *of an unorganized group of single businesses*. . . . Our Company
12 > will continue to provide its resources, both financial and personnel,
> to any effort which can be demonstrated to be trying to grow the
13 > surety-backed agency channel.  (Emphasis added.)

14     81.    Carmichael has long recognized that if the sale of commercial bail bonds were a

15 competitive market, the profitability of ASC and other Defendants would plummet, because

16 sureties rarely have to pay out a bond to a court.  Those low costs should otherwise encourage

17 discounting by sureties to increase their respective market shares.  As Carmichael stated in a

18 March 2005 article:

19
> 2005 will not be a year when we, as an industry, can sit passively
> by while competitive forces continue to encroach upon our
20 > markets . . . .  Advocates argue that the market dictates that they
> charge and collect less than the filed rate. . . . *[But] I can safely*
21 > *predict that if left unchecked, rampant premium discounting will*
> *result in the end of the bail bond business as we know it, to be*
22 > *replaced by a new model that properly reflects the proper balance*
> *of risk and reward.  Simple economics dictates it. . . . I urge all of*
23 > *us to recognize the serious nature of the threats to our industry*
> *and work collectively to repel them.  Leaving profit on the table,*
24 > *in the form of discounts or uncollected accounts receivable, is a*
> *fool's game.*  (Emphasis added.)
25

26     82.    Thus, Carmichael and other sureties have recognized the need to avoid the "simple

27 economics" that would create a market "reflect[ing] the proper balance of risk and reward"—i.e.,

28 a market with low premiums to reflect the low likelihood that a criminal defendant will "jump

16

bail" and a surety will have to pay out on a bond. Carmichael called upon bail bond agents to be "our industry's eyes, ears and mouths in recognizing and alerting all to the impending attack [on the industry]. When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response."

83. The sureties have taken matters into their own hands to avoid the "simple economics" that would otherwise reduce their profits. A 2002 essay entitled *Predatory Pricing*, by Michael J. Whitlock, Vice President of Defendant ASC, explained, with particular reference to California, that "*[p]rice gauging [sic] or predatory pricing is being addressed in several markets around the country*…. Fix the system and you will correct those areas which allow large retailers to prostitute the bail industry for short term gain." (Emphasis added.)

**B.** **Defendants Have Enlisted or Created Industry Associations to Enforce Their Conspiracy**

84. Industry associations, including, for example, Defendant California Bail Agents Association, Defendant Golden State Bail Agents Association, and Bail Agents Association of San Diego County, host meetings that provide opportunities for Defendants to maintain and enforce the conspiracy.

85. The California Bail Agents Association is the primary industry association of bail agents in California. CBAA hosts annual conventions every year. The 39th Annual Convention was held in Reno, Nevada on October 1, 2018.

86. The CBAA provides material to the general public in service of the conspiracy, falsely designed to hide the conspiracy behind misrepresentations of the governing law.

87. The CBAA's "How Bail Bonds Works" web page deliberately misleads consumers, but also ensures its members know the association-wide policy: "Are there any restrictions on how high my bail can be? Each surety company must file rates with the Department of Insurance. Bail agents representing a company must charge the same, filed rates." The "rates" here are the Maximum Rates. The CBAA does not disclose that agents are allowed to rebate appropriately based on market competition.

17

1      88.     The CBAA also maintains information regarding premiums charged that

2 Defendants and their agents can use to detect and prevent premium discounting.

3      89.     The Golden State Bail Agents Association ("GSBAA"), founded in 2004 by

4 "competitors, [who] discovered that they had a lot in common and formed GSBAA to pursue

5 their common interest in promoting and propagating the California bail industry," functions

6 similarly.

7      90.     The trade associations cooperate with each other as well. According to ASC VP

8 Whitlock's blog, "[a] bail industry meeting took place on the 2nd floor of the Crown Plaza Hotel

9 down the street from LAX on November 2, 2011. The meeting was organized by the American

10 Bail Coalition and included representatives of not only the members of ABC, but California's two

11 bail agent associations, California Bail Agents Association and The Golden State Bail Agents

12 Association and representatives of Aladdin Bail Bonds, the state's largest retailer. This

13 cooperative was named the California Bail Coalition (CBC)."

14      91.     The coordination extends to the national level, with the "ABC [] working with a

15 large coalition that includes California's two state associations, CBAA and GSBAA," according

16 to ASC VP Whitlock's blog written in 2017. In that same blog, Whitlock wrote that "[t]he

17 cooperation among industry competitors at both the agency and surety level has been nothing

18 short of inspiring."

19     **C.**     **Defendants Have Used Bail Agent Training Courses to Enforce Cartel Pricing**

20      92.     The cartel has also been reinforced by industry-sponsored, privately-run bail agent

21 training courses where industry participants train other participants in implementing the

22 conspiracy. For example, a course offered by the Bail Resource Center & Career Academy

23 teaches the cartel line: "the right answer on the test: no rebates."

24      93.     Sean Cook, of Bail Bonds Universal California, Board Member At-Large of the

25 CBAA, and author of the e-book "Bail Bonds 101," which the CBAA advises is an essential

26 starting point for all bail agents, works to "educate" bail agents into the cartel.

27      94.     For example, in an article titled "Running a Bail Bond Business: Answering

28 Calls," Cook advises:

[T]he caller may be shopping to see what fees you charge, but always keep in mind that your state DOI regulates the fees for bail bonds and if a competitor offers a lower percentage fee, they WILL make up the point or two somewhere in the transaction. In California, the only time you might lower the fee to 8%, which is 2% less than the standard 10%, is if you are working with a referral from an attorney.

**D.** **Bail Agents, Following Surety Instructions, Have Implemented Uniform Pricing and Made Misrepresentations Regarding Bail Bond Premiums**

95.     The sureties contractually dictate the rates for their associated bail agents, who then advertise these rates as nonnegotiable.

96.     Contractual agreements establishing the relationship between sureties and bail agents may include strictures like the following: "The premiums to be charged and collected" by the bail agent "shall be at such rates as may be approved by the Department of Insurance of the State of California or by statute, or *in the absence of some such established rates, as may be prescribed by the [surety]*." (Emphasis added.)

97.     Bail agents then advertise these dictated rates, misleading Class members into thinking they are mandated by law rather than by the sureties. For example, as of January 2019, the website for Quick Bail Bonds Covina, which operates under License No. 1J09699 and contracts with AIA, states: "The Bail Bond agency in California (by California law) is not allowed to charge more or less than 10%."

98.     For example, as of January 2019, the website for Padilla Bail Bonds (License No. 1639213) states, on behalf of its surety, Lexington National Insurance: "The California Law mandated bail bond fee (also called premium) is 10% of the bail. This is non-refundable, but can be lowered to 8% if you qualify for the discount—if you're a veteran, union member or have a lawyer retained."

99.     As of January 2019, the website for 888 Bail Bonds (which operates under several license numbers) states on behalf of its sureties, including Defendants Allegheny Casualty Company and International Fidelity Insurance Company: "Can I find Cheap Bail? The cost of a bail bond in California is set with the Department of Insurance at 10% of the total bail amount. We often get the question from potential clients: 'Can you do it for less?' 'Would you take 5% if

19

I pay cash?' *Any agent offering bail at 5% in the State of California is simply acting illegally or deceptively . . . .*" (Emphasis added.)  Finally, the website states, "Do you Offer 5% Bail or Negotiate Premium?  We do not negotiate bail premium.  Some people may not care if paying an illegal 5% bail premium is against the law.  However, we ask you to consider carefully the position in which unlawful bail puts you.  If a bail agent is breaking the law by price-cutting, will the same agent return your collateral?"

100.    As of January 2019, the website for Bad Boy Bail Bonds (License No. 1846634) says, on behalf of its surety: "The process of bail is regulated by the State of California.  A Judge within the county of arrest sets the bail amount.  Once bail is set, a Bad Boys Bail Bonds Agent charges 10%.  (The State of California regulates this fee.  All Bail Bonds companies charge the same rate.)."

101.    As of January 2019, the website for All American Bail Bonds (License No. 1845565) says, on behalf of its sureties, "the lowest legal rate that any one Bail Bonding company can charge is 8%, anything less is ILLEGAL."  Characterizing rates lower than 10% (or, where applicable, 8%) as "illegal" is a frequent occurrence.

102.    Similar deceptive language used by other bail agents discourages consumers from comparison shopping to find the best rates.  As of January 2019, the website for Almighty Bail Bonds (License No. 1842942) says, on behalf of its sureties: "there are companies that can legally charge 8%, while the allowable premium is set at 10% for others.  If a company that [sic] agrees to discount their fee, they may lose their license."

103.    Examples of bail agents purporting to be prohibited by California law from charging less than 10% (or 8% under limited circumstances) are hardly restricted to the foregoing; indeed, they are ubiquitous.

104.    These statements misrepresent the law and mislead consumers by omitting or disclaiming that bail bond agents and their sureties are free to charge a lower effective rate through rebates.

**E.  Defendants Have Maintained Their Conspiracy by Punishing Undercutting**

105.  Understanding that it is within their legal authority—and economic self-interest, absent the cartel—to offer and advertise lower prices, a small number of maverick bail agents have done so.

106.  But the mavericks who have opted to openly compete on price, either through lower filed rates or by advertising their lawful rebating authority, have faced retaliation from participants in the price-fixing conspiracy.  This has resulted in some bail agents being forced to exit the market.  As Dennis Bartlett, former Executive Director of Defendant ABC, has noted, higher bail amounts have "disadvantaged not only defendants but bail agents, some of whom have cut premium rates in order to write any bonds at all," and explained that in response, "*[t]he bonding industry has worked hard to rectify this abuse.*"  (Emphasis added.)

107.  For example, in a 2014 online post, bail agent Chad Conley (also known as "Chad the Bail Guy") explained the legal effect of Proposition 103 on bail agents' ability to give rebates to consumers: "bail bonds are regulated under Proposition 103, which provides for premium rebates as long as they are not unfairly discriminatory."  Mr. Conley's post is notable: Plaintiffs have been able to identify only one clear public acknowledgement from a market participant about their rebating authority under Proposition 103.  In a response to a comment on this post, Mr. Conley stated that his efforts to provide lower prices for his bail bond clients resulted in pressure from a "good ol boys club," which "came after [his] license for trying to save clients' money."  He further confirmed that other bond agents are aware of their ability to provide lower prices but have conspired to avoid this form of competition: "They prefer price fixing . . . ."

**F.  The Industry Is Well Aware That the Law Encourages Price Competition, and Would Discount Absent Their Agreement**

108.  The bail industry has every reason to behave competitively and yet it does not because of the conspiracy.

109.  The industry regulator, CDI, has publicly explained that "to become more competitive, a bail agent may choose to negotiate a lower fee by rebating, as allowed by Proposition 103."

21

110.    In addition, in *Pacific Bonding Corp. v. John Garamendi*, No. GIC815786 (Cal. Sup. Ct. Feb. 24, 2004), the California Superior Court enjoined the California Department of Insurance from enforcing a regulation prohibiting bail sureties from offering rebates to consumers; the court relied in part on Proposition 103's repeal of anti-rebate statutes. Thus, it has been clear since that time that sureties and bail agents may offer rebates below the approved maximum insurance rate.

111.    What the regulators and the judiciary made clear is as also what economics would yield but for the conspiracy. Market dynamics would normally provide a strong incentive to compete on price. As discussed above, the loss ratios and profit margins of the California bail bonds market strongly suggest a lack of competition—that is, the high uniform premiums make no economic sense. In a competitive market for the sale of commercial bail bonds, one would expect bail-bond agents to advertise premiums based on market conditions and actuarial determinations, and offer competitive payment structures that would attract consumers. They would do this based on instruction from their sureties, who would know that reducing premiums would allow them to increase their market share, with little downside risk because of the rarity with which criminal defendants "jump bail" and collection is sought from sureties.

112.    This competitive dynamic would be especially likely in a market where demand is declining and supply increasing. Defendant Jerry Watson, in a 2009 article called "The New Age of Bail," observed a simultaneous increase in the supply and reduction in demand for commercial bail services:

> For a number of years, there has been concern that too many new agents are entering an already crowded industry. An inherent problem has revealed itself as an increasing number of bail agents want a piece of a shrinking bail bond pie. . . . [Meanwhile,] data compiled concludes that the number of nationwide arrests is decreasing by slightly over two percent each year. . . . Whatever the cause may be, the effect is clear:  There are increasingly fewer bonds in the marketplace.

113.    Watson was describing changes that have affected bail agents across the country, but the same dynamic has been observed in California, including by Maggie Kreins, president of the California Bail Agents' Association (CBAA): "When I first started writing bail in the mid-

80s, there were 1,200 agents in the state. Now there are 3,400, one on top of the other, and everyone is fighting for that slice of the pie."

114.    Economic theory and common sense dictate that in industries with numerous competitors, a cartel is harder to create, monitor, and enforce. Near-universal adherence to the 10% rule by thousands of California bail agents would be surprising without a conspiracy among the sureties that are licensed to sell commercial bail bonds in the state. That there are far fewer sureties makes a cartel easier to enforce. Only licensed sureties may legally sell commercial bail bonds to California criminal defendants. Not only are there regulatory entry barriers, but to be successful, a surety must have a network of bail agents selling its bonds, which requires developing arrangements and contracting with bail agents.

115.    That these sureties would have independently decided to keep premiums uniformly high is particularly inexplicable in light of the industry's shrinking size. With the onset of what is typically referred to in industrial-organization literature as "secular decline"—long-term reduction in demand for a product, rather than cyclical shifts—the standard response in other industries has been vigorous price competition. Yet despite these changes, Defendants have managed to avoid competing on price.

116.    That has been true even as various forms of *non-price* competition have responded in just the way that economic theory would predict: bail agents and sureties have become increasingly fierce competitors in marketing (both legal and prohibited forms), credit terms, and other respects.

117.    For a 2017 report titled "The Devil in the Details: Bail Bond Contracts in California," the CDI's Deputy Legislative Director noted that the Department has seen unfair and illegal solicitation including (1) soliciting bail in a prohibited place such as a court, jail, or police station, (2) "spoofing" inmate locator websites to gather information on the accused that the bail bond agent uses for solicitation, (3) using data mining strategies to collect public information about new admissions to jail facilities to "bond drop" or conduct illegal solicitations of arrestees, (4) using attorney-client jail visiting room scams to illegally solicit other inmates for bail, or (5) inmate "capping," which consists of paying an inmate to refer clients to a bail agent. These

1    findings have been corroborated by other government investigations and even arrests of bail

2    agents.

3          118.    Despite sometimes fierce competition on other terms, the Bail Agency Defendants

4    and other bail agents do not compete on price, because prices are controlled by their respective

5    sureties. Today, and throughout the Class period, substantially all (1) sureties in California have

6    filed for the same Maximum Rate, offered under nearly identical conditions (including the

7    standard Fully Earned Term), and (2) bail agents, to whom sureties dictate rates, have advertised

8    those Maximum Rates as the required price, even though they could offer lower prices. That not

9    only reflects the conspiracy's success, but—as in other industries in which pricing is

10   transparent—facilitates identification and punishment of those industry participants who dare to

11   deviate.

12                   **PLAINTIFFS AND THE CLASS HAVE BEEN HARMED**

13          119.    Consumers were harmed by Defendants' conspiracy to fix bail bond prices.

14          120.    Absent the conspiracy to fix default premiums at 10%, sureties and agents would

15   have competed by filing lower Maximum Rates with CDI or charging rates that are lower than

16   their respective Maximum Rates through rebates and other discounts. Price competition would

17   have led to lower prices across the market, which would have resulted in consumers paying less

18   to get out of jail or incurring less debt when consumers financed the premium.

19          121.    In addition, absent the conspiracy, fewer consumers would have been left in

20   pretrial detention because they could not afford to pay a bail bondsman to post bail. California

21   holds a disproportionate number of people in pretrial detention—as of 2015, 59% of people

22   accused of crimes, compared to the nationwide average of 32%. According to Human Rights

23   Watch, "[i]n California, consistently over 63 percent of prisoners in county jails have not been

24   sentenced, but are serving time because they cannot afford to pay bail." A working group

25   appointed by the Chief Justice of the Supreme Court of California reported that, "although the

26   available statistical data are limited, information gathered by the working group confirms that

27   some people currently in California jails who are safe to be released are held in custody solely

28   because they lack the financial resources for a commercial bail bond." Further, pretrial

1    incarceration has been linked to loss of housing and employment, deterioration in familial

2    relationships, and harms to mental and physical health, among other consequences. Simply put:

3    Defendants' conspiracy to generate unlawful profits caused more Californians to remain in

4    detention, and suffer collateral consequences, than otherwise would be the case.

**FRAUDULENT CONCEALMENT, THE DISCOVERY RULE, AND EQUITABLE ESTOPPEL**

7         122.    Application of the doctrines of fraudulent concealment and the discovery rule

8    tolled the statutes of limitations on claims asserted by Plaintiffs and the Class. Plaintiffs and

9    Class members were persons in pretrial detention or friends and relatives who paid premiums on

10   bail bonds but had no actual knowledge, or reason to have knowledge, of the secret conspiracy

11   alleged herein or any reasonably available means to discover or investigate it. Defendants'

12   pervasive public misrepresentations that their prices were legally required gave Plaintiffs and the

13   Class no reason to suspect that an unlawful conspiracy to restrain competition was afoot.

14   Plaintiffs and the Class were justified in relying on these misrepresentations. Plaintiffs and the

15   Class also lacked the specialized economic and industry knowledge necessary to discover the

16   conspiracy sooner despite the exercise of due diligence.

17        123.    Alternatively, Defendants are equitably estopped from asserting a statute of

18   limitations defense because, by their affirmative misrepresentations and by intentional acts to

19   conceal their wrongdoing, Defendants misled Plaintiffs and the Class into believing they had no

20   choice but to pay the cartel price. Defendants should not be permitted to profit from their

21   wrongdoing.

**FIRST CLAIM FOR RELIEF**

**Violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16720**

24        124.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of

25   this Complaint.

26        125.    Defendants, and their co-conspirators, entered into and engaged in a continuing

27   unlawful trust in restraint of the trade and commerce described above in violation of California

28   Business and Professions Code section 16720.

126.     Beginning on or about February 24, 2004, Defendants have engaged in continuing trusts in restraint of trade and commerce, and the fixing of commercial bail bond premiums sold to Plaintiffs and members of the Class in violation of the Cartwright Act.

127.     Defendants' trusts have included concerted action and undertakings among the Defendants with the purpose and effect of fixing advertised premiums for commercial bail bonds at 10% of the bond, with the exception that 8% may be offered to some consumers meeting certain criteria.

128.     The wrongful acts done in furtherance of Defendants' conspiracy include, but are not limited to:

a.     Agreeing at meetings—at industry conferences and elsewhere—to fix the advertised premiums for commercial bail bonds;

b.     Filing uniform Maximum Rates submitted to the California Department of Insurance;

c.     Advertising those Maximum Rates as the minimum price of bail bonds on their websites and elsewhere while concealing their ability to offer rebates;

d.     Falsely claiming that the offered prices were required by law and that rebates or discounts were unlawful;

e.     Maintaining industry discipline and coordination through blog posts and articles advocating against price competition; and

f.     Retaliating, via threats and other means, against those supporting or engaging in price competition.

129.     The agreement that Defendants entered, maintained, renewed, and enforced with one another had the purpose and effect of fixing or inflating bail bond prices in California.  As a result of this agreement, Plaintiffs and Class members have been forced to pay inflated bail bonds premiums, and otherwise have been damaged as described in this Complaint.  But for the conspiracy alleged herein, bail bond premiums paid by Plaintiffs and Class members in California would have been significantly lower.

26

130.    As a direct and proximate result of Defendants' past and continuing violation of the Cartwright Act, Plaintiffs and the Class have suffered injury and damages in an amount to be proven at trial.

131.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Defendants jointly and severally for these violations. These damages represent the difference between the amount Plaintiffs and other members of the Class paid in premiums for bail bonds in California and what Plaintiffs and other members of the Class would have paid in premiums in the absence of the violations alleged. Damages may be quantified on a Class-wide basis. Actual damages should be trebled under California Business and Professions Code section 16750.

132.    Plaintiffs and members of the Class are "persons" within the meaning of the Cartwright Act as defined in section 16702.

133.    The acts done by each Defendant as part of, and in furtherance of, their agreements, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

134.    Defendants' agreements, combinations and/or conspiracies are a per se violation of the Cartwright Act.

## SECOND CLAIM FOR RELIEF

### Unfair Competition in Violation of Cal. Bus. & Prof. Code § 17200, et. seq.

135.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

136.    Defendants' and their co-conspirators' actions to restrain trade and fix prices in the market for commercial bail bonds constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code sections 17200, *et seq*.

137.    Defendants' and their co-conspirators' conduct in engaging in combinations of capital, skill, and acts with others with the intent, purpose, and effect of restraining trade and

27

1 fixing prices in the market for commercial bail bonds, including falsely advertising that they were

2 required to charge the filed Maximum Rates while concealing their ability to charge a lower

3 effective rate through rebates, constitutes and was intended to constitute unfair competition and

4 unlawful, unfair, and fraudulent business acts and practices within the meaning of California

5 Business and Professions Code section 17200.

6       138.   Defendants and their co-conspirators also violated California's Unfair Competition

7 Law by violating the Cartwright Act.

8       139.   As a result of Defendants' and their co-conspirators' violations of Business and

9 Professions Code section 17200, Defendants have unjustly enriched themselves at the expense of

10 the Class. The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent

11 business acts and practices continue.

12       140.   To prevent their unjust enrichment, Defendants should be required pursuant to

13 Business and Professions Code sections 17203 and 17204 to disgorge their illegal gains for the

14 purpose of making full restitution to all injured Class members identified hereinabove.

15 Defendants should also be permanently enjoined from continuing their violations of Business and

16 Professions Code section 17200.

17       141.   The acts and business practices, as alleged herein, constituted and constitute a

18 common, continuous, and continuing course of conduct of unfair competition by means of unfair,

19 unlawful, and/or fraudulent business acts or practices within the meaning of California Business

20 and Professions Code section 17200, *et seq.*, including, but not limited to, violations of the

21 Cartwright Act, California Business and Professions Code section 16720, *et seq.*

22       142.   Defendants' and their co-conspirators' acts and business practices as described

23 above, whether or not in violation of California Business and Professions Code section 16720, *et*

24 *seq.*, are otherwise unfair, unconscionable, unlawful, and fraudulent.

25       143.   The illegal conduct alleged herein is continuing, and there is no indication that

26 Defendants and their co-conspirators will not continue such activity into the future.

27

28

## **PRAYER FOR RELIEF**

Plaintiffs request relief as follows:

a.   That the Court determine that this action may be maintained as a class action under section 382 of the California Code of Civil Procedure, and direct that notice of this action, as provided by California Rule of Court 3.766 and 3.767(a)(1), be given to Class members;

b.   That Defendants be declared to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, e-mail, and publication designed to give immediate notification to Class members;

c.   That the Court enter an order declaring Defendants' actions, as set forth in this Complaint, violate the law;

d.   That the Court issue an injunction against Defendants, stopping and preventing the violations alleged herein and requiring Defendants to correct all false or misleading statements in any materials, online or otherwise, relating to the discounting of bail;

e.   That the Court award Plaintiffs and Class members damages and/or restitution in an amount to be determined at trial, with damages to be trebled pursuant to California Business and Professions Code section 16750(a);

f.   That the Court require disgorgement and/or impose a constructive trust upon Defendants' ill-gotten gains, freeze Defendants' assets, and/or require Defendants to pay restitution to Plaintiffs and to all members of the Class of all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent, business practice, a violation of state law, or to constitute unfair competition;

g.   That the Court award Plaintiffs and the Class pre- and post-judgment interest;

h.   That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorney's fees and expenses; and

i.   That the Court award such other relief as the Court may deem just and proper.

29

## JURY DEMAND

Plaintiffs hereby demand a jury trial for all triable issues.

Respectfully submitted,

Dated: January 29, 2019

By: _[signature]_

Dean M. Harvey (SBN 250298)
Katherine C. Lubin (SBN 259826)
Adam Gitlin (SBN 317047)
Yaman Salahi (SBN 288752)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
dharvey@lchb.com
kbenson@lchb.com
agitlin@lchb.com
ysalahi@lchb.com

Benjamin David Elga (*pro hac vice* motion forthcoming)
Brian James Shearer (*pro hac vice* motion forthcoming)
JUSTICE CATALYST LAW
25 Broadway, 9th Floor
New York, NY
Telephone:    (518) 732-6703
belga@justicecatalyst.org
brianshearer@justicecatalyst.org

Stephanie Carroll (SBN 263698)
Nisha Kashyap (SBN 301934)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California, 90005
Telephone:    (213) 385-2977
Facsimile:    (213) 201-4722
scarroll@publiccounsel.org
nkashyap@publiccounsel.org

CLASS ACTION COMPLAINT
CASE NO.

Stuart T. Rossman (*pro hac vice* motion forthcoming)
Brian Highsmith (*pro hac vice* motion forthcoming)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110-1245
Telephone:    (617) 542-8010
Facsimile:     (617) 542-8028
srossman@nclc.org
bhighsmith@nclc.org

Alexander Hood (*pro hac vice* motion forthcoming)
Andrew Schmidt (*pro hac vice* motion forthcoming)
David Seligman (*pro hac vice* motion forthcoming)
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Telephone:    (720) 441-2236
Facsimile:     (303) 957-2289
alex@towardsjustice.org
andy@towardsjustice.org
david@towardsjustice.org

31