1   Dean M. Harvey (SBN 250298)
    Katherine C. Lubin (SBN 259826)
2   Adam Gitlin (SBN 317047)
    Yaman Salahi (SBN 288752)
3   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
4   San Francisco, CA 94111
    Telephone: (415) 956-1000
5   dharvey@lchb.com
    kbenson@lchb.com
6   agitlin@lchb.com
    ysalahi@lchb.com
7
    *Interim Class Counsel*
8

9                   UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                    SAN FRANCISCO DIVISION

12                                         Master File No. 3:19-CV-000717-JST

13                                         CLASS ACTION
    IN RE CALIFORNIA BAIL BOND
14  ANTITRUST LITIGATION                   **PLAINTIFFS' OPPOSITION TO
                                           DEFENDANTS' MOTION TO DISMISS**

15  This Document Relates To:             Judge:         Hon. Jon S. Tigar
                                          Hearing Date:  October 16, 2019
16                                        Courtroom:     6, 2d Floor
                                          Time:          2:00 p.m.
17  ALL ACTIONS

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................... 1

II.  STATEMENT OF FACTS ....................................................................................... 3

III.  LEGAL STANDARD ............................................................................................. 7

IV.  ARGUMENT ......................................................................................................... 8

    A.  Plaintiffs Allege A Plausible Antitrust Conspiracy To Fix The Prices of Bail Bonds in California .................................................................................... 8

        1.  Actions To Eliminate Price Competition .................................................... 8

        2.  Defendants' Own Statements Evidence the Conspiracy ............................. 9

        3.  Market Factors In the Bail Industry Further Support A Plausible Conspiracy .......................................................................................... 10

        4.  Defendants' Involvement in Trade Associations, and the Trade Associations Themselves, Reinforce Inference of a Conspiracy ............. 14

        5.  The CAC Alleges Facts With Sufficient Specificity As To Each Defendant's Participation .................................................................. 15

    B.  The CAC States A UCL Claim ............................................................................. 20

    C.  Defendants' Immunity Defenses Fail As A Matter of Law ................................. 20

        1.  The McCarran-Ferguson Act Does Not Apply ........................................ 20

        2.  Defendants' Conspiracy Is Not State Action ........................................... 21

        3.  The Filed Rate Doctrine Does Not Bar Plaintiffs' Claims ....................... 23

            a.  The Filed Rate Doctrine Does Not Apply Because the Filed Bail Bond Premium Rates Set Only A Ceiling, Not A Floor ....... 23

            b.  Rebates Are Not Filed With or Approved By CDI ...................... 24

            c.  The Filed Rate Doctrine Does Not Bar Plaintiffs' Claims for Injunctive Relief .......................................................................... 25

            d.  The Filed Rate Doctrine Does Not Apply to Plaintiffs' California Cartwright Act Claim .................................................. 25

        4.  CDI Does Not Have Jurisdiction Over Plaintiffs' Claims ....................... 27

        5.  Agreeing to File Fixed Prices Is Not Protected Petitioning ..................... 29

    D.  Defendants' Statute of Limitations Defenses Are Meritless ................................ 30

        1.  Defendants Fraudulently Concealed Their Conspiracy ........................... 30

        2.  The Discovery Rule Delays Accrual of Plaintiffs' Claims ...................... 32

        3.  Defendants Are Estopped From Benefiting From Their Own Concealment ............................................................................................ 34

        4.  Plaintiffs Plead A Continuing Violation .................................................. 34

        5.  The Claims Against Danielson National Insurance Company Are Timely ...................................................................................................... 35

V.  CONCLUSION .................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Aberin v. Am. Honda Motor Co., Inc.*,
No. 16-cv-04384, 2018 WL 1473085 (N.D. Cal. Mar. 26, 2018) ............................................ 31

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ............................................................................................................... 29

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
456 U.S. 556 (1982) ........................................................................................................... 18, 19

*Apr. Enters., Inc. v. KTTV*,
147 Cal.App.3d 805 (1983) ................................................................................................... 33

*Aryeh v. Canon Business Solutions, Inc.*,
55 Cal.4th 1185 (2013) ......................................................................................................... 33

*AT&T Commc'n Sys. v. Pac. Bell*,
203 F.3d 1183 (9th Cir. 2000) ............................................................................................... 29

*AT&T Mobility LLC v. AU Optronics Corp.*,
707 F.3d 1106 (9th Cir. 2013) ............................................................................................... 20

*Bailey v. Memphis Bonding Co., Inc.*,
No. 18-2115, 2019 WL 1300092 (W.D. Tenn. Mar. 21, 2019) ............................................. 21

*Barlow v. Safety Nat'l Cas. Corp.*,
856 F. Supp. 2d 828 (M.D. La. 2012) ................................................................................... 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................... 7, 8, 13

*Buckman v. Am. Bankers Ins. Co. of Fla.*,
924 F. Supp. 1156 (S.D. Fla. 1996) ...................................................................................... 21

*Cal. Comput. Prods., Inc. v. Int'l Bus. Mach. Corp.*,
613 F.2d 727 (9th Cir. 1979) ................................................................................................. 14

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
445 U.S. 97 (1980) ................................................................................................................. 22

*Callahan v. A.E.V., Inc.*,
947 F. Supp. 175 (W.D. Pa. 1996) .......................................................................................... 8

*Cantor v. Detroit Edison Co.*,
428 U.S. 579 (1976), *cert. denied*, 459 U.S. 1145 (1983) ..................................................... 22

*Carlin v. DairyAmerica, Inc.*,
705 F.3d 856 (9th Cir. 2013) ...................................................................................... 23, 24, 26

*Cellular Plus, Inc. v. Super. Ct.*,
14 Cal. App. 4th 1224 (1993) ...................................................................................... 26, 27, 28

*Chambers & Barber, Inc. v. Gen. Adjustment Bureau, Inc.*,
60 F.R.D. 455 (S.D.N.Y. 1973) .............................................................................................. 31

*Columbia Steel Casting Co., Inc. v. Portland Gen. Elec. Co.*,
111 F.3d 1427 (9th Cir. 1996) ............................................................................................... 30

*Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*,
858 F.2d 499 (9th Cir. 1988) ............................................................................................ 30, 32

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3   *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
       370 U.S. 690 (1962).................................................................................................. 8

4   *Coppinger-Martin v. Solis*,
5       627 F.3d 745 (9th Cir. 2010).................................................................................. 34

    *Corazon v. Aurora Loan Servs., LLC*,
6       No. 11-00542 SC, 2011 WL 1740099 (N.D. Cal. May 5, 2011) ............................. 17

7   *County of Stanislaus v. Pacific Gas & Electric Company*,
       114 F.3d 858 (9th Cir. 1997)............................................................................ 24, 26

8   *Cramer v. Sup. Ct.*,
       130 Cal. App. 4th 42 (2005) .................................................................................. 26
9
    *Donabedian v. Mercury Ins. Co.*,
10      116 Cal. App. 4th 968 (2004) ................................................................................ 28

11  *E.W. French & Sons, Inc. v. Gen. Portland Inc.*,
       885 F.2d 1392 (9th Cir. 1989)................................................................................ 30

12  *Eclectic Properties E., LLC v. Marcus & Millichap Co.*,
       751 F.3d 990 (9th Cir. 2014).................................................................................. 13
13
    *Ellsworth v. U.S. Bank, N.A.*,
       908 F. Supp. 2d 1063 (N.D. Cal. 2012) ................................................................. 28
14
    *Feinstein v. Nettleship Co. of Los Angeles*,
15      714 F.2d 928 (9th Cir. 1983)............................................................................ 21, 22

16  *Fenerjian v. Nongshim Co., Ltd*,
       72 F. Supp. 3d 1058 (N.D. Cal. 2014) ................................................................... 32

17  *Fogel v. Farmers Grp., Inc.*,
       160 Cal. App. 4th 1403 (2008) .............................................................................. 24
18
    *Fox v. Ethicon Endo-Surgery, Inc.*,
       35 Cal.4th 797 (2005) ........................................................................................... 33
19
    *Freeman v. San Diego Ass'n of Realtors*,
20      322 F.3d 1133 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003)...... 18

21  *FTC v. Phoebe Putney Health Sys., Inc.*,
       568 U.S. 216 (2013)............................................................................................... 22

22  *FTC v. Ticor Title Ins. Co.*,
       504 U.S. 621 (1992)............................................................................................... 22

23  *Garrison v. Oracle Corporation*,
       159 F.Supp.3d 1044 (N.D. Cal. 2016) ................................................................... 33

24  *Georgia v. Penn. R. Co.*,
25      324 U.S. 439 (1945)............................................................................................... 25

    *Grp. Life & Health Ins. Co. v. Royal Drug Co.*,
26      440 U.S. 205 (1979)............................................................................................... 20

27  *Harman v. Valley Nat'l Bank of Ariz.*,
       339 F.2d 564 (9th Cir. 1964).................................................................................. 29

28  *Hennegan v. Pacifico Creative Service, Inc.*,
       787 F.2d 1299 (9th Cir.), *cert. denied*, 479 U.S. 886 (1986).................................. 30

**TABLE OF AUTHORITIES**
(continued)

Page

*Herremans v. BMW of N. Am., LLC*,
    No. CV-02363, 2015 WL 12712082 (C.D. Cal. Feb. 19, 2015) .............................................. 31

*Hexcel Corp. v. Ineos Polymers, Inc.*,
    681 F.3d 1055 (9th Cir. 2012) .................................................................................... 30, 32

*Hinds Cnty., Miss. v. Wachovia Bank N.A.*,
    700 F.Supp.2d 378 (S.D.N.Y. 2010) ................................................................................. 16

*Hoover v. Ronwin*,
    466 U.S. 558 (1984) ........................................................................................................ 23

*Hosp. Bldg. Co. v. Trs. of Rex Hosp.*,
    425 U.S. 738 (1976) .......................................................................................................... 8

*Hubbard v. Sup. Ct.*,
    66 Cal. App. 4th 1163 (1997) ........................................................................................ 27

*In re Animation Workers Antitrust Litigation*,
    87 F.Supp.3d 1195 (N.D. Cal. 2015) ......................................................................... 33, 35

*In re California Title*,
    No. C 08-01341 JSW, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ..................................... 15

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    MDL No. 1917, 2013 WL 5425183 (N.D. Cal. Sept. 26, 2013) ...................................... passim

*In re Chocolate Confectionary Antitrust Litig.*,
    602 F.Supp.2d 538 (M.D. Pa. 2009) .......................................................................... 10, 11, 12

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ..................................................................................... 14, 19

*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990) ......................................................................................... 10

*In re Copper Antitrust Litig.*,
    436 F.3d 782 (7th Cir. 2006) ......................................................................................... 32

*In re Flat Glass Antitrust Litig.*,
    385 F.3d 350 (3d Cir. 2004) .......................................................................................... 12

*In re Fresh & Process Potatoes Antitrust Litig.*,
    834 F. Supp. 2d 1141 (D. Idaho 2011) ............................................................................ 18

*In re German Auto. Manufacturers Antitrust Litig.*,
    No. MDL 2796 CRB (JSC), 2019 WL 2509771 (N.D. Cal. June 17, 2019) ........................... 19

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .......................................................................................... 8

*In re Graphics Processing Units Antitrust Litig.*,
    527 F. Supp. 2d 1011 (N.D. Cal. 2007) ....................................................................... 15, 19

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ...................................................................................... 10, 12

*In re Late Fee & Over-Limit Fee Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007), *aff'd,* 741 F.3d 1022 (9th Cir. 2014) ....................... 17

*In re Lithium Ion Batteries Antitrust Litig.*,
    No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ..................................... 8

-iv-

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*In re Marriage of Cornejo,*
  13 Cal. 4th 381 (1996) .................................................................................................. 27

4

*In re Musical Instruments & Equip. Antitrust Litig.,*
  798 F.3d 1186 (9th Cir. 2015)................................................................................... 10, 12, 19

5

*In re Packaged Ice Antitrust Litig.,*
  723 F. Supp. 2d 987 (E.D. Mich. 2010).......................................................................... 11

6

*In re Packaged Ice Antitrust Litig.,*
  723 F.Supp.2d 987 (E.D. Mich. 2010)............................................................................ 32

7

*In re Polyurethane Foam Antitrust Litig.,*
  799 F.Supp.2d 777 (N.D. Ohio 2011)............................................................................. 32

8

*In re Rubber Chemicals Antitrust Litig.,*
  504 F. Supp. 2d 777 (N.D. Cal. 2007) ....................................................................... 31, 32

9

10

*In re Sagent Tech., Inc., Derivative Litig.,*
  278 F. Supp. 2d 1079 (N.D. Cal. 2003) ......................................................................... 17

11

*In re Se. Milk Antitrust Litig.,*
  555 F. Supp. 2d 934 (E.D. Tenn. 2008) ......................................................................... 9, 16

12

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
  580 F.Supp.2d 896 (N.D. Cal. 2008) ...................................................................... 11, 15, 20

13

14

*In re Text Messaging Antitrust Litig.,*
  630 F.3d 622 (7th Cir. 2010).......................................................................................... 8

15

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) .................................................................... 9, 15, 16, 31

16

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
  820 F. Supp. 2d 1055 (N.D. Cal. 2011) ......................................................................... 35

17

*In re Transpac. Passenger Air Transp. Antitrust Litig.,*
  69 F. Supp. 3d 940 (N.D. Cal. 2014) ............................................................................. 25

18

19

*In re Urethane Antitrust Litig.,*
  409 F. Supp. 2d 1275 (D. Kan. 2006) ............................................................................ 11

20

*Jung v. Ass'n of Am. Med. Colls.,*
  300 F. Supp. 2d 119 (D.D.C. 2004) ............................................................................... 17

21

*Kelly-Brown v. Winfrey,*
  717 F.3d 295 (2d Cir. 2013)........................................................................................... 35

22

*Keogh v. Chicago & Northwest Railway Co.,*
  260 U.S. 156 (1922)................................................................................................... 23, 24

23

24

*King v. Nat'l Gen. Ins. Co.,*
  129 F. Supp. 3d 925 (N.D. Cal. 2015) ........................................................................... 28

25

*Klehr v. A.O. Smith Corp.,*
  521 U.S. 179 (1997)........................................................................................................ 35

26

*Knevelbaard Dairies v. Kraft Foods, Inc.,*
  232 F.3d 979 (9th Cir. 2000)........................................................................................... 26

27

*Kona Enters., Inc. v. Estate of Bishop,*
  229 F.3d 877 (9th Cir. 2000)........................................................................................... 27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Kottle v. Northwest Kidney Centers,*
       146 F.3d 1056 (9th Cir. 1998)...................................................................... 30

4    *Lantzy v. Centex Homes,*
       31 Cal.4th 363 (2003) ................................................................................. 34

5

6    *Lukovsky v. City & Cnty. of San Francisco,*
       535 F.3d 1044 (9th Cir. 2008)...................................................................... 34

7    *M&F Fishing, Inc. v. Sea-Pac Insurance Managers, Inc.,*
       202 Cal.App.4th 1509 (2012) ...................................................................... 34

8    *MacKay v. Sup. Ct.,*
       188 Cal. App. 4th 1427 (2010) ......................................................... 26, 27, 29

9    *Mangum v. Action Collection Serv., Inc.,*
       575 F.3d 935 (9th Cir. 2009)........................................................................ 32

10

11   *Murphy Tugboat Co. v. Shipowners & Merch. Towboat Co.,*
       467 F. Supp. 841 (N.D. Cal. 1979),
       *aff'd sub nom. Murphy Tugboat Co. v. Crowley,* 658 F.2d 1256 (9th Cir. 1981)...................... 18

12   *Norcen Energy Resource Ltd. v. Pacific Gas & Electric Co.,*
       No. C–94–0911–VRW, 1994 WL 519461 (N.D. Cal. Sept. 19, 1994) .................................... 23

13

14   *Nw. Pub. Commc'ns Council v. Qwest Corp.,*
       538 Fed. Appx. 822 (9th Cir. 2013) .............................................................. 25

15   *Oliver v. SD-3C LLC,*
       751 F.3d 1081 (9th Cir. 2014)...................................................................... 35

16   *Pacific Bonding Corp. v. John Garamendi,*
       No. GIC815786 (Cal. Super. Ct. Feb. 24, 2004)............................................... 4

17   *Parker v. Brown,*
       317 U.S. 341 (1943)..................................................................................... 22

18

19   *People ex rel. City of Santa Monica v. Gabriel,*
       186 Cal.App.4th 882 (2010) ......................................................................... 27

20   *Perez v. State Farm Auto. Ins. Co.,*
       391 Fed. Appx. 653 (9th Cir. 2010)......................................................... 27, 28

21   *Perry v. Fidelity Union Life Ins. Co.,*
       606 F.2d 468 (5th Cir. 1979), *cert. denied,* 446 U.S. 987 (1980)............................ 21

22   *Phonetele, Inc. v. American Tel. & Tel. Co.,*
       664 F.2d 716 (9th Cir. 1981)........................................................................ 22

23

24   *Poller v. Columbia Broad. Sys., Inc.,*
       368 U.S. 464 (1962)....................................................................................... 8

25   *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union,*
       No. 11-CV-2652-GPC-RBB, 2013 WL 3873074 (S.D. Cal. July 25, 2013)........................ 17

26   *Rowe v. Educ. Credit Mgmt. Corp.,*
       559 F.3d 1028 (9th Cir. 2009)......................................................................... 7

27   *Ryan v. Microsoft Corp.,*
       147 F.Supp.3d 868 (N.D. Cal. 2015) ............................................................ 33

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Samsung Elecs. Co. v. Panasonic Corp.*,
747 F.3d 1199 (9th Cir. 2014)............................................................................ 35

4

*Schmidt v. Found. Health*,
35 Cal. App. 4th 1702 (1995) ............................................................................ 24

5

*Shames v. California Travel & Tourism Comm'n*,
626 F.3d 1079 (9th Cir. 2010)............................................................................ 23

6

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
476 U.S. 409 (1986) ......................................................................................... 25

7

*Standard Iron Works v. ArcelorMittal*,
639 F. Supp. 2d 877 (N.D. Ill. 2009) ................................................................ 13

8

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
No. 09-cv-0560, 2010 WL 3521979 (E.D. Cal. Sept. 3, 2010) .............................. 17

9

10

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011)......................................................................... 7, 13

11

*State Farm Mut. Auto. Ins. Co. v. Garamendi*,
32 Cal.4th 1029 (2004) .................................................................................... 24

12

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003)............................................................................ 24

13

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008)............................................................................ 16

14

15

*Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*,
295 F.3d 918 (9th Cir. 2002).............................................................................. 26

16

*TYR Sport Inc. v. Warnaco Swimwear Inc.*,
679 F. Supp. 2d 1120 (C.D. Cal. 2009) .............................................................. 18

17

*Union Labor Life Ins. Co. v. Pireno*,
458 U.S. 119 (1982) ..................................................................................... 20, 21

18

19

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973) ........................................................................................... 8

20

*United States v. Title Ins. Rating Bureau of Ariz., Inc.*,
700 F.2d 1247 (9th Cir. 1983).............................................................................. 21

21

*Wahl v. Am. Sec. Ins. Co.*,
No. C 08-0555, 2010 WL 4509814 (N.D. Cal. Nov. 1, 2010)................................ 28

22

*Walker v. Allstate Indem. Co.*,
77 Cal. App. 4th 750 (2000) ............................................................................ 29

23

24

*Western Landscape Const. v. Bank of Am. Nat'l Trust & Sav. Ass'n*,
58 Cal.App.4th 57 (1997) ................................................................................ 27

25

*Wortman v. All Nippon Airways*,
854 F.3d 606, 617 (9th Cir. 2017)................................................................. 24, 25

26

**Statutes**

27

10 C.C.R. § 1642.1.............................................................................................. 27

28

15 U.S.C. § 1012(b) ......................................................................................... 20

## TABLE OF AUTHORITIES
### (continued)

**Page**

15 U.S.C. §§ 1011-1015 ............................................................................................... 20

Cal. Bus. & Prof. § 17200 ........................................................................................... 33

Cal. Ins. Code § 1861.05(a) ............................................................................... 5, 27, 28

Cal. Public Util. Code § 739.6 ................................................................................... 23

Section 2054.4 of Title 10 California Code of Regulations ............................................ 4

**Rules**

Fed. R. Civ. P. 15 ....................................................................................................... 36

**Other Authorities**

https://www.insurance.ca.gov/01-consumers/170-bail-bonds/ ....................................... 4

State of California Attorney General, *Antitrust Guidelines for the Insurance Industry*
    34-35 (Mar. 1990) ................................................................................................ 26

1
2
3
4
5

> I can safely predict that if left unchecked, rampant premium discounting will result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward.  Simple economics dictates it.  I urge all of us to recognize the serious nature of the threats to our industry and work collectively to repel them.  Leaving profit on the table, in the form of discounts or uncollected accounts receivable, is a fool's game.  It reminds me of stripping the wood off the walls for a fire to stay warm.  It works briefly but eventually you have no fire and no building.

6
7
8
9

> - *Defendant William B. Carmichael, President and CEO, Defendant American Surety Company since 2004, current Chairman of Defendant American Bail Coalition* (March 2005). (Declaration of Adam Gitlin ("Gitlin Decl."), Ex. 1.)

10

## I.    **INTRODUCTION**

11    Defendants ask this Court to dismiss as "inherently implausible" an alleged conspiracy

12 that Defendant Carmichael described.  Dkt. 56 at ECF 13.  Carmichael explained why the

13 conspiracy he "urge[d]" made economic sense to bail agents and bail sureties alike.  Carmichael

14 identified the "serious threat" of "rampant premium discounting" ("both legal and illegal"), a

15 threat so serious that "if left unchecked" would "end the bail bond business as we know it, to be

16 replaced by a new model that properly reflects the proper balance of risk and reward."  Gitlin

17 Decl. Ex. 1.  Market competition would harm sureties because they would be forced to "accept

18 less and less as their share of the premium in the form of higher and higher commission rates to

19 the agents." *Id.*  "Sureties will not stand still for incurring losses directly while being

20 compensated as a secondary guarantor.  Decisions will be made by carriers to either leave the

21 market entirely (as evidenced by our loss of a significant number of bail writers recently) or to

22 consider alternative methods of distribution or compensation." *Id.*  Agents would also suffer.

23 "Eventually, the surety market is going to realize that the party who is expected to provide first

24 dollar loss payment (the agent) has been so financially weakened as to be incapable of doing so,

25 regardless of the extremely high commission rate." *Id.*  What was Carmichael's solution?

26 Defendants needed to "work collectively to repel" competition. *Id.*  And that is exactly what

27 Defendants did, in violation of the antitrust laws.

28    Defendants have no response to these admissions other than to say that they are taken out

1   of context (they are not, *see* Gitlin Decl. Ex. 1), or that they are merely the personal musings of

2   someone incapable of colluding with his competitors.  Dkt. 56 at ECF 34.  But Plaintiffs did not

3   find these admissions in a personal diary of a delusional bail agent who failed to grasp how his

4   industry worked.  These statements were a call to action from one of the industry's foremost

5   experts and leaders.  Carmichael was (and remains) President and CEO of Defendant American

6   Surety Company since 2004, and is Chairman of the cash bail industry's leading trade

7   association: Defendant American Bail Coalition.  Carmichael was perfectly positioned to

8   orchestrate and maintain the conspiracy he described and that Plaintiffs here allege.

9       Why should the Court conclude that discovery will plausibly yield evidence of the

10   conspiracy Carmichael urged the industry to undertake?  Because, despite the facts that California

11   voters passed Proposition 103 in 1988 permitting insurers to charge less than the maximum prices

12   authorized by the California Department of Insurance ("CDI"), and that a California Superior

13   Court expressly authorized bail bond premium discounting in 2004, bail bond sureties and agents

14   in California have somehow avoided competing on price, and essentially never advertise

15   discounts below their authorized maximum price.  Defendants' inability to provide the Court with

16   even a *single* example of advertised premium discounting speaks volumes.  Instead, Defendants

17   assert that rebating is "no secret," and cite only to statements by CDI and a 1993 *New York Times*

18   article that has nothing to do with bail bonds.  Dkt. 56 at ECF 17.  This absence of competitive

19   behavior is inexplicable but for collusion.  Without collusion, "simple economics dictates" that

20   unilateral action would have resulted in a market-wide shift away from supracompetitive profits

21   to a "new model that properly reflects the proper balance of risk and reward"; namely, "rampant

22   premium discounting" that would lower commissions to agents, lower profits to sureties, and

23   lower prices to consumers.  Gitlin Decl. Ex. 1.  That did not happen because Defendants

24   succeeded in "work[ing] collectively to repel" that competitive outcome.  *Id.*

25       In short, the Court need only credit Defendants' own statements to conclude that the

26   alleged conspiracy is, at the very least, plausible.

27       Defendants also argue that California citizens should not receive the benefit of the

28   Proposition they passed because Defendants are entitled to price-fix with impunity.  Fortunately

-2-

for California consumers, Defendants are wrong. First, fixing bail bond prices is not the legitimate business of insurance, and thus Defendants cannot benefit from the McCarran-Ferguson Act. Second, Defendants' conspiracy cannot be State action. California has not clearly articulated a State policy displacing competition for bail bond sales. To the contrary, California has unambiguously done the opposite by passing Proposition 103. Third, the filed rate doctrine does not apply to Plaintiffs' claims. CDI-approved maximum prices are merely a ceiling, not a floor. Bail bond prices may be discounted without supervision or approval by the State. The filed rate doctrine also does not apply to Cartwright Act claims or claims for injunctive relief. Fourth, CDI does not have exclusive jurisdiction over Plaintiffs' antitrust claims. Far from it: CDI has *no* jurisdiction over Plaintiffs' claims because CDI is *statutorily prohibited* from investigating or enforcing the competitiveness of bail bond prices. Further, CDI does not review or approve premium discounts. The proper—and only—forum to resolve Plaintiffs' antitrust claims is this Court. Fifth, Defendants cannot seek refuge under the *Noerr-Pennington* doctrine because Defendants did not effectuate their conspiracy through protected government petitioning. Defendants colluded among themselves in order to contravene State policy, not to change State policy through lawful means.

Finally, Defendants' statute of limitation arguments fail because Plaintiffs purchased their bail bonds within the statutory period, and, with respect to absent class members' claims, have adequately pled tolling through fraudulent concealment, delayed accrual under the discovery rule, and equitable estoppel.

Defendants' motions to dismiss should be denied.

## II.     STATEMENT OF FACTS

This case challenges a conspiracy to fix the prices of bail bonds in California.

State courts set bail for persons accused of crimes at amounts far exceeding what they can typically pay out-of-pocket. CAC ¶ 2. Those who cannot afford to post bail themselves must obtain a bail bond from an agent of a surety. The cost of a bail bond is a non-refundable "premium," which is a percentage of the bail amount. *Id.* ¶ 56. With almost no exception, sureties authorized to transact in California set the baseline premium level at 10%, and offer a

1   somewhat lower premium of 8% if the accused fits into certain defined categories, such as if they

2   are represented by a private attorney rather than a public defender.  *Id.* ¶¶ 61, 90.  For instance, if a

3   Court sets bail at $100,000, the accused must pay $10,000 (or $8,000) to a bail agent to obtain a

4   bail bond from a surety.  The purchaser of the bail bond loses that money immediately upon

5   release, and does not receive any of it back, regardless of whether the accused appears as

6   scheduled.  *Id.* ¶ 57.  Bail premiums are usually a tremendous expense to those paying for it, who

7   are commonly impoverished family members of the accused.  *Id.* ¶ 2.

8          Sureties face essentially zero risk.  Criminal defendants rarely jump bail, and when they

9   do, the bond, even if forfeited, is typically exonerated.  CAC ¶ 63.  Indeed, Defendant Jerry

10   Watson boasted that AIA has never written a single check to pay a bail loss despite operating for

11   107 years and underwriting $700 million in bail bonds annually.  *Id.*  A municipal report from

12   San Francisco confirms that 80% of forfeited bail bonds are exonerated, and "bail bond agencies

13   are rarely held accountable to the courts when an individual fails to appear."  *Id.*  The large

14   revenues thanks to both pricing and volume, and the nearly zero-risk associated, contribute to

15   profit margins that are unlike those of any other insurance industry.  *Id.*

16   In 1988, California voters passed Proposition 103, repealing then-existing prohibitions on

17   discounting insurance products, to encourage competition in insurance markets.  CAC ¶ 66.  In

18   2004, a California Superior Court made clear that Proposition 103 extended to bail bonds, and

19   enjoined the California Department of Insurance ("CDI") from enforcing a bail bond anti-rebating

20   regulation (Section 2054.4 of Title 10 California Code of Regulations).  *Pacific Bonding Corp. v.*

21   *John Garamendi*, No. GIC815786 (Cal. Super. Ct. Feb. 24, 2004) (Dkt. 57-2).  From that point

22   forward, bail agents were free to lawfully discount bail bond prices below the maximum rates

23   sureties submitted to CDI.  CAC ¶ 67.

24          CDI acknowledges, and Defendants concede, that Proposition 103 and *Pacific Bonding*

25   permit bail agents to offer competitive discounts below approved premium rates.  *See* https://

26   www.insurance.ca.gov/01-consumers/170-bail-bonds/ ("A bail agent may choose to negotiate a

27   lower fee by rebating, as allowed by Proposition 103.").  CDI reviews and approves maximum

28   prices that sureties submit, however CDI is prohibited from, and does not, assess whether the

1   maximum prices submitted to it result from unlawful coordination among competing sureties, nor

2   does CDI conduct any review or supervision of premium discounts offered.  *See* Cal. Ins. Code §

3   1861.05(a) ("[i]n considering whether a rate is excessive, inadequate or unfairly discriminatory,

4   no consideration shall be given to the degree of competition . . . .").

5          Despite Proposition 103 and *Pacific Bonding*, bail bond premiums in California have not

6   budged, and remain effectively non-negotiable.  CAC ¶¶ 91, 120.  Bail agents tell consumers they

7   cannot offer discounts, and often go further and misrepresent that premium discounting is

8   unlawful.  *See, e.g.*, *id.* ¶ 99.  Because Defendants eliminated competition, the baseline premium

9   level has remained nearly lockstep at 10% throughout the class period.  *Id.* ¶ 120.  Thus

10  purchasers of bail bonds in California have received no benefit from Proposition 103.

11         Participants in this conspiracy fall into four groups: twenty-two Surety Defendants that

12  underwrote bail bonds in California, CAC ¶¶ 13-36; two Bail Agency Defendants who sold bail

13  bonds to California consumers, *id.* ¶¶ 37-9; three Bail Association Defendants which facilitated

14  and helped implement the conspiracy, *id.* ¶¶ 40-3; and two Individual Defendants who are veteran

15  leaders of the industry, William Carmichael and Jerry Watson, *id.* ¶¶ 44-6.

16         The Surety Defendants sold bail bonds in California during the class period and submitted

17  10% maximum prices with CDI.  CAC ¶¶ 61, 115.  All twenty-two Surety Defendants joined the

18  conspiracy because the conspiracy could not work without uniform participation.  Bail bonds are

19  quintessential commodities and are substitutes for each other.  A purchaser of a bail bond cares

20  only about getting the best price, since the utility of a bail bond does not change from surety to

21  surety.  Thus, each surety had a powerful individual incentive to encourage its agents to discount

22  in order to grab market share from its rivals.  A surety would refrain from doing so only if it was

23  assured that the other sureties would do the same.  *See id.* ¶¶ 110, 116-17.  Those assurances

24  occurred publicly, to say nothing of private communications to which Plaintiffs do not yet have

25  access.

26         The two Bail Agency Defendants are Two Jinn, Inc., which also operates as "Aladdin Bail

27  Bonds", and All-Pro Bail Bonds Inc.  CAC ¶ 37-38.  Aladdin is the largest bail agency in

28  California and is owned and controlled by a Surety Defendant, Seaview Insurance Corp.  *Id.* ¶ 72.

1    Aladdin works with Seaview to maintain the conspiracy.  Seaview submits the agreed-upon 10%

2    maximum prices to CDI, Aladdin refuses to discount, and Aladdin toes the conspiracy line and

3    tells its customers that no other bond agent is capable of offering discounts off of the agreed-upon

4    maximum prices. *Id.*¶ 73.  All Pro transacts of behalf of Surety Defendants Bankers Co. and

5    Philadelphia Reinsurance Corp, and, like Aladdin, refuses to discount.

6          The three Bail Association Defendants are the American Bail Coalition, Inc., which is a

7    trade association for the national bail underwriting industry, CAC ¶ 40, and the California Bail

8    Agents Association ("CBAA") and Golden State Bail Agents Association ("GSBAA"), which

9    represent California bail agents, *id.* ¶¶ 41-42.  CBAA hosts annual conventions each year, and

10   provides misleading material to the public designed to conceal the conspiracy.  *Id.* ¶ 81-83.  For

11   example, its website does not disclose that agents are allowed to discount but instead gives the

12   false impression that agents may only charge the CDI-approved maximum prices.  *Id.* ¶ 83.

13   CBAA also maintains a database of premiums charged by bail agents to detect and prevent

14   discounting.  *Id.* ¶ 84.  Training materials that are authored, disseminated, or otherwise endorsed

15   by the Bail Agent Association Defendants teach bail agents, "the right answer on the test: no

16   rebates."  *Id.* ¶ 88.

17         The two Individual Defendants, Carmichael and Watson, directed the conspiracy and

18   made public assurances to their competitors that they would not compete on price.  For example,

19   Watson, on behalf of Defendant surety AIA, decried "price-cutting" as a "cancer" on the AIA's

20   official website, signaling to potential competitors AIA's participation in the conspiracy and

21   urging others to follow.  CAC ¶ 75.  AIA is an insurance group composed of Defendants

22   Allegheny Casualty Company, Associated Bond and Insurance Agency, and International Fidelity

23   Insurance Company.  CAC ¶ 44.  Watson is also a Board Member of Defendant ABC.  *Id.* ¶ 44.

24   Watson understood the importance of coordinated action in light of economic challenges the

25   industry faced: a huge increase in supply (more and more bail agents), but a corresponding

26   decrease in demand (the "shrinking bail bond pie" caused by decreasing arrests).  *Id.* ¶ 111.

27         These industry veterans used their positions of power and influence to emphasize the

28   importance of collusion by the sureties:  Carmichael described "a cohesive band of agents and

1   companies whose power, when combined, far exceed[s] the power of an unorganized group of

2   single businesses." CAC ¶ 77.  Carmichael also explained that Defendant ASC "actively

3   participate[s] in just about every agents' association that we know of," due to the "important role

4   a surety must play in protecting our markets." CAC ¶ 80.  "Protecting [sureties'] markets" means

5   that deviation by bail agents is not tolerated.  For example, bail agent Chad Conley reported that

6   Proposition 103 allowed bail agents to discount below the maximum prices and in response

7   received pressure from a "good ol boys club" which "came after [his] license for trying to save

8   clients' money." CAC ¶ 105.  And Defendant Carmichael threatened bail agents who offered

9   premium discounts as follows:  "I don't know who the math wiz was who thought that [premium

10  discounting] was a good idea but they get my vote for a lifetime in Guantanamo." CAC ¶ 106.

11  **III.   LEGAL STANDARD**

12       *Twombly* requires that the plaintiff allege "enough facts to state a claim to relief that is

13  plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court must

14  "accept all factual allegations in the complaint as true and construe the pleadings in the light most

15  favorable to the nonmoving party."  *Rowe v. Educ. Credit Mgmt. Corp.*, 559 F.3d 1028, 1029-30

16  (9th Cir. 2009) (citation and quotation omitted).  "If there are two alternative explanations, one

17  advanced by [the] defendant and the other advanced by [a] plaintiff, both of which are plausible,

18  [a] plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."  *Starr v. Baca*, 652

19  F.3d 1202, 1216 (9th Cir. 2011).  An antitrust complaint's allegations of parallel conduct need

20  only be accompanied by a factual context sufficient to "nudg[e] th[e] claims across the line from

21  conceivable to plausible . . . ." *Twombly*, 550 U.S. at 570.  These allegations "are not to be judged

22  by dismembering [the conspiracy] and viewing its separate parts, but only by looking at it as a

23  whole."  *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377,

24  at *30 (N.D. Cal. Oct. 2, 2014) (citation and quotation omitted); *see also Cont'l Ore Co. v. Union

25  Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (same).

26       "Asking for plausible grounds to infer an agreement does not impose a probability

27  requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable

28  expectation that discovery will reveal evidence of illegal agreement."  *In re Cathode Ray Tube*

1    *(CRT) Antitrust Litig.*, MDL No. 1917, 2013 WL 5425183, at *2 (N.D. Cal. Sept. 26, 2013)

2    (quoting *Twombly*, 550 U.S. at 556).  A complaint satisfies *Twombly* if the allegations, taken as a

3    whole, are not "facially implausible." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir.

4    2008).  As the Seventh Circuit has explained, a court should deny a Rule 12 motion even if the

5    complaint establishes only a "nonnegligible probability that the claim is valid; . . . the probability

6    need not be as great as such terms as 'preponderance of the evidence' connote." *In re Text*

7    *Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).  In assessing allegations of

8    conspiracy, it is important to keep in mind that "motive and intent play leading roles" and "the

9    proof is largely in the hands of the alleged conspirators . . . ." *Poller v. Columbia Broad. Sys.,*

10   *Inc.*, 368 U.S. 464, 473 (1962); *Hosp. Bldg. Co. v. Trs. of Rex Hosp.*, 425 U.S. 738, 746 (1976).

11   An antitrust conspiracy "is generally covert and must be gleaned from records, conduct, and

12   business relationships." *Callahan v. A.E.V., Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996).  Hence,

13   "circumstantial evidence is the lifeblood of antitrust law . . . ." *United States v. Falstaff Brewing*

14   *Corp.*, 410 U.S. 526, 536 n.13 (1973).  This is particularly true in assessing allegations drafted

15   without the benefit of discovery.

16   **IV.    ARGUMENT**

17      **A.    Plaintiffs Allege A Plausible Antitrust Conspiracy To Fix The Prices of Bail
               Bonds in California**

18

19          **1.    Actions To Eliminate Price Competition**

20          Proposition 103 and *Pacific Bonding* posed a clear threat to the extraordinary profitability

21   of the bail bond business in California.  Without coordinated action, Defendants knew that

22   premium discounting would introduce competition and force prices to fall, reducing profits to

23   agents and sureties alike.  As Carmichael put it, their pricing practices would be "replaced by a

24   new model that properly reflects the proper balance of risk and reward."  CAC ¶ 78.  Defendants

25   responded swiftly, led by Carmichael, Watson, and other senior executives.  They assured each

26   other that they would not allow discounting to occur, and worked through their trade associations

27   and agents to make sure no one cheated.  Since the Surety Defendants knew they would not

28   undercut each other with discounts off of the maximum rates, they could safely coordinate on the

1   rate submissions and maintain them at the default 10% level, throughout the class period.  As

2   Carmichael explained, coordination was required to avoid the competitive outcome that "simple

3   economics" would otherwise dictate.  Gitlin Decl. Ex. 1.

4          This parallel behavior is evidence of conspiracy, particularly because the parallel acts

5   would not have occurred unilaterally.  *See*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586

6   F. Supp. 2d 1109, 1115 (N.D. Cal. 2008) ("The complaint alleges complex and unusual pricing

7   practices by defendants . . . which cannot be explained by the forces of supply and demand."); *In*

8   *re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 944 (E.D. Tenn. 2008) ("It seems to this Court to

9   be only logical that the more individual instances of parallel conduct alleged by the plaintiffs, the

10  stronger the inference that can be drawn from those acts of parallel conduct to support an illegal

11  conspiracy and the less likely it is that these parallel acts occurred unilaterally without any

12  conspiracy or agreement.").  As Carmichael explained, avoiding competitive pricing required

13  coordinated action.  Carmichael asked agents to be "our industry's eyes, ears and mouths in

14  recognizing and alerting all to the impending [attack on] the industry.  When you [agents] become

15  aware of a situation, please contact us so that we may assess the depth of the threat and work

16  alongside of you to craft an appropriate response."  CAC ¶ 79.  Former executive director of

17  Defendant ABC Dennis Bartlett explained that "[t]he bonding industry has worked hard to rectify

18  th[e] abuse" of discounting.  CAC ¶ 104.  And Michael Whitlock, a high-level executive of

19  Defendant American Surety Company recently touted the impressive coordination, calling it

20  "inspiring."  CAC ¶ 87.

21              **2.      Defendants' Own Statements Evidence the Conspiracy**

22         The CAC bolsters its allegations with statements from Defendants' own senior executives

23  that describe the conspiracy and its illicit purpose: a conspiracy to fix bail bond prices by

24  eliminating discounts and to submit maximum prices at a default level of 10%.  *See* CAC ¶¶ 66-

25  70.  The effort was industry-wide, and depended upon industry-wide communications through

26  trade associations to maintain.  *Id.* ¶¶ 70, 73, 83, 89, 90, 93-102.  Defendants' senior executives

27  also admitted how they enforced the conspiracy: by identifying and punishing those who dare to

28  discount.  CAC ¶¶ 79, 105, 106.  These statements, at the very least, plausibly suggest a

1    conspiracy.  *See In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 906

2    F.2d 432, 446-47 (9th Cir. 1990) ("evidence concerning the purpose and effect of price

3    announcements, when considered together with the evidence concerning the parallel pattern of

4    price restorations, is sufficient to support a reasonable and permissible inference of an

5    agreement").  In their motion, Defendants try to dismiss their own statements for not being even

6    more explicit.  But such evidence is "not to be disregarded because of [its] ambiguity; [indeed]

7    most cases are constructed out of a tissue of such statements and other circumstantial evidence,

8    since an outright confession will ordinarily obviate the need for a trial."  *In re High Fructose*

9    *Corn Syrup Antitrust Litig.,* 295 F.3d 651, 661-62 (7th Cir. 2002).  Indeed, "[a]ny plaintiff may

10   raise this inference of plausibility through allegations that contextually suggest an anticompetitive

11   agreement."  *In re Chocolate Confectionary Antitrust Litig.*, 602 F.Supp.2d 538, 575 (M.D. Pa.

12   2009) (sustaining Section 1 claim). And Defendants' statements are the reason their other

13   authority, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015), is

14   inapposite: there were no communications by alleged co-conspirators in that case that suggested

15   an agreement.

16                **3.       Market Factors In the Bail Industry Further Support A Plausible
                            Conspiracy**

18          The California bail bonds market, like others in which courts have denied motions to

19   dismiss, "is characterized by economic factors that courts and antitrust experts and economists

20   have found are conducive to collusive behavior," which "support[s] an inference of plausibility."

21   *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1014 (E.D. Mich. 2010); *see also In re*

22   *Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F.Supp.2d 896, 902 (N.D. Cal. 2008);

23   *Chocolate*, 602 F. Supp. 2d at 575; *In re Urethane Antitrust Litig.,* 409 F. Supp. 2d 1275, 1282

24   (D. Kan. 2006).  In particular, it is characterized by commodity products, declining demand,

25   increasing supply, high barriers to entry, and reflects loss ratios and profit margins otherwise

26   unheard of in the insurance industry.  CAC ¶¶ 62-65; 107-120.  These factors support the

27   conspiracy.

28          To begin with, there is the low loss ratio of the California bail bonds market.  An insurer's

loss ratio represents the fraction of premium revenues it must pay out in claims.  CAC ¶ 62.  The low loss ratios seen here (CAC ¶ 63) strongly suggest a lack of competition driven by collusive activity.  The CAC explains that losses in the bail industry are low, because there is very rarely the need to pay the bond.  *Id*.  The CAC quotes Defendant Watson stating that his company has *never* had to write a check to cover a bail amount.  *Id*.  At the same time, bail premium revenues are high, given both the pricing mechanism and volume.  *Id*. ¶ 64.  The CAC details the extraordinary revenue for California-licensed sureties, which topped $4.4 billion every year between 2011 and 2013, with gross profit margins likely reaching *80%*.  *Id*.  The low cost/high revenue spread exhibited in the California bail market appears in no competitive insurance market, and makes no economic sense absent a market failure in the form of collusive activity.  In a market like this with commodity products, the marginal cost of issuing another bond is only a matter of paperwork, and inexplicable profit margins, it is astounding that no price competition occurs.  *Id*. ¶ 110.

Defendants' response (Dkt. 56 at ECF 35) is to claim that the proper comparison is not loss ratio to profit margin, but loss ratio to "benefit-expense ratio," which the CAC does not address.  That benefit-expense ratios, by including certain expenses, may indicate a lower margin than loss ratios, proves nothing:  it will be true in any part of the insurance industry, unless Defendants mean to imply that their advertising costs, legal fees, and so forth are orders of magnitude higher than, say, United Healthcare's or GEICO's.  The low loss ratios seen among bail sureties show an opportunity to gain market share through discounting with little risk of pay-out.  The dearth of such conduct here supports the plausibility of the alleged conspiracy.  It is especially supportive given that several Surety Defendants sell insurance in other, properly functioning markets, yet Defendants offer no explanation for the bail industry's sui generis status.  CAC ¶¶ 62-65.  Defendants' authority, *Musical Instruments*, illustrates this point, because each guitar manufacturer's adoption of a "minimum advertised-price" policy was an economically rational, independent response to pressure from a large and important retailer, even absent collusion amongst the manufacturers.  *See Musical Instruments*, 798 F.3d at 1197.  In contrast, here, Defendants' self-interest is to compete on price in order to secure a larger market share of

the shrinking bail bond pie.  CAC ¶ 78.  The low loss ratios in the bail industry as compared to others where insurers cover risk is an "economic . . . outcome[] that [is] largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194.

The "waning demand" in the bail market also reflects a "prototypical market susceptible to conspiratorial price-fixing." *Chocolate*, 602 F. Supp. 2d at 576.  The CAC explains that the number of bail agents has increased significantly over the years, causing what Defendant Watson called in 2009 a "crowded industry."  *See* CAC ¶¶ 111-12.  At the same time, the industry is experiencing declining arrests and thus fewer bail bonds.  CAC ¶¶ 111-14.  And all bail agents and sureties offer the same product.  *Corn Syrup*, 295 F.3d at 658 (lack of differentiated product is market factor supporting conspiracy).  More bail agents and fewer bail bonds *should* result in price competition, as agents compete among themselves to offer discounts in order to get business.  CAC ¶ 78.  That the bail industry has managed to maintain nearly universal premium rates at the "maximum" level allowed by CDI suggests a "market behav[ing] in a noncompetitive manner." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) (citation and quotation omitted); *see also Text Messaging*, 630 F.3d at 628 (increasing prices in the face of steeply falling costs was "anomalous behavior" plausibly suggesting conspiracy).

In response, Defendants lean heavily on the fact that premium rates are approved through a regulatory process that wants to ensure rates are "neither too high nor too low," claiming that this might lead agents to unilaterally offer the same default maximum rates.  Dkt. 56 at ECF 35.  But that relies on the faulty assumption that the rates filed with the CDI are "standard" or "required"; in truth, they are a ceiling, but the CDI sets no floor on price.  CAC ¶¶ 108-09.  There is no "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for the fact that nearly every bail agent charges the exact same price, when they could gain more business by discounting even slightly.  Further, Defendants' alternative explanations for their behavior (Dkt. 56 at ECF 35), even if plausible, do not support granting their motion, as their own authority recognizes.  *See Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) ("If there are two alternative explanations, one advanced by defendant and the other advanced by

1  plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under

2  Rule 12(b)(6)." (quoting *Starr*, 652 F.3d at 1216)).

3       Market factors also explain why the primary actors in the conspiracy were the sureties, not

4  their agents.  There are far fewer sureties than bail agents in the state, making it easier to enforce

5  the cartel.  CAC ¶ 116.  The bail surety market also has high barriers to entry, including

6  regulatory requirements with the state and the need to establish a network of bail agents for whom

7  to underwrite bail bonds.  *See Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 883,

8  893 (N.D. Ill. 2009) (market with "significant barriers to entry, including high capital

9  requirements and regulatory barriers" was "ripe for collusion").  Indeed, that bail sureties and

10  agents compete in ways other than price further supports the conspiracy.  Bail agents routinely

11  engage in a number of unfair and often illegal solicitation schemes.  *See* CAC ¶ 119.  If the bail

12  agents themselves were responsible for the prices they charged (as Defendants contend), premium

13  discounting would be rampant, as agents aggressively compete in other ways to get customers.

14  That they nevertheless charge the same premium rates and uniformly refuse to discount further

15  suggests a conspiracy among the sureties who control their agents' behavior.  CAC ¶ 120.

16       Defendants disagree with their own senior executives and argue that "[n]one of the

17  sureties would receive an economic benefit for entering into such a conspiracy because sureties

18  must charge the approved rate regardless of whether the agent rebates a portion of its

19  commission." Dkt. 56 at ECF 36.  But a surety encouraging its agents to discount would, at a

20  minimum, allow that surety to take market share from other sureties by having its agents compete

21  more aggressively for a greater fraction of the market.  CAC ¶ 64.  In their brief, and the

22  numerous documents for which they request judicial notice, Defendants offer no explanation for

23  why one or more sureties have not sought to expand market share by encouraging discounts.

24  *Accord Cal. Comput. Prods., Inc. v. Int'l Bus. Mach. Corp.*, 613 F.2d 727, 742 (9th Cir. 1979)

25  ("Where the opportunity exists to increase or protect market share profitably by offering

26  equivalent or superior performance at a lower price, even a virtual monopolist may do so.").

27

28

1

**4.     Defendants' Involvement in Trade Associations, and the Trade Associations Themselves, Reinforce Inference of a Conspiracy**

2

3      Defendants dismiss the trade association meetings on the grounds that mere attendance in

4   a trade-association meeting does not give rise to a plausible inference of a conspiracy.  *See* Dkt.

5   56 at ECF 32.  It is not accurate to say that the CAC alleges mere membership.  To the contrary,

6   the very individuals who led these trade associations (such as Carmichael) are the same

7   executives who publically extolled the virtues of price-fixing.  If these individuals published such

8   statements on the internet, there is certainly a reasonable expectation that discovery of their

9   private communications will yield yet more evidence.  In addition, bail trade associations

10   provided a mechanism for Defendants to teach and enforce the conspiracy.  The "training"

11   sessions they provided misled agents into believing that discounting was unlawful and improper.

12   CAC ¶¶ 88-90.  Defendants dismiss these training sessions by asserting that the speaker was

13   himself not a defendant (Dkt. 56 at ECF 33), but that elides the key point, which is that such

14   training sessions taught the conspiracy—"no rebates" (CAC ¶ 88)—to agents, who then carried it

15   out.

16      Defendants point to *Citric Acid*, claiming that where a defendant did not attend a meeting,

17   a conspiracy cannot be inferred.  But that decision turned on the fact that the moving defendant

18   attended trade association meetings but *not* the separate meetings held for the purpose of fixing

19   prices.  *In re Citric Acid Litig.*, 191 F.3d 1090, 1096-98 (9th Cir. 1999).  It does not bear on the

20   question presented here, which is whether the existence of trade association meetings, attended by

21   industry leaders including at least some of the Defendants, plausibly supports a conspiracy when

22   combined with Plaintiffs' other allegations in the CAC.  In fact, when it comes to trade

23   association meetings, Plaintiffs need not "plead specific back-room meetings between specific

24   actors at which specific decisions were made."  *In re Graphics Processing Units Antitrust Litig.*,

25   527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007).  Defendants' other authority, *In re California Title*,

26   is also inapposite.  No. C 08-01341 JSW, 2009 WL 1458025, at *5 (N.D. Cal. May 21, 2009)

27   ("Participation in the rate setting organizations may have provided Defendants the opportunity to

28   discuss setting rates in California, but opportunity, without more, is not a plausible basis to

1    suggest a conspiracy.").  The CAC, by contrast, pleads association participation as one additional

2    factor supporting a plausible conspiracy, not the only means of achieving that conspiracy.

3              **5.     The CAC Alleges Facts With Sufficient Specificity As To Each
                         Defendant's Participation**[1]

4

5              "Although Plaintiffs will need to provide evidence of each Defendants' participation in

6    any conspiracy, they now only need to make allegations that plausibly suggest that each

7    Defendant participated in the alleged conspiracy."  *LCD*, 586 F. Supp. 2d at 1117; *SRAM*, 580 F.

8    Supp. 2d at 904.  *CRT* is particularly instructive on how this district's courts have approached this

9    issue.  There, the court had originally "permitted other plaintiffs to proceed not with detailed,

10   defendant-by-defendant allegations but with more general—but still plausible—contentions that

11   each defendant participated in the alleged conspiracy."  2013 WL 5425183, at *2.  But three years

12   into the case, after the plaintiffs claimed to have obtained inculpatory evidence through discovery

13   in parallel actions, the court held that when the plaintiffs had "been involved in this case for

14   years," defendant-by-defendant allegations were required, and in their absence, the motion to

15   dismiss was granted with leave to amend.  *Id.* at *2-3; *accord*, *In re Cathode Ray Tube (CRT)*

16   *Antitrust Litig.*, MDL No. 1917, 2014 WL 1091095, at *3 (N.D. Cal. Mar. 13, 2014) (reaffirming

17   that "pleadings must be plausible, but they do not have to be in the form of precisely detailed,

18   defendant-by-defendant allegations" even where plaintiff had access to written discovery

19   responses and some documents).

20             Surety Defendants.  The CAC alleges that each of the Surety Defendants participated in

21   the conspiracy by agreeing with other sureties to fix the prices of bail bonds, to instruct their

22   agents not to discount, and to file 10% maximum premium rates with CDI.  CAC ¶¶ 61; 68.

23   Indeed, the sureties' contractual agreements direct the agents to charge and collect premiums at

24   rates approved by the CDI "or in the absence of some such established rates, as may be prescribed

25   by the [surety]."  *Id.* ¶ 92.  The CAC also alleges that Sureties dictate prices to bail agents, and

26

     _____

27   [1] In addition to challenging the sufficiency of the CAC in the joint motion, certain Defendants
     challenge the allegations about them in a separate brief (Dkt. 58).  The arguments in both briefs
28   are addressed herein.  Defendants confirmed to Plaintiffs that they do not object to Plaintiffs
     responding to both opening briefs with one consolidated opposition brief.

1  that bail agents then advertise those prices and mislead consumers to think the prices are

2  mandated by law and cannot be discounted or negotiated.  *Id.* ¶¶ 92-102.  They participate in bail

3  associations that provide the opportunity to teach the conspiracy (*id.* ¶¶ 80-87); and punish

4  undercutting (*id.* ¶¶ 103-106).  These allegations put the Surety Defendants on notice of what the

5  conspiracy is and how they are alleged to have participated in it.

6          Eighteen sureties assert in their separate motion that their names do not appear in the CAC

7  except for where they are named.  Dkt. 58 at ECF 14-15.  But that ignores that they are all alleged

8  to have directed their agents not to discount, and that they file maximum rates of 10% throughout

9  the class period.  CAC ¶¶ 61, 68-69.  This is not the "generic pleading" complained of in

10  Defendants' Sixth Circuit authority, which failed to allege "when Defendants joined the []

11  conspiracy, where or how this was accomplished, and by whom or for what purpose."  *Total*

12  *Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir.

13  2008).  Instead, the CAC alleges that the Surety Defendants joined the conspiracy when they sold

14  bail bonds in California after 2004, and what they did to implement that conspiracy.  That is

15  sufficient to plead "how each individual defendant joined the alleged price-fixing conspiracy."

16  *LCD*, 586 F. Supp. 2d at 1117; *see also Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700

17  F.Supp.2d 378, 394 (S.D.N.Y. 2010) ("A § 1 complaint must adequately allege the plausible

18  involvement of each defendant and put defendants on notice of the claims against them, but it

19  need not be detailed with overt acts by each defendant."); *Milk*, 555 F.Supp.2d at 949 (so long as

20  plaintiffs plead the requisite contours of a claim against an antitrust defendant, "[t]hat they require

21  only a few paragraphs or sentences to do so is of no consequence").

22          Defendants' remaining cases are inapposite.  For example, *In re Late Fee* (Dkt. 58 at ECF

23  22) simply mentions that the allegations were collective but does not discuss it nor dismiss the

24  Sherman Act claim on that basis.  *See In re Late Fee & Over-Limit Fee Litig.,* 528 F. Supp. 2d

25  953, 956 (N.D. Cal. 2007), *aff'd,* 741 F.3d 1022 (9th Cir. 2014).  Similarly, the complaint in

26  *Prime Healthcare* was that the conspiracy was "plagued by vagueness and ambiguity," not that it

27  relied on purported "group pleading."  *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,

28  No. 11-CV-2652-GPC-RBB, 2013 WL 3873074, at *9 (S.D. Cal. July 25, 2013); *see also Jung v.*

1   *Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 165 (D.D.C. 2004) (refusing to impute actions of

2   organization's members to the organization absent allegations that the organization participated in

3   the conspiracy); *Corazon v. Aurora Loan Servs., LLC*, No. 11-00542 SC, 2011 WL 1740099, at

4   *4 (N.D. Cal. May 5, 2011) (dismissing complaint against loan *servicer* where plaintiff failed to

5   explain connection to alleged conspiracy among loan *originators*); *Stanislaus Food Prods. Co. v.*

6   *USS-POSCO Indus.*, No. 09-cv-0560, 2010 WL 3521979, at *18 (E.D. Cal. Sept. 3, 2010)

7   (dismissing where, unlike the single conspiracy alleged here, plaintiffs alleged four distinct

8   conspiracies without identifying which defendant participated in which). *In re Sagent Tech., Inc.,*

9   *Derivative Litig.*, 278 F. Supp. 2d 1079, 1094 (N.D. Cal. 2003), disposed of breach of fiduciary

10  duty claims because the complaint lacked information on when specific individuals breached their

11  particular fiduciary duties (not an antitrust case).

12     Bail Agency Defendants. Two Jinn (Dkt. 56 at ECF 27-28) and All-Pro (Dkt. 58 at ECF

13  14-15) claim that the CAC impermissibly relies on group pleading.  They sold bail bonds to

14  Plaintiffs at inflated rates.  CAC ¶¶ 11-12.  The CAC makes numerous specific allegations that

15  Two Jinn (more commonly known as Aladdin Bail Bonds), is at the heart of the conspiracy and is

16  vertically integrated with its own surety.  *See generally* CAC ¶¶ 72-74.  The CAC alleges that

17  Aladdin misleads consumers by suggesting that it cannot offer discounts, and states that no

18  competitor prices lower (that is, that no competitor discounts).  CAC ¶ 73.  All-Pro does the

19  same; it failed to offer Ms. Crain a rebate and sold her a bail bond at an inflated price.  CAC ¶ 11.

20     The Individual Defendants. The Individual Defendants Carmichael and Watson separately

21  move to dismiss the claims against them (Dkt. 58 at ECF 15-18).  From their perches at the

22  highest levels of the California bail industry, Carmichael and Watson were ideally situated to

23  implement and enforce the alleged conspiracy among the sureties, bail agents, and associations.

24  *Id.* ¶¶ 77, 80.  Carmichael made thinly veiled threats in service of enforcing the conspiracy.  *Id.* ¶

25  78.  Carmichael and Watson's positions also allowed them to approve and ratify the conduct of

26  ASC and the AIA Defendants, respectively, and both explain that their success in the bail market

27  is dependent upon avoiding lawful competition through eliminating premium discounting.  *Id.* ¶¶

28  75 and 78.  Carmichael and Watson are separately liable as executives because they approved and

ratified price fixing that they knew was occurring at their own companies and associations.  *See Murphy Tugboat Co. v. Shipowners & Merch. Towboat Co.*, 467 F. Supp. 841, 851-852 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981).  Principals may be liable for the conduct of their employer on the basis of either their direct action or knowing approval or ratification of "inherently wrongful conduct."  *Id.* at 852–53.

The Industry Association Defendants.  The CAC also states a claim against the three Industry Association Defendants: the American Bail Coalition, Inc., the California Bail Agents Association, and the Golden State Bail Agents Association.  "[I]t is beyond debate that nonprofit organizations can be held liable under the antitrust laws." *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 576–78 (1982); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1144–47 (9th Cir. 2003), *as amended on denial of reh'g* (Apr. 24, 2003).  There is no requirement that all members of the conspiracy be "market participants" or that a non-participant in the market cannot benefit from anticompetitive behavior.  *See TYR Sport Inc. v. Warnaco Swimwear Inc.*, 679 F. Supp. 2d 1120, 1135–36 (C.D. Cal. 2009) (denying motion to dismiss and finding no merit to argument that Section 1 conspiracy requires all members to be "market participants").

As described above, the CAC alleges specific facts concerning the Industry Association Defendants.  They participate in the conspiracy by providing meetings where the Surety Defendants can meet among themselves and with bail agents to eliminate price competition.  CAC ¶¶ 81-87.  The Industry Association Defendants also provide training for bail agents that emphasizes that discounts should not be offered.  *Id.* ¶¶ 89-90; *see In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1160 (D. Idaho 2011) (allegation that defendants created non-profit organizations to manage supply and fix prices of goods was evidence of formalization of conspiracy); *see also Hydrolevel*, 456 U.S. at 576 (industry association that facilitated coordination "is in the best position to take precautions that will prevent future antitrust violations").  The CAC also alleges specific statements by certain associations that are consistent with the conspiracy: the CBAA states that "[b]ail agents representing a company must charge the same, filed rates" (*i.e.*, the maximum rates) but does not disclose that agents may discount freely.

1    CAC ¶ 83.  The Associations also keep information about premiums charged that can be used to

2    identify and deter deviation from the agreed-upon rates, including those that discount.  *See* CAC

3    ¶¶ 84, 104-06.

4        The Industry Association Defendants' authorities (Dkt. 58 at ECF 20-21) miss the mark

5    because they deal with situations where the agreements were merely made by others at

6    association meetings without misconduct by the association itself.  *See In re German Auto.*

7    *Manufacturers Antitrust Litig.*, No. MDL 2796 CRB (JSC), 2019 WL 2509771, at *9 (N.D. Cal.

8    June 17, 2019) (allegations only vaguely referred to "clandestine agreements to limit

9    technological innovation") (citation and quotation omitted); *In re Musical Instruments*, 798 F.3d

10   at 1196–97 ("[M]ere participation in trade-organization meetings where information is exchanged

11   and strategies are advocated does not suggest an illegal agreement"); *Graphics*, 527 F. Supp. 2d

12   at 1023 ( "[t]he sum of their allegations of agreement is that executives from [defendant

13   corporations] attended the same conferences and trade meetings").  *Citric Acid* was decided on

14   summary judgment and here, unlike there, Plaintiffs do not merely allege that the trade

15   associations "[g]ather[] information about pricing," *Citric Acid*, 191 F.3d at 1098, but also that

16   they use it "to detect and prevent premium discounting," CAC ¶ 84.

17       <u>Defendant Lexington</u>.  Finally, Defendant Lexington moves to dismiss on the grounds that

18   the CAC alleges insufficient facts concerning its involvement in the conspiracy.  Dkt. 58 at ECF

19   22-23.  That argument fails for the same reason the others do:  the CAC alleges that Defendants,

20   including Lexington, participated in the conspiracy by agreeing to fix prices, by agreeing to

21   instruct its agents not to discount, and by agreeing to submit the same uniform 10% maximum

22   rate.  The specific representations by Padilla Bail Bonds on behalf of the surety further support

23   Lexington's involvement, because they suggest that California "mandate[s]" a 10% premium

24   (when it does not) and that the only discounts available are to 8% in certain circumstances.  CAC

25   ¶ 94.  This plausibly supports Lexington's involvement in the conspiracy.

26       At the pleading stage Plaintiffs are only required to "make allegations that plausibly

27   suggest that each Defendant participated in the alleged conspiracy."  *SRAM*, 580 F. Supp. 2d at

28   904.  Plaintiffs have done so.

## B.   The CAC States A UCL Claim

Defendants' challenge to the UCL claim fails.  The violations of the Sherman and Cartwright Acts alleged in the CAC are predicate violations of law under the "unlawful" prong of the UCL.  *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1107 n.1 (9th Cir. 2013).

## C.   Defendants' Immunity Defenses Fail As A Matter of Law

### 1.   The McCarran-Ferguson Act Does Not Apply

Defendants contend that the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, protects their anticompetitive conspiracy.  Defendants are wrong—their conspiracy is not "the business of insurance," 15 U.S.C. § 1012(b); it is not part of, let alone integral to, the surety-consumer relationship; and it is effectuated substantially through the efforts of those outside the insurance industry.  In making their argument, they fail to cite, much less distinguish, the leading case applying the Act to an antitrust conspiracy:  *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205 (1979), which rejected application of McCarran-Ferguson protection to allegedly anticompetitive agreements that had nothing to do with the business of insurance—i.e., the underwriting and spreading of risk, by insurers—that the Act was meant to cover where states choose to regulate it. *See id.* at 213-220, 224.  In *Pireno*, the Supreme Court gave further structure to the test for McCarran-Ferguson applicability, explaining:

> *Royal Drug* identified three criteria relevant in determining whether a particular practice is part of the "business of insurance" exempted from the antitrust laws by § 2(b): *first*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry.

*Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129 (1982).  Defendants' misconduct does not qualify under *any* of the criteria set forth in *Pireno*.

As an initial matter, while Defendants would have the Court believe that the story begins and ends with the fact that bail is the "business of insurance," it is, at best, a question of fact whether sureties' sale through bail agents are even properly characterized as such. *Cf. United States v. Title Ins. Rating Bureau of Ariz., Inc.*, 700 F.2d 1247, 1252 (9th Cir. 1983) (home-buying escrow process does not qualify as "business of insurance").  Other courts have treated

bail bonds as a form of debt or credit.  *See, e.g.*, *Barlow v. Safety Nat'l Cas. Corp.*, 856 F. Supp. 2d 828, 834 (M.D. La. 2012) (debt); *Bailey v. Memphis Bonding Co., Inc.*, No. 18-2115, 2019 WL 1300092, at *11 (W.D. Tenn. Mar. 21, 2019) (credit).  That some Defendants engage in what is clearly the business of insurance in other industries does not extend McCarran-Ferguson protection for their conduct here, as "[t]he appropriate focus is thus the nature of the activity itself, not the type of business that is conducting it." *Perry v. Fidelity Union Life Ins. Co.*, 606 F.2d 468, 470 (5th Cir. 1979), *cert. denied*, 446 U.S. 987 (1980).  Thus, if nothing else, development of a factual record on the proper characterization of bail bonds is critical before the Court can rule on this defense.

Assuming arguendo that bail bonds in principle are "the business of insurance," Defendants cannot satisfy *Pireno*.  *First*, the agreement being challenged is between sureties to fix prices and not discount, and thus has no more to do with the business of insurance than did the insurer-pharmacy agreement that *Royal Drug* ruled was outside the scope of the Act.  *Second*, the agreement challenged is not between sureties and bond purchasers, and has nothing to do with spreading risk across the latter.  *Third*, the agreements involve parties outside the insurance industry enforcing the conspiracy's aim—namely the bail agents and their associations. CAC ¶¶ 37-38, 40-42, 44-46, 69, 72-93.

Defendants' authorities are inapposite; both challenged aspects of the "insurer"-"insured" relationship.  *Buckman v. Am. Bankers Ins. Co. of Fla.*, 924 F. Supp. 1156 (S.D. Fla. 1996) relied on a Florida statute to conclude that Florida considers bail the "business of insurance," and concluded that enforcement of bail bonds was thus protected.  *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928 (9th Cir. 1983), considered a medical association and insurers' decision whether to offer malpractice insurance, a practice that was "demonstrably related to the allocation and spreading of risk, for . . . it defines a pool of insureds over which risk is spread," *id* at 932. That is not the case here.

### 2.    Defendants' Conspiracy Is Not State Action

Defendants are also wrong to challenge (Dkt. 56 at ECF 21-22) the Sherman Act claim under the state action doctrine articulated in *Parker v. Brown*, 317 U.S. 341 (1943), because there

1    is no reasonable argument that California (1) has a clearly articulated policy displacing

2    competition in the bail industry, and (2) "actively supervises" the bail industry's conspiracy.

3    California voters established the opposite by passing Proposition 103.

4         "[G]iven the fundamental national values of free enterprise and economic competition that

5    are embodied in the federal antitrust laws, 'state-action immunity is disfavored, much as are

6    repeals by implication.'" *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013)

7    (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992)).  Defendants ask the Court to

8    infer—from the mere fact that the industry is regulated—that California has "clearly articulated"

9    a policy against competition in the industry.  Were that true, all regulated industries would be

10   exempt from the Sherman Act.  *Cf. Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,

11   445 U.S. 97, 106 (1980) ("The national policy in favor of competition cannot be thwarted by

12   casting [a] gauzy cloak of state involvement over what is essentially a private price-fixing

13   arrangement.").  As the Supreme Court recently explained in *Phoebe Putney,* supervising the

14   industry itself is not enough; the defendant must establish that the anticompetitive conduct was, in

15   effect, that of the State.  568 U.S. at 225 ("[W]e recognize state-action immunity only when it is

16   clear that the challenged anticompetitive conduct is undertaken pursuant to a regulatory scheme

17   that is 'the State's own.'"); *see also Phonetele, Inc. v. American Tel. & Tel. Co.*, 664 F.2d 716,

18   736 (9th Cir. 1981) ("'state authorization, approval, encouragement, or participation in restrictive

19   private conduct confers no antitrust immunity'" absent expression of state policy to displace

20   competition with regulation (quoting *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 592–93 (1976),

21   *cert. denied*, 459 U.S. 1145 (1983)).  Defendants do not contend (nor could they) that California

22   adopted a policy authorizing sureties to fix bail bond prices through eliminating discounts and

23   colluding on premium rate submissions.  Without "a clear and affirmative state policy to displace

24   pure competition with regulation or monopoly," *Shames v. California Travel & Tourism*

25   *Comm'n*, 626 F.3d 1079, 1083 (9th Cir. 2010), as a predicate, especially in the face of Proposition

26   103's endorsement of discounting and market competition, Defendants cannot satisfy the state

27   action doctrine's clear-articulation prong.  And even if Defendants could establish that such a

28   policy existed, active supervision, or lack thereof, cannot be demonstrated without a factual

1    record.  *See, e.g.*, *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984) ("Closer analysis is required when

2    the activity at issue is not directly that of" the State itself, but rather "is carried out by others

3    pursuant to state authorization.").

4    Defendants' only authority, an unpublished district court case, is inapposite.  Dkt. 56 at

5    ECF 21 (citing *Norcen Energy Resource Ltd. v. Pacific Gas & Electric Co.*, No. C–94–0911–

6    VRW, 1994 WL 519461 (N.D. Cal. Sept. 19, 1994)).  In *Norcen*, the defendant, a heavily

7    regulated public utility, engaged in two acts that eliminated competition.  Both were explicitly

8    applied for and approved by the supervising state agency that set the actual rates paid by

9    customers.  *See* Cal. Public Util. Code § 739.6.  That is not the case here.

**3.      The Filed Rate Doctrine Does Not Bar Plaintiffs' Claims**

**a.      The Filed Rate Doctrine Does Not Apply Because the Filed Bail Bond Premium Rates Set Only A Ceiling, Not A Floor**

13   The filed rate doctrine's rationale has no application to California's bail bond regulatory

14   system.  A brief history of the doctrine illustrates why.  It traces its roots in the antitrust context to

15   *Keogh v. Chicago & Northwest Railway Co.*, in which the Supreme Court barred a Sherman Act

16   damages claim premised on a conspiracy between common carriers to submit uniform rates for

17   agency approval, rates the agency actually reviewed and approved.  260 U.S. 156 (1922).  The

18   doctrine applied "because otherwise the paramount purpose of Congress—prevention of unjust

19   discrimination—might be defeated."  *Id.*  at 163.  If the plaintiff had been permitted to proceed,

20   "the amount recovered might, *like a rebate*, operate to give him a preference over his trade

21   competitors."  *Id.* (emphasis added).  Courts have applied the doctrine where this rationale

22   applies.  *See*, *e.g.*, *Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 867-68 (9th Cir. 2013) (doctrine's

23   purpose "concern[s] stabilizing rates and preventing pricing discrimination amongst ratepayers").

24   The rationale articulated by the Supreme Court and followed by lower courts does not

25   apply here, because, since Proposition 103, bail agents are permitted to discount beneath CDI-

26   approved maximum prices.  As Defendants acknowledge (Dkt. 56 at ECF 16-17), rebates—the

27   specific concern in *Keogh*, 260 U.S. at 163—are permitted by California law.  *See also Schmidt v.*

28   *Found. Health*, 35 Cal. App. 4th 1702, 1711 n.4 (1995) (observing that "rebating by insurance

brokers is permissible since the passage of Proposition 103"). Rebates vindicate Proposition 103's "stated purpose" of "'encourag[ing] a competitive insurance marketplace.'" *State Farm Mut. Auto. Ins. Co. v. Garamendi*, 32 Cal.4th 1029, 1041 (2004). The sizes of permissible rebates are not specified by law or otherwise constrained by CDI. Thus Proposition 103 is completely incompatible with the filed rate doctrine, and thus cannot apply here. In *Wortman v. All Nippon Airways*, for example, the Ninth Circuit refused to apply the filed doctrine where, like here, "the entire system of discount [air]fares [was] premised on varied pricing between consumers . . . ." 854 F.3d 606, 617 (9th Cir. 2017). The California Court of Appeal has also explained that "under California's system regulating insurance rates, insurers are allowed to rebate excess premiums to their policyholders," so the filed rate doctrine "*would have no application*." *Fogel v. Farmers Grp., Inc.*, 160 Cal. App. 4th 1403, 1418 (2008) (emphasis added); *see also Ting v. AT&T*, 319 F.3d 1126, 1143-44 (9th Cir. 2003) (filed rate doctrine did not bar state law claims).

The non-justiciability rationale of avoiding "the unnecessary interjection of the courts into the rate-making process," *Carlin*, 705 F.3d at 868, is similarly inapplicable. Unlike the prototypical case where the plaintiff would have to prove that a "hypothetical lower rate" was one which the defendant "could have maintained legally," *Keogh*, 260 U.S. at 163-64, here, California law authorizes discounts without setting a floor. Because California permits such discounting, any price below the filed maximum "could have [been] maintained legally." *Id.* That is unlike the regulatory scheme in the case cited by Defendants, *County of Stanislaus v. Pacific Gas & Electric Company*, 114 F.3d 858, 861 (9th Cir. 1997), which did not involve the CDI, where the regulated entities were not free to deviate from the rates or import volumes approved by the reviewing agencies, and where, unlike here, the agency also took competitiveness into consideration. Plaintiffs' challenge, by contrast, does not require the Court to speculate about whether lower prices would have been lawful. They would have been.

### b.   Rebates Are Not Filed With or Approved By CDI

The filed rate doctrine also does not apply because bail agents are not required to, and do not, seek approval from CDI or any other agency regarding discounts offered to consumers. *See* CAC ¶ 108. Discounting is a distinct and separate practice from the maximum prices submitted

to CDI.  Cal. Ins. Code § 1860 (discounts "shall not be deemed a rating plan or system" subject to review and approval).  Thus, unlike maximum premium rates, rebate amounts simply are not submitted to or reviewed by CDI. The filed rate doctrine only applies when (assuming all other conditions are met) the challenged practice is one that an agency has and exercises the authority to regulate.  *See Wortman*, 854 F.3d at 614-16 (filed rate doctrine did not bar antitrust claim based on unfiled air fares and fuel surcharges where the agency did not exercise its regulatory authority to review them); *Nw. Pub. Commc'ns Council v. Qwest Corp.*, 538 Fed. Appx. 822, 824 (9th Cir. 2013) (filed rate doctrine does not apply when "suit does not challenge filed rates").  Defendants fail to cite any authority to support application of the doctrine when, as here, that is not the case. Further, Plaintiffs allege CDI did *not* regulate rebates (CAC ¶ 108); at best, it is a factual question.  *Wortman*, 854 F.3d at 614 (on summary judgment, agreeing there were genuine disputes of material fact whether agency actually exercised its regulatory authority).

> **c.**     **The Filed Rate Doctrine Does Not Bar Plaintiffs' Claims for Injunctive Relief**

Nor does the filed rate doctrine bar Plaintiffs' injunctive relief claims (*see* CAC ¶¶ 6, 54, 135, 152).  The doctrine does not preclude claims for injunctive relief that seek to end an anticompetitive conspiracy and do not interfere with an agency's regulatory authority.  *See Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 419 (1986); *Georgia v. Penn. R. Co.*, 324 U.S. 439, 455 (1945).  Indeed, Defendants' own authority is in accord.  *In re Transpac. Passenger Air Transp. Antitrust Litig.*, 69 F. Supp. 3d 940, 946 n.1 (N.D. Cal. 2014) ("The filed rate doctrine does not bar Plaintiffs' claims for injunctive relief.").

> **d.**     **The Filed Rate Doctrine Does Not Apply to Plaintiffs' California Cartwright Act Claim**

Finally, Defendants are wrong that Plaintiffs' state law Cartwright Act claim is barred by the filed rate doctrine.  There is "no compelling underlying logic or policy reasons for denying a Cartwright Act cause of action for treble damages to a person injured by reason of a price fixing conspiracy, even if the fixed prices had been approved as reasonable by a regulatory agency." *Cellular Plus, Inc. v. Super. Ct.*, 14 Cal. App. 4th 1224, 1241-42 (1993) (declining to adopt the

1    federal filed rate doctrine vis-à-vis Cartwright Act).  This conclusion stems from "the strong

2    public policy of the Cartwright Act encouraging free and open competition and competitively

3    established prices." *Id.* at 1243.  Barring such a claim based on the filed rate doctrine "would

4    implicitly . . . encourag[e] regulated companies to engage in anticompetitive price fixing activities

5    . . . ." *Id.*

6           The Ninth Circuit recognizes that Cartwright Act claims that involve only state agency

7    review are not barred by the filed rate doctrine.  *Carlin*, 705 F.3d at 868, n.9 ("California has

8    declined to create a state filed rate doctrine even where the tariffs are filed with the state

9    regulatory agency having authority over the subject area and even if the rates have been approved

10   as reasonable by that agency."); *see also Transmission Agency of N. Cal. v. Sierra Pac. Power

11   Co.*, 295 F.3d 918, 933 n.11 (9th Cir. 2002) (similar); *Knevelbaard Dairies v. Kraft Foods, Inc.*,

12   232 F.3d 979, 992 (9th Cir. 2000) (similar); *County of Stanislaus*, 114 F.3d at 866 (similar).  The

13   California Attorney General agrees. Gitlin Decl. Ex. 7 (State of California Attorney General,

14   *Antitrust Guidelines for the Insurance Industry* 34-35 (Mar. 1990) ("AG Guidelines") (explaining

15   that "[t]he 'filed rate' doctrine does not apply to insurance rates in California" in part because

16   "Proposition 103 . . . divest[s] the commissioner of earlier authority over the competitiveness of

17   rates")).  Under California law, the state Attorney General's views "while not binding, are entitled

18   to great weight," particularly where, as here, there has been "no Legislative reaction." *Cramer v.

19   Sup. Ct.*, 130 Cal. App. 4th 42, 49 (2005).

20          Notwithstanding this authority, Defendants rely on *MacKay v. Sup. Ct.*, 188 Cal. App. 4th

21   1427 (2010).  Their reliance is misplaced.  *First*, *MacKay* only addressed the filed rate doctrine in

22   dicta, which has no force as precedent.  *Hubbard v. Sup. Ct.*, 66 Cal. App. 4th 1163, 1168 (1997)

23   ("statements of law . . . necessary to the decision [but rather] general observations, unnecessary to

24   the decision, i.e., dicta, with no force as precedents.") (citation and quotation omitted).  The

25   plaintiff in *MacKay* brought a UCL claim challenging an automobile insurer's practice of

26   considering an individual's prior insurance coverage (or lack thereof) in determining rates or

27   premiums, and the Court of Appeals concluded that the plaintiff's claim was preempted by

28   California Insurance Code section 1860.1, which sets forth an administrative process for

1   challenging certain insurance practices (discussed further *infra*, at 27-28).  188 Cal. App. 4th at

2   1448-49.  The filed rate doctrine was discussed only in dicta as further "support[]" for the court's

3   interpretation of California Insurance Code Section 1860.1, a statute it described as "analogous"

4   to the doctrine.  *Id*.  Accordingly, *MacKay* could not overrule *Cellular Plus*.  *See Western*

5   *Landscape Const. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 58 Cal.App.4th 57, 61 (1997) ("Only

6   statements necessary to the decision are binding precedents; explanatory observations are not

7   binding precedent.").  *Second*, *MacKay* pre-dates the Ninth Circuit's decision in *Carlin*.  *Carlin* is

8   binding "in the absence of any subsequent indication from the [state] courts that [its]

9   interpretation was incorrect," *Kona Enters., Inc. v. Estate of Bishop*, 229 F.3d 877, 885 n.7 (9th

10  Cir. 2000), and Defendants have not identified any such authority.  *Third*, the decision in *MacKay*

11  does not refer to, much less distinguish, *Cellular Plus* (or even refer to the Cartwright Act itself).

12  It cannot therefore constitute authority for the proposition that *Cellular Plus*'s holding with

13  respect to the viability of such Cartwright Act claims should be overruled.  *See People ex rel. City*

14  *of Santa Monica v. Gabriel*, 186 Cal.App.4th 882, 890 (2010) ("[A]ppellate courts do not

15  establish precedent by implication[.]"); *In re Marriage of Cornejo*, 13 Cal. 4th 381, 388 (1996).

16          **4.      CDI Does Not Have Jurisdiction Over Plaintiffs' Claims**

17          "[C]ourts have the 'primary, if not exclusive, jurisdiction over antitrust causes of

18  action.'" *Perez v. State Farm Auto. Ins. Co.*, 391 Fed. Appx. 653, 655 (9th Cir. 2010) (quoting

19  *Cellular Plus*, 14 Cal.App.4th at 1247).  Here, no aspect of the conspiracy that Plaintiffs

20  challenge is premised on a collateral attack on matters within CDI's purview.  The substantive

21  scope of CDI's rate-review authority is limited.  The agency only determines whether rates are

22  "excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter [the

23  Insurance Code]."  Cal. Ins. Code § 1861.05(a).  CDI's approval does not imply any immunity or

24  determination of lawfulness.  In fact, CDI's standard approval letter states that "[i]f any portion of

25  the application or related documentation conflicts with California law, that portion is specifically

26  not approved."  Gitlin Decl. Ex. 8 (excerpt from CDI rate review file).

27          Contrary to Defendants' suggestion (Dkt. 56 at ECF 14), "excessive" does not simply

28  mean "too high."  10 C.C.R. § 1642.1 (defining "excessive").  The CAC does not allege that

Defendants charge bail bond premiums that are "excessive" in any sense supervised by CDI; rather, Plaintiffs' allegation is that bail bond prices were unlawfully inflated by a conspiracy to eliminate discounts and to submit identical maximum premium rates.  A price can be supracompetitive and unlawful within the meaning of the antitrust laws whether or not it is otherwise "excessive, inadequate, [or] unfairly discriminatory" under the Insurance Code.  CDI is *prohibited* by statute from considering competition in determining whether a rate is excessive. Cal. Ins. Code § 1861.05(a).  The Ninth Circuit confirms that Section 1860.1 does not bar antitrust claims because CDI "does not consider anticompetitive forces that might influence the rate structure." *Perez*, 391 Fed. Appx. at 655.  Thus, "the [CDI] Commissioner's review of 'the economic reasonableness of prices' does not prevent antitrust claims alleging that 'the prices were in fact artificially maintained at a uniform level, whether 'reasonable' or not." *Id.* (quoting *Cellular Plus*, 14 Cal. App. 4th at 1246).

Defendants' authorities are not to the contrary; most find Section 1860.1 *inapplicable* because, as here, the challenge presented was to a matter outside CDI's jurisdiction.  *See Ellsworth v. U.S. Bank, N.A.*, 908 F. Supp. 2d 1063, 1082 (N.D. Cal. 2012) (challenge to unlawful kickbacks not barred by Section 1860.1); *Donabedian v. Mercury Ins. Co.*, 116 Cal. App. 4th 968 (2004) (insurer's use of unapproved factors to calculate premiums); *King v. Nat'l Gen. Ins. Co.*, 129 F. Supp. 3d 925, 935 (N.D. Cal. 2015) (application of incorrect rate to plaintiff); *Wahl v. Am. Sec. Ins. Co.*, No. C 08-0555, 2010 WL 4509814, at *2 (N.D. Cal. Nov. 1, 2010) (challenge to force-placed insurance practice that did not involve rate setting process).  Their two cases actually applying Section 1860.1 involved direct collateral challenges to issues clearly within CDI's purview—aspects of the rates subject to CDI's review, not the rates' competitiveness.  *See Walker v. Allstate Indem. Co.*, 77 Cal. App. 4th 750, 755 (2000) (plaintiffs' claims "each bottomed on the insurers' charging approved rates alleged nevertheless to be 'excessive' within the meaning of section 1861.05, subdivision (a)"); *MacKay*, 188 Cal. App. 4th at 1436-39 (plaintiffs challenged insurer's reliance on rating factors actually approved by CDI). They are inapplicable, as explained above.

Further, even if Section 1860.1 applied to the Cartwright Act claim, Defendants cite no

1    authority holding that it would apply to the Sherman Act. *See AT&T Commc'n Sys. v. Pac. Bell*,

2    203 F.3d 1183, 1185 (9th Cir. 2000) ("[U]nmet state exhaustion requirements bar federal court

3    review only if Congress intended them to bar review.").

### 5.    Agreeing to File Fixed Prices Is Not Protected Petitioning

5        Finally, Defendants' *Noerr-Pennington* argument fails.  Defendants claim (Dkt. 56 at ECF

6    25) that to effectuate the conspiracy alleged in the CAC, they "would need to agree on premium

7    rates before seeking regulatory approval, then approach the Department together or in parallel,"

8    *i.e.*, they would *openly* approach CDI with a proposal of *jointly* setting all their premium rates.

9    That is a mischaracterization of the CAC's allegations.  The CAC alleges an injury entirely

10   disconnected from protected petitioning or state action.

11       *Noerr* has two "distinct foundations"—the first is "the citizen's privilege of 'petitioning'

12   governmental organs to influence the governmental process"; the second is "that the restraint

13   injuring the plaintiff was proximately 'caused' by the government . . . rather than by the

14   defendant who asked the government to act as it did."  Areeda & Hovenkamp, *Antitrust Law*

15   ¶ 210a.  The CAC alleges a conspiracy that includes covertly agreeing on a uniform maximum

16   premium rate, separately filing them under the false guise of being the product of a competitive

17   industry, and then refraining from discounting from the maximum rates filed.  CAC ¶¶ 61, 66-79,

18   110-117, 120.  That is not protected conduct.  *See Harman v. Valley Nat'l Bank of Ariz.*, 339 F.2d

19   564, 566 (9th Cir. 1964); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S.

20   492, 503 (1988) ("We cannot agree with petitioner's absolutist position that the *Noerr* doctrine

21   immunizes every concerted effort that is genuinely intended to influence governmental action. If

22   all such conduct were immunized then, for example, competitors would be free to enter into

23   horizontal price agreements as long as they wished to propose that price as an appropriate level

24   for governmental ratemaking or price supports."); *see also Columbia Steel Casting Co., Inc. v.

25   Portland Gen. Elec. Co.*, 111 F.3d 1427, 1446 (9th Cir. 1996) (*Noerr-Pennington* protection

26   inapplicable where utility was "not being held liable for filing the application that resulted in the

27   1972 Order," but rather "for agreeing with [a competitor] to replace competition with area

28   monopolies in the Portland market").  Nor is CDI alleged to have blessed joint rate-filing by the

1    Defendants.  Defendants' authority, *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056 (9th Cir.

2    1998), where a kidney dialysis market incumbent *openly* lobbied to prevent a competitor's market

3    entry, is therefore irrelevant.

4              **D.      Defendants' Statute of Limitations Defenses Are Meritless**

5                       **1.      Defendants Fraudulently Concealed Their Conspiracy**

6            The statute of limitations may be tolled "if the plaintiff proves the defendant fraudulently

7    concealed the existence of the cause of action so that the plaintiff, acting as a reasonable person,

8    did not know of its existence."  *E.W. French & Sons, Inc. v. Gen. Portland Inc.*, 885 F.2d 1392,

9    1399 (9th Cir. 1989) (citing *Hennegan v. Pacifico Creative Service, Inc.*, 787 F.2d 1299, 1302

10   (9th Cir.), *cert. denied*, 479 U.S. 886 (1986)).  Fraudulent concealment is established where

11   defendants "affirmatively misled" plaintiffs; the plaintiffs "had neither actual nor constructive

12   knowledge of the facts giving rise to its claim"; and plaintiffs acted diligently "in trying to

13   uncover those facts."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)

14   (citing *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988)).

15          The CAC pleads fraudulent concealment.  *First*, Defendants affirmatively misled class

16   members through numerous deceptive statements to the public asserting that bail rates were high

17   because the law required a 10% price, not because Defendants had conspired to fix those prices

18   and refuse to offer discounts.  *See, e.g.*, CAC ¶ 73 (Defendants SIC and Aladdin Bail Bonds

19   represent that "Aladdin Bail Bonds is authorized to offer an 8% rate in addition to the standard

20   10%. Nobody has lower prices than Aladdin."); ¶ 83 (misleading statement by Defendant CBAA

21   that bail agents may only charge the "same, filed rates", i.e. the maximum prices); ¶¶ 95, 99, 100

22   (three false statements by bail agents on behalf of their sureties that a bail premium lower than

23   8% or 10 % is illegal).  These misleading and false reasons for the inflated prices charged toll the

24   statute.  *LCD*, 586 F. Supp. 2d at 1119 ("the complaint alleges many acts of fraudulent

25   concealment during the relevant period, including defendants providing numerous specific

26   pretextual reasons for the inflated prices of LCDs"); *In re Rubber Chemicals Antitrust Litig.*, 504

27   F. Supp. 2d 777, 788 (N.D. Cal. 2007) (defendant's "pretextual justifications for the inflated

28   prices of rubber chemicals" in price-fixing conspiracy was an affirmative act to conceal).

1   Further, Defendants have also punished industry dissenters to coerce and intimidate them into

2   compliance, CAC ¶¶ 104-106, another example of an affirmative act to conceal the conspiracy.

3   *See Chambers & Barber, Inc. v. Gen. Adjustment Bureau, Inc.*, 60 F.R.D. 455, 458-59 (S.D.N.Y.

4   1973) (efforts to "coerce and intimidate" agents to channel business to a particular corporation

5   was a means of concealment).

6        *Second*, Plaintiffs had no actual or constructive knowledge of the wrongdoing, and

7   "lacked the specialized economic and industry knowledge necessary to discover the conspiracy

8   sooner." CAC ¶ 124.  Defendants do not explain why pre-trial detainees without enough money

9   or collateral to post bond without resorting to a bail agent would have the economic or regulatory

10  knowledge to know that rebates were lawful, or that their absence was economically counter-

11  intuitive and suggested a conspiracy. *See Herremans v. BMW of N. Am., LLC*, No. CV-02363,

12  2015 WL 12712082, at *5 (C.D. Cal. Feb. 19, 2015) (citing cases that plaintiff's sophistication is

13  relevant to inquiry notice); *Aberin v. Am. Honda Motor Co., Inc.*, No. 16-cv-04384, 2018 WL

14  1473085, at *6 (N.D. Cal. Mar. 26, 2018) (Tigar, J.) (acknowledging relevance of consumer's

15  sophistication to fraudulent concealment).  Absent any reason to be suspicious, class members

16  were "not under a duty continually to scout around to uncover claims which they have no reason

17  to suspect they might have." *Rubber Chemicals*, 504 F. Supp. 2d at 788 (quotation omitted).  As

18  this Court recognizes, whether Plaintiffs had constructive knowledge is itself a question for the

19  jury, not the pleadings. *CRT*, 2016 WL 8669891, at *5 (Tigar, J.).

20       *Third*, the diligence requirement "is only meaningful . . . when facts exist that would

21  excite the inquiry of a reasonable person." *Rubber Chemicals*, 504 F. Supp. 2d at 788 (citing

22  *Conmar*, 858 F.2d at 504).  *See also In re Polyurethane Foam Antitrust Litig.*, 799 F.Supp.2d

23  777, 803-04 (N.D. Ohio 2011) (due diligence is adequately pled when a plaintiff alleges they had

24  no reason to know of an unlawful conspiracy); *In re Packaged Ice Antitrust Litig.*, 723 F.Supp.2d

25  987, 1018-19 (E.D. Mich. 2010) (same).  Those facts do not exist here. CAC ¶ 124.  Defendants

26  appear to suggest (Dkt. 56 at ECF 39-40) that public statements made before 2015 "support the

27  existence of the alleged conspiracy," but those statements helped *conceal* the misconduct, rather

28  than shed light on it. *See, e.g.*, CAC ¶ 99 (2010 blog post by bail agent claiming that "there is no

1   such thing as a 'discounted rate of 5%'").  Further, Defendants do not explain why Class

2   members would or should have been aware of Defendants' inculpatory statements, particularly in

3   a context of Defendants' pervasive misinformation and in the absence of a sophisticated

4   economic analysis of the bail bond industry suggesting collusion or awareness.  *See, e.g.*,

5   *Conmar*, 858 F.2d at 503-04 (denying summary judgment concerning notice of antitrust claim);

6   *CRT*, 2016 WL 8669891, at *16-17.  In any case, when the Class was put on inquiry notice and

7   whether Class members exercised due diligence are factual questions for the jury.  *See Rubber*

8   *Chemicals*, 504 F. Supp. 2d at 789 ("[I]t is generally inappropriate to resolve the fact-intensive

9   allegations of fraudulent concealment at the motion to dismiss stage, particularly where the proof

10  relating to the extent of the fraudulent concealment is alleged to be largely in the hands of the

11  alleged conspirators.").

12              **2.        The Discovery Rule Delays Accrual of Plaintiffs' Claims**

13          The CAC alleges that Plaintiffs did not know of and could not have known of Defendants'

14  conspiracy until shortly before filing suit. CAC ¶ 125.  The statute of limitations therefore never

15  began to run.  *In re Copper Antitrust Litig.*, 436 F.3d 782, 789 (7th Cir. 2006).  The discovery

16  rule applies to claims under the Sherman Act.  *See Mangum v. Action Collection Serv., Inc.*, 575

17  F.3d 935, 940–41 (9th Cir. 2009) ("We have made it clear that, in general, the discovery rule

18  applies to statutes of limitations in federal litigation . . . .");  *Fenerjian v. Nongshim Co., Ltd*, 72 F.

19  Supp. 3d 1058, 1077 (N.D. Cal. 2014) ("The discovery rule applies broadly to federal litigation,

20  including Sherman Act claims.").  Defendants' Ninth Circuit authority, *Hexcel*, does not address

21  the discovery rule at all (*see* 681 F.3d at 1060); and their remaining authorities are all non-binding

22  orders from one district court declining to apply the rule to antitrust claims.

23          The discovery rule also applies to Plaintiffs' Cartwright Act and UCL claims.  In *Aryeh v.*

24  *Canon Business Solutions, Inc.*, the California Supreme Court recognized that "the UCL is

25  governed by common law accrual rules to the same extent as any other statute," and whether the

26  discovery rule would apply depended on "the nature of the right sued upon" under the UCL.  55

27  Cal.4th 1185, 1196 (2013) (quotation and citation omitted).  The court specifically criticized prior

28  California appellate authority which relied on federal cases interpreting the Sherman Act as a

1  basis not to apply the discovery rule under the Cartwright Act, holding that "[i]nterpretations of

2  federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act,

3  given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes

4  enacted by California's sister states around the turn of the 20th century." *Id.*  That is a strong

5  indication that the California Supreme Court would permit a Cartwright Act claim brought by

6  consumers who allege they had no reason to know about the anticompetitive conspiracy or their

7  injury to invoke the discovery rule.  *See Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.4th 797, 815

8  (2005) ("It would be contrary to public policy to require plaintiffs to file a lawsuit 'at a time when

9  the evidence available to them failed to indicate a cause of action.'"); *Apr. Enters., Inc. v. KTTV*,

10  147 Cal.App.3d 805, 826-27 (1983) (discovery rule's purpose is to protect plaintiffs who are

11  "blamelessly ignorant of [their] cause of action" because it would be "manifestly unjust to

12  deprive plaintiffs of a cause of action before they are aware that they have been injured")

13  (quotation and citation omitted).

14          To argue otherwise, Defendants cite *Ryan v. Microsoft Corp.*, 147 F.Supp.3d 868 (N.D.

15  Cal. 2015) and *Garrison v. Oracle Corporation*, 159 F.Supp.3d 1044 (N.D. Cal. 2016), in which

16  Judge Koh cited her earlier holding that the discovery rule did not apply to the Cartwright Act in

17  *In re Animation Workers Antitrust Litigation*, 87 F.Supp.3d 1195, 1211 (N.D. Cal. 2015).  In

18  *Animation Workers*, Judge Koh described *Aryeh* as suggesting that the discovery rule might not

19  be appropriate "in unfair competition claims." *Id.* (quoting *Aryeh*, 55 Cal.4th at 1196-97).

20  Similarly, in *Garrison*, Judge Koh cited the same provision of *Aryeh* to mean that "the discovery

21  rule does not apply to UCL claims based purely on allegations of unfair competition."  159

22  F.Supp.3d at 1082.  As a threshold matter, *every* claim under the Unfair Competition Law is one

23  for "unfair competition"—that is the name of the law.  *See* Cal. Bus. & Prof. § 17200 ("[U]nfair

24  competition shall mean and include any unlawful, unfair or fraudulent business act or

25  practice[.]").  Yet *Aryeh* held that the rule *does* apply to some unfair competition claims.

26  Furthermore, the portion of *Aryeh* that Judge Koh relied on merely describes *M&F Fishing, Inc.

27  v. Sea-Pac Insurance Managers, Inc.*, 202 Cal.App.4th 1509, 1531-32 (2012), as one type of

28  "unfair competition claim" to which the discovery rule might not apply.  Critically, however,

*M&F Fishing* did not involve an antitrust violation or alleged price-fixing agreement, but rather an alleged "failure to provide one or more disclosure statements required by Insurance Code section 1764.1." 202 Cal. App. 4th at 1531. The Court should not follow these authorities; they do not explain why *M&F Fishing* is relevant to antitrust claims.

### 3.   Defendants Are Estopped From Benefiting From Their Own Concealment

Equitable estoppel "focuses primarily on actions taken by the defendant to prevent a plaintiff from filing suit, sometimes referred to as 'fraudulent concealment.'" *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008) (citation omitted). The test is the same under both federal and California common law. *Id.* at 1051-52. Estoppel "takes its life . . . from the equitable principle that no man [may] profit from his own wrongdoing in a court of justice." *Lantzy v. Centex Homes*, 31 Cal.4th 363, 383 (2003) (citation and quotation omitted). The critical question is whether the plaintiff's delay in filing suit has been "induced by the conduct of the defendant . . . ." *Id.* at 384 (citation and quotation omitted). Defendants ignore (Dkt. 56 at ECF 40) Plaintiffs' allegations that Defendants fraudulently concealed the conspiracy, delaying the class's claims. *See* Section IV.D.1, *supra*. Further, the basis for equitable estoppel is Defendants' misrepresentations, which are distinct from the basis for Defendants' liability, their anticompetitive conspiracy. That distinguishes this case from Defendants' authorities. Defendants' authorities are therefore inapposite. *Compare Lukovsky*, 535 F.3d at 1052 (plaintiff did "not point to any misrepresentation by the Defendants that concealed" facts relevant to discrimination claim); *Coppinger-Martin v. Solis*, 627 F.3d 745, 752 (9th Cir. 2010) (in retaliation claim, equitable estoppel not justified based on defendant's revelation of retaliatory motive because that was basis for claim).

### 4.   Plaintiffs Plead A Continuing Violation

Plaintiffs have pled facts supporting a continuous conspiracy since 2004. *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) ("To state a continuing violation of the antitrust laws in the Ninth Circuit, a plaintiff must allege that a defendant completed an overt act during the limitations period that meets two criteria: 1) It must be a new and independent act

1    that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating

2    injury on the plaintiff." (citation and quotation omitted)).  With each sale of a bail bond that

3    included an overcharge due to the conspiracy, Class members were injured anew.  *Oliver v. SD-*

4    *3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014) ("[T]he Supreme Court and federal appellate courts

5    have recognized that each time a defendant sells its price-fixed product, the sale constitutes a new

6    overt act causing injury to the purchaser and the statute of limitations runs from the date of the

7    act." (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)).  This case is distinct from

8    *Animation Workers*, where the court found "no allegations of any new or independent actions

9    taken by the Defendants" during the limitations period.  87 F. Supp. 3d at 1211-12.

10                    **5.**      **The Claims Against Danielson National Insurance Company Are**
                              **Timely**
11

12           Finally, the claims against Defendant Danielson National Insurance Company

13   ("Danielson") are also timely.  According to Danielson, because it "exited the bail bond industry

14   prior to the limitations period," the claims against it must fail. Dkt. 58 at ECF 23-24.  As

15   explained above, the claims are timely under the doctrine of fraudulent concealment, the

16   discovery rule, and equitable estoppel.  Further, the question whether Danielson adequately

17   withdrew from the conspiracy is an affirmative defense that cannot be resolved on the pleadings.

18   *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 820 F. Supp. 2d 1055, 1060 (N.D. Cal. 2011)

19   (withdrawal is an affirmative defense on which defendants bear the burden of proof); *see also*

20   *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (an affirmative defense "often requires

21   consideration of facts outside of the complaint and thus is inappropriate to resolve on a motion to

22   dismiss" unless the "facts necessary to establish the defense are evident on the face of the

23   complaint").  Danielson has not demonstrated—and cannot at this stage—that they not only

24   "exited the industry" but in fact "*cut all ties*" to the industry.  *CRT*, 2016 WL 8669891, at *8

25   (emphasis added).  Danielson's separate motion should be denied.

26   **V.**      **CONCLUSION**

27           For the foregoing reasons, Defendants' motions should be denied. Should the Court grant

28   the motion in whole or in part, Plaintiffs respectfully request leave to amend, which should be

1  "freely give[n]."  Fed. R. Civ. P. 15.

2

3  Dated:  August 14, 2019          Respectfully submitted,

4                                   */s/ Dean M. Harvey*
                                    Dean M. Harvey (SBN 250298)
5                                   Katherine C. Lubin (SBN 259826)
                                    Adam Gitlin (SBN 317047)
6                                   Yaman Salahi (SBN 288752)
                                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
7                                   275 Battery Street, 29th Floor
                                    San Francisco, CA 94111
8                                   Telephone: (415) 956-1000
                                    dharvey@lchb.com
9                                   kbenson@lchb.com
                                    agitlin@lchb.com
10                                  ysalahi@lchb.com

11                                  *Interim Class Counsel*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2          I hereby certify that on August 14, 2019, I caused the foregoing to be electronically filed

3   and served with the Clerk of the Court using the CM/ECF system to all parties of record.

4

5   DATED:  August 14, 2019          /s/ Dean M. Harvey
                                     DEAN M. HARVEY
6                                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28