1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

IN RE CALIFORNIA BAIL BOND
ANTITRUST LITIGATION

Case No. 19-cv-00717-JST

8

This Document Relates To:

**ORDER GRANTING IN PART AND
DENYING IN PART MOTIONS TO
DISMISS**

9
10

ALL ACTIONS

Re: ECF No. 56, 58

11
12

Plaintiffs Shonetta Crain and Kira Serna have filed a putative class action complaint

13

against various members of the California bail bonds industry, alleging that Defendants have

14

conspired to artificially inflate the price of bail bonds in California.  Consolidated Amended Class

15

Action Complaint ("CAC"), ECF No. 46.  Defendants have filed a motion to dismiss the CAC.

16

ECF No. 56.  A subset of Defendants have filed an additional motion to dismiss the claims against

17

them.  ECF No. 58.

18

The Court will grant in party and deny in part both motions.

19

**I.     BACKGROUND**

20

**A.     Factual Background**

21

Plaintiffs bring this action against 28 members of the California bail bonds industry.  As

22

set forth in the operative complaint, Crain purchased a bail bond from Defendant All-Pro Bail

23

Bonds Inc. ("All-Pro") in 2016 to secure the pretrial release of a relative.  CAC ¶ 11.  The bond

24

was underwritten by Defendant Bankers Insurance Company.  *Id.*  Serna purchased a bail bond

25

from Defendant Two Jinn, Inc. ("Two Jinn") in 2016 to secure her own pretrial release.  *Id.* ¶ 12.

26

That bond was underwritten by Defendant Seaview Insurance Company.  *Id.*

27

Plaintiffs allege that they paid inflated prices for these bonds due to a conspiracy by

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendants to fix the price of bail bonds in California.  They name four categories of defendants: (1) eighteen surety companies, who underwrite bail bonds sold by bail agents;[1] (2) two bail agencies, whose agents sell bail bonds to customers; (3) three bail agent associations, nonprofit trade associations for the bail industry; and (4) two individuals who have served as executives for various Defendant organizations.  *Id.* ¶¶ 13-45.  They bring the action on behalf of themselves as well as a putative class of individuals who "paid for part or all of a commercial bail bond premium in connection with a California state court criminal proceeding" between February 24, 2004 and the present.  *Id.* ¶ 47.

For the purposes of these motions to dismiss, the Court adopts the following factual allegations from the CAC.  Most criminal arrestees in California have the right to seek and post bail for their release.  *Id.* ¶ 56.  Many arrestees (or their friends or family members) who cannot afford bail purchase bail bonds to obtain pretrial release.  *Id.* ¶ 57.  Bail agents charge purchasers a non-refundable premium to post a bond with the court.  *Id.*  If the defendant attends all court dates, the bond is exonerated and the bail agency is released from liability.  *Id.*  If the defendant does not show up to court, the bond is theoretically forfeited to the court, though Plaintiffs allege that this rarely happens – both that defendants rarely "jump bail" and that, even when they do, bail agencies are usually released from their obligation to pay.  *Id.* ¶ 63.  Regardless, the purchaser does not receive any of her premium back, even if charges are dropped or never filed.  *Id.* ¶ 58.

Bail agencies contract with sureties, who underwrite the bonds.  *Id.* ¶ 91.  Sureties collect a portion of the premiums paid by purchasers while bail agents take a commission.  *Pacific Bonding Corp. v. John Garamendi*, No. GIC815786, at *3 (Cal. Super. Ct. Feb. 24, 2004) (ECF No. 57-2).[2] California law requires sureties to submit proposed premium rates to the California Department of Insurance ("CDI").  Cal. Ins. Code § 1861.05.  CDI approves the rates unless they are "excessive, inadequate, unfairly discriminatory" or otherwise unlawful.  *Id.*  Once CDI has approved a premium rate, a surety must charge that rate.  *Id.*

---

[1] Plaintiffs stipulated to the dismissal without prejudice of surety Defendant Crum & Forster Indemnity Company on July 15, 2019.  ECF No. 55.

[2] As discussed below, the Court takes judicial notice of the California Superior Court's unpublished decision in *Pacific Bonding*.  *See* ECF No. 57-2.

Bail agents, however, are permitted to offer customers rebates on bail bonds.  CAC ¶ 67.
Rebates are discounts to purchasers that come out of the bail agent's commission.  ECF No. 57-2
at 5.  In 1988, California voters passed Proposition 103, which allowed insurers to offer rebates on
insurance products, to encourage competition in insurance markets.  CAC ¶ 66; Cal. Ins. Code
§ 750(d); *see also Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805, 841 (1989) (noting that
Proposition 103 "repeals laws that . . . prohibit rebates to consumers"); *Schmidt v. Found. Health*,
35 Cal. App. 4th 1702, 1711 (1995) (noting that "rebating by insurance brokers [has been]
permissible since the passage of Proposition 103").  In 2004, a California Superior Court made
clear that Proposition 103 extended to bail bonds, and enjoined CDI from enforcing a bail bond
anti-rebating regulation (§ 2054.4 of Title 10 California Code of Regulations).  *Pacific Bonding
Corp.*, No. GIC815786 (ECF No. 57-2).  From that point forward, bail agents were free to
lawfully discount bail bond prices below the maximum rates sureties submitted to CDI.  CAC
¶ 67.  CDI points its website visitors to the *Pacific Bonding* decision, noting that "to become more
competitive, a bail agent may choose to negotiate a lower fee by rebating, as allowed by
Proposition 103."  *Id.*; *see also* ECF No. 57-3 at 4.[3]

Plaintiffs allege a conspiracy by sureties, bail agencies, bail industry associations, and two
individual Defendants "to keep default premium rates fixed at 10%, advertise them as legal
minimums, and prevent discounting or rebating as much as possible."  CAC ¶ 65.  These
allegations can be sorted into two categories: (1) the fixing of premium rates, and (2) the
prevention of rebating.

As for the first category, Plaintiffs allege that the surety Defendants have "nearly
uniformly filed for a default premium rate of 10 percent of the posted bond, with an 8 percent
maximum for consumers who meet enumerated and nearly identical criteria (*e.g.*, veterans,
homeowners, union members, government employees, or certain arrestees represented by a private
lawyer)."  *Id.* ¶ 61; *see also id.* ¶ 140(b).  In effect, Plaintiffs allege that the surety Defendants
have fixed the maximum price of bail bonds.

---

[3] The Court also takes judicial notice of two pages on the CDI website, discussed below.  *See* ECF
Nos. 57-3, 57-4.

United States District Court
Northern District of California

1     The second category of allegations is much broader.  Plaintiffs allege that, despite knowing

2  since 2004 that rebating was allowed, "Defendants have agreed to advertise only the default

3  Maximum Rate, to conceal their ability to charge a lower effective rate through rebating, and

4  generally to refrain from offering competitive rebates."  *Id.* ¶ 68.  They also allege that Defendants

5  have "misrepresent[ed] that rebating or discounting is unlawful" and "intimidate[] competitors"

6  into not offering rebates, often through retaliation.  *Id.* ¶¶ 69-70, 104.  The Court will discuss

7  specific examples of the alleged behavior where relevant below.  For now, it notes that these

8  allegations amount to a claim that Defendants have also fixed the minimum price of bail bonds.

9         **B.     Procedural Background**

10     Plaintiffs filed a class action complaint against Defendants in Alameda County Superior

11  Court on January 29, 2019.  No. 19-cv-01265-JST, ECF No. 1.  Defendants removed the action to

12  this district on March 8.  *Id.*  On March 19, the Court related Plaintiffs' case to a similar case

13  brought by a different plaintiff.  ECF No. 14.  The Court consolidated the cases pursuant to

14  Federal Rule of Civil Procedure 42(a) on May 1, ECF No. 29, and appointed interim class counsel

15  on June 3, ECF No. 44.  On June 13, Plaintiffs filed a consolidated amended class action

16  complaint ("CAC"), ECF No. 46, which the Court ruled shall relate back to January 29, 2019, the

17  date Plaintiffs filed their first complaint in state court, ECF No. 29.  The CAC brings claims for

18  violations of (1) Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) the Cartwright Act, Cal. Bus. &

19  Prof. Code § 16720; and (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

20  Code § 17200, *et seq.*  CAC ¶¶ 126-55.

21     On July 15, 2019, Defendants filed a joint motion to dismiss the CAC, ECF No. 56, along

22  with a related request for judicial notice, ECF No. 57.  The same day, a subset of Defendants filed

23  a consolidated motion to dismiss the CAC.  ECF No. 58.  Plaintiffs filed a single opposition

24  responding to both motions, ECF No. 68, as well as an accompanying request for judicial notice,

25  ECF No. 66.  Defendants filed two separate replies.  ECF Nos. 72, 74.  The Court has stayed

26  discovery pending resolution of these motions.  ECF No. 64.

27  **II.     JURISDICTION**

28     This Court has subject-matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26 and 28

United States District Court
Northern District of California

1   U.S.C. §§ 1337 and 1367.

2   **III.    REQUESTS FOR JUDICIAL NOTICE**

3          Before turning to the merits, the Court addresses the parties' requests for judicial notice.

4   "Generally, district courts may not consider material outside the pleadings when assessing the

5   sufficiency of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Khoja v.*

6   *Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).  Judicial notice provides an

7   exception to this rule.  *Id.*

8          Pursuant to Federal Rule of Evidence 201(b), "[t]he court may judicially notice a fact that

9   is not subject to reasonable dispute because it: (1) is generally known within the trial court's

10   territorial jurisdiction; or (2) can be accurately and readily determined from sources whose

11   accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  If a fact is not subject to

12   reasonable dispute, the court "must take judicial notice if a party requests it and the court is

13   supplied with the necessary information." *Id.* 201(c)(2).  The Ninth Circuit has cautioned,

14   however, that courts must be wary that the "use of extrinsic documents to resolve competing

15   theories against the complaint risks premature dismissals of plausible claims that may turn out to

16   be valid after discovery." *Khoja*, 899 F.3d at 998.  Accordingly, "a court cannot take judicial

17   notice of disputed facts contained in . . . public records," when, for instance, "there is a reasonable

18   dispute as to what the [record] establishes." *Id.* at 999, 1001.

19          **A.    Defendants' Requests**

20          Defendants' first request for judicial notice, which is unopposed, is for the *Pacific Bonding*

21   *Corp.* decision.  ECF No. 57 at 3.  The Court grants this request.  *See U.S. ex rel. Robinson*

22   *Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (taking judicial

23   notice of "proceedings in other courts, both within and without the federal judicial system, if those

24   proceedings have a direct relation to matters at issue") (citation omitted).  The Court also grants

25   Defendants' unopposed request for judicial notice of the definition of "loss ratio" on

26   Investopedia.com, a publicly available website.  ECF No. 57 at 4; *see Terraza v. Safeway Inc.*, 241

27   F. Supp. 3d 1057, 1067 (N.D. Cal. 2017).

28          Defendants next request judicial notice for two different pages on the CDI website, one of

*United States District Court*
*Northern District of California*

5

United States District Court
Northern District of California

1    which Plaintiffs cite in the CAC.  ECF No. 57 at 4; CAC ¶ 108.  The web pages themselves are

2    judicially noticeable as a general matter.  *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992,

3    998-99 (9th Cir. 2010) (taking judicial notice of information "made publicly available by

4    government entities" online, where "neither party disputes the authenticity of the web sites or the

5    accuracy of the information displayed therein").  The parties do not currently dispute the accuracy

6    of the information therein.  ECF No. 65 at 2.  The Court therefore grants notice of the two web

7    pages, though it will limit that notice to the existence of the pages should any dispute over the

8    facts therein arise in the future.  Likewise, it grants judicial notice of the existence of the CDI

9    report regarding Defendant Danielson National Insurance Company, *see* ECF No. 57 at 5, but not

10   of its content, the accuracy of which Plaintiffs dispute, ECF No. 65 at 3.

### B.      Plaintiffs' Requests

12   Plaintiffs request judicial notice of six documents currently or formerly available on

13   publicly accessible websites.  ECF No. 66 at 4-6.  They support their request as follows:

> Plaintiffs request that the Court judicially notice these materials in
> response to Defendants' assertion in their motion that some of the
> quoted statements are taken out of context and/or represent only the
> personal opinions of the author.  *See, e.g.*, Dkt. 56 at ECF 34.
> Judicial notice of the materials will allow the Court to consider the
> context of the statements.  Defendants do not contend that any of the
> statements or documents in which they appear are inauthentic.

18   ECF No. 66 at 4.  Defendants do not dispute the authenticity of these documents, ECF No. 75 at 2,

19   but they do dispute the accuracy of the statements therein, *id.*; ECF No. 73 at 3.

20   The Court starts by observing that a document is not judicially noticeable "simply because

21   it appears on a publicly available website."  *Rollins v. Dignity Health*, 338 F. Supp. 3d 1025, 1032

22   (N.D. Cal. 2018).  Plaintiffs are correct, however, that Defendants attack Plaintiffs' use of the

23   quoted statements in the CAC, *e.g.,* ECF No. 56 at 34; ECF No. 58 at 16, and so the Court grants

24   judicial notice based on the incorporation by reference doctrine.  The Court also notes, however,

25   that Plaintiffs do not discuss many of these judicially noticed exhibits in their brief, so it is unclear

26   why Plaintiffs requested judicial notice in the first place.  Where Plaintiffs failed to discuss a

27   document in their brief, the Court has not considered it.

28   Plaintiffs also seek judicial notice pursuant to Rule of Evidence 201(b) of the *Antitrust*

1   *Guidelines for the Insurance Industry* issued by the State of California Department of Justice in

2   March 1990.  ECF No. 66 at 6.  They argue that "[c]ourts in this circuit have taken judicial notice

3   of similar advisory documents from the California Attorney General's office," citing *Call v.*

4   *Badgley*, 254 F. Supp. 3d 1051, 1061 & n.5 (N.D. Cal. 2017).  Defendants oppose judicial notice

5   on the grounds that "the contents of Exhibit 7 [the *Guidelines*], a 29 year old document, do not

6   constitute an 'adjudicative fact.'"  ECF No. 73.

7         Neither side's brief is of much help to the Court on this point.  *Call* is inapposite because,

8   in that case, no party objected to judicial notice.  Nor is Defendants' argument helpful, given that

9   the contents of the *Guidelines* are not a "fact."  Ultimately, however, the dispute is beside the

10  point.  A party may cite guidelines promulgated by the California Attorney General as non-

11  binding legal authority without resorting to the use of judicial notice.  *See, e.g., People v. Jackson*,

12  210 Cal. App. 4th 525, 536 n.2 (2012); *People v. Solis*, 217 Cal. App. 4th 51, 57 (2013).  As to

13  this document, the request is therefore denied as moot.

14        Lastly, the Court grants Plaintiffs' request to judicially notice an excerpt from a CDI rate

15  review file, which they cite as an example of the savings clause CDI uses in its disposition of rate

16  filings.  ECF No. 66 at 6; ECF No. 68 at 36.  Defendants do not oppose this request.  ECF No. 73

17  n.1.

18  **IV.   LEGAL STANDARD**

19        **A.     Federal Rule of Civil Procedure 12(b)(1)**

20        "If the court determines at any time that it lacks subject-matter jurisdiction, the court must

21  dismiss the action." Fed. R. Civ. P. 12(h)(3).  A defendant may raise the defense of lack of subject

22  matter jurisdiction by motion pursuant to Federal Rule of Civil Procedure 12(b)(1).  The party

23  asserting subject matter jurisdiction bears the burden of establishing it.  *Kokkonen v. Guardian*

24  *Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

25        **B.     Federal Rule of Civil Procedure 12(b)(6)**

26        A complaint must contain "a short and plain statement of the claim showing that the

27  pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Dismissal under Federal Rule of Civil

28  Procedure 12(b)(6) "is appropriate only where the complaint lacks a cognizable legal theory or

United States District Court
Northern District of California

7

sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  A complaint need not contain detailed factual allegations, but facts pleaded by a plaintiff must be "enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While this standard is not a probability requirement, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted).  In determining whether a plaintiff has met this plausibility standard, a court must "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff. *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005).

## V.       DISCUSSION

### A.       Immunity Defenses

Defendants make a number of arguments that the alleged conduct is immune from antitrust review.   The defenses largely boil down to the same proposition:   that Defendants cannot be liable for fixing the price of bail bonds when California law requires them to submit proposed premium rates to CDI and charge only the approved premiums.   While this argument does shield Defendants' submission of proposed premium rates from Sherman Act review, it misses the point.  Plaintiffs allege not just that Defendants conspired to fix the premium rates approved by CDI, but also that they conspired to prevent rebates, effectively setting a minimum price for bail bonds in California.

Defendants contend that CDI sets "both a ceiling and a floor" for bail bond premiums and that Plaintiffs "obfuscate premiums (what the CAC fundamentally claims were fixed through the supposed conspiracy) with the agents' right to rebate purchasers some portion of their commission."  ECF No. 72 at 9-10.  It is true that when an agent offers a rebate, the savings to the

customer comes out of his commission, not the premium.  ECF No. 57-2 at 5.  It is also true that Plaintiffs sometimes incorrectly refer to the alleged rebate agreement as the fixing of premiums. *See, e.g.*, CAC ¶ 127 (accusing Defendants of "the fixing of commercial bail bond premiums sold to Plaintiffs and members of the Class . . . by restraining competition in . . . the offering of rebates or discounts from the maximum filed rate").  But Plaintiffs' core argument is that this agreement has "had the purpose and effect of fixing or inflating bail bond *prices* in California."  *Id.* at ¶¶ 128, 141 (emphasis added).  Had Defendants not conspired to prevent the offering of rebates, Plaintiffs argue, customers would be paying less for bail bonds.  The Court finds any obfuscation between premiums and prices semantic and will treat Plaintiffs' rebating arguments as an allegation that Defendants have conspired to set a minimum price for bail bonds.

And while California law does set *maximum* prices for bail bonds, Proposition 103 and *Pacific Bonding Corp.* eliminated any argument that it also sets *minimum* prices.  Defendants do not dispute this.  *See, e.g.*, ECF No. 72 at 11.  Instead, they dismiss Plaintiffs' theory "that the Defendants agreed to prohibit 3200+ agents from offering purchasers some cash back" as a "narrow claim."  *Id.*; *see also id.* at 7 n.2.  Narrow or not, however, this claim is not barred by Defendants' immunity defenses.

### 1.     McCarran-Ferguson Act

Defendants first argue that Plaintiffs' Sherman Act claim is barred by the McCarran-Ferguson Act, which exempts from federal antitrust laws "the business of insurance, but only to the extent that such business is regulated by the state, and does not involve a boycott, coercion or intimidation."  *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928, 931 (9th Cir. 1983).  "[E]xemptions from the antitrust laws must be construed narrowly."  *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982).

Courts consider three factors in determining whether something is "the business of insurance":  "(1) whether the practice has the effect of transferring or spreading the policyholders' risks; (2) whether the practice is an integral part of the policy relationship between the insurer and insured; and (3) whether the practice is limited to entities within the insurance industry." *Feinstein*, 714 F.2d at 931 (citing *Pireno*, 458 U.S. at 129).  "[T]he primary characteristic of the

business of insurance is the transferring or spreading of risk." *Id.* "Provided the risk spreading factor is present, the business of insurance is not limited to traditionally recognized areas of insurance." *Id.*

In *Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979), the Supreme Court held that an agreement between a health insurer and pharmacies on how much to charge insured customers was not "the business of insurance" because it did not have to do with spreading risk. Rather, it was a mere "cost-savings arrangement[]" between the insurer and a third party. *Id.* The Court distinguished this agreement from the "cooperative ratemaking efforts" that the drafters of the McCarran-Ferguson Act intended to exempt from antitrust laws. *Id.* at 221. Similarly, the *Pireno* Court found that an agreement between a chiropractic trade association and an insurance company to fix the prices of chiropractic services "was logically and temporally unconnected to the transfer of risk accomplished by [the defendant's] insurance policies." 458 U.S. at 130. Following this reasoning, the Ninth Circuit has held that an agreement between a medical association and a medical malpractice insurer to only cover doctors who were members of the association *was* "the business of insurance" because it was "demonstrably related to the allocation and spreading of risk" by "defin[ing] a pool of insureds over which risk is spread." *Feinstein*, 714 F.2d at 932.

As explained above, Plaintiffs allege that Defendants have violated the Sherman Act by "the fixing of commercial bail bond premiums sold to Plaintiffs and members of the Class . . . by restraining competition" in (1) "decisions on what maximum default rates to file," CAC ¶ 127, and (2) "the offering of rebates or discounts from the maximum filed rate," *id.* The first category of activity seems at first glance like the kind of "cooperative ratemaking" that the McCarran-Ferguson Act intended to exempt from antitrust scrutiny. *See Royal Drug*, 440 U.S. at 225 n.32 ("It is clear from the legislative history [of the McCarran-Ferguson Act] that the fixing of rates is the 'business of insurance.'"). However, Plaintiffs are targeting not the actual filing of rates but the alleged agreement beforehand concerning what rates to file. Plaintiffs argue that this collusive pre-filing activity is not the business of insurance.

While the argument has common-sense appeal, Plaintiffs cite no authority directly

supporting it.  Plaintiffs' principal case on this point is *Perry v. Fidelity Union Life Insurance Co.*, 606 F.2d 468 (5th Cir. 1979).  The *Perry* court did say that in determining whether something constituted the business of insurance, "the appropriate focus is thus the nature of the activity itself, not the type of business that is conducting it." *Id.* at 470.  But the facts of that case were different than the ones at issue here.  *Perry* held that the McCarran-Ferguson Act did not apply to financing plans that an insurance company offered to help purchasers pay their premiums because "financing activity is purely ancillary to the insurance relationship between the insurance company and the policyholder." 606 F.2d at 470.  The court pointed out that the insurance company was playing "two distinct roles": "On the one hand, the company is an insurer, the purchaser an insured; but on the other hand, the company is a creditor, the purchaser a debtor. The former relationship constitutes the 'business of insurance,' while the latter does not." *Id.*

Here, unlike in *Perry*, Plaintiffs are challenging conduct that is interconnected with the filing of premium rates.  In addition, *Perry* was issued before *Pireno* and does not apply its "business-of-insurance" framework.  Applying that framework here, the alleged agreement to file uniform rates appears to meet the first two *Pireno* factors because the setting of premium rates is essential to the "transferring or spreading" of risk between the insurer and insured and is "an integral part of the policy relationship" between them.  *Pireno*, 458 U.S. at 129; *see also In re Workers' Compensation Ins. Antitrust Litig.*, 867 F.2d 1552, 1556-57 (8th Cir. 1989) (finding that alleged "fixing of rates . . . whether by private or by state-approved rate setting, is integral to the price charged to policy holders and to the contractual relationship with the insured").  And because only surety companies file proposed rates to CDI, the alleged activity is also "limited to entities within the insurance industry." *Pireno*, 458 U.S. at 129.  Based on these authorities, the Court concludes that Defendants' alleged agreements regarding which rates to submit constitutes the business of insurance for purposes of the McCarran-Ferguson Act.

In order for the conduct to fall within McCarran-Ferguson, however, it must also be "regulated by the state" and "not involve a boycott, coercion or intimidation." *Feinstein*, 714 F.2d at 93.  Plaintiffs' allegations satisfy this prong as well.  As for the regulation requirement, "[i]t is not necessary to point to a state statute which gives express approval to a particular practice;

United States District Court
Northern District of California

1    rather, it is sufficient that a state regulatory scheme possess jurisdiction over the challenged

2    practice." *Id.* at 933 (holding that California's "extensive regulatory scheme with jurisdiction over

3    all rating practices of insurers," including the medical malpractice insurer defendants, clearly

4    satisfied this requirement).  Like the insurance practices at issue in *Feinstein*, the issuance of bail

5    bonds in California is subject to an "extensive regulatory scheme."  *Id.*; *see* Cal. Ins. Code §1860

6    *et seq.*  And the CAC does not allege any "boycott, coercion, or intimidation" within the meaning

7    of the McCarran-Ferguson Act.  Accordingly, the Court finds that Plaintiffs' Sherman Act claim

8    that Defendants conspired to submit uniform maximum rates to CDI is barred by the McCarran-

9    Ferguson Act.  Defendants' motion to dismiss is granted as to this portion of Plaintiffs' Sherman

10   Act claim.  Because Plaintiffs cannot amend their complaint to resolve this issue, this dismissal is

11   with prejudice.

12          The second category of alleged activity, however – an alleged agreement not to rebate –

13   does not meet the *Royal Drug* and *Pireno* requirements for McCarran-Ferguson Act immunity.

14   First, the Court fails to see how an agreement not to rebate, when that rebate comes out of the

15   agent's commission rather than the premium, has to do with spreading the risk that a defendant

16   will jump bail.  Defendants claim that this alleged practice "relates to risk evaluation," but they do

17   not even attempt to explain how.  ECF No. 72 at 8.  When asked about this argument at the

18   hearing, Defendants referred to several cases that do not employ the *Royal Drug*/*Pireno*

19   framework and are thus not on point.[4]  ECF No. 76.  The Court can only conclude that, like the

20   "cost-savings arrangement[]" in *Royal Drug*, the alleged anti-rebating practices serve the purpose

21   of maximizing profits rather than spreading risk.  Because the first *Pireno* factor is not met, the

22   Court need not proceed to the other factors.  Plaintiffs' Sherman Act claim regarding the alleged

23

24   [4] Defendants cite *Buckman v. American Bankers Insurance Co. of Florida*, 924 F. Supp. 1156,
     1157 (S.D. Fla. 1996), which held that posting a bail bond is "the business of insurance."  ECF
25   No. 56 at 21; ECF No. 72 at 8.  But this holding relies solely on Florida law's definition of "surety
     insurance" and does not consider any of the *Pireno* factors.  *Buckman*, 924 F. Supp. at 1157.
26   Defendants' assertion that "courts give heavy weight to a state's determination that an activity
     constitutes the 'business of insurance,'" ECF No. 72 at 8, is premised on Fifth Circuit law before
27   the Supreme Court decided *Royal Drug*.  *See Buckman*, 924 F. Supp. at 1157 (citing *Royal Drug
     Co., Inc. v. Grp. Life & Health Ins. Co.*, 556 F.2d 1375, 1384 (5th Cir.1977)).  Equally unhelpful
28   is *Groves v. City of Los Angeles*, 40 Cal. 2d 751, 753 (1953), which does not even mention the
     McCarran-Ferguson Act.

agreement not to rebate, including Defendants' alleged misrepresentation of their ability to do so, is thus not barred by the McCarran-Ferguson Act.

### 2.   State Action Doctrine

Defendants make largely the same points in arguing that Plaintiffs' Sherman Act claim is barred by the state action doctrine, which "provides generally that the antitrust laws do not apply to action by a state operating in its sovereign capacity, or to private conduct approved and supervised by the state as a matter of state policy."  William C. Holmes & Melissa Mangiaracina, *Antitrust Law Handbook* § 8:7 (2018).  "[S]tate action immunity derives from principles of federalism:  Certain actions of the state that restrict competition are immunized from federal antitrust law."  *Snake River Valley Elec. Ass'n v. PacifiCorp*, 357 F.3d 1042, 1047 (9th Cir. 2004). The test for state action immunity is "that the challenged restraint must (1) reflect a clearly articulated state policy that permits the anti-competitive conduct and (2) that the permitted anti-competitive activities are actively supervised by the state."  *Id.* at 1047-48.

Defendants' state action arguments regarding the alleged agreement not to rebate fail for the same reasons they did under the McCarran-Ferguson Act.  Defendants' argument that the "uniformity in bail bond pricing that Plaintiffs challenge flows directly from the Department's statutorily-mandated rate-setting process," ECF No. 56 at 21, again conflates Defendants' obligation to offer fixed premiums with their ability to offer rebates.  Claiming that the latter is foreclosed by the CDI rate-setting process is an attempt to cast a "gauzy cloak of state involvement over what is essentially a private price-fixing arrangement."  *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 106 (1980).  The state action doctrine does not bar Plaintiffs' claims of minimum price fixing.

### 3.   Filed Rate Doctrine

Defendants argue that Plaintiffs' Sherman Act and Cartwright Act claims are barred by the filed rate doctrine.  ECF No. 56 at 22.  Because the Court has concluded that Plaintiffs' Sherman Act claim regarding submission of uniform premium rates to CDI is barred by the McCarran-Ferguson Act, it need not address Defendants' argument that it is also barred by the filed rate doctrine.  As for Plaintiffs' Sherman Act and Cartwright Act claims regarding rebating,

Defendants concede that they are not barred by this doctrine.  ECF No. 72 at 11.  That leaves only Plaintiffs' Cartwright Act claim regarding maximum premium rates.

"The filed rate doctrine and associated principles of federal preemption bar challenges under state law and federal antitrust laws to rates set by federal agencies."  *E. & J. Gallo Winery v. EnCana Corp.*, 503 F.3d 1027, 1033 (9th Cir. 2007).  "At its most basic, the filed rate doctrine provides that state law, and some federal law (e.g. antitrust law), may not be used to invalidate a filed rate nor to assume a rate would be charged other than the rate adopted by the federal agency in question."  *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007) (quoting *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 929-30 (9th Cir. 2002)).  "[C]ourts have [also] concluded that the 'rationales underlying the filed rate doctrine apply equally strongly to regulation by state agencies.'"  *Blaylock v. First Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1100 (W.D. Wash. 2007) (quoting *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17, 20 (2d Cir. 1994)).  "Many courts, both state and federal, have concluded that the doctrine bars . . . challenges to rates set by state agencies regulating insurance premiums."  *Id.* at 1100.

Here, the parties dispute whether the doctrine applies to challenges to insurance rates approved by CDI.  Plaintiffs rely on *Cellular Plus, Inc. v. Superior Court*, 14 Cal. App. 4th 1224, 1241-42 (Cal. Ct. App. 1993), which declined to adopt the filed rate doctrine for Cartwright Act claims challenging rates approved by the California Public Utilities Commission.  *See also Fogel v. Farmers Grp., Inc.*, 160 Cal. App. 4th 1403, 1418 (Cal. Ct. App. 2008) (holding that the filed rate doctrine did not apply to California insurance laws because, unlike in federal cases establishing the doctrine, California insurers "are allowed to rebate excess premiums to their policyholders").  The Ninth Circuit has deferred to this approach, rejecting an argument that the filed rate doctrine barred a Cartwright Act claim challenging milk prices set by a California agency.  *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 992 (9th Cir. 2000) ("Whether damages can be awarded to the injured parties is a matter of state law. California has held, in contrast to federal law, that no filed rate doctrine exists as a bar.").  The California Department of

1    Justice's *Antitrust Guidelines* also echo this approach, noting that "[t]he filed rate doctrine does

2    not apply to insurance rates in California."  ECF No. 67-7 at 38-39.

3          Defendants, however, rely heavily on *MacKay v. Superior Court*, 188 Cal. App. 4th 1427,

4    1449 (Cal. Ct. App. 2010), which disagreed with *Fogel* "to the extent that it rejected the

5    application of the filed rate doctrine to California insurance rates."  Defendants claim that "the

6    California Court of Appeals has unequivocally held that the filed rate doctrine bars suits like this

7    one."  ECF No. 56 at 23 (*citing MacKay*, 188 Cal. App. 4th at 1448).  The Court is not convinced

8    by this argument.  *MacKay*'s passing reference to the filed rate doctrine is dicta; that court based

9    its decision on statutory grounds.  Because Defendants provide no other authority for the

10    proposition that the filed rate doctrine bars a Cartwright Act claim challenging California

11    insurance rates, the Court denies the motion to dismiss Plaintiffs' Cartwright Act claim on these

12    grounds.

13              **4.**        **Exclusive Jurisdiction of CDI**

14          Defendants also contend that Plaintiffs' California claims are barred by the California

15    Insurance Code, which "vests exclusive jurisdiction over the setting of bail bond premium rates

16    with CDI."  ECF No. 56 at 24.  Two provisions of the code are relevant here: (1) Section 1860.1,

17    which states that "[n]o act done, action taken or agreement made pursuant to the authority

18    conferred by this chapter shall constitute a violation of or grounds for prosecution or civil

19    proceedings under any other law of this State heretofore or hereafter enacted which does not

20    specifically refer to insurance,"  Cal. Ins. Code § 1860.1, and (2) Section 1861.03(a), which

21    provides that "[t]he business of insurance shall be subject to the laws of California applicable to

22    any other business, including, but not limited to . . . the antitrust and unfair business practices

23    laws," *id.* § 1861.03(a).

24          In order to resolve the "apparent contradiction" between these provisions, the *MacKay*

25    court explored their legislative history.  188 Cal. 4th at 1442.  In 1947, in the wake of a

26    Supreme Court decision holding that insurance was subject to federal antitrust law, the California

27    legislature enacted Section 1860.1 as part of the McBride-Grunsky Act "in order to immunize

28    insurers from antitrust laws."  *Id.* at 1444.  The McBride-Grunsky Act included a provision

"permitting insurers to act in concert." *Id.* at 1445.  In 1988, however, California voters passed Proposition 103, which "was intended to eliminate insurers' exemption from antitrust laws." *Id.* at 1447.  Among other things, Proposition 103 repealed the portion of the McBride-Grunsky Act "permitting insurers to act in concert." *Id.* at 1445-46.  That proposition, however, left Section 1860.1 in place. *Id.* at 1446.  The *MacKay* court concluded that Section 1860.1 should thus be read narrowly, to "exempt[] from other California laws acts done and actions taken pursuant to the ratemaking authority conferred by the ratemaking chapter, including the charging of a preapproved rate." *Id.* at 1443 (emphasis omitted).  The court stressed that the provision "does not extend to insurer conduct *not* taken pursuant to that authority." *Id.* at 1449.

Defendants rightly note that the key question in determining whether CDI has exclusive jurisdiction over Plaintiffs' California claims is whether the "CAC challenges the reasonableness of Defendants' approved rates."  ECF No. 56 at 25.  But Plaintiffs' claims do no such thing.  The first category of conduct that Plaintiffs identify – the alleged agreement to submit identical premium rates to CDI – is exactly the type of concerted insurer conduct that California law once immunized but that Proposition 103 subjected to antitrust scrutiny.  And the second category of conduct – the alleged agreement not to offer rebates – has nothing to do with the reasonableness of the approved premium rates.  Because neither of these agreements were authorized by the ratemaking authority as laid out in *MacKay*, Section 1860.1 poses no bar to Plaintiffs' remaining claims.

### 5.    The *Noerr-Pennington* Doctrine

Defendants also argue that the *Noerr-Pennington* doctrine bars Plaintiffs' Cartwright Act claim "that Defendants conspired to secure the Department's approval of a uniform rate."[5]  ECF No. 56 at 25.  "[T]he *Noerr-Pennington* doctrine . . . places certain '[j]oint efforts to influence public officials' beyond the reach of the antitrust laws." *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 627 (1992) (citing *Mine Workers v. Pennington,* 381 U.S. 657, 670 (1965) and *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961)).  While the

---

[5] Defendants do not argue that *Noerr-Pennington* bars Plaintiffs' rebating claims.

doctrine originated in the Sherman Act context, it applies to the Cartwright Act as well.  *See Blank v. Kirwan*, 39 Cal. 3d 311, 322 (1985).

In *Noerr*, the Court held that the Sherman Act did not apply to an anti-trucking publicity campaign staged by a group of railroads insofar as it was designed to "foster the adoption and retention of laws and law enforcement practices destructive of the trucking business . . . ."  *Id.* at 129.  The Court distinguished this sort of "attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly" from "the agreements traditionally condemned by § 1 of the Act," such as "price-fixing agreements, boycotts, market-division agreements, and other similar arrangements."  *Id.* at 136.  Summarizing part of the *Noerr* holding in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (emphasis added), the Court noted that "where, independent of any government action, the anticompetitive restraint results directly from private action, the restraint cannot form the basis for antitrust liability if it is 'incidental' to a *valid* effort to influence governmental action."

Plaintiffs do not allege that Defendants jointly lobbied the California legislature to set certain premium rates, or that they staged a misleading but lawful publicity campaign intended to obtain a legislative or regulatory result.[6]  They allege that Defendants covertly conspired to submit identical rates to CDI, the very type of "price-fixing agreement[]" that the *Noerr* Court emphasized was still subject to Sherman Act scrutiny.  365 U.S. at 136; *see also Allied Tube*, 486 U.S. at 503 ("If all such conduct were immunized then, for example, competitors would be free to enter into horizontal price agreements as long as they wished to propose that price as an appropriate level for governmental ratemaking or price supports.").  Because this arrangement is not a "valid effort to influence governmental action," *Allied Tube*, 486 U.S. at 499, the *Noerr-Pennington* doctrine does not bar Plaintiffs' Cartwright Act claim.

In sum, the portion of Plaintiffs' Sherman Act claim relating to submission of uniform premium rates to CDI is barred by the McCarran-Ferguson Act, but the rebating portion of their

---

[6] Plaintiffs' allegations regarding misleading advertising relate only to their rebating claims – essentially, that Defendants misled consumers into thinking that they were not legally permitted to offer rebates.

United States District Court
Northern District of California

1    Sherman Act claim and the entirety of their Cartwright Act and UCL claims are not barred by any

2    of the argued immunity defenses. The Court now turns to Defendants' 12(b)(6) arguments

3    regarding these claims.

### B.    Antitrust Conspiracy Claim

5        Defendants next argue that the CAC fails to state claims under the Sherman and Cartwright

6    Acts. Because the Cartwright Act was modeled after the Sherman Act, the Court's analysis

7    addresses both statutes together pursuant to federal antitrust law. *See, e.g.*, *County of Tuolumne v.*

8    *Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

### 1.    Legal Standard

10       Section one of the Sherman Act prohibits any contract, combination, or conspiracy

11   constituting an "unreasonable restraint" of trade. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997). In

12   order to state a Section 1 claim, antitrust plaintiffs must claim more than parallel conduct and a

13   conclusory allegation of agreement. "Without more, parallel conduct does not suggest conspiracy,

14   and a conclusory allegation of agreement at some unidentified point does not supply facts

15   adequate to show illegality." *Twombly*, 550 U.S. at 556-57. Allegations of parallel conduct must

16   thus "be placed in a context that raises a suggestion of a preceding agreement." *Id.* at 557.

17       The Ninth Circuit "has distinguished permissible parallel conduct from impermissible

18   conspiracy by looking for certain 'plus factors.'" *In re Musical Instruments & Equip. Antitrust*

19   *Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). "Whereas parallel conduct is as consistent with

20   independent action as with conspiracy, plus factors are economic actions and outcomes that are

21   largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated

22   action." *Id.* (citing *Twombly,* 550 U.S. at 557 n.4). "If pleaded, they can place parallel conduct 'in

23   a context that raises a suggestion of preceding agreement.'" *Id.* (quoting *Twombly*, 550 U.S. at

24   557).

25       When the court evaluates whether a plaintiff has plausibly alleged an antitrust conspiracy,

26   a "co-conspirator need not know of the existence or identity of the other members of the

27   conspiracy or the full extent of the conspiracy." *In re High-Tech Employee Antitrust Litig.*, 856 F.

28   Supp. 2d 1103, 1118 (N.D. Cal. 2012) (citing *Beltz Travel Serv. Inc. v. Int'l Air Transp. Ass'n*, 620

United States District Court
Northern District of California

18

F.2d 1360, 1366-67 (9th Cir. 1980)); *see also Beltz*, 620 F.2d at 1367 ("Participation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result.").  Nor should courts indulge antitrust defendants who move to dismiss by "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . ." *High-Tech Employee*, 856 F. Supp. 2d at 1118 (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).  "[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . ." *Id.*

### 2.   Sufficiency of Allegations

Plaintiffs do not plead direct evidence of a conspiracy.  Instead, they allege that Defendants engaged in parallel conduct that, viewed in the context of various plus factors, "raises a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 556.  As discussed above, Plaintiffs allege two main types of parallel conduct: (1) filing uniform maximum premium rates with CDI, *see* CAC ¶¶ 61, 140(b), and (2) declining to offer (or encouraging or instructing agents to decline to offer) rebates on bail bonds, along with various activities designed to prevent rebating, *see id.* ¶¶ 140(c)-(f), 149.  While the Court has already dismissed Plaintiffs' Sherman Act claim as it relates to the uniform filing allegations, these allegations are still relevant to Plaintiffs' Cartwright Act claim.  The Court therefore considers both categories of parallel conduct.

As for the first, Plaintiffs allege that the surety Defendants "have nearly uniformly filed for a default premium rate of 10 percent of the posted bond, with an 8 percent maximum for consumers who meet enumerated and nearly identical criteria . . . ." *Id.* ¶ 61; *see also id.* ¶ 115 ("Despite the emergence of market pressures and sureties' knowledge of their ability to rebate, the sureties have largely stayed the course with their rates. With limited exceptions, the default rate for sureties in California remains 10%."); *id.* ¶ 120 ("sureties in California have filed for the same Maximum Rate, offered under nearly identical conditions (including the standard Fully Earned Term)"); *id.* ¶ 140(b).  They also allege that Aladdin (another name for Two Jinn, *id.* ¶ 38) "uses the SAA as a justification for setting its standard rate, and has said in its CDI filings that '[t]he standard rate is based on Surety Association of America (SAA) pricing.'" *Id.* ¶ 74.  These facts,

1    taken together, sufficiently allege that Defendants engaged in parallel conduct by filing for

2    uniform premium rates.

3         As for the second category, Plaintiffs allege that since 2004, when the *Pacific Bonding*

4    *Corp.* decision and CDI clarified that Proposition 103 permits bail agents to offer rebates "to

5    become more competitive," Defendants have "generally" declined to do so.  CAC ¶¶ 67-68.  They

6    also allege that Defendants uniformly "advertise only the default Maximum Rate, to conceal their

7    ability to charge a lower effective rate through rebating," "misrepresent[] that rebating or

8    discounting is unlawful," and "intimidate[] competitors to toe the line" when it comes to rebating.

9    *Id.* ¶¶ 68-69.  Defendants argue that these allegations are conclusory because Plaintiffs offer "no

10   facts about rebating, such as statistics on the frequency of rebating or even whether Plaintiffs

11   themselves sought or received rebates."  ECF No. 56 at 31.  They also note that the statements

12   Plaintiffs provide as examples of misleading advertising "were made by bail agents who are not

13   Defendants."  *Id.*

14        As for the first criticism, Plaintiffs admittedly allege very little in terms of actual rebating

15   practices.  The CAC's only allegation that Defendants do not in fact offer rebates is its statement

16   that Defendants "generally . . . refrain from offering competitive rebates."  CAC ¶ 68.  Plaintiffs

17   note that Defendant California Bail Agents Association ("CBAA") "maintains information

18   regarding premiums charged that Defendants and their agents can use to detect and prevent

19   premium discounting," *id.* ¶ 84, though Plaintiffs presumably do not have access to this

20   information.  They also note that "[w]ith limited exceptions, the default rate for sureties in

21   California remains 10%."  *Id.* ¶ 115.  It is unclear, however, whether this "default rate" refers to

22   the CDI-approved premium rate or the rate actually charged by bail agents, taking any rebates (or

23   lack thereof) into account.  If Plaintiffs' parallel conduct claims depended solely on allegations of

24   actual rebating practices, these statements might not be enough to state a claim.  But the alleged

25   conspiracy hinges just as much on Plaintiffs' allegations of uniform premium rate filing and

26   misrepresentation regarding Defendants' ability to offer rebates.

27        And Plaintiffs provide multiple examples of such misrepresentations, including two

28   statements made by Defendants.  *See id.* ¶ 73 (citing statements on the website of Defendant

United States District Court
Northern District of California

Aladdin Bail Bonds, also known as Two Jinn); *id.* ¶ 83 (citing statements on the website of

Defendant CBAA). They also provide examples of allegedly misleading representations by bail

agencies who contract with Defendant sureties. *See id.* ¶ 93 (citing statement by Quick Bail

Bonds Covina, which contracts with Defendant surety AIA); *id.* ¶ 94 (citing statement by Padilla

Bail Bonds, a representative of Defendant surety Lexington National Insurance); *id.* ¶ 95 (citing

statements by 888 Bail Bonds, a representative of Defendant sureties Allegheny Casualty

Company and International Fidelity Insurance Company). In addition, Plaintiffs cite statements

by members of the bail industry who are not named as Defendants. *See id.* ¶ 88 (citing an

"industry-sponsored, privately-run bail agent training course[]" that included the line, "the right

answer on the test: no rebates"); *id.* ¶ 90 (citing passage from e-book that Defendant CBAA

"advises is an essential starting point for all bail agents"); *id.* ¶¶ 96-100 (citing statements by bail

agencies with no purported connection to Defendants). Taken together, these allegations suffice to

show parallel conduct in the form of similarly allegedly misleading statements about Defendants'

ability to offer rebates.[7]

     While Plaintiffs provide a number of statements by Defendants or bail agents in

contractual relationships with Defendants, the statements by non-Defendant members of the bail

industry also help state a conspiracy claim. "Under *Twombly,* parallel conduct, such as

competitors adopting similar policies around the same time in response to similar market

conditions, may constitute circumstantial evidence of anticompetitive behavior." *Musical

Instruments*, 798 F.3d at 1193. Plaintiffs allege a price-fixing conspiracy throughout the

California bail bonds industry. Allegations that members of this industry "adopt[ed] similar

policies around the same time in response to similar market conditions" establish parallel conduct

for the purpose of *Twombly*. *Id.*

     Of course, where Plaintiffs name a particular industry member as a Defendant, they must

allege sufficient facts about that Defendant's role in the conspiracy to "give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555

---

[7] The Court addresses whether these allegations are adequate as to particular Defendants in Section V.B.3.

(citation and quotation omitted).  But that is a separate question from whether Plaintiffs have alleged enough parallel conduct to describe the conspiracy as a whole.

Having identified allegations of parallel conduct, the Court now turns to whether Plaintiffs have alleged plus factors that are "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."  *Musical Instruments*, 798 F.3d at 1194.  Plus factors that courts have found, taken in context, tend to suggest conspiracy include: participation in trade associations that provide "opportunities to exchange information or make agreements," *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008); public statements by defendants that could be construed as "invitations to agree," *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008); and factors suggesting a "market susceptible to conspiratorial price-fixing," such as high barriers to entry, waning demand, and saturation, *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 577 (M.D. Pa. 2009).

Plaintiffs allege all three of these plus factors.  The CAC alleges that the industry association Defendants "host meetings that have provided opportunities for Defendants to maintain and enforce the conspiracy," CAC ¶ 80, and gives examples of meetings that included all three association Defendants, *id.* ¶¶ 81, 86.  It also cites numerous statements by individual Defendants that could plausibly be interpreted as inviting cooperation to prevent rebating.  *See, e.g.*, *id.* ¶ 78 (predicting that "if left unchecked, rampant premium discounting will result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward" and urging members of the bail industry "to recognize the serious nature of the threats to our industry and work collectively to repel them"); *id.* ¶ 79 (urging bail agents to "recogniz[e] and alert[] all to the impending attack [on the industry].  When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response.").  The CAC additionally alleges market factors that create a susceptibility to price fixing, such as increasing supply and waning demand, *id.* ¶ 111-14, as well as regulatory and networking barriers to entry, *id.* ¶ 116.  Lastly, the CAC alleges market factors that suggest the presence of price fixing, such as an

unusually low loss ratio, *id.* ¶ 63, and competition on factors other than price, such as marketing and credit terms, *id.* ¶¶ 118-19.

Taken together with Plaintiffs' allegations of uniform filing and parallel decisions not to offer rebates and to misrepresent the availability of discounts, these factors "raise[] a suggestion of a preceding agreement." *Twombly*, 550 U.S. at 556.

### 3.    Specific Allegations About Defendants

Defendants also argue that Plaintiffs fail to allege sufficient facts about how each Defendant "joined or participated" in the alleged conspiracy.  ECF No. 56 at 27.  A subset of Defendants, some of whom the CAC names only in the caption and list of parties, make similar arguments in a separate motion to dismiss.  ECF No. 58.

To survive a motion to dismiss, a complaint alleging an antitrust conspiracy "must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it." *TFT-LCD*, 586 F. Supp. 2d at 1117 (citation omitted).  The complaint "need not plead each defendant's involvement in the alleged conspiracy in elaborate detail, but must simply include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy." *Id.*

The *TFT-LCD* court followed this rule in dismissing horizontal price-fixing claims against particular corporate entities where the complaint included only "general allegations as to all defendants, to 'Japanese defendants,' or to a single corporate entity such as 'Hitachi.'" *Id.*  The plaintiffs amended their complaints to add detail about "numerous illicit conspiratorial communications between and among defendants"; "facts of the guilty pleas entered by four defendants for fixing prices of TFT-LCD"; "specific information about the group and bilateral meetings by which the alleged price-fixing conspiracy was effectuated," including "the structure and content of these meetings, as well as the types of employees who attended the meetings"; details of "bilateral discussions between various defendants . . . [that] took the form of in-person meetings, telephone calls, e-mails and instant messages"; and information about "which types of meetings the defendants and co-conspirators participated in," including in some instances "more detail such as the year of a meeting and other meeting participants." *TFT-LCD*, 599 F. Supp. 2d

United States District Court
Northern District of California

1179, 1184 (N.D. Cal. 2009).  The court held that the amended complaints sufficiently alleged

each defendant's participation in the conspiracy, despite defendants' objection that they "still [did]

not differentiate between related corporate entities."  *Id.* at 1184-85.

Plaintiffs cite *In re Cathode Ray Tube (CRT) Antitrust Litigation*, in which the district

court "permitted other plaintiffs to proceed not with detailed, defendant-by-defendant allegations

but with more general – but still plausible – contentions that each defendant participated in the

alleged conspiracy."  ECF No. 68 at 24 (citing No. C-07-5944-SC, 2013 WL 5425183, at *2 (N.D.

Cal. Sept. 26, 2013)).  However, the plaintiffs who were allowed to proceed in that litigation had

alleged far more specific facts about each defendant than Plaintiffs have here.  The *CRT*

complaints contained "allegations concerning specific Defendants' participation in the alleged

unlawful meetings and agreements," including the estimated number of meetings each defendant

participated in, what sorts of agreements were reached, and in some cases what types of

employees had represented defendants at the meetings.  *CRT*, 738 F. Supp. 2d 1011, 1019-22

(N.D. Cal. 2010).

Bearing this analysis in mind, the Court now turns to particular defendants or categories of

defendants.

### a.    Surety Defendants

Plaintiffs make many allegations about the surety Defendants as a group: that they have

agreed not to compete on the price of bail bonds and to file uniform rates with CDI, CAC ¶¶ 61,

120, directed their agents not to compete on price, used industry associations and bail education

courses to enforce this agreement, and retaliated against agents who have offered rebates, *see, e.g.*,

*id.* ¶ 71.  They provide sample language from a contract between a surety and a bail agency,

though they do not say which ones.  *Id.* ¶ 92.  They also make some allegations related to

particular surety Defendants, for example, citing allegedly misleading statements by bail agencies,

some of whom they allege are contractually connected to certain Defendant sureties.  *Id.* ¶¶ 93-95.

They also quote statements by executives of certain surety Defendants.  *See, e.g.*, *id.* ¶¶ 75-79, 80,

87, 104, 106.

These claims, however, do not sufficiently allege each surety Defendant's "role in the

United States District Court
Northern District of California

1   alleged conspiracy." *TFT-LCD*, 586 F. Supp. 2d at 1117; *see also TFT-LCD*, Nos. M 07-1827 SI,

2   C 09-5609 SI, 2010 WL 2629728, at *6-7 (N.D. Cal. June 29, 2010) (dismissing claim against

3   particular defendant where the complaint alleged only its "corporate status," that it "manufactured,

4   sold, and/or distributed LCDs to other purchasers," and that it "participated in the conspiracy").

5   This is especially true for the 17 surety Defendants who are mentioned by name only in the

6   caption and in the list of parties.  ECF No. at 13-14.  However, since Plaintiffs' opposition does

7   not attempt to distinguish between these Defendants and those for whom the CAC includes

8   additional allegations, *see* ECF No. 68 at 24-26, the Court dismisses the claims against all surety

9   Defendants with leave to amend.

**b.     Bail Agency Defendants**

11       Plaintiffs name two bail agency Defendants in their complaint: Two Jinn and All-Pro.

12   CAC ¶¶ 37-38.  The CAC alleges that Two Jinn, which also does business as Aladdin Bail Bonds,

13   sold Plaintiff Serna a bail bond and that it is "[a]t the center of the conspiracy."  *Id.* ¶¶ 12, 38, 72-

14   74.  It also alleges that Aladdin representatives attended a trade association meeting in November

15   2011 but says nothing about what occurred at that meeting.  *Id.* ¶ 86.  Lastly, the CAC cites a

16   statement on Defendant Aladdin's website claiming that "Aladdin Bail Bonds is authorized to

17   offer an 8% rate in addition to the standard 10%.  Nobody has lower prices than Aladdin."  *Id.* ¶

18   73.  These allegations are insufficient to allege liability on the part of Two Jinn.  A firm cannot

19   enter a conspiracy merely by selling a bail bond, and the law is well-settled that attending a trade

20   association meeting, without more, is not evidence of participation in a conspiracy.  *See, e.g.,*

21   *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 918 (N.D. Cal. 2019) ("Membership in

22   associations and attendance at trade meetings presents nothing more than an opportunity to

23   collude, and an opportunity, without more, is insufficient to state a claim under § 1." (footnote and

24   citation omitted)); *In re California Title Ins. Antitrust Litig.*, No. C 08-01341 JSW, 2009 WL

25   1458025, at *5 (N.D. Cal. May 21, 2009) ("If such meetings occurred, Plaintiffs do not set forth

26   facts about where or when those meetings took place, or whether the Defendants communicated

27   with one another in advance of or after the meetings."); *In re Graphics Processing Units Antitrust*

28   *Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Attendance at industry trade shows and

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

events is presumed legitimate and is not a basis from which to infer a conspiracy, without more. . . .  [T]here are no allegations that representatives from ATI and Nvidia actually met or spoke with one another during those widely-attended conferences.  Here, plaintiffs have pleaded no facts indicating that defendants' attendance at trade shows and conferences was part of a conspiracy.").  Aladdin's statement about its rates, while potentially somewhat misleading as the rates it is "authorized" to charge, also is not evidence of agreement.  Finally, as for the naked allegation that Two Jinn was the "center" of the conspiracy, simply saying it does not make it so. *See Dietrick v. Securitas Sec. Servs. USA, Inc.*, 50 F. Supp. 3d 1265, 1276 (N.D. Cal. 2014) (recalling Abraham Lincoln's aphorism that "calling a tail a leg doesn't make it one." (citation omitted)).  Plaintiffs' claim against Two Jinn is dismissed with leave to amend.

The claim against All-Pro is even thinner.  The only allegation against that firm is that it sold Plaintiff Crain an allegedly inflated bail bond.  *Id.* ¶ 11.  Plaintiffs' opposition brief claims that the CAC alleges that All-Pro failed to offer Crain a rebate, ECF No. 68 at 26, but the CAC does not in fact make that allegation.  Plaintiffs' claim against All-Pro is thus dismissed with leave to amend.

### c.    Industry Association Defendants

The CAC names three bail agent association Defendants: American Bail Coalition, Inc. ("ABC"), CBAA, and Golden State Bail Agents Association ("GSBAA").  CAC ¶¶ 40-42.  The CAC alleges that the surety Defendants use all three association Defendants "as tools for enforcing their price-fixing cartel." *Id.* ¶ 71.  It alleges that the association Defendants "host meetings that have provided opportunities for Defendants to maintain and enforce the conspiracy," *id.* ¶ 80, and gives examples of meetings that included all three association Defendants, *id.* ¶¶ 81, 86.  Once again, however, the question is whether the CAC provides enough information regarding each individual defendant.

As to defendant CBAA, it does.  The CAC alleges that CBAA "maintains information regarding premiums charged that Defendants and their agents can use to detect and prevent premium discounting." *Id.* ¶ 84.  It notes that CBAA maintains a web page for consumers called "How Bail Bonds Works." *Id.* ¶ 83.  CBAA there poses the question, "Are there any restrictions

on how high my bail can be?," and gives the allegedly misleading answer that "Bail agents

representing a company must charge the same, filed rates," without disclosing that agents are

allowed to rebate.  *Id.*  The CAC states that CBAA promotes a book called "Bail Bonds 101,"

which includes the following advice about dealing with customers:

> [T]he caller may be shopping to see what fees you charge, but
> always keep in mind that your state DOI regulates the fees for bail
> bonds and if a competitor offers a lower percentage fee, they WILL
> make up the point or two somewhere in the transaction.  In
> California, the only time you might lower the fee to 8%, which is
> 2% less than the standard 10%, is if you are working with a referral
> from an attorney.

*Id.* ¶¶ 89-90.  These allegations provide the "something more" sufficient to allege CBAA's

participation in the asserted conspiracy.

The allegations against ABC and GSBAA, by contrast, are inadequate.  The only specific

allegation concerning ABC relates to a statement made by a former – not current – executive

director.  *Id.* ¶ 104.  And there are no specific allegations concerning GSBAA whatsoever.

Accordingly, the motion to dismiss claims against CBAA is denied.  The motion to dismiss

on behalf of ABC and GSBAA is granted with leave to amend.

### d.    Individual Defendants

The CAC names two individual Defendants: (1) Jerry Watson, vice president of the AIA[8]

and senior counsel and board member of industry association Defendant ABC, *id.* ¶ 44, and (2)

William B. Carmichael, president and CEO of Defendant American Surety Company ("ASC") and

former president and executive director, as well as current chairman, of Defendant ABC, *id.* ¶ 45.

The CAC alleges that both Watson and Carmichael "directly participated in" the alleged

conspiracy and "approved and ratified the conduct of" AIA's member sureties and ASC,

respectively, and that they both approved and ratified the conduct of ABC.  *Id.* ¶¶ 44-45.

The CAC also cites multiple statements by each individual Defendant that it alleges

---

[8] The CAC makes several references to "Defendant AIA," CAC ¶¶ 63, 75, which it elsewhere
describes as "the nation's largest bail surety administrator," of which three other surety
Defendants are members, *id.* ¶¶ 14, 17, 25.  The CAC does not name AIA in its list of parties or in
its caption, however, so the Court is unclear as to whether AIA is in fact a separate named
Defendant.  Plaintiffs are instructed to clarify this inconsistency in any future amended complaint.

United States District Court
Northern District of California

demonstrate the existence of, and their participation in, a conspiracy.  As for Watson, the CAC alleges that he made statements about the bail industry's low loss ratio as well as its shrinking demand and rising supply, *id.* ¶¶ 63, 111, and that he "derided 'price-cutting' as a 'cancer'" in an article on AIA's website, *id.* ¶ 75.  As for Carmichael, the CAC cites a statement he made on behalf of Defendant ASC noting "the important role a surety must play in protecting our markets," i*d.* ¶ 80 (emphasis omitted), as well as one demonstrating his opposition to rebating, *id.* ¶ 106.  *See also id.* ¶ 77 (Carmichael statement referencing a "cohesive band of agents and companies" who play "vital roles . . . in the protection and betterment of our markets"); *id.* ¶ 78 (Carmichael statement predicting that "if left unchecked, rampant premium discounting will result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward" and urging members of the bail industry "to recognize the serious nature of the threats to our industry and work collectively to repel them"); *id.* ¶ 79 (Carmichael statement urging bail agents to "recogniz[e] and alert[] all to the impending attack [on the industry].  When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response.").

Individuals may be liable for the antitrust violations of their employers if they have directly participated in or knowingly approved or ratified "inherently wrongful" conduct.  *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F. Supp. 841, 852-53 (N.D. Cal. 1979), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir. 1981).  Plaintiffs allege both that Watson and Carmichael directly participated in the alleged conspiracy and that they approved and ratified of anticompetitive conduct by AIA's member sureties, ASC, and ABC – specifically, their alleged agreement not to rebate and to misrepresent their ability to do so.  Because the allegations in the CAC sufficiently make this claim as to both Watson and Carmichael, the Court denies their motion to dismiss Plaintiffs' claims against them.

### C.    UCL Claim

The CAC alleges UCL violations based on a predicate Cartwright Act violation as well as conduct that is "otherwise unfair, unconscionable, unlawful, and fraudulent," CAC ¶¶ 153-54, though Plaintiffs' opposition brief argues a UCL claim based only on predicate violations of the

United States District Court
Northern District of California

Sherman and Cartwright Acts, ECF No. 68 at 29.  Because Plaintiffs have sufficiently stated Sherman and Cartwright Act claims as to certain Defendants, they have sufficiently stated a UCL claim as to those Defendants.  The Court therefore grants Defendants' motions to dismiss the UCL claim as to the surety Defendants, the bail agency Defendants, ABC, and GSBAA, and denies them as to CBAA and the individual Defendants.

### D.       Statutes of Limitations

Defendants also argue that Plaintiffs' pre-2015 claims are barred by the four-year statute of limitations on antitrust and UCL claims.  ECF No. 56 at 38.  "The burden of alleging facts which would give rise to tolling falls upon the plaintiff."  *Hinton v. Pac. Enterprises*, 5 F.3d 391, 395 (9th Cir. 1993).  However, because resolving tolling disputes is a fact-intensive process, statute of limitations defenses "may not be raised by motion to dismiss" unless they include "no disputed issues of fact."  *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984) (citing 5 Charles Alan Wright & Arthur R. Miller, *Fed. Practice & Proc.*, § 1277 (3d ed. 2019)).

Plaintiffs argue that the statutes should be tolled under the fraudulent concealment, discovery, equitable estoppel, and continuing violation doctrines.  ECF No. 68 at 39-44.

### 1.       Fraudulent Concealment and Equitable Estoppel

For fraudulent concealment, a plaintiff must plead facts alleging that (1) the defendant "affirmatively misled it," (2) the plaintiff "had neither actual nor constructive knowledge of the facts giving rise to its claim," and (3) the plaintiff acted diligently "in trying to uncover those facts." *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988)).  "Fraudulent concealment tolling must be pled with particularity under Fed. R. Civ. P. 9(b)."  *In re Ford Tailgate Litig.*, No. 11-CV-2953-RS, 2014 WL 1007066, at *8 (N.D. Cal. Mar. 12, 2014), *order corrected on denial of reconsideration*, No. 11-CV-2953-RS, 2014 WL 12649204 (N.D. Cal. Apr. 15, 2014).  Because the equitable estoppel doctrine is interconnected with fraudulent concealment, *see Lukovsky v. City and County of San Francisco*, 535 F.3d 1044, 1051 (9th Cir. 2008), the Court will assess these arguments together.

Plaintiffs have adequately alleged that Defendants "affirmatively misled" them as to

whether they could obtain lower prices for bail bonds.  *See, e.g.*, CAC ¶ 73 (citing statement on Defendant Aladdin's website claiming that "Aladdin Bail Bonds is authorized to offer an 8% rate in addition to the standard 10%.  Nobody has lower prices than Aladdin."); *id.* ¶ 83 (citing statement on Defendant CBAA's website claiming that "[b]ail agents representing a company must charge the same, filed rates"); *id.* ¶ 95 (citing statement "on behalf of [bail agency's] sureties, including Defendants Allegheny Casualty Company and International Fidelity Insurance Company," that "[a]ny agent offering bail at 5% in the State of California is simply acting illegally or deceptively," and alleging that the statement was posted on the agency's website "continuously since at least October 2013"); *id.* ¶ 104-06 (alleging that Defendants retaliated against bail agents who offered rebates); *id.* ¶¶ 124-25 (alleging fraudulent concealment).  Defendants argue that these statements are truthful and are not "'above and beyond' facts establishing the alleged conspiracy itself."  ECF No. 56 (citing *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1215 (N.D. Cal. 2015)).  But the defendants in *Animation Workers* were alleged to have "discussed the conspiracy in small in-person group meetings, avoided memorializing the scheme in writing, and attempted to keep the conspiracy secret from Plaintiffs," which the court held was passive concealment rather than "affirmative attempts to mislead 'above and beyond' the existence of the conspiracy itself."  87 F. Supp. 3d at 1215.  Here, the CAC alleges that Defendants have not only conspired to fix the price of bail bonds, but have taken affirmative steps to conceal this conspiracy from purchasers by misrepresenting their ability to offer rebates.  These allegations are sufficient to allege the first prong of fraudulent concealment.

As for the second, Defendants argue that the statements Plaintiffs allege were affirmatively misleading gave Plaintiffs "constructive knowledge and inquiry notice of the alleged conspiracy." ECF No. 72 at 20.  Given the questions of fact around where the statements were made and how a reasonable person in Plaintiffs' shoes would have interpreted them, the Court cannot hold on a motion to dismiss that they provided constructive knowledge.  *See Lundy v. Union Carbide Corp.*, 695 F.2d 394, 397 (9th Cir. 1982) (constructive knowledge is normally a question of fact for the jury).  The same is true of whether the Plaintiffs acted diligently to uncover the conspiracy.  *See In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007) ("As many courts

1    have noted in the antitrust conspiracy context, it is generally inappropriate to resolve the fact-

2    intensive allegations of fraudulent concealment at the motion to dismiss stage, particularly where

3    the proof relating to the extent of the fraudulent concealment is alleged to be largely in the hands

4    of the alleged conspirators."). The Court thus holds that Plaintiffs have pled facts to allege

5    fraudulent concealment.

6                        **2.      Discovery**

7            Plaintiffs' argument that the discovery rule tolled the Sherman Act statute of limitations is

8    barred as a matter of law because "the U.S. Supreme Court and Ninth Circuit have clearly held

9    that claims under the Sherman Act are subject to an injury rule, rather than a discovery rule."

10   *Animation Workers*, 87 F. Supp. 3d at 1209.

11           It is less clear whether the discovery rule applies to Cartwright Act and UCL claims. The

12   California Supreme Court has rejected the theory that, because Sherman Act claims are not subject

13   to the discovery rule, the same must be true of Cartwright Act claims. *Aryeh v. Canon Bus.*

14   *Solutions, Inc.*, 55 Cal. 4th 1185, 1194-95 (2013) ("Interpretations of federal antitrust law are at

15   most instructive, not conclusive, when construing the Cartwright Act . . . ."). Defendants cite no

16   case holding the converse. *See* ECF No. 72 at 21 (citing *Hexcel*, 681 F.3d at 1060, which

17   discusses only fraudulent concealment, not the discovery rule, and *Ryan v. Microsoft Corp.*, 147 F.

18   Supp. 3d 868, 893 (N.D. Cal. 2015), which discusses the discovery rule only in the context of

19   UCL claims).

20           As for UCL claims, the California Supreme Court has held that they are subject to the

21   same accrual rules as "any other statute": while the injury rule is the default, the discovery rule

22   applies "precisely to the extent the preconditions for [its] application are met . . . ." *Aryeh*, 55 Cal.

23   4th at 1196; *but see Animation Workers*, 87 F. Supp. 3d at 1211 (describing *Aryeh* as explaining

24   that "the discovery rule might be appropriate for misrepresentation or fraud claims, but not in

25   unfair competition claims"). The Court thus cannot hold that Plaintiffs' discovery rule argument

26   as to their Cartwright Act and UCL claims is barred as a matter of law.

27           The discovery rule in California requires the plaintiff to plead facts "which show (1) the

28   time and manner of discovery and (2) the inability to have made earlier discovery despite

United States District Court
Northern District of California

31

1   reasonable diligence . . . . However, mere conclusory assertions that delay in discovery was

2   reasonable are insufficient." *In re Conseco Ins. Co. Annuity Mktg. & Sales Practices Litig.*, No.

3   C-05-04726 RMW, 2008 WL 4544441, at *8 (N.D. Cal. Sept. 30, 2008) (internal citations

4   omitted); *see also Asghari v. Volkswagen Grp. of Am., Inc.*, 42 F. Supp. 3d 1306, 1320-21 (C.D.

5   Cal. 2013).  To invoke the discovery rule, each Plaintiff must allege the time and manner by which

6   she discovered the cause of action.  *See Philips v. Ford Motor Co.*, No. 14-CV-02989-LHK, 2015

7   WL 4111448, at *7 (N.D. Cal. July 7, 2015); *In re Conseco*, 2008 WL 4544441, at *9 (citing

8   *Community Cause v. Boatwright*, 124 Cal. App. 3d 888, 900 (Cal. Ct. App. 1981)).  Relatedly,

9   each Plaintiff must also show that she acted reasonably and diligently.  *Plumlee v. Pfizer, Inc.*, No.

10  13-CV-00414-LHK, 2014 WL 4275519, at *6 (N.D. Cal. Aug. 29, 2014), *aff'd*, 664 F. App'x 651

11  (9th Cir. 2016).

12         Plaintiffs here allege the time of discovery ("no earlier than January 2, 2019," CAC ¶ 124)

13  and the inability to have made discovery earlier despite reasonable diligence ("Plaintiffs and the

14  Class also lacked the specialized economic and industry knowledge necessary to discover the

15  conspiracy sooner despite the exercise of reasonable due diligence," *id.*).  Plaintiffs do not,

16  however, allege the manner of discovery.  Should they wish to rely on this argument in the future,

17  they should amend the complaint accordingly.  *See Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-

18  cv-04384-JST, 2017 WL 2797810, at *7 (N.D. Cal. June 28, 2017).

19              **3.     Continuing Violation**

20         The continuing violation doctrine holds that, "[i]n the context of a continuing conspiracy to

21  violate the antitrust laws, . . . each time a plaintiff is injured by an act of the defendant[ ] a cause of

22  action accrues to him to recover the damages caused by that act."  *Oliver v. SD-3C LLC*, 751 F.3d

23  1081, 1086 (9th Cir. 2014) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321,

24  338 (1971)).  The statute of limitations restarts with each "new overt act that: (1) is 'new and

25  independent ... [and] not merely a reaffirmation of a previous act,' and (2) 'inflict[s] new and

26  accumulating injury on the plaintiff.'"  *Id.* (quoting *Pace Indus., Inc. v. Three Phoenix Co.*, 813

27  F.2d 234, 238 (9th Cir. 1987)).  "[E]ach time a defendant sells its price-fixed product, the sale

28  constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from

United States District Court
Northern District of California

the date of the act." *Id.* (citing *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) and *Hennegan v. Pacifico Creative Serv., Inc.*, 787 F.2d 1299, 1301 (9th Cir. 1986)).

The CAC alleges that "Plaintiffs and Class members have been forced to pay inflated bail bond premiums." CAC ¶¶ 128, 141. Under this theory, each sale of a bail bond that was artificially inflated as a result of the alleged conspiracy thus constitutes an overt act restarting the statute of limitations. Because Plaintiffs have alleged that bail bonds are continuously sold in California, *see, e.g.*, *id.* ¶¶ 3, 114, they have sufficiently alleged continuing violations for the purposes of tolling.

### 4.    Danielson National Insurance Company

Defendant Danielson National Insurance Company ("DNIC") makes an additional argument that, because it "exited the bail bond industry prior to the limitations period," all claims against it should be dismissed. ECF No. 58 at 23-24. Because Plaintiffs argue that their claims against DNIC are timely under the fraudulent concealment and discovery doctrines, ECF No. 68 at 44, and because withdrawal from a conspiracy is an affirmative defense, *TFT-LCD*, 820 F. Supp. 2d 1055, 1060 (N.D. Cal. 2011), the application of which Plaintiffs dispute, Danielson's motion on this point is also denied.

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' joint motion to dismiss Plaintiffs' Sherman Act claim regarding the filing of uniform premium rates. This claim is dismissed with prejudice. The Court denies the motion as to Plaintiffs' Sherman and Cartwright Act claims regarding rebating, their Cartwright Act claim regarding uniform rate filing, and their UCL claim. As for the consolidated motion to dismiss the claims against certain Defendants, the Court grants the motion to dismiss all claims as to the surety Defendants, the bail agency Defendants, ABC, and GSBAA, with leave to amend, and denies it as to CBAA and the individual Defendants. Lastly, the Court denies the motion to dismiss Plaintiffs' pre-2015 claims.

/ / /

/ / /

/ / /

United States District Court
Northern District of California

1    Plaintiffs may file an amended complaint within 30 days of this order that addresses the

2    deficiencies identified herein.

3        **IT IS SO ORDERED.**

4    Dated:  April 13, 2020



5

6                                    JON S. TIGAR
                                    United States District Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California