1   Dean M. Harvey (SBN 250298)
2   Katherine C. Lubin (SBN 259826)
    Yaman Salahi (SBN 288752)
3   Adam Gitlin (SBN 317047)
    LIEFF CABRASER HEIMANN &BERNSTEIN, LLP
4   275 Battery Street, 29th Floor
    San Francisco, CA 94111
5   Telephone:  (415) 956-1000
    dharvey@lchb.com
6   kbenson@lchb.com
    ysalahi@lchb.com
7   agitlin@lchb.com

8
    *Interim Class Counsel*
9
    *(Additional counsel listed on signature page)*
10
                    UNITED STATES DISTRICT COURT
11
                  NORTHERN DISTRICT OF CALIFORNIA
12
                        OAKLAND DIVISION
13

14

15  IN RE CALIFORNIA BAIL BOND              Case No.  4:19-cv-00717-JST
16  ANTITRUST LITIGATION
                                            CLASS ACTION
17  This Document Relates To:
                                            **SECOND CONSOLIDATED AMENDED**
18                                          **CLASS ACTION COMPLAINT**
    ALL ACTIONS
19                                          **JURY TRIAL DEMANDED**

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF ACTION ............................................................................. 1

II.   JURISDICTION AND VENUE ............................................................... 5

III.  DEFENDANTS ............................................................................................ 6

    A.    Trade Association Defendants ................................................. 6

    B.    Surety Defendants ..................................................................... 7

    C.    Bail Agency Defendants ........................................................... 9

    D.    Individual Defendants ............................................................. 10

IV.  PLAINTIFFS ............................................................................................. 10

V.   CLASS ALLEGATIONS ......................................................................... 11

VI.  DEFENDANTS CONSPIRED TO ARTIFICIALLY INFLATE THE PRICES OF BAIL BONDS IN CALIFORNIA ........................................................... 13

    A.    The Market for Bail Bonds in California ............................ 13

    B.    The California Bail Bonds Market Is Ideally Suited to Price-Fixing ................... 15

        1.    Bail Bonds Are Homogenous Commodities ........................... 15

        2.    The Rate of Relevant Technological Change is Nearly Zero ................ 17

        3.    Demand for Bail Bonds is Highly Inelastic ........................... 18

        4.    Bail Bonds Sales Are Small, Frequent, and Regular .............................. 20

        5.    Bail Bonds Have Essentially Identical Production Costs ....................... 20

        6.    High Barriers to Entry Exist for California Bail Sureties ....................... 20

        7.    The Sureties Are Highly Concentrated and Act as Cartel Ringleader ...... 21

        8.    Defections from Cartel Are Easily Detectable ....................... 22

        9.    Industry Social Structure and Trade Associations ................... 23

    C.    The 10 Percent "Standard" Premium Rate Makes No Economic Sense ............. 25

    D.    Defendants' Extraordinary Profits Could Not Be Sustained Without Collusion ..................................... 28

    E.    Proposition 103 Posed An Existential Threat To Defendants' Bloated Profits ............................. 31

    F.    Defendants Colluded To Deprive California Consumers of the Competition Proposition 103 Required .......................... 32

        1.    Trade Association Defendants ............................................... 32

            a.    American Bail Coalition ............................................... 33

            b.    California Bail Agents Association ............................. 35

            c.    Golden State Bail Agents Association ....................... 36

            d.    The Surety and Fidelity Association of America .......... 38

        2.    Surety Defendants ................................................................... 39

            a.    American Surety Company ......................................... 39

**TABLE OF CONTENTS**
(continued)

Page

b.  Allegheny Casualty Company, International Fidelity Insurance Company, and AIA ....................................................... 42

c.  American Contractors Indemnity Insurance Company ................ 46

d.  Bankers Insurance Company ........................................................ 49

e.  Accredited Surety and Casualty Company, Inc. ......................... 51

f.  Lexington National Insurance Corporation .................................. 54

g.  Seneca Insurance Company ......................................................... 56

h.  Continental Heritage Insurance Company ................................... 58

i.  Seaview Insurance Company ....................................................... 61

j.  Danielson National Insurance Company ...................................... 64

k.  Financial Casualty & Surety, Inc. .............................................. 66

l.  Indiana Lumbermens Mutual Insurance Company ...................... 69

m.  Lexon Insurance Company .......................................................... 72

n.  North River Insurance Company ................................................. 74

o.  Philadelphia Reinsurance Corporation ........................................ 77

p.  Sun Surety Insurance Company ................................................... 79

q.  United States Fire Insurance Company ........................................ 81

r.  Universal Fire & Casualty Insurance Company ........................... 84

s.  Williamsburg National Insurance Company ................................ 86

3.  Individual Defendants ........................................................................ 89

a.  William Carmichael ..................................................................... 89

b.  Jerry Watson ................................................................................ 91

4.  Bail Agency Defendants ..................................................................... 93

a.  Two Jinn, Inc. d/b/a Aladdin Bail Bonds ................................... 93

b.  All-Pro Bonds Inc. ....................................................................... 94

G.  Fraudulent Concealment and Equitable Estoppel ................................................ 95

H.  Plaintiffs Could Not Have Discovered Defendants' Misconduct Earlier Despite Reasonable Diligence .............................................................................. 96

VII.  FIRST CLAIM FOR RELIEF:  VIOLATIONS OF THE CARTWRIGHT ACT ............ 97

VIII.  SECOND CLAIM FOR RELIEF:  UNFAIR COMPETITION ...................................... 99

IX.  THIRD CLAIM FOR RELIEF:  VIOLATION OF THE SHERMAN ACT ................... 100

X.  PRAYER FOR RELIEF ................................................................................................. 101

XI.  JURY DEMAND ........................................................................................................... 102

## I.     SUMMARY OF ACTION

1.      Individual and representative plaintiffs Shonetta Crain and Kira Monterrey[1] bring this class action to challenge a conspiracy to fix the prices of bail bonds in California (the "Conspiracy").

2.      Every year in California, nearly one million people are arrested and taken into custody.  Many are released if they can post money bail, which will be returned to them as long as they appear for scheduled court dates.  But the bail amounts courts typically require far exceed what most people can pay out-of-pocket:  60% of people in California jails are there because they cannot afford to pay bail.  Those people can remain in jail, away from their jobs and loved ones, or they can purchase a bail bond.

3.      The price of a bail bond is determined by the premium rate offered by the surety that underwrites the bond, less any rebates offered by that surety's agent.  That is, price = premium – rebates.  For instance, if bail is set at $30,000, the premium is set at 10%, and the agent does not offer rebates, then the bail bond price will be:  $30,000 x .1 – $0, or $3,000.  This premium is non-refundable, even if the accused attends all court dates, and even if charges are dismissed the next day.

4.      If the California bail bond market operated competitively, sureties would compete against each other on price.  Bail bonds are commodity products.  In competitive commodity markets, prices are typically set at or near the marginal cost of production.  In California, the standard bail bond premium adopted by nearly all sureties is 10% of the bail amount, and rebates are unusual.  Sureties and their agents generally do not advertise rebates, and instead endeavor to create the false impression that rebating is illegal and that prices below the filed rate may not be charged.  The resulting price to California consumers is nowhere near the very small marginal costs of production, and bears no reasonable relationship to the near zero risk of loss to the surety.  This inflated price has been made possible through the Conspiracy alleged herein.  Without the Conspiracy, California consumers would have paid substantially less for bail bonds.

---

[1] When this action was first initiated, Ms. Monterrey's last name was Serna. She has since married and legally taken the name Monterrey.

5.      In 1988, California voters passed the Insurance Rate Reduction and Reform Act ("Proposition 103"), which allowed bail agents to charge consumers less than the premium rates submitted to the California Department of Insurance ("CDI") by offering rebates.  Proposition 103 was enacted to protect consumers from arbitrary insurance rates and practices and to encourage competitive insurance markets.  In 2004, a California Superior Court eliminated any doubt that Proposition 103 required price competition in the bail bond industry.  *See Pacific Bonding Corp. v. John Garamendi*, No. GIC815786 (Cal. Super. Ct. Feb. 24, 2004) ("*Pacific Bonding*").  Defendants faced a choice: they could let competitive forces operate in their market, or they could collude to deprive California consumers of the competition that Proposition 103 required.  Defendants chose collusion.

6.      Defendants' Conspiracy had two components:   (1) to maintain the "standard" premium rate at 10%; and (2) to discourage and suppress rebating, including suppressing the advertisement of rebates.  Both components had the actual and intended effect of artificially increasing the prices paid by Ms. Crain, Ms. Monterrey, and other members of the proposed Class.

7.      The first aspect of the conspiracy is demonstrated by the Surety Defendants' nearly uniform reliance on 10% standard premium rates beginning at least as early as 2004:

## Timeline of Standard Premium Rates Charged by Defendant Sureties

| Surety | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Surety |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | 10% | | | | | | | | | 1 |
| 2 | | | | | | | 10% | | | | | | | | 9% | | 2 |
| 3 | | | | | | | | 10% | | | | | | | | | 3 |
| 4 | | | | | | | | 10% | | | | | | | | | 4 |
| 5 | | | | | | | | 10% | | | | | | | | | 5 |
| 6 | | | | | | | | 10% | | | | | | | | | 6 |
| 7 | | | | | | | | 10% | | | | | | | | | 7 |
| 8 | | | | | | | | 10% | | | | | | | | | 8 |
| 9 | N/A | | | | | | | | 10% | | | | | | | | 9 |
| 10 | N/A | | | | | | | | 10% | | | | | | | | 10 |
| 11 | Not in Market | | | | | | | 10% | | | | | | | 9% | | 11 |
| 12 | Not in Market | | | | | | | | 10% | | | | | | | | 12 |
| 13 | Not in Market | | | | | | | | 10% | | | | | | | | 13 |
| 14 | Not in Market | | | | | | | | | 10% | | | | | | | 14 |
| 15 | Not in Market | | | | | | | | | 10% | | | | | | | 15 |
| 16 | Not in Market | | | | | | | | | | 10% | | | | | | 16 |
| 17 | Not in Market | | | | | | | | | | 10% | | | | | | 17 |
| 18 | Not in Market | | | | | | | | | | | 10% | | | | | 18 |
| 19 | Not in Market | | | | | | | | | | | | | | 10% | | 19 |
| 20 | Not in Market | | | | | | | | | | | | | | 10% | | 20 |

**Key:**
1- American Surety Company
2- AIA: Allegheny Casualty Co.
3- Accredited Surety and Casualty Company, Inc.
4- American Contractors Indemnity Co
5- Bankers Insurance Co
6- Continental Heritage Insurance Co.
7- Lexington National Insurance Corporation
8- Seneca Insurance Company
9- Financial Casualty & Surety, Inc
10- Indiana Lumbermens Mutual Insurance Co.

11- AIA: International Fidelity Insurance Co.
12- North River Insurance Co.
13- United States Fire Insurance Company
14- Danielson National Insurance Co.
15- Sun Surety Insurance Co
16- Lexon Insurance Co.
17- Williamsburg National Insurance Co
18- Seaview Insurance Company
19- Philadelphia Reinsurance Corp.
20- Universal Fire & Casualty Insurance Co

8.     The second aspect of the Conspiracy, regarding rebates, is demonstrated by the Surety Defendants' nearly uniform misrepresentations and omissions that mislead consumers into believing that rebates are unavailable.  The following are examples of notices that the Surety Defendants require their agents to post in their retail offices:

---

**NOTE**

These rates must be charged by ALL agents of Accredited Surety And Casualty Co., Inc.  These rates are for premium only and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

ALL AGENTS: Please post this rate chart in public view in your office.

---

**NOTE**

These rates must be charged by ALL agents of INTERNATIONAL FIDELITY INSURANCE COMPANY. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or book reports, travel and other miscellaneous expenses.

ALL AGENTS:  Please post this rate chart where it can be seen by the public.

---

These rates must be charged by all Agents of
BANKERS INSURANCE COMPANY.

These rates include all costs, expenses, and service fees.

---

**NOTE**

THESE RATES MUST BE CHARGED BY ALL AGENTS OF SENECA INSURANCE COMPANY, INC.  THESE RATES ARE FOR PREMIUM ONLY AND DO NOT INCLUDE OTHER EXPENSES INCURRED SUCH AS TELEPHONE, PHOTOGRAPHS, POSTING FEES, WRITS, TRAVEL AND OTHER MISCELLANEOUS EXPENSES.

**NOTE**

THESE RATES MUST BE CHARGED BY ALL AGENTS OF UNITED STATES FIRE INSURANCE COMPANY, THE NORTH RIVER INSURANCE COMPANY, CRUM & FORSTER INDEMNITY COMPANY AND SENECA INSURANCE COMPANY

**NOTE**

These rates must be charged by ALL agents of ULICO STANDARD OF AMERICA CASUALTY COMPANY These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

ALL AGENTS: Please post this rate chart where it can be seen by the public.

**NOTE**

ALL AGENTS: Please post this rate chart in public view in your office.

These rates must be charged by ALL agents of FINANCIAL CASUALTY & SURETY, INC. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

**STATE BONDS**

$ 1.00 Through $500.00                $50.00 Plus
                                      $15.00 per bond

Over $500.00... 10% of the penal amount of the bond per annum, plus $15.00 per bond. These rates SHALL be charged by all agents of Indiana Lumbermens Mutual Insurance Company. These rates are for PREMIUM ONLY, and do not include other expenses incurred, such as telephone, posting fees, writs, travel and other miscellaneous expenses.

**NOTE**

ALL AGENTS of Lexon Insurance Company MUST CHARGE THESE FILED RATES. THESE RATES ARE FOR PREMIUM ONLY, AND DO NOT INCLUDE OTHER EXPENSES INCURRED, SUCH AS TELEPHONE, POSTING FEES, APPRAISALS OR LOT-BOOK REPORTS, TRAVEL AND OTHER MISCELLANEOUS EXPENSES.

ALL AGENTS: PLEASE POST THIS RATE CHART IN PUBLIC VIEW IN YOUR OFFICE

These rates must be charged by ALL agents of THE NORTH RIVER INSURANCE COMPANY. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

ALL AGENTS: Please post this rate chart in public view in your office.

THESE RATES MUST BE CHARGED BY ALL AGENTS OF
SUN SURETY INSURANCE COMPANY.

**NOTICE**

These rates must be charged by ALL producers of THE WILLIAMSBURG NATIONAL INSURANCE COMPANY. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

ALL PRODUCERS:   Please post this rate chart in public view in your office.

**NOTICE**

These rates must be charged by ALL producers of UNIVERSAL FIRE & CASUALTY INSURANCE COMPANY. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

ALL PRODUCERS:   Please post this rate chart in public view in your office.

9.      The Surety Defendants' bail agents execute these instructions, making misleading statements, often on their websites, that suggest rebating is wrong, unavailable, or illegal,

reinforcing the Surety Defendants' objective of suppressing rebates. For example, as of January 2019 and at least since June 2015, the website for Almighty Bail Bonds (License No. 1842942) says, on behalf of its sureties: "there are companies that can legally charge 8%, while the allowable premium is set at 10% for others. If a company that [sic] agrees to discount their fee, they may lose their license." In a blog post dated May 24, 2010, the website for Family Bail Bonds says, on behalf of its surety: "There is no such thing as a "discounted rate of 5%." If you hear that being offered, run the other way. This company is not practicing legal protocol or standards. Only work with a reputable company." And as of June 2019 and at least since April 2015, the website for WAVE Bail Bonds says, on behalf of its surety: "At the lowest, an 8% rate after rebate is the very least a bail bonds company can charge for a premium, and any less is illegal. . . . Don't risk placing your trust and your loved one's freedom in the hands of a company offering illegal rates."

10.     This class action seeks damages for Californians who have overpaid for bail bonds, and injunctive relief to bring competition to this collusive and dysfunctional market.

## II.    **JURISDICTION AND VENUE**

11.     This class action is filed, and these proceedings are instituted, to recover damages and to obtain other relief for harm that Plaintiffs and the members of the Class have sustained due to violations by Defendants, as hereinafter alleged, of California Business and Professions Code sections 16720, *et seq.*, commonly known as the Cartwright Act, California Business and Professions Code sections 17200, *et seq.*, commonly known as the Unfair Competition Law, and Section 1 of the Sherman Act, 15 U.S.C. § 1.

12.     This Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) and 28 U.S.C. §§ 1331, 1337, and 1367.  The Court also has jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5,000,000, at least one member of the proposed class is diverse from at least one Defendant, and the size of the proposed class exceeds 100.

13.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22); 28 U.S.C. § 1441(a) because the action was removed from Alameda County

1   Superior Court; and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the events

2   giving rise to Plaintiffs' claims occurred in this district and a substantial portion of the affected

3   interstate trade and commerce was carried out in this district.

4          14.    Defendants are subject to the jurisdiction of this Court because all Defendants

5   maintain an office, transact business, have an agent, or are found in this State, and have transacted

6   business or performed other acts in this State that give rise to Plaintiffs' claims.  The unlawful

7   acts hereinafter alleged had a direct effect on persons who paid premiums for bail bonds within

8   the State of California and, more particularly, within this district.  Furthermore, the Court has

9   personal jurisdiction over each Defendant as a co-conspirator as a result of the acts of any of the

10  co-conspirators occurring in California and in connection with Defendants' violations of the

11  Cartwright Act, the Unfair Competition Law, and/or the Sherman Act.

12  **III.**    **DEFENDANTS**

13        **A.**    **Trade Association Defendants**

14         15.    Defendant American Bail Coalition, Inc. ("ABC") is a nonprofit association

15  organized under § 501(c)(6) of the Internal Revenue Code, incorporated in the state of

16  Pennsylvania with its principal place of business located in Lancaster, Pennsylvania.  ABC is a

17  trade association for the national bail underwriting insurance industry.

18         16.    Defendant California Bail Agents Association ("CBAA") is a nonprofit

19  corporation organized under § 501(c)(6) of the Internal Revenue Code, incorporated in the state

20  of California with its principal place of business in Pomona, California.  CBAA is a trade

21  association for bail agents in California.

22         17.    Defendant Golden State Bail Agents Association ("GSBAA") is a nonprofit

23  corporation organized under § 501(c)(6) of the Internal Revenue Code, incorporated in the state

24  of California with its principal place of business in Fresno, California.

25         18.    Collectively, the Defendants named in paragraphs 14-16 are referred to as the

26  "Trade Association Defendants."

27

28

**B.**     **Surety Defendants**

19.     Defendant Accredited Surety and Casualty Company is incorporated in the state of Florida, has its principal place of business in Orlando, Florida, and has a designated agent for service of process in Sacramento, California.

20.     Defendant Allegheny Casualty Company is incorporated in the state of New Jersey, has its principal place of business in New Jersey, and has a designated agent for service of process in Walnut Creek, California.  Allegheny Casualty is a member of AIA, the nation's largest bail surety administrator, with offices in Calabasas, California.

21.     Defendant American Contractors Indemnity Company ("ACIC") is a member of the HCC Surety Group.  ACIC is incorporated in the state of California, has its principal place of business in Los Angeles, California, and has a designated agent for service of process in Los Angeles, California.

22.     Defendant AIA Holdings, Inc. ("AIA") is incorporated in the state of Delaware, has its principal place of business in Calabasas, California, and has a designated agent for service of process in Calabasas, California.

23.     Defendant American Surety Company ("ASC") is incorporated in the state of Indiana with its principal place of business in Indianapolis, Indiana.  ASC has an agent for service of process located in San Francisco, California.

24.     Defendant Bankers Insurance Company ("Bankers") is incorporated in the state of Florida, has its principal place of business in St. Petersburg, Florida, and has a designated agent for service of process in Sacramento, California.  Bankers Insurance is a member of the Bankers Insurance Group.

25.     Defendant Continental Heritage Insurance Company ("Continental") is incorporated in the state of Florida, has its principal place of business in Mayfield Heights, Ohio, and has a designated agent for service of process in Los Angeles, California.

26.     Defendants Danielson National Insurance Company ("Danielson") is a member of the DHC Group and is incorporated in the state of California, has its principal place of business in

San Diego, California, and has a designated agent for service of process in Sacramento, California.

27.     Defendant Financial Casualty & Surety, Inc. is a member of the HCC Surety Group. It is incorporated in the state of Texas, has its principal place of business in Houston, Texas, and has a designated agent for service of process in Sacramento, California.

28.     Defendant Indiana Lumbermens Mutual Insurance Company is a member of ILM Group and is incorporated in the state of Indiana, has its principal place of business in Indianapolis, Indiana, and has a designated agent for service of process in Sacramento, California.

29.     Defendant International Fidelity Insurance Company is incorporated in the state of New Jersey, has its principal place of business in Newark, New Jersey, and has a designated agent for service of process in Walnut Creek, California.  International Fidelity is a member of AIA, the nation's largest bail surety administrator, with offices in Calabasas, California.

30.     Defendant Lexington National Insurance Corporation is incorporated in the state of Maryland, has its principal place of business in Cockeysville, Maryland, and has a designated agent for service of process in Los Angeles, California.

31.     Defendant Lexon Insurance Company ("Lexon") is incorporated in the state of Texas, has its principal place of business in Mount Juliet, Tennessee, and has a designated agent for service of process in Sacramento, California.  Lexon Insurance is a member of the J.A. Patterson Group.

32.     Defendant North River Insurance Company ("North River") is incorporated in the state of New Jersey, has its principal place of business in Morristown, New Jersey, and has an agent for service of process in Orange, California.  North River is a member of the Crum & Forster group.

33.     Defendant Philadelphia Reinsurance Corporation is incorporated in the state of Pennsylvania, has its principal place of business in San Diego, California, and has a designated agent for service of process in San Diego, California.

34.     Defendant Seaview Insurance Company ("Seaview") is incorporated in the state of California with its principal place of business located in Carlsbad, California.  Seaview is the

surety for Defendant Two Jinn, Inc.'s bail bonds, and is a wholly-owned subsidiary of Seaview Surety Holdings, LLC.

35.     Defendant Seneca Insurance Company is incorporated in the state of New York, has its principal place of business in New York, New York, and has an agent for service of process in La Jolla, California.  Seneca is a member of the Crum & Forster group.

36.     Defendant Sun Surety Insurance Company is incorporated in the state of South Dakota, has its principal place of business in Rapid City, South Dakota, and has a designated agent for service of process in Los Angeles, California.

37.     Defendant United States Fire Insurance Company is incorporated in the state of Delaware, has its principal place of business in Morristown, New Jersey, and an agent for service of process in Orange, California.  United States Fire is a member of the Crum & Forster group.

38.     Defendant Universal Fire & Casualty Company is incorporated in the state of Indiana, has its principal place of business in Hudsonville, Michigan, and has a designated agent for service of process in Lancaster, California.

39.     Defendant Williamsburg National Insurance Company is a member of the Meadowbrook Insurance Group and is incorporated in the state of Michigan, has its principal place of business in Southfield, Michigan, and has a designated agent for service of process in Los Angeles, California.

40.     Collectively, the Defendants named in paragraphs 18-39 are referred to as the "Surety Defendants."

**C.      <u>Bail Agency Defendants</u>**

41.     Defendant All-Pro Bail Bonds Inc. is incorporated in the state of California with its principal place of business in Solana Beach, California.  It operates as a bail bond agent in California.

42.     Defendant Two Jinn, Inc. is incorporated in the state of California with its principal place of business in Carlsbad, California.  It is an affiliate of Seaview Insurance Company, and it does business as Aladdin Bail Bonds ("Aladdin"), Aladino Bail Bonds, AM/PM Bail Bonds, Andy's Bail Bonds, and Express Bail Bonds, and is incorporated in the State of

California, with its principal place of business in Carlsbad, California.  Two Jinn, Inc. operates as a bail bond agent in California.

43.     Collectively, the Defendants named in paragraphs 40-42 are referred to as the "Bail Agency Defendants."

**D.     Individual Defendants**

44.     Defendant Jerry Watson is the Vice President of the AIA and Senior Counsel and Board Member of Defendant American Bail Coalition.  Defendant Watson directly participated in the Conspiracy alleged herein and approved and ratified the conduct of AIA's members (including Defendants Allegheny Casualty Company and International Fidelity Insurance Company) and Defendant American Bail Coalition.  Upon information and belief, Defendant Watson is a resident of Oxnard, California.

45.     Defendant William B. Carmichael is the President and CEO of Defendant American Surety Company and the former President and Executive Director of Defendant American Bail Coalition.  He presently serves as the American Bail Coalition's Chairman. Defendant Carmichael directly participated in the Conspiracy alleged herein and approved and ratified the conduct of Defendants American Surety Company and American Bail Coalition. Upon information and belief, Defendant Carmichael is a resident of Indianapolis, Indiana.

46.     DOES 1-50, inclusive, were co-conspirators with other Defendants in the violations alleged in this Complaint and performed acts and made statements in furtherance thereof.  Plaintiffs are presently unaware of the true names and identities of those defendants sued herein as DOES 1-50.  Plaintiffs will amend this Complaint to allege the true names of the DOE defendants when they have been ascertained.

**IV.     PLAINTIFFS**

47.     Plaintiff Shonetta Crain resides in the County of Alameda.  In 2016, Ms. Crain paid an unlawfully inflated bond price to secure pretrial release of a relative charged and detained in Alameda County and against whom all criminal charges were subsequently dropped.  The bond was arranged through Defendant All-Pro Bail Bonds Inc. and underwritten by Defendant Bankers Insurance Company.  All-Pro told Ms. Crain that the price of the bail bond was 10%, and misled

her to believe that the price was non-negotiable and there was no available alternative price.  Ms.

Crain was not offered a rebate.  Although charges were dropped against her relative, Ms. Crain

was not refunded or reimbursed any portion of the bond premium.  She proceeds on her own

behalf and on behalf of a Class of similarly situated people subjected to Defendants' scheme.

48.     Plaintiff Kira Monterrey resides in the County of Contra Costa.  In 2016, Ms.

Monterrey (then Serna) paid an unlawfully inflated bond price to secure her own pretrial release.

She was never charged with an offense.  The bond was arranged through Defendant Two Jinn,

Inc., d/b/a Aladdin Bail Bonds and underwritten by Defendant Seaview Insurance Company.

Aladdin told Ms. Monterrey that the price of the bail bond was 10%, which it reduced to 8%,

because Ms. Monterrey certified she was a veteran of the United States Air Force, and thus

qualified for the lower premium.  Aladdin misled Ms. Monterrey to believe that the price was

non-negotiable and that there was no available alternative price.  Ms. Monterrey was not offered a

rebate.  Although she was never charged with a criminal offense, Ms. Monterrey was not

refunded or reimbursed any portion of the bond premium.  She proceeds on her own behalf and

on behalf of a Class of similarly situated people subjected to Defendants' scheme.

## V.     CLASS ALLEGATIONS

49.     Plaintiffs bring this action on behalf of themselves and all others similarly situated

(the "Class"), pursuant to Federal Rule of Civil Procedure 23.  The Class is defined as follows:

> All persons who, between February 24, 2004 and present (the
> "Class Period"), paid for part or all of a commercial bail bond
> premium in connection with a California state court criminal
> proceeding.  Specifically excluded from this Class are Defendants;
> the officers, directors or employees of any Defendant; any entity in
> which any Defendant has a controlling interest; any affiliate, legal
> representative, heir or assign of any Defendant and any person
> acting on their behalf; any person who acted as a bail agent during
> the Class Period; any judicial officer presiding over this action and
> the members of his/her immediate family and judicial staff; and any
> juror assigned to this action.

50.     Based upon the nature of the trade and commerce involved, there are at least

hundreds of thousands of Class members dispersed throughout the State of California.  According

to one report, approximately 27.8% of individuals booked on misdemeanors or felonies in

1   California from October 2011 to October 2015 (approximately 180,000 people) were released

2   pretrial on bail. Nearly all rely on commercial surety bonds.

3       51.   The questions of law and fact common to the Class include but are not limited to:

4           a.    Whether the conduct of Defendants and their co-conspirators violated

5   Section 1 of the Sherman Act, 15 U.S.C. § 1;

6           b.    Whether the conduct of Defendants and their co-conspirators violated

7   sections 16720, *et seq*., of the California Business and Professions Code;

8           c.    Whether the conduct of Defendants and their co-conspirators violated

9   sections 17200, *et seq*., of the California Business and Professions Code;

10          d.    Whether Defendants' acts, contracts, combinations and/or conspiracies

11   restrained trade, commerce, or competition for the sale of bail bonds in California;

12          e.    Whether Defendants fraudulently concealed their misconduct;

13          f.    Whether Plaintiffs and the Class they seek to represent have suffered

14   antitrust injury and/or have been threatened with antitrust injury; and

15          g.    The type and measure of damages suffered by Plaintiffs and the Class.

16      52.   These and other questions of law and fact are common to the Class, and

17   predominate over any questions affecting only individual members of the Class.

18      53.   Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and members of

19   the Class sustained damages arising out of Defendants' common course of conduct in violation of

20   the laws alleged herein. The damages and injuries of each Class member were directly caused by

21   Defendants' wrongful conduct.

22      54.   There are no defenses of a unique nature that may be asserted against Plaintiffs

23   individually, as distinguished from the other members of the Class, and the relief sought is

24   common to the Class.

25      55.   Plaintiffs will fairly and adequately protect the interests of the members of the

26   Class. Plaintiffs' interests are aligned with, and not antagonistic to, those of the other members of

27   the Class, and Plaintiffs have retained counsel competent and experienced in the prosecution of

28   antitrust class action litigation to represent themselves and the Class.

56.     Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

## VI.   DEFENDANTS CONSPIRED TO ARTIFICIALLY INFLATE THE PRICES OF BAIL BONDS IN CALIFORNIA

### A.     The Market for Bail Bonds in California

58.     Most people arrested on suspicion of violating California's criminal laws have the right to seek and post bail for their release.  An arrestee who cannot afford the posted bail can contract with a bail agency to post bail in exchange for a non-refundable premium.  At the time of arrest, during the booking process, the arrestee must be afforded an opportunity to call a bail agency to initiate the process of obtaining a bail bond, and retains that right throughout any pretrial detention.

59.     Consumers of commercial bail pay a premium in exchange for the bail agency's service of posting the bond.  The transaction is carried out through a bail agent who posts a bond with the court that allows the arrestee to leave custody pending trial.  If the arrestee attends all court dates, the posted bond is "exonerated," releasing the surety and bail bond company from all liability.  However, the consumer does not get any portion of his or her premium back.  This is true even if a prosecutor never files charges, all charges are dismissed, or the accused is acquitted.

60.     The premium is expressed as a percentage of the bail amount set by the court, which is based, in turn, on a county schedule that assigns bail amounts according to the alleged crime.  For bail bonds sold in California, sureties must file a rate application with the California Department of Insurance ("CDI") stating a proposed premium—again, expressed as a rate—that

the surety may charge its consumers.  All Surety Defendants have made the requisite filing, received approval, and currently sell bail bond products in California or did so during the Class Period.

61.     The revenue from a bail bond premium is split between the surety underwriting the bond, and the bail agent who receives a commission.  The amount retained by each is based on a contractual arrangement between them.  Contractual agreements establishing the relationship between sureties and bail agents include strictures like the following: "The premiums to be charged and collected" by the bail agent "shall be at such rates as may be approved by the Department of Insurance of the State of California or by statute, or in the absence of some such established rates, as may be prescribed by the [surety]."

62.     Any rebate to a consumer initially comes out of the bail agent's commission.  But as Defendant Carmichael has complained, "[s]urety companies have continued to accept less and less as their share of the premium in the form of higher and higher commission rates to the agents."  The Surety Defendants understood that, while rebates might initially be provided by their agents, competitive rebating would force the Surety Defendants to forgo a portion of their share of the premium.

63.     The "standard" premium, as California's bail industry refers to it, is 10% of the bail amount set.  That is the default rate that *all* Surety Defendants have filed with CDI.  The Surety Defendants have also filed 8% rates for a limited set of criminal defendants—those represented by an attorney, veterans, teachers,  government employees, union members, and/or those who provide collateral.

64.     Although California law bars sureties and agents from charging more than the approved premium, they can charge less by offering rebates to consumers.

65.     All prices paid by members of the Class were determined, at least in part, by the inflated "standard" rate of 10%.  The "standard" rate is the benchmark reference price by which all bail bond prices are determined.  If the "standard" rate fell to reflect competition, Class members who paid the default premium rate would have paid less.  Class members who qualified for the discounted premium rate also would have paid less, because the discounted premium rate

also would have fallen.  And Class members who managed to negotiate a lower price by obtaining a rebate would have paid less, because their negotiation would have been based off of a lower benchmark reference price.

66.     The market for bail bonds in California also has profound information asymmetries that Defendants exploited to inflate prices.  The typical consumer of a bail bond is desperate to secure either their own release or the release of a loved one.  The jailed individual may have children who need to be cared for and a job they may lose if not released.  The jailed individual may fear for their physical safety.  These consumers are not situated to conduct detailed market research before making a bail bond transaction.  They do not possess a key piece of information: bail bond prices are negotiable, and bail agents are legally permitted to provide rebates to lower the price.  Defendants colluded to deprive consumers of this critical fact so that they could be misled into paying supracompetitive prices.

**B.     The California Bail Bonds Market Is Ideally Suited to Price-Fixing**

67.     Economists who study industrial organization and collusive behavior know that to be effective, a cartel requires three things:  the ability to reach agreement, the ability to detect breaches of agreement, and the ability to punish breaches.  They have identified additional factors that indicate whether a given market is especially susceptible to collusion.  The United States Department of Justice and Federal Trade Commission, in their joint Horizontal Merger Guidelines ("Guidelines"), most recently revised in 2010, highlight many of these factors as well because they raise concerns that a particular merger or acquisition will lead to coordination in industries already ripe for it.  Reviewing these factors shows how susceptible California's bail industry has been for collusion.

**1.     Bail Bonds Are Homogenous Commodities**

68.     It is easier for competitors to reach an agreement and detect cheating on the agreement in markets for what economists call "homogeneous" products.  For a consumer, two products are homogeneous when they have few if any meaningful differences.  The cross-price elasticity of demand measures how the quantity demanded of one product changes as the price of another product changes.  An economist measures whether two products are homogeneous in part

by looking at the cross-price elasticity of demand between them.  If a slight price increase in product A substantially increases the quantity of product B that consumers purchase, meaning consumers are substituting or switching in favor of product B in response to the price increase in product A, they are more likely to be homogeneous.

69.     Gasoline purchased at gas stations is an example of a homogeneous product. Although gas stations may compete against each other with add-on services, gasoline has three standard grades—premium, midgrade, and regular—the prices of which are visibly posted and can be seen by potential consumers as well as competitors.  So, for example, if two gas stations compete to sell the three standard grades of regular gasoline, of course there will be slight differences between the two gas stations (one might offer a carwash), and even between the crude oil refined to make the gasoline, but if one gas station's regular gasoline is sold for $3 a gallon, and the other's for $4, the vast majority of consumers will buy what is to them the same gasoline for $1 less—indeed, research shows that local competitive intensity is a good predictor of variations in pricing of gasoline by gas stations.  Because the gasoline is otherwise the same from consumers' perspective, competition occurs only on price, and so only an agreement on that parameter is required for collusive pricing to occur.  The more differentiated products are, however, the more parameters require agreement, and the harder it is to reach agreement.

70.     The Guidelines importantly note that goods need not be identical for the increased risk of collusion to exist:  it is enough for them to be "relatively homogeneous."  For example, credit-lending markets are thought by economists to be relatively homogeneous.  While each borrower may have slight differences in risk of default, borrowers are routinely categorized into a small number of pools based on risk profiles determined from actuarial analysis, and lenders compete on price to service the pool.

71.     A bail bond serves one purpose, and one purpose only, for its consumer:  to avoid time in jail after arrest, for themselves or their loved ones.  The consumer does not care what color or quality paper is used in the bond contract, or whether they can keep the pen they use to sign it.  The consumer does not care who the backing surety is—and may not even be aware of its

identity until signing the agreement.  Differences in availability of payment plans do not change the fact that bail bonds are a relatively homogeneous commodity from consumers' perspective.

72.    Bail is, if anything, more homogenous than other insurance products because courts are constitutionally charged with assessing flight risk in the first instance in deciding whether to set bail and for how much:  "In fixing the amount of bail, the court shall take into consideration the seriousness of the offense charged, the previous criminal record of the defendant, and *the probability of his or her appearing at the trial or hearing of the case*."  Cal. Const. art. I, § 12 (emphasis added).  Courts are also constitutionally required to consider the safety of the alleged victim and their family "in fixing the amount of bail and release conditions for the defendant."  Cal. Const. art. I, § 28.  And a 2019 study found that "[f]orty-nine of California's 58 counties use pretrial risk assessment tools alongside bail" including "demographic, and/or socioeconomic information to make 'risk predictions' of whether individuals are likely to be arrested during the pretrial period or to miss their court date."  Thus, the process of judicial bail-setting makes bail bonds even more homogeneous with regard to risk of flight than they would otherwise be, because bail bonds are being issued to a population where adjustments have already been made to account for flight risk.  With a more homogeneous product, an economist would expect premiums to be heavily correlated with the frequency of flight, yet in California, while the Surety Defendants regularly acknowledge that flight has extremely low probability, bail bond prices are inexplicably high.

## 2.    The Rate of Relevant Technological Change is Nearly Zero

73.    It is easier for competitors to reach an agreement and punish deviation from the agreement in markets with a low rate of technological change.  Markets characterized by frequent technological change are less susceptible to collusion, because with each technological change, agreements must be renegotiated.  The more innovation occurs, the more firms' revenue and/or cost functions may change.  Further, the less stable market shares become, the more—and the more often—firms' incentives change.  A firm that unlocks a new technological advantage may see a significant decrease in its cost of production, incentivizing it to reduce its price and take share from competitors.  Its competitors, in turn, know they cannot substantially reduce price to

match the innovator—or price even lower to punish the innovator for breaching the agreement— because it would require pricing below cost, but in later rounds of competition the competitors may be able to recapture share through their own innovations.  These sorts of dynamics make agreement on a single price or rate more difficult to reach.

74.     California may be a hotbed of technological progress in many industries, but the bail bond industry is not one of them.  There is little room for improving efficiency or reducing the costs associated with issuing a bail bond.  Further, although the California Department of Insurance does not regulate the competitiveness of premium rates or competition, it regulates many other aspects of bail bond agent behavior, such as prohibitions on solicitation by agents.  Such rigid regulations themselves reduce opportunities for innovation and the structural incentives to engage in maverick behavior.  As Defendant ASC's Vice President Michael Whitlock explained, "prohibiting soliciting has been instrumental in keeping out large retailers whose modis [*sic*] operandi is to enter a market with the express purpose of cutting premium rates to gain market share."  The lack of technological and other innovation in the bail bond industry means that the market landscape is relatively stable and thus more readily susceptible to collusion.

### 3.     Demand for Bail Bonds is Highly Inelastic

75.     It is easier for competitors to reach an agreement in markets that economists characterize as having demand that is highly inelastic with respect to the product's price.  Price-elasticity of demand, as described above, measures how the quantity of a product demanded changes in response to changes in price.  A product's "own" price elasticity of demand measures how the quantity of a product demanded market-wide changes in response to changes in its own price, rather than changes in the prices of other products.  In markets with own-price inelastic demand, if the product's price increases or decreases, the quantities demanded by consumers will not be significantly affected—in other words, consumers will not substitute to other products in large numbers.  A market with an own-price inelastic demand for its products is conducive to collusion because, in a conspiracy to raise prices above the competitive level, the quantities demanded will not significantly decrease—revenues will simply increase.

76.     Demand for bail bonds in California is inelastic with respect to its own price (premium less any rebates).  As Defendant Sun Surety Insurance Company admitted, this demand is what economists would call perfectly inelastic:  "In the court appearance bond industry, ***price has no effect on the volume of business written***."  (Emphasis added.)  Not purchasing a bail bond leaves alternatives that are few and unattractive:  the arrestee can stay in jail—risking loss of employment, harm to physical and mental health and to family relationships, and even deprivation of child custody—or pay the full amount of bail:  ten times Defendants' price-fixed standard premium.  Indeed, demand for bail bonds is inelastic even with respect to buying a bond for those other than oneself and one's loved ones, as illustrated by one sociologist's example from his experience working as a bail agent to study the industry:

> Toward the end of a long, boring shift, a young Laotian woman named Anna flew into the bail office.  Her ex was in jail, and she had to bail him out.  I explained that she needed to pay $150 (10 percent of the $1,500 bail) and co-sign the bond.  As she read the co-signer agreement, she sighed and shook her head.  She had recently left the defendant because she was tired of taking care of him.  Here she was, taking responsibility for him again.
>
> "So, why do it?" I asked.  Anna felt she had no choice:  If she didn't bail out her ex, he would remain in jail, unable to work or help care for their child.  Anna hurried through the paperwork and paid the cash, eager to get back to her mother, who was facing deportation to Laos.

77.     Defendants know that *market* demand for bail bonds is own-price inelastic—they know that no good, comparably priced substitutes exist.  They also know that for most consumers, demand for *a particular surety's product* would be elastic—if one surety increased its prices, consumers would flock to its competitors.  By the same token, with a relatively small price decrease, a surety could capture substantial share from its competitors.  Defendants have therefore exploited the inelasticity of market demand, and used misinformation and collusion to suppress a high elasticity of demand for a given surety's bail bonds through the Conspiracy alleged herein.  With the Conspiracy, they have been able to keep rates above where they would be in a competitive market, confident that consumers will continue to buy the bonds in substantially the same numbers.

1

### 4.   Bail Bonds Sales Are Small, Frequent, and Regular

2     78.    It is easier for competitors to reach agreement and detect cheating on the

3  agreement in markets where sales are small, frequent, and regular.  In industries with sales that

4  are, according to the Guidelines, "small and frequent rather than via occasional large and long-

5  term contracts," collusive agreements are likelier to succeed.  More frequent sales give

6  competitors greater ability to detect cheating.  The larger and less frequent the sales, the more

7  incentive for a conspiracy participant to undercut, with or without expected detection by other

8  participants.

9     79.    In 2018 alone, approximately 175,000 bail bonds were written in California,

10  according to CDI.  And according to one report, between 2011 and 2013, the average number of

11  bail bonds executed was 205,000.  They are sold one at a time, frequently, and at regular

12  intervals.  One does not walk into a bail agent office and purchase a thousand bail bonds at a time.

13  Thus, it is more difficult for a surety to benefit from breaking with the Conspiracy, because any

14  increase in sales volume from cheating must be achieved through many individual transactions.

15

### 5.   Bail Bonds Have Essentially Identical Production Costs

16     80.    It is easier for competitors to reach agreement in markets where competitors have

17  similar production costs.  Agreements on price—with or without rebating—require firms to

18  evaluate what the optimal price is.  If firms have similar production costs, the profit-maximizing

19  price will be easier to determine.  If firms have significantly different production costs, the profit-

20  maximizing price for one may be different than for another, making agreement harder to reach.

21     81.    The cost of producing a bail bond does not materially vary from one producer to

22  the next, in good part because bail bonds are not materially differentiated from each other.  The

23  extremely low loss ratios for the Surety Defendants, as discussed below, reinforce that production

24  costs are similar across them, that is, they are all near zero.

25

### 6.   High Barriers to Entry Exist for California Bail Sureties

26     82.    It is easier for competitors to reach agreement in markets with high barriers to

27  entry.  The more difficult it is for a new participant to enter a market, the more susceptible that

28  market is to collusion.  Participants in markets with high barriers to entry know that once an

1  agreement is operative, potential new undercutting competitors will first need to overcome entry

2  obstacles.

3       83.    The surety side of California's bail industry is characterized by high barriers to

4  entry.  Only licensed sureties may legally sell commercial bail bonds in California.  Becoming

5  licensed does not go without saying:  Defendant Universal Fire & Casualty Insurance Company

6  learned this several years ago, after unsuccessfully pursuing approval, despite its singular focus

7  on bail bonds and the fact that it was already writing them in numerous other states, leading to an

8  exasperated plea from its compliance manager to CDI:   "This is my 5th time trying to get our

9  application approved, so hints you can give me would be greatly appreciated."

10       84.    Not only are there regulatory entry barriers, but to be successful, a surety must

11  have a network of bail agents selling its bonds, which requires developing arrangements and

12  contracting with bail agents.  These "network effects" have been the subject of substantial

13  economic study, and provide a formidable obstacle to effective entry.

14                **7.    The Sureties Are Highly Concentrated and Act as Cartel Ringleader**

15       85.    It is easier for competitors to reach agreement, detect cheating, and punish

16  deviation from the agreement in concentrated markets with one or more effective ringleaders.

17  Moderately and highly concentrated industries tend to be riper for collusion as an empirical

18  matter, but particularly where a potential "ringleader" or "ringmaster" exists to enforce adherence

19  to the conspiracy.

20       86.    The Conspiracy has been led by the Surety Defendants, who are the prime movers

21  behind the cartel's enforcement efforts.  In particular, the California bail industry found a capable

22  ringleader in Defendant ASC.  As ASC's Vice President Michael Whitlock wrote:   "Price

23  gauging or predatory pricing is being addressed in several markets around the country.  California

24  Bail Agent Association president Barry Pearlstein said the problems are 'systemic'.  Fix the

25  system and you will correct those areas which allow large retailers to prostitute the bail industry

26  for short term gain."

27       87.    Defendant Carmichael has "fix[ed] the system" as needed since the dawn of the

28  conspiracy.  In 2005, Defendant Carmichael wrote that Defendant ASC "actively participate[s] in

just about every agents' association that we know of," in recognition of the "important role a surety must play in **protecting our markets**."  (Emphasis added.)  He explained to fellow sureties that "2005 will not be a year when we, as an industry, can sit passively by while competitive forces continue to encroach upon our markets."  As he put it (emphases added):

> I can safely predict that if left unchecked, rampant premium discounting will result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward.  **Simple economics dictates it**.
>
> I urge all of us to recognize the serious nature of the threats to our industry and **work collectively to repel them**.  **Leaving profit on the table, in the form of discounts or uncollected accounts receivable, is a fool's game**.  It reminds me of stripping the wood off the walls for a fire to stay warm.  It works briefly but eventually you have no fire and no building.

### 8.    Defections from Cartel Are Easily Detectable

88.    It is easier for competitors to reach agreement and punish cheating on an agreement in markets where detection of agreement breaches cheating is easy.  The Guidelines explain that "[a] market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals," which is more likely where terms offered to customers are transparent.  And "[r]egular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent."  Regular monitoring enabled by price transparency allows faster responses to correct the defector's behavior.

89.    Rate filings are public, and bail agents advertise the rates dictated by the sureties, but do not advertise the possibility of rebates.  This makes detecting any deviation easy.  Rival sureties will know if any of them attempts to seek permission for a lower premium, because California Insurance Code Section 1861.05 requires a 60-day public notice period before CDI may approve an application to change an insurance rate, CDI has published weekly public notice lists of rate applications since 1995, and CDI filings are easily accessible to the public in reading rooms and on CDI's website.

90.    Further, rival sureties coordinate their agents to monitor and report rebating practices.  As ASC explained, rival bail agents are "**our industry's** eyes, ears and mouths in

1  recognizing and ***alerting all*** to the impending attack [on the industry].  When you [agents]

2  become aware of a situation, ***please contact us*** so that we may assess the depth of the threat and

3  work alongside of you to craft ***an appropriate response***."  (Emphasis added.)

4        91.  Another aspect of the bail industry that reduces the ability of cheating to go

5  undetected is the legal prohibition on solicitation.  Violating this prohibition can be costly, as

6  California has charged bail agents with felonies for soliciting.  If competitors cannot solicit

7  customers with rebates, then they must advertise those rebates, in full view of their competitors.

8        92.  That cheating is not only easy to detect, but actually detected, in California's bail

9  industry is evident from the conspiracy's enforcement efforts to punish would-be mavericks.  For

10  example, in a 2014 online post, bail agent Chad Conley (also known as "Chad the Bail Guy")

11  explained the legal effect of Proposition 103 on bail agents' ability to give rebates to consumers:

12  "bail bonds are regulated under Proposition 103, which provides for premium rebates as long as

13  they are not unfairly discriminatory."  Mr. Conley's post is notable:  Plaintiffs have been able to

14  identify only one other public acknowledgement among the thousands of California bail agents

15  about their rebating authority under Proposition 103.  In a response to a comment on this post,

16  Mr. Conley stated that his efforts to provide lower prices for his bail bond clients resulted in

17  pressure from a "good ol boys club," which "came after [his] license for trying to save clients

18  money."  This retaliation also highlights the intimacy of bail industry incumbents.

19        **9.**    **Industry Social Structure and Trade Associations**

20        93.  It is easier for competitors to reach agreement, detect cheating, and punish

21  deviations from the agreement in markets anchored by familiar social structures and trade

22  associations.  An industry's social structure affects its conduct.  Industries that are close-knit and

23  in which competitors are friendly with each other may be more likely to reach collusive

24  arrangements.  As Adam Smith famously observed, "People of the same trade seldom meet

25  together, even for merriment and diversion, but the conversation ends in a conspiracy against the

26  public, or in some contrivance to raise prices."  Trade associations have frequently been the target

27  of antitrust enforcement because they provide opportunities for competitors to meet and fortify

28

1   the industry's social structure.  One study found that 30% of antitrust cases brought by the

2   government involve trade associations.

3        94.      It is hard to imagine an industry that speaks more often of acting collectively than

4   the bail industry.  The industry's leaders, talking to other industry insiders, frequently have

5   spoken of addressing threats to profits collectively.  As described further *infra*, Section VI.F.1,

6   trade associations play a vital role in sustaining the Conspiracy.

7        95.      Defendant Carmichael, Chairman of the trade association ABC, explained the

8   importance of trade associations in coordinating the activities of bail sureties and their agents

9   (emphasis added):

> In 1986, when Jack and I started, we dreamt of an industry solidly
> united against its foes.  National, State and Local associations well-
> versed in the vital roles they play in the protection and betterment
> of our markets. . . . ***We wished for a cohesive band of agents and***
> ***companies whose power, when combined, far exceeded the power***
> ***of an unorganized group of single businesses***. . . . Our Company
> will continue to provide its resources, both financial and personnel,
> to any effort which can be demonstrated to be trying to grow the
> surety-backed agency channel.

15       96.      The Golden State Bail Agents Association ("GSBAA") functions similarly to ABC

16  and was founded in 2004—the year *Pacific Bonding* eliminated any ambiguity about whether

17  rebating was permissible—by "competitors, [who] discovered that they had a lot in common and

18  formed GSBAA to pursue their common interest in promoting and propagating the California bail

19  industry."

20       97.      The industry's leaders, talking to other industry insiders, frequently have spoken of

21  addressing threats to profits collectively.

22       98.      In addition to those instances discussed above in connection with other plus

23  factors, Dennis Bartlett, former Executive Director of Defendant ABC, has noted, higher bail

24  amounts have "disadvantaged not only defendants but bail agents, some of whom have cut

25  premium rates in order to write any bonds at all," and explained that in response, "***[t]he bonding***

26  ***industry has worked hard to rectify this abuse***."  (Emphasis added.)

27       99.      Even the industry's public-facing efforts speak of the industry as an

28  undifferentiated, monolithic entity.  Defendant CBAA's lobbyist told the press when California

1  was considering legislation to end cash bail: "You don't eliminate an industry and expect those

2  people to go down quietly." He added: "Every single weapon in our arsenal will be fired."

3       100.   The industry also relies on trade association meetings which provide opportunities

4  to conspire. Each of the Trade Association Defendants hosts meetings that provide opportunities

5  for sureties and bail agents to collude. Bail industry trade associations also collect information on

6  rates and rebating practices to share with other agents and sureties.

7       **C.   The 10 Percent "Standard" Premium Rate Makes No Economic Sense**

8       101.   California's bail industry does not merely display signs of susceptibility to

9  collusion—it functions using a business model that cannot be otherwise explained, and its

10  participants' statements confirm that collusion is actually occurring.

11      102.   Other insurance markets—from healthcare to life insurance to farmers' insurance

12  for crops—are generally priced based on risk factors that predict the likelihood that the insurer

13  will have to pay out, together with other actuarial practices that are frequently based on

14  proprietary formulas and market competition. That, after all, is why insurance exists as a

15  business: risk underwriters are betting that they can assess the probability that certain events will

16  happen better than the persons who will experience those events, and underwriters perceive a

17  value in spreading that risk across a large pool of customers. The more precise and accurate the

18  insurer's measurements, the better the insurer will perform, other things equal.

19      103.   The Surety Defendants price bail bonds in a very different way from typical

20  insurance products: they have nearly uniformly filed for a standard premium rate of 10 percent of

21  the posted bond. Many sureties also offer "preferred" rates of 8 or 7 percent for consumers who

22  meet enumerated and nearly identical criteria (*e.g.*, veterans, homeowners, union members,

23  government employees, or representation by a private lawyer). Even these "preferred" rates are

24  the product of collusion and are higher than they would have been if the sureties had not agreed to

25  the same "standard" premium rate of 10 percent. That is because the standard premium rate is a

26  reference price for any preferred premium rates. These rates do not result from a remarkable

27  coincidence of actuarial analyses. Indeed, when Defendant Financial Casualty & Surety, Inc.

28  applied to CDI for permission to enter California's bail bond market in 2004, it also sought

permission to use a 10% rate, cited the fact that all other California sureties used the same rate, and stated, **"[t]here is no actuarial justification for bail bond rates filed by any insurance company writing bail bond surety.**"  (Emphasis added.)  The rates, therefore, are the result of collusion.  Defendant Financial Casualty & Surety confirmed that fact, too, describing every insurance company's request for a 10% rate as "**essentially 'ME TO[O]' filings.**"  (Emphasis added.)

104.   Gross profit margins also distinguish California bail bonds from more traditional insurance markets.  In a competitive market, pricing will be driven down to the marginal cost of providing a good or service.  Thus, in general, the lower the expected need to pay out on a claim, the lower the marginal cost of supplying insurance; and the lower the marginal cost of supplying insurance, the lower the premium should be in a competitive market.

105.   Indeed, economists often assess the competitiveness of an insurance market by looking at the fraction of premium revenue that insurers pay out to cover claims (the "loss ratio"), net of any commissions paid to insurers' agents, as appropriate:

$$\text{Loss Ratio} = \frac{\text{Incurred Losses}}{\text{Written Premiums - Commissions}}$$

106.   The lower the loss ratio, the higher the profit margins, and the less competitive the market is likely to be.  In California, the 2017 loss ratio across all lines of insurance was roughly 78%, and in 2018, it was roughly 72%.

107.   The California bail bonds market as a whole exhibits an extremely low loss ratio.  On the one hand, costs are low:  the expected need to pay out is minimal because criminal defendants rarely "jump bail" and even when they do, the bond, even if forfeited, is typically exonerated.  For instance, Defendant AIA has been operating in the bail market for 107 years (now underwriting $700 million of bail annually), and its Vice President, Defendant Jerry Watson (also Senior Counsel and Board Member of Defendant American Bail Coalition) has admitted:  "You know how many checks has this company written to pay a bail loss? **Not a single one.**"

(Emphasis added.)  Similarly, in a 2015 financial statement, Defendant Continental Heritage Insurance Company reported that "[t]he Company has not paid a loss on its . . . bail segments during the past 17 years."  Defendant Seaview's 2011 application to CDI also reported that "sureties consistently incur extremely low losses," and that "it is not at all uncommon in the commercial bail industry for bail sureties consistently to experience loss ratios at or just slightly above 0.0%."

108.    Indeed, a report by the San Francisco Office of the Treasurer & Tax Collector observes that "bail bond agencies are rarely held accountable to the courts when an individual fails to appear."  In San Francisco, for example, bail bond agencies are released from their obligation to pay approximately 4 out of every 5 challenges they make to a bail forfeiture.  People facing criminal charges rarely skip bail, and, when they do, bail agents and sureties are rarely forced to pay up.

109.    The Surety Defendants have numerous other protections against losses.  Their agents have an opportunity to cure any forfeiture through various means, and their agents pay any related expenses.  Agents use bail bond indemnity agreements that require the criminal defendant and any co-signers to indemnify both the agent and the surety for any losses.  Agents frequently require collateral, in the form of cash deposits or trusts on real property, as another resource to pay for potential losses.  The Surety Defendants also require their agents to deposit a fixed percentage of the gross bail premium received into an escrow account, known as a build-up fund ("BUF") or a contingent reserve account ("CRA"), which the Surety Defendants hold in trust as further collateral.  Further, even if the BUF or CRA is exhausted, the agent themselves are obligated to pay for losses directly and indemnify the surety against any losses.  It is thus no surprise that the Surety Defendants often report *zero* losses.

110.    Notwithstanding the extremely low number of bail bond obligations that sureties ever have to pay out, premium revenues are high, thanks to both pricing and volume.  According to Defendant American Surety Company, "[w]ith the highest average bond in the nation at approximately $14,000, more commercial bail is written in [California] than in any other [state]."  Every year between 2011 and 2013, California-licensed sureties underwrote bonds with a face

value of more than $4.4 billion.  In each of these years, 13 of the 17 licensed sureties for which data exists collected more than $308 million in nonrefundable premium fees per year, on average, from criminal defendants and their families.  The CDI estimates that "[t]he business costs of a bail bond company are typically 20% of the bail fee to be paid to the surety company," meaning gross profit margins may be as high as 80%.

111.    In no competitive insurance market are loss ratios that low and gross profit margins that high.  The premiums found in the California bail bonds market make no economic sense, and can be explained only by a market failure.  The market failure here is Defendants' conspiracy to keep the "standard" premium rate fixed at 10% and suppress discounting or rebating.

112.    Defendant Carmichael, President and CEO of ASC, and current Chairman and former President and CEO of Defendant American Bail Coalition, has long recognized that if the sale of commercial bail bonds were a competitive market, the profitability of ASC and other Defendants would plummet, because sureties rarely have to pay out a bond to a court.  Those low costs should otherwise encourage discounting by sureties to increase their respective market shares.  Carmichael and other sureties have recognized the need to avoid the "simple economics" that would create a market "reflect[ing] the proper balance of risk and reward"—*i.e.*, a market with low premiums to reflect the low likelihood that a criminal defendant will "jump bail" and a surety will have to pay out on a bond.  Carmichael called upon bail bond agents to be "our industry's eyes, ears and mouths in recognizing and alerting all to the impending attack [on the industry].  When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response."  And that is exactly what they did.

**D.    Defendants' Extraordinary Profits Could Not Be Sustained Without Collusion**

113.    Although the economic plus factors described above make the California Bail Bonds market highly susceptible to price-fixing, the Surety Defendants could not sustain a 10% "standard" premium, or avoid advertised discounting through rebates, absent an agreement among

them.  The reason is that each Surety Defendant had a huge amount to gain if it decided to compete against its rivals by seeking approval for a lower standard premium or by promoting discounting through rebates.  By the same token, each Surety Defendant had a huge amount to lose if it failed to lower the prices of bail bonds while its rivals did so.

114.    This dynamic is a classic prisoner's dilemma (no pun intended).  The prisoner's dilemma describes a situation in which two prisoners who commit a crime together are jailed separately.  They will both go free if neither prisoner confesses; if only one prisoner confesses, the prisoner offering the confession will receive a more lenient sentence, while the other who did not confess will receive a more severe sentence.  If both confess, they will both receive severe sentences.  When neither prisoner knows or has assurances about what the other prisoner will do, each is better off by informing on the other, regardless of what the other prisoner does.  Hence, both prisoners inform and both are convicted and receive severe sentences.  If both prisoners get off scot-free, then, it is because they have reached and followed an agreement not to inform on each other.

115.    This dynamic is why, in competitive commodity markets where collusion is not present, firms compete on price and the stable outcome is a price level very close (if not identical) to marginal costs.  This would have occurred in the California bail bond market, too, if there were no price-fixing conspiracy.

116.    The chart below summarizes this dynamic at work in the California bail bond market with respect to two hypothetical sureties, Surety A and Surety B, and demonstrates what happens when both parties collude (Box 1, top left), when one party competes but the other does not (Boxes 2, top right, and 3, bottom left), and when both parties compete (Box 4, bottom right).  In each box, Surety A's market share is depicted with a dotted background based on the bail bond premium it charges.  Surety B's market share is depicted with a solid gray background based on the bail bond premium it charges.



Dotted Background = Surety A's Market Share
Solid Background = Surety B's Market Share

117.    As demonstrated above, Surety A and Surety B would prefer to maintain their market shares at the inflated premium rate of 10 percent as long as they have assurances that the other Surety will do the same (Box 1).  However, in a world where there is no agreement, Surety A fears that Surety B may compete by lowering its standard premium while Surety A does not, leading to the least profitable outcome for Surety A, *i.e.*, the loss of market share to Surety B (Box 2).   The reverse also holds true without an agreement between the sureties: Surety B fears that Surety A may lower its standard premium while Surety B does not, leading to the least profitable outcome for Surety B, *i.e.*, the loss of market share to Surety A (Box 3).  Hence, absent collusion, Surety A and B will both pursue their unilateral self-interest by competing on price, resulting in a situation in which each surety will maintain its respective market share at the lower price level (Box 4).

118.    The competitive outcome reflected in Box 4 is what Game Theory refers to as the "Nash Equilibrium": a stable result whereby no Surety can gain by a unilateral change of its strategy at the same time another Surety maintains the same strategy.  The Surety Defendants

1    understood this dynamic well, and colluded with each other to avoid the Nash Equilibrium of

2    competitive prices.

3           **E.      Proposition 103 Posed An Existential Threat To Defendants' Bloated Profits**

4           119.    In November 1988, California voters enacted the Insurance Rate Reduction and

5    Reform Act ("Proposition 103"), which allowed insurers to charge consumers less than the

6    standard rate they submitted to the CDI by offering rebates or discounts.  The express purpose of

7    Proposition 103 was, among other things, "to protect consumers from arbitrary insurance rates

8    and practices [and] to encourage a competitive insurance marketplace."

9           120.    Less than two years later, in March 1990, the California Attorney General issued

10   guidance expressly stating that Proposition 103 allowed for rebating and discounts, and made

11   clear that the CDI no longer had authority to regulate the competitiveness of filed rates.  As the

12   Attorney General explained, "Proposition 103 . . . divest[s] the commissioner of earlier authority

13   over the competitiveness of rates."

14          121.    The California Insurance Code §1861.05(a) similarly explains that while the CDI

15   reviews and approves premium rates that sureties submit, it is prohibited from—and does not—

16   assess whether premiums submitted to it result from unlawful coordination among competing

17   sureties, nor does CDI conduct any review or supervision of discounts or rebates offered.  *See*

18   Cal. Ins. Code §1861.05(a) ("[i]n considering whether a rate is excessive, inadequate or unfairly

19   discriminatory, *no consideration shall be given to the degree of competition . . . .*") (emphasis

20   added).

21          122.    In February 2004, case authority removed any doubt that the bail industry was

22   subject to Proposition 103, and could offer rebates and discounts.  *See Pacific Bonding Corp. v.*

23   *John Garamendi*, No. GIC815786 (Cal. Super. Ct. Feb. 24, 2004).  In *Pacific Bonding*, the trial

24   court enjoined the CDI from enforcing an anti-rebate statute pre-dating Proposition 103.  The CDI

25   provides a link to this decision on its website, and explains that "to become more competitive, a

26   bail agent may choose to negotiate a lower fee by rebating, as allowed by Proposition 103."

27          123.    Thus, the bail industry was aware of as of at least February 2004 that CDI was not

28   evaluating the competitiveness of the submitted premiums, and that it was permissible to offer

rebates and discounts off of approved premium rates.  The ability to compete by submitting lower premium rates for approval, and the ability to discount freely below those premiums through rebates, posed an existential threat to the bail industry's profits.

124.    Market dynamics would normally provide a strong incentive to compete on price. As discussed above, the loss ratios and profit margins of the California bail bonds market strongly suggest a lack of competition.  In a competitive market for the sale of commercial bail bonds, one would expect sureties to file lower proposed bond rates and bail bond agents to advertise rebates, based on market conditions and actuarial determinations.  Sureties would encourage bail agents to offer rebates, because the sureties would know that reducing prices would allow them to increase their market share, with little downside risk because of the rarity with which criminal defendants "jump bail" and with which collection is sought from sureties.  As discussed *supra* at Section VI.D, the decision by any single surety to compete aggressively on price (either through lower premiums or advertising rebates), would allow that surety to take market share away from other sureties.  Were that to happen, all sureties would be forced to compete, and prices actually paid by Class members would be lower across the board.  As Defendant Carmichael put it, "simple economics dictates it."

125.    The Conspiracy has even prevented this from happening in the face of the industry's shrinking size. With the onset of what is typically referred to in industrial-organization literature as "secular decline"—long-term reduction in demand for a product, rather than cyclical shifts—the standard response in other industries has been vigorous price competition. Yet despite these changes, Defendants have avoided competing on price.

**F.    Defendants Colluded To Deprive California Consumers of the Competition Proposition 103 Required**

**1.    Trade Association Defendants**

126.    The following three Trade Association Defendants played critical roles in creating and maintaining the Conspiracy.

### a.      American Bail Coalition

127.     Defendant American Bail Coalition ("ABC") is a trade association for the national bail underwriting insurance industry.  Many of the Surety Defendants are current members of Defendant ABC:   American Surety Company, AIA members Allegheny Casualty Company and International Fidelity Insurance Company, Sun Surety, and Bankers.

128.     ABC, along with other Trade Association Defendants, hosts meetings that provide opportunities for sureties and bail agents to collude.  As Defendant Carmichael explains in his 2006 article "Who Do Associations Serve?," posted on ASC's website:

> Any number of local, state and national gatherings of the bail industry have taken place in the past year.  Each designed to provide a forum in which concerned members of our industry could gather, share ideas and plan strategies which would expand, protect and advance our industry in their respective markets.  Any successful association will have as its basis the commonality of an idea or likemindedness.

129.     According to Defendant ASC VP Whitlock's blog, "[a] bail industry meeting took place on the 2nd floor of the Crown Plaza Hotel down the street from LAX on November 2, 2011.  The meeting was organized by the American Bail Coalition and included representatives of not only the members of ABC, but California's two bail agent associations, California Bail Agents Association and The Golden State Bail Agents Association and representatives of Aladdin Bail Bonds, the state's largest retailer.  This cooperative was named the California Bail Coalition (CBC)."

130.     In fact, ABC's Board of Directors developed its own American Bail Agent Coalition ("ABAC") to "creat[e] a platform to empower bail agents to participate in real advocacy efforts and solutions for our industry."  According to its own website, "[t]he purpose of ABAC is to protect the interests and prosperity of the commercial surety bail agent in the United States of America and to strengthen the partnership between surety partners and licensed commercial bail agents."

131.     ABC and ABAC allow sureties and agents to exchange information about the bail industry.  Bail agent membership in ABAC includes, *inter alia*, "access to industry research and experts."  ABAC provides different membership levels:  "Advocate Membership," which any

licensed bail agent, surety, or general agent may join, and the elevated "Associate ABAC Membership," which only those bail agents that work with the surety members may join. Associate ABAC Membership gives bail agent members "Access to ABAC members [*sic*] only online discussion board."  The ABAC touts its Associate ABAC Membership as "Being an active member of the national effort to preserve the bail industry."

132.    ABC hosts conferences for the ABAC bail agents.  As recently as November 2019, ABC hosted the 4th Annual American Bail Agent Coalition Conference in Las Vegas, Nevada. Among the "Sustaining Member Companies" were Defendants ASC, AIA, Bankers, and Sun Surety.  Such conferences provided the participating Defendants opportunities to collude.

133.    ABC plays an important role in detecting and punishing those who attempt to deviate from the Conspiracy.  Dennis Bartlett, former Executive Director of Defendant ABC, explains that higher bail amounts have "disadvantaged not only defendants but bail agents, some of whom have cut premium rates in order to write any bonds at all," and explained that in response, "*[t]he bonding industry has worked hard to rectify this abuse*."  (Emphasis added.) For example, in 2005, Defendant Carmichael, who currently serves as Chairman of ABC, wrote that his bail surety company, Defendant ASC, "actively participate[s] in just about every agents' association that we know of," in recognition of the "important role a surety must play in *protecting our markets*."  (Emphasis added.)

134.    The coordination extends to the national level, with the "ABC [] working with a large coalition that includes California's two state associations, CBAA and GSBAA," according to ASC VP Whitlock's blog written in 2017.  In that same blog, Whitlock wrote that "[t]he cooperation among industry competitors at both the agency and surety level has been nothing short of inspiring."

135.    ABC seeks donations from its members.  As described below, many of the Surety Defendants have made donations, some totaling hundreds of thousands of dollars, to ABC.  In 2017 and 2018, for example, Surety Defendants ASC, American Contractors Indemnity Co., Bankers Insurance Company made donations of $277,717, $115,000, and $246,563, respectively.

### b. California Bail Agents Association

136.    The California Bail Agents Association is the primary industry association of bail agents in California.

137.    CBAA hosts annual conventions every year.  The 39th Annual Convention was held in Reno, Nevada on October 1, 2018.

138.    The CBAA provides material to the general public in service of the Conspiracy, designed to hide the Conspiracy behind misleading omissions.  The CBAA's "How Bail Bonds Works" web page deliberately misleads consumers, but also ensures its members know the association-wide policy:   "Each surety company must file rates with the Department of Insurance.  Bail agents representing a company must charge the same, filed rates."  The CBAA does not disclose that agents are allowed to rebate freely based on market competition.

139.    The CBAA also maintains information regarding premiums charged that Defendants and their agents can use to detect and prevent premium discounting.  For example, in a CDI filing by Defendant Universal Fire & Casualty Insurance Company stated in a 2017 filing that it was "***basing its rates for bail bonds on rate data obtained from the California Bail Agents Association.***"  (Emphasis added).

140.    Among the services CBAA offers its members are training courses.  Sean Cook, of Bail Bonds Universal California, Board Member At-Large of the CBAA, and author of the e-book "Bail Bonds 101," which the CBAA advises is an essential starting point for all bail agents, works to "educate" bail agents into the Conspiracy.

141.    For example, in an article titled "Running a Bail Bond Business:  Answering Calls," Cook advises:

> [T]he caller may be shopping to see what fees you charge, but always keep in mind that your state DOI regulates the fees for bail bonds and if a competitor offers a lower percentage fee, they WILL make up the point or two somewhere in the transaction.  In California, the only time you might lower the fee to 8%, which is 2% less than the standard 10%, is if you are working with a referral from an attorney.

142.    CBAA also provides agents with the opportunity to exchange information about the bail industry.  CBAA's website explains that among the benefits of joining the Association

1    are:  "Valuable Information:  CBAA is a valuable source of information pertaining to the bail

2    industry. As a member, you will have access to information that will assist you with questions

3    pertaining to your business and profession."  This "information" includes pricing data that

4    sureties and bail agents use to fix bail bond prices.

5                          c.      **Golden State Bail Agents Association**

6            143.    The Golden State Bail Agents Association ("GSBAA") was founded in 2004—the

7    same year *Pacific Bonding* eliminated any ambiguity about whether rebating was permissible—

8    by "competitors, [who] discovered that they had a lot in common and formed GSBAA to pursue

9    their common interest in promoting and propagating the California bail industry."  GSBAA's

10   website describes its purpose as follows:

11               The Golden State Bail Agents Association, Inc. (hereafter "GSBAA") is a
                 non profit corporation dedicated to facilitate professional interaction,
12               cooperation and communication between individuals and organizations
                 engaged in the bail industry in California, to improve business conditions
13               and promote professionalism in California's bail industry, to advance the
                 common business interests of individuals and organizations engaging in
14               the bail industry and to engage in public educational activities and
                 advocacy regarding the business interests of California's bail industry.
15

16           144.    Its website further explains:  "[t]here are many reasons to join GSBAA including

17   being kept abreast of issues affecting the California bail industry through our web site, email

18   alerts and other correspondence, networking with other like minded professionals in the bail

19   industry, and attending our meetings."  GSBAA hosts one live annual conference a year for its

20   members, and quarterly telephonic meetings.  These meetings allow GSBAA members to share

21   information about the bail industry.

22           145.    GSBAA is run by several significant members of the bail industry that work with

23   many of the Defendant Sureties.

24           146.    For example, GSBAA was founded by Topo Padilla, the owner of Greg Padilla

25   Bail Bonds, whose bonds are underwritten by Lexington National Insurance Corporation.  In

26   January 2019, the website for Padilla Bail Bonds (License No. 1639213) states, on behalf of its

27   surety Lexington National:  "The California Law mandated bail bond fee (also called premium) is

28   10% of the bail. This is non-refundable, but can be lowered to 8% if you qualify for the

discount—if you're a veteran, union member or have a lawyer retained." Like Defendants' other remarkably similar statements, this is calculated to mislead consumers into believing that discounts or rebates are unavailable.

147.   Jeff Stanley also serves on the board of GSBAA; he is President of BBBB Bonding Corporation (Bad Boys Bail Bonds) and a co-founder of the GSBAA. Bad Boys is authorized to sell bonds on behalf of Defendants North River and United States Fire Insurance Company.  Mr. Stanley's Bad Boy Bail Bonds website represents the following:  "The process of bail is regulated by the State of California. A Judge within the county of arrest sets the bail amount. Once bail is set, a Bad Boys Bail Bonds Agent charges 10%. (The State of California regulates this fee. All Bail Bonds companies charge the same rate.)."   Bad Boys Bail Bonds has also used substantially similar language on its website continuously since at least August 2004: "Bail in the state of California is regulated by the Department of Insurance. Every bail bonds agency charges the same, which is 10 percent of the total bail amount. This 10 percent fee is also known as premium."

148.   Another GSBAA board member, Terry Fowler, is past president of Defendant CBAA and the owner of Liberty Bail Bonds which sells on behalf of Defendants Lexington National and United States Fire.  Liberty Bail Bonds' website states: "Liberty Bail Bonds charges 10% of the amount of bail plus a $10 service charge.  Liberty Bail Bonds also offers a 20% discount off the standard bail bond premium rate [i.e., 8%] for clients of private defense counsel and for union members."  These statements are calculated to mislead consumers into the false belief that the only possible "discount" is the lower premium rate.

149.   GSBAA's members include both bail agents and surety companies.  For example, GSBAA's website provides "Surety Links" to the websites of Defendants Lexington National Insurance Corporation and Financial Casualty and Surety, Inc.  As described below, Defendants Lexington and Financial Surety both make statements that the 10% standard rate is required by law, which is misleading to consumers when bail agents fail to disclose that rebating is another way to reduce the price charged.

150.     The Conspiracy has also been reinforced by industry-sponsored, privately-run bail agent training courses where industry participants train other participants in implementing the Conspiracy.  Many of these training courses are promoted by trade associations, including GSBAA.  For example, GSBAA's website, under its Resources tab, provides "Bail Education" information.  The only "Bail Education" information provided is a link to the Bail Resource Center & Career Academy.  The Bail Resource Center & Career Academy provides training courses to members of the bail industry.  Among the books offered at the Bookstore section is Mr. Cook's Bail 101, described *supra*.  A course offered by the Bail Resource Center & Career Academy further teaches the Conspiracy line:   "the right answer on the test:  no rebates."

### d.        The Surety and Fidelity Association of America

151.     Many of the Surety Defendants also participate in the Surety and Fidelity Association of America ("SFAA").  SFAA is a trade association for the national bail underwriting industry located in Washington, District of Columbia.  The SFAA is not a named Defendant in this action, but Plaintiffs reserve the right to add it as a Defendant as discovery unfolds.

152.     The Surety Defendants work through the SFAA to monitor compliance with the Conspiracy.  The following Surety Defendants are dues-paying members of the SFAA: Allegheny Casualty Company, American Contractors Indemnity Company, American Surety Company, Indiana Lumbermens Mutual Insurance Company, International Fidelity Insurance Company, Lexington National Insurance Corporation, Lexon Insurance Company, North River Insurance Company, Seaview Insurance Company, Seneca Insurance Company, United States Fire Insurance Company, Universal Fire & Casualty Company, and Williamsburg National Insurance Company.

153.     SFAA devised and promulgated the "standard rate" of 10%, on which the Surety Defendants relied to fix premiums.  The Surety Defendants expressly referred to their 10% fixed premiums as "Surety Association of America (SAA) pricing."  (The SFAA was founded in 1908 and was previously known as the Surety Association of America, or "SAA.")

154.     The Surety Defendants provide the SFAA with detailed data concerning all premiums charged and all losses incurred.  The data must be coded to specific surety products and

to indicate the specific geographic area.  For instance, the State code for California is 04, with additional codes for Alameda County (032), San Francisco County (043), Los Angeles (021), and so on.  The SFAA also maintains an "Incentive Assessment Program" whereby Surety Defendants are penalized if they fail to provide annual premium and loss data by the annual deadline.  If Surety Defendants fail to provide complete data by the deadline, the SFAA imposes "fines" on a daily basis that increase over time.  If there are errors in the data submitted, the SFAA may assess costs up to "$25,000 for each occurrence."  After collecting the data, the SFAA creates and disseminates reports to the Surety Defendants that describe the prices charged by their potential rivals.  The Surety Defendants use these reports to determine whether, and to what extent, their potential rivals are deviating from the Conspiracy.

155.    The SFAA also provided further opportunities to conspire, including at meetings of its "members-only" Bail Bond Advisory Committee.

## 2. <u>Surety Defendants</u>

### a. <u>American Surety Company</u>

156.    <u>Background and Market Entry</u>:  American Surety Company ("ASC") has been selling bail bonds in California at least since 1993.  It was a ringleader of the Conspiracy at its inception in 2004.  Though ASC now operates in 46 states, when it began it was licensed only in California.  ASC is a privately held company that is led and controlled by its President and CEO, William B. Carmichael, and its Executive Vice President, Michael J. Whitlock.  Indeed, a different surety described the ownership of ASC as "Private/Whitlock, Carmichael" in a rate-filing with CDI.

157.    At the start of the Conspiracy in 2004, ASC was one of the leading bail bond sureties in California, selling millions in bail bond premiums annually.  After the *Pacific Bonding* decision made clear that California bail agents were free to offer competitive discounts through rebating commissions, ASC sprung into action to avoid the "fool's game" of competing on price.  ASC recognized that, without collusion, the market structure described above would "dictate[]" lower prices to consumers, and lower profits to ASC and other sureties.  To avoid this competitive outcome, ASC communicated to its surety rivals that ASC would not seek to lower

1  its default premium rate below 10%, and that ASC would discourage its agents from rebating or

2  advertising rebates.  ASC also exhorted its rivals to follow.  ASC described price competition as

3  akin to "stripping the wood off the walls for a fire to stay warm."  ASC further told other sureties

4  that price competition "works briefly, but eventually you have no fire and no building."

5       158.   Standard Rates:   ASC followed the terms of the Conspiracy it proselytized.  From

6  2004 through the present, ASC has never attempted to seek approval of a standard premium rate

7  below 10%.

8       159.   Loss Ratios:   ASC's failure to attempt to seek approval of lower standard

9  premium bail bond rates cannot be explained by independent decision-making.  Based on ASC's

10  annual financial disclosures filed with the CDI, ASC has consistently experienced loss ratios in

11  California bail bond sales that were near zero, and has sometimes even had *negative* loss ratios:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written[2] (CA only)** | $2,468,274 | $3,570,372 | $3,706,632 | $4,501,395 | $2,226,603 |
| **Losses Incurred (CA only)** | $161,621 | $(13,977) | $(296,961) | $(58,222) | $29,373 |
| **Loss Ratio (CA only)** | 6.548% | -0.391% | -8.012% | -1.293% | 1.319% |

25      160.   ASC's loss ratio makes no economic sense but for the Conspiracy. A surety

26  company in a commodity market that was competitive would have had the incentive to expand

27  ───────────────────

28  [2]  Unless otherwise stated, all references to direct premiums written in the charts throughout the complaint are net of bail agent commissions.

1    output by lowering its filed rate after incurring such small losses.  But ASC has not done so, and

2    has maintained its rates for over two decades.

3           161.    <u>Trade Association Participation</u>:   ASC helped create a collusive industry social

4    structure with robust trade associations that monitored and enforced compliance with the

5    Conspiracy.  ASC is a member of both the SFAA and ABC, and is also an active participant in

6    several bail agent associations, including the GSBAA and CBAA.

7           162.    <u>Rebate Suppression</u>:   ASC also discouraged its agents from rebating, and

8    instructed them to report any rebating observed by ASC's agents or agents of rival sureties

9    directly to ASC, and to the ABC, GSBAA, and the CBAA.  When ASC learned of rebating by

10   agents of rival sureties, ASC communicated with those rival sureties and agents through the ABC,

11   the GSBAA, and the CBAA, and sought to eliminate the practice.

12          163.    <u>Economic Plus Factors</u>:  Each and every economic plus factor described above

13   applies to the bail bond business of ASC in California.  ASC's California bail bonds are

14   homogenous commodities.  The rate of technological change for ASC's California bail bonds has

15   been essentially zero throughout the Conspiracy:   ASC's bail bonds are functionally the same

16   now as they were in 2004.  ASC's bail bond sales have been small, frequent, and regular.  They

17   are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost

18   of a bail bond for ASC is nearly identical across its customers.

19          164.    ASC understood that, if it cheated on the terms of the Conspiracy, rival sureties

20   would soon discover it.  If ASC had sought approval of a standard premium lower than 10%, it

21   would need to seek approval from the CDI, and its application and the approved premium rate

22   would become available to its rivals and co-conspirators.

23          165.    Further, ASC understood that, if it encouraged its agents to offer rebates, word of

24   this would surely spread to other rival sureties.  ASC did not do so because it abided by the

25   Conspiracy.  Indeed, ASC worked with rival sureties and bail agents to create an industry culture

26   and practice of monitoring rebating practices of rivals and, if any rebating occurred, to report that

27   practice to ASC and other sureties through trade associations including the ABC, the GSBAA,

28   and the CBAA.  ASC then coordinated with rival sureties through the ABC, the GSBAA, and the

1    CBAA to craft an appropriate response to reduce competitive rebating as much as possible.  As

2    ASC explained, rival bail agents are "***our industry's*** eyes, ears and mouths in recognizing and

3    ***alerting all*** to the impending attack [on the industry].  When you [agents] become aware of a

4    situation, ***please contact us*** so that we may assess the depth of the threat and work alongside of

5    you to craft ***an appropriate response***."  (Emphasis added.)

6                        **b.**      **Allegheny Casualty Company, International Fidelity Insurance**
                                     **Company, and AIA**
7

8          166.    Background and Market Entry:   Right before the start of the Conspiracy, in 2003,

9    three of the nation's leading bail bond sureties (Allegheny Casualty Company, International

10   Fidelity Insurance Company, and Associated Bond Insurance Agency) formed an "alliance"

11   umbrella organization they called "AIA" ("AIA" consist of the first letter of each of the three

12   constituent companies).  AIA refers to itself as the "overwhelming industry leader" regarding the

13   number of bail bonds it writes and the number of bail bond agents under its control.  AIA has a

14   common executive team that coordinates the bail bond business across its three component

15   companies.

16         167.    Until recently, Defendant Jerry Watson was the Vice President of AIA and helped

17   oversee the business operations of all three companies.  He is also Senior Counsel and Board

18   Member of Defendant American Bail Coalition.  Mr. Watson has been involved in the bail

19   business for decades.  As described below, *infra* Section VI.F.3, Mr. Watson holds a crucial role

20   in establishing and maintaining the Conspiracy.  To that end, he routinely published articles

21   throughout the Class Period on AIA's website stating AIA's position with respect to what he

22   called the "cancer" of price-cutting.  AIA, ACC, and IFIC followed the terms of the Conspiracy.

23         168.    When the Conspiracy began in 2004, two of AIA's companies were among

24   California's leading sureties:  Allegheny Casualty Company ("ACC") and International Fidelity

25   Insurance Company ("IFIC").  Together, they sold approximately $50 million in California Bail

26   Bond premiums annually.

27         169.    Standard Rates:   ACC and IFIC first applied for permission to sell bail bonds in

28   California in 1995 at a standard premium rate of 10%.  For over two decades, ACC and IFIC did

1  not attempt to seek approval of a standard premium rate below 10%.  In September 2017, IFIC

2  requested approval of a 9% standard premium rate.  ACC later joined IFIC in the application.

3  CDI approved the request on January 23, 2018, and the new rates took effect on April 1, 2018.

4  ACC/IFC did not explain their reasons for seeking approval to use a lower standard premium rate

5  at that time.  Plaintiffs believe discovery will show that no AIA entity withdrew from the

6  Conspiracy.

7       170.   Loss Ratios:   ACC and IFIC's failure to attempt to seek approval of standard

8  premium bail bond rates lower than 10% until September 2017, and lower than 9% thereafter,

9  cannot be explained by independent decision-making.  Based on their annual financial disclosures

10  with the CDI, ACC and IFIC have consistently experienced zero losses.  The chart below lists

11  IFIC's reported losses from bail bond sales nationwide:

12

| Category[3] | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Direct Premiums Written | $3,490,895 | $3,159,610 | $3,014,197 | $2,819,936 | $2,722,010 |
| Losses Incurred | $0 | $0 | $0 | $0 | $0 |
| Loss Ratio | 0% | 0% | 0% | 0% | 0% |

22       171.   The chart below depicts ACC's reported losses:

---

[3]  Unless otherwise indicated, charts depicting each surety defendant's premiums written, losses incurred, and loss ratios are based on nationwide bail bond sales data.

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written** | $2,875,726 | $2,729,607 | $2,666,234 | $2,558,039 | $2,699,457 |
| **Losses Incurred** | $0 | $0 | $0 | $0 | $0 |
| **Loss Ratio** | 0% | 0% | 0% | 0% | 0% |

172.    These loss ratios make no economic sense but for the Conspiracy.  An insurance company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after paying out effectively zero dollars.  But, with the exception of the September 2017 application, IFIC and ACC have not done so, and maintained their standard rates at 10% from 1995 to 2017, and at 9% thereafter.  Even the 9% rate is far above the competitive price that likely would have prevailed but for the Conspiracy.

173.    <u>Trade Association Participation</u>:   AIA, IFIC, and ACC are members of the SFAA and ABC.  ACC gave $13,539 to the SFAA in 2014 and $16,539 in 2015.  IFIC gave $56,570 to the SFAA in 2014, $60,014 in 2015, $82,627 in 2017, and $86,151 in 2018.

174.    <u>Rebate Suppression</u>:   Once rebating was permitted under California law, AIA, IFIC, and ACC agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail agents from advertising rebates to consumers.  As a result, their bail agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Indeed, AIA, ACC, and IFIC worked with rival sureties and bail agents to create an industry culture and practice of monitoring rebating practices of rivals and, if any rebating occurred, to report that practice to AIA, ACC, and IFIC and other sureties through trade associations including the SFAA, the ABC, the GSBAA, and the CBAA.

175.    Indeed, to this day, AIA's website says that the "fee for a bail bond is normally restricted by law and is a certain percentage of the bond amount, often 10% of the bond."  There is no mention of rebates or discounts, misleading consumers into believing that the posted rate is the only rate permissible by law.  Similarly, beginning at least in 2006, ACC instructed its bail agents to post a "SCHEDULE OF PREMIUMS" in their offices which provided that the standard premium bail bond rate was 10%, and that "[t]hese rates must be charged by ALL agents of Allegheny Casualty Company," without disclosing that bail agents have the ability to offer rebates.  ACC and IFIC modified their schedule of premiums in 2013 but still failed to disclose that agents were authorized to offer rebates.  A screenshot of the relevant portion of the rate sheet is depicted below:

## NOTE

These rates must be charged by ALL agents of INTERNATIONAL FIDELITY INSURANCE COMPANY. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or book reports, travel and other miscellaneous expenses.

ALL AGENTS: Please post this rate chart where it can be seen by the public.

176.    AIA, ACC, and IFIC also discouraged their agents from rebating, or advertising rebates.

177.    <u>Economic Plus Factors</u>:  Each and every economic plus factor described above applies to the bail bond business of AIA, ACC, and IFIC in California.  AIA's, ACC's, and IFIC's California bail bonds are homogenous commodities.  The rate of technological change for their California bail bonds has been essentially zero throughout the Conspiracy:   their bail bonds are functionally the same now as they were in 2004.  Their bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for them is nearly identical across their customers.

178.    AIA, ACC, and IFIC understood that, if any of them cheated on the terms of the Conspiracy, rival sureties would soon discover it.  For AIA, ACC, or IFIC to charge lower

premiums, they would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals.

179.   Further, AIA, ACC, and IFIC all understood that, if any of them encouraged their agents to offer rebates, word of this would surely spread to other rival sureties.  They did not do so because they abided by the Conspiracy.

### c.   American Contractors Indemnity Insurance Company

180.   Background and Market Entry:   American Contractors has been operating in California's bail bond market since at least 1995.  It sought and obtained approval from CDI to do so in the same year.  It has been a member of the Conspiracy since its start in 2004.  It is an indirect subsidiary and member of the HCC Insurance Holdings, Inc. group.

181.   Standard Rates:   Since entering the bail bond market in 1995, American Contractors has never attempted to seek approval of a standard premium rate below 10%.

182.   Loss Ratios:   American Contractors' failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making.  Based on American Contractors' annual financial disclosures filed with the CDI, American Contractors has consistently experienced very low loss ratios, and has sometimes even had *negative* loss ratios:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written** | $3,888,525 | $4,327,998 | $4,188,790 | $4,000,934 | $4,584,774 |
| **Losses Incurred** | $305,132 | $1,298,580[4] | $(283,493) | $163,576 | $48,630 |
| **Loss Ratio** | 7.8% | 30% | -6.7% | 4.08% | 1.06% |

183.    These loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses.  But American Contractors has not done so, and has maintained its rates for over two decades.

184.    <u>Trade Association Participation</u>:   American Contractors has been a member of the ABC, and contributed $26,712 to it in 2014.  It is also a member of the SFAA, and contributed $41,032 to it in 2014.

185.    <u>Rebate Suppression</u>:   Once rebating was permitted under California law, American Contractors agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, American Contractor's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  American Contractors worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals.

186.    American Contractors' own bail agents implemented this policy by holding out its 10% standard price as being required by law.  For example, ACME Bail is a bail agent for

---

[4]  These losses do not appear to be related to the California bail bond business because American Contractors reported that its surety business in California actually experienced negative losses of $2,944,907 in 2015, but it is unclear what portion of its surety business is limited to bail bonds.

American Contractors, and states on its website that "[t]he California Department of Insurance has set a standardized 10% fee to all companies known as a Premium," misleading consumers because the CDI does not set rates for "all companies," or any company, it merely reviews them for approval.  This misrepresentation deliberately misleads consumers into thinking that it is impossible to obtain a bail bond for less than 10% of the bail amount.  Further, ACME Bail's website conceals that bail agents have the ability to offer rebates.

187.   American Contractors' standard bond forms also mislead consumers.  A form it used beginning at least in 1999 stated that "any bond that does not qualify for high risk or preferred rates *shall* be underwritten at the standard rate" of 10%.  (Emphasis added.)  Its revised rate forms in 2008 also failed to disclose agents' ability to rebate, instead referring to the 10% standard rate as the amount that "[w]ill be charged" if qualifications for the preferred rate were not met.

188.   <u>Economic Plus Factors</u>:   Each and every economic plus factor described above applies to the bail bond business of American Contractors in California.  American Contractors' California bail bonds are homogenous commodities.  The rate of technological change for American Contractors' California bail bonds has been essentially zero throughout the Conspiracy: American Contractors' bail bonds are functionally the same now as they were in 1995.  American Contractors' bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for American Contractors is nearly identical across its customers.

189.   American Contractors understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If American Contractors had sought approval of a standard premium lower than 10%, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.

190.   Further, American Contractors understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  American Contractors did not do so because it abided by the Conspiracy.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

#### d. **Bankers Insurance Company**

191.   <u>Background and Market Entry</u>:   Bankers Insurance Company has been operating in California's bail bond market since at least 1994.  It has been a member of the Conspiracy since its start in 2004.

192.   <u>Standard Rates</u>:   Since entering the bail bond market, Bankers Insurance has never attempted to seek approval of a standard premium rate below 10%.

193.   <u>Loss Ratios</u>:   Bankers Insurance Company's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making. Based on Bankers Insurance Company's annual financial disclosures filed with the CDI, Bankers Insurance Company has consistently experienced loss ratios near zero:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written** | $13,280,229 | $14,720,920 | $18,959,024 | $18,230,056 | $19,962,606 |
| **Losses Incurred** | $0 | $0 | $0 | $0 | $0 |
| **Loss Ratio** | 0% | 0% | 0% | 0% | 0% |

194.   These loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses.  But Bankers Insurance Company has not done so, and has maintained its rates for over two decades.

195.   <u>Trade Association Participation</u>:   Bankers Insurance Company has been a member of the American Bail Coalition, and contributed $246,563 to it in 2017.

196.   <u>Rebate Suppression</u>:   Once rebating was permitted under California law, Bankers Insurance Company agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, Bankers Insurance Company's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Bankers Insurance Company worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to Bankers Insurance Company and other sureties through trade associations including the ABC.  Bankers Insurance Company then coordinated with rival sureties to craft an appropriate response to reduce competitive rebating as much as possible.

197.   Bankers Insurance Company's own bail agents implemented this policy by holding out its 10% standard rate as being required by law.  For example, Bankers Insurance Company's bail agent All-Pro Bail Bonds' website once stated that "[t]he Department of Insurance regulates the rates all bail agents must change.  Essentially, all bail agents charge the same rates. . . . ***Failure to charge the proper rate for a bail bond is a crime***.  That's why ALL PRO BAIL BONDS always charges the rates shown below to ALL clients."  (Emphasis added.)  Below that false and misleading warning, All-Pro Bail Bonds' website listed "Bankers Insurance Company and Bail Bond Rates," including 10% for California state bonds.

198.   Further, Bankers Insurance Company's standard rate sheet since at least 2003 also misleads consumers about the availability of rebating.  It states that state bonds over $500.00 "will be charged 10% of the penal amount," and that "[t]hese rates ***must*** be charged by all Agents of Bankers Insurance Company," without disclosing that bail agents have the authority to offer rebates per California law.  (Emphasis added.)  A screenshot of the relevant portion of the rate sheet is depicted below:

These rates must be charged by all Agents of
BANKERS INSURANCE COMPANY.

These rates include all costs, expenses, and service fees.

199.   <u>Economic Plus Factors</u>:  Each and every economic plus factor described above applies to the bail bond business of Bankers Insurance Company in California.  Bankers Insurance Company's California bail bonds are homogenous commodities.  The rate of technological change for Bankers Insurance Company's California bail bonds has been essentially zero throughout the Conspiracy:   Bankers Insurance Company's bail bonds are functionally the same now as they were in 1994.  Bankers Insurance Company's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for Bankers Insurance Company is nearly identical across its customers.

200.   Bankers Insurance Company understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If Bankers Insurance Company had sought approval of a standard premium lower than 10%, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.

201.   Further, Bankers Insurance Company understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  Bankers did not do so because it abided by the Conspiracy.

**e.**   **Accredited Surety and Casualty Company, Inc.**

202.   <u>Background and Market Entry</u>:  Accredited Surety has been operating in California's bail bond market since on or around 1997, when it sought permission to sell bail bonds in California from CDI for the first time.  It has been a member of the conspiracy since its start in 2004.  In March 1, 2019, Accredited Surety began transferring its book of bail business to Crum & Forster.

203.   <u>Bail Agents</u>:  Accredited Surety sells bail bonds through Accredited Bond Agencies, Inc., its wholly-owned subsidiary.

204.   <u>Standard Rates</u>:  Since entering the bail bond market, Accredited Surety has never attempted to seek approval of a standard premium rate below 10%.

205.   Loss Ratios:  Accredited Surety's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making.  Based on its annual financial disclosures filed with the CDI, Accredited Surety has consistently experienced loss ratios of zero:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written** | $13,280,229 | $14,720,920 | $18,959,024 | $18,230,056 | $19,962,606 |
| **Losses Incurred** | $0 | $0 | $0 | $0 | $0 |
| **Loss Ratio** | 0% | 0% | 0% | 0% | 0% |

206.   These loss ratios make no economic sense but for the Conspiracy.  Indeed, in connection with its 2014 annual financial statements, Accredited Surety stated that bail writings comprised 97% of its direct written premiums for all insurance products, and noted that it would "focus on strategic expansion of its bail surety program, a class that has proven very profitable for the Company since its inception."  Thus, bail bonds were perceived as a uniquely profitable line of insurance business.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses and particularly in light of how profitable the company perceived bail bonds to be.  But Accredited Surety has not done so, and has maintained its rates for over two decades.

207.   Trade Association Participation:  Accredited Surety has been a member of the American Bail Coalition, and contributed $220,416 to it in 2016.  It is also a member of the SFAA.

208.   Rebate Suppression:  Once rebating was permitted under California law, Accredited Surety agreed to abide by the understanding between and amongst other bail bond

1   sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result,

2   Accredited Surety's bail bond agents rarely offer rebates to consumers, or at least do so less

3   frequently and in smaller amounts than they otherwise would have absent the anti-rebating

4   conspiracy.  Accredited Surety worked with rival sureties and with bail agents to create an

5   industry culture and practice of monitoring rebating practices of rivals, and, if any rebating

6   occurred, to report that practice to Accredited Surety and other sureties through trade associations

7   including ABC and the SFAA.  Accredited Surety then coordinated with rival sureties through the

8   ABC to craft an appropriate response to reduce competitive rebating as much as possible.

9       209.    Accredited Surety's own bail agents implemented this policy by holding out its

10  10% standard rate as being required by law.  For example, at least since the Conspiracy began,

11  Accredited Surety's bail rate sheet (which agents must display in their offices), to state: "THE

12  FOLLOWING RATES WILL BE CHARGED ON BAIL BONDS:  CALIFORNIA BAIL BOND

13  PREMIUMS WILL BE CHARGED AT A RATE OF 10% OF THE PENAL AMOUNT OF THE

14  BOND."  The rate sheet prominently states that "[t]hese rates must be charged by ALL agents of

15  Accredited Surety and Casualty Co., Inc."  A screenshot of the relevant portion of the rate sheet is

16  depicted below:

17

18

19

20

### NOTE

These rates must be charged by ALL agents of Accredited Surety And Casualty Co., Inc.  These rates are for premium only and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

21

22                  ALL AGENTS: Please post this rate chart in public view in your office.

23

24

25      210.    Economic Plus Factors:  Each and every economic plus factor described above

26  applies to the bail bond business of Accredited Surety in California.  Accredited Surety's

27  California bail bonds are homogenous commodities.  The rate of technological change for

28  Accredited Surety's California bail bonds has been essentially zero throughout the Conspiracy:

Accredited Surety's bail bonds are functionally the same now as they were in or around 1997 when it entered the California bail bond market.  Accredited Surety's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for Accredited Surety is nearly identical across its customers.

211.  Accredited Surety understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If Accredited Surety had sought approval of a standard premium lower than 10%, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.

212.  Further, Accredited Surety understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  Accredited Surety did not do so because it abided by the Conspiracy.

### f.  Lexington National Insurance Corporation

213.  <u>Background and Market Entry</u>:  Lexington National Insurance Corporation has been operating in California's bail bond market since on or around 1997, when it sought permission to sell bail bonds in California from CDI for the first time.  It primarily underwrites bail bonds.  It has been a member of the conspiracy at least since its start in 2004.

214.  <u>Bail Agents</u>:  Lexington National's bail agents include Gotham Bail Bonds, Greg Padilla Bail Bonds, Preston's Bail Bonds, and Tapout Bail Bonds.

215.  <u>Standard Rates</u>:  Since entering the bail bond market, Lexington National has never attempted to seek approval of a standard premium rate below 10%.

216.  <u>Loss Ratios</u>:  Lexington National's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making.  Lexington National has consistently experienced loss ratios near zero.  Plaintiffs do not here allege Lexington National's specific reported loss ratios because, as Lexington National has itself admitted, they are inaccurate. As Lexington National notes in its financial statement, "[t]he Company's experience has been that its losses incurred are, for the most part, a timing difference. A considerable portion of the previous year's losses incurred are recovered in subsequent years."

217.   Such low loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses. But Lexington National has not done so, and has maintained its standard premium rate at 10% for over two decades.

218.   <u>Trade Association Participation</u>:  Lexington National is a member of the SFAA and is listed as a Surety Resource for the GSBAA.

219.   <u>Rebate Suppression</u>:  Once rebating was permitted under California law, Lexington National agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, Lexington National's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Lexington National worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to Lexington National and other sureties through trade associations.

220.   Lexington National's own bail agents implemented this policy by holding out its 10% standard rate as being required by law, a fact which is misleading to consumers when bail agents fail to disclose that rebating is another way to reduce the price charged.  For example, as of January 2019, the website for Padilla Bail Bonds (License No. 1639213) states, on behalf of its surety Lexington National:  "The California Law mandated bail bond fee (also called premium) is 10% of the bail. This is non-refundable, but can be lowered to 8% if you qualify for the discount—if you're a veteran, union member or have a lawyer retained."  The website's failure to disclose that the 10% price can also be reduced by rebating is misleading and reinforces the notion that bail bond prices are not negotiable by operation of law.

221.   Further Lexington National's standard rate sheet states that standard state bail bonds "charge 10% of the penal amount," without disclosing the availability of rebating.

222.   <u>Economic Plus Factors</u>:  Each and every economic plus factor described above applies to the bail bond business of Lexington National in California.  Lexington National's

California bail bonds are homogenous commodities.  The rate of technological change for Lexington National's California bail bonds has been essentially zero throughout the Conspiracy: Lexington National's bail bonds are functionally the same now as they were when it entered California's bail bond market in or around 1997.  Lexington National's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for Lexington National is nearly identical across its customers.

223.    Lexington National understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If Lexington National had sought approval of a standard premium lower than 10%, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.

224.    Further, Lexington National understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  Lexington National did not do so because it abided by the Conspiracy.

### g.    Seneca Insurance Company

225.    Background and Market Entry:  Seneca has been operating in California's bail bond market since on or around 1997, when it sought permission to sell bail bonds in California from CDI for the first time.  Seneca is a member of the Crum & Forster group.  It has been a member of the Conspiracy at least since its start in 2004.

226.    Standard Rates:  Since entering the bail bond market, Seneca has never attempted to seek approval of a standard premium rate below 10%.

227.    Loss Ratios:  Seneca's failure to attempt to seek approval of lower standard bail bond rates cannot be explained by economic factors.  Based on Seneca's annual financial disclosures filed with the CDI, Seneca has consistently experienced loss ratios near zero, and has sometimes even had negative loss ratios:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| Direct Premiums Written | $5,374,576 | $5,324,697 | $5,038,336 | $2,172,976 | $25,898 |
| Losses Incurred | $0 | $0 | $0 | $0 | $0 |
| Loss Ratio | 0% | 0% | 0% | 0% | 0% |

228.     These loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses.  But Seneca has not done so, and has maintained its standard premium rates at 10% for over two decades.

229.     <u>Trade Association Participation</u>:  Seneca is a member of the SFAA.

230.     <u>Rebate Suppression</u>:  Once rebating was permitted under California law, Seneca agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, Seneca's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Seneca worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to Seneca and other sureties through trade associations.

231.     Seneca's own bail agents implemented this policy by holding out its 10% standard rate as being required by law.  For example, since at least 2005, Seneca's standard bail rate sheet—which must be posted in all of its agents' offices—states that "PREMIUMS WILL BE CHARGED AT A RATE OF 10% OF THE PENAL AMOUNT OF THE BOND" for standard premiums, and that "THESE RATES *MUST* BE CHARGED BY ALL AGENTS OF SENECA INSURANCE COMPANY, INC."  By 2018, the form was revised to state that the standard rate

1  "*MUST* BE CHARGE BY ALL AGENTS OF UNITED STATES FIRE INSURANCE

2  COMPANY, THE NORTH RIVER INSURANCE COMPANY, CRUM & FORSTER

3  INDEMNITY COMPANY, AND SENECA INSURANCE COMPANY."  A screenshot of the

4  relevant portion of the rate sheet is reproduced below:

<u>NOTE</u>

THESE RATES MUST BE CHARGED BY ALL AGENTS OF SENECA INSURANCE
COMPANY, INC.  THESE RATES ARE FOR PREMIUM ONLY AND DO NOT
INCLUDE OTHER EXPENSES INCURRED SUCH AS TELEPHONE,
PHOTOGRAPHS, POSTING FEES, WRITS, TRAVEL AND OTHER
MISCELLANEOUS EXPENSES.

10  232.  <u>Economic Plus Factors</u>:  Each and every economic plus factor described above

11  applies to the bail bond business of Seneca in California.  Seneca's California bail bonds are

12  homogenous commodities.  The rate of technological change for Seneca's California bail bonds

13  has been essentially zero throughout the Conspiracy:  Seneca's bail bonds are functionally the

14  same now as they were when it entered California's bail bond market in or around 1997.

15  Seneca's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to

16  thousands of customers a year, at regular intervals.  The production cost of a bail bond for Seneca

17  is nearly identical across its customers.

18  233.  Seneca understood that, if it cheated on the terms of the Conspiracy, rival sureties

19  would soon discover it.  If Seneca had sought approval of a standard premium lower than 10%, it

20  would need to seek approval from the CDI, and its application and the approved premium rate

21  would become available to its rivals and co-conspirators.

22  234.  Further, Seneca understood that, if it encouraged its agents to offer rebates, word

23  of this would surely spread to other rival sureties.  Seneca did not do so because it abided by the

24  Conspiracy.

25  **h.  <u>Continental Heritage Insurance Company</u>**

26  235.  <u>Background and Market Entry</u>:  Continental Heritage first obtained permission

27  from CDI to operate in California's bail bond market on January 15, 1998, and has been a

28  member of the Conspiracy at least since its start in 2004.  It began selling bail bonds in California

in 2000.  Bail bonds are one of Continental Heritage's primary lines of business:  according to its annual financial statements, they represented 97.2% of surety-related earned premiums in 2014 and 97.5% in 2015.  That proportion subsequently decreased, primarily because the company started new lines of surety business.  The bail bond market remained profitable for Continental Heritage, however.

236.  <u>Standard Rates</u>:  Since entering the bail bond market, Continental Heritage has never attempted to seek approval of a standard premium rate below 10%.

237.  <u>Loss Ratios</u>:  Continental Heritage's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making.  Indeed, in its 2015 financial disclosures, Continental Heritage stated that "***[t]he Company has not paid a loss on its . . . bail segments during the past 17 years.***"  (Emphasis added.)  Based on Continental Heritage's annual financial disclosures filed with the CDI, Continental Heritage has consistently experienced loss ratios near zero:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written** | $2,525,334 | $2,102,955 | $1,681,961 | $1,578,578 | $1,453,072 |
| **Losses Incurred** | $0 | $0 | $0 | $0 | $0 |
| **Loss Ratio** | 0% | 0% | 0% | 0% | 0% |

238.  These loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses.  But Continental Heritage has not done so, and has maintained its standard premium rates at 10% for over two decades.

239.   <u>Trade Association Participation</u>:  Continental Heritage has been a member of the SFAA, and contributed $10,178 to it in 2014.

240.   <u>Rebate Suppression</u>:  Once rebating was permitted under California law, Continental Heritage agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, Continental Heritage's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Continental Heritage worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to Seneca and other sureties through trade associations.

241.   Continental Heritage's own bail agents implemented this policy by holding out its 10% standard rate as being required by law.  For example, since at least 2000, Continental Heritage's standard bail bond rate sheet, which bail agents post in their offices, states that the standard premium rate is 10% without disclosing that agents may rebate to reduce the price.

242.   <u>Economic Plus Factors</u>:  Each and every economic plus factor described above applies to the bail bond business of Seneca in California.  Continental Heritage's California bail bonds are homogenous commodities.  The rate of technological change for Continental Heritage's California bail bonds has been essentially zero throughout the Conspiracy:  Continental Heritage's bail bonds are functionally the same now as they were when it entered California's bail bond market in or around 2000.  Continental Heritage's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for Continental Heritage's is nearly identical across its customers.

243.   Continental Heritage understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If Continental Heritage had sought approval of a standard premium lower than 10%, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.

244.     Further, Continental Heritage understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties. Continental Heritage did not do so because it abided by the Conspiracy.

### i.     Seaview Insurance Company

245.     <u>Background</u>:  Seaview has been operating in California's bail bond market since January 2012.  It sought and obtained approval from CDI to do so in 2011 under its prior name, Ulico Standard of America Casualty Company ("Ulico").  It has been a member of the Conspiracy since that time.

246.     <u>Market Entry</u>:  Seaview became a member of the Conspiracy at least as early as 2011, when it sought approval of rates that it explicitly acknowledged were based on those used by its future competitors.  For example, it described its proposal as "an adoption of current bail bond rates approved for use by Danielson National Insurance Company."  Seaview thus sought approval of a standard premium rate of 10%.  Seaview's pricing scheme was expressly "based on Surety Association of America (SAA) pricing."  Seaview explained that "[t]he Danielson National Insurance Company adopts the standard 10% of liability rate," and that "[w]e adopt the Danielson National Insurance Company standard rate."

247.     <u>Standard Rates</u>:  Since entering the bail bond market in early 2012, Seaview has never attempted to seek approval of a standard premium rate below 10%.

248.     <u>Loss Ratios</u>:  Seaview's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making.  As a new entrant to the market, Seaview would have been expected to seek approval for premium rates below its competitors in an effort to gain market share.  Indeed, Seaview could have done so and maintained profitability.  In its 2011 filing, Seaview projected it would incur very low losses, explaining that "***sureties consistently incur extremely low losses.***"  (Emphasis added.)  Seaview elaborated that "***it is not at all uncommon in the commercial bail industry for bail sureties consistently to experience loss ratios at or just slightly above 0.0%.***"  (Emphasis added.)  It even summarized loss ratios of its competitors, claiming that "the mean of the average annual Loss Ratios of bail bond-only sureties from 2004 to 2009 was 1.9%, while the median of the average

loss ratios was 0.4% during the period." Seaview's 2011 prediction that it would incur low loss ratios has proved correct. Based on Seaview's annual financial disclosures filed with the CDI, Seaview has consistently experienced loss ratios near zero, and has sometimes even had ***negative*** loss ratios:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written (CA)** | $9,196,422 | $9,421,620 | $8,349,276 | $6,824,054 | $6,716,198 |
| **Losses Incurred** | $130,933 | $32,177 | $(27,069) | $(99,067) | $(64,173) |
| **Loss Ratio** | 0.014% | 0.003% | -0.003% | -0.014% | -0.009% |

249. These loss ratios make no economic sense but for the Conspiracy. An insurance company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after paying out effectively zero dollars. But Seaview has not done so, and has maintained its rates ever since.

250. Trade Association Participation: Seaview is a member of the SFAA.

251. Rebate Suppression: When it entered the market in 2012, Seaview agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers. As a result, Seaview's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy. Seaview worked with rival sureties and bail agents to create an industry culture and practice of monitoring rebating practices of rivals and, if any rebating occurred, to report that practice to Seaview and other sureties through trade associations. Seaview then coordinated with rival sureties to craft an appropriate response to reduce competitive rebating as much as possible.

252.     Seaview's own bail agents implemented this anti-rebating agreement by holding out its 10% standard rate as being required by law.  For example, Aladdin claims that its fees are standard and non-negotiable.  On its website under the heading "Standard Premium Rate," Aladdin claims that its prices are required by law:  "All insurers who work with bail service providers are required to file their premium rates with the Department of Insurance.  In California . . . Aladdin Bail Bonds is authorized to offer an 8% rate in addition to the standard 10%.  ***Nobody has lower prices than Aladdin***."  (Emphasis added.)  These statements are misleading insofar as they conceal the ability of Aladdin—and its competitors—to offer lower prices with rebates.

253.     Further, at least as early as 2011, Seaview's standard rate form, which agents are required to display in their offices, stated that the 10% standard premium rate "must be charged by ALL agents."  This form was initially adopted when Seaview was still operating under the name "Ulico Standard of America Casualty Company."  A screenshot of the relevant portion of the ratesheet is reproduced below:

**NOTE**

These rates must be charged by ALL agents of
ULICO STANDARD OF AMERICA CASUALTY COMPANY
These rates are for premium only, and do not
include other expenses incurred, such as tele-
phone, posting fees, appraisals or lot book
reports, travel and other miscellaneous expenses.

**ALL AGENTS:**  Please post this rate chart where it can be seen by the public.

254.     <u>Economic Plus Factors</u>:  Each and every economic plus factor described above applies to the bail bond business of Seaview in California.  Seaview's California bail bonds are homogenous commodities.  The rate of technological change for Seaview's California bail bonds has been essentially zero throughout the Conspiracy:  Seaview's bail bonds are functionally the same now as they were in 2012.  Seaview's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for Seaview is nearly identical across its customers.

255.     Seaview understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If Seaview had sought approval of a standard premium lower than 10%,

1   it would need to seek approval from the CDI, and its application and the approved premium rate

2   would become available to its rivals and co-conspirators.

3   256.   Further, Seaview understood that, if it encouraged its agents to offer rebates, word

4   of this would surely spread to other rival sureties.  Seaview did not do so because it abided by the

5   Conspiracy.

### j. **Danielson National Insurance Company**

7   257.   Background and Market Entry:  Danielson National first obtained permission to

8   operate in California's bail bond market in 2008, and has been a member of the Conspiracy at

9   least since that time.  Danielson National signaled its agreement to abide by the Conspiracy in its

10   first rate filing application, stating that its proposed rates "are an adoption of current bail bond

11   rates approved for use by Lincoln General Insurance Company."  Danielson National stopped

12   writing bail bonds in 2013.

13   258.   Bail Agents:  In April 2008, Danielson National entered into an arrangement with

14   Two Jinn, Inc. to write bail bonds on its behalf.  That arrangement ceased in 2013.

15   259.   Standard Rates:  While it was active in the bail bond market, Danielson National

16   never attempted to seek approval of a standard premium rate below 10%.

17   260.   Loss Ratios:  Danielson National's failure to attempt to seek approval of lower

18   standard premium bail bond rates cannot be explained by independent decision-making.  Indeed,

19   in its 2014 financial statements, Danielson National acknowledged that its "bail loss and ALAE

20   [adjusted loss after expense] ratio applied for both 2013 and 2012 was 7.0% based on Two Jinn's

21   historical experience; however, the Company holds agency indemnification collateral in trust of

22   slightly more than the projected loss and ALAE, effectively reducing the loss and ALAE ratio to

23   0%."  According to its 2014 financial annual statement, its net bail bond premiums written in

24   2013 were $21,868, with no losses incurred.

25   261.   These loss ratios make no economic sense but for the Conspiracy.  A surety

26   company in a commodity market that was competitive would have had the incentive to expand

27   output by lowering its filed rate after incurring such small losses.  But Danielson National did not

28   do so, and maintained its standard premium rates from the time it entered the market until its exit.

262.   <u>Rebate Suppression</u>:  When it entered the market, Danielson National agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, Danielson National's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Danielson National worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to Danielson National.  Danielson National then coordinated with rival sureties to craft an appropriate response to reduce competitive rebating as much as possible.

263.   Danielson National's own bail agents implemented this policy by holding out its 10% standard rate as being required by law.  For example, its standard rate sheet, which its bail agents are required to display, states that "The Following Rates Will Be Charged to All Bail Bonds," and lists 10% as the standard premium rate without disclosing bail agents' ability to offer rebates to consumers.

264.   <u>Economic Plus Factors</u>:  Each and every economic plus factor described above applies to the bail bond business of Danielson National in California.  Danielson National's California bail bonds are homogenous commodities.  The rate of technological change for Danielson National's California bail bonds has been essentially zero throughout the Conspiracy: Danielson National's bail bonds were functionally the same at all times that Danielson National sold bail bonds as they were when it entered California's bail bond market in or around 2008.  Danielson National's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for Danielson National was nearly identical across its customers.

265.   Danielson National understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If Danielson National had sought approval of a standard premium lower than 10%, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.

266.     Further, Danielson National understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  Danielson National did not do so because it abided by the Conspiracy.

### k.     Financial Casualty & Surety, Inc.

267.     Background and Market Entry:  Financial Casualty first obtained permission to operate in California's bail bond market in 2005, and has been a member of the Conspiracy at least since that time.  In its 2004 application to CDI for permission to enter the bail bond market, Financial Casualty admitted that **"[t]here is no actuarial justification for bail bond rates filed by any insurance company writing bail bond surety."**  (Emphasis added.)  Recognizing that the bail bond business was "a very small niche surety market," rather than attempt to gain market share as a new competitor by seeking to undercut its competitors' pricing, Financial Casualty instead signaled its intent to abide by the Conspiracy by stating that it would simply use "[t]he common rate used in every state" of 10%.  It specifically referred to the 10% rate used by Ranger Insurance Company, American Contractors Insurance Company, Continental Heritage Insurance Company, Lincoln National Insurance Company, American Surety Insurance Company, Bankers Insurance Company, and International Fidelity Insurance Company and Allegany Insurance Company.

268.     Financial Casualty's 2004 application concedes that the 10% standard rate it applied to use, and which was used by every other co-conspirator, had no basis in economics or risk analysis.  Financial Casualty admitted that "**none of the above filed rates are actuarially justified,**" observed that they "have been in use for many years," and that "**[n]ew insurance company rate filings for bail bond surety . . . are essentially 'ME TO[O]' filings**."  (Emphasis added.)  In so doing, Financial Casualty said "ME TOO" to the Conspiracy, opting to join it and abide by its rules rather than attempt to gain a foothold and larger market share through competitive pricing.

269.     Standard Rates:  Since entering the bail bond market, Financial Casualty has never attempted to seek approval of a standard premium rate below 10%.

270.   <u>Loss Ratios</u>:  Financial Casualty's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making, as the company itself acknowledged when it first applied for permission to enter the market in 2004.  It had never suffered direct losses on written bail premiums, and acknowledged it had no actuarial justification for a 10% rate.  Based on Financial Casualty's annual financial disclosures filed with the CDI, Financial Casualty has consistently experienced loss ratios near zero, and has sometimes even had negative loss ratios:

| Category | 2016 | 2017 | 2018 |
|---|---|---|---|
| **Direct Premiums Written (CA only)** | $6,385,655 | $5,918,771 | $9,390,728 |
| **Losses Incurred (CA only)** | $(45,236) | $(411,491) | $425,626 |
| **Loss Ratio (CA only)** | -0.708% | -6.952% | 4.532% |

271.   These loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses.  Financial Casualty in particular had an incentive to do so when it sought to enter what it called a "small" and "niche" market, particularly as it recognized that regardless of what rate it charged, it was unlikely to ever incur losses.  But Financial Casualty has not done so, and has maintained its standard premium rates since it entered the market.

272.   <u>Trade Association Participation</u>:  Financial Casualty is identified as a surety resource for Defendant Trade Association GSBAA.

273.   <u>Rebate Suppression</u>:  When it entered the market, Financial Casualty agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  Indeed, at least as early as 2005, Financial Casual's standard rate form, which its agents were required to display in their offices, provided that the standard premium rate was 10% and that "[t]hese rates ***must*** be charged by ALL agents of FINANCIAL CASUALTY & SURETY, INC."  Financial Casualty's forms failed to disclose the permissibility of rebating at least until October 2014.  A screenshot of the relevant portion of the rate sheet is reproduced below:

**NOTE**
ALL AGENTS: Please post this rate chart in public view in your office.

These rates must be charged by ALL agents of FINANCIAL CASUALTY & SURETY, INC. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

274.   As a result, Financial Casualty's bail bond agents rarely offered rebates to consumers, or at least did so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Financial Casualty worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to Financial Casualty and other sureties.  Financial Casualty then coordinated with rival sureties through to craft an appropriate response to reduce competitive rebating as much as possible.

275.   <u>Economic Plus Factors</u>:  Each and every economic plus factor described above applies to the bail bond business of Financial Casualty in California.  Financial Casualty's California bail bonds are homogenous commodities.  The rate of technological change for Financial Casualty's California bail bonds has been essentially zero throughout the Conspiracy: Financial Casualty's bail bonds are functionally the same now as they were when it entered California's bail bond market in or around 2005.  Financial Casualty's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at

1   regular intervals.  The production cost of a bail bond for Financial Casualty is nearly identical

2   across its customers.

3       276.    Financial Casualty understood that, if it cheated on the terms of the Conspiracy,

4   rival sureties would soon discover it.  If Financial Casualty had sought approval of a standard

5   premium lower than 10%, it would need to seek approval from the CDI, and its application and

6   the approved premium rate would become available to its rivals and co-conspirators.

7       277.    Further, Financial Casualty understood that, if it encouraged its agents to offer

8   rebates, word of this would surely spread to other rival sureties.  Financial Casualty did not do so

9   because it abided by the Conspiracy.

10                  **l.       Indiana Lumbermens Mutual Insurance Company**

11      278.    <u>Background and Market Entry</u>:  Indiana Lumbermens Mutual Insurance Company

12   ("ILM") has been selling bail bonds in California since at least 2005.  It has been a member of the

13   Conspiracy since at least that time.  At that time, ILM had nationwide earned premiums in the

14   bail industry of over $40 million.

15      279.    <u>Standard Rates</u>:  Since entering the California bail bond market, ILM never

16   attempted to seek approval of a standard premium rate below 10%.

17      280.    <u>Loss Ratios</u>:  ILM's failure to attempt to seek approval of lower standard premium

18   bail bond rates cannot be explained by independent decision-making.  Based on ILM's annual

19   financial disclosures with the CDI, ILM has consistently experienced a loss ratio of zero:

20

21

22

23

24

25

26

27

28

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|----------|------|------|------|------|------|
| **Direct Premiums Written** | 455,700 | 488,381 | 447,929 | 56,906 | 0 |
| **Losses Incurred** | 0 | 0 | 0 | 0 | 0 |
| **Loss Ratio** | 0% | 0% | 0% | 0% | 0% |

281.    ILM's loss ratios make no economic sense in California but for the Conspiracy.  In 2005, projecting forward, ILM estimated losses of $15,000 on written premiums of $400,000 in California.  The implied loss ratio, 3.75%, makes no economic sense but for the Conspiracy.  If ILM truly believed it would only have to pay out 3.75% of the premiums it wrote, then in a competitive market it would have filed for a lower rate than the standard 10% to attempt to gain market share.  But because of the Conspiracy, ILM knew it was better off not filing a lower rate to take market share, with the assurance that other sureties would act similarly.  It would have no reason for either belief absent collusion.  In fact, as the chart above demonstrates, ILM's loss ratio on bail bonds nationally has been zero.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring zero losses.  But ILM has not done so, and has maintained its standard premium rates since it entered the market.

282.    Trade Association Participation:  ILM is a member of the SFAA, and contributed to it in 2015 and 2016.

283.    Rebate Suppression:  Once rebating was permitted under California law, ILM agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, ILM's bail bond agents

1    rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than

2    they otherwise would have absent the anti-rebating conspiracy.  ILM worked with rival sureties

3    and with bail agents to create an industry culture and practice of monitoring rebating practices of

4    rivals, and, if any rebating occurred, to report that practice to ILM and other sureties.  ILM then

5    coordinated with rival sureties to craft an appropriate response to reduce competitive rebating as

6    much as possible.

7         284.    ILM's own bail agents implemented this policy by holding out its 10% standard

8    rate as being required by law.  For example, the bail agents for which ILM underwrites bail

9    bonds, like the Bail Hotline, state on their websites that "[i]n Southern California, the cost of the

10   bail bond, which is called 'the premium,' is generally 10% of the total bail amount. You do not

11   get this money back."  This reference is misleading because it omits the fact that bail agents may

12   offer rebates to reduce the price of a bail bond.  Only after the original complaint in this case was

13   filed, the website was changed, so that it now states that "[r]ebates may be applied." Montana

14   Bail Bonds, which also sells bail bonds underwritten by ILM, states unambiguously on its

15   website: "In the state of California the legal percentage of a bail bond premium is 10%."

16        285.    Further, since at least 2005, ILM's standard rate sheet states that the standard 10%

17   rate "SHALL be charged by all agents of Indiana Lumbermens Mutual Insurance Company," and

18   instructs all agents to "[p]lease post the above schedule in a conspicuous place where it can be

19   seen by the public."  (Emphasis in original.)  A screenshot of the relevant portion of the rate sheet

20   is reproduced below:

21

22

23

24

25

26

27

28

286.     Economic Plus Factors:  Each and every economic plus factor described above apply to the bail bond business of ILM in California.  ILM's California bail bonds are homogenous commodities.  The rate of technological change for ILM's California bail bonds has been essentially zero throughout the Conspiracy:  ILM's bail bonds are functionally the same now as they were in 1989.  ILM's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for ILM is nearly identical across its customers.

287.     ILM understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  If ILM had sought approval of a standard premium lower than 10%, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.  Therefore, in its 2005 rate filing with the CDI, ILM explicitly stated that it would "model its new program after American Surety Company's bail bond program."

288.     Further, ILM understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  ILM did not do so because it abided by the Conspiracy.

### m.     Lexon Insurance Company

289.     Background and Market Entry:  Lexon Insurance Company ("Lexon") has been operating in California's bail bond market since at least 2011.  It has been a member of the Conspiracy since at least that time.  Lexon specialized in the business of surety bonds during the Class Period.

290.     Standard Rates:  Since entering the California bail bond market, Lexon has never attempted to seek approval of a standard premium rate below 10%.

291.     Loss Ratios:  In 2014, the last year for which Lexon reported national bail premium data to CDI, the company wrote $364,550 of premiums net of bail agent commissions, and incurred no losses.  Lexon's zero loss ratio makes no economic sense in California but for the Conspiracy.  An insurance company like Lexon that specializes in surety bonds, in a commodity market that was competitive, had the incentive to expand output by lowering its filed rate after

1    incurring zero losses.  But Lexon has not done so, and has maintained its standard premium rates

2    since it entered the market.

3        292.    <u>Trade Association Participation</u>:  Lexon is a member of the SFAA.

4        293.    <u>Rebate Suppression</u>:  When it entered the market, Lexon agreed to abide by the

5    understanding between and amongst other bail bond sureties to prevent its bail bond agents from

6    advertising rebates to consumers.  As a result, Lexon's bail bond agents rarely offer rebates to

7    consumers, or at least do so less frequently and in smaller amounts than they otherwise would

8    have absent the anti-rebating conspiracy.  Lexon worked with rival sureties and with bail agents

9    to create an industry culture and practice of monitoring rebating practices of rivals, and, if any

10   rebating occurred, to report that practice to Lexon and other sureties.  Lexon then coordinated

11   with rival sureties to craft an appropriate response to reduce competitive rebating as much as

12   possible.

13       294.    Lexon's own bail agents implemented this policy by holding out its 10% standard

14   rate as being required by law.  Indeed, Lexon's standard rate sheet, which must be posted in bail

15   agents' offices, includes a prominent black box warning that "all agents of Lexon Insurance

16   Company must charge these filed rates."  The omission of any reference of Lexon's agents'

17   ability to offer rebates misleads consumers into believing that the price of a bail bond may not be

18   below the filed premium rate.  A screenshot of the relevant portion of the rate sheet is reproduced

19   below:

20

21
                  **NOTE**
22       ALL AGENTS OF LEXON INSURANCE COMPANY MUST CHARGE THESE FILED RATES. THESE RATES ARE FOR PREMIUM ONLY, AND DO NOT INCLUDE OTHER EXPENSES INCURRED, SUCH AS TELEPHONE, POSTING FEES, APPRAISALS OR LOT-BOOK REPORTS, TRAVEL AND OTHER MISCELLANEOUS EXPENSES.

23       **ALL AGENTS: PLEASE POST THIS RATE CHART IN PUBLIC VIEW IN YOUR OFFICE**

24

25       295.    <u>Economic Plus Factors</u>:  Each and every economic plus factor described above

26   applies to the bail bond business of Lexon in California.  Lexon's California bail bonds are

27   homogenous commodities.  The rate of technological change for Lexon's California bail bonds

28   has been essentially zero throughout the Conspiracy:  Lexon's bail bonds are functionally the

1    same now as they were in 2011.  Lexon's bail bond sales have been small, frequent, and regular.

2    They are sold one at a time, to thousands of customers a year, at regular intervals.  The production

3    cost of a bail bond for Lexon is nearly identical across its customers.

4          296.    Lexon understood that, if it cheated on the terms of the Conspiracy, rival sureties

5    would soon discover it.  If Lexon had sought approval of a standard premium lower than 10%, it

6    would need to seek approval from the CDI, and its application and the approved premium rate

7    would become available to its rivals and co-conspirators.  Accordingly, Lexon's standard bail

8    bond rate notice includes a prominent black box warning that "all agents of Lexon Insurance

9    Company must charge these filed rates."  A screenshot of the relevant portion of the rate sheet is

10    reproduced below:

11

12

13

14

15

**NOTE**

ALL AGENTS OF LEXON INSURANCE COMPANY MUST CHARGE THESE FILED RATES. THESE RATES ARE FOR PREMIUM ONLY, AND DO NOT INCLUDE OTHER EXPENSES INCURRED, SUCH AS TELEPHONE, POSTING FEES, APPRAISALS OR LOT-BOOK REPORTS, TRAVEL AND OTHER MISCELLANEOUS EXPENSES.

ALL AGENTS: PLEASE POST THIS RATE CHART IN PUBLIC VIEW IN YOUR OFFICE

16          297.    Further, in its applications to CDI, Lexon signaled its intent to abide by the

17    Conspiracy by explicitly modeling its rate structure after those of Safety First Insurance

18    Company, Roche Surety and Casualty Company, Inc., National American Insurance Company of

19    California, and Sun Surety Insurance Company."

20          298.    Further, Lexon understood that, if it encouraged its agents to offer rebates, word of

21    this would surely spread to other rival sureties.  Lexon did not do so because it abided by the

22    Conspiracy.

23                 **n.**      **North River Insurance Company**

24          299.    <u>Background and Market Entry:</u>  The North River Insurance Company ("North

25    River") has been operating in California's bail bond market since at least 2006.  It has been a

26    member of the Conspiracy since at least that time.  North River is a subsidiary of Crum & Forster

27    Insurance Companies.  North River has been in operation since 1972.

28

300.   <u>Standard Rates</u>:  Since entering the bail bond market, North River has never attempted to seek approval of a standard premium below 10%.

301.   <u>Loss Ratios</u>:  North River's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making.  Based on North River's annual financial disclosures filed with the CDI, North River has consistently experienced a national loss ratio of zero on its bail bond business:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written** | $2,364,725 | $2,501,741 | $2,739,950 | $2,886,771 | $2,990,126 |
| **Losses Incurred** | $0 | $0 | $0 | $0 | $0 |
| **Loss Ratio** | 0% | 0% | 0% | 0% | 0% |

North River's zero loss ratios make no economic sense in California but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses.  But North River has not done so, and has maintained its rates since it entered the market.

302.   <u>Trade Association Participation</u>:  North River is a member of the SFAA.

303.   <u>Rebate Suppression</u>:  Once rebating was permitted under California law, North River agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, North River's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  North River worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to

1   North River and other sureties.  North River then coordinated with rival sureties to craft an

2   appropriate response to reduce competitive rebating as much as possible.

3   304.    North River's own bail agents implemented this policy by holding out its 10%

4   standard rate as being required by law.  For example, North River's bail agents include Bad Boys

5   Bail Bonds.  As of May 2020, the website for Bad Boy Bail Bonds (License No. 1846634): "The

6   process of bail is regulated by the State of California. A Judge within the county of arrest sets the

7   bail amount. Once bail is set, a Bad Boys Bail Bonds Agent charges 10%. (The State of

8   California regulates this fee. All Bail Bonds companies charge the same rate.)."  Bad Boys Bail

9   Bonds has also used substantially similar language on its website continuously since at least

10  August 2004:  "Bail in the state of California is regulated by the Department of Insurance. Every

11  bail bonds agency charges the same, which is 10 percent of the total bail amount. This 10 percent

12  fee is also known as premium."

13  305.    Economic Plus Factors:  Each and every economic plus factor described above

14  applies to the bail bond business of North River in California.  North River's California bail

15  bonds are homogenous commodities.  The rate of technological change for North River's

16  California bail bonds has been essentially zero throughout the Conspiracy:  North River's bail

17  bonds are functionally the same now as they were in 2006.  North River's bail bond sales have

18  been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year,

19  at regular intervals.  The production cost of a bail bond for North River is nearly identical across

20  its customers.

21  306.    North River understood that, if it cheated on the terms of the Conspiracy, rival

22  sureties would soon discover it.  If North River had sought approval of a standard premium lower

23  than 10%, it would need to seek approval from the CDI, and its application and the approved

24  premium rate would become available to its rivals and co-conspirators.  Accordingly, North

25  River's bail bond rate notice includes a prominent black box warning that "[t]hese rates must be

26  charged by ALL agents of THE NORTH RIVER INSURANCE COMPANY."  The notice also

27  includes the instruction:  "ALL AGENTS:  Please post this rate chart in public view in your

28  office."  A screenshot of the relevant portion of the rate sheet is reproduced below:

These rates must be charged by ALL agents of THE NORTH RIVER INSURANCE COMPANY. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

ALL AGENTS: Please post this rate chart in public view in your office.

307. Further, North River understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties. North River did not do so because it abided by the Conspiracy.

**o.      Philadelphia Reinsurance Corporation**

308. <u>Background and Market Entry</u>:  Philadelphia Reinsurance Corporation ("PRC") has been operating in California's bail bond market since at least 2017.  It has been a member of the Conspiracy since at least that time. PRC was incorporated in 1952.  PRC's ownership has changed hands over the years, but currently is a subsidiary of Bondsman Insurance Company, for whom it began writing surety business in February 2017.

309. <u>Standard Rates</u>:  Since entering the California bail bond market in 2017, PRC has never attempted to seek approval of a standard premium below 10%.

310. <u>Loss Ratios</u>:  PRC's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making. Based on PRC's annual financial disclosures filed with the CDI, PRC has consistently experienced loss ratios near zero:

| Category | 2017 | 2018 |
|---|---|---|
| **Direct Premiums Written** | $1,509,826 | $2,139,264 |
| **Losses Incurred** | $28,737 | $7,971 |
| **Loss Ratio** | 1.903% | 0.373% |

311.     These loss ratios make no economic sense but for the Conspiracy.  A surety

company in a commodity market that was competitive would have had the incentive to expand

output by lowering its filed rate after incurring such small losses.  PRC *only* writes bail in

California, so the figures above, while reported by PRC as "national" bail numbers like those of

other Surety Defendants, are California numbers.  Thus, in 2018, PRC wrote $2,139,264 in bail

premiums in California.  It incurred $7,971 in losses, reflecting a loss ratio less than 1%. An

insurance company like PRC that is so geographically limited has more incentive than more

diversified companies to examine opportunities to cut price where the predicted result of such

unilateral action in this commodity market would be to increase PRC's own overall revenues.

But PRC has not done so, and has maintained its standard premium rates since it entered the

market.

312.     Rebate Suppression:  When it entered the market, PRC agreed to abide by the

understanding between and amongst other bail bond sureties to prevent its bail bond agents from

advertising rebates to consumers.  Therefore, a 2016 PRC rate filing included a 10% premium

and, in its Bail Bond Rate & Risk Classification Criteria, explained "Chargeable Rates:  The

premium rates filed by Company's filed and approved premium rates for the Territory have been

provided to Producer and are to be complied with, without exception."  As a result, PRC's bail

bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller

amounts than they otherwise would have absent the anti-rebating conspiracy.  PRC worked with

rival sureties and with bail agents to create an industry culture and practice of monitoring rebating

practices of rivals, and, if any rebating occurred, to report that practice to PRC and other sureties.

PRC then coordinated with rival sureties to craft an appropriate response to reduce competitive

rebating as much as possible.

313.     Economic Plus Factors:  Each and every economic plus factor described above

applies to the bail bond business of PRC in California.  PRC's California bail bonds are

homogenous commodities.  The rate of technological change for PRC's California bail bonds has

been essentially zero throughout the Conspiracy:  PRC's bail bonds are functionally the same

now as they were when it began writing surety business for Bondsman Insurance Company in

2017.  PRC's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for PRC is nearly identical across its customers.

314.  PRC understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  For PRC to charge lower premiums, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals.

315.  Further, PRC understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  PRC did not do so because it abided by the Conspiracy.

**p.**   **Sun Surety Insurance Company**

316.  Background and Market Entry:  Sun Surety Insurance Company ("Sun") has been operating in California's bail bond market since at least 2008.  It has been a member of the Conspiracy since that time.  Sun is primarily in the business of writing primarily bail bonds, and was actively writing bail bonds in 31 states as of 2018.

317.  Standard Rates:  Since entering the California bail bond market in 2008, Sun never attempted to seek approval of a standard premium rate below 10%.

318.  Loss Ratios:  Sun's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making. Based on Sun's annual financial disclosures filed with the CDI, Sun has consistently experienced loss ratios of zero:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written (CA only)** | $59,883 | $60,548 | $48,673 | $90,513 | $121,829 |
| **Losses Incurred (CA only)** | $0 | $0 | $0 | $0 | $0 |
| **Loss Ratio (CA only)** | 0% | 0% | 0% | 0% | 0% |

These loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by

1    lowering its filed rate after incurring such small losses. For example, in 2018, Sun's "low

2    historical loss ratio" meant the company was not required to establish loss reserves."  An

3    insurance company like Sun that specializes in surety bonds and offers them in numerous states,

4    in a commodity market that was competitive, had the incentive to expand output by lowering its

5    filed rate. But Sun filed for 10% in 2018, and indeed has maintained its standard premium rates

6    since it entered the market.

7         319.    Trade Association Participation:  Sun Surety is a member of the American Bail

8    Coalition.

9         320.    Rebate Suppression:  When it entered the market, Sun agreed to abide by the

10   understanding between and amongst other bail bond sureties to prevent its bail bond agents from

11   advertising rebates to consumers.  As a result, Sun's bail bond agents rarely offer rebates to

12   consumers, or at least do so less frequently and in smaller amounts than they otherwise would

13   have absent the anti-rebating conspiracy.  Sun worked with rival sureties and with bail agents to

14   create an industry culture and practice of monitoring rebating practices of rivals, and, if any

15   rebating occurred, to report that practice to Sun and other sureties.  Sun then coordinated with

16   rival sureties to craft an appropriate response to reduce competitive rebating as much as possible.

17        321.    Sun's own bail agents implemented this policy by holding out its 10% standard

18   rate as being required by law.  Indeed, Sun's most recent rate filing, approved in 2017, includes a

19   schedule of premiums for bail agents to post in their offices stating that:  "THESE RATES MUST

20   BE CHARGED BY ALL AGENTS OF SUN SURETY INSURANCE COMPANY."  A

21   screenshot of the relevant portion is reproduced below:

22

23                    THESE RATES MUST BE CHARGED BY ALL AGENTS OF
                              SUN SURETY INSURANCE COMPANY.

24

25

26        322.    Economic Plus Factors:  Each and every economic plus factor described above

27   applies to the bail bond business of Sun in California.  Sun's California bail bonds are

28   homogenous commodities.  The rate of technological change for Sun's California bail bonds has

been essentially zero throughout the Conspiracy:  Sun's bail bonds are functionally the same now as they have always been.  Sun's bail bond sales have been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost of a bail bond for Sun is nearly identical across its customers.

323.  Sun also understood the issue of elasticity of demand:  it knew that it and its coconspirators could maintain the 10% rate because, as Sun's management noted in multiple annual reports, "[i]n the court appearance bond industry, price has no effect on the volume of business written."  Sun explicitly modeled its rate structure "on rate data obtained from the California Bail Agents Association and American Contractors Indemnity Company."

324.  Sun understood that, if it cheated on the terms of the Conspiracy, rival sureties would soon discover it.  For Sun to charge lower premiums, it would need to seek approval from the CDI, and its application and the approved premium rate would become available to its rivals and co-conspirators.  Sun was therefore very careful in its filing, approved in 2017, when it proposed to adopt the 8% rate for the limited number of groups to which all Conspiracy members offer a set discount off the standard premium rate of 10%.  This move, the stated purpose of which was to "put Sun Surety's rates in line with our competitors," confirms that bail agents working with Sun were performing no risk analysis at all; rather, Sun was aligning itself more precisely with the Conspiracy's mandates, competing at less than the standard 10% along only the avenue it could without deviating from the Conspiracy—for the discrete, limited, actuarially arbitrary groups that can receive an 8% rate, the agreed-upon departure from the 10% reference standard the Conspiracy employs.

325.  Further, Sun understood that, if it encouraged its agents to offer rebates, word of this would surely spread to other rival sureties.  Sun did not do so because it abided by the Conspiracy.

### q.  United States Fire Insurance Company

326.  Background and Market Entry:  United States Fire Insurance Company ("U.S. Fire") has been operating in California's bail bond market since at least 2006.  It has been a

member of the Conspiracy since at least that time. U.S. Fire is a member of the Crum & Forster group.

327.  Standard Rates:  Since entering the California bail bond market, U.S. Fire never attempted to seek approval of a standard premium rate below 10%.

328.  Loss Ratios:  U.S. Fire's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making. Based on U.S. Fire's annual financial disclosures filed with the CDI, U.S. Fire has consistently experienced zero loss ratios:

| Category | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Direct Premiums Written** | $2,374,102 | $2,212,145 | $2,038,972 | $2,090,478 | $2,164,814 |
| **Losses Incurred** | $0 | $0 | $0 | $0 | $0 |
| **Loss Ratio** | 0% | 0% | 0% | 0% | 0% |

329.  These loss ratios make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring zero losses. But U.S. Fire has not done so, and has maintained its standard premium rates since it entered the market.

330.  Trade Association Participation:  U.S. Fire is a member of the SFAA.

331.  Rebate Suppression:  When it entered the market, U.S. Fire agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, U.S. Fire's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would

1   have absent the anti-rebating conspiracy.  U.S. Fire worked with rival sureties and with bail

2   agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if

3   any rebating occurred, to report that practice to U.S. Fire.  U.S. Fire then coordinated with rival

4   sureties to craft an appropriate response to reduce competitive rebating as much as possible.

5          332.    U.S. Fire's own bail agents implemented this policy by holding out its 10%

6   standard rate as being required by law.  U.S. Fire's bail agents include Bad Boys Bail Bonds,

7   which represents: "Once bail is set, a Bad Boys Bail Bonds Agent charges 10%. (The State of

8   California regulates this fee. All Bail Bonds companies charge the same rate)." Another, Patriot

9   Bail Bonds, states on its website: "In California, the cost of a bail bond is 10% of the bail. . . .

10  [T]he rates are non-negotiable." Yet a third, Watkins Bail Bonds, states: "In general, all bail

11  agents will charge 10% of the amount of the bail, which is the standard industry rate." And Nor

12  Cal Bail Bonds states: "For this service, the bail agent charges a premium for the service (10% of

13  the full bail amount, it is a standard fee set by the California licensed Surety Companies and the

14  California Department of Insurance)."

15         333.    Economic Plus Factors:  Each and every economic plus factor described above

16  applies to the bail bond business of U.S. Fire in California.  U.S. Fire's California bail bonds are

17  homogenous commodities.  The rate of technological change for U.S. Fire's California bail bonds

18  has been essentially zero throughout the Conspiracy:  U.S. Fire's bail bonds are functionally the

19  same now as they were in 2006.  U.S. Fire's bail bond sales have been small, frequent, and

20  regular.  They are sold one at a time, to thousands of customers a year, at regular intervals.  The

21  production cost of a bail bond for U.S. Fire is nearly identical across its customers.

22         334.    U.S. Fire understood that, if it cheated on the terms of the Conspiracy, rival

23  sureties would soon discover it.  For U.S. Fire to charge lower premiums, it would need to seek

24  approval from the CDI, and its application and the approved premium rate would become

25  available to its rivals.  And indeed, Like North River, U.S. Fire's earliest available public filings,

26  in 2006, make clear that "[t]hese rates must be charged by ALL agents of UNITED STATES

27  FIRE INSURANCE COMPANY."  It also includes North River's same instruction:  "ALL

28

1    AGENTS:  Please post this rate chart in public view in your office."  A screenshot of the relevant

2    portion of the rate sheet is reproduced below:

3
4

```
NOTE
THESE RATES MUST BE CHARGED BY ALL AGENTS OF UNITED STATES FIRE INSURANCE
COMPANY, THE NORTH RIVER INSURANCE COMPANY, CRUM & FORSTER INDEMNITY COMPANY
AND SENECA INSURANCE COMPANY
```

5

6    335.    Further, U.S. Fire understood that, if it encouraged its agents to offer rebates, word

7    of this would surely spread to other rival sureties.  U.S. Fire did not do so because it abided by the

8    Conspiracy.

9                          **r.    Universal Fire & Casualty Insurance Company**

10   336.    <u>Background and Market Entry</u>:  Universal Fire & Casualty Insurance Company

11   ("UFCIC") has been operating in California's bail bond market since at least 2017.  It has been a

12   member of the Conspiracy since that time.  As of 2017, UFCIC's sole surety business is writing

13   bail bonds.  It began writing bail in other states in 2003.

14   337.    <u>Standard Rates</u>:  Since entering the California bail bond market in 2017, UFCIC

15   never attempted to seek approval of a standard premium rate below 10%.

16   338.    <u>Loss Ratios</u>:  UFCIC's failure to attempt to seek approval of lower standard

17   premium bail bond rates cannot be explained by independent decision-making. UFC has not

18   reported national bail numbers in recent years, but touts the "uniqueness of its line of business"

19   and "the fact that the company has not had any losses since it began writing bail." A zero loss

20   ratio makes no economic sense but for the Conspiracy.  A surety company in a commodity market

21   that was competitive would have had the incentive to expand output by lowering its filed rate

22   after incurring such small losses.  But UFCIC has not done so, and has maintained its standard

23   premium rates since it entered the market.

24   339.    <u>Trade Association Participation</u>:  UFCIC is a member of the SFAA.

25   340.    <u>Rebate Suppression</u>:  When it entered the market, UFCIC agreed to abide by the

26   understanding between and amongst other bail bond sureties to prevent its bail bond agents from

27   advertising rebates to consumers.  As a result, UFCIC's bail bond agents rarely offer rebates to

28   consumers, or at least do so less frequently and in smaller amounts than they otherwise would

1    have absent the anti-rebating conspiracy.  UFCIC worked with rival sureties and with bail agents

2    to create an industry culture and practice of monitoring rebating practices of rivals, and, if any

3    rebating occurred, to report that practice to UFCIC and other sureties.  UFCIC then coordinated

4    with rival sureties to craft an appropriate response to reduce competitive rebating as much as

5    possible.

6          341.    UFCIC's own bail agents implemented this policy by holding out its 10% standard

7    rate as being required by law.  For example, one of its agents, the Bail Bond Store, states on its

8    website: "The premium due upon posting of bail is 10% of the total bail amount. This rate, or

9    'Premium', is ***across the board for all bail bond agencies***." (Emphasis added.)

10         342.    <u>Economic Plus Factors</u>:  Each and every economic plus factor described above

11   applies to the bail bond business of UFCIC in California.  UFCIC's California bail bonds are

12   homogenous commodities.  The rate of technological change for UFCIC California bail bonds has

13   been essentially zero throughout the Conspiracy:  UFCIC's bail bonds are functionally the same

14   now as they were in 2003.  UFCIC's bail bond sales have been small, frequent, and regular.  They

15   are sold one at a time, to thousands of customers a year, at regular intervals.  The production cost

16   of a bail bond for UFCIC is nearly identical across its customers.

17         343.    UFCIC has also identified what may be a plus factor somewhat unique to the bail

18   industry in encouraging collusion:  Because bail agents, rather than the sureties, pay out claims

19   unless they reach catastrophic levels, sureties are exposed to less risk, and therefore have less risk

20   to allocate, and accordingly less incentive to cut prices to increase share and diversify their risk

21   portfolio. As UFCIC explains, "the insurance company enters into a 'fronting' arrangement with

22   its agents and typically is only necessary for catastrophic loss, which the principal has never had

23   occur in over 49 years of operating in the bail industry."  UFCIC sets aside zero reserves as of

24   2017, and "[m]anagement believes this is adequate due to layers of insulation from loss, ability to

25   mitigate claims to $0 and comprehensive indemnification by the producing agent, as well as the

26   Principal (and Indemnitor) on each risk."  An insurance company like UFCIC that specializes in

27   surety bonds and offers them in numerous states, with no losses, should have sensed the

28   opportunity, given its ability to insulate itself from loss, and should have entered the California

1    bail market in 2017 at a lower rate than 10%.  But it did not.  Instead, as it explained in a 2017

2    rate filing, it based "its rates for bail bonds on rate data obtained from the California Bail Agents

3    Association and rates that have been filed by and are in line with our competitors."  UFCIC noted

4    elsewhere in its application that its rates "are in line with our competitor's [*sic*] rates."

5           344.    UFCIC understood that, if it cheated on the terms of the Conspiracy, rival sureties

6    would soon discover it.  For UFCIC to charge lower premiums, it would need to seek approval

7    from the CDI, and its application and the approved premium rate would become available to its

8    rivals.  Therefore, when UFCIC sought approval just a few years ago to begin writing bail in

9    California, its bail bond rate notice states that its rates "must be charged by ALL producers of

10   [UFCIC]," and includes the following alert:  "ALL PRODUCERS:  Please post this rate chart in

11   public view in your office."  The relevant portions of the rate sheet are reproduced in a screenshot

12
13
14
15

**NOTICE**

These rates must be charged by ALL producers of UNIVERSAL FIRE & CASUALTY INSURANCE COMPANY. These rates are for premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports, travel and other miscellaneous expenses.

**ALL PRODUCERS:**    Please post this rate chart in public view in your office.

16   below:

17

18          345.    UFCIC also knew that the SFAA would require it to provide sales data that would

19   then be included in SFAA reports to other sureties.

20          346.    Further, UFCIC understood that, if it encouraged its agents to offer rebates, word

21   of this would surely spread to other rival sureties.  UFCIC did not do so because it abided by the

22   Conspiracy.

23                  **s.      Williamsburg National Insurance Company**

24          347.    Background and Market Entry:  Williamsburg National Insurance Company

25   ("Williamsburg") has been operating in California's bail bond market since at least 2011, when it

26   obtained approval to do so.  It has been a member of the Conspiracy since that time.  Prior to

27   2011, Williamsburg wrote bail in other states.

28

348.    Standard Rates:  Since entering the California bail bond market, Williamsburg never attempted to seek approval of a standard premium rate below 10%.

349.    Loss Ratios:  Williamsburg's failure to attempt to seek approval of lower standard premium bail bond rates cannot be explained by independent decision-making.  Based on Williamsburg's annual financial disclosures filed with the CDI, Williamsburg has consistently experienced a zero loss ratio:

| Category | 2016 | 2017 | 2018 |
|---|---|---|---|
| **Direct Premiums Written** | $634,686 | $275,232 | $32,403 |
| **Losses Incurred** | $0 | $0 | $0 |
| **Loss Ratio** | 0% | 0% | 0% |

350.    A zero loss ratio make no economic sense but for the Conspiracy.  A surety company in a commodity market that was competitive would have had the incentive to expand output by lowering its filed rate after incurring such small losses.  But Williamsburg has not done so, and has maintained its standard premium rates since it entered the market.

351.    It is clear from Williamsburg's entry into California's bail industry that its rates never had any actuarial basis.  During the CDI rate approval process in 2011, after Williamsburg submitted bail bond rates for state and federal bail, the reviewer told Williamsburg by letter dated March 28, 2011, that its "filing did not include supporting data for the determination of Bail Bond Rates. Please advise how the rates were determined for each category? Please be specific in your responses."  Williamsburg, of course, could not represent that it had done any actuarial analysis, because the Conspiracy is based not on standard practices in other types of insurance, but rather

on uniform adherence to what other sureties have agreed to charge.  Williamsburg responded to this request on April 18, 2011 (via Meadowbrook, Inc., its affiliate), by simply stating:  "The rates were determined by reviewing and are the same as those filed and approved by Western Insurance Company."  In response to CDI's question whether the filed rates were subject to individual risk premium modification plans, Williamsburg answered an unqualified "no," and when asked to explain the connection between the rates filed and its forms, made clear that "[a]ll bond rates are the same."  The next time Williamsburg made a rate filing was in 2017, only to update its power-of-attorney form.  Williamsburg's experience is evidence, if anything, of how unlikely entry is to undo the Conspiracy:  An insurance company like Williamsburg that entered into the market relatively late should have applied actuarial analysis as insurers do in the numerous other lines of business inside and outside of California.  Instead, it participated in the Conspiracy, and filed for 10% in every year for which its CDI filings are publicly available.

352.    <u>Trade Association Participation</u>:  Williamsburg is a member of the SFAA. Williamsburg National "Bail Bonds" (rather than Insurance Company) is listed as a "surety resource" for the GSBAA.  This is likely a reference to Defendant Williamsburg, which appears at the same address.

353.    <u>Rebate Suppression</u>:  When it entered the market, Williamsburg agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail bond agents from advertising rebates to consumers.  As a result, Williamsburg's bail bond agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Williamsburg worked with rival sureties and with bail agents to create an industry culture and practice of monitoring rebating practices of rivals, and, if any rebating occurred, to report that practice to Williamsburg and other sureties. Williamsburg then coordinated with rival sureties to craft an appropriate response to reduce competitive rebating as much as possible.

354.    Williamsburg's own bail agents implemented this policy by holding out its 10% standard rate as being required by law.  For example, Montana Bail Bonds, one of Williamsburg's

1   agents, states on its website, as of August 2018:  "In the state of California the legal percentage of

2   a bail bond premium is 10%."

3          355.    Economic Plus Factors:  Each and every economic plus factor described above

4   applies to the bail bond business of Williamsburg in California.  Williamsburg's California bail

5   bonds are homogenous commodities.  The rate of technological change for Williamsburg's

6   California bail bonds has been essentially zero throughout the Conspiracy:  Williamsburg's bail

7   bonds are functionally the same now as they were in 2011.  Williamsburg's bail bond sales have

8   been small, frequent, and regular.  They are sold one at a time, to thousands of customers a year,

9   at regular intervals.  The production cost of a bail bond for Williamsburg is nearly identical across

10  its customers.

11         356.    Williamsburg understood that, if it cheated on the terms of the Conspiracy, rival

12  sureties would soon discover it.  For Williamsburg to charge lower premiums, it would need to

13  seek approval from the CDI, and its application and the approved premium rate would become

14  available to its rivals.  Therefore, Williamsburg's rate filings include a bail bond rate notice

15  warns:  "These rates must be charged by ALL producers of THE WILLIAMSBURG NATIONAL

16  INSURANCE COMPANY."  Agents are told:  "ALL PRODUCERS:  Please post this rate chart

17  in public view in your office."  The relevant portions of the rate sheet are reproduced below:

18

**NOTICE**

19
These rates must be charged by ALL producers of THE WILLIAMSBURG NATIONAL INSURANCE COMPANY. These rates are for
premium only, and do not include other expenses incurred, such as telephone, posting fees, appraisals or lot book reports,

20
travel and other miscellaneous expenses.

21
ALL PRODUCERS:    Please post this rate chart in public view in your office.

22         357.    Further, Williamsburg understood that, if it encouraged its agents to offer rebates,

23  word of this would surely spread to other rival sureties.  Williamsburg did not do so because it

24  abided by the Conspiracy.

25                    **3.      Individual Defendants**

26                         **a.      William Carmichael**

27         358.    Defendant Carmichael holds vaulted positions in the California bail industry.  He

28  is the President, CEO, and co-owner of Defendant ASC.  He also served as the former President

1   and Executive Director of Defendant ABC, the trade association, and is presently its Chairman.

2   Defendant Carmichael directly participated in the conspiracy alleged herein and approved and

3   ratified the conduct of the Surety Defendant ASC and the Trade Association Defendant ABC.

4        359.   In a 2006 blog post on Defendant ASC's website, Carmichael posted the

5   following, describing the importance of creating and maintain the Conspiracy (emphasis added):

6        In 1986, when Jack and I started, we dreamt of an industry solidly
        united against its foes.  National, State and Local associations well-
7        versed in the vital roles they play in the protection and betterment
        of our markets. . . . *We wished for a cohesive band of agents and*
8        *companies whose power, when combined, far exceeded the power*
        *of an unorganized group of single businesses*. . . . Our Company
9        will continue to provide its resources, both financial and personnel,
        to any effort which can be demonstrated to be trying to grow the
10       surety-backed agency channel.

11

12       360.   Indeed, Carmichael has long recognized that if the sale of commercial bail bonds

13   were a competitive market, the profitability of ASC and other Defendants would plummet,

14   because sureties rarely have to pay out a bond to a court.  Those low costs should otherwise

15   encourage discounting by sureties to increase their respective market shares.

16       361.   As Carmichael stated in a March 2005 article (soon after the trial court decision in

17   *Pacific Bonding* made clear that discounting was legal) (emphasis added):

18       2005 will not be a year when we, as an industry, can sit passively
        by while competitive forces continue to encroach upon our
19       markets . . . .  Advocates argue that the market dictates that they
        charge and collect less than the filed rate. . . . *[But] I can safely*
20       *predict that if left unchecked, rampant premium discounting will*
        *result in the end of the bail bond business as we know it, to be*
21       *replaced by a new model that properly reflects the proper balance*
        *of risk and reward.  Simple economics dictates it. . . . I urge all of*
22       *us to recognize the serious nature of the threats to our industry*
        *and work collectively to repel them.  Leaving profit on the table,*
23       *in the form of discounts or uncollected accounts receivable, is a*
        *fool's game.*
24

25

26       362.   Thus, Carmichael and other sureties have recognized the need to avoid the "simple

27   economics" that would create a market "reflect[ing] the proper balance of risk and reward"—i.e.,

28   a market with low premiums to reflect the low likelihood that a criminal defendant will "jump

bail" and a surety will have to pay out on a bond.  Carmichael called upon bail bond agents to be "our industry's eyes, ears and mouths in recognizing and alerting all to the impending attack [on the industry].  When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response."

363.    Later that year, in August 2005, in another article posted to Defendant ASC's website, he further explained what he saw as his and his company ASC's role in "protecting" the bail market:

> We actively participate in just about every state agents' association that we know of, we continue to aggressively finance legislative agendas in numerous locales and we monitor the country for either advantageous or detrimental legislation in every state in which we transact bail. My point is that we attempt to be actively involved in every facet of our industry. We're not content to simply write bail. We recognize the important role a surety must play in protecting our markets. If only every competitor we have would do the same.

### b.    <u>Jerry Watson</u>

364.    Defendant Jerry Watson is the Vice President of the AIA and Senior Counsel and Board Member of Defendant American Bail Coalition.  Watson directly participated in the conspiracy alleged herein and approved and ratified the conduct of AIA's members (Defendants Allegheny Casualty Company, and International Fidelity Insurance Company), Defendant ABC, and SFAA.

365.    Defendant Watson is an active participant in several trade associations.  He has served as legal counsel to Defendant ABC, and is a member of the Bail Advisory Council of SFAA.

366.    Defendant Watson recognizes that there is very little risk to bail sureties, including his company AIA.  He has admitted about Defendant AIA:  "You know how many checks has this company written to pay a bail loss? ***Not a single one***."  (Emphasis added.)

367.    Defendant Watson has also expressed concern that the increasing number of bail agents in California, combined with the lower number of arrests, means fewer bail bonds will be written.  He spelled out the economic realities of this business in a 2009 article called "The New Age of Bail" posted to Defendant AIA's website:

> For a number of years, there has been concern that too many new agents are entering an already crowded industry. An inherent problem has revealed itself as an increasing number of bail agents want a piece of a shrinking bail bond pie. . . . [Meanwhile,] data compiled concludes that the number of nationwide arrests is decreasing by slightly over two percent each year. . . . Whatever the cause may be, the effect is clear:  There are increasingly fewer bonds in the marketplace.

368.   Defendant Watson directly participates in the conspiracy by publishing articles warning against the dangers of newcomers to the bail market, and publicly derided "price-cutting" as a "cancer" and a "sickness" that was infecting the bail industry.  In an article he wrote on behalf of Defendant AIA, published on AIA's website, he explains:

> **4. The Steady Spread of Price-Cutting**
> Webster's definition of cancer is:  "A malignant tumor that spreads locally and then to distant parts of the body." Price-cutting is a form of cancer in the bail industry. And, just like when cancer spreads, price-cutting leaves behind pockets of inertia where life is no longer present. How does this happen? Cancer starts as a seemingly harmless presence just like the new bail guy moving in across the street with a Yellow Pages ad that reads, "Best Prices in Town!" No One Sells Cheaper!" They seem like harmless words at first. After all, you've been around longer and have more experience, right? Wrong. Today's bail bond customer shops around just like any other consumer marketplace. And with the United State's [sic] economy in a tailspin, everybody is looking for a deal. The price-cutting sickness has reached epidemic proportions in the bail profession.

369.   Watson's solution to the "problem" of price-cutting—rather than cutting AIA's own rates—was instead to offer "exceptional service" to show potential customers seeking bail that you are one of the "good guys" (the implication being those price-cutting and offering lower rates are the "bad guys").  He explains:

> When trying to survive amidst a bunch of cost-cutting competitors, exceptional service shines like a new penny. People intuitively know who the good guys are by reputation and word of mouth. So if you can maintain that you are one of the good guys, often times cost can take a back seat to service.

370.   Defendant Watson's statements help teach and enforce the Conspiracy, by instructing other sureties and agents (on behalf of himself and his Company, AIA), that the right approach is not to cut their own prices, but instead maintain the Conspiracy and compete on other dimensions, such as service.

4.     **Bail Agency Defendants**

a.     **Two Jinn, Inc. d/b/a Aladdin Bail Bonds**

371.    Plaintiff Monterrey's bail bond was arranged by Defendant Two Jinn, Inc. d/b/a Aladdin Bail Bonds ("Aladdin"), and underwritten by Surety Defendant Seaview.  Plaintiff Monterrey was charged and paid an 8% rate, having received the standard veterans' discount to which the Surety Defendants have agreed.  Aladdin gave her no indication that a lower price was possible, and instead misled her into believing that it was not.  In other words, the Conspiracy worked exactly as intended, causing Plaintiff Monterrey to pay an artificially inflated price for a bail bond.

372.    Aladdin's website FAQs, under the heading "How does a bail bond work?" currently states that "For providing the pre-trial release service, bail service providers charge a premium – a percentage of the total bail amount, typically 10%."  Under the section "What is the difference between bail bond amount and premium?" Aladdin explains that "The premium is the dollar amount charged by the bail service provider for providing the pre-trial release service.  Usually this premium is 10% of the bail amount."  The FAQ states only that the rate is "typically" or "usually" 10%, suggesting that other rates are not normally used.  There is no mention of rebates or discounts at all.

373.    The same FAQ website from 2006 was even more misleading.  For example, under the question "How much do you charge?", Aladdin described the 10% rate as "standard":

> All bail agencies are required to file their rate with the Department of Insurance. Aladdin Bail Bonds is one of the few bail bond agencies in CA who is authorized to offer an 8% rate in addition to the standard 10%. The 8% rate is given to any client who is actively enrolled in a union or has retained private counsel for the case. There is a minimum premium of $50 per bond and a state bond fee is charged per bond as well ($15 in CA & $35 in ID).

374.    The 2006 FAQ also contained the question "Do you offer 5% bail?" with the response that called such a rate "misleading":

> 5% bail or less is misleading advertising used by some agencies to describe the down payment they require. The agency is still required by state law to collect the remainder of the premium, which is granted on credit. Aladdin Bail Bonds does not specifically use the term 5% bail, but we will work with clients to make financial arrangements at ZERO INTEREST.

375.    That is, Aladdin's 2006 website told consumers that anything below the "standard" 10% rate (other than the 8% rate available to union members or those with private counsel), was misleading advertising, suggesting that such prices were misleading or illegal.  Further, the clear implication of the statement is that the only price competition that exists pertains to the timing, not the amount, of payment, and that "state law" requires the agent to "collect the remainder[.]"

376.    Aladdin has additional statements on its website relating to premiums suggesting that particular prices are required by law.  For example, on its website under the heading "Standard Premium Rate," Aladdin claims that its prices are required by law:  "All insurers who work with bail service providers are required to file their premium rates with the Department of Insurance.  In California . . . Aladdin Bail Bonds is authorized to offer an 8% rate in addition to the standard 105.  ***Nobody has lower prices than Aladdin***."  (Emphasis added).  These statements are misleading insofar as they conceal the ability of Aladdin—and its competitors—to offer lower prices with rebates.

377.    Further, Aladdin uses the Surety Association of America's rates as a justification for setting its standard rate, and Seaview, its surety, has said in its CDI filings, in connection with the rate filing for Ulico Standard of America Casualty Company, which Seaview acquired in 2011, that "[t]he standard rate is based on Surety Association of America (SAA) pricing."

378.    Aladdin also participates in the Trade Association Defendants described above. As ASC Whitlock VP describes, a conference organized by Defendant ABC in 2011 included among the attendees "representatives of Aladdin Bail Bonds, the state's largest retailer," which joined with several other trade associations to create a cooperative called the California Bail Coalition (CBC).

### b.      All-Pro Bail Bonds Inc.

379.    Plaintiff Crain's bond was arranged through Defendant All-Pro Bail Bonds Inc. ("All-Pro") and underwritten by Defendant Bankers Insurance.  On Christmas Day, All-Pro charged Plaintiff Crain a 10% rate with no rebates or discounts.  All-Pro gave her no indication that a lower price was possible, and instead misled her into believing that it was not.  In other

1  words, the Conspiracy worked exactly as intended, causing Plaintiff Crain to pay an artificially

2  inflated price for a bail bond.

3  380.  All-Pro directly participates in the conspiracy through statements on its website

4  that it offers the standard premium rate of 10%.  For example, in its FAQ under a section titled

5  "What does bail cost?" All-Pro states that "In general, *the standard industry rate* for bail bonds is

6  10% of the face amount of bail. For example, if the face amount of bail is $10,000, *the fee* is

7  $1,000."  (Emphasis added.)  By reiterating the Conspiracy line that the "standard" rate is 10%

8  and ignoring the possibility of a lower rate to those outside of specific, pre-authorized categories,

9  All-Pro furthers the Conspiracy.

10  381.  All-Pro made similar statements near the beginning of the Class Period, further

11  reflecting participation in the conspiracy.  For example, in the 2008 version of its "Rates" page,

12  All-Pro stated unequivocally that all bail agents charge the same rates and that it was illegal for an

13  agent to charge a lower rate (emphasis added):

14  
15  The Department of Insurance regulates the rates all bail agents must charge. Essentially, *all bail agents charge the same rates*. *The only difference* is that some bail agents allow the client to pay the balance due over time-regardless of the rate. *Failure to charge the proper rate for a bail bond is a crime*. That's why ALLPRO BAIL BONDS always charges the rates shown below to ALL clients.

18  382.  These statements were calculated to mislead Class members into believing that it

19  was impossible to pay less than the standard price-fixed rates, and that if anyone offered them

20  less, purchasing a discounted bail bond might somehow be part of a "crime."  It is hard to

21  imagine a more effective misrepresentation to a population of consumers who are either in jail or

22  who seek to obtain release for a loved one in jail.

23  **G.  Fraudulent Concealment and Equitable Estoppel**

24  383.  The doctrine of fraudulent concealment tolled the statutes of limitations on claims

25  asserted by Plaintiffs and the Class.  Plaintiffs and Class members are or were persons in pretrial

26  detention or friends and relatives who paid premiums on bail bonds but had no actual knowledge,

27  or reason to have knowledge, of the secret conspiracy alleged herein or any reasonably available

28  means to discover or investigate it.  Defendants' pervasive public misrepresentations that their

prices were required by law and that discounting was illegal actively concealed material facts from Plaintiffs and the Class, and thus Plaintiffs and the Class had no reason to suspect that an unlawful conspiracy to restrain competition was afoot.  Plaintiffs and the Class were justified in relying on these misrepresentations.

384.    As a result, Plaintiffs learned of the alleged conspiracy no earlier than January 2, 2019, through counsel's investigation.  Because of Defendants' misrepresentations regarding premiums and rebating, they had no reason to suspect it at any time before that date.  The Class learned of the Conspiracy no sooner than, and had no reason to suspect it before, January 29, 2019, when Plaintiffs first filed this action.

385.    Alternatively, Defendants are equitably estopped from asserting a statute of limitations defense because, by their affirmative misrepresentations and by intentional acts to conceal their wrongdoing, Defendants misled Plaintiffs and the Class into believing they had no choice but to pay the Conspiracy price.  Defendants should not be permitted to profit from their wrongdoing.

**H.    <u>Plaintiffs Could Not Have Discovered Defendants' Misconduct Earlier Despite Reasonable Diligence</u>**

386.    Plaintiffs and the Class could not have discovered Defendants' violations prior to January 2019, through the exercise of due diligence.

387.    First, as described above, Defendants misled Plaintiffs and the Class into believing that their prices were required by law, and that the Class could not find cheaper prices elsewhere. Defendants should not be rewarded for successfully misleading Plaintiffs and the Class.

388.    Second, Plaintiffs and the Class were not in a position to undertake a costly and detailed investigation.  Plaintiffs and the Class were either themselves incarcerated at the time, or sought the release of someone who was.  It would have been essentially impossible for them in that situation to conduct the kind of investigation reflected in this complaint.  Bail bond retail locations are typically concentrated across the street from jails.  The reason is not because bail bond consumers devote large resources to investigating bail bond competition.

389. Third, Plaintiffs and the Class lacked the specialized economic and industry knowledge necessary to discover the Conspiracy sooner. Collecting the data and information alleged herein was a very complex and time-consuming undertaking, made more difficult by industry participants. For example, AmBest, a rating services agency for the insurance industry, refused to sell information to Plaintiffs' counsel that it provides to the Defendants. AmBest confirmed it had information compiled from publicly-available CDI filings in a usable and digestible format. But AmBest refused to provide that information to Plaintiffs' counsel without Plaintiffs' counsel first agreeing not to use the information in litigation. (Plaintiffs' counsel, of course, refused that condition.) Thus, this information is not available to Plaintiffs or other consumers reasonably exercising diligence to uncover their claims.

## VII.    FIRST CLAIM FOR RELIEF:  VIOLATIONS OF THE CARTWRIGHT ACT

390. Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

391. Defendants, and their co-conspirators, entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code section 16720.

392. Beginning on or about February 24, 2004, Defendants have engaged in continuing trusts in restraint of trade and commerce, and the fixing of commercial bail bond prices sold to Plaintiffs and members of the Class in violation of the Cartwright Act.

393. Defendants colluded to artificially increase the prices of bail bonds in California by:  (1) fixing the standard premium at 10%; and (2) suppressing rebating.

394. The wrongful acts done in furtherance of Defendants' conspiracy include, but are not limited to:

a.    Agreeing at meetings—at industry conferences and elsewhere—to fix the premiums for commercial bail bonds;

b.    Filing uniform premiums submitted to the California Department of Insurance;

c.      Advertising those premiums and misleading the Class into believing that they could not pay less than those premiums;

d.      Maintaining industry discipline and coordination through communications and in-person meetings ;

e.      Retaliating, via threats and other means, against those supporting or engaging in price competition.

395.    The agreement that Defendants entered, maintained, renewed, and enforced with one another had the purpose and effect of fixing or inflating bail bond prices in California.  As a result of this agreement, Plaintiffs and Class members have been forced to pay inflated bail bonds prices, and otherwise have been damaged as described in this Complaint.  But for the conspiracy alleged herein, bail bond premiums paid by Plaintiffs and Class members in California would have been lower.

396.    As a direct and proximate result of Defendants' past and continuing violation of the Cartwright Act, Plaintiffs and the Class have suffered injury and damages in an amount to be proven at trial.

397.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Defendants jointly and severally for these violations.  These damages represent the difference between the amount Plaintiffs and other members of the Class paid for bail bonds in California and what Plaintiffs and other members of the Class would have paid in the absence of the violations alleged.  Damages may be quantified on a Class-wide basis.  Actual damages should be trebled under California Business and Professions Code section 16750.

398.    Plaintiffs and members of the Class are "persons" within the meaning of the Cartwright Act as defined in section 16702.

399.    The acts done by each Defendant as part of, and in furtherance of, their agreements, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

400.     Defendants' agreements, combinations and/or conspiracies are a *per se* violation of the Cartwright Act.

**VIII.   SECOND CLAIM FOR RELIEF:  UNFAIR COMPETITION**

401.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations of this Complaint.

402.     Defendants' and their co-conspirators' actions to restrain trade and fix prices in the market for commercial bail bonds constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professions Code sections 17200, *et seq*.

403.     Defendants' and their co-conspirators' conduct in engaging in combinations of capital, skill, and acts with others with the intent, purpose, and effect of restraining trade and fixing or inflating prices in the market for commercial bail bonds, constitutes and was intended to constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business and Professions Code section 17200.

404.     Defendants and their co-conspirators also violated California's Unfair Competition Law by violating the Cartwright Act.

405.     As a result of Defendants' and their co-conspirators' violations of Business and Professions Code section 17200, Defendants have unjustly enriched themselves at the expense of the Class.  The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

406.     To prevent their unjust enrichment, Defendants should be required pursuant to Business and Professions Code sections 17203 and 17204 to disgorge their illegal gains for the purpose of making full restitution to all injured Class members identified hereinabove. Defendants should also be permanently enjoined from continuing their violations of Business and Professions Code section 17200.

407.     The acts and business practices, as alleged herein, constituted and constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business

1    and Professions Code section 17200, *et seq*., including, but not limited to, violations of the

2    Cartwright Act, California Business and Professions Code section 16720, *et seq*.

3        408.    Defendants' and their co-conspirators' acts and business practices as described

4    above, whether or not in violation of California Business and Professions Code section 16720, *et*

5    *seq*., are otherwise unfair, unconscionable, unlawful, and fraudulent.

6        409.    The illegal conduct alleged herein is continuing, and there is no indication that

7    Defendants and their co-conspirators will not continue such activity into the future.

8    **IX.    THIRD CLAIM FOR RELIEF:  VIOLATION OF THE SHERMAN ACT**

9        410.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations of

10   this Complaint.

11       411.    Defendants and their co-conspirators entered into and engaged in unlawful

12   agreements in restraint of the trade and commerce described above in violation of Section 1 of the

13   Sherman Act, 15 U.S.C. § 1.  Beginning no later than February 24, 2004 and continuing through

14   the present, Defendants have engaged in continuing trusts in restraint of trade and commerce, and

15   the fixing or inflating of commercial bail bond prices sold to Plaintiffs and members of the Class

16   in violation of the Sherman Act by restraining competitive discounting or rebating below

17   approved premium rates.

18       412.    The agreement that Defendants entered, maintained, renewed, and enforced with

19   one another had the purpose and effect of fixing or inflating bail bond prices in California.  As a

20   result of this agreement, Plaintiffs and Class members have been forced to pay inflated bail bonds

21   prices, and otherwise have been damaged as described in this Complaint.  But for the conspiracy

22   alleged herein, bail bond prices paid by Plaintiffs and Class members in California would have

23   been lower.

24       413.    As a direct and proximate result of Defendants' and their co-conspirators'

25   combinations and contracts to restrain trade and eliminate competition over the sale of bail bonds

26   in the State of California, members of the Class have suffered injury to their property and been

27   deprived of the benefits of free and fair competition on the merits.

28

414.    Plaintiffs, on behalf of themselves and other members of the Class, seek money damages from Defendants jointly and severally for these violations.  These damages represent the difference between the amount Plaintiffs and other members of the Class paid for bail bonds in California and what Plaintiffs and other members of the Class would have paid in the absence of the violations alleged.  Damages may be quantified on a Class-wide basis.  Actual damages should be trebled under 15 U.S.C. § 15.

415.    The acts done by each Defendant and their co-conspirators as part of, and in furtherance of, their contracts, combinations, or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Defendant's affairs.

416.    Defendants' and their co-conspirators' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

## X.    PRAYER FOR RELIEF

Plaintiffs request relief as follows:

a.    That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to Class members;

b.    That the Court enter an order declaring Defendants' actions, as set forth in this Complaint, violate the law;

c.    That the Court issue an injunction against Defendants, stopping and preventing the violations alleged herein and requiring Defendants to correct all false or misleading statements in any materials, online or otherwise, relating to the discounting of bail;

d.    That the Court award Plaintiffs and Class members damages and/or restitution in an amount to be determined at trial, with damages to be trebled pursuant to California Business and Professions Code section 16750(a) and 15 U.S.C. § 15;

e.    That the Court require disgorgement and/or impose a constructive trust upon Defendants' ill-gotten gains, freeze Defendants' assets, and/or require Defendants to pay restitution to Plaintiffs and to all members of the Class of all funds acquired by means of any act

1  or practice declared by this Court to be an unlawful, unfair, or fraudulent, business practice, a

2  violation of state law, or to constitute unfair competition;

3           f.      That the Court award Plaintiffs and the Class pre- and post-judgment

4  interest;

5           g.      That the Court award Plaintiffs and the Class their costs of suit, including

6  reasonable attorney's fees and expenses; and

7           h.      That the Court award such other relief as the Court may deem just and

8  proper.

9  **XI.    JURY DEMAND**

10          Plaintiffs hereby demand a jury trial for all triable issues.

11  Dated: May 13, 2020                 Respectfully submitted,

12                                      LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

13                                      By:  */s/ Dean M. Harvey*

14
                                            Dean M. Harvey (SBN 250298)
15                                          Katherine C. Lubin (SBN 259826)
                                            Yaman Salahi (SBN 288752)
16                                          Adam Gitlin (SBN 317047)
                                            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
17                                          275 Battery Street, 29th Floor
                                            San Francisco, CA 94111
18                                          Telephone:  (415) 956-1000
                                            dharvey@lchb.com
19                                          kbenson@lchb.com
                                            ysalahi@lchb.com
20                                          agitlin@lchb.com
21
                                            *Interim Class Counsel*
22

23
                                            Benjamin David Elga (pro hac vice)
24                                          Brian James Shearer (pro hac vice)
                                            JUSTICE CATALYST LAW
25                                          25 Broadway, 9th Floor
                                            New York, NY
26                                          Telephone: (518) 732-6703
                                            belga@justicecatalyst.org
27                                          brianshearer@justicecatalyst.org

28

block">David Seligman (pro hac vice)
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Telephone: (720) 441-2236
Facsimile: (303) 957-2289
david@towardsjustice.org

Stuart T. Rossman (pro hac vice)
Brian Highsmith (pro hac vice)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110-1245
Telephone: (617) 542-8010
Facsimile: (617) 542-8028
srossman@nclc.org
bhighsmith@nclc.org

Cindy Pánuco (SBN 266921)
Stephanie Carroll (SBN 263698)
Nisha Kashyap (SBN 301934)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California, 90005
Telephone: (213) 385-2977
Facsimile: (213) 201-4722
cpanuco@publiccounsel.org
scarroll@publiccounsel.org
nkashyap@publiccounsel.org

*Counsel for Plaintiffs and the Proposed Class*

1991854.1