1    COOLEY LLP
     MICHAEL A. ATTANASIO (151529)
2    (mattanasio@cooley.com)
     4401 Eastgate Mall
3    San Diego, CA  92121-1909
     Telephone:    (858) 550-6000
4    Facsimile:    (858) 550-6420

5    BEATRIZ MEJIA (190948)
     (mejiab@cooley.com)
6    DAVID HOUSKA (295918)
     (dhouska@cooley.com)
7    MAX SLADEK DE LA CAL (324961)
     (msladekdelacal@cooley.com)
8    101 California Street, 5th Floor
     San Francisco, CA 94111-5800
9    Telephone:   (415) 693-2000
     Facsimile:    (415) 693-2222

10   Attorneys for Defendants
     SEAVIEW INSURANCE COMPANY
11   and TWO JINN, INC.

12   [*Additional Moving Defendants and Counsel
     Listed on Signature Pages*]

13

14

15                      UNITED STATES DISTRICT COURT

16                  NORTHERN DISTRICT OF CALIFORNIA

17                          OAKLAND DIVISION

18

19   IN RE CALIFORNIA BAIL BOND          Master Docket No. 19-cv-00717-JST

20   ANTITRUST LITIGATION                CLASS ACTION

21                                       **DEFENDANTS' NOTICE OF MOTION AND
                                         MOTION TO DISMISS; MEMORANDUM OF
22   THIS DOCUMENT RELATES TO:           POINTS AND AUTHORITIES**

23   ALL ACTIONS                         Judge:         Hon. Jon S. Tigar
                                         Hearing Date:  August 26, 2020
24                                       Courtroom:     2, 4th Floor
                                         Time:          2:00 p.m.
25                                       Trial Date:    Not Set

26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION .................................................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................... 2

I.     INTRODUCTION ............................................................................................................ 2

II.    OVERVIEW OF BRIEF STRUCTURE ......................................................................... 4

III.   BACKGROUND ............................................................................................................. 5

    A.     Procedural History .............................................................................................. 5

    B.     The SCAC's New Allegations ............................................................................ 6

        1.     Plaintiffs copy and paste the same set of allegations against each
             Surety Defendant. ................................................................................... 7

        2.     Plaintiffs' new allegations regarding the alleged market for bail bonds
             in California. ............................................................................................ 8

        3.     Plaintiffs' allegations around rebating remain thin. ............................... 10

        4.     Plaintiffs' allegations against the Bail Agency and Trade Association
             Defendants offer more of the insufficient same. ..................................... 11

IV.    LEGAL STANDARD ...................................................................................................... 11

V.     THE SCAC'S NEW ALLEGATIONS DO NOT ADDRESS THE COURT'S
      ORDER DISMISSING THE CAC .................................................................................. 12

VI.    PLAINTIFFS' OVER-SIMPLIFIED THEORY IS INSUFFICIENT TO MAINTAIN
      THAT THE SURETY DEFENDANTS CONSPIRED TO FIX PREMIUM RATES ......... 14

    A.     Plaintiffs' Allegations of "Uniform" Premium Rate Filings Are Misleading
        and Insufficient .................................................................................................. 15

        1.     The Surety Defendants' premium rate filings were far from "uniform." ...... 16

             a.     The qualifications for a 10% "standard" vs. 8% "preferred" rate
                 vary widely between Surety Defendants. ...................................... 16

             b.     Many sureties charge premium rates higher than 10% or as low
                 as 6%. ........................................................................................... 17

             c.     The average premium rate has decreased during the supposed
                 conspiracy. .................................................................................... 18

        2.     The SCAC's "benchmark" theory concerning the "standard" premium
             rates does not explain the multitude of variations in rate filings. .................. 20

    B.     Plaintiffs' Allegations of Outsized Profits Are Misplaced ...................................... 21

    C.     Plaintiffs' New Allegations Regarding the Alleged Bail Bond Market
        Undermine the Plausibility of the Alleged Conspiracy .......................................... 24

         1.     The dynamics of concentrated markets for fungible, price-inelastic
             goods. ...................................................................................................... 25

        2.     Additional market features could likewise dis-incentivize price-
             cutting. .................................................................................................... 27

        3.     Market growth also makes a conspiracy implausible. .................................. 29

**TABLE OF CONTENTS**
(continued)

Page

D.      Plaintiffs' Allegations Regarding Trade Association Membership Are
        Insufficient .................................................................................................. 30

VII.    THE ALLEGED CONSPIRACY TO "SUPPRESS" REBATES IS IMPLAUSIBLE ......... 32

        A.      Plaintiffs Do Not Sufficiently Allege Any Defendant Joined an Anti-Rebating
                Conspiracy .......................................................................................... 33

        B.      The Court Should Dismiss the Claims Against the Bail Agency Defendants ........... 36

                1.      Plaintiffs do not add facts regarding  participation by Defendant Two
                        Jinn, Inc. ................................................................................. 36

                2.      The allegations against Defendant All-Pro Bail Bonds, Inc. fail ................. 37

VIII.   THE COURT SHOULD DISMISS THE CLAIMS AGAINST THE TRADE
        ASSOCIATIONS ............................................................................................. 38

        A.      American Bail Coalition ..................................................................... 39

        B.      Golden State Bail Agents Association ....................................................... 40

        C.      The Allegations Against the Non-Party Surety Fidelity Association of
                America Are Irrelevant ....................................................................... 42

IX.     THE COURT SHOULD DISMISS THE INDIVIDUAL DEFENDANTS AND
        CBAA BECAUSE A CONSPIRACY IS NO LONGER PLAUSIBLE ............................... 43

X.      THE COURT SHOULD DISMISS NEWLY ADDED DEFENDANT AIA
        BECAUSE THE FACTS PLED DO NOT ESTABLISH THAT AIA ENGAGED IN
        CONSPIRATORIAL CONDUCT ............................................................................. 44

XI.     THE UCL CLAIM FALLS WITH PLAINTIFFS' ANTITRUST CLAIMS ....................... 46

XII.    CONCLUSION ................................................................................................. 47

APPENDIX A ................................................................................................ A-1 – A-11

APPENDIX B ................................................................................................ B-1 – B-2

Cooley LLP
Attorneys At Law
San Diego

ii.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A White & Yellow Cab, Inc. v. Uber Techs., Inc.,*
No. 15-cv-5163, 2017 WL 1208384 (N.D. Cal. Mar. 31, 2017) ............................................46

*Alberta Pork Producers Marketing Board v. U.S.,*
683 F. Supp. 1398 (Ct. Int'l Trade 1988) ......................................................................8

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009).........................................................................................11

*Askins v. U.S. Dept. of Homeland Security,*
899 F.3d 1035 (9th Cir. 2018) .............................................................................12

*In re Baby Food Antitrust Litig.,*
166 F.3d 112 (3d Cir. 1999)................................................................................22

*Bell Atl. Corp v. Twombly,*
550 U.S. 544 (2007)...........................................................................11, 12, 15, 29

*Brazil v. Dole Food Co.,*
935 F. Supp. 2d 947 (N.D. Cal. 2013) ....................................................................46

*Buller v. Sutter Health,*
160 Cal. App. 4th 981 (2008) .............................................................................34

*In re Cal. Title Ins. Antitrust Litig.,*
2009 WL 1458025 (N.D. Cal. May 21, 2009) ........................................................31, 32

*In re Cathode Ray Tube (CRT) Antitrust Litigation,*
738 F. Supp. 2d 1011 (N.D. Cal. 1010) ...............................................................13, 14

*CDC Technologies, Inc. v. IDEXX Laboratories, Inc,*
7 F.Supp.2d 119 (D. Conn. 1998).........................................................................29

*In re Citric Acid Litig.,*
191 F.3d 1090 (9th Cir. 1999) .................................................................... *passim*

*Clamp-All Corp. v. Cast Iron Soil Pipe Inst.,*
851 F.2d 478 (1st Cir. 1988)...............................................................................25

*Drum v. San Fernando Valley Bar Ass'n,*
182 Cal. App. 4th 247 (2010) .............................................................................46

*E.I. du Pont de Nemours & Co v. FTC,*
729 F.2d 128 (2d Cir. 1984)...............................................................................26

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii.

**DEFENDANTS' MOTION TO DISMISS**
**MASTER DOCKET NO. 19-CV-00717-JST**

**TABLE OF AUTHORITIES**
(continued)

Page

*In re German Automotive Mfrs. Antitrust Litig.*,
 392 F. Supp. 3d 1059 (N.D. Cal. 2019) ........................................................................39

*Graham v. VCA Antech, Inc.*,
 2016 WL 5958252 (C.D. Cal. Sep. 12, 2016)...............................................................34

*In re Graphics Processing Units Antitrust Litig.*,
 527 F. Supp. 2d 1011 (N.D. Cal. 2007) .................................................................. *passim*

*Groves v. City of Los Angeles*,
 40 Cal. 2d 751 (1953) .....................................................................................................23

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3rd Cir. 2010) ..........................................................................................35

*Int'l Healthcare Mgmt. v. Haw. Coal. for Health*,
 332 F.3d 600 (9th Cir. 2003) ..........................................................................................41

*Jones v. Micron Tech, Inc.*
 400 F. Supp. 3d 897 (N.D. Cal. 2019) ..................................................................... *passim*

*Kearns v. Ford Motor Co.*,
 567 F.3d 1120 (9th Cir. 2009) ........................................................................................46

*Kelsey K. v. NFL Enters., LLC*,
 254 F. Supp. 3d 1140 (N.D. Cal. 2017) ..........................................................................21

*Kendall v. Visa U.S.A., Inc.*,
 518 F.3d 1042 (9th Cir. 2008) ..................................................................................12, 30

*Kleen Prods. LLC v. Int'l Paper*,
 276 F. Supp. 3d 811 (N.D. Ill. 2017) ..........................................................25, 26, 29, 35

*Krehl v. Baskin-Robbins Ice Cream Co.*,
 1979 WL 1662 (C.D. Cal. Aug. 7, 1979), *aff'd*, 664 F.2d 1348 (9th Cir. 1982)....................21

*Kwikset Corp. v. Super. Ct.*,
 51 Cal. 4th 310 (2011) ....................................................................................................46

*In re Late Fee and Over-Limit Fee Litig.*,
 528 F. Supp. 2d 953 (N.D. Cal. 2007) ............................................................................29

*Levine v. Blue Shield of Cal.*,
 189 Cal. App. 4th 1117 (2010) ............................................................................34, 37, 38

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iv.

**DEFENDANTS' MOTION TO DISMISS**
**MASTER DOCKET NO. 19-CV-00717-JST**

# TABLE OF AUTHORITIES
(continued)

Page

*In re LTL Shipping Servs. Antitrust Litig.*,
  2009 WL 323219 (N.D. Ga. Jan. 28, 2009)..............................................................27, 28, 29

*Lubic v. Fidelity Nat'l Fin., Inc.*,
  2009 WL 2160777 (W.D. Wa. July 20, 2009)..................................................................20, 25

*MacKay v. Super. Ct.*,
  188 Cal. App. 4th 1427 (2010) .......................................................................................33

*Meyers v. Bd. of Equalization*,
  240 Cal. App. 4th 722 (2015) ........................................................................................22

*MGIC Indem. Corp. v. Weisman*,
  803 F.2d 500 (9th Cir. 1986) .........................................................................................12

*U.S. ex rel. Modglin v. DJO Glob. Inc.*,
  48 F. Supp. 3d 1362 (C.D. Cal. 2014) ...........................................................................38

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*,
  47 F. Supp 841 (N.D. Cal 1979) ....................................................................................44

*In re Musical Instruments and Equipment Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .............................................................................30, 36, 39

*In re Nat'l Ass'n of Music Merchants, Musical Instruments and Equip. Antitrust
  Litig.*, 09-cv-2002, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012), .................................40

*Oliver v. SD-3C LLC*,
  Case No. 11-cv-01260, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) .................................24

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
  971 F. 2d 37 (7th Cir. 1992) ....................................................................................25, 27

*Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*,
  No. 12-cv-5847, 2013 WL 3242245 (N.D. Cal. June 25, 2013)............................................11

*SC Manufactured Homes, Inc. v. Liebert*,
  162 Cal. App. 4th 68 (2008), *as modified on denial of reh'g* (May 19, 2008)..................46

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ....................................................................................12, 26

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  586 F. Supp. 2d 1109 (N.D. Cal. 2008) ....................................................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Int'l Harvester Co.*,
  274 U.S. 693 (1927)........................................................................................42

*United States v. Ritchie*,
  342 F.3d 903 (9th Cir. 2003) .........................................................................12

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) .......................................................................46

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
  815 F.2d 522 (9th Cir. 1987) ...................................................................3, 27, 34, 42

*Workman v. State Farm Mut. Auto. Ins. Co.*,
  520 F. Supp. 610 (N.D. Cal. 1981) ................................................................20

*Zoslaw v. MCA Distrib. Corp.*,
  693 F.2d 870 (9th Cir. 1982) .........................................................................20

**Statutes**

Cal. Bus. & Prof. Code §§ 17200, *et seq.* ............................................................6

Cal. Ins. Code
  § 1857.7.........................................................................................................42
  § 1857.9.........................................................................................................42
  § 1861.01(c)...................................................................................................34
  § 1861.05(a).....................................................................................................9
  § 1861.05(c)...................................................................................................42

**Other Authorities**

10 CCR
  § 2081............................................................................................................34
  § 2095(k)........................................................................................................35
  § 2096............................................................................................................35

*Best's Methodology and Criteria Rating Surety Companies*, A.M. Best Rating
  Services, Inc., 1, 2, 8 (Oct. 13, 2017) ...........................................................23

Fed. R. Civ. P.
  9(b).................................................................................................................46
  12(b).................................................................................................................1
  12(b)(6)..........................................................................................................11

Fed. R. Evid. 201 ..................................................................................................38

Cooley LLP
Attorneys At Law
San Diego

vi.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on August 26, 2020 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom of Honorable Jon S. Tigar, United States District Judge, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Courtroom 2, 4th floor, the undersigned Defendants will, and hereby do, move the Court for an order dismissing Plaintiffs' Second Consolidated Amended Class Action Complaint (ECF No. 94) (the "SCAC") with prejudice.

This motion is made pursuant to Federal Rule of Civil Procedure 12(b) and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, the pleadings and evidence on file in this matter, oral argument of counsel, and such other materials and argument as may be presented in connection with the hearing of the motion.

## STATEMENT OF RELIEF SOUGHT

Defendants seek an order dismissing the SCAC in its entirety with prejudice.

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether the SCAC alleges facts sufficient to plead each Defendant's role in the alleged conspiracy.

2.     Whether the SCAC's federal and state antitrust claims should be dismissed for failing to plausibly allege an illegal agreement between and/or among Defendants.

3.     Whether the SCAC's Unfair Competition Law claim should be dismissed for failure to state a claim upon which relief can be granted.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

After sifting through hundreds of pages of briefing and supporting documents submitted by the parties, the Court previously dismissed the claims against nearly all Defendants.[1]  Plaintiffs had failed to plead facts sufficient to find that each of the dismissed Defendants—20 sureties, two bail bond agencies, and two trade associations—had actually joined or participated in the alleged cartel to fix a uniform premium rate of 10% and avoid issuing rebates to bail bond purchasers.  (ECF No. 91, Order Granting in Part and Denying in Part Motions to Dismiss (the "Order") at 24).)  In response, Plaintiffs have added hundreds of paragraphs of mostly conclusory allegations (many of them copied and pasted), purporting to detail facts particular to each Defendant.  The new allegations are more volume than substance.  While Plaintiffs continue to allege a two-pronged conspiracy to fix premium rates and suppress rebating, they do not come close to rectifying the deficiencies identified in the Court's Order.  They do not allege when or how each Defendant entered the conspiracy beyond allegations of when Defendants entered the market, they do not allege any new statements suggesting a prior agreement, and they do not allege meetings or other instances where Defendants struck an agreement to charge uniform premium rates or avoid rebating.

Instead, Plaintiffs' Second Consolidated Amended Class Action Complaint (ECF No. 94 (the "SCAC")) asks this Court to infer a conspiracy to fix premium rates solely based on a generalized theory of the alleged bail bond market.[2]  Plaintiffs' theory is premised on two basic claims: (1) each Surety Defendant submitted near uniform premium rate applications to the California Department of Insurance ("CDI") and generally did not attempt to compete on price; and (2) each Surety Defendant's failure to submit lower premium rates, combined with their allegedly outsized profits and certain alleged market features, can only be explained by collusive conduct.

---

[1]  For purposes of this Motion, Defendants adopt the same meaning of "Defendant," "Surety Defendants," "Bail Agency Defendants," "Trade Association Defendants," and "Individual Defendants" as used in Part III of the SCAC.

[2]  The SCAC alleges that there is a single California market for bail bonds. (*See* SCAC ¶ 4.) Defendants accept this premise for this motion only, and reserve all arguments with respect to the relevant market(s), including whether one or more exist, whether the market for surety bonds and bail bonds are the same or separate, and the scope and features of any relevant market.

This oversimplified economic argument does not give the Court any reason to revisit its prior decision.  The new allegations the SCAC adds and the facts it incorporates by reference not only fail to support this theory, they actually undercut the plausibility of the alleged conspiracy for at least three reasons.  ***First***, it is clear from the explicit allegations of the SCAC and the facts incorporated by reference that premium rates are not uniform and the alleged bail bond market is dynamic and competitive.  As demonstrated by the rate filing applications on which the SCAC relies, far from acting in lockstep, the sureties impose a wide variety of conditions and qualifications on their customers for different premium rates, such that the same purchaser would be charged materially different premium rates by different Surety Defendants.  Moreover, the Surety Defendants impose a varying range of rates beyond the 10% premium rate that Plaintiffs myopically focus on, charging premium rates as high as 15% or as low as 6% depending on the company.  And over time, the Surety Defendants have increasingly sought approval to charge lower ("preferred" or "qualified") premium rates and have expanded eligibility for preferred rates to an ever wider range of bail bond purchasers.  In short, over the exact period Plaintiffs allege that the Surety Defendants were submitting "uniform" filings as part of a conspiracy to keep the price of bail artificially high, ***the average premium rate for bail bonds decreased***.  These facts are incompatible with any inference of wrongdoing and preclude Plaintiffs from pleading a plausible conspiracy as a whole, much less against any specific Defendant.

***Second***, Plaintiffs' allegations of outsized profits that they contend could never result from competition are not supported by well-pled allegations.  Rather than provide actual indicators of profit, Plaintiffs provide figures on loss ratios.  Indeed, the SCAC devotes more space to loss ratios than any of its other theories.  But these new allegations get Plaintiffs nowhere.  Not only are these loss ratios not the same as metrics of profitability, Plaintiffs' reliance on this point reveals a fundamental misapprehension about how the relevant industry works.

***Third***, assuming *arguendo* that the SCAC's new market feature allegations are correct—that the bail bond market is highly concentrated, homogenous, and price inelastic—these allegations actually undermine the plausibility of the purported conspiracy.  Courts have recognized that when these features are all present in a single market, market participants are generally ***not*** incentivized to try to underprice their competitors.  In other words, each market participant is unilaterally driven

toward the same pricing scheme and is significantly less likely to compete via lower prices, absent any kind of cartel. As such, Plaintiffs' recurring allegation that Defendants' conduct can only be explained through wrongdoing is unsupported at best and contradicted at worst by the allegations of the SCAC and the facts subject to judicial notice.

The second component of Plaintiffs' alleged conspiracy—to avoid offering bond purchasers rebates—fares no better. Plaintiffs notably fail to allege that Defendants actually agreed not to rebate, *i.e.* the gravamen of an antitrust complaint, and instead vaguely assert an amorphous agreement to "suppress" rebating. Yet the SCAC alleges no facts as to when or how this supposed agreement was reached. The facts alleged in support of this purported agreement are statements that accurately recite California law regarding what premium rates bail agents may charge. Accurate declarations of what the law provides cannot be evidence of an illegal agreement to suppress rebating.

Plaintiffs' only remaining plus factor involves allegations that trade associations provided opportunities for collusion. However, Plaintiffs allege only two relevant meetings of the associations occurred (over a 16-year class period), and that only a small fraction of the Defendants attended either of them. These allegations cannot be used to infer any agreement or participation in a conspiracy.

In sum, as before, the allegations against each individual Defendant largely boil down to conclusory statements or facts that cannot support any inference of wrongdoing. Further, taken as a whole, the new allegations and incorporated facts undermine any inference of a conspiracy. The Court should dismiss with prejudice the SCAC in its entirety.

## II.    OVERVIEW OF BRIEF STRUCTURE

Part III of this brief summarizes the procedural history of this case and the new allegations in the SCAC. Part IV sets out the legal standard for a motion to dismiss, while Part V explains why Plaintiffs have failed to add allegations that would correct the material deficiencies the Court previously identified. In Part VI, Defendants focus on the allegations against the Surety Defendants regarding premium rate filings. Defendants first show that Plaintiffs' allegations of uniform filings are not supported by the actual submissions to the CDI. These filings are incorporated by reference into the SCAC and accordingly may be considered by the Court at this juncture. (*See* Defendants' concurrently filed Request for Judicial Notice.) The CDI filings reflect significant price variation and

demonstrate Plaintiffs' misunderstanding of how surety bonds operate.  Defendants also show that the market features Plaintiffs rely on as plus factors have the opposite effect: collectively they provide an alternative, entirely lawful explanation for the conduct Plaintiffs claim can only have been the product of a conspiracy.  Part VII rebuts Plaintiffs' contentions regarding a supposed agreement to suppress rebates and argues that the Bail Agency Defendants should be dismissed.  Part VIII addresses the insufficient allegations against the previously dismissed Trade Association Defendants; Part IX explains why the new allegations and incorporated facts compel dismissal of the claims against the three Defendants that the Court previously sustained; and Part X debunks the claims against the one newly added Defendant.  Part XI explains that Plaintiffs' unfair competition claim fails with the antitrust claims, and Part XII concludes.

To avoid duplicative briefing, Defendants include Appendix A briefly summarizing the pleading deficiencies as to each individual Surety Defendant.  And to assist the Court in analyzing the CDI filings Plaintiffs have incorporated by reference, Defendants have prepared two charts in Appendix B summarizing key points from those filings referenced by this Motion.

## III.   BACKGROUND[3]

### A.   Procedural History

The Court previously dismissed almost all of the claims present here.  The Court first dismissed with prejudice Plaintiffs' Sherman Act claim as it relates to uniform premium rate filings on jurisdictional grounds. (Order at 17.)  Then, after examining hundreds of pages of briefing, allegations, and papers subject to judicial notice, the Court found that while Plaintiffs had—at a conceptual level— plausibly alleged the general existence of a cartel, they had failed to allege facts sufficient to infer that any of the Surety Defendants or Bail Agency Defendants had participated in a conspiracy to fix bail prices.  (Order at 25-26.)  The Court determined that Plaintiffs' first amended complaint (ECF No. 46 (the "CAC")) had made only undifferentiated allegations about the conspiracy as a whole, rather than making allegations particular allegations as to how each Defendant actually joined and participated in a conspiracy.  (Order at 25-26.)  Since Plaintiffs could not allege how "each individual defendant

---

[3] The Court is familiar with the basic mechanics of the California bail bond system as alleged in the SCAC (*see* Order at 1-4), and accordingly, Defendants will not repeat that factual background here.

joined the conspiracy and played some role in it," the Court dismissed the claims against them.  (Order at 23 (citing *In re TFT-LCD (Flat Panel) Antitrust Litg.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008).)

Similarly, the Court found that the allegations against two of the three Trade Association Defendants were inadequate, holding that a single specific allegation against the American Bail Coalition and "no specific allegations concerning GSBAA [Golden State Bail Agents Association] whatsoever" were not enough to allege that they participated in a price fixing cartel.  (Order at 27.)

The Court granted Plaintiffs leave to amend—save for the Sherman Act claim based on the uniform premium rate filings allegations, which was dismissed with prejudice—and Plaintiffs filed the SCAC on May 13, 2020.  (ECF No. 94.)  The SCAC alleges a conspiracy "(1) to maintain the 'standard' premium rate [for commercial bail bonds] at 10%; and (2) to discourage and suppress rebating."  (SCAC ¶ 6.)  The causes of action in the SCAC remain the same as in the CAC.  Plaintiffs allege violations of the Sherman Act, Cartwright Act, and California Business and Professions Code sections 17200, *et seq.* (the "UCL").  (*See id.* ¶¶ 390-416.)  Plaintiffs added AIA Holdings, Inc. as a named Defendant (SCAC ¶ 22) and dropped formerly named defendant Harco National Insurance Co., but otherwise the parties remain the same.[4]

**B.     The SCAC's New Allegations**

Instead of making particular allegations as to how each Defendant joined and participated in a conspiracy, the allegations against the Surety Defendants follow the same template, while the allegations against the Bail Agency Defendants and Trade Association Defendants amount to the same basic theories that the Court already held were insufficient.  Indeed, much of what the SCAC does add—allegations that purport to describe the economics of the alleged bail bond market—do nothing to allege when or how any particular Defendant joined the conspiracy and, in many cases, are contradicted by other allegations of the SCAC.

---

[4] The SCAC lists The Surety and Fidelity Association of America (SFAA) as a "Trade Association Defendant" in the complaint's Table of Contents (SCAC at pg. i), and Plaintiffs devote multiple paragraphs to discussing SFAA (SCAC ¶¶ 151-55), but Plaintiffs clarify that "SFAA is not a named Defendant in this action."  (*Id.* ¶ 151.)  (*See infra* Section VIII.C (discussing insignificance of allegations against SFAA).)

1. **Plaintiffs copy and paste the same set of allegations against each Surety Defendant.**

The SCAC gives each individual Surety Defendant the same basic treatment.  First, Plaintiffs indicate when the Surety Defendant joined the alleged bail bond market, and assert without further elaboration that they joined the conspiracy in 2004 or, for those who entered the market later, when the Surety Defendant began operating in California.  (*See, e.g.,* SCAC ¶¶ 180, 245.)  Then, Plaintiffs contend that the each Surety Defendant has "never attempted to seek approval of a standard premium rate below 10%." (*E.g., id.* ¶ 181.)  But as Plaintiffs are forced to acknowledge (though conspicuously did not in the CAC), even this supposedly parallel conduct had significant exceptions, as two named Surety Defendants did lower their "standard" rate from 10% to 9% in 2018.  (*Id.* ¶ 169.)

Plaintiffs then refer to the last few years of data on the Surety Defendants' revenues and associated loss ratios, alleging each company suffered few losses on the premiums it underwrote. (*E.g., id.* ¶ 182.)  Plaintiffs provide no direct measurements of profitability beyond these conclusory assertions, and the information they do offer on loss ratios is irrelevant for purposes of demonstrating participation in the conspiracy.

Next, the SCAC almost uniformly repeats the same four allegations against every Surety Defendant.  Plaintiffs contend in rote fashion that (1) the failure to lower prices makes no economic sense but for the conspiracy; (2) the company attempted to suppress rebates through statements that the surety's bail agents were only allowed to charge the rates approved by the CDI; (3) the company was a member of a trade group (and in some cases may have contributed money to it); and (4) the alleged nature of the bail bond market is conducive to collusion.  (*See, e.g., id.* ¶¶ 183-190.)

Plaintiffs' only material deviation from this formula comes in their allegations against Surety Defendants American Surety Co., Allegheny Casualty Co., and International Fidelity Insurance Co. With respect to American Surety, Plaintiffs attempt to impute the statements of Defendant Carmichael to the company.  (*Id.* ¶¶ 87, 157.)  Plaintiffs also imply that Allegheny Casualty and International Fidelity adopted statements by Defendant Watson about the "cancer" of price cutting.  (*Id.* ¶ 167.) Two paragraphs later though, Plaintiffs show that, far from following Mr. Watson's edict to the alleged conspiracy, Allegheny Casualty and International Fidelity lowered their standard rate from 10% to 9%

in 2018.  (*Id.* ¶ 169.)

While Plaintiffs' allegations against each Surety Defendant largely turn on their supposedly "uniform" 10% premium rate filings, Plaintiffs chose not to attach the rate filings themselves to the SCAC.  Instead, Plaintiffs incorporate them by reference and present a chart allegedly showing every Surety Defendant using the same 10% rate (save for the exceptions mentioned above).  (*Id.* ¶ 7.)  But this chart, and the recurring allegation that each Surety Defendant never sought to charge less than 10% for a "standard" premium, cherry picks a single data point from numerous rate filings and ignores significant variances in the actual premium rates the Surety Defendants charged.  Even a cursory examination of the premium rate filings reveals that: (1) what constituted a "standard" rate varied significantly between sureties because the Surety Defendants used different criteria  to set eligibility for "standard" vs. lower "preferred" rates; (2) many Surety Defendants charged rates as high as 15% or as low as 6%; and (3) over time, more sureties added and expanded eligibility for lower premium rates, causing the average premium rate to decline.  (*See infra* Section VI.A and Appendix B.)  In other words, the filings show that the Surety Defendants were taking action wholly at odds with the alleged price-fixing conspiracy.

### 2. Plaintiffs' new allegations regarding the alleged market for bail bonds in California.

Instead of individualized allegations, the SCAC adds numerous allegations regarding the alleged market for bail bonds in California, supposedly creating a set of economic "plus factors" to support an inference of a conspiracy to fix premium rates at 10%.  The alleged bail bond market is highly complex and Plaintiffs' description of the market is both incomplete and inaccurate.  However, Plaintiffs contend that the following economic factors make a conspiracy more plausible:

Bail bonds are price inelastic.  The "price elasticity" of a product determines how much demand changes in response to shifts in price: if a product is price inelastic then increases or decreases in the cost of the product will not greatly effect demand for it.[5]  (SCAC ¶ 75.)  Plaintiffs allege that

---

[5] Elasticity exists on a continuum rather than being an absolute value; when a product is price inelastic it does not mean that demand does not respond at all to changes in price, only at a lower level than is generally expected.  *See Alberta Pork Producers Marketing Board v. U.S.*, 683 F. Supp. 1398, 1400 (Ct. Int'l Trade 1988) ("the price elasticity of demand is defined as the percentage change in the

the market for bail bonds as a whole and at the point of sale in California is price inelastic.  (*Id.* ¶¶ 75-76.)  As Plaintiffs explain, bail bond "consumers are not situated to conduct detailed market research before making a bail bond transaction."  (*Id.* ¶ 66.)  Given this allegation, if an individual surety or bail agent raises or lowers their price, it will allegedly have "no effect on the volume of business written."  (*Id.* ¶ 76.)

The market is highly concentrated.  Plaintiffs contend that the alleged bail bond market in California is dominated by a handful of firms.  (*Id.* ¶ 85-86.)  In particular, Plaintiffs allege that when the conspiracy allegedly began in 2004, only eight sureties underwrote bail in California.  (*Id.* ¶ 7.)  Plaintiffs also allege that there are high barriers to entry (*Id.* ¶ 82), but this allegations is contradicted by the fact that over the putative class period, the number of participants in the market allegedly more than doubled from eight to twenty.  (*Id.* ¶ 7.)

Bail bonds are fungible.  According to Plaintiffs, there is no meaningful difference between a bail bond sold by one firm or another.  (*Id.* ¶¶ 71-72.)  They are a commodity like gasoline or iron—identical from the purchaser's perspective.  (*Id.*)

Firms face the same cost structures.  Plaintiffs also allege that the Defendants themselves are largely homogenous enterprises.  The SCAC argues that the sureties and bail agents have largely identical cost inputs, profit margins, and business models, reflecting the fact that the underlying product does not vary much between firms.  (*Id.* ¶¶ 74, 81.)

Pricing is public and highly visible.  As Plaintiffs allege, all sureties must receive approval from the CDI for the rates they charge.  (*Id.* ¶ 89.)  Thus, the Surety Defendants operate from the unusual position of knowing exactly what their competitors charge for the relevant product at all times.[6]

---

quantity of a good for a 1% change in the price of the good").

[6] The Court has denied, at this stage, the various regulatory doctrines Defendants previously advanced as grounds for dismissing the complaint.  It nevertheless bears mentioning that the Insurance Commissioner has to approve bail bond premiums and must assess whether the premium rates are inadequate nor excessive, as thoroughly discussed in the prior round of briefing.  *See* Cal. Ins. Code § 1861.05(a).

### 3.     Plaintiffs' allegations around rebating remain thin.

The Order noted that Plaintiffs' previous complaint "allege[d] very little in terms of actual rebating practices."  (Order at 20.)  Instead of pleading new facts, Plaintiffs made changes to the wording of their allegations regarding rebating practices.  Where previously Plaintiffs alleged that Defendants agreed "generally to refrain from offering competitive rebates" (CAC ¶ 68), the SCAC now alleges that Defendants agreed "to discourage and suppress rebating" (SCAC ¶ 6) and that they mislead bail bond purchasers with advertisements that did not reference the availability of rebates (*id.* ¶ 8).

Specifically as to the Surety Defendants, the SCAC alleges the same copy-pasted language concerning what Plaintiffs dub "Rebate Suppression":

> Once rebating was permitted under California law, [Surety X] agreed to abide by the understanding between and amongst other bail bond sureties to prevent its bail agents from advertising rebates to consumers.  As a result, their bail agents rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy.  Indeed, [Surety X] worked with rival sureties and bail agents to create an industry culture and practice of monitoring rebating practices of rivals and, if any rebating occurred, to report that practice to [Surety X] and other sureties through trade associations . . . .

(*E.g.*, *id.* ¶ 174.)  This conclusory mantra is the full extent of Plaintiffs' allegations on the agreement to suppress rebating; the SCAC does not allege any more specific or concrete facts concerning actual rebating practices for so much as a single Defendant, or any further details on the supposed agreement.

Plaintiffs also contend that the rebate suppression conspiracy "is demonstrated by the Surety Defendants' nearly uniform misrepresentations and omissions that mislead consumers into believing that rebates are unavailable."  (*Id.* ¶ 8.)  In support, Plaintiffs cite for some, but not all Surety Defendants, "examples of notices that the Surety Defendants require their agents to post in their retail offices." (*See, e.g.*, *id.* ¶¶ 8, 175, 198.)  These notices—required to be filed with the CDI—state that the CDI-approved premium rates "must be charged" by the bail agents.  (*See infra* Section VII.A (explaining rate notice filing requirements).)  Despite being a true statement of California's law regarding which premium rates may be charged, (which Plaintiffs themselves plead as fact (*see* SCAC ¶ 60), and as this Court previously recognized (Order at 2)) Plaintiffs assert that these notices are "misleading" because they do not "disclos[e] that bail agents have the authority to offer rebates per

Cooley LLP
Attorneys At Law
San Diego

10.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

California law." (*See, e.g.*, *id.* ¶ 198.)

**4. Plaintiffs' allegations against the Bail Agency and Trade Association Defendants offer more of the insufficient same.**

Plaintiffs allegations against the two Bail Agency Defendants—Two Jinn, Inc. (d.b.a. "Aladdin") and All-Pro Bail Bonds, Inc. Bail—remain effectively the same. (*See id.* ¶¶ 371-382.) The SCAC alleges that Two Jinn and All-Pro gave named Plaintiffs "no indication that a lower price was possible" on the bail bonds they purchased, "and instead misled [them] into believing that it was not [possible]." (*Id.* ¶¶ 371, 379.) However, Defendants still plead no facts as to any specific representations that "misled" Plaintiffs. Instead, the SCAC relies on statements from Defendants' websites (from 2006 and 2008) that make "no mention of rebates or discounts at all." (*Id.* ¶ 372.) Plaintiffs do not allege that either Two Jinn or All-Pro in fact ***does not*** offer rebates, or that either Two Jinn or All-Pro ever specifically agreed not to offer or advertise the availability of rebates. (*See infra* Section VII.B.)

The SCAC's allegations against the Trade Association Defendants are likewise virtually the same and inadequate for the reasons the Court previously dismissed all claims against two of the associations. (*See* Order at 26-27 (noting inadequacy of specific allegations against associations in CAC); *infra* Part VIII (explaining insufficiency of new allegations against Trade Association Defendants).)

## IV.   LEGAL STANDARD

Rule 12(b)(6) requires dismissal of complaints that "fail to state a claim upon which relief may be granted." To survive a Rule 12(b)(6) motion, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 555 (2007). This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* "[C]ourts are not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (citation omitted); *see also Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-5847, 2013 WL 3242245, at *6 (N.D. Cal. June 25, 2013) (Tigar, J.) ("the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements") (quoting *Ashcroft v. Iqbal*, 556 U.S.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

11.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

662, 678 (2009)).  Such specificity is particularly important in antitrust cases, where discovery "frequently causes substantial expenditures and gives the plaintiff the opportunity to extort large settlements even where he does not have much of a case." *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).  Accordingly, when a complaint fails to adequately state a claim, such a deficiency should be "exposed at the point of minimum expenditure of and money by the parties and the court." *Twombly*, 550 U.S. at 558.

When ruling on a motion to dismiss, a court may consider any material that is subject to judicial notice, or incorporated into, or relied upon by, the complaint.  *See MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 503-04 (9th Cir. 1986); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.").  "The court need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  Additionally, a district court is not "bound by any law of the case" in ruling on a second motion to dismiss an amended complaint.  *Askins v. U.S. Dept. of Homeland Security*, 899 F.3d 1035, 1043 (9th Cir. 2018).  "[P]ermitting the filing of an amended complaint requires a new determination." *Id.*

## V.   THE SCAC'S NEW ALLEGATIONS DO NOT ADDRESS THE COURT'S ORDER DISMISSING THE CAC

Plaintiffs' obligation is to plead facts specific to each Defendant that state a cause of action; in this case, that requires pleading some facts that suggest each Defendant actually joined in and participated in the conspiracy Plaintiffs have alleged.  As this Court previously explained in dismissing all claims against the Surety Defendants, the Bail Agency Defendants, and two of the three Trade Association Defendants, Plaintiffs' burden is to allege facts regarding how "each individual defendant joined the conspiracy and played some role in it."  (Order at 23.)

Plaintiffs failed to do this.  Opting for quantity over quality, Plaintiffs have added hundreds of paragraphs of new allegations but include almost nothing in the way of substantive, well-pled factual

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

allegations as to each Defendant.[7]  Beyond asserting in conclusory terms that each Defendant joined the conspiracy either in 2004 or when they entered the market at a later date (*see, e.g.,* SCAC ¶¶ 180, 245), the SCAC pleads no specific or general facts as to how any Defendant learned about the conspiracy, or when or how it struck an agreement with the other Defendants to collude.  Indeed, the SCAC ***fails to allege any*** specific facts underlying the supposed industry-wide, decades-long agreement to fix prices:

| | |
|---|---|
| Allegations that a specific defendant agreed with any other defendant to do anything. | NONE |
| Allegations that any defendant participated in even a single discussion, communication or meeting with any other defendants related to fixing premium rates or suppressing rebates. | NONE |
| Allegations that any defendant was present at even one meeting where any agreement on premium rates or rebating was proposed, discussed or reached. | NONE |
| Allegations that any defendants communicated with one another in advance of or after any trade association or industry meetings. | NONE |

Accordingly, the SCAC simply does not meet the standard articulated by this Court (*see* Order at 23-24), and as applied in *TFT-LCD* and *In re Cathode Ray Tube (CRT) Antitrust Litigation.  See TFT-LCD*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009) (complaint survived only after plaintiffs amended to add detail about: "numerous illicit conspiratorial communications between and among defendants"; "facts of the guilty pleas entered by four defendants for fixing prices"; "specific information about the group and bilateral meetings by which the alleged price-fixing conspiracy was effectuated," including "the structure and content of these meetings" and "who attended the meetings"'; and details of "bilateral discussions between various defendants . . . [that] took the form of in-person meetings,

---

[7] Appendix A summarizes the lack of specific allegations against each Surety Defendant.

Cooley LLP
Attorneys At Law
San Diego

13.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

telephone calls, e-mails and instant messages"); *CRT*, 738 F. Supp. 2d 1011, 1019-22 (N.D. Cal. 2010) (complaints allowed to proceed containing "allegations concerning specific [d]efendants' participation in the alleged unlawful meetings and agreements," including the estimated number of meetings each defendant participated in, what sorts of agreements were reached, and what types of employees represented defendants at the meetings).

Therefore, for the same reasons the Court dismissed Plaintiffs' first amended complaint as to almost all Defendants, the Court should dismiss the SCAC.  (*See* Order at 23-27.)

## VI. PLAINTIFFS' OVER-SIMPLIFIED THEORY IS INSUFFICIENT TO MAINTAIN THAT THE SURETY DEFENDANTS CONSPIRED TO FIX PREMIUM RATES

Recognizing that they have not, and cannot, allege facts as to when or how any particular Surety Defendant agreed to fix premium rates, Plaintiffs take an entirely different approach.  Plaintiffs contend that each Surety has submitted near uniform premium rate filings to the CDI, has generally failed to cut its premium rates, and is highly profitable.  The SCAC asserts that this behavior is economically irrational and only collusion can explain it.  Plaintiffs claim these allegations, combined with two plus factors (market features and trade associations), is enough to infer a conspiracy.

This theory is fundamentally unsound.  Contrary to Plaintiffs' allegations of uniform premium rate filings and non-existent price competition, the CDI rate filings Plaintiffs rely on and incorporate by reference show that the Surety Defendants sought approval for a wide variety of different rates, and actively cut their premium rates over the relevant time period.  Moreover, the supposed profitability of the Surety Defendants is based on inappropriate metrics coupled with a misunderstanding of how sureties work. And not only do Plaintiffs' alleged market features fail to address the reasons why the Court previously dismissed the claims against the Surety Defendants, they undermine the very plausibility of a conspiracy.  With the market features Plaintiffs rely on cutting against their argument, the only plus factor Plaintiffs have remaining is membership in trade associations.  As the Court previously noted, however, mere participation in a trade association is not enough to infer collusive conduct.

In short, in place of facts particular to each Surety Defendant, Plaintiffs invoke an economic theory that undermines, rather than assists, their argument that a conspiracy is the only explanation for

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

the Surety Defendants' actions.  In Plaintiffs' effort to get across "the line between possibility and plausibility," *Twombly*, 550 U.S. at 557, the SCAC moves further away.

**A.      Plaintiffs' Allegations of "Uniform" Premium Rate Filings Are Misleading and Insufficient**

Plaintiffs' case rests almost entirely on allegedly parallel conduct between the Surety Defendants, and specifically alleged similarities in their CDI premium rate filings, as purportedly illustrated in the SCAC's chart of rates charged by the Surety Defendants.  (SCAC ¶ 7.)  On its own, however, this allegation of parallel conduct is not enough to infer the existence of a conspiracy.  (*See* Order at 18; *see also infra* Section VI.B (discussing plausible non-collusive explanation for alleged parallel conduct).)  And it is certainly not sufficient to infer that any specific Defendant actually joined or participated in a conspiracy.

More fundamentally, Plaintiffs' story of lockstep premium rate filings is premised on cherry picking a single data point and is belied by the facts subject to judicial notice.[8]  The Surety Defendants' publicly available CDI premium rate filings over the class period show that far from being "near[] uniform" as Plaintiffs allege (*id.* ¶ 7), the rate filings varied significantly, as each individual Surety Defendant imposed different qualifications for "standard" premium rates, and in some cases, charged premium rates as high as 15% or as low as 6%.  And—in stark contrast to Plaintiffs' contention that the Surety Defendants did not attempt to compete on price—the rate filings reveal that over time the sureties both introduced and expanded eligibility for lower rates, ***causing the average premium rate to decline***.  Having made the premium rate filings the cornerstone of their case, Plaintiffs should not be allowed to pretend as though they only contain a single data point.  The Court can and should consider the full story the premium rate filings tell.

---

[8] *See* Defendants' Request for Judicial Notice (establishing CDI rate filings are subject to judicial notice and submitting filings for the Surety Defendants since 2004 (Exhibits 1-51)).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

15.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1.      **The Surety Defendants' premium rate filings were far from "uniform."**

     a.     **The qualifications for a 10% "standard" vs. 8% "preferred" rate vary widely between Surety Defendants.**

Beyond the supposedly uniform filings for a 10% "standard" premium rate, the SCAC acknowledges that "[t]he Surety Defendants have also filed 8% rates for a limited set of criminal defendants," implying incorrectly that eligibility for an 10% and 8% rate is the same across Surety Defendants.  (*Id.* ¶ 63.)  In fact, as demonstrated by the chart in Appendix B, there is significant variability in how the Surety Defendants apply "standard" versus "preferred" or "qualified" rates— information that the SCAC ignores.  For example, Defendant Seaview Insurance Co.'s current 8% "Qualified Bail Bonds" rate applies if the bail bond purchaser has retained private counsel, is a labor union member, or is an active duty member or veteran of the U.S. armed services, or has an immediate family member who is a veteran or on active duty.  (*See* Ex. 39.)  In contrast, Defendant Universal Fire & Casualty Insurance Co.'s 8% "Qualified" rate does not extend to veterans or active duty service members, but does provide preferred rates to government employees and those who can post collateral equaling 100% of the bond's value.  (*See* Ex. 46.)  Other differences abound.  Defendants International Fidelity Insurance Co. and Allegheny Casualty Co. charge an 8% premium if the arrestee or indemnitor is an active duty law enforcement officer or the full premium is paid before the bond is posted (*see* Exs. 4, 28), while Defendant American Contractors Indemnity Co. charges a "Preferred" 8% rate if the arrestee or co-signer is a member of the American Association of Retired Persons ("AARP") (one of just three Surety Defendants to do so).  (*See* Ex. 6.)

In practice then, none of the Surety Defendants' 10% premium rates applies in the same manner as all the others.  An AARP member would receive an 8% rate from Defendant American Contractors Indemnity Co., but would be charged 10% by Defendant Allegheny Casualty Co.  In the other direction, an active duty law enforcement officer would receive an 8% rate from Defendant Allegheny Casualty Co., but would not qualify for 8% premium rates from Defendant American Contractors Indemnity Co.  (*See infra* Appendix B (providing comparison of Surety Defendants' preferred rates).)

Not only do Plaintiffs omit these variances from the SCAC, they appear to actively ignore them.  The SCAC states that Plaintiff Kira Monterrey "was charged and paid an 8% rate, having

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

received the ***standard veterans' discount*** to which the Surety Defendants have agreed." (SCAC ¶ 371 (emphasis added).) ***This statement is flatly contradicted by the rate filings that Plaintiffs rely on in the SCAC and have in their possession.*** As discussed above, the veterans' discount is not "standard" and the Surety Defendants have not all "agreed" to offer it. Ms. Monterrey's veteran status would ***not*** qualify her for a lower premium rate from multiple other Surety Defendants, including American Contractors, American Surety, Indiana Lumbermens, North River, Seneca Insurance, United States Fire Insurance, and Universal Fire & Casualty Insurance. These Surety Defendants do not presently offer preferred rates to veterans. (*See infra* Appendix B.)[9]  Furthermore, additional Surety Defendants—including Allegheny Casualty and International Fidelity—who might currently offer lower rates to veterans did not offer discounted premiums to veterans when Monterrey purchased her bond in 2016. (*See* SCAC ¶ 48; *infra* Appendix B; Exs. 5, 29.) Plaintiffs' allegations of "uniform" premium rate filings are belied by the very filings they rely on, which show that Ms. Monterrey would have received materially different prices depending on which Surety Defendant underwrote her bond. And crucially, as these examples illustrate, Plaintiffs' repeated allegation that each surety "never attempted to seek approval of a standard premium rate below 10%" does not provide an apples-to-apples comparison—each Surety Defendant applies its own "standard" rate depending on the other rates that they offer and who qualifies for those premium rates.

> **b.** **Many sureties charge premium rates higher than 10% or as low as 6%.**

Plaintiffs also ignore the fact that many Surety Defendants have multi-tiered rate structures whose rates are as high as 15% or as low as 6%. Some of the Surety Defendants have charged 15% "high risk" premium rates where, for instance, the customer is the sole signatory on the bond, pays nothing at signing, and posts no collateral. (*See* Exs. 6, 16, 44 (rate filing applications from Defendants American Contractors Indemnity Co., Continental Heritage Insurance Co., and Sun Surety Insurance Co.).) At the other end of the spectrum, multiple Surety Defendants—but once again, not all—have also received CDI approval to charge 7% premium rates for certain low-risk bond purchasers. (*See*

---

[9] This is also precisely why it is important for the Court to consider the rate filings in their entirety, and not merely the SCAC's selective descriptions of them.

Cooley LLP
Attorneys At Law
San Diego

17.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

Exs. 4, 9, 28, 30, 34, 40, 46 (rate filing applications from Allegheny Casualty Co., Bankers Insurance Co., International Fidelity Insurance Co., Lexington National, The North River Insurance Co., Seneca Insurance Co., and United States Fire Insurance Co. 7% rate filings).)   Additionally, in 2017, Defendant Continental Heritage Insurance Co. applied for a 6% premium rate when the purchaser can provide 100% collateral of the penal amount of the bond.  (*See* Ex. 16.)  These Surety Defendants now offer multiple tiers of preferred rates: one at 8% for customers who meet one of certain enumerated qualifications (for instance, being a military veteran, union member, retaining private counsel, or paying a certain amount at signing), and a second, lower rate at 7% or 6% for customers that meet two of those enumerated qualifications.  (*See, e.g., id.*; *infra* Appendix B.)

Notably, the Surety Defendants have not uniformly adopted these higher and lower rates—and those that have adopted lower preferential rates did not all do so at the same time.  For example, Defendants United States Fire Insurance Co. was approved for a 7% premium rate in 2012, but Defendant Seneca Insurance Co. was not so approved until 2018.  (*See* Exs. 47, 40.)  Once again, the SCAC ignores significant differences between the Surety Defendants' premium rate filings which are incorporated by reference, and that wholly undermine the "uniform" 10% premium rate allegation.

### c.     The average premium rate has decreased during the supposed conspiracy.

Putting it all together, the Surety Defendants' rate filings reveal that over the putative class period, the average premium rate decreased as (1) the percentage of Surety Defendants offering premiums below 10% grew significantly; and (2) the Surety Defendants greatly expanded eligibility for their sub-10% rates.  (*See infra* Appendix B (demonstrating these two trends side-by-side).)

In 2004, of the nine Surety Defendants in the alleged bail bond market at the time,[10] five offered only one rate (10%) to bail bond purchasers in California.  (*See infra* Appendix B.)  Those that did

---

[10] Note that the SCAC's timeline incorrectly represents that Defendant International Fidelity was "Not in the Market" until 2006.  (*See* SCAC ¶ 7 (timeline row 11).)  As Plaintiffs later allege though (*see id.* ¶ 168), and as accurately reflected in Defendants' Appendix B, International Fidelity *was* in the market in 2004.  The SCAC's timeline also incorrectly shows Defendant Lexon Insurance Co. as currently in the market.  (*See id.* ¶ 7 (timeline row 16).)  It is not, as reflected by the SCAC's allegations concerning Lexon.  (*Id.* ¶ 291 (noting that 2014 was "the last year for which Lexon reported national bail premium data to CDI").)

Cooley LLP
Attorneys At Law
San Diego

18.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

offer lower preferred rates only extended this option to a small number of people—almost exclusively those who had retained private defense counsel, were union members, or provided full collateral at the time of purchase. (*See, e.g.*, Exs 7, 14, 20, 32.) But over time preferred premium rates became the dominant trend. In 2019 only three Surety Defendants out of eighteen in the market still had only a single 10% rate tier. (*See infra* Appendix B.) As one of the Surety Defendants' filings stated, the new preferred premium rates were filed to be competitive: "[Accredited Surety & Casualty] believes implementing this rule will enable ASC ***to be more competitive in the marketplace***." (Ex. 2 at 1 (emphasis added).)

Indeed, multiple Surety Defendants not only introduced new preferred rates, but have ***repeatedly extended 8% rates*** to new categories of customers during the class period. For example, in 2017, Defendant Sun Surety Insurance Co. significantly expanded the class of purchasers who qualify for its 8% rate. When Defendant Sun Surety first submitted its premium rate filing schedule with the CDI in 2008, its 8% rate only applied to an extremely narrow set of customers: those with bonds greater than $30,000, who could pay the premium in full at the bond's execution, and post either full cash collateral or real property worth at least 150% the total level of bail. (*See* Ex. 45.) In 2017, it received CDI approval for an expanded 8% preferred premium rate program that applied to a bond of any value if only one of a number of less onerous criteria were met, such as if the purchaser had retained private counsel or was a union member. (*See* Ex. 44.) As another example, Defendant Bankers Insurance Co. expanded application of its 8% rate multiple times over the class period, in 2007, 2009, and 2013. (*See* Exs. 10, 11, 12.) Additionally, as explained above, multiple Surety Defendants have started to offer sub-8% premium rates in recent years. (*See supra* Section VI.A.1.b.) The SCAC also alleges that two Surety Defendants—Allegheny Casualty Co. and International Fidelity Insurance Co.—have recently filed for 9% "standard" premium rates, despite their supposed agreement to hold fast at 10%. (*Id.* ¶ 169.)

By 2019, when Plaintiffs filed this suit, almost all of the Surety Defendants offered preferred premium rates below 10%, and at least as importantly, a far greater share of bail bond purchasers qualified for a preferred rate than in 2004. The net result is clear: the average premium rate for a bail bond decreased over the very period that Plaintiffs contend Surety Defendants were colluding to

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

maintain uniform rates.  The Court cannot plausibly infer a conspiracy based on the facts and documents Plaintiffs have chosen to build their case on and must dismiss the SCAC accordingly.  *See Lubic v. Fidelity Nat'l Fin., Inc.*, 2009 WL 2160777, at *4 (W.D. Wa. July 20, 2009) at *4 (dismissing antitrust complaint where substantial variation in prices offered between defendants undermined any inference of a conspiracy); *Workman v. State Farm Mut. Auto. Ins. Co.,* 520 F. Supp. 610, 621 (N.D. Cal. 1981) (lack of uniformity of rates across defendants "detracts significantly from any theory that defendants' parallel activity raises an inference of conspiracy to fix prices"); *see also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 884 (9th Cir. 1982) (price fixing claim could not survive where defendants demonstrated "considerable variation in the distributors' account classification system as well as variance in prices offered to retailers by distributors" and "each distributor offered its own package of promotional offers and discounts which, in fact, substantially encouraged competition in the record business") (citation omitted).

### 2.  The SCAC's "benchmark" theory concerning the "standard" premium rates does not explain the multitude of variations in rate filings.

Plaintiffs will likely attempt to dismiss the price competition demonstrated above as irrelevant. According to the SCAC, "[a]ll prices paid by members of the Class were determined, at least in part, by the inflated 'standard' rate of 10%.  The 'standard' rate is the benchmark reference price by which all bail bond prices are determined."  (SCAC ¶ 65.)  Therefore, Plaintiffs theorize that if "standard" premium rates fell, bail bond purchasers "who qualified for the discounted premium rate also would have paid less, because the discounted premium rate would have fallen."  (*Id.*)  In other words, any price competition would have occurred in a range that had already been distorted upwards by the alleged conspiracy.

The allegation that preferred premium rates would have necessarily changed if the "standard" rates changed is nothing more than speculation.  More fundamentally, this argument would miss the point as it assumes the existence of a cartel in the first place.  As demonstrated above, the "standard" premium rate filings do not actually demonstrate parallel conduct since the "standard" premium rate for each Surety Defendant is in fact ***not the same***.  The 10% premium rate that most—not all—Surety Defendants currently have received approval to charge ***applies differently*** depending on each

individual Surety Defendant's varying qualifications for lower premium rates. And even the preferred premium rates vary among the Surety Defendants, ranging from 6-8%. The 10% rate is also not the "maximum" rate charged by multiple Surety Defendants as some have received approval to charge 15%. (*See infra* Section VI.A.1.b.) (*Cf.* Order at 3 (interpreting Plaintiffs' rate filing theory as a conspiracy to "fix[] the maximum price of bail bonds").) The fact that premium rates actually ***declined*** over the relevant time frame cuts against the plausibility of a conspiracy—it simply does not make sense for the members of an antitrust conspiracy to be actively cutting the prices they were supposed to be fixing. For these reasons, Plaintiffs' "benchmark" theory cannot respond to the facts incorporated by referenced, which gut the heart of the SCAC's alleged conspiracy.

In sum, the SCAC takes a single data point out of context to create an appearance of parallel conduct for premium rate filings where none actually exists, as the facts subject to judicial notice reveal that no such uniformity in pricing existed. As such, the claims against the Surety Defendants should be dismissed for this independent reason. *See Krehl v. Baskin-Robbins Ice Cream Co.,* 1979 WL 1662, at *10 (C.D. Cal. Aug. 7, 1979), *aff'd*, 664 F.2d 1348 (9th Cir. 1982) ("The actual prices charged by the area franchisers have been disparate and in themselves demonstrate no pattern from which this Court may infer a conspiracy"); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017) (dismissing antitrust claims where "non-parallel conduct undercut the very theory asserted by the complaint" and rejecting plaintiff's "attempts to gloss over the differences in conduct between defendants"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1022 (N.D. Cal. 2007) (finding allegations of parallel conduct unconvincing where defendants accused of price fixing in fact released products with different prices).

### B.    Plaintiffs' Allegations of Outsized Profits Are Misplaced

Plaintiffs allege that the Surety Defendants enjoy "bloated" profits (*e.g.,* SCAC ¶ 119), but notably fail to ***allege any profit figures for any Defendant***. Instead, Plaintiffs assume that bail bond loss ratios submitted in CDI filings are representative of the Surety Defendants' profit margins. (*See* SCAC ¶ 106 (claiming that "[t]he lower the loss ratio, the higher the profit margin").) This argument, however, not only conflates profits with loss ratios, it is also based on fundamental misapprehensions

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

21.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

regarding how surety bonds work.[11]

Loss ratios do not correlate directly with profit margins because companies must also account for other expenses.  (*See* ECF No. 57-5 (judicially noticed Investopedia "Loss Ratio Definition").)  A more common measure of profitability would be a benefit-expense ratio, which compares premiums collected along with other expenses, such as "employee wages, agent and broker commissions, dividends, advertising, legal fees, and other general administrative expenses." (*Id.*)  As with Plaintiffs' initial complaint, the SCAC is silent as to benefit-expense ratios and therefore its allegations concerning "extraordinary profits"—that allegedly could only be explained by conspiratorial action— are conclusory assertions that should be ignored.  (*See* SCAC ¶ 110 (misinterpreting one quote from the CDI to speculate that "gross profit margins may be as high as 80%" for the Surety Defendants).)  For example, as discussed in the Appendix A entry regarding Defendant Continental Heritage Insurance Co., the figures contained in the CDI filings—filings clearly in Plaintiffs' possession— actually reveal far leaner profit margins than Plaintiffs suggest.  (*See infra* Appendix A at 3-4.)  Plaintiffs once again appear to ignore facts that do not support their flawed theory.  Among others, there is no mention in the SCAC of direct defense and cost containment expenses, or premium taxes,[12] licenses, and fees.  Each of these expenses are reported as line items in the very documents that the SCAC relies on.  (*See generally* Ex. 52.)  And for Defendant Continental Heritage, the CDI filings show that the profit margin on its bail bond business in California would barely exceed three percent.  (*See infra* Appendix A at 3-4; Ex. 52 at 14 (noting gross bail premium collected net of agent commissions and premium taxes).)

Plaintiffs' use of loss ratios also reveals a fundamental misapprehension about how surety

---

[11] Regardless of the factual merit of Plaintiffs' allegations, the notion that Defendants must have conspired to create lower loss ratios or greater profits compared to other segments of the insurance industry is far from sufficient in a plus factors analysis.  (*See* SCAC ¶¶ 104-107.)  "In a free capitalistic society, profit is always a motivating factor in the conduct of a business.  Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pric[es]."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 134-35 (3d Cir. 1999).
[12] The premium taxes paid by sureties are substantial because they are paid on the gross premium written, not the premium net of bail agent commissions.  *Meyers v. Bd. of Equalization*, 240 Cal. App. 4th 722, 726 (2015) ("[T]he California Constitution imposes a tax of 2.35 percent on the amount of *gross* premiums received each year by each insurer doing business in this state") (quotation marks omitted) (emphasis original).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

22.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

bonds work.  A surety typically receives only a very small portion of a bond premium, as low as 10% in some cases.  *See Groves v. City of Los Angeles*, 40 Cal. 2d 751, 761 (1953) (describing economics of surety-bail bond relationship).  The bail agent absorbs all initial defaults, and the surety is only required to step in if the bail agent fails.  This structure means that the surety is also likely to experience few losses.  As explained in *Best's Methodology and Criteria Rating Surety Companies*:

> Rather than a traditional insurance agreement between an insurer and an insured, a surety bond is a three-party agreement among the surety company, a principle, and the obligee.  The surety guarantees the performance and payment obligation of the principal to the obligee as contracted, which can include the suppliers and subcontractors of the principal.  The principal pays the surety a premium for this guarantee.  If the principal does not have adequate financial resources to qualify for a bond, the surety may accept collateral.

> \*\*\*

> A bail bond is a type of judicial bond that guarantees the appearance of a criminal defendant in court.  Bail bonds are unique in that bail agents are contractually obligated to make sure a criminal defendant appears in court at the proper time.  In the US, the gross premium a defendant pays for a bail bond is generally 10% of the bond limit.  The bail agent is the insurer's first line of defense against potential loss, so the agent typically receives a commission of approximately 90% of the gross premium so that it has the financial resources to assure compliance with the court.  Because the insurer keeps approximately 10% of the premium charged by the agent, the premium charged by the agent is 10% of the bond limit, the net premium retained by the insurer is approximately 1% of the bond limit.

> \*\*\*

> Bail bond insurers typically incur very low losses, as they are absorbed by the agents (through the BUF).  However, with 90% or more of the premiums retained by agents as commissions, this leaves a very low premium base with the insurer; expense ratios therefore tend to be very high, typically exceeding 80%.

*Best's Methodology and Criteria Rating Surety Companies*, A.M. Best Rating Services, Inc., 1, 2, 8 (Oct. 13, 2017), *available at* https://www3.ambest.com/ambv/ratingmethodology/OpenPDF.aspx?rc= 208573.

The low loss ratios that Plaintiffs cite as evidence of a conspiracy are thus consistent with how a surety product normally operates.  This is underscored by the fact that the SCAC refers to low loss ratios both in California and nationwide.  It is unclear why, but Plaintiffs use California specific data

1   for certain Surety Defendants (*e.g.,* SCAC ¶159), but in other cases, the SCAC uses national figures

2   (*id.* ¶ 170). (*See also, e.g.,* *id.* ¶ 291 (alleging "national" bail premiums earned by Lexon in 2014, not

3   California bail bond premiums or losses).)  Regardless of the geography though, the loss numbers

4   alleged by the SCAC remain at or around 0.  The fact that Plaintiffs' key metric remains constant, both

5   in the state where they claim a cartel operates and in the rest of the country where a cartel presumably

6   does not, shows that low loss ratios are simply not indicative of collusive conduct.  *See, e.g., Oliver v.*

7   *SD-3C LLC*, Case No. 11-cv-01260, 2016 WL 5950345, at *6 (N.D. Cal. Sept. 30, 2016) (granting

8   motion to dismiss where non-defendant manufacturers' prices moved in parallel with the defendants

9   "suggests some other reason for the parallelism among all competitors.").

10   **C.    Plaintiffs' New Allegations Regarding the Alleged Bail Bond Market Undermine the Plausibility of the Alleged Conspiracy**

11

12   Plaintiffs contend that a competitive market incentivizes each individual firm to undercut its

13   competitors' rates to capture greater market share and increase profits (SCAC ¶¶ 4, 113-117), and

14   therefore, each Surety Defendants' alleged failure to cut premium rates can only be explained by a

15   conspiracy.  (*See, e.g., id.* ¶¶ 124, 160 (alleging that the Surety Defendants' profits and losses "make[]

16   no economic sense but for the Conspiracy.  A surety company in a commodity market that was

17   competitive would have had the incentive to expand output by lowering its filed rate").)  Plaintiffs try

18   to buttress this theory with various market feature allegations about the alleged California bail bond

19   market, specifically that it is "highly concentrated" (*id.* ¶ 85), and that the bonds themselves are a

20   "homogenous commodity" (*id.* ¶ 71) that is price inelastic at both the individual firm level (*id.* ¶¶ 66,

21   76) and for the market as a whole (*id.* ¶¶ 75-76).  Plaintiffs further allege that the Surety Defendants

22   all have the same cost structures (*id.* ¶ 74), and due to the need to publicly file their rates with the CDI,

23   they have fully transparent pricing (*id.* ¶ 89).

24   Assuming *arguendo* that these market features are present in the alleged bail bond market, they

25   in fact undermine the plausibility of the alleged conspiracy.  Plaintiffs' theory of the case depends on

26   there being only one reasonable explanation for an alleged lack of price-cutting of premium rates.

27   These supposed market features, however, provide an alternative plausible explanation because

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

**DEFENDANTS' MOTION TO DISMISS**
**MASTER DOCKET NO. 19-CV-00717-JST**

concentrated markets for homogenous price inelastic goods generally see low levels of price competition **absent** any collusive conduct.

### 1. The dynamics of concentrated markets for fungible, price-inelastic goods.

Highly concentrated markets "present a special problem under [antitrust] analysis: rational, independent actions . . . can be nearly indistinguishable from horizontal price fixing." *Jones v. Micron Tech, Inc.* 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) (dismissing complaint); *see also In re Graphics Processing*, 527 F. Supp. 2d at 1022 (dismissing complaint because "competitive market forces will tend to drive the prices of like goods to the same level, so like prices on like products are not, standing alone, sufficient to implicate price-fixing.")   As the Seventh Circuit explained, "[a] firm in a concentrated industry typically has reason to decide (individually) to copy an industry leader. After all, a higher-than-leader's price might lead a customer to buy elsewhere, while a lower-than-leader's price might simply lead competitors to match the lower price, reducing profits for all.  One does not need an agreement to bring about this kind of follow-the-leader effect in a concentrated industry." *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F. 2d 37, 54 (7th Cir. 1992) (quoting *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 484 (1st Cir. 1988)).  In other words, pricing in concentrated markets is "interdependent" and firms are more likely to match one another's behavior absent any conspiracy.  *Jones*, 400 F. Supp. 3d at 917 (firm in a concentrated market "must anticipate, or at the very least consider, the reactions of the other competitors" and therefore seemingly anomalous conduct is "often the result of non-conspiratorial market behavior.") (citation omitted).

Markets for commodities or other fungible goods also tend to produce parallel pricing decisions absent any kind of collusion or cartel.  Since firms cannot easily differentiate their product from their competitors' "participants in a commodity market are likely to monitor and mimic the behavior of competitors carefully because pricing provides the chief competitive leverage."  *Id.* Furthermore, firms in commodity markets are less likely to try to gain advantage through price cuts because their "competitors will be pressured to match the price cut, thus resulting in static market shares [] and reduced profit margins for all."  *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 823-24 (N.D. Ill. 2017) (alteration in original); *Lubic*, 2009 WL 2160777, at *4 (dismissing complaint and explaining that "[i]n a concentrated market such as that Plaintiffs allege in Washington, uniformity

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

25.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

is not unexpected—price uniformity is normal in a market with few sellers and homogeneous products").

These effects are magnified when the relevant product is price-inelastic.  If an individual firm has a price-inelastic product, they will not cut prices as doing so will result in the same level of sales but at lower revenues.  And when the market as a whole is price-inelastic, a company still has little incentive to attempt to compete on price.  Thus, a firm in a concentrated market for a price-inelastic commodity faces two possible outcomes if it tries to compete by cutting prices:

Outcome 1: Inelastic demand offsets any gains.  Because price does not factor into purchasing decisions (or only contributes minimally to consumer behavior), a firm that cuts its prices may easily wind up serving the exact same customers as it did before, only at lower prices and profits.  Its competitors may not match the price cut, and the firm will be left worse off.  *Kleen Prods.*, 276 F. Supp. 3d at 823 ("[T]he inelasticity of demand is exactly the reason that a price cut would not much help a Defendant's bottom line, and in fact, may hurt it."). [13]

Outcome 2: The market resets at a lower profit level for all firms.  If the firm manages to attract enough new customers to offset their reduced prices, the firm will only win a pyrrhic victory.  "Although a manufacturer in an inelastic market can temporarily capture an increased market share by price reductions or secret discounts, the reductions or discounts are usually discovered and met sooner or later by some form of competition by the other producers without increasing the volume of total sales in the market.  ***The sole effect of a price reduction in a declining, inelastic market therefore, is to reduce the industry's total profits.***"  *E.I. du Pont de Nemours & Co v. FTC*, 729 F.2d 128, 132 (2d Cir. 1984) (emphasis added) (citation omitted); *see also Kleen Prods.*, 276 F. Supp. 3d at 823-24 ("[I]f a seller attempts to sell at a lower price . . . its competitors will be given the opportunity to meet its lower price, thereby resulting in uniform prices again, but at a lower level; and without any increase

---

[13] Plaintiffs allege that while the alleged market for bail bonds as a whole is price-inelastic, the market for each individual surety's bonds would respond to changes in price.  (SCAC ¶ 77.)  But this conclusory assertion is contradicted by other allegations of the SCAC contending  that price is not a significant factor in the decision making of an individual bail bond purchaser (*id.* ¶¶ 66, 75-76)  and should be ignored accordingly.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) ("The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.  Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citation omitted).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

26.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

in the original seller's net share of the market.") (quoting *Owens-Corning Fiberglas Corp.*, 971 F.2d at 50).

As this illustration shows, in concentrated markets for fungible, price inelastic goods, the "normal" incentives to compete on price simply are not present to the same degree because cutting prices can easily result in long run losses for the company. Since the overall size of the market will not expand in response to a price cut, any customers a firm gains from lower prices must come from their competitors who will in turn cut their own prices to match, rapidly causing the market to "reset" at a lower price and lower profit margin for all. *Owens-Corning Fiberglas*, 971 F.2d at 54 ("The logical outcome of the price-cutting that [plaintiff] advocates would be static market shares for the producers and reduced profit margins"); *see also In re LTL Shipping Servs. Antitrust Litig.*, 2009 WL 323219, at *17 (N.D. Ga. Jan. 28, 2009) (dismissing antitrust claim based on parallel pricing as implausible because "[o]ne LTL carrier would generally not have a financial incentive to charge less for fuel than all other carriers when the market will by its structure bear whatever fuel surcharges are assessed by other carriers in a market of fungible services and inelastic demand").

## 2.   Additional market features could likewise dis-incentivize price-cutting.

In addition to being a concentrated market for a price inelastic, fungible good, Plaintiffs allege two additional aspects of the alleged bail bond market that (if true) tend to further discourage price competition. ***First***, Plaintiffs contend that the Surety Defendants have nearly identical cost structures. (SCAC ¶¶ 81-81.) This factor, however, does not suggest a conspiracy because firms with similar cost structures would naturally be expected to arrive at similar pricing decisions. *See In re LTL Shipping*, 2009 WL 323219, at *15 (parallel conduct was the natural consequence of the fact that "[a]ll Defendants have similar cost structures . . . . [e]ach LTL carrier would have the same incentive, at the same time, to adjust its shipping rates").

***Second***, Plaintiffs allege that each Surety Defendant's pricing is highly visible to all other Defendants, as premium rate applications must be publicly filed with the CDI. (SCAC ¶ 89.) While Plaintiffs contend this makes a conspiracy more feasible since defections can be easily detected, it actually has the opposite effect: any firm that even considers trying to compete on price knows that its competitors will both know about its price cut and be able to rapidly match it, ensuring a swift market

Cooley LLP
Attorneys At Law
San Diego

27.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

re-set if the price cut proves profitable.  *In re LTL Shipping*, 2009 WL 323219, at *15 ("Plaintiffs' allegations establish a factual context suggesting parallel conduct that could just as well be independent action" where the relevant market "appears to be one in which all players are operating from essentially the same information at the same time charging the same rates") (citation omitted).

Therefore, the very market forces Plaintiffs describe could result in both parallel pricing and comparatively low levels of price competition, even absent any conspiracy.  Courts considering cases in markets with similar features have dismissed claims on this basis.  For instance, in *Jones v. Micron Tech.*, the plaintiffs alleged an antitrust conspiracy to restrict the supply of a type of computer memory known as DRAM.  400 F. Supp. 3d at 904.  The *Jones* plaintiffs primarily based their complaint on (1) a parallel series of price increases by the defendants; and (2) economic plus factors which indicated the market for DRAM was conducive to collusion, including that the market was highly concentrated and that the product itself was a commodity subject to inelastic price demand.  *Id.* at 916.  The court dismissed the complaint, finding that these market factors would produce the very conduct plaintiffs complained of without collusion.  *Id.* at 917 ("Plaintiffs' allegations concerning market characteristics are, therefore, just as likely to be consistent with innocent as unlawful behavior.").

Similarly, the court dismissed the complaint in *In re LTL Shipping* largely because the unique alleged market dynamics demonstrated that the defendants' conduct was just as likely the product of competition.  Again, the market at issue (for "less-than-truckload" freight transport) was concentrated and for a fungible, price inelastic service.  2009 WL 323219, at *15.  Additionally, the defendant firms all used the same basic business model, faced the same input and output costs, and operated off the same publicly available pricing information.  *Id.*  The court found that these factors naturally explained a series of parallel price increases since each individual defendant "would generally not have a financial incentive to charge less for fuel than all other carriers when the market will by its structure bear whatever fuel surcharges are assessed by other carriers in a market of fungible services and inelastic demand."  *Id.* at *17.  The court specifically rejected the plaintiffs' contention that the defendants' high profit margins could only be explained through collusive conduct: given the unusual nature of the market, as each defendant "raises prices and improves it profits, the other competitors have a natural incentive to do the same, comfortable in the knowledge that demand for LTL services

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

28.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

will not drop appreciably as a result. . . . ***These circumstances do not indicate anticompetitiveness, they indicate a close and competitive industry.***"  *Id.* at *18 (emphasis added).

As explained above in Part VI.A., Plaintiffs are simply wrong about the lack of price competition in the alleged bail bond market.  But, to the extent the very market features Plaintiffs advance as plus factors exist, those features undermine their theory.  *See In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962-63 (N.D. Cal. 2007) (dismissing complaint where "the complaint itself provides an alternative explanation" for the parallel conduct); *Kleen Prods.*, 276 F. Supp. 3d at 824 ("The industry features that Plaintiffs rely on to make out their case for an antitrust violation also provide Defendants with a ready-made defense that they did not break the law").  Given these allegations, Plaintiffs cannot allege, as they must, that a supposed failure by any individual Surety Defendant to cut prices "raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  As such, the conspiracy as a whole is implausible.

### 3.  Market growth also makes a conspiracy implausible.

Plaintiffs' allegation that the alleged bail bond market is subject to high barriers to entry is squarely contradicted by the SCAC, which shows that the number of sureties in the alleged bail bond market more than doubled over the relevant timeframe—going from nine in 2004 to 20 in 2019.  *See* SCAC ¶ 7.[14]  *CDC Technologies, Inc. v. IDEXX Laboratories, Inc*, 7 F.Supp.2d 119, 130-31 (D. Conn. 1998) (finding no barriers to entry in part because of an actual entry by competitor).  Not only does this mean that the Plaintiffs cannot rely on this as a plus factor, it undermines the overall plausibility of the conspiracy.  Plaintiffs assert that the size of the alleged bail bond market is fixed by wholly external forces: the number of people arrested by the police and the level of bail set by the courts.  (*See, e.g.*, SCAC ¶¶ 2-3.)  As such, new market entrants would be a major threat to established firms (since they cannot create new demand, any new entrant can only make money by diverting customers from established companies)—yet the SCAC alleges that far from being treated as hostile, the alleged

---

[14] As noted above, Plaintiffs' timeline at paragraph 7 is inaccurate as to International Fidelity not being in the market in 2004.  (*Compare* SCAC ¶ 7 *with* ¶ 168.)  Hence the reference to 9 sureties, as opposed to 8.  (*See infra* Appendix B (Defendants' timeline reflecting correction).)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

29.

**DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST**

conspiracy was able to seamlessly grow with each new entrant.  (SCAC ¶ 7.)  Plaintiffs provide no specific allegation or mechanism as to how any particular Surety Defendant was brought into the conspiracy, much less how the conspiracy was able to more than double in size.  *See Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) (plaintiffs must plead evidentiary facts to "answer the basic questions" about their conspiracy claims).  Absent some clear allegation on this point, the conspiracy theory as a whole is even less plausible.

**D.     Plaintiffs' Allegations Regarding Trade Association Membership Are Insufficient**

Plaintiffs' allegations regarding the Surety Defendants' membership in various trade organizations fails to address the deficiencies identified by the Court's Order dismissing the CAC.  As the Court recognized, "[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement." (Order at 25-26 (quoting *In re Musical Instruments and Equipment Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015).)   The SCAC does not allege that the supposed conspiracy was hatched at any particular conference or event, and indeed, does not allege so much as a single event where all of the conspirators met.  The SCAC contains specific allegations about only two industry conferences.  The allegations as to both are sparse.

With respect to the first, an ABC conference allegedly held in Nevada (10 months after Plaintiffs filed this suit), the SCAC ***does not even allege actual attendance by any Surety Defendant***. (SCAC ¶ 132.)  The SCAC claims that American Bail Coalition hosted the 2019 conference and that four Surety Defendants were listed as "Sustaining Member Companies," but crucially fails to allege that any one of them actually attended the conference.  (*Id.* ¶ 132.)  In short, Plaintiffs' allegation is that four Defendants sponsored a trade conference in Nevada, but otherwise the SCAC alleges no relevant additional facts about who attended, if there was any agreement reached, or otherwise how this conference supposedly provided "Defendants opportunities to collude." (*Id.*)  This is far from enough to plausibly infer that ***twenty*** different Surety Defendants used this conference to conspire to fix prices in the alleged bail bonds market after Plaintiffs initiated the present suit.  *See In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) (antitrust conspiracy could not be imputed to defendants based on meetings they did not attend).

Cooley LLP
Attorneys At Law
San Diego

30.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

With respect to the second conferenced alleged, the SCAC contends that Defendant Two Jinn, Inc. attended a 2011 ABC but *not any other Defendants*. (SCAC ¶ 378.) In view of this, Plaintiffs cannot plausibly allege that the relevant trade associations presented an actual opportunity to collude, and cannot use their mere existence as a plus factor. *Jones*, 400 F. Supp. at 918 (trade associations were not a plus factor as "though Plaintiffs allege Defendants were members of the groups that held these meetings, there are no allegations that Defendants attended these four meetings"); *In re Graphics Processing*, 527 F. Supp. 2d at 1024 (dismissing complaint where "Plaintiffs have not pleaded that defendants ever met and agreed to fix prices; they plead at most that defendants had the opportunity to do so because they attended many of the same meetings"). A conference on its own is nothing more than a chance to collude, and "opportunity, without more, is not a plausible basis to suggest a conspiracy." *In re Cal. Title Ins. Antitrust Litig.*, 2009 WL 1458025, at *5-6 (N.D. Cal. May 21, 2009). This is particularly the case here, where many of the Surety Defendants *are not even alleged to be members of the relevant trade associations that hosted any specific conferences.* (*See infra* Appendix A (noting absence of trade association allegations for numerous Surety Defendants).)

Plaintiffs attempt to buttress this plus factor by imputing statements from the various associations (*e.g.*, "Bail agents representing a company must charge the same, filed rates" (SCAC ¶ 138)), as though they were evidence of some kind of misconduct, rather than an accurate recitation of the law.[15] Moreover, the fact that an association put out a statement is not sufficient to plausibly allege that an association member was even aware of that statement, much less that the member agreed to collude. (*See* Order at 25-26.) And as explained below, the idea that related trade groups do not widely advertise the availability of rebates is hardly surprising given that (1) they are under no duty to advertise *discretionary* rebates; and (2) in an allegedly price inelastic market, there is little incentive to do so, as discussed above.

Plaintiffs also claim that the trade associations provided opportunities to exchange information. (*E.g.,* SCAC ¶ 139.) There is no indication in the SCAC that the rate information gathered is not aggregated and anonymous. And if it were not, premium rate filings are public information, easily

---

[15] Defendants discuss these statements further in Section VII.A *infra*.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

31.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

accessed on the CDI website, as explained in Defendants' Request for Judicial Notice, and as Plaintiffs themselves have alleged (*see id.* ¶ 89 ("CDI filings are easily accessible to the public in reading rooms and on CDI's website").  There is no reason why the modest time-savings industry groups might provide by aggregating publicly available data in one place should be indicative of a conspiracy.  *See In re Citric Acid*, 191 F.3d at 1098 ("Gathering information about pricing and competition in the industry is standard fare for trade associations.  If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action.").

Finally, most of the Surety Defendants are only accused of being members of the various trade groups or giving them money—allegations that they actually attended meetings, saw or made incriminating statements, or were otherwise somehow involved in a conspiracy are conspicuously absent.  (*See, e.g.*, SCAC ¶¶ 173, 184, 195; *see also* Appendix A.)  The dismissal order from *In re California Title Ins. Antitrust Litigation* addressed this exact scenario.  There, as here, the plaintiffs did not "set forth factual allegations about whether the rate setting organizations merely gave the Defendants the opportunity to obtain information about each other's rates . . . [,] [did] not set forth facts about where or when those meetings took place, or whether the Defendants communicated with one another in advance of or after the meetings[,] . . . [and] [did] not allege facts setting forth, at a basic level, which Defendants may have attended meetings of the rate setting organizations, the types of employees that may have attended such meetings, or whether those employees reported back to their parent organizations."  2009 WL 1458025, at *5-7 (citations omitted).

## VII.  THE ALLEGED CONSPIRACY TO "SUPPRESS" REBATES IS IMPLAUSIBLE

In the CAC, Plaintiffs alleged that Defendants had "eliminate[d] to a substantial degree . . . the offering of discounts or rebates."  (CAC ¶ 129.)  The SCAC shifts to a muddier, and even less plausible theory—not that Defendants had agreed not to rebate or to fix rebates at certain levels, but that they have conspired to "discourage and suppress rebating."  (SCAC ¶ 6.)  However, the actual conduct Plaintiffs allege in support of this conspiracy consists entirely of statements that accurately describe the law—and as importantly, Plaintiffs do not allege that any Defendant ever entered into any kind of agreement.  The SCAC also only offers warmed over versions of the same allegations against

the Bail Agency Defendants, which the Court already found were insufficient.  The Court should dismiss the claims against them once more.

### A.  Plaintiffs Do Not Sufficiently Allege Any Defendant Joined an Anti-Rebating Conspiracy

The Court previously found that "Plaintiffs admittedly allege very little in terms of actual rebating practices." (Order at 20.)  As the Court explained in its Order and as Plaintiffs fully recognize, the decision whether to rebate on the bail agents' commission—the only form of rebating allowed by CDI regulations—is ***made by bail agents not sureties***.  (*See* SCAC ¶ 62 ("Any rebate to a consumer initially comes out of the bail agent's commission"); Order at 2-3 ("Once CDI has approved a premium rate, a surety must charge that rate. . . . Bail agents, however, are permitted to offer customers rebates on bail bonds.").)  Even still, Plaintiffs stick with their theory that there is a Surety Defendant-led suppression of rebates, whereby Surety Defendants have prevented some unidentified bail agents from "advertising rebates to customers."  (*See, e.g., id.* ¶ 174.)

The only conduct that Plaintiffs actually allege in support though are statements (primarily notices from the Surety Defendants) stating that bail agents must charge the rates approved by the CDI.  (*See id.* ¶ 8 (collecting examples of rate notices from certain Surety Defendants); ¶ 138 (similar statement from CBAA); ¶ 373 (similar statement from Two Jinn).)  Plaintiffs' allegation that these statements are "misleading" and are accordingly evidence of misconduct runs headlong into a simple and insurmountable problem: the notices and other statements accurately recite California law, reflect the same language the CDI uses on its own website, and appear on forms submitted to the CDI.[16]

Once the CDI approves a premium rate, the relevant surety ***must*** charge it.  *MacKay v. Super. Ct.*, 188 Cal. App. 4th 1427, 1449 n.18 (2010) ("once a rating plan has been approved, the insurer may charge no other rate").  If a surety were to charge any other rate, even a lower rate, it would violate the Insurance Code's edicts that "[i]nsurance rates subject to this chapter [including bail bond

---

[16] Additionally, no Surety Defendant can be deemed to have participated in or joined this conspiracy if Plaintiffs cannot even allege that the Surety Defendant in fact required its bail agents to post such an allegedly misleading notice.  Yet, as reflected in Appendix A, Plaintiffs do not even make that allegation against several of the Surety Defendants, so claims based on an anti-rebating conspiracy cannot be maintained against those Defendants for this added reason.

Cooley LLP
Attorneys At Law
San Diego

33.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

premiums] must be approved by the commissioner prior to their use" (Cal. Ins. Code § 1861.01(c)) and that a bail agent cannot charge any price other than the approved premium.  10 CCR § 2081 (limiting what an agent may collect to the approved premium rate, collateral, and reimbursement for reasonable and necessary expenses).  The CDI's website on bail bonds clearly states that "Each surety company must file rates with CDI *and bail agents representing a surety must charge the same filed rates*." *See* http://www.insurance.ca.gov/01-consumers/170-bail-bonds/ (last accessed June 11, 2020) (emphasis added).

Each and every notice and statement that Plaintiffs point to accurately states that bail agents must charge the rates approved by the CDI.  (*See* SCAC ¶ 8 (alleged notices from Surety Defendants).) The fact that bail agents might choose to offer a rebate on their commission does not change the fact that they must initially *charge* the approved rate.  Plaintiffs' contention that these notices are misleading and indicative of an antitrust conspiracy because they fail to disclose the availability of rebates is flawed for at least three other reasons.

*First*, Plaintiffs cannot allege that failing to affirmatively disclose the availability of a discretionary discount is "misleading."  Courts generally hold that advertisements or other representations are not inaccurate or misleading simply because they do not inform consumers of every discount or price cut that might be available.  *See, e.g., Buller v. Sutter Health,* 160 Cal. App. 4th 981, 989 (2008) (hospital's failure to disclose the availability of a "prompt-pay discount" in invoices was not misleading and could not be the basis for a UCL claim); *Graham v. VCA Antech, Inc.*, 2016 WL 5958252, at *14-15 (C.D. Cal. Sep. 12, 2016) (statements by veterinarians that they were "required to charge" a specific fee were not false or misleading even though fee waivers were potentially available); *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1129 (2010) ("we can conceive of no principled basis for concluding that Blue Shield owed the Levines a duty to disclose how the Levines could obtain the same health care coverage for a lower price").  This rationale is especially true here as the supposedly misleading statements accurately reflect California law, and indeed, parrot what the CDI says on its own website.

*Second*, Plaintiffs cannot contend that the statements were misleading when they must be submitted to the CDI for review.  The California Insurance Code requires that bail agents submit all

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

34.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1  forms and other documents they will use in the ordinary course of business to the CDI.  10 CCR §

2  2095(k) (bail agents must file with the CDI "all forms or documents which the [agent] intends to use

3  regularly or frequently in connection with his bail transactions").  The exact forms that Plaintiffs

4  contend were "misleading" (and which compromise the overwhelming majority of the statements

5  Plaintiffs cite in support of an anti-rebating conspiracy) were included in the packets which the various

6  Surety Defendants submitted to the CDI in connection with their rate filings.  (*See* Exs. 1, 22, 36, 37,

7  39, 40, 42, 49.)  And 10 CCR § 2096 provides that:

> If the commissioner finds that any form or document, the filing of which is required by Section 2095(k), is misleading or contrary to any provision of this article or any law relating to bail, he shall notify the bail licensee specifying wherein such form or document is misleading or contrary to any provision of this article or any law relating to bail.  Thereafter such bail licensee may not use such form or document.

11  It is simply not plausible that the main mechanism for a conspiracy to mislead the public was reviewed

12  by the CDI.[17]

13      ***Third***, and most importantly, assuming *arguendo* there is little advertisement of discretionary

14  rebates, this is neither surprising nor indicative of a conspiracy.  The Court itself recognized this when

15  it dismissed the Bail Agency Defendants.  (Order at 25-26.)  Outwardly parallel conduct cannot be the

16  basis for an antitrust claim when "common economic experience, and the facts alleged in the complaint

17  itself show that independent self-interest is an obvious alternative explanation for defendants' common

18  behavior."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3rd Cir. 2010) (noting that, in

19  such cases, a claim of conspiracy predicated on parallel conduct should be dismissed).  As explained

20  further above, Plaintiffs have alleged that bail bonds are not merely price inelastic as to the market as

21  a whole but are also inelastic at the level of each individual bail agent.  (SCAC ¶¶ 66, 75-76.)  If the

22  product is price inelastic (as alleged), then advertising and providing rebates will not drive additional

23  business; it will only ensure that the bail agents make a smaller profit on each bond that they would

24  have written anyway.  *Kleen Prods.*, 276 F. Supp. 3d at 823 ("[T]he inelasticity of demand is exactly

25  the reason that a price cut would not much help a Defendant's bottom line, and in fact, may hurt it.")

---

[17] Nor can Plaintiffs rely on statements made by non-party bail agencies who are allegedly connected to certain surety Defendants.  (*See, e.g.,* SCAC ¶¶ 147, 148, 186, 197, 220, 252, 284, 304, 332, 341, 354.)  The Court has already held that statements like these "do not sufficiently allege each surety Defendant's 'role in the alleged conspiracy.'" (*See* Order at 24-25.)

Cooley LLP
Attorneys At Law
San Diego

35.

Defendants' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

Plaintiffs have alleged nothing on rebates beyond statements on what the law requires. "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a § 1 violation." *In re Musical Instruments*, 798 F.3d at 1194. As such, the SCAC's allegations around rebating neither suggest that any individual Defendant participated in the supposed conspiracy, nor are they even suggestive of a plausible anti-rebating cartel.

### B.   The Court Should Dismiss the Claims Against the Bail Agency Defendants

First, Plaintiffs do not allege how as bail agents, Defendants Two Jinn, Inc. (d.b.a. "Aladdin") and All-Pro Bail Bonds, Inc. conspired to submit uniform premium rate filings. Second, the SCAC's allegations regarding Defendants Two Jinn and All-Pro's involvement in the supposed agreement to suppress rebating are primarily notable for what they do not say. Plaintiffs do not allege that either Bail Agent Defendant does not offer rebates. Plaintiffs do not allege that either Bail Agent Defendant ever agreed not to offer rebates. Plaintiffs do not allege that Bail Agent Defendant ever agreed not to offer rebates above some certain amount. Plaintiffs ask the Court to infer an agreement to "suppress" rebates based primarily on the fact that Defendant Two Jinn was a member of trade associations and that both Bail Agent Defendants used advertisements that did not outwardly mention the possibility of rebates. These allegations are (once again) insufficient to state a claim that the Bail Agency Defendants were involved in a price-fixing conspiracy.

#### 1.   Plaintiffs do not add facts regarding participation by Defendant Two Jinn, Inc.

The Court previously dismissed the claims against Defendant Two Jinn because statements on its website were not evidence of any price-fixing agreement and because its mere attendance at trade conferences, without more, did not raise the inference of misconduct. (Order at 25-26.) The SCAC does nothing to rectify these shortcomings.[18]

---

[18] Notably, the SCAC does not include "the naked allegation that Two Jinn was the 'center' of the conspiracy," in light of the Court's observation concerning the CAC that "simply saying it does not make it so." (Order at 26.)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

36.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

Plaintiffs initially re-tread their allegations that the statements on Aladdin's website are misleading because they do not affirmatively disclose the availability of discretionary rebates.  (SCAC ¶¶ 372-76.)  The fact that Plaintiffs hold up obvious advertising puffery (*see* SCAC ¶ 376 highlighting the statement that "Nobody has lower prices than Aladdin") as evidence of wrongdoing only underscores how thin their allegations are.  The statements themselves are (as explained above) accurate statements of California law that mirror what the CDI has on its own website, and Plaintiffs cannot turn the failure to disclose rebates—***which a bail agent is not required to offer, much less affirmatively advertise***—into a "misleading" action as a matter of law.  *Levine*, 189 Cal. App. 4th at 1130.  More to the point, the Court already held that "Aladdin's statement about its rates . . . is not evidence of agreement."  (Order at 26.)  For the same reason, the Court cannot use Plaintiffs' conclusory allegations that Defendant Two Jinn "mislead" Plaintiff Monterrey (apparently by not affirmatively telling her that she could potentially bargain for a rebate) as evidence of a prior agreement not to offer rebates.  Plaintiffs' only other allegation with respect to Defendant Two Jinn is that it is a member of trade associations and participated in a single conference in 2011.  (*See* SCAC ¶ 378.)  But once again, the Court previously held that this was not enough, and Plaintiffs have offered no reason to revisit this holding.  (Order at 25 ("Membership in associations and attendance at trade meetings presents nothing more than an opportunity to collude, and an opportunity, without more, is insufficient to state a claim under § 1.") (quoting *Jones*, 400 F. Supp. 3d at 918).)

Given that Plaintiffs have failed to offer anything more than warmed over versions of the allegations that the Court already determined were insufficient, the claims against Defendant Two Jinn should be dismissed with prejudice.

## 2.    The allegations against Defendant All-Pro Bail Bonds, Inc. fail.

The Court previously found that the allegations against Defendant All-Pro were "even thinner" than the inadequate claims against Defendant Two Jinn.  (Order at 26.)  The SCAC is no different in this regard.  The only allegations against Defendant All-Pro in the SCAC are that it sold Plaintiff Shonetta Crain a bail bond, that it did not offer her a rebate and gave her no indication one was available, and that it has made statements on its website about bail bond rates that Plaintiffs allege are misleading.  (SCAC ¶¶ 380-81.)  The SCAC also alleges that bail agents for Bankers Insurance

Company (of which Defendant All-Pro was one at the time of Plaintiff Crain's bond purchase) "rarely offer rebates to consumers, or at least do so less frequently and in smaller amounts than they otherwise would have absent the anti-rebating conspiracy" (*id.* ¶ 196), although Plaintiffs do not specify which, if any, of these conclusory assertions apply to Defendant All-Pro.

These allegations are not sufficient to state a claim that Defendant All-Pro joined or participated in a conspiracy. The Court already rejected similar allegations as insufficient the Order. There, it explained that a bail bond firm "cannot enter a conspiracy merely by selling a bail bond," and that website statements about rates, even if "potentially somewhat misleading," are "not evidence of agreement." (Order at 25-26.) And an allegation that Defendant All-Pro did not affirmatively offer Plaintiff Crain a rebate does not give rise to a plausible claim of participation in a conspiracy. *See Levine*, 189 Cal. App. 4th at 1129 (noting that an insurer is not required to "disclose the lowest price that the insurer is willing to accept in exchange for providing coverage").

Indeed, there is no allegation anywhere in the SCAC about how Defendant All-Pro is supposed to have joined or participated in a conspiracy, as would be required for the claims against it to survive dismissal. *TFT-LCD*, 586 F. Supp. 2d at 1117. While Plaintiffs allege in conclusory terms that trade associations played "critical roles in creating and maintaining the Conspiracy" (SCAC ¶ 126), Plaintiffs do not even allege that Defendant All-Pro is a member of any trade associations, much less that it attended any of the association meetings that supposedly "provided opportunities to conspire" (*id.* ¶ 100). In fact, Defendant All-Pro, which was not founded until April 2006,[19] did not even exist when the conspiracy was supposedly formed (SCAC ¶ 7) or when the supposed invitations to collude were made (*id.* ¶¶ 361-62). The claims against All-Pro should be dismissed with prejudice.

## VIII.   THE COURT SHOULD DISMISS THE CLAIMS AGAINST THE TRADE ASSOCIATIONS

In its Order dismissing the claims against Defendants American Bail Coalition ("ABC") and Golden State Bail Agents Association ("GSBAA") the Court stated that "[t]he only specific allegation

---

[19] *See* Cal. Sec. of State, *Business Search*, https://businesssearch.sos.ca.gov/ ("All-Pro Bail Bonds, Inc."). Under Federal Rule of Evidence 201, "[a] court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." *U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO
38.
DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

concerning ABC relates to a statement made by a former—not current—executive director. . . . And there are no specific allegations concerning GSBAA whatsoever." (Order at 27.) Although Plaintiffs continue to assert claims against three Trade Association Defendants (*see* SCAC ¶ 18), their allegations against Defendants ABC and GSBAA still lack specificity. Plaintiffs again recite the same allegations against Defendant California Bail Agents Association ("CBAA"), and refer at length to, but do not name as a defendant, the Surety and Fidelity Association of America ("SFAA"). (*See, e.g., id.* ¶¶ 151-55.) None of these new allegations overcomes the fact that there are ***no allegations that any defendants (or anyone else) discussed fixing premiums, or barring discounting, or otherwise colluded at any meetings hosted by Defendants ABC, GSBAA***, or by non-party SFAA, or that Defendants ABC or GSBAA knew about or facilitated such collusion. *See In re Graphics Processing*, 527 F. Supp. 2d at 1020-23 (mere existence of industry conferences was insufficient where there were "no allegations that representatives from [the defendants] actually met or spoke with one another"); *In re German Automotive Mfrs. Antitrust Litig.*, 392 F. Supp. 3d 1059, 1071-72 (N.D. Cal. 2019) (plaintiffs' allegations regarding working groups and trade associations lacked detail where, despite a dozen pages of pleading, plaintiffs "almost never identify what was agreed to in these meetings and instead only vaguely refer to 'clandestine agreements to limit technological innovation.'"); *In re Musical Instruments*, 798 F.3d at 1196 ("mere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement").

## A.     American Bail Coalition

Many of the allegations in the SCAC against Defendant ABC are identical to those the Court found insufficient in its Order. For example, SCAC ¶ 95 is identical to CAC ¶ 77; SCAC ¶129 is identical to CAC ¶ 86 (except that the introductory sentence that "the trade associations cooperate with each other as well" has been deleted); and the same is true for SCAC ¶ 134 and CAC ¶ 87. Likewise, SCAC ¶ 133 is a reorganized compilation of allegations from CAC ¶ 104 and CAC ¶ 80. Yet, as before, Plaintiffs cite the same statement from a former executive director of ABC, Dennis Bartlett, to support their claim that "ABC plays an important role in detecting and punishing those who attempt to deviate from the Conspiracy." (SCAC ¶ 133.) The Court has already rejected this allegation. (*See* Order at 27.)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

39.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1  Plaintiffs next allege that Defendant "ABC, along with other Trade Association Defendants,

2  hosts meetings that provide opportunities for sureties and bail agents to collude." (*Id*. ¶ 128.) Yet,

3  Plaintiffs identify only two meetings hosted by Defendant ABC and despite baldly alleging that

4  "[s]uch conferences provided the participating Defendants opportunities to collude," Plaintiffs have

5  pled no facts supporting their conclusion that any such collusion actually occurred at these meetings

6  or elsewhere. And the mere fact that the Trade Association Defendants hosted meetings is routine

7  business activity, not an indication of illicit conduct. *See In re Graphics Processing*, 527 F. Supp. 2d

8  at 1023 ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from

9  which to infer a conspiracy, without more."); *In re Nat'l Ass'n of Music Merchants, Musical*

10 *Instruments and Equip. Antitrust Litig*., 09-cv-2002, 2012 WL 3637291, at *2 (S.D. Cal. Aug. 20,

11 2012) ("[n]or does attendance at trade shows or other large meetings imply an agreement or

12 conspiracy"), *aff'd sub nom. In re Musical Instruments*, 798 F.3d 1186.

13  Similarly, no inference of wrongdoing can be drawn from a 2006 article allegedly written by

14 Carmichael and posted on Defendant ASC's website, titled "Who Do Associations Serve?," in which

15 he wrote that "[a]ny number of local, state and national gatherings of the bail industry have taken place

16 in the past year" which were "designed to provide a forum in which concerned members of our

17 industry could gather, share ideas and plan strategies which would expand, protect and advance our

18 industry in their respective markets." (SCAC ¶ 128.) There is nothing suspect about his statements

19 that trade associations exist to advance the interests of their members. *See In re Citric Acid*, 191 F.3d

20 at 1098 ("It is well-settled that trade associations often serve legitimate functions, such as providing

21 industry information to members, conducting research to further industry goals, and promoting

22 demand"). Finally, the allegation that Defendant ABC—a nonprofit organization—solicits and

23 receives donations from members is neither surprising nor indicative of any wrongdoing. (*See* SCAC

24 ¶ 135.)

25  **B.  Golden State Bail Agents Association**

26  Defendant GSBAA allegedly "functions similarly to ABC." (SCAC ¶ 96.) Like the allegations

27 against Defendant ABC, Plaintiffs have recycled their prior, sparse allegations against Defendant

28 GSBAA. And the newly pled allegations do not overcome the defects of the prior complaint. As one

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

40.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

example, the first sentence of SCAC ¶ 143 is identical to CAC ¶ 85.  The addition of a sentence from Defendant GSBAA's website describing its purpose and objectives as a non-profit corporation entirely fails to even suggest that it was involved in any antitrust violations.[20]

Plaintiffs also allege that Defendant GSBAA hosts an annual conference and quarterly phone meeting.  (*Id.* ¶ 144.)  It encourages potential members to join: "including being kept abreast of issues affecting the California bail industry through our web site, email alerts and other correspondence, networking with other like-minded professionals in the bail industry, and attending our meetings." (*Id.*)  Yet, as with ABC, the allegations concerning meetings and the benefits of membership are entirely innocuous and wholly consistent with legitimate business activity.  *See Jones*, 400 F. Supp. 3d at 918.  Indeed, rather than being an antitrust violation, "[d]isseminating information that fosters rational business decisions is pro-competitive."  *Int'l Healthcare Mgmt. v. Haw. Coal. for Health*, 332 F.3d 600, 608 (9th Cir. 2003).

Rather than plead facts, Plaintiffs' allegations offer innuendo.  (*See* SCAC ¶ 145 ("GSBAA is run by several significant members of the bail industry that work with many of the Defendant Sureties.").)  That industry participants are involved in a trade association is only to be expected.

In a further attempt to overcome their prior failure to plead any facts about GSBAA, Plaintiffs include statements regarding bail bond premium rates by non-parties on their websites.  (*See, e.g.*, *id.* ¶ 146 (statements on the website of non-Defendant Topo Padilla's website); *id.* ¶ 147 (statements by president of non-Defendant Bad Boys Bail Bonds); *id.* ¶ 148 (statements by  owner of non -Defendant Liberty Bail Bonds).)  GSBAA is not alleged to have adopted the statements on the websites of those non-parties.

---

[20] GSBAA describes itself as:

> dedicated to facilitate professional interaction, cooperation and communication between individuals and organizations engaged in the bail industry in California, to improve business conditions and promote professionalism in California's bail industry, to advance the common business interests of individuals and organizations engaging in the bail industry and to engage in public educational activities and advocacy regarding the business interests of California's bail industry.

(SCAC ¶ 143.)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

41.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1       The SCAC also alleges that GSBAA's website has links to Lexington National Insurance

2   Corporation's and Financial Casualty & Surety's websites where purportedly misleading statements

3   are made.  (*Id.* ¶ 149.)  Yet, there is no mention of a website in the section of the SCAC about Financial

4   Casualty.   Rather, the SCAC focuses on the allegations that Financial Casualty does not reflect

5   actuarial analysis, but rather was a "me too" filing referencing the rates filed with the CDI by other

6   sureties.  (*Id.* ¶¶ 267-68.)  Follow the leader pricing has long been recognized as not reflecting a price

7   fixing agreement.   *In re Citric Acid*, 191 F.3d at 1102 (Section 1 violation "cannot, however, be

8   inferred" from parallel pricing alone "nor from an industry's follow-the-leader pricing strategy")

9   (citing *United States v. Int'l Harvester Co.,* 274 U.S. 693, 708–09 (1927) and *Wilcox v. First Interstate*

10  *Bank of Oregon, N.A.*, 815 F.2d 522, 526 (9th Cir. 1987)).

11       The website in Lexington's section of the SCAC is not Lexington's; rather, it is the website

12  of non-Defendant Topo Padilla and the statements quoted accurately reflect the law on charging the

13  filed rate, as discussed at Section VII.A..  And, the fact that GSBAA's website provides a link to a

14  bail education website (*see id*. ¶ 150) does not indicate that GSBAA adopted statements allegedly

15  made in courses taught by that online training course.  Regardless of the accuracy of any of these

16  alleged statements, none were made by or can be attributed to GSBAA.

## C.    The Allegations Against the Non-Party Surety Fidelity Association of America Are Irrelevant

19       In the SCAC, Plaintiffs now contend that 13 of the Surety Defendants are "dues paying

20  members" of SFAA.  (*See* SCAC ¶ 152.)  That a non-party trade association charges dues to its

21  members is not surprising.   What is perhaps surprising is that Plaintiffs allege—again only in

22  conclusory terms—that "SFAA devised and promulgated the 'standard rate' of 10%, on which the

23  Surety Defendants relied to fix premiums" (*id*. ¶ 153).  Relying again on innuendo, Plaintiffs contend

24  that the Surety Defendants provide non-party SFAA with "detailed data concerning all premiums

25  charged and all losses incurred" (*id*. ¶ 154), yet fail to mention that the CDI also collects and publishes

26  such information (*see* Cal. Ins. Code §§ 1857.7, 1857.9, 1861.05(c)), undermining Plaintiffs' desperate

27  suggestion of backroom conspiracies.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

42.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1    Likewise, allegations that non-party SFAA provided "further opportunities to conspire"

2    including at "'members-only' Bail Bond Advisory Committee" meetings do not meet the requisite

3    standard: plausible allegations that hat any of the unnamed attendees actually conspired at any such

4    meetings.   Altogether, the newly added allegations against non-party SFAA do not support any

5    plausible inference of wrongdoing by any of the Defendants.

6    **IX.   THE COURT SHOULD DISMISS THE INDIVIDUAL DEFENDANTS AND CBAA BECAUSE A CONSPIRACY IS NO LONGER PLAUSIBLE**

7

8    In its Order the Court held that the statements made by the Individual Defendants—which are

9    re-alleged in the SCAC—were sufficient to state claims against each of them.   The Court held that

10   "Plaintiffs allege both that Watson and Carmichael directly participated in the alleged conspiracy and

11   that they approved and ratified of anticompetitive conduct by AIA's member sureties, ASC, and

12   ABC—specifically, their alleged agreement not to rebate and to misrepresent their ability to do so."

13   (Order at 28.)  The Court also allowed the claims against Defendant CBAA to go forward because the

14   company allegedly maintained databases on pricing that could be used by a cartel to detect defections.

15   (*Id.* at 26-27.)  But, as demonstrated above, the SCAC fails to allege a plausible conspiracy as a whole,

16   and therefore the claims against Defendants Watson, Carmichael and CBAA should be dismissed.

17   Indeed, Defendants Carmichael, Watson, and the CBAA could hardly have orchestrated, much less

18   executed, the wide-ranging conspiracy Plaintiffs allege on their own.

19   Furthermore, the new allegations in the SCAC put the allegedly incriminating statements by

20   Defendants Carmichael and Watson in a new light.   The statements are nearly fifteen years old (*e.g,*

21   SCAC ¶ 361), and over half of the Surety Defendants joined the alleged conspiracy years after the

22   statements were made.  (*Id.* ¶ 7.)  Even if all the original conspirators had somehow been aware of

23   these statements (which Plaintiffs do not allege), Plaintiffs cannot extrapolate these isolated statements

24   into the vast conspiracy they allege.  *In re Graphics Processing*, 527 F. Supp. 2d at 1023 ("[E]ven

25   where some competitors have admitted to meeting to fix prices at or near trade shows and conferences,

26   it is not reasonable to infer that another competitor in attendance at the same meeting had done

27   likewise"); *see also TFT-LCD*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) (complaint "must allege

28   that each individual defendant joined the conspiracy and played some role in it").

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

43.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1    The SCAC's allegations have also exposed the serious deficiencies in the claims asserted

2    against the Individual Defendants.  There are no allegations (i) that Defendants Carmichael or Watson

3    ever met with or communicated with any other defendant regarding premiums or rebating; (ii) that

4    they ever agreed with any other Surety Defendants or Bail Agency Defendants to do anything; or (iii)

5    that they prohibited the bail agents of their respective surety companies from offering rebates, or

6    instructed them not to discuss or disclose the possibility of rebates to customers. Although Defendant

7    s Carmichael and Watson are alleged to be involved in Defendant ABC, Plaintiffs do not allege that

8    they had collusive communications regarding fixing premiums or suppressing rebating through this

9    trade association.

10    In its Order, the Court noted that "Individuals may be liable for ***the antitrust violations of their***

11    ***employers*** if they have directly participated in or knowingly approved or ratified 'inherently wrongful'

12    conduct."  (Order at 28 (citing *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.,*

13    47 F. Supp 841, 852-53 (N.D. Cal 1979) (emphasis added).)  However, the Court also held that the

14    statements supposedly made by Defendants Carmichael and Watson were insufficient to state a claim

15    against their alleged employers, Defendants American Surety Co., Allegheny Casualty Co., and

16    International Fidelity Insurance Co., where Plaintiffs failed to demonstrate these Surety Defendants'

17    purported "role in the alleged conspiracy." (*See* Order at 24-25 (quoting *TFT-LCD*, 586 F. Supp. 2d

18    at 1117).)  For the reasons set forth earlier in this brief, Plaintiffs' allegations against Defendants

19    American Surety Co., Allegheny Casualty Co., International Fidelity Insurance Co., and ABC do not

20    plausibly infer their participation in a conspiracy.  If the Court agrees that that the Plaintiffs have failed

21    to allege facts sufficient to constitute antitrust violations against these entities, then Defendants

22    Watson and Carmichael should also be dismissed.

23    As Plaintiffs have failed to plead a claim against any of the other Defendants, they are left with

24    a conspiracy without conspirators.  This is simply not tenable, and Defendants Carmichael, Watson,

25    and the CBAA should be dismissed accordingly.

26    **X.    THE COURT SHOULD DISMISS NEWLY ADDED DEFENDANT AIA BECAUSE THE FACTS PLED**
     **DO NOT ESTABLISH THAT AIA ENGAGED IN CONSPIRATORIAL CONDUCT**

27

28    The SCAC alleges that new Defendant AIA held a crucial role in establishing and maintaining

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

44.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

the Conspiracy (SCAC ¶ 167), but apparently not so crucial to be named in the original CAC.  AIA is not alleged to be a surety company, a bail bond agent, or a trade association. Plaintiffs now allege that in 2003, "three of the nation's leading bail sureties (International Fidelity Insurance Co., Allegheny Casualty Co., and Associated Bond Insurance Agency) formed an 'alliance' umbrella organization they called AIA." (SCAC ¶ 167.)  Plaintiffs do not allege what is meant by an "alliance" or an "umbrella organization," nor do they allege the legal relationship between AIA, on the one hand, and Defendants International Fidelity Insurance Co. and Allegheny Casualty Co, on the other hand. Instead, Plaintiffs merely allege that "AIA has a common executive team that coordinates the bail bond business across the three component companies." (*Id.* ¶ 167.)  However, Plaintiffs do not allege that Defendant AIA's executive team is common to that of Defendants International Fidelity Insurance Co. and Allegheny Casualty Co., nor do Plaintiffs allege the purported commonality of the executive teams of the "component companies."  Finally, Plaintiff do not allege that AIA had the right to control, bind, or take any action on behalf of Defendants International Fidelity Insurance Co. and Allegheny Casualty Co., instead simply stating that Defendant AIA "coordinated" the bail bond business for these surety companies.  (*Id.* ¶ 166.)

In addition to failing to allege any legally recognizable relationship between Defendant AIA and Defendants International Fidelity Insurance Co. and Allegheny Casualty Co., Plaintiffs fail to allege any facts to establish any participation by Defendant AIA in any purported conspiracy to set premiums or to suppress rebating. Plaintiffs' sole factual allegations of Defendant AIA's purported participation in the Conspiracy are (i) the statements purportedly made by Defendant Jerry Watson, the former Vice President of Defendant AIA (*id.* ¶ 167), and (ii) the allegation that Defendant AIA is a member of the SFAA and Defendant ABC (*id.* ¶ 173).  The alleged statements made by Defendant Watson are addressed in Part IX above.  Nothing that Defendant Watson is alleged to have said or done on behalf of Defendant AIA in any manner supports the Plaintiffs' allegation that Defendant AIA was a member of any purported Conspiracy.  There are no allegations (i) that Defendant AIA ever met with or communicated with any other defendant regarding premiums or rebating; (ii) that it agreed with any other Surety Defendants or Bail Agency Defendants to do anything; (iii) that it is an insurance company that had the ability to set premium rates; or (iv) that it prohibited their bail agents from

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

45.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1   offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

2   Defendant AIA is alleged to be a member of Defendant ABC and non-party SFAA (despite the fact

3   that these are surety organizations, and Defendant AIA is not a surety), but Defendant AIA is not

4   alleged to have had collusive communications regarding fixing premiums or suppressing rebating

5   through any these trade associations.  These facts fall far short of alleging any agreement by Defendant

6   AIA with any surety to fix premiums at 10% or to suppress rebating by bail agents in California, and

7   therefore the SCAC should be dismissed as to it.

8   ## XI.   THE UCL CLAIM FALLS WITH PLAINTIFFS' ANTITRUST CLAIMS

9   The SCAC asserts a claim under the UCL's unlawful, unfair, and fraudulent prongs based on

10  the same conduct underlying the alleged antitrust claims.  (*See* SCAC ¶¶ 401-09.)  Therefore, the

11  failure of Plaintiffs' antitrust claims likewise compels dismissal of the UCL claim.  "If the same

12  conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same

13  reason—because it unreasonably restrains competition and harms consumers—the determination that

14  the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair'

15  toward consumers."  *SC Manufactured Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 93 (2008), *as*

16  *modified on denial of reh'g* (May 19, 2008) (citation omitted); *see also Drum v. San Fernando Valley*

17  *Bar Ass'n*, 182 Cal. App. 4th 247, 254 (2010).

18  To the extent Plaintiffs claim a violation of the UCL's fraudulent prong based on allegedly

19  false statements in the SCAC, they fare no better.  Claims under the UCL's fraudulent prong are

20  subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *Brazil v.*

21  *Dole Food Co.*, 935 F. Supp. 2d 947, 963 (N.D. Cal. 2013) (citing *Kearns v. Ford Motor Co.*, 567

22  F.3d 1120, 1125 (9th Cir. 2009)).  Rule 9(b) requires plaintiffs to plead "'the who, what, when, where,

23  and how' of the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir.

24  2003) (citation omitted).  Furthermore, "[A] plaintiff 'proceeding on a claim of misrepresentation as

25  the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or

26  misleading statements."  *A White & Yellow Cab, Inc. v. Uber Techs., Inc.*, No. 15-cv-5163, 2017 WL

27  1208384, at *7 (N.D. Cal. Mar. 31, 2017) (quoting *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326-

28  27 (2011)).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

46.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1   Plaintiffs do not meet either the particularly or standing requirements for the UCL claim.  As

2   with the first complaint, the named Plaintiffs do not allege that they encountered any allegedly false

3   statements before making their bond purchasing decisions, much less that they relied on the

4   statements.  (*See* SCAC ¶ 371 (no allegation that Plaintiff Monterrey relied on any false or misleading

5   statements by Two Jinn); *id.* ¶ 379 (no allegation that Plaintiff Crain relied on any false or misleading

6   statements by All-Pro).)  Plaintiffs also fail to explain how the allegedly false statements made by

7   certain third-parties (*e.g.*, SCAC ¶ 140) should be imputed to Defendants.  In any event, as detailed at

8   length above, the statements Plaintiffs point to about premium rates that bail agents must charge are

9   not false or misleading—they are required by California law and approved by the CDI.  (*See supra*

10   Section VII.A.)  The UCL claim should be dismissed with prejudice.

11   **XII.   CONCLUSION**

12   For the foregoing reasons, the Court should dismiss with prejudice the SCAC in its entirety.

13

14   Dated:  June 12, 2020                           Respectfully submitted,

15

16                                                   By: */s/ Beatriz Mejia*
                                                     Beatriz Mejia (190948)

17
                                                     COOLEY LLP
18                                                   MICHAEL A. ATTANASIO (151529)
                                                     BEATRIZ MEJIA (190948)
19                                                   DAVID HOUSKA (295918)
                                                     MAX SLADEK DE LA CAL (324961)
20
                                                     *Attorneys for Defendants Seaview Insurance*
21                                                   *Company and Two Jinn, Inc.*

22

23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

47.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1   Dated:  June 12, 2020

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

By: */s/ Julie A. Gryce*

Julie A. Gryce (319530)
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone:  (619) 699-2700
Facsimile:  (619) 699-2701
julie.gryce@dlapiper.com

Michael P. Murphy (*pro hac vice*)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone:  (212) 335-4500
Facsimile:  (212) 335-4501
michael.murphy@dlapiper.com

John Hamill
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
Telephone: 312.368.7036
Facsimile: 312.251.5809
John.hamill@us.dlapiper.com

*Attorneys for Defendant Danielson National Insurance Company*

Dated:  June 12, 2020

By: */s/ Blake Zollar*

Drew Koning (263082)
Blake Zollar (268913)
Shaun Paisley (244377)
KONING ZOLLAR LLP
169 Saxony Road, Suite 115
Encinitas, CA 92024
Telephone:  (858) 252-3234
Facsimile:  (858) 252-3238
drew@kzllp.com
blake@kzllp.com
shaun@kzllp.com

*Attorneys for Defendant All-Pro Bail Bonds, Inc.*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

48.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

Dated:  June 12, 2020

By: */s/ Gerard G. Pecht*

Gerard G. Pecht (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas  77010
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246
gerard.pecht@nortonrosefulbright.com

Joshua D. Lichtman (SBN 176143)
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street, Forty-First Floor
Los Angeles, California  90071
Telephone:  (213) 892-9200
Facsimile:  (213) 892-9494
joshua.lichtman@nortonrosefulbright.com

*Attorneys for Defendant American
Contractors Indemnity Company*

Dated:  June 12, 2020

By: */s/ Anne K. Edwards*

Anne K. Edwards (110424)
SMITH, GAMBRELL & RUSSELL, LLP
444 South Flower Street, Suite 1700
Los Angeles, CA 90071
Telephone:  (213) 358-7210
Facsimile:  (213) 358-7310
aedwards@sgrlaw.com

*Attorneys for Defendant Williamsburg
National Insurance Company*

Dated:  June 12, 2020

By: */s/ Nicole S. Healy*

Todd A. Roberts
Nicole S. Healy
Edwin B. Barnes
ROPERS MAJESKI PC

*Attorneys for Defendants American Bail
Coalition, Inc. and William B. Carmichael*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

49.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1    Dated:  June 12, 2020                    By: */s/ David F. Hauge* _____

2
                                             David F. Hauge (128294)
3                                            Todd H. Stitt (179694)
                                             Vincent S. Loh (238410)
4                                            MICHELMAN & ROBINSON, LLP

5                                            *Attorneys for Defendants United States Fire*
                                             *Insurance Company, The North River*
6                                            *Insurance Company, and Seneca Insurance*
                                             *Company*
7

8    Dated:  June 12, 2020                    By: */s/ Christie A. Moore* _____

9                                            Christie A. Moore (*pro hac vice*)
                                             W. Scott Croft (*pro hac vice*)
10                                           DENTONS BINGHAM GREENEBAUM DOLL LLP
                                             101 S. Fifth Street
11                                           3500 PNC Tower
                                             Louisville, KY 40202
12                                           Telephone:  502.587.3758
                                             Facsimile:  502.540.2276
13                                           cmoore@bgdlegal.com
                                             wcroft@bgdlegal.com
14

15                                           *Attorneys for Lexon Insurance Company*

16   Dated:  June 12, 2020                    By: */s/ Travis Wall* _____

17
                                             Travis Wall (191662)
18                                           Spencer Kook (205304)
                                             HINSHAW & CULBERTSON LLP
19                                           One California Street, 18th Floor
                                             San Francisco, CA 94111
20                                           Tel: (415) 362-6000
                                             twall@hinshawlaw.com
21

22                                           *Attorneys for Defendant Philadelphia*
                                             *Reinsurance Corporation*
23

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

50.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1   Dated:  June 12, 2020                    By: */s/ Gregory S. Day*

2

3                                          Gregory S. Day
                                           LAW OFFICES OF GREGORY S. DAY
                                           120 Birmingham Drive, Suite 200
4                                          Cardiff, CA  92007
                                           Telephone:  (760) 436-2827
5                                          attygsd@gmail.com

6                                          *Attorneys for Defendants California Bail*
                                           *Agents Association, Universal Fire &*
7                                          *Insurance Company, Sun Surety Insurance*
                                           *Company*
8

9   Dated:  June 12, 2020                    By: */s/ Howard Holderness*

10                                         John A. Sebastinelli (127859)
                                           Howard Holderness (169814)
11                                         GREENBERG TRAURIG, LLP
                                           4 Embarcadero Ctr, Ste. 3000
12                                         San Francisco, CA 94111-5983
                                           Telephone: (415) 655-1289
13                                         Facsimile: (415) 358-4796
                                           sebastinellij@gtlaw.com
14                                         holdernessh@gtlaw.com

15

16                                         *Attorneys for Defendants American Surety*
                                           *Company and Indiana Lumbermens Mutual*
17                                         *Insurance Company*

18  Dated:  June 12, 2020                    By: */s/ Gary A. Nye*

19

20                                         Gary A. Nye (126104)
                                           ROXBOROUGH, POMERANCE, NYE & ADREANI,
21                                         LLP

22                                         *Attorneys for Defendants Allegheny Casualty*
                                           *Company, AIA Holdings, Inc., Bankers*
23                                         *Insurance Company, International Fidelity*
                                           *Insurance Company, Lexington National*
24                                         *Insurance Corporation, and Jerry Watson*

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

51.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

Dated:  June 12, 2020                    By: */s/ Brendan Pegg*

Brendan Pegg (174159)
LAW OFFICES OF BRENDAN PEGG
201 E. Ojai Avenue #1505
Ojai, CA93024
Telephone:  (805) 3024151
Facsimile:  (877) 719-7298
brendan@bpegglaw.com

*Attorneys for Defendant Financial Casualty &*
*Surety, Inc.*

Dated:  June 12, 2020                    By: */s/ Erik K. Swanholt*

Erik K. Swanholt
FOLEY & LARDNER
555 South Flower St., 33rd Floor
Los Angeles, CA 90071
Telephone:  (213) 972-4500
Facsimile:  (213) 486-0065

*Attorneys for Defendants Continental Heritage*
*Insurance Company*

Dated:  June 12, 2020                    By: */s/ John M. Rorabaugh*

John M. Rorabaugh (178366)

*Attorney for Defendant Golden State Bail*
*Association*

Dated:  June 12, 2020                    By: */s/ Paul J. Riehle*

Paul J. Riehle (115199)
FAEGRE DRINKER BIDDLE & REATH LLP
4 Embarcadero Center, 27th Floor
San  Francisco, California 94111
Telephone:  (415) 551-7521
Facsimile:  (415) 551- 7510
paul.riehle@faegredrinker.com

*Attorneys for Defendant Accredited Surety and*
*Casualty Company, Inc.*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

52.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

## <u>ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)</u>

I, Beatriz Mejia, attest that concurrence in the filing of this document has been obtained from the other signatories.  Executed on June 12, 2020, in Berkeley, California.

*/s/ Beatriz Mejia*
Beatriz Mejia

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

53.

DEFENDANTS' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

**APPENDIX A**
**to Defendants' Motion to Dismiss**
**Plaintiffs' Second Consolidated Amended Class Action Complaint**

The following Appendix is provided to assist the Court in reviewing the deficiencies of Plaintiffs' allegations as to each of the Surety Defendants.

The numbering in this Appendix corresponds to the numbering in the "Timeline of Premium Rates Charged by Surety Defendants" and "Comparison of Surety Defendants' Preferred Premium Rates" contained in Appendix B that follows.[1]

Citations to Exhibits in this Appendix correspond to the Exhibits filed with Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss.

\* \* \*

1.  **American Surety Company – SCAC ¶¶ 156-165**

    - No allegations that American Surety acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past.

    - No allegations that it ever met with or communicated with any other defendant regarding premiums.

    - Alleged to be a member of ABC and non-party SFAA but not alleged to have had collusive communications regarding premiums through trade associations.

    - No allegations that it attended meetings sponsored by trade associations. Although it is alleged to be an "active participant" in various trade associations, there is no allegation that American Surety Company actually attended any meeting sponsored by a trade association. *See* SCAC ¶ 161.

    - No allegations that it required bail agents to post notices.

    - No allegations that it required bail agents to use specific forms.

    - No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers. It is only alleged that the bail agents were discouraged from offering rebates. *See* SCAC ¶ 162.

2.  **Allegheny Casualty Company – SCAC ¶¶ 166-179**

    - No allegations that Allegheny Casualty acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past.

    - No allegations that they ever met with or communicated with any other defendant regarding premiums or rebating,

    - Alleged to be members of ABC and non-party SFAA, but not alleged to have had collusive communications regarding premiums or rebating through trade associations.

---

[1] This also corresponds to the numbering the SCAC uses in its "Timeline of Standard Premium Rates Charged by Defendant Sureties." *See* SCAC ¶ 7.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

APPENDIX A TO DEFS.' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

A-1.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms, that bail agents ever posted rate charts in their offices, or that any customers ever saw or relied on a rate chart.

- No allegations that it prohibited their bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy. *See* ECF No. 91, Order Granting in Part and Denying in Part Motions to Dismiss (the "Order") at 24-25.

**3.  Accredited Surety and Casualty Company, Inc. – SCAC ¶¶ 202-212**

- No allegations that Accredited Surety and Casualty ("Accredited") acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past. Accredited "has been operating in California's bail bond market since on or around 1997." SCAC ¶ 202; *see also* Ex. 3. Accredited's use of a 10% rate pre-dated the alleged conspiracy by seven years. SCAC ¶ 202.

- In its only other bail bond rate filing in California, in 2010 Accredited filed for an 8% rate to be competitive regarding criminal defendants deemed more credit worthy and less of a risk:

  "This rule change adds additional factors that may enable applicants to qualify for Preferred rates. The rationale for adding these factors is that [Accredited] believes defendants with Private Counsel or defendants who are Union Members, Military, Senior Citizens, or provide collateral are less of a flight risk. [Accredited] *believes implementing this rule will enable [Accredited] to be more competitive in the marketplace.* Additionally, these factors are currently being used in the marketplace by both American Contractors Indemnity Company (filing 08-2395) and Banker's Insurance Company (filing 09-4748)." Ex. 2 at 1 (emphasis added).

- No statements attributed to Accredited.

- No allegations that it ever met with or communicated with any other defendant regarding fixing premiums or suppressing rebates.

- Not alleged to be a member of or involved with GSBAA or CBAA, and not alleged to have had collusive communications regarding fixing premiums or suppressing rebating through trade associations, or at, in advance of, or after any trade association meeting.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- The bail rate sheet referred to at SCAC ¶ 209 was filed with the CDI. *See* Ex. 1.

**4.  American Contractors Indemnity Insurance Company – SCAC ¶¶ 180-190**

- No allegations comparable to those the Court recognized other courts had relied on in finding an individual defendant joined and participated in a conspiracy (Order at 23-24 (citing *In re TFT-LCD* and *In re CRT* opinions)):

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

A-2.

**APPENDIX A TO DEFS.' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST**

- Unlike *TFT-LCD*, no allegations of *any* "illicit conspiratorial communications" between American Contractors and any defendant or third-party.

- Unlike *TFT-LCD*, no allegations of any "guilty pleas" by American Contractors for price-fixing.

- Unlike *TFT-LCD*, no allegations of any "group and bilateral meetings" in which American Contractors participated "by which the alleged price-fixing conspiracy was effectuated."

- Unlike *TFT-LCD*, no allegations of *any* "bilateral discussions between" American Contractors and any other defendant, and thus no allegations that such non-existent discussions "took the form of in-person meetings, telephoe calls, e-mails and instant messages."

- Unlike *TFT-LCD*, no allegations of "which types of meetings" American Contractors and the alleged co-conspirators "participated in," including "more detail such as the year of a meeting and other meeting participants."

- Unlike *CRT*, no allegations that American Contractors "participat[ed] in the alleged unlawful meetings and agreements" and no "estimated number of meetings [American Contractors] participated in, what sorts of agreements were reached, and in some cases what types of employees had represented defendants at the meetings."

- No allegations specific to American Contractors to suggest it knew about, agreed to, joined in, or participated in any conspiracy with respect to premiums or rebates. In particular:

  - No allegations that American Contractors acted any differently with respect to setting its premiums, preparing its rate filings, or its dealings with its bail agents, when the conspiracy was supposedly formed in 2004 than it had in the past.

  - No statements attributed to American Contractors.

  - No allegations that it ever met or communicated with any other defendant or alleged co-conspirator regarding premiums or rebates.

- No allegation other than mere membership in trade association:

  - American Contractors is alleged to be a member of two trade associations: ABC and non-party SFAA. Mere membership is all that is alleged. There are no allegations of any communications regarding premiums or rebating through these trade association memberships.

  - No allegations that American Contractors was even a member of or involved with GSBAA or CBAA, which are the trade associations that involve the bail agents who supposedly implemented the alleged conspiracy.

  - No allegations that American Contractors attended meetings sponsored by trade associations, or any meetings in which premium prices or rebating was discussed.

- No allegations of control or influence over bail agents' disclosures or conduct with respect to offering rebates:

  - No allegation that American Contractors exercised any control or oversight in any

Cooley LLP
Attorneys At Law
San Diego

A-3.

Appendix A to Defs.' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

way over what its bail agents disclosed to customers about rebates or premium prices or whether its bail agents offered rebates to customers.

- No allegations that American Contractors required its bail agents to post notices related to premiums.

- No allegations that American Contractors prohibited its bail agents from offering rebates.

- No allegations that American Contractors instructed or encouraged its bail agents not to discuss or disclose the possibility of rebates to customers.

5.   **Bankers Insurance Company – SCAC ¶¶ 191-201**

- No allegations that Bankers acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past.

- No statements attributed to Bankers.

- Alleged to be a member of ABC but not alleged to have had collusive communications regarding premiums through trade associations.

- Not alleged to be a member of or involved with GSBAA or CBAA.

- No allegations that it attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

6.   **Continental Heritage Insurance Company – SCAC ¶¶ 235-244**

- No allegations that Continental acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past.

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums through trade associations.

- Not alleged to be a member of or involved with GSBAA or CBAA.

- No allegations it attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

-  Continental charged customers who were sole signatories of their bonds a "high-risk" rate of 15% well above the 10% threshold; it also offered customers who were better credit risks "preferred" rates of eight, seven, and even six percent.  *See* Exs. 16, 18, 20.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

APPENDIX A TO DEFS.' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

A-4.

- Loss ratios were low because the bail "agent[s] themselves are obligated to . . . indemnify the surety against any losses." SCAC ¶ 109. That indemnification comes at a cost—Continental must pay bail agents hefty commissions to assume the risk of forfeiture. The same annual financial disclosures that Plaintiffs cite (*id.* ¶ 237) show that, in 2018, Continental earned $8,006,159 in gross bail premium in California but paid out $7,753,965 in agent commissions and premium taxes. *See* Ex. 52 at 14. As a result, the profit margin on Continental's bail business in California barely exceeded three percent.

**7. <u>Lexington National Insurance Corporation – SCAC ¶¶ 213-224</u>**

- No allegations that Lexington National acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past.

- No statements attributed to Lexington National; the website cited in the SCAC belongs to a non-defendant bail agent.

- Alleged to be a member of non-party SFAA and a "surety resource" for GSBAA but not alleged to have had collusive communications regarding premiums through trade associations.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to post notices.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy. *See* Order (ECF No. 91) at 24-25.

**8. <u>Seneca Insurance Company – SCAC ¶¶ 225-234</u>**

- No allegations that Seneca acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past.

- In 2005, only one year after the alleged conspiracy was supposedly formed, Seneca applied and was approved for an 8% rate that could be charged to qualified union members and in cases with private defense counsel. *See* Ex. 42. In 2007, Seneca applied and was approved for an 8% rate that could be charged to government employees (in addition to qualified union members and in cases with private defense counsel). *See* Ex. 41. In 2018, Seneca applied and was approved for an 8% rate that could be charged where the bond was fully secured with real property (in addition to qualified union members, cases with private defense counsel, and to government employees), and a 7% rate that could be charged to attorney referrals with full premium paid at the time of sale. *See* Ex. 40.

- No statements attributed to Seneca.

- No allegations that Seneca ever met with or communicated with any other defendant regarding fixing premiums or suppressing rebates.

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums or suppressing rebating through trade associations. Mere membership is alleged.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

APPENDIX A TO DEFS.' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

A-5.

- Not alleged to be a member of or involved with GSBAA or CBAA.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- The bail rate sheet referred to at SCAC ¶ 231 was filed with the CDI.  Exs. 40, 42.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25

**9.    Financial Casualty & Surety, Inc. – SCAC ¶¶ 267-277**

- Did not enter the market until 2005.

- Alleged to be a "surety resource" for GSBAA but not alleged to have had collusive communications regarding premiums through trade associations.

- No allegations it attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Allegations that Financial Casualty's rates did not reflect actuarial analysis, but instead was a "me too" filing does not plead price fixing.  SCAC ¶¶ 267-68.

- Financial Casualty & Surety's original rate filing when it entered the market included a 10% premium rate and an 8% preferred rate for attorney referred clients and union member defendants. In 2014, Financial Casualty & Surety filed rates specifically to clarify that rebates may be offered pursuant to California Proposition 103 (*see* Ex. 25), but the filing was rejected as incomplete.  Since 2018, Financial Casualty & Surety's rate filing has included a 10% fee and specification of the ability to offer rebates pursuant to California Proposition 103.  *See* Ex. 24 at 4 ("In accordance with California Proposition 103, the Bail Agent may offer rate rebates.").

**10.    Indiana Lumbermens Mutual Insurance Company – SCAC ¶¶ 278-288**

- Did not enter the market until 2005.

- No statements attributed to Indiana Lumbermens.

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums through trade associations.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

APPENDIX A TO DEFS.' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

A-6.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

**11.    International Fidelity Insurance Company – SCAC ¶¶ 166-179**

- No allegations that International Fidelity acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past.

- No allegations that they ever met with or communicated with any other defendant regarding premiums or rebating,

- Alleged to be member of ABC and non-party SFAA, but not alleged to have had collusive communications regarding premiums or rebating through trade associations.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms, that bail agents ever posted rate charts in their offices, or that any customers ever saw or relied on a rate chart.

- No allegations that it prohibited their bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

**12.    The North River Insurance Company – SCAC ¶¶ 299-307**

- Did not enter the market until 2006.

- In 2007, The North River applied and was approved for an 8% rate that could be charged to qualified union members, government employees, cases with private defense counsel, and cases where the bond was fully secured with real property. Ex. 36.  In 2012, The North River applied and was approved for a 7% rate that could be charged to attorney referrals with full premium paid at the time of sale.  Prior to being approved for the 7% rate, none of the other named Defendants had been approved for a 7% rate.  Ex. 35.

- No statements attributed to The North River.

- No allegations that The North River ever met with or communicated with any other defendant regarding fixing premiums or suppressing rebates.

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums or suppressing rebating through trade associations. Mere membership is alleged.

- Not alleged to be a member of or involved with GSBAA or CBAA.

- Not alleged to have attended meetings sponsored by trade associations

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- The bail rate sheet referred to at SCAC ¶ 306 was filed with the CDI. Exs. 36, 37.

Cooley LLP
Attorneys At Law
San Diego

A-7.

Appendix A to Defs.' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

13. <u>**United States Fire Insurance Company – SCAC ¶¶ 326-335**</u>

- Did not enter the market until 2006.

- In 2007, U.S. Fire applied and was approved for an 8% rate that could be charged to qualified union members, cases with private defense counsel, to government employees, and cases where the bond was fully secured with real property.  Ex. 48. In 2012, U.S. Fire applied and was approved for a 7% rate that could be charged to attorney referrals with full premium paid at the time of sale.  Prior to being approved for the 7% rate, none of the other named Defendants had been approved for a 7% rate.  Ex. 47.

- No statements attributed to U.S. Fire.

- No allegations that U.S. Fire ever met with or communicated with any other defendant regarding fixing premiums or suppressing rebates.

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums or suppressing rebating through trade associations. Mere membership is alleged.

- Not alleged to be a member of or involved with GSBAA or CBAA.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- The bail rate sheet referred to at SCAC ¶ 334 was filed with the CDI.  Ex. 49.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

14. <u>**Danielson National Insurance Company – SCAC ¶¶ 257-266**</u>

- Did not enter the market until 2008.

- Stopped writing bail bonds in 2013 (a fact Plaintiffs previously disputed).

- No statements attributed to Danielson.

- Not alleged to be a member of any trade association or group.

- No allegations it attended meetings sponsored by trade associations or that it attended any meetings at all.

- Not alleged to have had collusive communications regarding premiums or suppressing rebating through trade associations, or at, in advance of, or after any trade association meeting.

- No allegations that it ever met with or communicated with any other Defendant regarding

Cooley LLP
Attorneys At Law
San Diego

Appendix A to Defs.' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

A-8.

premiums, rebates or any other issue (other than Two Jinn, with which it had a legal contract, but even then there are no allegations as to any specific communications).

- No allegations that it agreed with any other Surety Defendants or Bail Agent Defendants to do anything.

- No allegations that it required bail agents to use specific forms.

- No allegations that it required bail agents to post notices.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Not even an allegation that it followed the rates of any other *Defendant* (the SCAC alleges Danielson adopted the rates of *non-party* Lincoln General Insurance Company). (*See* SCAC ¶ 257.)

- The bail rate sheet referred to at SAC ¶ 263 was filed with the CDI.  *See* Ex. 22.

- Any statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

**15.** **Sun Surety Insurance Company – SCAC ¶¶ 316-325**

- Did not enter the market until 2008.

- Alleged to be a member of ABC but not alleged to have had collusive communications regarding premiums through trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

**16.** **Lexon Insurance Company – SCAC ¶¶ 289-298**

- Did not enter the market until 2011.

- No longer in the market after 2014.  *See* SCAC ¶ 291 (noting that 2014 was "the last year for which Lexon reported national bail premium data to CDI").

- No statements attributed to Lexon.

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums through trade associations.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

Cooley LLP
Attorneys At Law
San Diego

Appendix A to Defs.' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

A-9.

1

**17.** <u>**Williamsburg National Insurance Company – SCAC ¶¶ 347-357**</u>

2

- Did not enter the market until 2011.

3

- Alleged to be a member of non-party SFAA and "Williamsburg National 'Bail Bonds'" is listed as a surety resource for GSBAA but not alleged to have had collusive communications regarding premiums through trade associations.

4

5

- Not alleged to have attended meetings sponsored by trade associations.

6

- No allegations that it required bail agents to use specific forms.

7

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

8

9

**18.** <u>**Seaview Insurance Company – SCAC ¶¶ 245-256**</u>

- Did not enter the market until 2012.

10

- Allegations regarding rates at market entry only show "follow the leader" pricing.

11

12

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums through trade associations or any other channel.

13

- Not alleged to have attended meetings sponsored by trade associations.

14

- No statements suggesting a conspiracy attributed to Seaview.

15

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

16

17

- The bail rate sheet referred to at SCAC ¶ 253 was filed with the CDI.  Ex. 39.

18

- Statements allegedly made by its bail agents are insufficient to allege its role in the alleged conspiracy.  *See* Order at 24-25.

19

20

**19.** <u>**Philadelphia Reinsurance Corporation – SCAC ¶¶ 308-315**</u>

21

- Did not enter the market until 2017.

- No statements attributed to Philadelphia.

22

- Not alleged to be a member of any trade organization or group.

23

- Not alleged to have attended meetings sponsored by trade associations.

24

25

- No allegations that it required bail agents to post notices.

- No allegations that it required bail agents to use specific forms.

26

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

27

28

Cooley LLP
Attorneys At Law
San Diego

A-10.

Appendix A to Defs.' Motion to Dismiss
Master Docket No. 19-cv-00717-JST

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**20.**    **Universal Fire & Casualty Insurance Company – SCAC ¶¶ 336-346**

- Did not enter the market until 2017.

- Alleged to be a member of non-party SFAA but not alleged to have had collusive communications regarding premiums through trade associations.

- Not alleged to have attended meetings sponsored by trade associations.

- No allegations that it required bail agents to use specific forms.

- No allegations that it prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

- Universal Fire & Casualty explained credit risk and reserves as to bail bond sureties; no allegations that statements are inaccurate.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

APPENDIX A TO DEFS.' MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

A-11.

## APPENDIX B

### Timeline of Premium Rates Charged by Surety Defendants



Key:

| | |
|---|---|
| 1 American Surety Co. | 8 Seneca Ins. Co. | 15 Sun Surety Ins. Co. |
| 2 Allegheny Casualty Co. | 9 Financial Casualty & Surety | 16 Lexon Insurance Co. |
| 3 Accredited Surety & Casualty Co., Inc. | 10 Indiana Lumbermens Mutual | 17 Williamsburg National |
| 4 American Contractors Indemnity Co. | 11 International Fidelity | 18 Seaview Ins. Co. |
| 5 Bankers Ins. Co. | 12 The North River Ins. Co. | 19 Philadelphia Reinsurance Corp. |
| 6 Continental Heritage Ins. Co. | 13 United States Fire Ins. Co. | 20 Universal Fire & Casualty Ins. Co. |
| 7 Lexington Nat'l | 14 Danielson Nat'l Ins. Co. | |

Legend:
- 15%
- 10%
- 9%
- 8%
- 7%
- 6%
- N/A

## Comparison of Surety Defendants' Preferred Premium Rates

| Surety | 8% Premium Rate | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Private Counsel | Union Member | AARP | Military | Senior Citizen | Full Payment of Premium | Collateral | Government | Employer Assistance | Student | Homeowner | Fixed Income | Native American | Law Enforcement | 7%* | 6% |
| 1 American Surety Co. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 2 Allegheny Casualty Co. | ✓ | ✓ | - | ✓ | - | ✓ | ✓ | - | - | - | - | - | - | ✓ | ✓ | - |
| 3 Accredited Surety & Casualty Co., Inc. | ✓ | ✓ | - | ✓ | ✓ | - | - | ✓ | - | - | - | - | - | - | - | - |
| 4 American Contractors Indemnity Co. | ✓ | ✓ | ✓ | - | - | - | - | ✓ | - | - | - | - | - | - | - | - |
| 5 Bankers Ins. Co. | ✓ | ✓ | ✓ | - | - | - | - | - | - | - | - | - | - | - | ✓ | - |
| 6 Continental Heritage Ins. Co. | ✓ | ✓ | - | ✓ | ✓ | ✓ | ✓ | - | - | - | - | - | - | ✓ | ✓ | ✓ |
| 7 Lexington Nat'l | ✓ | ✓ | - | ✓ | ✓ | - | - | - | - | - | - | - | - | ✓ | ✓ | - |
| 8 Seneca Ins. Co. | ✓ | ✓ | - | - | - | - | ✓ | ✓ | - | - | - | - | - | - | ✓ | - |
| 9 Financial Casualty & Surety | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 10 Indiana Lumbermens Mutual | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 11 International Fidelity | ✓ | ✓ | - | ✓ | - | ✓ | ✓ | - | - | - | - | - | - | ✓ | ✓ | - |
| 12 The North River Ins. Co. | ✓ | ✓ | - | - | - | - | ✓ | ✓ | - | - | - | - | - | - | ✓ | - |
| 13 United States Fire Ins. Co. | ✓ | ✓ | - | - | - | - | ✓ | ✓ | - | - | - | - | - | - | ✓ | - |
| 14 Danielson Nat'l Ins. Co. | ✓ | ✓ | - | ✓ | - | - | - | - | ✓ | - | - | - | - | - | - | - |
| 15 Sun Surety Ins. Co. | ✓ | ✓ | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 16 Lexon Insurance Co. | ✓ | ✓ | - | ✓ | - | - | - | ✓ | - | ✓ | ✓ | ✓ | ✓ | - | - | - |
| 17 Williamsburg National | ✓ | ✓ | - | - | - | - | ✓ | ✓ | - | - | - | - | - | - | - | - |
| 18 Seaview Ins. Co. | ✓ | ✓ | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 19 Philadelphia Reinsurance Corp. | ✓ | ✓ | ✓ | ✓ | - | - | - | - | - | - | - | - | - | - | - | - |
| 20 Universal Fire & Casualty Ins. Co. | ✓ | ✓ | - | - | - | - | ✓ | ✓ | - | - | - | - | - | - | - | - |

*Surety Defendants listed that offer 7% premium rates have varying qualifications for application of the 7% rate.