1  Dean M. Harvey (SBN 250298)
   Katherine Lubin (SBN 259826)
2  Yaman Salahi (SBN 288752)
   Adam Gitlin (SBN 317047)
3  Jallé Dafa (SBN 290637)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
4  275 Battery Street, 29th Floor
   San Francisco, CA 94111
5  Telephone: (415) 956-1000
   dharvey@lchb.com
6  kbenson@lchb.com
   ysalahi@lchb.com
7  agitlin@lchb.com
   jdafa@lchb.com
8
   *Interim Class Counsel*
9
   *(Additional counsel listed on signature page)*
10

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                         OAKLAND DIVISION

14

15  IN RE CALIFORNIA BAIL BOND          Master Case No. 4:19-CV-00717-JST
    ANTITRUST LITIGATION
16                                       **PLAINTIFFS' OPPOSITION TO
                                         DEFENDANTS' JOINT MOTION TO
17                                       DISMISS**
    THIS DOCUMENT RELATES TO:
18
    All Actions
19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ............................................................................................................ 1

II. BACKGROUND ............................................................................................................ 6

    A. The Consolidated Amended Complaint and the Court's Motion to Dismiss Order .............................................................................................................. 6

    B. The Second Consolidated Amended Complaint ................................................... 9

III. LEGAL STANDARD ..................................................................................................... 9

IV. ARGUMENT ................................................................................................................. 11

    A. Defendants Ignore Their Own Admissions Explaining Why the Conspiracy Was Necessary to Sustain Their Supracompetitive Prices ..................................... 11

    B. Defendants' Parallel Conduct ............................................................................... 14

        1. Defendants' Parallel Rate Filings ............................................................. 15

            a. For 14 Years, No Defendant Sought a Standard Premium Rate Below 10% ............................................................... 15

            b. Defendants' "Preferred" Rates Were Benchmarked to the Fixed "Standard" Rate ...................................................... 16

            c. Defendants Do Not Establish That "Average" Prices Declined, and Whether They Did Is Irrelevant ................... 19

            d. Defendants Vastly Overstate Variations in "Preferred" Rate Prices and Eligibility ...................................................... 20

        2. Defendants' Parallel Anti-Rebating Practices ........................................... 21

    C. The Alleged Plus Factors Enhance the Conspiracy's Plausibility ........................ 25

        1. Trade Associations and Opportunities to Agree ....................................... 26

        2. Defendants' Invitations to Agree .............................................................. 27

        3. Other Market Factors Suggesting Collusion ............................................. 29

            a. Extremely Low Loss Ratios ......................................................... 30

            b. High Barriers to Entry ................................................................. 33

            c. Homogeneity of Bail Bonds ........................................................ 34

            d. Inelastic Demand for Bail Bonds ................................................ 36

            e. Regularity of Bail Bond Sales ..................................................... 40

            f. Identical Production Costs ............................................................ 40

            g. High Concentration ...................................................................... 41

            h. Lack of Technological Change ..................................................... 42

            i. Easily-Detectable Defections ...................................................... 42

            j. Defendants Retaliated Against Cheaters ...................................... 43

    D. The SCAC Sufficiently Alleges the Participation of Each Defendant .................. 44

        1. The Surety Defendants .............................................................................. 44

        2. The Bail Agency Defendants .................................................................... 50

3. The Trade Association Defendants ........................................................... 52

    a. ABC Joined the Conspiracy ..................................................... 53

    b. GSBAA Joined the Conspiracy ................................................... 56

4. The Individual Defendants ......................................................... 58

E. Plaintiffs State a Claim Under the UCL .......................................... 59

V. CONCLUSION ............................................................................. 60

# TABLE OF AUTHORITIES

**Page**

## Cases

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ............................................................................................................... 10

*AT&T Mobility LLC v. AU Optronics Corp.,*
707 F.3d 1106 (9th Cir. 2013) .............................................................................................. 59

*Bates v. State Bar of Ariz.,*
433 U.S. 350 (1977) ............................................................................................................... 22

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ............................................................................................. 2, 8, 10, 44

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n,*
620 F.2d 1360 (9th Cir. 1980) ........................................................................................ 50, 55

*Brown v. Pro Football, Inc.,*
518 U.S. 231 (1996) ............................................................................................................... 28

*Buller v. Sutter Health,*
160 Cal. App. 4th 981 (2008) ............................................................................................... 23

*CDC Technologies, Inc. v. IDEXX Laboratories, Inc.,*
7 F. Supp. 2d 119 (D. Conn. 1998) ................................................................................. 33, 34

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
370 U.S. 690 (1962) ....................................................................................................... passim

*Denny's Marina, Inc. v. Renfro Prods., Inc.,*
8 F.3d 1217 (7th Cir. 1993) .......................................................................................... 5, 22, 48

*Donaldson v. Read Mag.,*
333 U.S. 178 (1948) ............................................................................................................... 23

*E.I. du Pont de Nemours & Co. v. F.T.C.,*
729 F.2d 130 (2d Cir. 1984) ................................................................................................. 39

*Esco Corp. v. United States,*
340 F.2d 1000 (9th Cir. 1965) .............................................................................................. 59

*FTC v. H.J. Heinz Co.,*
246 F.3d 708 (D.C. Cir. 2001) .............................................................................................. 41

*Graham v. VCA Antech, Inc.,*
No. 2:14-cv-08614-CAS-JC, 2016 WL 5958252 (C.D. Cal. Sept. 12, 2016) .......................... 24

*Hadley v. Kellogg Sales Co.,*
273 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................................................ 51

*Home Depot, U.S.A., Inc. v. E.I. DuPont de Nemours & Co.,*
No. 16-cv-04865-BLF, 2019 WL 3804667 (N.D. Cal. Aug. 13, 2019) .................................... 29

*In re Animation Workers Antitrust Litig.,*
123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................................................................ 50

*In re Broiler Chicken Antitrust Litig.,*
290 F. Supp. 3d 772 (N.D. Ill. 2017) .................................................................................... 25

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
738 F. Supp. 2d 1011 (N.D. Cal. 2010) .......................................................................... 41, 47

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  MDL No. 1917, 2014 WL 1091095 (N.D. Cal. Mar. 13, 2014) ............................................... 54

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999) ................................................................................................ 55

*In re Domestic Airline Travel Antitrust Litig.*,
  221 F. Supp. 3d 46 (D.C. Cir. 2015) ...................................................................................... 28

*In re Flash Memory Antitrust Litig.*,
  643 F. Supp. 2d 1133 (N.D. Cal. 2009) ................................................................. 19, 33, 41, 44

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) ....................................................................................... 19, 25, 34

*In re German Auto. Manufacturers Antitrust Litig.*,
  No. MDL 2796 CRB (JSC), 2019 WL 2509771 (N.D. Cal. June 17, 2019) ........................... 55

*In re Gilead Scis. Sec. Litig.*,
  536 F.3d 1049 (9th Cir. 2008) ................................................................................................ 11

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ..................................................................... 18, 55, 59

*In re Graphics Processing Units Antitrust Litig.*,
  540 F. Supp. 2d 1085 (N.D. Cal. 2007) .................................................................................. 30

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) .......................................................................................... passim

*In re High-Tech Emp. Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ..................................................................... 10, 14, 22

*In re Indus. Diamonds Antitrust Litig.*,
  167 F.R.D. 374 (S.D.N.Y. 1996) ............................................................................................ 17

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 309192 (N.D. Cal. Jan. 21, 2014) ................................ 33, 41

*In re Lithium Ion Batteries Antitrust Litig.*,
  No. 13-MD-2420 YGR, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ..................................... 14

*In re LTL Shipping Services Antitrust Litigation*,
  No. 1:08-MD-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009) ................................. 39, 40, 41

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ............................................................................................ 8, 25

*In re Nat'l Ass'n of Musical Instruments & Equip. Antitrust Litig.*,
  09-cv-2002, 2012 WL 3637291 (S.D. Cal. Aug. 20 2012) ...................................................... 55

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) ........................................................................................... 10, 26

*In re Rubber Chems. Antitrust Litig.*,
  232 F.R.D. 346 (N.D. Cal. 2005) ............................................................................................ 17

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ...................................................................... 33, 34, 41

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  No. 07-md-01819 CW, 2010 WL 5071694 (N.D. Cal. Dec. 7, 2010) ...................................... 19

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010)................................................................ 11, 42

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ............................................ passim

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
599 F. Supp. 2d 1179 (N.D. Cal. 2009) .................................................. 47

*In re Titanium Dioxide Antitrust Litig.*,
959 F. Supp. 2d 799 (D. Md. 2013) .................................................. passim

*Int'l Healthcare Mgmt. v. Haw. Coal. for Health*,
332 F.3d 600 (9th Cir. 2003)................................................................... 57

*Jones v. Micron Technology, Inc.*,
400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................ 35, 36

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
190 F.3d 775 (7th Cir. 1999)................................................................... 42

*Kelsey K. v. NFL Enters., LLC*,
254 F. Supp. 3d 1140 (N.D. Cal. 2017) .................................................. 18

*Kendall v. Visa USA, Inc.*,
518 F.3d 1042 (9th Cir. 2008)............................................................ 46, 47

*Kleen Prods., LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ...................................................... 39

*Kleen Prods., LLC v. Int'l Paper*,
775 F. Supp. 2d 1071 (N.D. Ill. 2011) .................................................... 39

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005)................................................. 10, 12, 31, 57

*Krehl v. Baskin-Robbins Ice Cream Co.*,
No. CV 76-1797-DWW, 1979 WL 1662 (C.D. Cal. Aug. 7, 1979), *aff'd*, 664 F.2d 1348 (9th
Cir. 1982) ............................................................................................... 18

*Kwikset Corp. v. Sup. Ct.*,
51 Cal.4th 310 (2011) ............................................................................ 60

*Levine v. Blue Shield of Cal.*,
189 Cal. App. 4th 1117 (2010) ............................................................... 23

*Lifewatch Servs. Inc. v. Highmark Inc.*,
902 F.3d 323 (3d Cir. 2018)................................................................... 43

*Lubic v. Fidelity Nat'l Fin., Inc.*,
No. C08-0401 MJP, 2009 WL 2160777 (W.D. Wa. July 20, 2009)........................ 18

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008)................................................................. 10

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ............................................................................... 22

*Murphy Tugboat Co. v. Crowley*,
658 F.2d 1256 (9th Cir. 1981)................................................................. 58

*Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*,
467 F. Supp. 841 (N.D. Cal. 1979) ........................................................... 58

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
435 U.S. 679 (1978) .................................................................... 12, 22

*Oliver v. SD-3C LLC*,
No. 11-cv-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) ................... 32

*People v. Wahl*,
39 Cal. App. 2d Supp. 771 (1940) ............................................................. 23

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
279 F.2d 128 (9th Cir. 1960) ............................................................. 3, 17

*Poller v. Columbia Broad. Sys., Inc.*,
368 U.S. 464 (1962) ............................................................................. 47

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
971 F.2d 37 (7th Cir. 1992) .................................................................... 39

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ............................................................. 26, 41

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ...................................................... 10, 24, 44

*Sterling Drug, Inc. v. FTC*,
741 F.2d 1146 (9th Cir. 1984) .................................................................. 51

*Todd v. Exxon Corp.*,
275 F.3d 191, 209 (2d Cir. 2001) .............................................................. 34

*United States v. Container Corp. of Am.*,
393 U.S. 333 (1969) ....................................................................... 34, 36

*United States v. Gasoline Retailers Ass'n, Inc.*,
285 F.2d 688 (7th Cir. 1961) .......................................................... 5, 22, 48

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940) ............................................................................. 17

*Workman v. State Farm Mut. Auto. Ins. Co.*,
520 F. Supp. 610 (N.D. Cal. 1981) ............................................................ 18

*Zoslaw v. MCA Distrib. Corp.*,
693 F.2d 870 (9th Cir. 1982) ................................................................... 18

**Statutes**

10 C.C.R. § 2275 ................................................................................ 33

15 U.S.C. § 1 ..................................................................................... 7

Cal. Bus. & Prof. Code § 16720 ................................................................. 7

Cal. Bus. & Prof. Code § 17200 ................................................................. 7

Cal. Ins. Code § 1800(a) ....................................................................... 33

**Other Authorities**

ABA, *Econometrics: Legal, Practical, and Technical Issues*
354 (2d ed. 2014) ............................................................................................ 17

ABA, *Model Jury Instructions in Civil Antitrust Cases*
31 (2016 Ed.) ........................................................................................... passim

Andrew M. Rosenfield, *The Use of Economics in Antitrust Litigation and Counseling*,
1986 Colum. Bus. L. Rev. 49 (1986) .............................................................. 43

Cal. Dep't of Just. Crim. Just. Stat. Ctr., *Crime in California*, (2019) .......................................... 20

F.M. Scherer, *Industrial Market Structure and Economic Performance* (2d ed. 1980) ................ 29

George A. Hay & Daniel Kelley, *An Empirical Survey of Price Fixing Conspiracies*,
17 J.L. & Econ. 13 (1974) .................................................................................. 29

Michael K. Vaska, *Conscious Parallelism and Price Fixing: Defining the Boundary*,
52 U. Chi. L. Rev. 508 (1985) ........................................................................... 29

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2016 ed.) ..................................... passim

Richard Posner, *Antitrust Law: An Economic Perspective* (1976) ................................. 30

U.S. Dep't of Just. and the Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ...... passim

William E. Kovacic, *Antitrust Analysis of Joint Ventures and Teaming Arrangements Involving Government Contractors*,
58 Antitrust L.J. 1059 (1990) .......................................................................... 42

## I.    __INTRODUCTION__

The Court's April 13, 2020 order granting in part and denying in part Defendants' earlier motions to dismiss ("MTD Order"; ECF No. 91) rejected nearly every argument Defendants advanced.  The Court held that Defendants are not immune from the antitrust laws, Plaintiffs pled a plausible antitrust conspiracy to fix the prices of bail bonds in California, and Plaintiffs' pre-2015 claims are not barred by the statute of limitations.  MTD Order at 8-23, 29-33.[1]  With respect to particular Defendants, the Court sustained the antitrust claims against the California Bail Agents Association, William B. Carmichael, and Jerry Watson.  *Id.* at 26-28.  For the remaining Defendants, the Court granted leave to amend to permit Plaintiffs to "include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy." *Id.* at 23 (quoting *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008)).  Thus, the only remaining issue for the Court to resolve is whether the Second Consolidated Amended Complaint ("SCAC", ECF No. 94) provides those allegations.  It does.

While the prior complaint relied to a substantial degree on group pleading, with many Defendants named "only in the caption and list of parties," (MTD Order at 23), the SCAC carefully delineates the allegations Defendant-by-Defendant, and adds significantly more detail and factual context, both with respect to Defendants' alleged parallel conduct, and to the plus factors the Court previously recognized were sufficient to plead an antitrust conspiracy.

Defendants essentially ignore this last remaining issue, in a tacit admission that the SCAC provides the additional detail and clarity the Court sought.  Instead, Defendants' new motion to dismiss (ECF No. 112) attempts to relitigate the plausibility of the conspiracy, using many of the same arguments the Court has already rejected.  This is nothing more than an improper and meritless request for reconsideration.  *See* L.R. 7-9.  Defendants misinterpret or ignore the MTD Order, essentially asking the Court to discard it and start over.  But the Court has already held that Plaintiffs sufficiently allege a conspiracy to fix the prices of bail bonds in California.  MTD Order at 19-23.  This was based upon parallel conduct and plus factors.  Defendants' parallel conduct was: (1) to file standard rates of 10%; and (2) to suppress rebating, by misleading consumers to

---

[1]  Pincites to documents filed on the Court's docket follow the ECF-stamped pagination.

believe that prices could not fall below the approved rates. *Id.* at 20-22. The Court also identified three plus factors that "courts have found, taken in context, tend to suggest conspiracy": (1) participation in trade associations, providing opportunities to agree; (2) public invitations to agree; and (3) a market susceptible to price-fixing. *Id.* at 22. The Court concluded that "Plaintiffs allege all three of these plus factors." *Id.* Together with the parallel conduct, the Court concluded "these factors 'raise[] a suggestion of preceding agreement.'" *Id.* at 23 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

The SCAC alleges the same parallel conduct and the same plus factors. The differences are that the SCAC alleges further detail to the parallel conduct and plus factors previously alleged, and methodically applies them to each individual Defendant, remedying the deficiencies the Court identified. Defendants do not seriously dispute this, nor can they. With respect to parallel conduct, Defendants argued in the first round of motions to dismiss that the Consolidated Amended Complaint ("CAC", ECF No. 46) was deficient because it did "not allege even a single Defendant's approved premium or the premiums Plaintiffs themselves paid," nor "when CDI approved Defendant's premium[.]" ECF No. 56 at 30. To ensure that there would be no doubt that each Defendant has "fair notice of what the . . . claim is and the grounds upon which it rests," ECF No. 91 at 21 (quoting *Twombly*, 550 U.S. at 555), the SCAC specifies each and every standard premium Defendants submitted and CDI approved, when those premiums were charged and by whom throughout the entire Class Period, as well as the premiums that Plaintiffs themselves paid. SCAC ¶¶ ¶ 7, 47-48, 158, 169, 181, 192, 204, 215, 226, 236, 246-247, 259, 267-269, 279, 290, 300, 309, 317, 327, 337, 348. The result is undeniable: the Surety Defendants almost universally filed "standard" premium rates of 10%.

The SCAC's allegations regarding rebating practices are just as rock solid and Defendant-specific. Earlier, Defendants complained: "While the CAC has some examples of advertisements referencing premium rates, those statements were made by bail agents who are not Defendants." ECF No. 56 at 31. Again, to avoid any question, the SCAC provides abundant examples of notices that individual Surety Defendants required their agents to post in their retail offices, and other remarkably uniform misrepresentations and omissions. *E.g.*, *id.* ¶¶ 8, 162, 174-76, 185-87,

1  196-98, 208-09, 219-21, 230-31, 240-41, 251-53, 262-66, 273-77, 283-85, 293-94, 303-04, 312,
2  320-21, 331-32, 340-41, 353-54.

3      Cornered, Defendants resort to misstatement and distraction. Defendants falsely assert

4  that the SCAC's detailed allegations regarding premiums are nothing more than a "cherry

5  pick[ed]" "single data point." ECF No. 112 at 15, 22, and 28. This is flat wrong. The SCAC's

6  premium allegations cover every Surety Defendant's "standard" premium rate, throughout the

7  entire 16-year Class Period. To do this, Plaintiffs combed through the very same rate filings the

8  Defendants filed with their motion. ECF No. 111-1, Exs. 1-51. Indeed, Defendants' own

9  premium rate chart matches Plaintiffs' in this regard. *Compare* ECF No. 112 at 72 *with* SCAC ¶

10  7. The two charts even use the same color—red—to show that each Surety Defendant charged

11  the same "standard" 10% rate. (There are only minor and immaterial differences regarding the

12  market entry dates for International Fidelity, Seaview, and Philadelphia Reinsurance, and market

13  exit dates for Danielson National and Lexon.)

14      Unable to deal with these facts, Defendants throw out a red herring, contending that the

15  market for bail bonds in California was somehow "dynamic and competitive" because of

16  "preferred" rates that Defendants offered to only certain categories of consumers. ECF No. 112

17  at 10. But, as explained below, Defendants severely exaggerate the extent of variation among

18  them in their preferred rate levels and qualification criteria. Further, Defendants repeatedly

19  assert, often in bolded italics, that "the average premium rate has decreased" during the Class

20  Period. *Id.* at 10, 15, 22, 25-27. But Defendants provide **zero** support for this. To calculate the

21  average premium rate, one must know how many transactions occurred at each rate level.

22  Defendants provide no transaction data, even in summary form. (That is what discovery is for,

23  and Defendants refuse to participate in discovery.) In any event, under settled law, it is no

24  defense to price-fixing that co-conspirators did not eliminate all competition among them. *See*

25  *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) ("The fact

26  that there existed competition of other kinds between the various [defendants] . . . is irrelevant."); 

27  ABA, *Model Jury Instructions in Civil Antitrust Cases* 31 (2016 Ed.) ("ABA Model Jury

28  Instructions") ("[I]t is no defense that defendants actually competed in some respects with each

other or failed to eliminate all competition between them."). Defendants' unsupported and improper factual assertions are irrelevant to whether they colluded to fix the benchmark "standard" rate of 10%.

Defendants' argument on this point also contradicts Defendants' later, equally erroneous, contention that the Court should expect supracompetitive uniform prices and nearly identical misleading advertisements, as a "natural" consequence of interdependent pricing in a concentrated market. ECF No. 112 at 31-36. But the market for bail bonds in California cannot be both "dynamic and competitive," *id.* at 10, and "naturally . . . result in both parallel pricing and comparatively low levels of price competition," *id.* at 34-35. This is not just wrong, it is incoherent. Defendant Carmichael got it right: Defendants' sustained parallel conduct was made possible by Defendants "work[ing] collectively to repel" the forces of "simple economics." SCAC ¶ 87.

With respect to rebating, Defendants concede that the SCAC contains many specific and nearly identical examples of Defendants telling their consumers that their unlawfully inflated rates "must be charged," while omitting that bail agents may offer lower prices, and otherwise misleading consumers to believe that lower prices are unavailable, even criminal. Defendants respond by arguing that there was nothing wrong with these statements, because they "accurately reflect California law[.]" ECF No. 112 at 40. But even assuming for the sake of argument that these misleading or false statements are lawful on their own, Defendants ignore that the Court already found that "these allegations suffice to show parallel conduct in the form of similarly allegedly misleading statements about Defendants' ability to offer rebates." MTD Order at 21. Defendants provide no basis for the Court to reconsider this conclusion. This is not a consumer case in which Plaintiffs bring a claim for misleading advertising. This is an antitrust case in which Plaintiffs allege that Defendants colluded to suppress rebates by, among other things, eliminating a critical category of advertising: anything even suggesting that rebates, and lower prices, are available. Agreements to eliminate a form of advertising are per se unlawful under the antitrust laws, regardless of whether the agreed-upon message to consumers is or is not misleading under consumer protection laws. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2023b3

(2016 ed.) ("A naked or nearly naked agreement prohibiting rivals from advertising truthful and nonmisleading information about their prices is unlawful per se.") ("*Areeda*"); *see also Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1221 (7th Cir. 1993) ("Concerted action by dealers to protect themselves from price competition by discounters constitutes horizontal price-fixing" "notwithstanding the apparent lack of an explicit agreement to set prices." (citations omitted)); *United States v. Gasoline Retailers Ass'n, Inc.*, 285 F.2d 688, 691 (7th Cir. 1961) (agreement to restrict advertisements of gasoline prices or offers of premiums was per se unlawful).

Defendants' arguments regarding plus factors take the same approach: misstate or ignore what the SCAC actually says, and repeat the same arguments the Court rejected in its MTD Order. The Court already found that Plaintiffs adequately alleged all three relevant plus factors: (1) participation in trade associations; (2) public invitations to agree; and (3) a market susceptible to price-fixing. MTD Order at 22. At the outset, Defendants construct a straw man by pretending that the first two plus factors do not exist. ECF No. 112 at 9 (The SCAC "asks this Court to infer a conspiracy to fix premium rates solely based on a generalized theory of the alleged bail bond market."). Of course, the SCAC includes the same allegations regarding trade associations and public invitations to agree on which the Court previously relied. SCAC ¶¶ 100, 127-29, 131-34, 137-42, 143-150, 151-54. The SCAC goes further, detailing: (1) more invitations to agree, (2) trade association participation by each Defendant, and (3) signals of acceptance. *E.g.*, SCAC ¶¶ 364 and 368-69 (Defendant Watson, Vice President of Defendant AIA and Senior Counsel and Board Member of Defendant American Bail Coalition: "Price-cutting is a form of cancer in the bail industry" and those who do not cut prices are "the good guys"), 268 (Defendant Financial Casualty & Surety, Inc.: filing the fixed 10% standard rate, admitting there "is no actuarial justification for bail bond rates filed by any insurance company writing bail bond surety," and stating: "[n]ew insurance company rate filings for bail bonds surety [at the 10% rate]. . . are essentially 'ME TO[O]' filings").

With respect to the third plus factor—a market susceptible to price-fixing—the SCAC includes the same allegations the Court previously found to support an inference of conspiracy.

Namely, "increasing supply and waning demand" (MTD Order at 22; *see* SCAC ¶ 125 (describing phenomenon of "long-term reduction in demand")); and regulatory and networking barriers to entry (MTD Order at 22; *see* SCAC ¶¶ 82-4). The SCAC goes further and adds additional market factors that Courts and antitrust enforcers have found to facilitate collusion, and applies them to each Defendant. SCAC ¶¶ 67-118. The Court also noted that Plaintiffs previously alleged "market factors that suggest the presence of price fixing, such as an unusually low loss ratio, [] and competition on factors other than price[.]" MTD Order at 22-23. The SCAC goes into much further detail with respect to these factors, Defendant-by-Defendant. For instance, the SCAC provides specific year-by-year allegations regarding each Surety Defendant's loss ratios. SCAC ¶¶ 103, 159-60, 170-171, 182-183, 193-194, 205-206, 216-217, 227-228, 237-238, 248-249, 260-261, 270-271, 280-281, 291, 301, 310-311, 318, 323, 328-329, 338, 349-350. In response, Defendants again pretend the MTD Order never happened, and argue that loss ratios are irrelevant. ECF No. 112 at 10, 14, 28-31, 65. This is precisely the same argument Defendants made in their last motion to dismiss (ECF No. 56 at 35), and that the Court considered and rejected (MTD Order at 22-23).

However they try, Defendants cannot change the fact that, after the MTD Order, the only remaining issue is whether the SCAC addresses each Defendant's role in the alleged conspiracy to fix the prices of bail bonds in California. The SCAC does exactly that. Defendants' motion should be denied and the Court should lift the discovery stay.

## II. BACKGROUND

### A. The Consolidated Amended Complaint and the Court's Motion to Dismiss Order

On June 13, 2019, Plaintiffs filed a Consolidated Amended Complaint ("CAC"), ECF No. 46, alleging Defendants conspired to fix the prices of bail bonds in California. Defendants included twenty-two bail sureties, two bail agencies, three trade associations, and two individuals who served as senior executives for various defendant organizations (together, "Defendants"). *Id.* ¶¶ 13-45. Plaintiffs alleged Defendants conspired "to keep default premium rates fixed at 10%, advertise them as legal minimums, and prevent discounting or rebating as much as possible." *Id.*

¶ 65.

Plaintiffs brought the action on behalf of themselves as well as a proposed class of individuals who "paid for part or all of a commercial bail bond premium in connection with a California state court criminal proceeding" between February 24, 2004 and the present. *Id.* ¶ 47. The CAC alleged violations of (1) Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) the Cartwright Act, Cal. Bus. & Prof. Code § 16720; and (3) California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq. *Id.* ¶¶ 126-55. On July 15, 2019, Defendants filed a joint motion to dismiss the CAC. ECF No. 56. A subset of Defendants filed a separate consolidated motion to dismiss the CAC. ECF No. 58.

On April 13, 2020, the Court denied both motions in part. MTD Order. Defendants contended they were allowed to price-fix bail bonds with impunity because the antitrust laws did not apply to them. The Court rejected these arguments, and found that Defendants were subject to the Cartwright Act for colluding to submit uniform standard rates with the California Department of Insurance, and that Defendants were subject to both the Sherman Act and Cartwright Act for colluding to suppress rebating off of those rates. *Id.* at 19-20. Defendants also argued that the alleged conspiracy was implausible. The Court rejected this argument as well, and held that the CAC adequately alleged an antitrust conspiracy. *Id.* at 17-18. The Court noted that Plaintiffs alleged two types of parallel conduct: (1) filing uniform maximum premium rates with the California Department of Insurance ("CDI"), and (2) preventing rebates on bail bonds. *Id.* at 19.

As to the first category of parallel conduct, Plaintiffs alleged the surety Defendants nearly uniformly filed for a default premium rate of 10%. MTD Order at 19. The Court concluded: "These facts, taken together, sufficiently allege that Defendants engaged in parallel conduct by filing for uniform premium rates." *Id.* at 19-20.

As to the second category of parallel conduct, Plaintiffs alleged that since 2004, when *Pacific Bonding Corp. v. John Garamendi*, No. GIC815786 (Cal. Super. Ct. Feb. 24, 2004) clarified that rebates were permissible, Defendants did not advertise rebates but instead misled consumers into thinking that the approved rates were the legally required price. MTD Order at

20. Plaintiffs also alleged multiple examples of Defendants' misrepresentations regarding their ability to offer rebates. *Id*. The Court held that "[t]aken together, these allegations suffice to show parallel conduct in the form of similar allegedly misleading statements about Defendants' ability to offer rebates." *Id*. at 21.

The Court further found that Plaintiffs sufficiently alleged "plus factors," or factors that are "largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." MTD Order at 22 (citing *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015)). Those plus factors included: (1) meetings hosted by trade association Defendants which provided opportunities for Defendants to create and maintain the conspiracy; (2) statements by individual Defendants that could "plausibly be interpreted as inviting cooperation to prevent rebating"; (3) market factors that "create a susceptibility to price fixing, such as increasing supply and waning demand . . . as well as regulatory and networking barriers to entry"; and (4) market factors that suggest price fixing such as unusually low loss ratios and competition on elements other than price. *Id*. at 22-23. The Court held that these plus factors, together with "Plaintiffs' allegations of uniform filing and parallel decisions not to offer rebates and to misrepresent the availability of discounts," created a plausible inference of a "preceding agreement." *Id*. (citing *Twombly*, 550 U.S. at 556). Further, the Court concluded that because Plaintiffs sufficiently alleged a Sherman Act and Cartwright Act claim, Plaintiffs had "sufficiently stated a UCL claim." *Id*. at 29.

Defendants also argued Plaintiffs failed to allege sufficient facts regarding how each Defendant joined the conspiracy. MTD Order at 23. The Court rejected this argument as to three Defendants. *Id*. at 26-28. The Court held Plaintiffs sufficiently alleged trade association Defendant California Bail Agents Association ("CBAA") participated in the conspiracy because it (1) maintained information regarding the premiums Defendants charged in order to prevent discounting, (2) asserted on its webpage that bail agents must charge the same rate, and (3) referenced a book that explained the standard rate in California is 10%. *Id*. at 26-27.

The Court also held Plaintiffs sufficiently alleged that the individual Defendants, William Carmichael and Jerry Watson, participated in the conspiracy. MTD Order at 28. Plaintiffs

alleged Carmichael and Watson approved and ratified the anticompetitive conduct of their companies and made multiple statements regarding their participation in the conspiracy. *Id*. at 27-28. Watson discussed the bail industry's low loss ratio and asserted that rebating is a "cancer." *Id*. at 28. Carmichael advised sureties on the important role they must play in protecting the bail market and warned that price competition would end the bail bond business unless Defendants worked together to suppress it. *Id*. The Court concluded that these statements, taken together with Carmichael and Watson's ratification of the anticompetitive conduct of their companies, were sufficient to allege their participation in the conspiracy. *Id*.

In addition, Defendants argued that Plaintiffs' pre-2015 claims are barred by the statute of limitations. MTD Order at 29. The Court disagreed. *Id*. at 29-31 and 32-33.

Last, the Court held that the CAC lacked sufficient allegations regarding the role that the remaining Defendants played in the conspiracy. In particular, the Court granted Plaintiffs leave to amend the CAC to provide additional allegations regarding the surety, bail bond, and trade association Defendants American Bail Coalition Inc. ("ABC") and Golden State Bail Agents Association ("GSBAA"). MTD Order at 24-27. For the surety Defendants, the Court noted that Plaintiffs made several allegations about them as a group but did not disaggregate the allegations as to each particular surety. *Id*. at 24-25. For the two bail bond Defendants, Two Jinn d/b/a Aladdin Bail Bonds and All-Pro, the Court requested additional allegations regarding their role in the conspiracy. *Id*. at 26. Last, the Court granted Plaintiffs leave to add further allegations regarding each of the two remaining trade association Defendants, ABC and GSBAA. *Id*. at 27.

## B. The Second Consolidated Amended Complaint

On May 13, 2020, Plaintiffs filed their Second Consolidated Amended Complaint ("SCAC"). ECF No. 94. In light of the Court's guidance, Plaintiffs reorganized the previous allegations for clarity, added substantial additional facts regarding parallel conduct and plus factors, and specified how each individual Defendant joined the parallel conduct and how the plus factors apply to them, resulting in a plausible inference that they joined the conspiracy.

## III. LEGAL STANDARD

Dismissal under Federal Rule of Civil Procedure 12(b)(6) "is appropriate only where the

complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." MTD Order at 7-8 (quoting *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008)).  A complaint need not contain detailed factual allegations.  Plaintiffs must simply plead "enough to raise a right to relief above the speculative  level."  *Id.* at 8 (quoting *Twombly*, 550 U.S. at 555).  "To survive a motion to dismiss, a  complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is  plausible on its face.'"  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at  570)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the  court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

In reviewing a motion to dismiss, a court must "accept all factual  allegations in the complaint as true and construe the pleadings in the light most favorable" to the plaintiff.  MTD Order at 8 (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005)).  To support a reasonable inference of an unlawful antitrust conspiracy, a complaint's allegations of parallel conduct need only be accompanied by a factual context sufficient to "nudg[e] th[e] claims across the line from conceivable to plausible . . . ."  *Twombly*, 550 U.S. at 570.  A court should not "indulge antitrust defendants who move to dismiss by tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . ."  MTD Order at 19 (quoting *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012)).  Indeed, "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole . . . ."  *Id.  See also Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 933 F.3d 1136, 1152 (9th Cir. 2019) (same).

Moreover, "[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [a] plaintiff, both of which are plausible, [a] plaintiff's complaint survives a motion to dismiss . . . [unless the] defendant's plausible alternative explanation is so convincing that [the] plaintiff's explanation is implausible."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "[S]o long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the

1  plaintiff's case can be rejected on evidentiary grounds." *In re Gilead Scis. Sec. Litig.*, 536 F.3d

2  1049, 1057 (9th Cir. 2008).  *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629

3  (7th Cir. 2010) (complaint need only establish a "nonnegligible probability that the claim is

4  valid").

5  **IV.  ARGUMENT**

6       The bulk of Defendants' motion essentially asks the Court to re-consider and reverse its

7  holding that Plaintiffs have alleged a plausible price-fixing conspiracy.  Sections IV.A to IV.C,

8  *infra*, explain why the Court should stand by its prior order.  Section IV.A summarizes allegations

9  in the SCAC which Defendants ignore: the blue print and motive for the Conspiracy, in

10  Defendants' own words.  These admissions provide the critical context through which to interpret

11  and understand the parallel conduct (Section IV.B) and plus factors (Section IV.C).  Looking at

12  the SCAC as a whole, the alleged conspiracy is, at the very least, plausible.  Section IV.D

13  explains why the SCAC sufficiently alleges the participation of each Defendant, and Section IV.E

14  explains why Plaintiffs state a UCL claim.

15       **A.       Defendants Ignore Their Own Admissions Explaining Why the Conspiracy**
16                **Was Necessary to Sustain Their Supracompetitive Prices**

17       The ringleaders of the conspiracy—Defendants William Carmichael, CEO of Defendant

18  American Surety Company (ASC) and Chairman of Defendant American Bail Coalition (ABC),

19  and Jerry Watson, Vice President of Defendant AIA Holdings, Inc. ("AIA") (of which

20  Defendants Allegheny Casualty Company and International Fidelity Insurance Company are

21  members) and Senior Counsel and Board Member of Defendant ABC—candidly explained why

22  the conspiracy was needed and how it was to be carried out.  Carmichael urged the Surety

23  Defendants to "work collectively" to "repel" "premium discounting [that] will result in the end of

24  the bail bond business as we know it, to be replaced by a new model that properly reflects the

25  proper balance of risk and reward. ***Simple economics dictates it.***"  SCAC ¶¶ 86-87 (emphasis

26  added).  According to Carmichael, price competition "in the form of discounts" was a "fool's

27  game" because it meant "[l]eaving profit on the table." *Id.*  ¶ 87.  This "fool's game," however, is

28  what the antitrust laws require: competition without unlawful "agreement[s] that interfere[] with

the setting of price by free market forces . . . ." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978) (quotation and citation omitted).

Defendant Watson also played a lead role in the conspiracy, deriding "price-cutting" as a "cancer" and "sickness" through AIA's own website. SCAC ¶ 368. As Watson recognized, "everybody is looking for a deal" on bail bonds, but the bail industry should not give in because "just like when cancer spreads, price-cutting leaves behind pockets of inertia where life is no longer present." *Id.* He urged the industry to offer "exceptional service" instead of compete on price. *Id.* ¶ 369. He explained that the "good guys" do not compete on price. *Id.*

The cartel's ringleaders also instructed members of the cartel on how the conspiracy should be enforced. Speaking for ASC, Carmichael explained that surety participation in bail agents' associations was a critical vehicle for "protecting our markets" from price competition, and called on other sureties to "do the same." SCAC ¶ 363. He also explained that bail agents were the cartel's "eyes, ears and mouths in recognizing and alerting all to the impending attack [on the industry]. When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response." *Id.* ¶ 362. The "threat" was price competition, and the "appropriate response" was the conspiracy.

In no case on which Defendants rely were there similar admissions that were anywhere close to Defendants' admissions in this case. Here, top executives and conspiracy ringleaders: exhorted their competitors not to compete on price because such competition was a "cancer," explained that without coordinated action "simple economics" dictates price competition, and emphasized the need for competitors to "work collectively" to "repel" that competition. SCAC ¶¶ 86-87, 368-69. The Court already relied on Defendants' contemporaneous admissions to conclude that the alleged conspiracy is plausible, and for good reason. MTD Order at 22-23; *Knievel*, 393 F.3d at 1072 (allegations must be accepted as true and construed "in the light most favorable" to the plaintiff).

Defendants act as if this incriminating blue print does not exist, claiming Carmichael and Watson were nothing more than marginal figures who spoke only in their individual capacity. ECF No. 112 at 7. Carmichael, however, was obviously talking on behalf of his company, if not

also other sureties and trade associations.  SCAC ¶ 363 (Carmichael: "*We* actively participate in just about every state agents' association . . . . *We're* not content to simply write bail.  *We* recognize the important role a surety must play in protecting markets.") (emphasis added).  Both Carmichael and Watson were senior industry executives who published their remarks on ASC and AIA's websites, respectively, not a personal blog or diary, nor an internal listserv.  Their competitors were their audience.  *Id.* ¶ 363 (Carmichael's post stating, "[i]f only every competitor we have would do the same.").

Further, Carmichael and Watson were both senior leaders of the industry's primary trade associations.  SCAC ¶¶ 45 and 358 (Carmichael is the former President and Executive Director, and current Chairman, of the American Bail Coalition), 44 and 364-65 (Watson is Board Member and Senior Counsel of the American Bail Coalition and on the Bail Advisory Council of the Surety Fidelity Association of America).  In addition, they admitted that trade associations were essential vehicles for keeping the industry in line.  *Id.* ¶¶ 87, 358 (Carmichael stating that ASC "actively participate[s] in just about every agents' association that we know of" given the "important role a surety must play in protecting our markets"), 95 (Carmichael explaining that ABC was founded because he and other surety leaders "wished for a cohesive band of agents and companies whose power, when combined, far exceeded the power of an unorganized group of single businesses"), 112 (Carmichael called on bail agents to be "our industry's eyes, ears and mouths in recognizing and alerting all to the impending attack [on the industry]"), 358-63 (same), 368 (Watson wrote articles calling some agents' practice of advertising the "[b]est [p]rices in [t]own" to be "a form of cancer in the bail industry"), 369 (Watson urged agents to compete on service, not price, and that those who abided by this directive were the "good guys").

Further, Defendants' claim that Carmichael and Watson's "isolated" statements do not suggest a "vast conspiracy," ECF No. 112 at 50, is belied by the fact that the industry subsequently acted in precise accordance with the two industry leaders' proposals.  As explained in more detail below, from 2004 to 2017, no Surety Defendant sought permission from the CDI to lower its "standard" rates below 10%, and, thereafter, near the end of the class period, only the AIA Defendants offered a modest reduction to 9% (still higher than every Surety Defendant's

"preferred" rates).  SCAC ¶ 7 (timeline of rates).

Bail sureties and agents followed Watson and Carmichael's directive to avoid advertising rebates.  Despite a thorough investigation, Plaintiffs have not located—and Defendants have not identified—a single example of a California bail agent advertising a rebate.  Absent a conspiracy, such advertisements would be easy to locate because bail agents would be expected to use them to distinguish themselves to the shopping public.  *See* Section IV.B.2, *infra.*  But instead of advertisements for rebates, Plaintiffs located the story of a bail agent who explained that he faced retaliation from the "good ol boys club [*sic*]" when he attempted to offer rebates.  SCAC ¶ 92.  In other words, agents did exactly what ASC and Carmichael told them to do: be the industry's "eyes, ears and mouths in recognizing and alerting all to the impending attack" of price cuts.  *Id.* ¶ 165.  Further, there was not only an inexplicable lack of advertised rebates.  There was instead a remarkably uniform set of statements designed to mislead consumers into the false belief that posted prices were required by law and lower prices were unavailable or unlawful, even criminal. *E.g., id.* ¶ 8.  It beggars belief to conclude that the only plausible explanation for this parallel behavior is that the Surety Defendants and thousands of bail agents spontaneously, and individually, undertook the same misinformation campaign and sustained it throughout the entire Class Period.  As Carmichael explained, this was only possible through collective action.

Finally, Defendants mistakenly view these statements in isolation, divorcing them from the allegations of each Surety Defendant's participation in the conspiracy.  But allegations "are not to be judged by dismembering [the conspiracy] and viewing its separate parts, but [rather] by looking at it as a whole."  MTD Order at 19 (quoting *High-Tech Emp.*, 856 F. Supp. 2d at 1118); *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 4955377, at *30 (N.D. Cal. Oct. 2, 2014) (same); *Cont'l Ore*, 370 U.S. at 698-99 (same).  Watson and Carmichael's statements provide a lens through which to interpret, and must be viewed in the context of, Plaintiffs' allegations as a whole.

**B.** **Defendants' Parallel Conduct**

Plaintiffs allege a single "conspiracy to fix the prices of bail bonds in California."  SCAC ¶ 1.  The price of a bail bond to a consumer is equal to the rate submitted to CDI less any rebate.

*Id.* ¶ 3.  The SCAC alleges parallel conduct between Defendants with respect to both components of a bail bond price: (1) maintenance of the "standard" premium rate at a 10% benchmark and (2) "discourag[ing] and suppress[ing] rebating, including suppressing the advertisement of rebates." *Id.* ¶ 6.

### 1. **Defendants' Parallel Rate Filings**

#### a. **For 14 Years, No Defendant Sought a Standard Premium Rate Below 10%**

Defendants do not dispute that from 2004 to 2018, not a single Defendant offered a "standard" rate below 10%.  Defs.' App'x B-2; *see also* SCAC ¶¶ 7, 158, 169, 181, 192, 204, 215, 226, 236, 246-247, 259, 267-269, 279, 290, 300, 309, 317, 327, 337, 348.  This remarkably parallel behavior, in conjunction with Defendants' admissions described above and further plus factors described below, lead to a plausible inference of conspiracy.  SCAC ¶¶ 63, 65; MTD Order at 22-23 (holding that uniform filing, parallel decisions not to rebate, together with plus factors, supported conspiracy).

Despite failing to refute Plaintiffs' allegations of parallel behavior with respect to "standard" bail bond rates, Defendants claim that the market has been "dynamic and competitive."  ECF No. 112 at 3.  They do that by a sleight of hand, diverting their focus from the allegations of the complaint to extra-record evidence not about "standard" bail bond rates, but rather a different issue: the rates charged to "preferred" customers and the eligibility criteria for those "preferred" rates.[2]  This red herring ignores Plaintiffs' conspiracy theory and fails for three reasons.  First, even assuming Defendants do compete with respect to "preferred" rate categories, that would not negate Plaintiffs' allegations of a conspiracy to fix the baseline "standard" rate that commonly impacted the price of all transactions.  Second, Defendants' assertions that "average" rates declined over the class period are irrelevant because they do not refute the existence of a conspiracy, and are unsupported because Defendants offer no information about the proportion of

---

[2]  The "high risk" rate category offered by two Defendants at 15% similarly does not relate to the "standard" rate category.  Moreover, this category applied to only a limited subset of bail bonds and thus likely had minimal impact on the overall market: bail bonds with a penal amount of $10,000 or less (and thus a premium of less than $1,500) supported only by a single indemnitor's signature.  Plfs.' RJN, Ex. 5 at 18 and Plfs.' RJN, Ex. 6 at 11 (internal page numbering).

consumers who were actually charged "preferred" rates at or below 8% as opposed to "standard" rates at 10%.  Third, Defendants vastly overstate the supposed variation in "preferred" prices and eligibility criteria, which reflect a surprising degree of consistency suggestive of collusion rather than bona fide competition.

**b.** **Defendants' "Preferred" Rates Were Benchmarked to the Fixed "Standard" Rate**

Defendants falsely accuse Plaintiffs of "cherry pick[ing]" a "single data point" by focusing on "standard" premium rates without discussing their "preferred" premium rates, which Defendants say undermine the claim of parallel pricing.  ECF No. 112 at 8, 15-21.  However, the SCAC squarely addresses the relationship between Defendants' "standard" and "preferred" bail rates over the entire Class Period.  It explains that Defendants have "nearly uniformly filed for a standard premium rate of 10 percent" but that "[m]any sureties also offer 'preferred' rates of 8 or 7 percent for consumers who meet enumerated and nearly identical criteria."  SCAC ¶ 103.  And "[e]ven these 'preferred' rates are the product of collusion and are higher than they would have been if the sureties had not agreed to the same 'standard' premium rate of 10 percent" because "the standard premium rate is a reference price for any preferred premium rates."  *Id.*

Under Plaintiffs' theory, absent collusion, class members who paid the "standard" rate *and* those who paid "preferred" rates would have paid less in a competitive market "because the discounted premium rate also would have fallen."  SCAC ¶ 65.  This makes sense because, as Defendant Financial Casualty acknowledged in its own filings to CDI, "[t]here is no actuarial justification for bail bond rates filed by any insurance company writing bail bond surety," including the preferred rates.  *Id.* ¶ 103.  Because there is no actuarial basis for either rate category, Defendants set their preferred rates to create a certain perceived discount off of the "standard" rate, not to reflect differences in risk to the surety (which, the sureties acknowledge, is essentially zero regardless of customer characteristics, ECF No. 112 at 23; *see also* SCAC ¶¶ 4, 81, 107-109, 111).  *See, e.g.*, SCAC ¶ 148 ("Liberty Bail Bonds also offers a 20% discount off the standard bail bond premium rate [from 10% to 8%] for clients of private defense counsel and for union members").  If the "standard" rate fell, the "preferred" rates would have fallen as well, to

1  maintain the same perceived discount.

2      Defendants' assertions regarding "preferred" bail rates, then, are fully consistent with

3  Plaintiffs' allegations concerning the conspiracy to set "standard" bail rates. Plaintiffs allege a

4  pricing structure that moves chiefly based on how Defendants set their "standard" bail rates, and

5  it is well-settled that "[a]ny combination which tampers with price structures is engaged in an

6  unlawful activity." *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150, 221 (1940). Here,

7  the "standard" bail rate is akin to a "list price" that establishes the reference point from which all

8  other prices are set, whether with respect to the "preferred" rate categories or negotiated rebates.

9  *See, e.g.*, *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) ("[I]f a

10  plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a jury could

11  reasonably conclude that each purchaser who negotiated an individual price suffered some

12  injury."); *In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352-53 (N.D. Cal. 2005)

13  (certifying class of purchasers including both those who paid list price and those who negotiated

14  discounts because even the latter would have paid more as a result of conspiracy to fix list prices).

15  Courts regularly permit Plaintiffs to pursue such theories in antitrust litigation. *See* ABA,

16  *Econometrics: Legal, Practical, and Technical Issues* 354-55 (2d ed. 2014) (explaining that

17  "even if pricing is to some extent customer specific, a change in the price structure will impact all

18  members of the class because of the largely fixed differences in prices among customers over

19  time, which is a 'rising tide raises all boats' argument").

20      Against this backdrop, because Plaintiffs allege near uniformity around the baseline

21  "standard" rate in relation to which "preferred" rates were set, it is simply irrelevant whether or not

22  Defendants' "preferred" rate categories or eligibility criteria were uniform. *See Plymouth

23  Dealers'*, 279 F.2d at 132 ("The fact that there existed competition of other kinds between the

24  various [defendants] . . . is irrelevant."); ABA Model Jury Instructions at 31 ("[I]t is no defense

25  that defendants actually competed in some respects with each other or failed to eliminate all

26  competition between them.").

27      Finally, the cases on which Defendants rely do not apply here, where Plaintiffs allege

28  Defendants fixed "standard" rates, and that the "preferred" rates were supracompetitive not

necessarily because they were themselves fixed, but because they were linked to the fixed "standard" rates. In contrast, in Defendants' cases, there were in fact wide variations in the same behavior the plaintiffs attempted to characterize as parallel conduct. *See Krehl v. Baskin-Robbins Ice Cream Co.*, No. CV 76-1797-DWW, 1979 WL 1662, at *10 (C.D. Cal. Aug. 7, 1979), *aff'd*, 664 F.2d 1348 (9th Cir. 1982) (affirming judgment after bench trial where evidence showed that "actual prices charged" were "disparate and in themselves demonstrate no pattern" to infer price-fixing); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 884 (9th Cir. 1982) (at summary judgment, plaintiffs failed to substantiate alleged conspiracy between music distributors and retailers to favor chain stores at the expense of independent stores because there was "considerable variation in . . . classification systems [and] prices offered to retailers"); *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1147 (N.D. Cal. 2017) (plaintiffs alleged cheerleader wage-fixing conspiracy between NFL teams, but their own allegations showed wages varied from $0 to $125 per game and they "fail[ed] to show plus factors that would support an inference of conspiracy"); *Workman v. State Farm Mut. Auto. Ins. Co.*, 520 F. Supp. 610, 621 (N.D. Cal. 1981) (at summary judgment, in alleged conspiracy to fix prices paid by insurers to repair shops, plaintiffs' evidence showed that "at only one time were two defendants willing to pay the same hourly rate" but "[a]t all other times, each defendant's rates varied"); *Lubic v. Fidelity Nat'l Fin., Inc.*, No. C08-0401 MJP, 2009 WL 2160777, at *4 (W.D. Wa. July 20, 2009) (where plaintiffs alleged uniformity in insurance rates, court disagreed because "rate differentials rang[e]d from 5%-20%, . . . a material margin"). Further, in *In re Graphics Processing Units Antitrust Litigation*, the material issue was not a minor variation in product pricing, but that the "allegations of parallel conduct are consistent with conspiracy but they are equally consistent with lawful conduct." 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("*GPU*"). Here, however, Plaintiffs sufficiently allege that the conduct is inconsistent with lawful, rational economic behavior, *see* Section IV.C, *infra*, and there are no material variations at the level of the "standard" premium rates. Defendants described the 10% rate as the "standard rate" for a reason. *See, e.g.*, SCAC ¶¶ 153, 246, 267-68.

**c.** **Defendants Do Not Establish That "Average" Prices Declined, and Whether They Did Is Irrelevant**

No less than four times, Defendants proclaim that "average" bail bond prices have fallen and that any conspiracy is therefore implausible. ECF No. 112 at 3, 8, 15, 18-20. Defendants' claim is based solely on the fact that, over time, more Defendants created or expanded "preferred" rate categories.

However, it is black-letter law that falling prices do not exclude the possibility of a conspiracy to stabilize prices. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 362 (3d Cir. 2004) (calling Defendants' theory that declining prices preclude liability "simply wrong" because "[a]n agreement to fix prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices") (citation and quotation omitted); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (same); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1146 (N.D. Cal. 2009) (rejecting defendants' argument that decreasing prices undermine plausibility of conspiracy where plaintiffs alleged that conspiracy caused prices to fall at a lesser rate than in competitive conditions); *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-md-01819 CW, 2010 WL 5071694, at *4 (N.D. Cal. Dec. 7, 2010) (observing that "the efficacy of collusive activities may vary during the course of a price fixing conspiracy," but the conspiracy is nonetheless unlawful). Defendants cite no contrary authority. Thus, their unsubstantiated claims that "average" bail bond rates fell, even if true, do nothing to undermine Plaintiffs' allegations.

In any case, Defendants' assertion that average prices fell is unfounded. One cannot estimate the "average" price of bail bonds without looking at the actual rates charged, or at least knowing the average proportion of purchasers who qualified for "preferred" rates: for example, did 1%, 5%, or 30% of consumers qualify for "preferred" rates at any given time? Later, these questions may be relevant to determining damages. But they have nothing to do with liability. *See* ABA Model Jury Instructions, at 31 ("[I]t is no defense that defendants actually competed in some respects with each other or failed to eliminate all competition between them.").

### d. Defendants Vastly Overstate Variations in "Preferred" Rate Prices and Eligibility

Defendants contend that the market for bail bonds in California was "dynamic and competitive" because of purported variation in preferred rates that Defendants offered to only certain categories of consumers. ECF No. 112 at 10. Defendants then contend that this competition was so extensive that an alleged conspiracy involving the standard rate of 10% is implausible. *Id.* In reality, even these preferred rate categories were consistent and stable, and overlapped more than they diverged, supporting a plausible inference of collusion. Seventeen out of twenty Surety Defendants—indeed, *all* Defendants who offered any preferred rate at all— adopted *identical* criteria for detainees referred by private counsel and those in unions. *See* ECF No. 112 at 73. Eleven of those Defendants also offered preferred rates to military veterans or people who secured their bond with collateral. *Id.* The remaining categories were offered by a small number of Defendants and pertained to a narrow set of consumers: AARP members and Senior Citizens (six Defendants); people who paid the full premium up front (four Defendants); government employees (six Defendants); law enforcement officers (four Defendants); persons with employer assistance (one Defendant); students (one Defendant); homeowners (one Defendant); and Native Americans (one Defendant). None of these categories reflect the typical criminal defendant in California, who is young and poor and likely qualified only for the standard 10% rate. *See* Cal. Dep't of Just. Crim. Just. Stat. Ctr., *Crime in California*, Tables 32 and 35 (2019), https://data-openjustice.doj.ca.gov/sites/default/files/2020-06/Crime%20In%20CA%202019.pdf (approximately three-quarters of felony and misdemeanor arrestees are under the age of 40); SCAC ¶ 2 (60% of detained persons cannot afford bail). Further, as explained above, even those who qualified for a "preferred" rate overpaid, since those levels were set in relation to the inflated and fixed "standard" rate. Variation in preferred rates thus says nothing about the ability of Defendants to inflate prices by fixing the standard rate on which all preferred rates are based.

Further, Defendants read much into the fact that some sureties have offered 7% or even 6% preferred rates. Out of context, those numbers are misleading. First, before 2012, *no* Surety

Defendant offered a preferred rate below 8%; thus, for half of the Class Period (2004-2012), there were uniform 8% and 10% preferred and standard rates across the board. Defs.' App'x B-2. Second, after 2012, only eight sureties added 7% "preferred" rate categories in parallel with their 8% offerings, which applied in limited circumstances.[3] Third, only one Defendant, Continental Heritage, started offering a 6% "preferred" rate in 2017, and only for those who could satisfy the following narrow and likely rarely-applied criteria: "[c]ash collateral of 100% of the penal amount of the bond, and deed(s) of trust on real property with equity of at least 100% of the penal amount of the bond." ECF No. 111-1 at 97 (Defs.' Ex. 16).

In sum, Defendants fail to show that minor differences regarding "preferred" rate offerings render a conspiracy to fix "standard" rates or to suppress rebating implausible. These examples are no different from negotiated prices below fixed list prices.

### 2. Defendants' Parallel Anti-Rebating Practices

As a threshold matter, Defendants mistakenly parcel out Plaintiffs' allegations concerning rebating as if they were part of a different, separate conspiracy. *See*, *e.g.*, ECF No. 112 at 33 n.16 (referring to "an anti-rebating conspiracy"), 36 (same re: an "anti-rebating cartel"). But as explained above, Plaintiffs' allegations regarding rebating are part of a single price-fixing conspiracy, and must be viewed with the rest of the SCAC as a whole.

As Carmichael warned, rebates by the sureties' bail agents would have been a significant source of competition. SCAC ¶ 87. In a competitive market, one would expect bail agents to promote rebates to attract customers. *E.g.*, *id.* ¶¶ 113-18, 124-25. Instead, there is essentially zero such advertising. SCAC ¶ 92. Instead, Plaintiffs located a testimonial by one agent who

---

[3] In 2012, Crum & Forster affiliated companies North River Insurance Company and United States Fire jointly obtained approval to offer a 7% rate to persons who paid the full premium at time of sale. ECF No. 111-1 at 204 (Defs.' Ex. 35). In 2013, Bankers Insurance Company obtained approval for the same discount with the added condition that the customer also be referred by a private attorney. ECF No. 111-1 at 66 (Defs.' Ex. 10). In 2016, Lexington National Insurance Company obtained approval for the same discount when at least two of the following conditions were met: private counsel, full payment of the premium, full collateral offered. ECF No. 111-1 at 180 (Defs.' Ex. 30). In 2017, Continental Heritage mimicked Bankers' 7% discount for persons who both retain private counsel and pay the full premium. ECF No. 111-1 at 321-22 (Defs.' Ex. 16). Finally, in 2018, AIA members Allegheny and International Fidelity, and Crum & Forster member Seneca Insurance Company, adopted the 7% category for persons who qualified for the same criteria described above. Plfs.' RJN, Ex. 7 at 2 (internal numbering) and ECF No. 111-1 at 230 (Defs.' Ex. 40).

complained about retaliation when he merely acknowledged rebates were permitted by Proposition 103. *Id.*

In addition to agreeing to refrain from advertising rebates, the Surety Defendants affirmatively suppressed rebates by using, and encouraging their agents to use, misleading language suggesting that pricing below the posted rate was unlawful or criminal. SCAC ¶¶ 8, 162, 174-76, 185-87, 196-98, 208-09, 219-21, 230-31, 240-41, 251-53, 262-66, 273-77, 283-85, 293-94, 303-04, 312, 320-21, 331-32, 340-41, 353-54; 381 (All-Pro stating that "all bail agents charge the same rates," the "*only* difference is that some bail agents" have credit programs, and "[f]ailure to charge the proper rate for  a bail bond is a crime" (emphasis added)).

These anti-rebating efforts were all meant to stabilize bail bond prices at the filed rates and to discourage price competition. Courts have long recognized that restraints on the flow of information about prices to consumers have the obvious effect of keeping prices higher than they otherwise would be. *See*, *e.g.*, *Bates v. State Bar of Ariz.*, 433 U.S. 350, 377 (1977) (observing that restraints on advertising "serve[] to increase the difficulty of discovering the lowest cost seller" and thus "the incentive to price competitively is reduced"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388-89 (1992) (same); *cf. Nat'l Soc'y of Prof. Eng'rs*, 435 U.S. at 695 (observing that conspirators' "ban on competitive bidding prevents all customers from making price comparisons"); *cf. High-Tech Emp.*, 856 F. Supp. 2d at 1121 (agreement not to cold call or recruit competitors' workers restricted information flow and plausibly suppressed salaries). That is why agreements between competitors to restrict price advertising are per se unlawful under the antitrust laws. *Areeda* ¶ 2023b3; *Gasoline Retailers*, 285 F.2d at 691; *Denny's Marina*, 8 F.3d at 1221.

Ignoring that backdrop, Defendants reduce Plaintiffs' allegations regarding rebating to something like a "failure to disclose" theory of fraud. ECF No. 112 at 33-36. But Plaintiffs do not claim Defendants violated the law because they were *obligated* to inform customers they could rebate; rather, Plaintiffs allege that Defendants *would have* advertised rebates if they were competing on price, and that their failure to do so was against their independent economic self-interest and therefore indicative of an unlawful agreement. SCAC ¶¶ 113-118; Section IV.C,

*infra*. The fact that they did not—and, worse, that their advertising frequently *misrepresented* the availability of rebating—suggests a conspiracy.

Despite these allegations, Defendants mount a three-pronged attack on Plaintiffs' allegations regarding their communications with consumers. First, Defendants argue that their statements accurately describe California law. It is well-recognized, though, that a statement may be literally true but nonetheless misleading. *See, e.g.*, *Donaldson v. Read Mag.*, 333 U.S. 178, 188 (1948) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true."); *People v. Wahl*, 39 Cal. App. 2d Supp. 771, 773-74 (1940) (advertisement "although literally true, was nevertheless deceptive and misleading in its implications," even though a "person who knew the whole truth, would not be led astray by it"). Indeed, the Court has already observed that it could not "exclude the possibility that a reasonable consumer of bail bonds would read" such phrases and "think to themselves" that the posted rates were "the absolute rock bottom" and "as good as anybody could possibly get." Oct. 16, 2019 Hearing Tr. 29:23-30:2. Even so, Plaintiffs cite numerous examples where Defendants or their bail agents made statements that went beyond a narrow and misleading recitation of California law to affirmative misrepresentation. *See, e.g.*, SCAC ¶¶ 9 (bail agent states that "[i]f a company that [sic] agrees to discount their fee, they may lose their license"); *id.* (bail agent states "[t]here is no such thing as a 'discounted rate of 5%'." . . . [t]his company is not practicing legal protocol or standards"); *id.* ("an 8% rate after rebate is the very least a bail bonds company can charge . . . and any less is illegal"); *id.* ¶ 375 (stating Aladdin can charge an "8% rate" and "[n]obody has lower prices"); *id.* ¶ 381 (All-Pro Bail Bonds website states "all bail agents charge the same rates," "the *only* difference is that some bail agents allow the client to pay the balance due over time," and that "failure to charge the proper rate . . . *is a crime*") (emphasis added).

In any case, Plaintiffs' claims do not rest on whether Defendants' statements were misleading enough to violate false advertising laws, so the consumer cases cited by Defendants are irrelevant. *See, e.g.*, *Buller v. Sutter Health,* 160 Cal. App. 4th 981, 989 (2008) (analyzing fraudulent concealment claim, not plausibility of antitrust conspiracy); *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1129 (2010) (same); *Graham v. VCA Antech, Inc.*, No. 2:14-cv-

08614-CAS-JC, 2016 WL 5958252, at *13 (C.D. Cal. Sept. 12, 2016) (same, at summary judgment). Rather, the question is whether the similarity of these statements and their potential to mislead support an inference that Defendants conspired to fix bail bond prices, particularly in light of Plaintiffs' other allegations. The Court has already held that they do. MTD Order at 21 ("Taken together, these allegations suffice to show parallel conduct in the form of similarly allegedly misleading statements about Defendants' ability to offer rebates.").

Second, Defendants argue such statements cannot be misleading because some appeared in forms submitted to CDI, and CDI regulations prohibit "misleading" forms. ECF No. 112 at 34-35. As above, the question is not whether the statements themselves violate the law, but whether they suggest a conspiracy. They do: Defendants largely used verbatim language to give the strong impression that the prices charged were required by law. SCAC ¶ 8. Other market participants used similarly misleading statements, and some went even further to make affirmatively false statements on their websites or advertisements which were *not* submitted to CDI for review. *Id.* ¶¶ 9, 375, 381. As the Court has already held, even "the statements by non-Defendant members of the bail industry also help state a conspiracy claim" because they show parallel conduct suggestive of an industry-wide conspiracy. MTD Order at 21. Further, Defendant CBAA trained its agents that "the only time you might lower the fee to 8%, which is 2% less than the standard 10%, is if you are working with a referral from an attorney," which is wrong because bail agents may lower fees through rebates. SCAC ¶¶ 140-141. Defendants do not provide any "plausible alternative explanation" for this uniform misinformation campaign which "is so convincing that [the Plaintiffs'] is implausible." *Starr*, 652 F.3d at 1216.

Third, Defendants advance an argument that, in a price inelastic market, failure to cut prices might not suggest collusion, an argument that is rebutted below, Section IV.C.3, and that also ignores the numerous other plus factors cited in addition to Defendants' own incriminating statements, Section CIV.C.

Finally, certain sureties argue that statements by their bail agents cannot be attributed to them, *see*, *e.g.*, ECF No. 112 at 69, relying on this Court's order, *see* MTD Order at 24-25. However, the Court said nothing about whether such statements could be attributed to the

sureties; it merely held that Plaintiffs had not "sufficiently allege[d] each surety Defendant's 'role in the alleged conspiracy.'" *Id.* at 24-25. That is no longer the case.

In short, Plaintiffs plausibly allege that an industry-wide effort to suppress rebating was one means by which Defendants implemented their price-fixing conspiracy.

## C. The Alleged Plus Factors Enhance the Conspiracy's Plausibility

The Court has already held that Plaintiffs' alleged plus factors support an inference of conspiracy. MTD Order at 22-23. Defendants now argue that the SCAC's more thorough explanation of relevant plus factors should somehow prompt the Court to reconsider its holding. Defendants are mistaken.

As the Court previously recognized, the purpose of economic "plus factors" is to distinguish "permissible parallel conduct from impermissible conspiracy." ECF No. 91 at 18 (quoting *In re Musical Instruments*, 798 F.3d at 1194). "[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with and explicitly coordinated action." *Id.* (quoting *In re Musical Instruments*, 798 F.3d at 1194) ). "There are three kinds of 'plus factors' on which courts most often rely to determine whether an inference of conspiracy is permissible: (1) 'evidence that the defendant had a motive to enter into a price fixing conspiracy,' (2) 'evidence that the defendant acted contrary to its interests,' and (3) 'evidence implying a traditional conspiracy,' such as 'noneconomic evidence that there was an actual manifest agreement not to compete.'" *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 822 (D. Md. 2013) (quoting *Flat Glass*, 385 F.3d at 360). Because the first two types of plus factors may sometimes be consistent with unilateral, rational behavior in oligopolistic markets, the third type is often most important, and it consists of "proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or documents are shown." *Id.* at 822-23 (quoting *Flat Glass*, 385 F.3d at 361).

In reviewing these alleged plus factors, it is important to stress that they must be examined together, not in isolation. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 797 (N.D. Ill. 2017) (rejecting defendants' divide-and-conquer approach of "isolating each factor, and

finding instances when courts have questioned their weight in determining the plausibility of conspiracy allegations" " in favor of viewing all plus factors together "in light of the underlying premise of Plaintiffs' claims," *i.e.*, the alleged conspiracy); *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015) (rejecting approach of "pars[ing] each 'plus factor' individually and ask[ing] whether that factor, standing alone, would be sufficient to provide the 'more'" because "[a]ctions that might seem otherwise neutral in isolation can take on a different shape when considered in conjunction with other surrounding circumstances"); *see also NFL Sunday Ticket*, 933 F.3d at 1152 ("the 'character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole'" (quoting *Cont'l Ore*, 370 U.S. at 698-99).

### 1. Trade Associations and Opportunities to Agree

The Court previously relied on allegations that Plaintiffs alleged that the trade associations hosted meetings and provided opportunities for Defendants to maintain and enforce the conspiracy. MTD Order at 22. The SCAC expands on these allegations.

Information Sharing: The SCAC alleges that the Surety Defendants work through the Surety and Fidelity Association of America ("SFAA") "to monitor compliance with the Conspiracy." SCAC ¶ 152. The SFAA "devised and promulgated the 'standard rate' of 10%, on which the Surety Defendants relied to fix premiums," expressly referring to it in their filings. *Id.* ¶ 153. In particular, the SFAA is a clearing house through which sureties share information about premiums charged and losses incurred in California, whereby the SFAA penalizes Surety Defendants who fail to timely report their data. *Id.* ¶ 154. After the data is collected, it is disseminated to the Surety Defendants. *Id.* It also hosted "members-only" meetings of its Bail Bond Advisory Committee, *id.* ¶ 155, on which Defendant and lead conspirator Jerry Watson serves, *id.* ¶ 365. In addition to sharing rate and loss data through the SFAA, the Surety Defendants obtain "information regarding premiums charged that Defendants and their agents can use to detect and prevent premium discounting" from the CBAA. *Id.* ¶¶ 139-42. The other trade associations also provide venues for sureties and agents to exchange information and to identify cheaters, and to train agents on the conspiracy. *Id.* ¶¶ 131, 133, 149-50 (GSBAA links to online

training that teaches "the right answer on the test: no rebates").

Meetings and Opportunities to Conspire:  The SCAC also alleges that the Defendant Trade Associations host regular meetings where representatives of the sureties and bail agents, and often other trade associations, are present, with ample opportunities to conspire.  SCAC ¶¶ 127-29, 132, 134, 136-37, 143-44, 149.

Tightly-Knit Industry: In addition to the foregoing, SCAC alleges that the bail bond industry in California is tightly-knit and well-networked, with sureties and bail agents participating in trade associations, interacting with one another frequently, and generally having many opportunities to conspire.  SCAC ¶¶ 92 (retaliation against Chad Conley "also highlights the intimacy of bail industry members"); 93-100 (describing the industry's social structure). Defendants achieved what they set out to create: "a cohesive band of agents and companies," *id.* ¶ 359, and "cooperation among industry competitors at both the agency and surety level [which] has been nothing short of inspiring," *id.* ¶ 134.  The resulting web of trade associations and social structures provided the avenues by which Defendants created, maintained, and enforced the conspiracy Carmichael described.

## 2.     Defendants' Invitations to Agree

As explained above, Defendant Carmichael admitted that "simple economics dictates" that "rampant premium discounting will result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward."  SCAC ¶ 361.  Carmichael exhorted his competitors to present a united front against price cuts: "I urge all of us to recognize the serious nature of the threats to our industry and work collectively to repel them.  Leaving profit on the table, in the form of discounts . . . is a fool's game."  *Id.* Participation in trade associations was one of the "important role[s] a surety must play in protecting our markets."  *Id.* ¶ 363.  Similarly, Defendant Watson described "price-cutting" as a "cancer," encouraged agents and sureties to compete with "service" instead of "cost-cutting," and referring to those who toe the conspiracy line as the "good guys."  *Id.* ¶¶ 369-70.

These exhortations are prototypical examples of statements that support a reasonable inference of collective, rather than unilateral, action.  *See*, *e.g.*, *High Fructose Corn Syrup*, 295

F.3d at 662 (statements about "understandings" in the industry "not to undercut each other's prices" and "support" for efforts to limit pricing, as well as references to competitors as friends); *Titanium Dioxide*, 959 F. Supp. 2d at 829 (citing competitor statements about industry "discipline" and the sharing of industry information as a "collective need" as relevant plus factors); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 62-63 (D.C. Cir. 2015) (public statements about "the importance of maintaining . . . capacity discipline within the industry" were "notable because it involves more than a mere announcement of [each defendant's] own planned course of conduct"); *see also Brown v. Pro Football, Inc.*, 518 U.S. 231, 241 (1996) (noting that antitrust law can "permit[] judges or juries to premise antitrust liability upon little more than uniform behavior among competitors, preceded by conversations implying that later uniformity might prove desirable, or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision" (citations omitted)).

Indeed, the Court called these statements "invitations to agree" and relied on them to hold that Plaintiffs' had alleged a plausible conspiracy. MTD Order at 22 (statements "could plausibly be interpreted as inviting cooperation to prevent rebating"). Nevertheless, Defendants argue against the Court's last order by claiming there are innocent ways to read these statements, *see* ECF No. 112 at 40, but the law is clear that Defendants' statements "are not to be disregarded because of their ambiguity; most cases are constructed out of a tissue of such statements and other circumstantial, since an outright confession will ordinarily obviate the need for a trial." *High Fructose Corn Syrup*, 295 F.3d at 662. *See also Titanium Dioxide*, 959 F. Supp. 2d at 829 ("Ambiguous statements by competitors, taken as a whole, may support the inference of a price-fixing conspiracy.").

In addition, the SCAC alleges that numerous Defendants signaled they would accept these invitations to conspire by expressly adopting their competitors' fixed rates. For example, when Financial Casualty & Surety, Inc. joined the market and the conspiracy, it stated that it had no actuarial basis whatsoever for its proposed rates, and signaled its plan to abide by the conspiracy by stating it would use the standard rate of 10% used by its California competitors. SCAC ¶ 267.

Numerous other sureties used similar signals. *Id.* ¶ 257 (Danielson National Insurance Company: proposed rates are "an adoption of current bail bond rates approved for use by Lincoln General Insurance Company");[4] ¶ 297 (Lexon "explicitly model[ed] its rate structure after those of" four competitors); ¶ 246 (Seaview stating its proposal was "an adoption of current bail bond rates approved for use by Danielson National Insurance Company" and "based on Surety Association of America (SAA) pricing"). These types of public signals also support an inference of a conspiracy. *See, e.g.*, *Home Depot, U.S.A., Inc. v. E.I. DuPont de Nemours & Co.*, No. 16-cv-04865-BLF, 2019 WL 3804667, at *10 (N.D. Cal. Aug. 13, 2019) (indirect communications about parallel pricing a plus factor).

### 3. Other Market Factors Suggesting Collusion

In determining whether parallel conduct is the result of collusion, courts often rely on additional "evidence that the industry is conducive to oligopolistic price fixing, either independently or through a more express form of collusion." *Titanium Dioxide*, 959 F. Supp. 2d at 822 (citation and quotation omitted). Indicators of such a market "include the homogeneous and highly standardized, or commodity-like nature, of the product; a concentrated market dominated by a few sellers; high barriers to new players' entry, such as high investment or fixed costs; and excess production capacity." *Id.* These plus factors have also been recognized by the economic literature and federal agencies tasked with enforcing the antitrust laws. *See* U.S. Dep't of Just. and the Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 2.1 (2010) ("Merger Guidelines"), https://www.justice.gov/atr/horizontal-merger-guidelines-0; *see also* Michael K. Vaska, *Conscious Parallelism and Price Fixing: Defining the Boundary*, 52 U. Chi. L. Rev. 508, 510 n.19 (1985) ("Several market factors have been identified that facilitate collusion; these include product homogeneity, inelastic product demand, concentration of economic power, fewness of firms, and the conviviality of interfirm relationships." (citing F.M. Scherer, *Industrial Market Structure and Economic Performance* 199-227 (2d ed. 1980)); George A. Hay & Daniel Kelley, *An Empirical Survey of Price Fixing Conspiracies*, 17 J.L. & Econ. 13, 14-16 (1974)));

---

[4] Danielson argues that this statement is somehow less pertinent because Lincoln General is not a party, ECF No. 112 at 69, but its party status is irrelevant. Lincoln General went into liquidation in 2015.

Richard Posner, *Antitrust Law: An Economic Perspective* 55-62 (1976) (identifying facilitating factors including, inter alia, concentration of sellers; inelastic demand at the competitive price; barriers to entry; many customers; a standardized product; the principal firms selling at the same level in the chain of distribution; emphasis on price competition over other forms of competition; and static or declining demand over time).

The following characteristics of the California bail bond market also suggest it is conducive to collusion.

### a. <u>Extremely Low Loss Ratios</u>

The Court previously concluded that "unusually low loss ratios" serve as a plus factor that reinforces the Conspiracy's plausibility. MTD Order at 22-23, 28. The same low loss ratios are alleged in the SCAC, with much more detail and supporting allegations. *See*, *e.g.*, SCAC ¶ 107 (quoting Defendant Watson, AIA's principal, saying, "You know how many checks has this company written to pay a bail loss? ***Not a single one***.") (emphasis added); SCAC ¶ 206 (Accredited Surety would "focus on strategic expansion of its bail surety program, a class that has been very profitable for the Company since its inception"); ¶ 248 (admission in Seaview's rate application that "it is not at all uncommon in the commercial bail industry for bail sureties consistently to experience loss ratios at or just slightly above 0.0%"); ¶ 338 (United Fire citing "the fact that the company has not had ***any losses*** since it began writing bail" (emphasis added)); *see also* SCAC ¶¶ 159, 170-171, 182-183, 193-194, 216-217, 227-228, 237-238, 260-261, 270-271, 280-281, 291, 301, 310-311, 318, 328-329, 349-350.

These low loss ratios, on their own and relative to other insurance products, reinforce the conspiracy inference. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 540 F. Supp. 2d 1085, 1095 (N.D. Cal. 2007) (denying motion to dismiss and considering allegation that prices were lower in comparable product markets a sufficient plus factor).

Defendants, however, repeat their argument that benefit-expense ratios rather than loss ratios are the better measure of profitability, such that high profitability cannot be inferred based on loss ratios alone. ECF No. 112 at 22. The Court previously rejected that argument when it held that loss ratios were sufficient to support inference of a conspiracy, so Defendants' repetition

here is nothing more than a disguised and improper motion for reconsideration. MTD Order at 22-23, 28. Nevertheless, even without considering loss ratios, Defendants' own admissions, cited above, confirm the uniquely—and, absent a conspiracy, inexplicably—profitable and low-risk nature of the bail bond industry. *See*, *e.g.*, SCAC ¶ 107 (Seaview stating that "sureties consistently incur **extremely low** losses") (emphasis added).

Defendants nevertheless argue that, once the full scope of their costs is considered, the profitability of their bail bond business is lower than their loss ratios would suggest. Plaintiffs allege, however, that bail bond prices in California are "nowhere near the very small marginal costs of production, and bear[] no reasonable relationship to the near zero risk of loss to the surety." SCAC ¶ 4. Plaintiffs also allege that "CDI estimates that '[t]he business costs of a bail bond company are typically 20% of the bail fee to be paid to the surety company,' meaning that gross profit margins may be as high as 80%." *Id.* ¶ 110. These margins are not comparable to any "competitive insurance market." *Id.* ¶ 111. These allegations must be accepted as true at the pleading stage. *Knievel*, 393 F.3d at 1072.

Defendants invite the Court to perform a forensic analysis of Continental Heritage's line item entries on a financial statement for a single year to demonstrate that Plaintiffs have not accounted for all relevant costs. ECF No. 112 at 22. That task, however, is best reserved for expert analysis and discovery. In any case, the financial statement in question does not rebut Plaintiffs' allegations of unusually high profit margins and low loss ratios because it does not have sufficient information to either (1) differentiate costs specific to bail bonds from costs associated with Continental Heritage's other lines of surety insurance or product liability claims (*see*, *e.g.*, ECF No. 111-1 at 288 (Defs.' Ex. 52)),[5] nor (2) demonstrate that costs associated with bail bonds are unusually high compared to other insurance products, such that comparison of bail bond loss ratios to those of other insurance products are unreliable.

Defendants' also rely on hearsay outside the pleadings from the insurance rating service A.M. Best to argue that sureties have high expenses because agents retain the majority of the sale

---

[5] In other CDI filings, Continental Heritage explains that its "specialty surety programs . . . include bail, landfill closure and post closure bonds, standard and non-standard contract surety and waste collection bonds." Plfs.' RJN, Ex. 8 at 1 (internal numbering).

as a commission. ECF No. 112 at 23. Defendants have not requested judicial notice of this material (nor would that be appropriate), so it should be ignored. In any case, the statement merely highlights why the benefit-expense ratios Defendants advocate are misleading. The relevant data points for determining how profitable bail bonds are would be the losses paid out (*i.e.*, the riskiness of each bail bond) and the hard, out-of-pocket costs associated with selling them (*e.g.*, advertising, transactional costs, etc.). Agent commissions are different: they reflect how sureties and bail agents split their supra-competitive profits, not how much it costs to sell or secure a bail bond. Thus, commissions are irrelevant to evaluating the overall profitability of bail bonds.

Finally, Defendants ask why the SCAC uses California loss ratio data in some instances and national data in others. ECF No. 112 at 23-24. The reason is that Defendants have refused to engage in discovery, so Plaintiffs could only rely on publicly-available CDI submissions which include California-specific bail bond numbers in only certain instances. Indeed, Plaintiffs attempted to purchase data from the same A.M. Best on which Defendants rely, but A.M. Best refused to provide it unless Plaintiffs agreed not to use it in litigation. SCAC ¶ 389. In any case, loss ratios cannot be 0% nationwide if they are not also 0% in California, so the nationwide data suffices to show that California loss ratios were also low. *Id.* ¶ 110. Relatedly, Defendants mistakenly cite *Oliver v. SD-3C LLC*, for the proposition that Defendants' similar loss ratios *outside* California somehow foreclose collusive conduct *in* California, but *Oliver* addressed a different question: whether a conspiracy between *some* competitors is plausible when "the prices and market shares of eleven *other* manufacturers, with a combined 70% worldwide market share, *also* moved in parallel on a worldwide scale . . . ." No. 11-cv-01260-JSW, 2016 WL 5950345, at *6 (N.D. Cal. Sept. 30, 2016) (emphasis added). Here, the consistency of Defendants' loss ratios outside California only suggests that they might also be colluding in other markets.[6] The low loss ratios, therefore, are another plus factor suggesting the existence of a conspiracy.

---

[6] It is worth noting that not every state permits bail agents to rebate, and that Defendants may have immunity under the laws of other states that they do not have in California.

### b. <u>High Barriers to Entry</u>

The Court has already recognized that barriers to entry can suggest a market susceptible to price-fixing. MTD Order at 22; *see also In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-2420 YGR, 2014 WL 309192, at *10 (N.D. Cal. Jan. 21, 2014); *Flash Memory*, 643 F. Supp. 2d at 1142; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902–03 (N.D. Cal. 2008). "For antitrust purposes, a barrier to entry is best defined as any factor that permits firms already in the market to earn returns above the competitive level while deterring outsiders from entering." *Areeda* ¶ 420a.

Here, Plaintiffs allege that California's bail bond market is characterized by high barriers to entry because a surety must first be licensed by the state of California, which requires a firm to meet certain capital reserve requirements. *See* 10 C.C.R. § 2275; SCAC ¶¶ 82-84. Further, regulatory approval is not an easy process; Defendant Universal Fire & Casualty, for example, complained that it had difficulty obtaining approval. SCAC ¶ 83 ("This is my 5th time trying to get our application approved, so hints you can give me would be greatly appreciated."). In addition to financial and regulatory barriers to entry, prospective entrants face a practical challenge: California does not permit sureties to sell bail bonds directly to consumers, but rather requires them to work through licensed bail agents. Cal. Ins. Code § 1800(a). Thus, new entrants not only need to have sufficient capital to lawfully sell bail bonds, but must also establish a network of agents to sell them. SCAC ¶ 84. Together, these constitute barriers that deter market entry.

In response, Defendants argue that there can be no barriers to entry where the number of licensed sureties doubled from 2004 to 2019, citing *CDC Technologies, Inc. v. IDEXX Laboratories, Inc.*, 7 F. Supp. 2d 119 (D. Conn. 1998). *See* ECF No. 112 at 29. But barriers to entry are a matter of degree, and their significance depends on the type of antitrust claim asserted. *See Areeda* ¶ 420b (noting that monopolization claims "require robust proof of high entry barriers" whereas "a naked cartel" "can be both profitable and socially harmful even in the presence of modest entry barriers"). *CDC Technologies* is therefore inapposite because it involved a monopolization claim (not price-fixing) at summary judgment, so evidence of entry by

another competitor defeated the plaintiff's claim that the defendant exercised monopoly power. 7 F. Supp. 2d at 130.

In contrast, here, Plaintiffs do not cite barriers to entry in an attempt to show that Defendants exercised monopoly power, but rather to show that the bail bond market's structure was conducive to collusion. Defendants' observation about the number of sureties who entered the market after 2004, then, actually bolsters an inference of collusion by both pre-existing and new market entrants. That is because the 10% standard rate was profitable enough to attract new entrants, over and over, for years. *Areeda* ¶ 420a; *see also High Fructose Corn Syrup*, 295 F.3d at 662 ("A price-fixing conspiracy increases the attractiveness of entry into a market by creating a wedge between price and cost."). Further, the entry of new competitors into a market is generally expected to bring prices down to the equilibrium level as new entrants compete to gain a foothold. *Areeda* ¶ 420a ("In the perfectly competitive model, prices above the competitive level attract entry until the newcomers restore total market output to the competitive level, thus bringing about competitive performance."). But here, *none* of the 11 sureties who entered the market during the alleged conspiracy period sought to reduce the "standard" bail bond premium rate, even as they were working to establish a foothold in the market. The fact that 11 sureties chose to join the market *despite* barriers to entry, and *without* reducing prices to break into the market, confirms the market's susceptibility to collusion and that bail bond prices were well above competitive levels.

### c.     Homogeneity of Bail Bonds

Commodity markets are widely recognized to be more susceptible to collusion. *See*, *e.g.*, *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) (market conducive to collusion where "[t]he product is fungible and the competition for sales is price"); *SRAM*, 580 F. Supp. 2d at 902-03 (same); *Titanium Dioxide*, 959 F. Supp. 2d at 822; *Flat Glass*, 385 F.3d at 361; *High Fructose Corn Syrup*, 295 F.3d at 656-57; *see also Todd v. Exxon Corp.*, 275 F.3d 191, 209, 211 (2d Cir. 2001) ("[I]t is less realistic for a cartel to establish and police a price conspiracy where it is difficult to compare the products being sold.").

The SCAC alleges that bail bonds are homogeneous products, meaning that a bail bond

sold by one agent or surety is just as good as a bail bond from another, so consumers are likely to make their purchase decisions based primarily on price. *See* SCAC ¶¶ 68-72. Moreover, there is no substitute for a bail bond: when pre-trial release is conditional on posting bond and the accused cannot afford to post the whole bond out-of-pocket, a bail bond arranged by a bail agent and underwritten by a surety is the only way out of jail. *Id.* ¶ 71. The fact that all bail bonds are the same to consumers supports an inference that the market is conducive to collusion. *Titanium Dioxide*, 959 F. Supp. 2d at 826 (finding product was homogeneous where "price was the most important factor for . . . customers, since there are few qualitative differences in the products sold by the Defendants").

Defendants do not dispute that bail bonds are commodity-like products. Instead, they rely on *Jones v. Micron Technology, Inc.*, 400 F. Supp. 3d 897 (N.D. Cal. 2019), to argue that, in an oligopolistic commodity market, firms are likely to monitor and mimic one another's behavior to maintain stable market share, even absent an agreement—an economic phenomenon called "interdependence." ECF No. 112 at 25 (quoting *Jones*, 400 F. Supp. 3d at 917). *Jones* is inapposite, however. It involved an oligopoly of just three DRAM manufacturers. In contrast, this case involves a market of up to 20 sureties at different times. *Jones* recognizes that interdependent pricing is less likely to result in stable supracompetitive prices as the number of firms increase. 400 F. Supp. 3d at 917 ("[A]s the number of firms in a market declines, it also becomes increasingly likely that lawful conscious parallel behavior or interdependent pricing (following each other's pricing decisions) will occur without prior agreement.").

In addition, *Jones* involved a different market scenario: an alleged attempt by three DRAM manufacturers to drive up prices by reducing supply, with one firm taking the lead and the others following. 400 F. Supp. 3d at 919. Because all the firms were established and there were only three market players, the court's reasoning that the move could have resulted from unilateral action intended to stabilize each firm's market share (*i.e.*, firms simply copying one another without any agreement) is understandable. *Id.* (oligopolists might not cut prices because they know other oligopolists will immediately follow, resulting in the same market share with lower profits). In contrast, here, 11 sureties *joined* the market between 2004 and 2019; having no

market share, the rational economic decision would have been to gain a foothold by competing on price, but they inexplicably did not.  SCAC ¶¶ 101-118, 227-28, 248-49, 260-61, 268, 270-71, 280-81, 291, 301, 310-11, 318, 328-29, 338, 349-51.  Further, when several joined the market, they signaled to others that they would charge the fixed standard rate, reassuring their purported competitors that they would not rock the conspiracy boat.  *See*, *e.g.*, SCAC ¶¶ 268 (Financial Casualty stated its rates were based on those used by 8 then-active competitors and that "[n]ew insurance company rate filings for bail bond surety [including its own] . . . are essentially 'ME TO[O]' filings"), 257 (Danielson National stating it was "adopt[ing] current bail bond rates approved for use by [former competitor] Lincoln General Insurance Company"); 297 (Lexon explicitly modeled its rate structure on those of other competitors, including Sun Surety); 351 (Williamsburg stated that its rates "were determined by reviewing and are the same as those filed and approved by [then competitor] Western Insurance Company"); 246 (Seaview stated its rates were based on SFAA pricing and Danielson National's rates); 343 (Universal Fire stated its rates were based on "data obtained from the California Bail Agents Association and rates that have been filed by and are in line with our competitors").

Finally, *Jones* had nothing like the factual context here, including invitations to collude in which leading competitors described the conspiracy and urged each other to join, followed by parallel conduct matching that invited conspiracy.  400 F. Supp. 3d at 919  (contrasting "circumstances where defendants have called upon their competitors to 'exercise' discipline and therefore invited them to behave in a certain way").

### d.      **Inelastic Demand for Bail Bonds**

Demand for a product is inelastic when it is not sensitive to price, meaning that market-wide demand is a function of something other than price, such as necessity.  SCAC ¶ 75.  A market characterized by inelastic demand is widely recognized to be more conducive to collusion because sellers are more likely to get away with supracompetitive prices without a corresponding drop in market demand.  *See*, *e.g.*, *Container Corp.*, 393 U.S. at 337 (citing inelastic demand where "buyers place orders only for immediate, short-run needs"); Merger Guidelines ¶ 2.212.

Here, a consumer either purchases a bail bond to secure a person's release from jail, or

does not and the individual remains in detention.  SCAC ¶ 2.  There is no substitute for a bail

bond, and thus the total number of bail bonds demanded does not depend upon price, but rather

the number of arrests and the bonds required by courts.  *Id.* ¶ 76.

Defendants do not dispute that market-wide demand is unaffected by price, nor could

they.  SCAC ¶ 76 (Sun Surety rate filing stating that "[i]n the court appearance bond industry,

***price has no effect on the volume of business written***") (emphasis added).  Instead, they argue

that inelasticity of demand makes a conspiracy less likely because "a firm that cuts its prices may

easily wind up serving the exact same customers as it did before, only at lower prices and profits"

because "[i]ts competitors may not match the price cut, and the firm will be left worse off."  ECF

No. 112 at 26.  In fact, the opposite is true: if competitors do not match price cuts, the firm is

*better* off because lower prices grow market share.  SCAC ¶ 116.  That is why Plaintiffs allege

that while market-wide demand for bail bonds is not affected by price, "demand for *a particular*

*surety's product* would be elastic" because "if one surety increased its prices, consumers would

flock to its competitors" and vice versa.  SCAC ¶ 77.

Defendants make a specious argument that this allegation is "contradicted" by other

allegations supposedly "contending that price is not a significant factor in the decision making of

an individual bail bond purchaser."  ECF No. 112 at 26, n.13 (citing SCAC ¶¶ 66, 75-76).  That is

not what the cited paragraphs state.  Paragraph 66 merely observes that the typical consumer is

desperate, lacks market knowledge, and, because of Defendants' conspiracy to suppress rebating,

is unaware that prices are anything but fixed by law and non-negotiable.  Paragraphs 75 and 76

merely explain why market-wide demand is inelastic.  None of them contradict Paragraph 77, and

the SCAC repeatedly makes clear that price is elastic as between competing bail bond providers.

*See*, *e.g.*, SCAC ¶¶ 113-118.

Defendants also argue that their virtually uniform and actuarially-unjustified "standard"

10% premium rate and rebate suppression efforts are less likely to be the product of collusion in

an inelastic commodity market because in such a market price cuts are likely to be matched

immediately by competitors, resulting in a long-term decline of all firms' profits, even if the

short-term effect is a gain in market share.  ECF No. 112 at 26-27.  Thus, according to

1    Defendants, it is perfectly rational to expect that 20 sureties would independently and
2    coincidentally adopt or maintain their standard bail bond premium at 10% and refrain from
3    rebates of any kind.

4        This argument stretches credulity.  If it were true, every commodity market with dozens of
5    competitors would also price that way; but they do not, because of the forces of competition.  For
6    example, OPEC consists of 13 member countries that together account for approximately 80% of
7    the world's oil reserves.  *See* OPEC, *OPEC share of world crude oil reserves*, 2018 (2019),
8    https://www.opec.org/opec_web/en/data_graphs/330.htm.  OPEC exists for a reason: "to co-
9    ordinate and unify petroleum policies among Member Countries, in order to secure fair and stable
10   prices for petroleum produces," *i.e.*, to fix prices.  *See* OPEC, Brief History,
11   https://www.opec.org/opec_web/en/about_us/24.htm (last visited July 13, 2020).  Even despite
12   OPEC, member nations sometimes aggressively undercut each other, causing market prices to
13   plummet (such as the recent price war between Saudi Arabia and Russia).  *See* Clifford Krauss &
14   Stanley Reed, *Oil Prices Dive as Saudi Arabia Takes Aim at Russian Production*, N.Y. Times
15   (Mar. 8, 2020), https://www.nytimes.com/2020/03/08/business/saudi-arabia-oil-prices.html.

16       The OPEC example demonstrates that coordination is usually needed to maintain prices at
17   supra-competitive levels.  Defendant Carmichael said it best: "if left unchecked, rampant
18   premium discounting will result in the end of the bail bond business as we know it, to be replaced
19   by a new model that properly reflects the proper balance of risk and reward.  Simple economics
20   dictates it."  SCAC ¶ 87.  The same would have happened here, particularly in light of Plaintiffs'
21   allegations—and several Defendants' acknowledgement—that the Surety Defendants' premium
22   rates have no actuarial basis, rarely result in losses to either bail agents or sureties, and result in
23   very high profit margins otherwise unheard of in the insurance industry.  *See* Section IV.C.3.a,
24   *supra*.

25       The cases cited by Defendants involved very different factual scenarios and often
26   procedural postures.  For example, *E.I. du Pont de Nemours & Co. v. F.T.C.*, dealt with the
27   Second Circuit's review of an FTC order issued after an administrative trial under the Federal
28   Trade Commission[ Act, not the Sherman Act, and where the FTC "concede[d] that the petitioners

did not engage in the challenged practices by agreement or collusively" but that "[e]ach acted independently and unilaterally." 729 F.2d 130, 140 (2d Cir. 1984). The case thus says nothing about what is required to allege a plausible conspiracy.

Similarly, in *Kleen Products*, the court held that plaintiffs, at summary judgment, had failed to rule out the possibility that the defendants' pricing decisions reflected interdependent oligopoly behavior rather than a conspiracy because the market characteristics they identified (inelastic demand and homogenous products) were neutral in that context. *Kleen Prods., LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 823 (N.D. Ill. 2017). But whereas in *Kleen Products* the firms involved were already established (such that competitors would have been expected to match price cuts so that market shares would remain stable), *id.* at 823, in this case, Plaintiffs allege that even *new* market entrants who needed to gain market share refrained from price competition even though profit margins were exceptionally high. *See*, *e.g.*, SCAC ¶¶ 7, 227-28, 248-49, 260-61, 268, 270-71, 280-81, 291, 301, 310-11, 318, 328-29, 338, 349-51. Natural interdependence is not the only plausible explanation. Notably, at the motion to dismiss stage, even the *Kleen Products* court held that the plaintiffs had alleged a plausible conspiracy based on those same market factors. *Kleen Prods., LLC v. Int'l Paper*, 775 F. Supp. 2d 1071, 1079 (N.D. Ill. 2011) (holding that the defendants' explanation that follow-the-leader price-hikes in an oligopoly market could be the result of unilateral, rational decisions "may be plausible—but that does not negate the plausibility of Plaintiffs' competing version").

Defendants also cite *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, but that case was also decided at summary judgment and involved three competitors in the oligopoly market for residential fiberglass insulation who could easily and rapidly match one another's pricing decisions, thereby limiting any competitor's ability to gain market share through price cuts. 971 F.2d 37 (7th Cir. 1992). In contrast, here, there are twenty Surety Defendants and the Sureties must first prepare, submit, and receive approval for a rate application from CDI before they may change their bail bond rates, which form the benchmark for discounts. SCAC ¶ 21.

Finally, Defendants cite *In re LTL Shipping Services Antitrust Litigation*, but that case involves very different facts. No. 1:08-MD-WSD, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009).

The plaintiffs there alleged that the defendant freight companies conspired to fix fuel surcharges based on nothing more than the fact that the defendants publicly posted their surcharge rates and allegedly charged rates that exceeded the cost of fuel. *Id.* at *1. But that was insufficient to plausibly infer a conspiracy where the surcharges coincided with 50%-200% industry-wide increases in the cost of diesel fuel (and thus it was rational that all would raise their surcharges to cover growing costs), and where the plaintiffs alleged that the defendants had slim profit margins (and thus very little incentive to cut prices). *Id.* at *15. In contrast, here, Plaintiffs allege exorbitant profit margins unlike other insurance products; there is no cost-based explanation for the profit margins in light of the very low risk of default; and not even new market entrants who needed to gain market share attempted to compete on price.

### e. <u>Regularity of Bail Bond Sales</u>

Defendants do not dispute or address Plaintiffs' allegations that bail bond sales are small, frequent, and regular; that all Sureties know the filed rates sought and applied by other Sureties; and that the Sureties monitor rebating practices through data shared through trade associations. *See* SCAC ¶¶ 78-79, 89, and 139. That matters for two reasons: first, when transactions are small, frequent, and regular, it is less profitable to cheat on individual transactions, in contrast to industries where individual transactions are infrequent, have significant size, and may involve long-term contracts, such that a firm stands to gain a lot by cheating only on a single transaction; and, second, as a result of the first point, firms stand to gain from cheating only if they cheat "in a substantial way," but it is then difficult to do so "without the knowledge of rivals and without the opportunity for rivals to react." Merger Guidelines ¶ 2.12. Accordingly, this factor also weighs in favor of inferring a conspiracy.

### f. <u>Identical Production Costs</u>

Defendants do not dispute Plaintiffs' allegations that bail bonds have essentially identical production costs, which follows from the fact that bail bonds are fungible. SCAC ¶¶ 80-81. This factor also suggests a market structure conducive to collusion because when competitors have similar costs, it is easier for them to determine the optimal, industry-wide profit-maximizing price. *Id.* Further, the fact that products and costs are essentially identical supports an inference

of collusion where the sale price is well above the cost of production, as plaintiffs allege here, *see* Section IV.C.3, *supra*. *See High Fructose Corn Syrup*, 295 F.3dat 658 (noting that fungible products with similar production costs make collusion more feasible); *cf.* Merger Guidelines ¶ 2.11.

Nevertheless, Defendants argue that this factor "does not suggest a conspiracy because firms with similar cost structures would naturally be expected to arrive at similar pricing decisions." ECF No. 112 at 27. As support, Defendants cite *LTL Shipping*, a price-fixing case regarding fuel surcharges, but there the plaintiffs alleged that the industry "has slim profit margins," and diesel fuel prices rose between 50-200% for all the defendants when they announced corresponding hikes in fuel surcharges. 2009 WL 323219, at *14-15. Those contextual facts rendered an inference of conspiracy less plausible. *Id.* In contrast, here, Defendants have inexplicably high profit margins, no significant cost increases, and therefore a strong individual incentive to cut prices to gain market share. *See* Section IV.C.3.a, *supra*.

### g.    <u>High Concentration</u>

It is well-recognized that "[s]ignificant market concentration makes it easier for firms in the market to collude, expressly or tacitly, and thereby force price above or farther above the competitive level." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 724 (D.C. Cir. 2001) (citation and quotation omitted). *See also Batteries*, 2014 WL 309192, at *10; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1018 (N.D. Cal. 2010); *Flash Memory*, 643 F. Supp. 2d at 1142, 1145; *SRAM*, 580 F. Supp. 2d at 902-03; *Black & Decker*, 801 F.3d at 432; *see also* Merger Guidelines ¶ 2.0.

Here, at all times of the Conspiracy, there were 20 or fewer Surety Defendants in California, and several of them were affiliated—constructively, then, there were only 16 competing groups of sureties. Defendants claim that Plaintiffs' allegation of a concentrated market is "contradicted by the fact that over the putative class period, the number of participants . . . allegedly more than doubled," ECF No. 112  at 9, but that alone does not refute the claim of concentration. This market was sufficiently concentrated for Defendants to sustain the conspiracy. *See*, *e.g.*, *Black & Decker*, 801 F.3d at 442 (Wynn, J., concurring) ("Large

antitrust conspiracies have not only existed but have been caught—a perfect example being the famous international vitamin scandal of the 1990s—which involved 21 firms engaged in a conspiracy that lasted over a decade[.]").

### h.    Lack of Technological Change

Defendants do not dispute or address Plaintiffs' allegations that the rate of technological change in the bail bond market is essentially zero. *See* SCAC ¶¶ 73-74.  Markets with a low rate of technological innovation are more conducive to collusion because they make it easier to reach and maintain stable agreements, whereas markets characterized by frequent or rapid technological advancement require frequent renegotiation, may alter production costs, or may otherwise alter the incentives of various competitors. *Id.* ¶ 73; *see also* William E. Kovacic, *Antitrust Analysis of Joint Ventures and Teaming Arrangements Involving Government Contractors*, 58 Antitrust L.J. 1059, 1096 (1990) ("Accumulated experience to date and the economic literature dealing with the behavior of firms in industries characterized by rapid technological change . . . suggest that such collusion is unlikely.").  This factor, too, supports an inference of collusion.

### i.    Easily-Detectable Defections

Defendants do not dispute Plaintiffs' allegations that defections from the alleged conspiracy are easily detectable because bail bond pricing decisions are easily monitored through CDI public rate filings, monitoring of any public advertisements concerning rebates, and by the Surety Defendants' proactive efforts to track rebating practices.  SCAC ¶¶ 88-92.  Indeed, one bail agent complained that the "good ol boys' club" "came after [his] license for trying to save clients money" through lawful rebates. *Id.* ¶ 92.  Such price transparency is another factor making a market more conducive to collusion by making defections easier to detect. *See, e.g.*, *Text Messaging*, 630 F.3d at 628 (allegation of price-fixing was plausible where, *inter alia*, defendants allegedly exchanged pricing information and cheating could be detected "without having to create elaborate mechanisms"); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 777 (7th Cir. 1999) (noting that "the conditions for collusion are ripe" where cheating is "readily observable"); *see also Areeda* ¶ 2024a ("[P]osted prices can facilitate collusion . . . by making prices public and readily verifiable by rival sellers"); Andrew M. Rosenfield, *The Use of*

*Economics in Antitrust Litigation and Counseling*, 1986 Colum. Bus. L. Rev. 49, 56 (1986) ("Cheating is the death-knell of almost all attempts at collusion. Thus, the ability of rival sellers to detect secret price-cutting or cheating will determine the likelihood of successful collusion; the easier it is for sellers to detect price cutting, the more stable the collusion will be and therefore the more likely it is to persist."); Merger Guidelines ¶ 2.12.

Rather than dispute that price changes are detectable, Defendants instead rely on *LTL Shipping* for the proposition that "any firm that even considers trying to compete on price knows that its competitors will both know about its price cut and be able to rapidly match it, ensuring a swift market re-set if the price cut proves profitable." ECF No. 112 at 27-28. However, as explained above, here (1) new entrants who need to gain market share failed to compete on price, unlike in *LTL* where there was no new entry; (2) Defendants' had inexplicably high profit margins, unlike in *LTL* where profit margins were "slim"; and (3) Surety Defendants here may not necessarily be able to match price cuts immediately as adjusting their premium rates requires first seeking and obtaining regulatory approval.

### j. Defendants Retaliated Against Cheaters

The SCAC alleges that the bail bond industry has "punish[ed] would-be mavericks." SCAC ¶ 92. In particular, bail agent Chad Conley published an online post in 2014 explaining that "bail bonds are regulated under Proposition 103, which provides for premium rebates as long as they are not unfairly discriminatory." *Id.* In response to a commenter, Mr. Conley explained that when he attempted to provide lower prices through rebates, he faced "pressure from a 'good ol boys' club,' which 'came after [his] license for trying to save clients money.'" *Id.* Similarly, Plaintiffs cite numerous examples of industry actors defaming any bail agents who offer rebates and discounts as law-breakers. *See, e.g.*, SCAC ¶¶ 381 (Defendant All-Pro stating that "all bail agents charge the same rates" and "[f]ailure to charge the proper rate for a bail bond is a crime"); Plfs.' RJN, Ex. 1. Such evidence that non-compliant market actors were punished by the cartel supports an inference of conspiracy. *See, e.g.*, *Lifewatch Servs. Inc. v. Highmark Inc.*, 902 F.3d 323, 334 (3d Cir. 2018) (reversing order granting dismissal of antitrust conspiracy because plaintiff alleged that one conspirator faced retaliation when it deviated from agreement on the

basis that "[c]oncerted action is established . . . [by] proof of a causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator" (citation and quotation omitted)).

*          *          *

In sum, the foregoing plus factors, considered together and in the light most favorable to the Plaintiffs, support a plausible inference that the Surety Defendants' parallel conduct resulted from collusion. Further, to the extent Defendants argue that there may be an innocent explanation for their conduct, they have misconstrued the Rule 12(b)(6) standard. This is not a motion for summary judgment. This is a motion to dismiss, and the SCAC includes "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Plaintiffs are not required to establish that a conspiracy is the most likely explanation at the pleading stage, nor that it is the only plausible explanation. Plaintiffs' burden is simply to allege sufficient facts so that conspiracy is *a* plausible inference. *Starr*, 652 F.3d at 1216 (motion to dismiss must be denied when both the plaintiff and defendant's explanations are plausible, unless the "defendant's alternative explanation is so convincing that plaintiff's explanation is *implausible*" (emphasis in original)); *Flash Memory*, 643 F. Supp. 2d at 1145 (noting that although the defendants' alternative explanation "ultimately may prove to be valid, the Court cannot resolve this issue on the merits at this juncture").

### D.     The SCAC Sufficiently Alleges the Participation of Each Defendant

#### 1.     The Surety Defendants

The Court previously held that Plaintiffs' First Amended Complaint did "not sufficiently allege each surety Defendant's 'role in the alleged conspiracy.'" MTD Order at 24-25 (quoting *TFT-LCD*, 586 F. Supp. 2d at 1117), particularly with respect to "the 17 surety Defendants who are mentioned by name only in the caption and in the list of parties." *Id.* at 25. The Court did not at that time review the sufficiency of the particular allegations against the other surety Defendants, but rather dismissed all Surety Defendants with leave to amend. *Id.*

Plaintiffs have now addressed the deficiencies previously identified by the Court. The SCAC contains a separate section regarding each Surety Defendant, the date it allegedly entered

- 44 -

the market and joined the conspiracy, the parallel conduct in which it engaged (including the "standard" premium rates filed and anti-rebating practices), data about loss ratios, trade association participation, and applicable economic plus factors. The relevant paragraphs for each Surety Defendant are cited in the following chart:

| Surety Defendant | SCAC Paragraphs |
|---|---|
| Accredited Surety and Casualty Company, Inc. | 7-8, 19, 202-12 |
| American Contractors Indemnity Insurance Company | 7, 21, 135, 152, 180-90 |
| American Surety Company | 7, 23, 45, 62, 74, 86-87, 90, 95, 110, 112, 124, 127-29, 132-35, 152, 156-65, 358-63 |
| Allegheny Casualty Company, International Fidelity Insurance Company, and AIA, Holdings, Inc. | 7-8, 20, 22, 29, 44, 107, 127, 132, 152, 166-79, 364-70 |
| Bankers Insurance Company | 7-8, 24, 47, 127, 132, 135, 191-201, 379 |
| Continental Heritage Insurance Company | 7, 25, 107, 235-44 |
| Danielson National Insurance Company | 7, 26, 257-66 |
| Financial Casualty & Surety, Inc. | 7-8, 27, 103, 149, 267-77 |
| Indiana Lumbermens Mutual Insurance Company | 7-8, 28, 152, 278-88 |
| Lexington National Insurance Corporation | 7, 30, 146-49, 152, 213-24 |
| Lexon Insurance Company | 7-8, 31, 152, 289-98 |

| Surety Defendant | SCAC Paragraphs |
|---|---|
| North River Insurance Company | 7-8, 32, 147, 152, 231, 299-307 |
| Philadelphia Reinsurance Corporation | 7, 33, 308-15 |
| Seaview Insurance Company | 7, 34, 42, 48, 107, 152, 245-256, 371, 377 |
| Seneca Insurance Company | 7-8, 35, 152, 225-34 |
| Sun Surety Insurance Company | 7-8, 36, 76, 127, 132, 316-25 |
| United States Fire Insurance Company | 7-8, 37, 147-48, 152, 231, 326-35 |
| Universal Fire & Casualty Insurance Company | 7-8, 38, 83, 139, 152, 336-46 |
| Williamsburg National Insurance Company | 7, 39, 152, 347-57 |

Instead of addressing these substantive and substantial amendments, Defendants falsely assert that Plaintiffs merely "copy and paste the same set of allegations against each Surety Defendant." ECF No. 112 at 7. But the similarities in the allegations result not from some improper group pleading, but rather from the Surety Defendants' remarkably parallel behavior.

Defendants also claim that there is no plausible conspiracy because the SCAC does not allege "how any particular Surety Defendant was brought into the conspiracy, much less how the conspiracy was able to more than double in size." ECF No. 112 at 6. But these details are not required to state a plausible claim. Defendants rely on *Kendall v. Visa USA, Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008), but that case merely stated that the complaint should answer "the basic questions: who, did what, to whom (or with whom); where, and when?" Here, the answers are that the Surety Defendants (who) agreed to fix bail-bond prices (what) with one another (with whom) in California (where) in 2004 or at the time of subsequent market entry (when). That sets

this case apart from *Kendall*, where other than a conclusory allegation that the defendant banks "knowingly, intentionally and actively participated in an individual capacity in the alleged scheme" to fix credit card interchange fees, "no facts [were] alleged to support such a conclusion." 518 F.3d at 1048 (citation and quotation omitted).

Defendants also fault Plaintiffs for not including more detail about "illicit conspiratorial communications," "who attended the [conspiratorial] meetings," and the number and nature of those meetings, ECF No. 112 at 13, but the Court has already rejected that argument, holding that Plaintiffs "need not plead each defendant's involvement in the alleged conspiracy in elaborate detail, but must simply include allegations specific to each defendant alleging that defendant's role in the alleged conspiracy." MTD Order at 23 (quoting *TFT-LCD*, 586 F. Supp. 2d at 1117). Plaintiffs have done just that. To the extent Defendants have cited cases where plaintiffs were able to allege details about such secret meetings because they had the benefit of discovery or government investigations, those cases do not purport to set a floor for what must be alleged to meet the *Twombly* standard. *See*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) (denying motion to dismiss second consolidated amended complaint, for which parties had benefit of discovery and government investigation); *CRT*, 738 F. Supp. 2d at 1017-19 (complaint allegations based on information uncovered in criminal investigation and proceedings). Here, Plaintiffs are limited to publicly-available information, as Defendants have refused to engage in any discovery. In antitrust conspiracy cases, "the proof is largely in the hands of the alleged conspirators." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962). Defendants should not be permitted to refuse Plaintiffs discovery into their internal communications, and then ask the Court to dismiss the case because Plaintiffs do not have them.

Additionally, in their appendix, Defendants fault the SCAC for failure to include certain types of allegations. *See generally* ECF No. 112 at 61-71. Their objections are repetitive and are generally addressed above, but here Plaintiffs address three additional common points.

First, the sureties in the market prior to the alleged conspiracy start date (2004) claim there are no allegations that they "acted any differently when the conspiracy was supposedly formed in 2004 than it had in the past," while others argue they "[d]id not enter the market" until

a later date.  *See, e.g.*, ECF No. 112 at 61 and 66.  However, 2004 coincides with the *Pacific Bonding* decision clarifying that bail agents were free to discount rates through rebates, SCAC ¶ 5, followed shortly thereafter by Defendant Carmichael's warning that "left unchecked, rampant premium discounting will result in the end of the bail bond business as we know it," to be replaced by "[s]imple economics," *id.* ¶ 87.  Thereafter, the "standard" rate did not budge and Defendants engaged in a concerted misinformation effort to prevent rebating. Defendants did exactly what Defendant Carmichael called upon them to do: "work collectively to repel" price competition.  *Id.*  As for the subsequent market entrants, they had a strong incentive to lower prices to gain market share but did not, and their late entry does not insulate them from liability. *See* ABA Model Jury Instructions at 13  ("A conspiracy may be formed without all parties coming to an agreement at the same time.").

Second, numerous sureties argue there are no allegations they "had collusive communications regarding premiums through trade association" or "actually attended any meeting sponsored by a trade association."  *E.g.*, ECF No. 112 at 61.  As explained above, specific communications are not required, nor is attendance at any particular meeting.  *See* ABA Model Jury Instructions at 13 ("The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose.").  Plaintiffs' allegations concerning information sharing through trade associations are sufficient in conjunction with other parallel conduct and plus factors.  *See* Section IV.C.1, *supra.*

Third, several defendants argue that there are no allegations that they "required bail agents to post notices" or "to use specific forms," prohibited agents "from offering rebates," or "instructed them not to discuss or disclose the possibility of rebates to customers."  ECF No. 112 at 61.  However, Plaintiffs allege that all the sureties discouraged their agents from rebating and asked them to report violations.  *See, e.g.*, SCAC ¶ 162.  An agreement to restrain advertisement of rebates is unlawful regardless of how it is effectuated.  *Areeda* ¶ 2023b3; *Gasoline Retailers*, 285 F.2d at 691; *Denny's Marina*, 8 F.3d at 1221; *see also* ABA Model Jury Instructions at 13 (conspirators need not have "stated the details or the means by which they would accomplish their

purpose" of stabilizing bail bond prices).  In any case, this point says nothing about the rate-filing aspect of the conspiracy.

Finally, Defendant AIA separately challenges the sufficiency of Plaintiffs' allegations.  ECF No. 112 at 44.  AIA was formed in 2003, just before the start of the alleged conspiracy, by three of the country's leading bail bond sureties, including Defendants Allegheny Casualty Company and International Fidelity Insurance Company, as an umbrella "alliance" and the "overwhelming [bail bonds] industry leader."  SCAC ¶ 166.[7]  Defendants argue that the term "alliance" is undefined, but they ignore that that is precisely how AIA describes itself.  *See* Plfs.' RJN, Ex. 2 (AIA's About Page: "The three companies that comprise AIA, Allegheny Casualty, International Fidelity and Associated Bond, have been partnering with agents across the country for over a century.  AIA was officially formed in 2003 ***as an alliance of these three industry leaders***." (emphasis added)).  Defendants also complain that AIA's role in the bail bond business is unclear, but Plaintiffs allege that "AIA has a common executive team that coordinates the bail bond business across its three component companies."  SCAC ¶ 166.  That means that AIA is in charge of and runs Defendants' Allegheny and International Fidelity's bail bond business, and therefore was a direct participant in the latter's conspiratorial activities.  *Id.*[8]

This is confirmed by the fact that Jerry Watson, until recently AIA's Vice President, made many of the incriminating public statements that provided a blueprint for the alleged price-fixing conspiracy.  In particular, Watson publicly derided price-cutting as a "cancer" and urged the industry to refrain from it ***on AIA's website***.  SCAC ¶ 167.  This, all in the face of exorbitant profits: as Watson himself has exclaimed, "You know how many checks has this company [AIA] written to pay a bail loss? ***Not a single one***."  *Id.* ¶ 366 (emphasis in original).  AIA has been in business for 107 years and underwrites $700 million in bail annually.  *Id.* ¶ 170.  The low loss

---

[7]  The third member of the "alliance," Associated Bond Insurance Agency, does not sell bail bonds in California and is not named as a Defendant.

[8]  If there were any doubt, however, Allegheny's filings with the State of New Jersey's Division of Insurance confirm that "[b]ail bonds are completely underwritten and marketed by AIA Holdings, Inc. (AIA) under a Managing General Agent (MGA) Agreement.  Under the Agreement AIA will act as bond manager and will perform the following [for Allegheny]: Appoint Producers; Underwrite and issue bonds; Bill premiums; Collect premium from agents; Perform claim handling services."  Plfs.' RJN, Ex. 9.

ratios are confirmed by Allegheny and International Fidelity's financial disclosures filed with the CDI, reporting *$0* losses from the bail business from 2014-2018. *Id.* ¶¶ 170-71. As explained above, Section IV.A, *supra*, Watson's statements are hardly innocuous and hardly isolated.

These allegations support a plausible inference that AIA directly participated in the conspiracy by urging competitors to join (through Watson's statements) and by ensuring its members, Allegheny and International Fidelity, abided by its terms. It is immaterial that AIA itself did not sell bail bonds directly. *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1208 (N.D. Cal. 2015) ("[P]articipation by each conspirator in every detail in the execution of the conspiracy is unnecessary to establish liability, for each conspirator may be performing different tasks to bring about the desired result." (quoting *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1367 (9th Cir. 1980)).

In short, for the same reasons Plaintiffs have stated a plausible claim against AIA's member companies Allegheny and International Fidelity, they have also done so against AIA

### 2. The Bail Agency Defendants

Aladdin/Two Jinn: The new allegations regarding Aladdin/Two Jinn's involvement in the Conspiracy more than suffice to state a plausible claim. The CAC alleged that Aladdin attended a November 2011 trade association meeting, advertised its 10% and 8% "authorized" rates, and advertised that "[n]obody has lower prices than Aladdin." CAC ¶ 86. The Court held this was insufficient to allege liability, while agreeing that calling the rates from which Aladdin is legally permitted to discount the "authorized" rates was "potentially somewhat misleading." MTD Order at 25-26.

The SCAC's additions confirm Aladdin's involvement. First, it alleges that Plaintiff Monterrey was never told of rebating being a possibility, nor was she offered a rebate. SCAC ¶ 371. The SCAC also shows that the misleading statements are not confined to the advertisement cited in the CAC. *See* SCAC ¶¶ 373 (Aladdin describing 10% rate as "standard"). Aladdin told customers that if they tried to get bail at 5%, "state law" would still require an agency to "collect the remainder of the premium," sending the clear message that there is a set price under state law (*i.e.*, if 5% is charged, there is a "remainder"), which is manifestly false.

SCAC ¶ 374. If Aladdin were not part of the conspiracy, it would have been incentivized to meet competition at 5%, not characterize it as a violation of "state law." Indeed, Aladdin's alternative proposal to customers that it will "work with clients to make financial arrangements at ZERO INTEREST" shows Aladdin's understanding of the terms of the agreement: it could perhaps compete on credit arrangements, but not on price. These overt acts in furtherance of the conspiracy make Aladdin a proper Defendant. *CRT*, at *3 (allegations need only "plausibly suggest[] that each Defendant participated in the alleged conspiracy").

Defendants brush these statements aside as mere "puffery." ECF No. 112 at 37. That is not the point—which is that Aladdin's overall behavior is at odds with its economic incentives absent a conspiracy. Nor is puffery a defense to an antitrust violation; the Conspiracy's plausibility does not turn on false advertising law, as explained in Section IV.B.2, *supra*. But courts evaluating "puffery" in the deceptive-practices context only disregard statements that are "vague" and "highly subjective." *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1150 (9th Cir. 1984). Specific or absolute characteristics that are quantifiable, on the other hand, are not puffery. *See*, *e.g.*, *Hadley v. Kellogg Sales Co*., 273 F. Supp. 3d 1052, 1089 (N.D. Cal. 2017). Aladdin's representation to consumers that rates below its own violate California law is both concrete and false.

All-Pro: The allegations against All-Pro similarly suffice at the pleading stage. The CAC stated that All-Pro sold Plaintiff Crain a bail bond at a supracompetitive price, which the Court found insufficient, noting the CAC had not pled that Plaintiff Crain was not offered a rebate. MTD Order at 26. The SCAC remedies any confusion on this issue, alleging that "[o]n Christmas Day, All-Pro charged Plaintiff Crain a 10% rate with no rebates or discounts. All-Pro gave her no indication that a lower price was possible, and instead misled her into believing that it was not." SCAC ¶ 379. The SCAC additionally describes All-Pro's role in the Conspiracy more generally, stating on its website that "***the standard industry rate*** for bail bonds is 10% of the face amount of bail." SCAC ¶ 380 (emphasis in SCAC). Like Defendant Aladdin, All-Pro has used the imprimatur of the law to give customers the impression that even trying to get a rate below 10% is illegal, stating: "***Failure to charge the proper rate for a bail bond is a crime***"—a statement

that must have particular force to persons already facing criminal charges. SCAC ¶¶ 381–82 (emphasis in SCAC). This is a far cry from "merely . . . selling a bail bond." MTD Order at 25. Further, referring to the 10% rate as industry standard is another example of a Defendant signaling acceptance of the conspiracy.[9]

Against these conspiratorial and deliberately misleading statements—which in their own words distinguish the SCAC from the allegations of simply failing to disclose the availability of lower rates in *Levine*, 189 Cal. App. 4th at 1129—Defendants say more is needed but don't say what. They cite *TFT-LCD*, but that case highlights that at the pleading stage, all Plaintiffs must do is allege "that each individual defendant joined the conspiracy and played some role in it." *TFT-LCD*, 586 F. Supp. 2d at 1117 (citation and quotation omitted). That is exactly what the SCAC does—allege that All-Pro "directly participates in the conspiracy," SCAC ¶ 380, by publicizing a lie that was against its individual interest absent a conspiracy: that charging below the 10% "standard industry rate" "is a crime." As to All-Pro's statements that it was not around when the Conspiracy began or invitations were made, and did not join certain meetings, ECF No. 112 at 38, later-joining co-conspirators, even with minor roles, are just as liable as founders and ringleaders. *See, e.g.*, ABA Model Jury Instructions at 13 ("A person can become a member without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts such members played in the charged conspiracy. . . . Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motive for entering the agreement.").

### 3. The Trade Association Defendants

The three trade association defendants, American Bail California ("ABC"), California

---

[9] All-Pro filed a Rule 11 Motion on July 7, 2020, asserting that, because All-Pro agreed to some rebates with individual customers, All-Pro could not possibly have participated in the alleged conspiracy. ECF No. 113. The motion is a frivolous waste of the Court's resources. Plaintiffs will file an opposition to this motion on July 21, 2020. For now, Plaintiffs note that All-Pro's argument is contrary to black letter antitrust law. *See, e.g.*, ABA Model Jury Instructions at 31 (instructing juries that "evidence of competition is no defense to participation in a price-fixing conspiracy" and that "it is no defense that defendants actually competed in some respects with each other or failed to eliminate all competition between them"). Further, All-Pro could not provide Plaintiffs with even a single example of an advertised rebate, and refused to provide any of the evidence Plaintiffs requested to evaluate All-Pro's claim that it did not join the conspiracy.

Bail Agents Association ("CBAA"), and Golden State Bail Agents Association ("GSBAA")
played important roles in creating and maintaining the conspiracy. SCAC ¶¶ 126-155. The Court
previously held Plaintiffs sufficiently alleged CBAA's participation. ECF No. ECF No. 91 at 27.
As a result, the only trade associations now at issue before the Court are ABC and GSBAA.

### a. ABC Joined the Conspiracy

Plaintiffs added several key allegations regarding ABC to the SCAC. ABC's current
chairman, Defendant William Carmichael, has publicly stated that sureties and bail agents should
not engage in premium discounting in order to protect the bail market. SCAC ¶¶ 45, 87, 95, 112.
ABC's current general counsel, Defendant Jerry Watson, routinely published articles referring to
price-cutting as a "cancer" in the bail industry. *Id*. ¶¶ 44, 167. ABC held meetings and
conferences whose attendees included sureties that publicly promoted the 10% premium rate and
discouraged discounting, such as surety defendants ASC, AIA, Bankers, and Sun Surety. SCAC
¶¶ 128, 132. ABC was part of the California Bail Coalition, a cooperative whose members
included not only sureties but also the two other trade association defendants in this case, CBAA
and GSBAA. *Id*. ¶ 129. ABC formed its own cooperative, the American Bail Agent Coalition,
whose stated purpose was to "protect the interests and property of the commercial surety bail
agent" and provided an opportunity for the surety members to collude with bail agents. *Id*. ¶ 130.
Viewed as a whole, Plaintiffs have sufficiently alleged ABC's participation in the conspiracy
through its principals. *See Cont'l Ore*, 370 U.S. at 699 ("In cases such as this, plaintiffs should be
given full benefit of their proof without tightly compartmentalizing the various factual
components and wiping the slate clean after scrutiny of each. '... [T]he character and effect of a
conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by
looking at it as a whole.")

Indeed, Carmichael's public statements are worth a closer look in this regard. Carmichael
is ABC's current Chairman, and has been a member of ABC's leadership since at least 2005,
when he also served as chairman. Plfs.' RJN, Ex. 3. Carmichael has made public statements
regarding the need to protect the bail market from price cutting: "I can safely predict that if left
unchecked, ***rampant premium discounting will result in the end of the bail bond business as we***

*know it*." SCAC ¶ 87 (emphasis added).  He has urged industry members to "recognize the serious nature of the threats to our industry and *work collectively to repel them*."  *Id.* (emphasis added). Carmichael has also highlighted the important role that trade associations such as ABC play in this effort.  *Id.* ¶ 95 ("National, State and Local associations [must be] well versed in the vital roles they play in the protection and betterment of our markets").  Moreover, Carmichael explained the need for trade associations to coordinate the activities of bail sureties and their agents.  *Id.*  ("We wished for a cohesive band of agents and companies whose power, when combined, far exceeded the power of an unorganized group of single businesses"). Carmichael also called upon bail bond agents to be "our industry's eyes, ears and mouths in recognizing and alerting all to the impending attack [on the industry]. When you [agents] become aware of a situation, please contact us so that we may assess the depth of the threat and work alongside of you to craft an appropriate response." *Id.* ¶ 112.  Carmichael's statements make clear that ABC's leadership strongly discouraged price competition.  Carmichael's statements, together with the allegations concerning ABC's activities, lead to the plausible inference that ABC participated in the conspiracy. *See Cont'l Ore*, 370 U.S. at 699.

Defendants' arguments to the contrary are unpersuasive.  They contend the SCAC contains no allegations that the trade associations discussed price fixing.  ECF No. 116 at 39.  Not so.  The SCAC alleges that Carmichael, the chairman of ABC, and Watson, who serves as general counsel, discouraged discounting in communications with competitors.  *Id.* ¶¶ 44, 45, 87, 95, 112, 167.

Further, Defendants argue the SCAC does not contain allegations about what was discussed at the meetings and conferences.  ECF No. 112 at 39-40.  Yet Plaintiffs are not required to identify specific statements from the meetings and conferences to overcome Defendants' motion to dismiss.  *See GPU*, 527 F. Supp. 2d at 1024 (noting that plaintiffs need not "plead specific back-room meetings between specific actors at which specific decisions were made").  Instead, Plaintiffs need only articulate sufficient allegations that, as a whole, would lead to the plausible inference that ABC participated in the conspiracy.  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2014 WL 1091095, at *3 (N.D. Cal. Mar. 13, 2014)

(emphasizing that "pleadings must be plausible, but they do not have to be in the form of precisely detailed, defendant-by-defendant allegations" even where plaintiff had access to written discovery responses and some documents). ABC's meetings and conferences are but one piece of the larger conspiracy puzzle. *See Cont'l Ore*, 370 U.S. at 699, 707 ("[A]cts which are themselves legal lose that character when they become constituent elements of an unlawful scheme"); *see also Beltz*, 620 F.2d at 1366.

Defendants rely on *In re Graphics Processing*, *In German Automotive,* and *Musical Instruments* for the same uncontroversial proposition: that simply pleading meetings is not enough to support the inference of a conspiracy. *See In re German Auto. Manufacturers Antitrust Litig.*, No. MDL 2796 CRB (JSC), 2019 WL 2509771, at *9 (N.D. Cal. June 17, 2019); *In re Nat'l Ass'n of Music Merchants, Musical Instruments & Equip. Antitrust Litig.*, 09-cv-2002, 2012 WL 3637291, at *2 (S.D. Cal. Aug. 20 2012); *GPU*, 527 F. Supp. 2d at 1021. Yet here, Plaintiffs have alleged not only the meetings but also the attendees, including but not limited to Defendants ASC, AIA, Bankers Insurance, and Sun Surety, all of whom required the 10% standard rate. SCAC ¶¶ 132, 157, 167, 192, 317, and 325. Moreover, as discussed above, Plaintiffs need not "plead specific back-room meetings between specific actors" to overcome Defendants' motion to dismiss, and the meetings constituted but one part of ABC's participation in the conspiracy. *GPU*, 527 F. Supp. 2d at 1024. ABC's meetings, taken together with ABC's member Defendants, ABC's stated purpose, ABC's formation and participation in coalitions, and the public statements of ABC's leadership lead to the plausible inference that ABC participated in the conspiracy. *See Cont'l Ore*, 370 U.S. at 699.

Defendants also point to *Citric Acid*. ECF No. at 40-1. *Citric Acid* turned on the fact that the moving defendant attended trade association meetings but *not* the separate meetings held for the purpose of fixing prices. *In re Citric Acid Litig.*, 191 F.3d 1090, 1096-98 (9th Cir. 1999). That issue does not bear on the question presented here, which is whether the existence of trade association meetings, attended by industry leaders including at least some of the Defendants, plausibly supports a conspiracy when combined with Plaintiffs' other allegations in the SCAC.

### b. GSBAA Joined the Conspiracy

GSBAA was established in 2004, the same year *Pacific Bonding* was decided. SCAC ¶ 96. GSBAA's brought together "competitors, [who] discovered that they had a lot in common and formed GSBAA to pursue their common interest." *Id.*

Topo Padilla is GSBAA's founder and current President. *Id.* ¶ 146; Plfs.' RJN ¶ 4. Padilla is also the owner of Greg Padilla Bail Bonds. SCAC ¶ 146. In a video statement about bail bonds, Padilla asserts "The premium of 10% is regulated by the California Department of Insurance. ***That rate cannot legally be discounted***." [10] *Id.* (emphasis added). Moreover, Padilla's website states: "The California Law mandated bail bond fee (also called premium) is 10% of the bail." SCAC ¶ 146. Jeff Stanley is a GSBAA co-founder and currently serves on the board. *Id.* ¶ 147. He is also the President of Bad Boys Bail Bonds, whose website states "Once bail is set, a Bad Boys Bail Bonds Agent charges 10%. (The State of California regulates this fee. All Bail Bonds companies charge the same rate.)." *Id.*

Further, GSBAA' website has a "Resources" page that links to three sureties: (1) Lexington National Insurance Corporation, (2) Financial Casualty, and (3) Williamsburg National Bail Bonds. SCAC ¶ 149. The Lexington and Financial Surety pages both state that the 10% standard rate is required by law. *See* SCAC ¶ 149.

Defendants' arguments to the contrary fail. First, as noted above, while it is true that meetings and conferences alone may not amount to participating in a conspiracy, this allegation cannot be analyzed separately from the other facts. ECF No. 112 at 41. Instead, the Court must connect the GSBAA meetings to the public statements of GSBAA's leadership (that the 10% premium rate cannot be legally discounted) and the GSBAA resource links (to sureties that also assert the 10% rate is legally required). As a whole, these allegations lead to the plausible inference that GSBAA participated in the conspiracy. *See Cont'l Ore*, 370 U.S. at 699. ("[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its

---

[10] Padilla's videos regarding the bail bond industry are publicly available on his company's website. Dafa Decl. ¶ 1. Padilla's statement that the 10% premium rate "cannot legally be discounted" is found here at minutes 1:25 and 1:49: https://www.padillabailbonds.com/how-bail-works-faq/ and https://www.youtube.com/watch?v=s-q25aTFcnI&feature=emb_logo. *Id.* ¶ 3.

1    separate parts, but only by looking at it as a whole.")

2          Defendants rely on *Int'l Healthcare Mgmt. v. Haw. Coal. for Health*, 332 F.3d 600, 608

3    (9th Cir. 2003) for the proposition that disseminating information that fosters rational business

4    decisions is pro-competitive.  ECF No. 112 at 48.  In that case, the developer of a health care plan

5    and provider network sued a coalition of doctors alleging the doctors' efforts to negotiate the fees

6    in a provider agreement constituted a conspiracy to fix prices.  *Id*. at 601-603.  The Ninth Circuit

7    concluded there was no conspiracy because the doctor coalition merely communicated with the

8    coalition members about the agreement provisions, and no doctor was bound by what the

9    coalition did.  *Id*. at 608-609.  Here, unlike *Int'l Healthcare Mgmt.*, the SCAC alleges Defendants

10   colluded to the fix rates at 10% and suppress rebates through a concerted misinformation

11   campaign.  Defendants were not simply disseminating legitimate business information.  Further,

12   *Int'l Healthcare Mgmt.* was decided at summary judgment.  This case is at the pleadings stage.

13   *See Knievel*, 393 F.3d at 1072 (courts must analyze complaint allegations in a light most favorable

14   to plaintiffs).

15         Second, Plaintiffs are not required to allege that GSBAA adopted the statements of the

16   GSBAA leadership.  ECF No. 112 at 41.  Rather, Plaintiffs' burden at this stage is to simply

17   allege sufficient facts to create a plausible inference that GSBAA participated in the conspiracy.

18   Plaintiffs do so by identifying GSBAA co-founders and board members, and their false and

19   misleading public statements.  These statements with the allegations concerning GSBAA's

20   activities lead to the plausible inference that GSBAA participated in the conspiracy. *See TFT-*

21   *LCD*, 586 F. Supp. 2d at 1116 (public statements by defendants can be construed as invitations to

22   agree).

23         Last, Defendants argue that the SCAC only discusses the GSBAA website links to

24   Lexington National Insurance Corporation and Financial Casualty and Surety in paragraphs 149

25   but not in the specific sections concerning those sureties in paragraphs 267-268 of the SCAC.

26   ECF No. 112 at 42.  But the manner in which Plaintiffs organize their allegations has no bearing

27   upon Plaintiffs' burden to plead sufficient facts to create a plausible inference that GBSAA

28   participated in the conspiracy.  If Plaintiffs repeated every relevant allegation every time it

1   applied the SCAC would be well beyond its current length of 102 pages.

2                      **4.    The Individual Defendants**

3          In its prior order, the Court held that Plaintiffs have stated a plausible antitrust claim

4   against Defendants William Carmichael and Jerry Watson in their individual capacities because

5   they "allege both that Watson and Carmichael directly participated in the alleged conspiracy and

6   that they approved and ratified [] anticompetitive conduct by AIA's member sureties, ASC, and

7   ABC – specifically, their alleged agreement not to rebate and to misrepresent their ability to do

8   so." MTD Order at 28. Nothing has changed.

9          The SCAC alleges the same statements on which the Court earlier relied. *Compare* MTD

10  Order at 27-28 *with* SCAC ¶ 367 (Watson's comments about low loss ratios, shrinking demand,

11  and rising supply), ¶ 368 (Watson deriding "price-cutting" as a "cancer"), ¶¶ 87, 363 (Carmichael

12  noting "the important role a surety must play in protecting our markets"), ¶ 359 (Carmichael's

13  statement re: a "cohesive band of agents and companies" who play "vital roles . . . in the

14  protection and betterment of our markets"), ¶ 361 (Carmichael observing that rebate discounts

15  "will result in the end of the bail bond business as we know it, to be replaced by a new model that

16  properly reflects the proper balance of risk and reward" and urging the bail industry "to recognize

17  the serious nature of the threats to our industry and work collectively to repel them"), ¶ 362

18  (urging bail agents to "recogniz[e] and alert[] all to the impending attack [on the industry]" and to

19  report threats to sureties). *See also* SCAC ¶¶ 44-45, 358, 364; MTD Order at 28 (citing *Murphy*

20  *Tugboat Co. v. Shipowners & Merchants Towboat Co., Ltd.*, 467 F. Supp. 841, 852-53 (N.D. Cal.

21  1979) (holding that individuals may be liable for directly participating in or approving "inherently

22  wrongful" conduct), *aff'd sub nom. Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256 (9th Cir.

23  1981)). Plaintiffs still allege that they held lead roles in Defendant American Bail Coalition.

24  SCAC ¶¶ 358, 364.

25         Though none of this has changed, Defendants argue the new allegations somehow render

26  the conspiracy implausible for the Surety Defendants and therefore also the Individual

27  Defendants, but as explained above, that is not the case. *See* Section IV.C, *supra*. Defendants

28  also say that "[t]he statements are nearly fifteen years old," ECF No. 112 at 43, as if that should

lead the Court to disregard them. This echoes an argument the Court has already rejected. ECF No. 58 at 16 (arguing that Carmichael and Watson's statements occurred "over a more than twenty-year period"). To the contrary, the admissions occurred at the outset of the conspiracy, exactly when one would expect evidence of the terms and formation of the conspiracy.

Additionally, Defendants argue Plaintiffs must allege that Carmichael and Watson "met with or communicated with" other defendants, but that misstates the law, *see* ABA Model Jury Instructions at 13 ("The agreement itself may have been entirely unspoken. . . . The members of the conspiracy need not necessarily have met together, directly stated what their object or purpose was to one another, or stated the details or the means by which they would accomplish their purpose."); *GPU*, 527 F. Supp. 2d at 1024 (no requirement to "plead specific back-room meetings between specific actors at which specific decisions were made"), and ignores that the duo's condemnation of price cuts *were* invitations to conspire directed at industry competitors and co-conspirators. This argument also ignores the numerous communications Carmichael and Watson made to their competitors, and the fact that they both held leadership roles in trade associations, no doubt involving meetings between them and their competitors. SCAC ¶¶ 44-45, 86-87, 95, 112, 165, 358-65, 368-69,  The law does not require Watson and Carmichael to use the word "agreement" to find liability. *See Esco Corp. v. United States*, 340 F.2d 1000, 1007 (9th Cir. 1965) ("A knowing wink can mean more than words."); *cf. Titanium Dioxide*, 959 F. Supp. 2d at 829-830 (at summary judgment, holding that "[a]mbiguous statements by competitors," such as references to industry "discipline" on prices, support inference of agreement).

Defendants provide no reason for the Court to reconsider and change its prior finding that Plaintiffs have stated plausible claims against Watson and Carmichael.

### E. Plaintiffs State a Claim Under the UCL

Plaintiffs' Unfair Competition Law ("UCL") claim is predicated on Defendants' Sherman Act and Cartwright Act violations. SCAC ¶¶ 401-09. Because Plaintiffs allege a plausible violation of those statutes, they have also done so under the "unlawful" prong of the UCL. *AT&T Mobility LLC v. AU Optronics Corp.*, 707 F.3d 1106, 1107 n.1 (9th Cir. 2013). Contrary to Defendants' argument, Plaintiffs have standing under the UCL because they paid "more . . . than

[they] otherwise would have" for bail bond premiums but for Defendants' unlawful conduct. *Kwikset Corp. v. Sup. Ct.*, 51 Cal.4th 310, 323 (2011). *See also* SCAC ¶¶ 396 & 403. Plaintiffs are not pursuing a claim under the UCL's "fraudulent" prong based on Defendants' misleading statements, ECF No. 112. at 46, as the Court already recognized, MTD Order at 28-29.

## V.    CONCLUSION

Plaintiffs respectfully request that the Court deny Defendants' motion and lift the discovery stay (*see* Plfs.' Motion to Lift Discovery Stay, ECF No. 95). In the alternative, if the Court is inclined to grant Defendants' motion with respect to any Defendant(s), Plaintiffs respectfully request that it do so without prejudice so that, if appropriate, Plaintiffs may amend the complaint based on evidence uncovered in discovery.

Dated: July 13, 2020

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By: _/s/ Dean M. Harvey_

Dean M. Harvey (SBN 250298)
Katherine C. Lubin (SBN 259826)
Yaman Salahi (SBN 288752)
Adam Gitlin (SBN 317047)
Jallé Dafa (SBN 290637)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
dharvey@lchb.com
kbenson@lchb.com
ysalahi@lchb.com
agitlin@lchb.com
jdafa@lchb.com

*Interim Class Counsel*

Benjamin David Elga (pro hac vice)
Brian James Shearer (pro hac vice)
JUSTICE CATALYST LAW
81 Prospect St.
Brooklyn, NY 11201
Telephone: (518) 732-6703
belga@justicecatalyst.org
brianshearer@justicecatalyst.org

David Seligman (pro hac vice)
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Telephone: (720) 441-2236
Facsimile: (303) 957-2289
david@towardsjustice.org

Stuart T. Rossman (pro hac vice)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110-1245
Telephone: (617) 542-8010
Facsimile: (617) 542-8028
srossman@nclc.org

Cindy Pánuco (SBN 266921)
Stephanie Carroll (SBN 263698)
Nisha Kashyap (SBN 301934)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California, 90005
Telephone: (213) 385-2977
Facsimile: (213) 201-4722
cpanuco@publiccounsel.org
scarroll@publiccounsel.org
nkashyap@publiccounsel.org

*Counsel for Plaintiffs and the Proposed Class*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 13, 2020, I caused the foregoing to be electronically filed and served with the Clerk of the Court using the CM/ECF system to all parties of record.

DATED:  July 13, 2020

*/s/ Dean M. Harvey*
DEAN M. HARVEY
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP

2008526.1