Dean M. Harvey (SBN 250298)
Katherine Lubin (SBN 259826)
Yaman Salahi (SBN 288752)
Adam Gitlin (SBN 317047)
Jallé Dafa (SBN 290637)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
dharvey@lchb.com
kbenson@lchb.com
ysalahi@lchb.com
agitlin@lchb.com
jdafa@lchb.com


*Interim Class Counsel*

*(Additional counsel listed on signature page)*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION<br><br><br>THIS DOCUMENT RELATES TO:<br><br>All Actions | Master Case No. 4:19-CV-00717-JST<br><br>**PLAINTIFFS' OPPOSITION TO ALL-PRO'S MOTION FOR SANCTIONS PURSUANT TO RULE 11** |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................................... 1

II. BACKGROUND ........................................................................................... 3

    A.     Plaintiffs' Factual Allegations Relevant to All-Pro's Liability............................ 3

        1.     All-Pro's Parallel Conduct ............................................................ 3

        2.     All-Pro's Surety, Bankers, Participated in the Conspiracy ...................... 4

        3.     Market Structure and Co-Conspirators' Behavior .................................... 4

    B.     Plaintiffs' Legal Claims Against All-Pro ................................................. 5

    C.     Plaintiffs' Reasonable And Competent Inquiries...................................... 6

III. LEGAL STANDARD .................................................................................. 10

IV. ARGUMENT ............................................................................................ 12

    A.     Plaintiffs' Claims Against All-Pro Have A Factual And Legal Basis ................. 12

    A.     Plaintiffs Have No Obligation To Include All-Pro's Contested Facts In the SCAC ...................................................................................... 15

    B.     The SCAC Reflects a Reasonable and Competent Inquiry................................. 17

V. CONCLUSION .......................................................................................... 19

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Bates v. State Bar of Ariz.*,
433 U.S. 350 (1977) ........................................................................................ 5

*Benedict v. Hewlett-Packard Co.*,
No. 13-CV-00119-LHK, 2014 WL 234207 (N.D. Cal. Jan. 21, 2014) ............................ passim

*Bovinett v. HomeAdvisor, Inc.*,
No. 17 C 06229, 2020 WL 1330407 (N.D. Ill. Mar. 23, 2020) .................................... 19

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ........................................................................................ 12

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) .................................................................................. 11, 17

*CQ Int'l Co., Inc. v. Rochem Intern., Inc., USA*,
659 F.3d 53 (1st Cir. 2011) ............................................................................... 11

*Denny's Marina, Inc. v. Renfro Prods., Inc.*,
8 F.3d 1217 (7th Cir. 1993) ........................................................................... 6, 12

*Frost v. LG Electronics Inc.*,
No. 16-CV-05206-BLF, 2017 WL 2775041 (N.D. Cal. June 27, 2017) ....................... 14, 15

*Golden Gate Way, LLC v. Stewart*,
No. C 09-04458 DMR, 2011 WL 3667496 (N.D. Cal. Aug. 22, 2011) ............................ 12

*Hall v. Hamilton Fam. Ctr.*,
No. 13-CV-03646-WHO, 2014 WL 1410555 (N.D. Cal. Apr. 11, 2014) .......................... 16

*Harara v. ConocoPhillips Co.*,
No. C04-0515 BZ, 2005 WL 240773 (N.D. Cal. Jan. 27, 2005) .................................. 15

*Holgate v. Baldwin*,
425 F.3d 671 (9th Cir. 2005) .............................................................................. 11

*Hunt v. Sunny Delight Beverages Co.*,
No. 818 CV00557 JLSDFM, 2018 WL 6786265 (C.D. Cal. Dec. 18, 2018) ..................... 19

*Iljas v. Ripley Entm't Inc.*,
403 F. Supp. 3d 793 (N.D. Cal. 2019) ................................................................... 11

*In re High-Tech Emp. Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ................................................................... 6

*In re Keegan Mgmt. Co., Sec. Litig.*,
78 F.3d 431 (9th Cir. 1996) .......................................................................... 11, 17

*In re Ronco, Inc.*,
838 F.2d 212 (7th Cir. 1988) .............................................................................. 17

*In re Wells Fargo & Co. S'holder Derivative Litig.*,
No. 16-CV-05541-JST, 2020 WL 1786159 (N.D. Cal. Apr. 7, 2020) ............................. 16

*Inn S.F. Enter., Inc. v. Ninth St. Lodging, LLC*,
No. 3:16-CV-00599-JD, 2016 WL 8469189 (N.D. Cal. Dec. 19, 2016) .......................... 15

*Merna v. Cottman Transmission Sys., LLC*,
No. C05-5446 RJB, 2005 WL 8173859 (W.D. Wash. Dec. 16, 2005) ............................ 16

*MetLife Bank, N.A. v. Badostain*,
   10–CV–118–CWD, 2010 WL 5559693 (D. Idaho 2010)............................................ 11

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ................................................................................................... 5

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
   435 U.S. 679 (1978) ................................................................................................... 6

*Operating Eng'rs Pension Tr. v. A-C Co.*,
   859 F.2d 1336 (9th Cir. 1988)........................................................................... 11, 15

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
   No. 18-CV-1374-DMS-AGS, 2020 WL 1028483 (S.D. Cal. Mar. 2, 2020) ............ 18

*Plymouth Dealers' Ass'n of N. Cal. v. United States*,
   279 F.2d 128 (9th Cir. 1960) ............................................................................... 1, 13

*Rachel v. Banana Republic Inc.*,
   831 F.2d 1503 (9th Cir. 1987) .................................................................................. 11

*Sconiers v. Fresno Cnty. Superior Ct.*, No. 1:11-CV-00113-LJO, 2011 WL 5884263
   (E.D. Cal. Nov. 23, 2011) ......................................................................................... 19

*Sconiers v. Jud. Council of California*,
   623 F. App'x 896 (9th Cir. 2015) ............................................................................. 19

*Smith v. Psychiatric Sols, Inc.*,
   750 F.3d 1253 (11th Cir. 2014)................................................................................. 12

*Superior Consulting Servs., Inc. v. Steeves-Kiss*,
   786 F. App'x 648 (9th Cir. 2019) ............................................................................. 19

*Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc.*,
   834 F.2d 833 (9th Cir. 1987)..................................................................................... 11

*Townsend v. Holman Consulting Corp.*,
   929 F.2d 1358 (9th Cir. 1990)................................................................................... 17

*Truesdell v. S. Cal. Permanente Med. Grp.*,
   293 F.3d 1146 (9th Cir. 2002)................................................................................... 16

*United Nat'l Ins. Co. v. R & D Latex Corp.*,
   242 F.3d 1102 (9th Cir. 2001)............................................................................. 11, 16

*United States v. Beaver*,
   515 F.3d 730 (7th Cir. 2008)..................................................................................... 14

*United States v. Foley*,
   598 F.2d 1323 (4th Cir. 1979)................................................................................... 14

*United States v. Gasoline Retailers Ass'n, Inc.*,
   285 F.2d 688 (7th Cir. 1961) ...................................................................................... 6

*United States v. Misle Bus & Equip. Co.*,
   967 F.2d 1227 (8th Cir. 1992)................................................................................... 14

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ........................................................................................... 1, 8, 13

*United States v. Stringfellow*,
   911 F.2d 225 (9th Cir. 1990)....................................................................................... 2

*Wold v. Min.s Eng'g Co.*,
575 F. Supp. 166 (D. Colo. 1983) ............................................................... 19

**Rules**

Cal. Rules of Prof'l Conduct, Rule 3.3, Candor Toward the Tribunal ............................................ 2

Fed. R. Civ. P. 11 .................................................................................................. 2, 12

**Other Authorities**

ABA Model Jury Instructions in Civil Antitrust Cases (2016 Ed.) ............................................ 1, 13

Edward D. Cavanagh, *Developing Standards Under Amended Rule 11
of the Federal Rules of Civil Procedure*, 14 Hofstra L. Rev. 499 (1986) .................................. 19

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2016 Ed.) ....................................... 6, 12

## I. **INTRODUCTION**

Of the twenty-eight Defendants named in the Second Consolidated Amended Complaint ("SCAC", ECF No. 94), Defendant All-Pro Bail Bonds, Inc. alone seeks sanctions against Plaintiffs ("Motion," ECF No. 113). All-Pro contends there cannot be a basis to allege it joined an antitrust conspiracy if All-Pro provided rebates to some members of the class. All-Pro is mistaken.

Pursuant to black letter law, an antitrust defendant cannot evade liability by providing evidence that it competed in some respects with its alleged co-conspirators. *See, e.g., United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 220-21 (1940) ("[T]he fact that sales on the spot markets were still governed by some competition is of no consequence."); *Plymouth Dealers' Ass'n of N. Cal. v. United States*, 279 F.2d 128, 132 (9th Cir. 1960) ("The fact that there existed competition of other kinds between the various [defendants] . . . is irrelevant."); ABA Model Jury Instructions in Civil Antitrust Cases, at 31 (2016 Ed.) ("ABA Model Jury Instructions") ("[I]t is no defense that defendants actually competed in some respects with each other or failed to eliminate all competition between them.") (collecting cases).

But instead of disclosing and contending with this controlling authority, All-Pro feigns ignorance that it even exists. ECF No. 113 at 10 ("Plaintiffs' counsel responded with a terse letter, stating that evidence of All-Pro's rebating was *somehow* 'irrelevant for purposes of determining liability.'") (emphasis added). All-Pro fails to mention that Plaintiffs provided this authority in the very letter to which All-Pro cites: "With respect to All-Pro's alleged rebating since 2017, evidence of competition is no defense to participation in a price-fixing conspiracy. As the jury will be instructed, 'it is no defense that defendants actually competed in some respects with each other or failed to eliminate all competition between them.' ABA Model Jury Instructions in Civil Antitrust Cases, at 31 (2016 Ed.)." ECF No. 113-1 at 20-21.[1]

All-Pro cites no authority to the contrary, because there is none. Indeed, All-Pro's Motion does not cite to a single antitrust case. All-Pro's Motion is thus not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law

---

[1] Pincites to documents filed on the Court's docket follow the ECF-stamped pagination.

1  or for establishing new law[.]" Fed. R. Civ. P. 11(b)(2).  Further, by ignoring the controlling

2  authority Plaintiffs brought to its attention, All-Pro violated its obligation to conduct an inquiry

3  reasonable under the circumstances, Fed. R. Civ. P. 11(b), and its duty of candor to this Court.

4  *See United States v. Stringfellow*, 911 F.2d 225, 226 (9th Cir. 1990) ("[If] omitted case law . . .

5  render the attorney's argument frivolous, he or she should not be able to proceed with impunity

6  in real or feigned ignorance of [them].") (citation and internal quotations omitted); Cal. Rules of

7  Prof'l Conduct, Rule 3.3, Candor Toward the Tribunal.  All-Pro's Motion thus violates the same

8  Rule that All-Pro falsely accuses Plaintiffs of violating.

9       All-Pro's Motion only confirms it is a proper Defendant in this case.  All-Pro ignores that

10  it engaged in the precise parallel conduct Plaintiffs challenge: misleading consumers to believe

11  that bail bond prices below the filed rates were unavailable, even criminal.  SCAC ¶¶ 379-82.

12  Plaintiffs explain why this parallel conduct only made sense if All-Pro and its competitors

13  reached the understanding the SCAC challenges.  SCAC ¶¶ 113-18.  All-Pro provides no

14  alternative explanation for why it participated in the concerted misinformation campaign.  All-

15  Pro is also silent with respect to all of the other allegations in the SCAC, including allegations

16  regarding its co-conspirators, the market, plus factors, and admissions from industry leaders.  All

17  of this evidence must be considered when evaluating the claims against All-Pro.

18       Plaintiffs made every effort to avoid burdening the Court with All-Pro's Motion.

19  Plaintiffs explained to All-Pro several times that its argument contradicted controlling antitrust

20  law.  Despite that, Plaintiffs considered every assertion and piece of evidence All-Pro provided,

21  and followed-up with questions and requests for supporting material.  In particular, Plaintiffs

22  asked All-Pro to provide examples of advertised rebates, and internal documents showing how

23  All-Pro directed its agents to behave with respect to rebates and other forms of competition.  All-

24  Pro refused to provide any evidence Plaintiffs requested, steadfastly insisting that evidence of

25  some price competition was dispositive and sufficient to determine its liability.  The unfortunate

26  result is the instant Motion.  It should be denied.

27

28

## II. BACKGROUND

### A. Plaintiffs' Factual Allegations Relevant to All-Pro's Liability

Plaintiffs filed their Second Consolidated Amended Complaint ("SCAC") on May 13, 2020. ECF No. 94. The following allegations are relevant to All-Pro's liability.

#### 1. All-Pro's Parallel Conduct

- On Christmas Day, 2016, All-Pro sold a bail bond to Plaintiff Shonetta Crain that was underwritten by Defendant Bankers Insurance Company. All-Pro told Ms. Crain that the price of the bond was 10% and misled her to believe that the price was non-negotiable and there was no available alternative price. All-Pro did not offer Ms. Crain a rebate. Although charges were dropped against her relative, All-Pro did not refund or reimburse Ms. Crain for any portion of the bond premium. *Id.* ¶¶ 47, 379.

- All-Pro and the surety for whom it acted as agent, Bankers, engaged in parallel conduct by charging a "standard" 10% rate throughout the entire Class Period. SCAC ¶ 7.

- All-Pro also engaged in parallel conduct with respect to anti-rebating practices. All-Pro's website stated: "The Department of Insurance regulates the rates all bail agents must charge. Essentially, all bail agents charge the same rates. *The only difference* is that some bail agents allow the client to pay the balance due over time-regardless of the rate. *Failure to charge the proper rate for a bail bond is a crime*. That's why ALLPRO BAIL BONDS always charges the rates shown below to ALL clients." *Id.* ¶ 381. Thus, All-Pro misled its customers, including Ms. Crain, to believe that prices below the price-fixed rates are unavailable, even criminal. *Id.* ¶¶ 379-382.

- All-Pro further told consumers: "In general, the standard industry rate for bail bonds is 10% of the face amount of bail. For example, if the face amount of bail is $10,000, the fee is $1,000." *Id.* ¶ 380. This repeated the conspiracy line that the "standard industry rate" is 10%, and that the price ("the fee") must be the full

1    10%.

2    • Competing bail agents engaged in the same parallel conduct as All-Pro. *Id.* ¶¶

3    371-378, 390.

4    **2.    All-Pro's Surety, Bankers, Participated in the Conspiracy**

5    • Bankers joined the conspiracy since its start in 2004. *Id.* ¶ 191. Bankers never

6    sought approval of a standard rate below 10%. *Id.* ¶ 192. From 2014-2018,

7    Bankers incurred zero losses, resulting in a zero loss ratio. *Id.* ¶ 193. During that

8    same time, Bankers' agents charged $85 million in premiums to class members.

9    *Id.* Given its zero losses, Bankers had an incentive to file lower rates to gain

10    market share. It did not do so. *Id.* ¶ 194.

11    • Once rebating was permitted under California law, Bankers agreed to abide by the

12    understanding to prevent its bail bond agents from advertising rebates to

13    consumers. *Id.* ¶ 196. Bankers' agents, including All-Pro, implemented this

14    understanding by holding out its 10% standard rate as being required, without

15    disclosing that lower prices were possible. *Id.* ¶ 197-198. As a result, Bankers'

16    agents, including All-Pro, offered fewer rebates and in smaller amounts than they

17    otherwise would have. *Id.* ¶ 196.

18    • Each and every plus factor applies to Bankers' sales of bail bonds in California.

19    *Id.* ¶ 199.

20    **3.    Market Structure and Co-Conspirators' Behavior**

21    • The market for bail bonds in California operates as Plaintiffs allege. *Id.* ¶¶ 58-66.

22    • The California bail bonds market is ideally suited to price fixing. *Id.* ¶¶ 67-100.

23    • The 10 percent "standard" premium rate makes no economic sense absent a

24    conspiracy. *Id.* ¶¶ 101-118.

25    • Proposition 103 posed an existential threat to Defendants' bloated profits. *Id.* ¶¶

26    119-125.

27    • As Defendant Carmichael warned, rebates by the sureties' bail agents would have

28    been a significant source of competition. *Id.* ¶ 87. In a competitive market, one

1  would expect bail agents to promote rebates to attract customers.  *Id.* ¶¶ 113-18,

2  124-25.  But there is essentially zero such advertising.  *Id.* ¶ 92.  Instead,

3  Plaintiffs located a testimonial by one agent who complained about retaliation

4  when he merely acknowledged rebates were permitted by Proposition 103.  *Id.*

5  • The Trade Association Defendants colluded to deprive consumers of the

6  competition Proposition 103 required.  *Id.* ¶¶ 126-50.  These Trade Associations

7  include the American Bail Coalition ("ABC"), which counts Bankers as a

8  member.  *Id.* ¶ 127.  Bankers contributed hundreds of thousands of dollars to

9  ABC.  *Id.* ¶ 135.

10  • Plaintiffs' allegations against the other Surety Defendants are accurate.  *Id.* ¶¶

11  156-190, 202-357.  In addition to agreeing to refrain from advertising rebates, the

12  Surety Defendants further suppressed rebates by using, and encouraging their

13  agents to use, misleading language suggesting that pricing below the posted rate

14  was unlawful.  *Id.* ¶¶ 8, 162, 174-76, 185-87, 196-98, 208-09, 219-21, 230-31,

15  240-41, 251-53, 262-66, 273-77, 283-85, 293-94, 303-04, 312, 320-21, 331-32,

16  340-41, 353-54, 381.

17  • The Individual Defendants were among the ringleaders of the conspiracy, and

18  explained how bail agents such as All-Pro played an important role in preventing

19  price competition.  *Id.* ¶¶ 358-370.

20  **B.**    **Plaintiffs' Legal Claims Against All-Pro**

21  For purposes of its Motion, All-Pro does not contest that the antitrust claims against it are

22  legally well-founded—in other words, that an agreement between competitors to restrain the

23  advertisement or offering of rebates would violate the antitrust laws.  Indeed, courts have long

24  recognized that such restraints on the flow of information about prices to consumers have the

25  obvious effect of keeping prices higher than they otherwise would be.  *See*, *e.g.*, *Bates v. State*

26  *Bar of Ariz.*, 433 U.S. 350, 377 (1977) (observing that restraints on advertising "serve[] to

27  increase the difficulty of discovering the lowest cost seller" and thus "the incentive to price

28  competitively is reduced"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388-89 (1992)

(same); *cf. Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978) (observing that conspirators' "ban on competitive bidding prevents all customers from making price comparisons"); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1121 (N.D. Cal. 2012) (agreement not to cold call or recruit competitors' workers restricted information flow and plausibly suppressed salaries). That is why naked agreements between competitors to restrict advertising are per se unlawful under the antitrust laws, on par with express agreements on price. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 2023b3 (2016 Ed.) ("Areeda"); *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1221 (7th Cir. 1993); *United States v. Gasoline Retailers Ass'n, Inc.*, 285 F.2d 688, 691 (7th Cir. 1961).

## C.     Plaintiffs' Reasonable And Competent Inquiries

The SCAC is the product of hundreds of hours of investigation by Plaintiffs' Counsel[2] spanning several years. Declaration of Dean M. Harvey in support of Plaintiff's Opposition to All-Pro's Motion for Sanctions ("Harvey Decl."), ¶¶ 2-18. Plaintiffs' Counsel's investigation included retaining the services of expert consultants and economists with expertise in the bail industry, whose expertise informed and supported the SCAC. *Id.* ¶¶ 4, 17.

This investigation included close examination of the Surety Defendants' rate filings with the California Department of Insurance ("CDI") during the class period, which showed that every Surety Defendant submitted the same 10% "standard" rate. Harvey Decl. ¶¶ 3, 11. Counsel also examined each and every Surety Defendant filing for financial statements reflecting low loss ratios and high margins, and statements from Surety Defendants explaining there was no actuarial justification for their rates (they had selected 10% only because their potential competitors did so). *Id.* ¶ 10-12; SCAC ¶ 103. Counsel searched the public statements of bail industry leaders, which revealed a desire and plan to limit price competition through collusion. *Id.* ¶ 5. Finally, Counsel scoured bail agent, surety, and trade association websites to determine whether agents or sureties advertised rebates. *Id.* ¶¶ 3, 13. But instead of price competition, Plaintiffs' Counsel found evidence that sureties and their agents routinely misrepresent to

---

[2] Plaintiffs' Counsel includes Interim Class Counsel Lieff Cabraser, along with co-counsel Public Counsel, Towards Justice, Justice Catalyst Law, and the National Consumer Law Center.

customers that the filed premium rates are the only available prices, and that offering lower prices is—according to All-Pro—a "crime." *Id.* ¶ 15.

As Plaintiffs were drafting the SCAC, on April 30, 2020, All-Pro wrote to Plaintiffs and provided (1) a purported printout from All-Pro's Customer Relationship Management ("CRM") database reflecting prices for bail bonds All-Pro sold on Christmas Day, 2016, the same day Plaintiff Ms. Crain purchased a bail bond from All-Pro; and (2) an unsupported representation by All-Pro's counsel that "over the course of the past four years, the average annual bail bond premium charged by All-Pro, after discounts and rebates, has ranged from 5.3% to 6.7%." ECF No. 113-1 at 5-6. The printout from All-Pro's CRM database confirmed Plaintiffs' allegation that All-Pro charged Plaintiff Shonetta Crain the full 10% "standard" rate. *Id.* at 7. It also showed some rebates to other members of the proposed class, and no rebates to others. *Id.* at 7. Based on these facts and representations, All-Pro demanded that Plaintiffs not assert "any claims against All-Pro in any amended complaint." *Id.* at 6. If Plaintiffs did assert claims against it, All-Pro threatened it would "have no choice but to seek Rule 11 sanctions." *Id.*

Plaintiffs studied All-Pro's letter and attachments and responded on May 5, 2020. ECF No. 113-1 at 20-21. Plaintiffs noted that the alleged conspiracy began in 2004, and the only information All-Pro provided begins over ten years later. *Id.* at 20. Plaintiffs also explained that "evidence of competition is no defense to participation in a price-fixing conspiracy," and quoted from the ABA Model Jury Instructions on this point, which collects cases reflecting this black letter law. *Id.* So that Plaintiffs could further evaluate All-Pro's contention that it did not join the alleged conspiracy, Plaintiffs requested additional information, including: transaction data covering the class period, examples of marketing materials offering rebates, internal documents regarding rebating policies, and any communications with alleged co-conspirators regarding premiums or rebates. *Id.* at 21.

All-Pro responded on May 11, 2020. ECF No. 113-1 at 23. In a footnote, All-Pro admitted its earlier unsupported assertion regarding the prices it charged for bail bonds was wrong. *Id.* Instead of ranging from 5.3% to 6.7% (*id.* at 5), the "average annual rate" actually ranged from 7.66% to 8.36% (inexplicably, the footnote also refers to a third range of 5.14% to

5.91%, which does not match the range All-Pro provided in its April 30 letter). *Id*. at 23. Just as before, All-Pro provided no support for this revised range. All-Pro refused to provide any of the follow-up information or backup data Plaintiffs requested. Instead, All-Pro offered to create printouts of transactions for five dates of Plaintiffs' choosing, as long as those dates were after January 29, 2014 (that is, ten years after the start of the class period). *Id*. at 24. On May 12, Plaintiffs declined that limited sample because of the false premise behind it, explaining that "it is black letter antitrust law that not only is evidence of price competition not a complete defense, evidence of price competition is *irrelevant* for purposes of determining liability," citing *United States v. Socony-Vacuum Oil Co*., 310 U.S. 150 (1940) in support. ECF No. 113-1 at 27 (emphasis in letter). Plaintiffs filed the SCAC the following day, May 13, 2020. ECF No. 94.

On June 8, 2020, All-Pro served Plaintiffs with a draft Rule 11 motion, in substantially similar form as this Motion. Plaintiffs reviewed the motion and responded by letter the following day, June 9, 2020. ECF No. 113-1 at 29-30. Plaintiffs reiterated their request for the same information from their May 5 letter, and explained that without it, Plaintiffs "cannot verify your assertion that All-Pro did not join the alleged conspiracy." *Id*. at 29. Plaintiffs further explained that they had declined All-Pro's offer of a small sample of just five days from 2014 onward because it "could not possibly shed additional light on whether All-Pro joined the conspiracy," because, among other things, the class period stretches back to 2004. *Id*. Plaintiffs also stated that the data All-Pro provided did not support its assertions that it "consistently provided rebates," and that the average premium rate of 7.66% to 8.36% was unsupported, but in any event only confirmed Plaintiffs' allegation that All-Pro charged its customers supra-competitive prices. *Id*. at 30.

All-Pro responded by letter on June 17, 2020. ECF No. 113-1 at 32. All-Pro did not address the controlling authority Plaintiffs provided. *Id*. at 32. Yet, All-Pro continued to claim that evidence of rebating in any form made Plaintiffs' allegations against All-Pro "baseless." *Id*. at 33.

The parties spoke on June 18, 2020, as memorialized by an email from Plaintiffs' counsel that same day. ECF No. 113-1 at 55. On the call, Plaintiffs explained, once again, that All-Pro's

evidence of rebating did not merit dismissal of the claims against All-Pro, because "evidence of price competition is not a defense to joining an antitrust conspiracy." *Id.* Nevertheless, Plaintiffs said they would consider any additional information All-Pro could provide, as it would at least be relevant to impact and damages. *Id.* at 55. When All-Pro's counsel asserted there could be no conspiracy to suppress rebates if some rebating occurred, Plaintiffs explained that agreeing not to advertise discounts was itself a violation of the antitrust laws, and that the existence of some rebating did not mean that prices were not otherwise higher than they would have been absent the conspiracy. *Id.* at 55. Because the complete absence of advertised rebates informed Plaintiffs' decision to name All-Pro as a defendant, Plaintiffs again repeated their request that All-Pro provide examples of advertised rebates. *Id.* at 56. All-Pro refused. *Id.*

The parties also discussed All-Pro's CRM data on the June 18 call. Plaintiffs posed questions to All-Pro about the scope of All-Pro's available data, including the time period covered by the CRM database, and whether All-Pro could create a report reflecting data for the four-year period for which All-Pro asserted the average price ranged from 7.66% to 8.36%. ECF No. 113-1 at 55. Plaintiffs also inquired about any burden that might be involved in generating a report for the entire class period, back to 2004. *Id.* All-Pro could not answer any of the questions on the call. *Id.*

All-Pro responded to Plaintiffs' June 18 email the same day, but did not provide any further information. ECF No. 113-1 at 53-54. In that letter, All-Pro acknowledged that "an agreement not to advertise rebates . . . might violate the antitrust laws," but continued to claim that Plaintiffs "have no facts supporting [their] false assertion that All-Pro conspired not to advertise[.]" *Id.* at 54. In response, Plaintiffs asked again for All-Pro to answer the questions posed in Plaintiffs' June 18 letter. ECF No. 113-1 at 52-53.

On June 30, 2020, All-Pro responded, providing inadequate answers to some of Plaintiffs' questions. ECF No. 113-1 at 51-52. With respect to the CRM database, All-Pro did not tell Plaintiffs what time period the database covered, nor confirm whether the underlying data for the purported "average premium ranges" had come from the CRM database. All-Pro instead represented that "it would be very burdensome" to produce a report of all bail bond sales for a

several year period, claiming it would take "thousands of hours." *Id*. at 52.  Further, All-Pro insisted it would not provide transaction data supporting the average premium rates it asserted without a protective order.  *Id*. at 52.  Instead, All-Pro only provided data on bonds sold on two additional days, November 8, 2017 and January 16, 2020.  *Id*. at 51-52.  The latter date occurred well after the initiation of this case.

In an effort to better understand All-Pro's contention that it would be "very burdensome" to provide support for the average premiums All-Pro said it charged, Plaintiffs posed questions to All-Pro about its CRM database.  ECF No. 113-1 at 50-51.  All-Pro refused to answer them. *Id*. at 48.

Further, given that All-Pro stated it would not produce additional information without entry of a protective order, on July 2, 2020, Plaintiffs drafted and provided a proposed protective order, substantially similar to the Northern District's model protective order, to all Defendants. Harvey Decl. Ex. 1.  Only All-Pro responded, stating that it was "premature" to discuss a protective order with a discovery stay in place.  Harvey Decl. Ex. 2.

On July 2, 2020, Plaintiffs responded to All-Pro's June 30 email, reiterating that "nothing [All-Pro] ha[d] provided contradicts a single allegation in the SCAC," and that rebating was not inconsistent with the SCAC's allegations, which contemplates that some rebating might have occurred, but explains that all prices would have been lower without the conspiracy.  Harvey Decl. Ex. 3.  Again, Plaintiffs pointed All-Pro to its misleading statements and the fact that All-Pro did not advertise rebates.  *Id*.

On July 6, 2020, All-Pro responded once more, claiming the limited information it provided "fatally undercuts" the antitrust claims against it.  Dkt. 113-1 at 48.

That same day, Plaintiffs' explained, as they had several times before, that they would not withdraw their allegations against All-Pro because it is black letter antitrust law that evidence of some competition does not "fatally undercut[]" allegations of conspiracy.  Dkt. 113-1 at 48.

All-Pro filed its Rule 11 Motion on July 7, 2020.  Dkt. 113.

### III.    LEGAL STANDARD

"Rule 11 is an extraordinary remedy, one to be exercised with extreme caution."

*Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988). Sanctions are reserved for the "rare and exceptional case . . . ." *Id*. at 1344. *See also Iljas v. Ripley Entm't Inc.*, 403 F. Supp. 3d 793, 812 (N.D. Cal. 2019) (Tigar, J.) ("This Court already dislikes reflexive requests for sanctions and awards them only sparingly.") (internal quotations omitted). "Rule 11 sanctions are appropriate if the allegations and other factual contentions entirely lack evidentiary support." *Benedict v. Hewlett-Packard Co.*, No. 13-CV-00119-LHK, 2014 WL 234207, at *5 (N.D. Cal. Jan. 21, 2014) (citations and internal quotations omitted). "A claim that has 'some plausible basis, [even] a weak one,' is sufficient to avoid sanctions under Rule 11." *Id.* (quoting *United Nat'l Ins. Co. v. R & D Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir. 2001)). "Further, 'circumstantial evidence, and the reasonable inferences drawn from that evidence, are treated as evidentiary support' for purposes of Rule 11." *Id.* (quoting *MetLife Bank, N.A. v. Badostain*, 10–CV–118–CWD, 2010 WL 5559693, at *6 (D. Idaho 2010)). *See also Rachel v. Banana Republic Inc.*, 831 F.2d 1503, 1508 (9th Cir. 1987) (reversing sanctions because of existence of circumstantial evidence plaintiffs relied upon in their complaint).

When a complaint is challenged under Rule 11, the Court performs a two-part inquiry to determine whether the complaint is frivolous: "(1) whether the complaint is legally or factually baseless from an objective perspective, *and* (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (emphasis added) (citation and internal quotations omitted). Sanctions are appropriate only if both elements are met. *Benedict*, 2014 WL 234207, at *4; *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 434 (9th Cir. 1996). As the moving party, All-Pro bears the burden to demonstrate why sanctions are justified. *Benedict*, 2014 WL 234207, at *5; *Tom Growney Equip., Inc. v. Shelley Irrigation Dev., Inc.*, 834 F.2d 833, 837 (9th Cir. 1987).

Rule 11 exists, in part, to conserve the resources of the courts and the parties, not to needlessly expend additional resources litigating meritless arguments. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990); *CQ Int'l Co., Inc. v. Rochem Intern., Inc., USA*, 659 F.3d 53, 62 (1st Cir. 2011). Indeed, baseless Rule 11 motions can themselves be the subject of Rule 11 sanctions. *See, e.g.*, *Smith v. Psychiatric Sols, Inc.*, 750 F.3d 1253, 1260 (11th Cir.

2014); Fed. R. Civ. P. 11 advisory comm. ("[T]he filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions.").

## IV.     ARGUMENT

### A.      Plaintiffs' Claims Against All-Pro Have A Factual And Legal Basis

All-Pro's Motion ignores every allegation in the SCAC apart from those regarding the extent to which All-Pro provided rebates to Class Members. But "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." ECF No. 91 at 19 (Order Granting in Part and Denying in Part Motions to Dismiss) (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). The SCAC contains abundant circumstantial evidence that provides a plausible basis from which to infer that All-Pro joined the alleged conspiracy to fix the prices of bail bonds in California. *See* Part II.A, *supra*; ECF No. 117. *See also Benedict*, 2014 WL 234207, at *5 (circumstantial evidence, and the reasonable inferences drawn from that evidence, are evidentiary support for purposes of Rule 11); *Golden Gate Way, LLC v. Stewart*, No. C 09-04458 DMR, 2011 WL 3667496, at *4 (N.D. Cal. Aug. 22, 2011) ("inference, reasonably drawn from the undisputed circumstantial evidence," is more than sufficient to avoid Rule 11 sanctions).

All-Pro also ignores or misstates the allegations specific to it. The SCAC does not allege that All-Pro *never* offered rebates. Rather, the SCAC alleges that, to increase prices, All-Pro and its alleged co-conspirators agreed not to advertise prices below approved rates (*i.e.*, not to advertise rebates), and to contribute to a market-wide disinformation campaign designed to fool class members into thinking that prices below approved rates were unlawful, rendering Proposition 103 a nullity. Courts have long recognized that agreements to limit advertisements concerning prices or discounts are tantamount to agreements to fix prices, because they have the same effect: increasing prices. *See* Areeda, *supra* at ¶ 2023b3 ("A naked or nearly naked agreement prohibiting rivals from advertising truthful and nonmisleading information about their prices is unlawful per se."); *Denny's Marina,* 8 F.3d at 1221 ("Concerted action by dealers to protect themselves from price competition by discounters constitutes horizontal price-fixing" "notwithstanding the apparent lack of an explicit agreement to set prices.") (citations omitted)).

Against this backdrop, All-Pro's representations do nothing to undermine a plausible inference that it joined and participated in a conspiracy to fix bail bond prices, by refraining from advertising rebates and suggesting that prices below approved rates are unlawful, even criminal.

Under Plaintiffs' theory of the case, but for the alleged conspiracy, All-Pro and its competitors would have competed on price by advertising rebates and eliminating misleading statements suggesting lower prices were unavailable or unlawful. This would have led to lower prices across the board. As Defendant William Carmichael explained, without coordinated action, "rampant" price cutting would "result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward. Simple economics dictates it." SCAC ¶ 87. That competition did not occur because of the conspiracy. The prices All-Pro in fact charged would have been lower, including any negotiated rebates. *Id*. ¶ 196. That difference is the measure of damages.

Even if All-Pro's assertions regarding rebates turn out to be accurate when tested by discovery, these rebates amount to nothing more than under-the-table competition while All-Pro otherwise complied with the conspiracy out in the open. All-Pro ignores and thus concedes: (1) it did not advertise rebates; (2) it misled its customers to believe that all bail agents charged the same prices; (3) it further misled its customers to believe that, if they purchased a bail bond that cost less, they were somehow parties to a "crime"; (4) its competitors did the same; and (5) none of this was in the individual self-interest of any bail agent or surety, but for the alleged conspiracy. Any secret competition All-Pro managed to engage in amidst this collusive conduct cannot immunize it from the antitrust claims in this case.

It has long been settled that an antitrust defendant cannot evade liability if the conspiracy failed to eliminate all competition. *See Socony-Vacuum*, 310 U.S. at 220-21 ("[T]he fact that sales on the spot markets were still governed by some competition is of no consequence"); *Plymouth Dealers'*, 279 F.2d at 132 ("The fact that there existed competition of other kinds between the various [defendants] . . . is irrelevant."); ABA Model Jury Instructions *supra* at 31 ("[I]t is no defense that defendants actually competed in some respects with each other or failed to eliminate all competition between them."); *United States v. Beaver*, 515 F.3d 730, 739 (7th

Cir. 2008) ("It is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself, prevent the government from proving a conspiracy."); *United States v. Misle Bus & Equip. Co.*, 967 F.2d 1227, 1231 (8th Cir. 1992) (the fact that defendant "occasionally 'cheated' his co-conspirators" did not preclude a finding that it joined a conspiracy); *United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979) ("Since the agreement itself, not its performance, is the crime of conspiracy, the partial non-performance of [the defendant company] does not preclude a finding that it joined the conspiracy.") (citations omitted).

Judge Freeman considered—and rejected—a similar Rule 11 challenge in *Frost v. LG Electronics Inc.*, No. 16-CV-05206-BLF, 2017 WL 2775041 (N.D. Cal. June 27, 2017). Plaintiffs' complaint alleged that various electronics manufacturers conspired to agree not to poach each other's employees, in violation of the antitrust laws. *Id.* at *1. Defendant LG brought a motion for Rule 11 sanctions against plaintiffs, asserting that plaintiffs' complaint was baseless based on (1) a declaration from LG stating, under oath, that no such agreement existed; and (2) LinkedIn pages from employees reflecting work at both LG and Samsung. *Id.* at *3. The court denied sanctions and observed that evidence of some competition did not disprove plaintiffs' claims, because "[f]urther analysis would be necessary to negate the possibility that exceptions or cheatings might have occurred in the presence of an alleged agreement . . . ." *Id.* In any event, the court recognized that, when confronted with such evidence, "[p]laintiffs have 'the right to decide whether to dismiss the action or proceed with discovery.'" *Id.* (quoting *Benedict*, 2014 WL 234207, at *8). Indeed, "[p]laintiffs' decision to continue litigating [wa]s consistent with the counsel's duty to zealously represent his clients and is not objectively baseless." *Id.*

All-Pro's factual assertions in its Motion only highlight the need for this Court to deny Defendants' motion to dismiss (ECF No. 112) and lift the discovery stay (ECF No. 95). For instance, All-Pro claims it "[k]now[s] that it had provided purchasers significant rebates *every day* for the entire period that it was required by law to complete records." ECF No. 113 at 9. (emphasis added). All-Pro has provided no evidence that it rebated "every day" (to do so, it

1  would need to produce the daily transaction information that it refuses to give Plaintiffs). Even

2  if it did, evidence of some rebates "every day" would not defeat the conspiracy or All-Pro's

3  participation in it.

4      All-Pro's bold claim that it "never participated in any conspiracy" (ECF No. 113 at 9) is

5  similarly unsupported, and Plaintiffs are "understandably skeptical of a defendant's assertion of

6  innocence." *Frost*, 2017 WL 2775041, at *3 (citations and internal quotations omitted). All-

7  Pro does not even provide a sworn declaration to that effect, as was provided in the failed bid for

8  sanctions in *Frost*. All-Pro asks, if the conspiracy were true, "how did All-Pro's rebating go on

9  for years without consequence?" *Id.* at 6. But All-Pro provides no evidence that its rebating

10  occurred "for years without consequence." Courts in this district recognize that "Rule 11 cannot

11  possibly require that an attorney accept as true the uncorroborated denials of an adversary

12  because that would violate the Ninth Circuit's unambiguous holding that 'Rule 11 must not be

13  construed so as to conflict with the primary duty of an attorney to represent his or her client

14  zealously.'" *Frost*, 2017 WL 2775041, at *3 (quoting *Benedict*, 2014 WL 234207, at *8 and

15  *Operating Eng'rs*, 859 F.2d at 1345).

16      At best, All-Pro's unsupported factual assertions are appropriately considered at

17  summary judgment with the benefit of discovery, or at trial. *Harara v. ConocoPhillips Co.*, No.

18  C04-0515 BZ, 2005 WL 240773, at *1 (N.D. Cal. Jan. 27, 2005) ("Rule 11 should not be used to

19  raise issues as to the legal sufficiency of a claim or defense that more appropriately can be

20  disposed of by a motion to dismiss, a motion for judgment on the pleadings, a motion for

21  summary judgment, or a trial on the merits.") (quoting 5A Charles Alan Wright & Arthur R.

22  Miller, *Federal Practice and Procedure* § 1336.6 (4th ed.)); *Inn S.F. Enter., Inc. v. Ninth St.

23  *Lodging, LLC*, No. 3:16-CV-00599-JD, 2016 WL 8469189, at *2 (N.D. Cal. Dec. 19, 2016)

24  (similar).

25  **A.    Plaintiffs Have No Obligation To Include All-Pro's Contested Facts In the
          SCAC**

26

27      All-Pro contends that Plaintiffs had a duty to allege that All-Pro rebates "consistently" or

28  "frequently." *See* Mot. at 8-9. It bears noting first that nothing about the data All-Pro provided

actually confirms "consistent" or "frequent" rebating. All-Pro provides transaction information for just *three days* in a *sixteen-year* class period. As this Court has previously held, "it is not possible to draw meaningful conclusions from such a small sample size because the data is not statistically significant." *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-CV-05541-JST, 2020 WL 1786159, at *15 (N.D. Cal. Apr. 7, 2020) (declining to draw conclusion from four instances over 17 years). The asserted "average premium rates" are unexplained and uncorroborated (indeed, All-Pro revised it upwards from 5.3-6.7% to 7.66-8.36%), and otherwise only cover one-quarter of the class period, from 2016 to 2019.

Plaintiffs have no obligation to include unsupported allegations in their complaint that All-Pro (incorrectly) thinks is relevant to its defense. Indeed, if Plaintiffs did so, they would be violating their "primary duty" to "represent his or her client zealously." *Operating Eng'rs*, 859 F.2d at 1344 (reversing imposition of Rule 11 sanctions). Plaintiffs must simply plead evidentiary support for their claim. *Benedict*, 2014 WL 234207, at *5. That is what Plaintiffs did, and nothing All-Pro provides conclusively refutes any allegation in the SCAC.

All-Pro's authorities are readily distinguishable. First, their reliance on *United National* is peculiar, because it supports *denying* sanctions: there, Ninth Circuit reversed an imposition of sanctions because "counsel had *some* plausible basis, albeit a weak one" for its argument. *United Nat'l Ins.*, 242 F.3d at 1117. The SCAC's evidentiary support is robust.

All-Pro's remaining cases are inapposite. *Truesdell* and *Hall*, unlike this case, presented situations where the plaintiff was aware of undisputed facts that affirmatively disproved the claim. *Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1153–54 (9th Cir. 2002) (counsel knew allegation that no employee had been fired for misreading medical slides was untrue because counsel had previously represented such an employee); *Hall v. Hamilton Fam. Ctr.*, No. 13-CV-03646-WHO, 2014 WL 1410555, at *9–10 (N.D. Cal. Apr. 11, 2014) (plaintiff alleged defense counsel had prohibited plaintiff from re-applying for a job when counsel explicitly allowed plaintiff to do so). Others deal with failure to disclose critical procedural facts that bear no relevance to All-Pro's contentions here. *Merna v. Cottman Transmission Sys., LLC*, No. C05-5446 RJB, 2005 WL 8173859, at *5 (W.D. Wash. Dec. 16, 2005) ("omission" was

plaintiff did not tell court that the action was an attempt to "end run" around injunction issued in another court); *In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988) (failure to disclose previous representation of unsecured creditor in bankruptcy request for continuance).

### B. The SCAC Reflects a Reasonable and Competent Inquiry

If the Court concludes that the antitrust claims against All-Pro are not baseless, then the inquiry ends, and All-Pro's Motion should be denied. *See*, *e.g.*, *Benedict*, 2014 WL 234207, at *11 (declining to assess the reasonableness of an investigation after finding that the counterclaim in question was not baseless) (collecting cases); *In re Keegan*, 78 F.3d at 434.

In the event the Court concludes that the antitrust claims against All-Pro *are* baseless, the Court must then determine whether these claims resulted from a reasonable and competent inquiry. A reasonable inquiry means an inquiry reasonable under "all the circumstances of a case." *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990). Determining whether such an inquiry took place is "intensely fact-bound . . . ." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1365 (9th Cir. 1990). The Ninth Circuit instructs that courts should view the reasonable inquiry lens with particular leniency, including, *inter alia*, in the early stages of litigation where "the relevant facts are in [the] control of the opposing party," and where allegations pertain to the opposing party's knowledge, purpose, or intent. *Id.* at 1364.

Plaintiffs' SCAC relies entirely on publicly available information gathered in an investigation spanning over two years and involving attorneys and staff at Lieff Cabraser and its co-counsel, four non-profits with experience in the bail industry. In total, Plaintiffs' Counsel spent hundreds of hours investigating the claims and conducting legal and economic analysis. Harvey Decl. ¶¶ 8, 18. Plaintiffs' Counsel examined the bail bond market and evaluated economic factors making the market susceptible to collusion and reflecting of lack of competition among sureties and agents. *Id.* ¶¶ 4, 10. Counsel conducted legal research and conferred with expert consultants, including economists, with expertise in the bail and insurance industries. *Id.* ¶¶ 4, 6, 17. Counsel thoroughly reviewed each and every CDI filing by a Surety Defendant (including All-Pro's surety, Bankers) to identify the filed premium rate (nearly always 10%), and evaluated financial information for loss ratio and profit margins suggesting

lack of competition. *Id.* ¶¶ 11, 14. Plaintiffs' counsel searched bail agent, trade association, and surety websites and other publicly-available sources for information reflecting advertisements of rebates (finding essentially none). *Id.* ¶ 3, 13-14. This included a close review of current and former iterations of All-Pro's website, revealing it mislead consumers to believe that the standard rate was the only rate available and that offering lower prices was a "crime." *Id.* ¶¶ 15-16. This investigation reflects robust inquiry into the factual and legal basis for the claims. *See Persian Gulf Inc. v. BP W. Coast Prods. LLC*, No. 18-CV-1374-DMS-AGS, 2020 WL 1028483, at *4 (S.D. Cal. Mar. 2, 2020) (denying Rule 11 sanctions in an antitrust case and noting that "perhaps most importantly . . . [plaintiffs] properly consult[ed] with [their] expert in drafting the operative complaint" (citation and internal quotations omitted)).

All-Pro contends that Plaintiffs "declined to even look at" its factual contentions, and "buried their heads in the sand" when presented with All-Pro's rebating information. ECF No. 91 at 2, 12. To the contrary, Plaintiffs carefully considered All-Pro's assertions, and explained why they did not and could not disprove Plaintiffs' claims. Plaintiffs also told All-Pro what information would be useful in further evaluating All-Pro's assertion that it never joined the alleged conspiracy. Plaintiffs asked for All-Pro to provide any marketing material advertising rebates, or communications between All-Pro and its bail agents directing the agents to rebate. ECF No. 113-1 at 21, 29. Plaintiffs also asked for additional transaction data from All-Pro's CRM database. *Id.* at 29. All-Pro did not provide any evidence of rebate advertisements, and it claimed it would be "very burdensome" to produce transaction data for a year or more from its CRM database. *Id.* at 35. Plaintiffs are skeptical of All-Pro's unsupported assertion of burden, and asked questions to evaluate it. All-Pro refused to answer Plaintiffs' questions meant to assess that burden. *Id.* at 48, 50-51. All-Pro also refused to provide the back-up data for its asserted "average premium rate," claiming it was based on "company financials" but refusing to produce the information to Plaintiffs "without entry of a protective order." *Id.* at 52. Given that, on July 2, 2020, Plaintiffs proposed a protective order nearly identical to the Northern District's Stipulated Protective Order to all Defendants. Harvey Decl. Ex. 1. No Defendant agreed to sign it, and All-Pro responded to claim such a protective order was "premature," even though it had

stated it would not produce back-up data without one.  Harvey Decl. Ex. 2.

At every turn, Plaintiffs sought more information and attempted to deepen the investigation Plaintiffs had already conducted of publicly-available information, with the benefit of information that is only in All-Pro's possession.  Plaintiffs also offered to walk through the SCAC and explain the basis for any allegation about which All-Pro had questions or concerns.  *See* ECF No. 113-1 at 38-39.  All-Pro consistently refused.  *Id.*  To now criticize Plaintiffs for lacking curiosity about the facts is the height of *chutzpah*.

Indeed, Plaintiffs' investigation stands in stark contrast to All-Pro's authorities, which reflect no investigation at all.  *See Hunt v. Sunny Delight Beverages Co.*, No. 818 CV00557 JLSDFM, 2018 WL 6786265, at *3 (C.D. Cal. Dec. 18, 2018) (plaintiff's counsel ignored a sworn declaration attesting that the stylized renderings plaintiff claimed she had seen in store had not actually appeared on any products); *Sconiers v. Fresno Cnty. Superior Ct.*, No. 1:11-CV-00113-LJO, 2011 WL 5884263, at *12 (E.D. Cal. Nov. 23, 2011), *report and recommendation adopted*, 2012 WL 174945 (E.D. Cal. Jan. 20, 2012), *aff'd sub nom. Sconiers v. Jud. Council of California*, 623 F. App'x 896 (9th Cir. 2015) (counsel failed to discover that courts had previously dismissed the very same claims with prejudice); *Wold v. Min.s Eng'g Co.*, 575 F. Supp. 166, 167 (D. Colo. 1983) (no investigation); *Bovinett v. HomeAdvisor, Inc.*, No. 17 C 06229, 2020 WL 1330407, at *5 (N.D. Ill. Mar. 23, 2020) (re-filing complaint after dismissal for lack of jurisdiction with "same [jurisdictional] deficiencies"); *Superior Consulting Servs., Inc. v. Steeves-Kiss*, 786 F. App'x 648, 651 (9th Cir. 2019) (confidentiality agreement underlying claim had expired).  All-Pro also cites to a 34-year-old law review article, which is irrelevant because nothing All-Pro provided "contradicts [Plaintiffs'] contentions."  *See* Mot. at 11 (citing Edward D. Cavanagh, *Developing Standards Under Amended Rule 11 of the Federal Rules of Civil Procedure*, 14 Hofstra L. Rev. 499, 521 (1986)).

Plaintiffs conducted a thorough, thoughtful investigation, stymied only by Defendants' refusal to participate in discovery.

## V.  CONCLUSION

For the foregoing reasons, All-Pro's Motion should be denied.  Should the Court deem it

appropriate to award Plaintiffs their attorney fees, Plaintiffs are prepared to submit time records reflecting the time spent responding to this Motion.

Dated: July 21, 2020

Respectfully submitted,

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

By:  _/s/ Dean M. Harvey_

Dean M. Harvey (SBN 250298)
Katherine C. Lubin (SBN 259826)
Yaman Salahi (SBN 288752)
Adam Gitlin (SBN 317047)
Jallé Dafa (SBN 290637)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone:  (415) 956-1000
dharvey@lchb.com
kbenson@lchb.com
ysalahi@lchb.com
agitlin@lchb.com
jdafa@lchb.com

*Interim Class Counsel*

Benjamin David Elga (pro hac vice)
Brian James Shearer (pro hac vice)
JUSTICE CATALYST LAW
25 Broadway, 9th Floor
New York, NY
Telephone: (518) 732-6703
belga@justicecatalyst.org
brianshearer@justicecatalyst.org

David Seligman (pro hac vice)
TOWARDS JUSTICE
1410 High Street, Suite 300
Denver, CO 80218
Telephone: (720) 441-2236
Facsimile: (303) 957-2289
david@towardsjustice.org

Stuart T. Rossman (pro hac vice)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110-1245
Telephone: (617) 542-8010
Facsimile: (617) 542-8028
srossman@nclc.org
bhighsmith@nclc.org

Cindy Pánuco (SBN 266921)
Stephanie Carroll (SBN 263698)
Nisha Kashyap (SBN 301934)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, California, 90005
Telephone: (213) 385-2977
Facsimile: (213) 201-4722
cpanuco@publiccounsel.org
scarroll@publiccounsel.org
nkashyap@publiccounsel.org

*Counsel for Plaintiffs and the Proposed Class*