COOLEY LLP
MICHAEL A. ATTANASIO (151529)
(mattanasio@cooley.com)
4401 Eastgate Mall
San Diego, CA 92121-1909
Telephone: (858) 550-6000
Facsimile: (858) 550-6420

BEATRIZ MEJIA (190948)
(mejiab@cooley.com)
DAVID HOUSKA (295918)
(dhouska@cooley.com)
MAX SLADEK DE LA CAL (324961)
(msladekdelacal@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Defendants
SEAVIEW INSURANCE COMPANY
and TWO JINN, INC.

[*Additional Moving Defendants and Counsel Listed on Signature Pages*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 19-cv-00717-JST<br><br><u>CLASS ACTION</u><br><br>**DEFENDANTS' REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Judge: Hon. Jon S. Tigar<br>Hearing Date: August 26, 2020<br>Courtroom: 2, 4th Floor<br>Time: 2:00 p.m.<br>Trial Date: Not Set |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

**TABLE OF CONTENTS**

                                                                                              **Page**

I.      INTRODUCTION ........................................................................................................ 1

II.     THE SCAC MUST STAND ON ITS OWN.......................................................... 2

III.    THE ALLEGATIONS AGAINST EACH DEFENDANT ARE INSUFFICIENT TO
        STATE A CLAIM ................................................................................................... 3

        A.      The SCAC Has Failed to Plead that Any Specific Defendant Participated in an
                Unlawful Meeting, Agreement, or Other Conspiratorial Conduct ............................ 3

        B.      The Surety Defendants........................................................................................ 4

                1.      Mere participation in trade associations is insufficient................................... 5

                2.      The SCAC's conclusory allegations regarding rebating are insufficient......... 6

                3.      Newly added Defendant AIA Holdings, Inc.................................................... 6

        C.      The Bail Agency Defendants ............................................................................ 7

                1.      Two Jinn, Inc. ........................................................................................... 7

                2.      All-Pro Bail Bonds, Inc................................................................................ 8

        D.      The Trade Association Defendants .................................................................. 9

                1.      American Bail Coalition .............................................................................. 9

                2.      Golden State Bail Agents Association ........................................................ 10

                3.      California Bail Agents Association ............................................................. 11

        E.      Plaintiffs Cannot Impute A Handful of Statements to All Defendants
                Particularly Where the Statements are Ambiguous and Made Years Ago ............... 12

IV.     THE SCAC'S ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS
        UNDERMINE THE PLAUSIBILITY OF THE PURPORTED CONSPIRACY ................. 14

        A.      Plaintiffs Have No Answer for the Variation in the Surety Defendants'
                Premium Rate Filings ...................................................................................... 14

                1.      Premium rate variations are not "minor" differences. .................................. 15

                2.      The "benchmark" theory concerning the "standard" vs. "preferred"
                        premium rates also fails. ........................................................................... 17

                3.      Plaintiffs are wrong that it is "irrelevant" that overall premium rates
                        declined over time. .................................................................................... 19

        B.      The "Parallel Anti-Rebating Practices" Allegations Remain Insufficient................. 20

V.      THE PLUS FACTORS, CONSIDERED TOGETHER, WEIGH AGAINST
        PLAINTIFFS' THEORY ....................................................................................... 22

        A.      Alleged Key Market Features Weigh Against Plaintiffs ............................. 23

                1.      Plaintiffs fail to meaningfully contest that, absent collusion, certain
                        market features produce parallel pricing...................................................... 23

                2.      Plaintiffs' attempts to distinguish the alleged plus factors fail. .................... 24

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

**TABLE OF CONTENTS**
(continued)

B.      Plaintiffs' Remaining Plus Factors Cannot Be Used to Infer Any Conspiracy ........ 26

VI.    PLAINTIFFS' UCL CLAIM FAILS ...................................................................................... 30

VII.   THE SCAC SHOULD BE DISMISSED WITH PREJUDICE ............................................. 30

VIII.  CONCLUSION.................................................................................................................... 30

Cooley LLP
Attorneys At Law
San Diego

**Cases**

*In re Animation Workers Antitrust Litig.*,
    87 F. Supp. 3d 1195 (N.D. Cal. 2015) ...................................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................................4

*Askins v. U.S. Dep't of Homeland Sec.*,
    899 F.3d 1035 (9th Cir. 2018) ............................................................................2

*Bates v. State Bar of Ariz.*,
    433 U.S. 350 (1977) ..........................................................................................22

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................6, 17, 25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ..........................................................................................24

*In re Cal. Title Ins. Antitrust Litig.*,
    No. C 08-01341 JSW, 2009 WL 1458025 (N.D. Cal. May 21, 2009) ...................29

*In re Capacitors Antitrust Litig.*,
    106 F. Supp. 3d 1051 (N.D. Cal. 2015) ................................................................9

*Cascades Computer Innovation LLC v. RPX Corp.*,
    No. 12-CV-01143, 2013 WL 316023 (N.D. Cal. Jan. 24, 2013) .....................3, 22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    738 F. Supp. 2d 1011 (N.D. Cal. 2010) ............................................................4, 5

*CDC Technologies, Inc. v. IDEXX Laboratories, Inc*,
    7 F. Supp. 2d 119 (D. Conn. 1998) ....................................................................27

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ..............................................................10, 11, 30

*Datel Holdings Ltd. Microsoft Corp.*,
    712 F. Supp. 2d 974 (N.D. Cal. 2010) ...............................................................21

*Donaldson v. Read Magazine,*
333 U.S. 178 (1948).............................................................................21

*In re Elevator Antitrust Litig.,*
502 F.3d 47 (2nd Cir. 2007)...........................................................24, 30

*In re Flash Memory Antitrust Litigation,*
643 F. Supp. 2d 1133 (N.D. Cal. 2009) ...........................................19, 20

*In re Flat Glass Antitrust Litigation,*
385 F.3d 350 (3d Cir. 2004)...............................................................19

*Gauvin v. Trombatore,*
682 F. Supp. 1067 (N.D. Cal. 1988) ...................................................12

*In re German Auto. Mfrs. Antitrust Litig.,*
MDL No. 2796 CRB, 2020 WL 1542373 (N.D. Cal. Mar. 31, 2020)....................30

*In re Graphics Processing Units Antitrust Litig.,*
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................10, 13, 16

*Groves v. City of Los Angeles,*
40 Cal. 2d 751 (1953) ........................................................................29

*In re High Fructose Corn Syrup Antitrust Litigation,*
295 F.3d 651 (7th Cir. 2002) ..........................................................13, 19

*In re Industrial Diamonds Antitrust Litigation,*
167 F.R.D. 374 (S.D.N.Y. 1996) ........................................................18

*International Healthcare Management v. Hawaii Coalition for Health,*
332 F.3d 600 (9th Cir. 2003) ..............................................................10

*Jones v. Micron Tech, Inc.,*
400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................23

*Kelsey K. v. NFL Enters., LLC,*
254 F. Supp. 3d 1140 (N.D. Cal. 2017) ..........................................15, 16

*Kleen Prods. LLC v. Int'l Paper,*
276 F. Supp. 3d 811 (N.D. Ill. 2017) ..........................................23, 25, 26

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

*Kleen Products, LLC v. Packaging Corp. of America,*
  775 F. Supp. 2d 1071 (N.D. Ill. 2011) ........................................................23, 24, 25

*In re Late Fee and Over-Limit Fee Litig.,*
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ..................................................................23

*Levine v. Blue Shield of Cal.,*
  189 Cal. App. 4th 1117 (2010) ............................................................................20

*In re LTL Shipping Servs. Antitrust Litig.,*
  No. 08-MD-01865 WSD, 2009 WL323219 (N.D. Ga. Jan. 28, 2009) .................23, 25, 26, 27

*Lubic v. Fidelity Nat'l Fin., Inc.,*
  No. C08-0401 MJP, 2009 WL 2160777 (W.D. Wa. July 20, 2009)........................16

*Morales v. Trans World Airline, Inc.,*
  504 U.S. 374 (1992) .............................................................................................22

*In re Musical Instruments,*
  798 F.3d 1186 (9th Cir. 2015) .......................................................16, 22, 24, 26

*Oliver v. SD-3C LLC,*
  No. 11-cv-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) ...............27

*Optivus Tech., Inc. v. Ion Beam Applications S.A.,*
  No. CV 03-2052 SJO, 2004 WL 5700631 (C.D. Cal. Aug. 31 2004) ...................21

*People v. Wahl,*
  39 Cal. App. 2d Supp. 771 (1940) .......................................................................21

*Plymouth Dealers Ass'n of Northern California v. Unites States,*
  279 F.2d 128 (9th Cir. 1960) ...............................................................................18

*Powell v. GMAC Mortg. LLC,*
  No. 09-CV-04928-LHK, 2010 WL 4502705 (N.D. Cal. Nov. 1, 2020).................30

*Precision Assoc., Inc. v. Panalpina World Transp. (Holding) Ltd.,*
  No. 08-CV-42 (JG)(VVP), 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011) ...............10

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,*
  971 F. 2d 37 (7th Cir. 1992) ........................................................................23, 26

*In re Rubber Chemicals Antitrust Litig.*,
232 F.R.D. 346 (N.D. Cal. 2005) ........................................................................18

*SC Mfr. Homes, Inc. v. Liebert*,
162 Cal. App. 4th 68 (2008) ...............................................................................30

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ............................................................................24

*In re Suboxone Antitrust Litig.*,
MDL No. 2445, 2017 WL 4642285 (E.D. Penn. Oct. 17, 2017) ..........................12

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
Nos. M 07-1827 SI, C 09-5609 SI, 2010 WL 2629728 (N.D. Cal. June 29, 2010)..................4

*In re TFT-LCD (Flat Panel) Antitrust Litig. (TFT-LCD I)*,
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................11, 13, 29

*In re Titanium Dioxide Antitrust Litig.*,
959 F. Supp. 2d 799 (D. Md. 2013) ...............................................................13, 24

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) ................................................................................3

*U.S. v. FMC Corp.*,
306 F. Supp. 1106 (E.D. Pa. 1969) ......................................................................26

*United States v. Container Corp. of America.*,
393 U.S. 333 (1969)............................................................................................24

*United States v. Ritchie*,
342 F.3d 903 (9th Cir. 2003) ................................................................................3

*United States v. Socony-Vacuum Oil Co.*,
310 U.S. 150 (1940)............................................................................................18

*Workman v. State Farm Mut. Auto. Ins. Co.*,
520 F. Supp. 610 (N.D. Cal. 1981) ......................................................................17

*Zheng-Lawson v. Toyota Motor Corp.*,
No. 17-cv-06591-BLF, 2018 WL 2298963 (N.D. Cal. May 21, 2018) .................12

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

*Zoslaw v. MCA Distrib. Corp.*,
  693 F.2d 870 (9th Cir. 1982) ..............................................................................17

**Statutes**

Sherman Act, 15 U.S.C. §§ 1-38 ................................................................. *passim*

**Other Authorities**

10 CCR
  § 2095(k) ...............................................................................................20
  § 2096.....................................................................................................20

FRCP
  8(a)(2) ....................................................................................................12
  12(b)(6) ....................................................................................................2

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

# I.    INTRODUCTION

Plaintiffs'[1] Opposition boils down to the argument that because the Court determined that the CAC stated a claim as to two individual Defendants and a trade association, the plausibility of an alleged conspiracy over sixteen years involving more than twenty defendants is a foregone conclusion. It is not and the SCAC must stand on its own.  As an initial matter, the SCAC suffers from the same infirmity as the CAC: it is devoid of the required individualized allegations as to each defendant.  The SCAC also presents a very different set of allegations and facts subject to judicial notice than its predecessor that render the purported conspiracy implausible as a whole.

Plaintiffs do not allege any direct evidence of a conspiracy, and instead point to supposed parallel pricing and statements about rebates that they assert can only be explained through collusion. But the facts subject to judicial notice demonstrate that there was significant price competition and that, in context, any parallel conduct was minimal and consistent with the regulatory and market environment in which the Surety Defendants operate.  The SCAC incorporates by reference the Surety Defendants' CDI premium rate filings that reveal sizable variances between Defendants' premium rates.  In response to these facts, the Opposition brazenly claims that they are "irrelevant" (Opp. at 3-4) and a "red herring" (*id.* at 3, 15).  But price competition is the antithesis of anticompetitive conduct. The facts before the Court now reveal that (1) there was no uniform definition of "standard" premium rates; (2) the Surety Defendants adopted a wide range of different rates below the 10% "standard" rate; (3) the Surety Defendants did not all shift their offerings at the same time or otherwise act in unison; and (4) the average premium rate for a bail bond offered by the Surety Defendants decreased over the course of the alleged conspiracy.  Notably, nearly half of the Surety Defendants would have given one of the named Plaintiffs a materially different price for her bond than what she received, demonstrating that the variance was anything but "irrelevant."  These judicially noticeable facts demonstrate that Defendants did not act in unison and competed on price, undermining the plausibility of a price-fixing conspiracy.

The SCAC also added numerous alleged plus factors about the bail bond market which were not present in the CAC that further undermine the plausibility of the alleged conspiracy.  To the extent

---

[1] All terms have the same definition as in Defendants' opening brief.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

Plaintiffs have sufficiently alleged parallel conduct (they have not), the crucial question is what the California bail bond market would look like if there were no cartel. If the answer is that the Court would expect to see the same alleged parallel conduct without collusion, Plaintiffs have not alleged a plausible conspiracy. Plaintiffs fail to meaningfully rebut the basic proposition that the combination of plus factors[2] they allege naturally and lawfully produce parallel pricing. The SCAC's allegations of "uniform" premium rates therefore cannot raise an inference of collusion. Finally, Plaintiffs once again shift their theory on rebating, now suggesting that Defendants engaged in a vaguely defined scheme to prevent others from advertising rebates. This new theory is based entirely on conclusory allegations and should be rejected.

Plaintiffs have thrown everything they have into the SCAC, but they have failed to address the deficiencies identified in the Court's Order and the new allegations of the SCAC and the facts subject to judicial notice demonstrate that there is no plausible conspiracy. Accordingly, the Court should dismiss the Complaint, this time with prejudice.

## II. THE SCAC MUST STAND ON ITS OWN

Plaintiffs repeatedly attempt to avoid Defendants' arguments by claiming that the Court already resolved certain issues or that Defendants' Motion is an improper attempt to seek reconsideration. (*See, e.g.*, Opp. at 1.) But the SCAC is "the only operative complaint before the district court," and the prior complaint must be "treated . . . as non-existent." *Askins v. U.S. Dep't of Homeland Sec.*, 899 F.3d 1035, 1043 (9th Cir. 2018) (citation omitted). Plaintiffs are therefore wrong to assert that "the only remaining issue for the Court to resolve" is whether Plaintiffs have provided the Defendant-specific allegations lacking in the CAC (they have not). (Opp. at 1.) The SCAC still must pass muster under Rule 12(b)(6), independent of the Court's findings regarding the preceding complaint. *See Askins,* 899 F.3d at 1043.

Likewise, Plaintiffs cannot avoid the SCAC's weaknesses by pointing to the Court's prior Order. Plaintiffs assert that the Court "already held" that they had sufficiently alleged parallel conduct

---

[2] Defendants accept Plaintiffs' characterization of the California bail bond market for this motion only, and reserve all arguments with respect to the relevant market(s), including whether one or more exist, whether the market for surety bonds and bail bonds are the same or separate, and the scope and features of any relevant market.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

that created a plausible inference of a "preceding agreement." (Opp. at 7-8.) The SCAC contains new allegations and facts incorporated by reference, making it different from its predecessor. As explained further below, these new allegations and judicially noticeable facts show, among other things, that (1) Defendants' rate filings were hardly "uniform" and were not consistent with a conspiracy (*see infra* Part IV); (2) to extent there was parallel conduct, it would likely occur with or without a cartel (*see infra* Part V). Because the SCAC must stand on its own, the Court must evaluate the overall plausibility of the alleged conspiracy based on the totality of the allegations in ***this*** complaint and the facts that are now incorporated by reference. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice.").

## III. THE ALLEGATIONS AGAINST EACH DEFENDANT ARE INSUFFICIENT TO STATE A CLAIM

### A. The SCAC Has Failed to Plead that Any Specific Defendant Participated in an Unlawful Meeting, Agreement, or Other Conspiratorial Conduct

In response to Defendants' argument regarding the lack of factual allegations as to each Defendant (*see* Mot. at 12-13, Appx. A), Plaintiffs offer a chart citing the supposed "relevant paragraphs." (Opp. at 44-45.) This chart confirms that the Court should dismiss the SCAC: it does ***not*** show fact-specific allegations and offers no substantive answer to Defendants' Appendix A, which summarizes in detail the lack of specific allegations against each Surety Defendant. All Plaintiffs have done is list the paragraphs containing general and conclusory allegations. "Generic pleading, alleging misconduct against defendants without *specifics* as to the role each played in the alleged conspiracy, was specifically rejected by *Twombly*." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008); *see also Cascades Computer Innovation LLC v. RPX Corp.*, No. 12-CV-01143, 2013 WL 316023, *6-7 (N.D. Cal. Jan. 24, 2013) (granting motion to dismiss where complaint consisted of the sort of "generic pleading—alleging misconduct against various defendants without specifics as to the role each played—that was rejected by *Twombly*").

Plaintiffs attempt to excuse their generic pleading by claiming the allegations are the result of "remarkably parallel behavior." (Opp. at 46.) This is a circular argument and fails to address the fundamental problem: the allegations are still far too conclusory to constitute the required well-pled

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET No. 19-CV-00717-JST

factual allegations. Plaintiffs *claim* that the SCAC includes the who, what, with whom and when (Opp. at 46), but the SCAC merely alleges when the Surety Defendants entered the market and then asserts in conclusory terms that they participated in the alleged conspiracy by offering the "standard premium rate" and suppressing rebates or advertising of rebates. Such unsupported allegations are insufficient to survive a motion to dismiss. (*See* Order at 25 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.* Nos. M 07-1827 SI, C 09-5609 SI, 2010 WL 2629728, at *6-7 (N.D. Cal. June 29, 2010).) Plaintiffs' reliance on *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019-22 (N.D. Cal. 2010), is misplaced because the SCAC contains no "allegations concerning specific Defendants' participation in any alleged unlawful meetings and agreements," including the estimated number of meetings each defendant participated in, what sorts of agreements were reached, or what types of employees represented defendants at those meetings. (*See* Order at 24 (citing *CRT*, 738 F. Supp. 2d at 1019-22).) Indeed, the SCAC contains no allegations that any Defendant participated in even a single discussion, communication or meeting with any other Defendants related to fixing premiums, suppressing rebates, or discouraging anyone from advertising rebates. (*See* Mot. at 13.)

Plaintiffs insist that their claim falls within some exception that a conspiracy may be formed without all parties coming to an agreement at the same time. (Opp. at 47-48.) But even if that were true, Plaintiffs would need to allege specific ***facts*** explaining how each Defendant learned of and joined the alleged conspiracy. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The SCAC fails to do so.[3]

## B. The Surety Defendants

The SCAC again fails to plead sufficient factual allegations that each of the dismissed Surety Defendants (plus the newly added AIA Holdings) joined or participated in the alleged conspiracy. Plaintiffs claim that the paragraphs identified on pages 45 and 46 of their Opposition constitute

---

[3] Plaintiffs attempt to distinguish *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009), and *CRT*, 738 F. Supp. 2d at 1017-19, on the ground that those plaintiffs had the benefit of discovery and government investigations. Nothing in those cases supports Plaintiffs' apparent view that a discovery stay excuses them from meeting the *Twombly* pleading standard.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

"substantive and substantial amendments" that address the deficiencies previously identified by the Court. (Opp. at 45.) On the contrary, the cited paragraphs are nothing more than conclusory, cut-and-paste allegations that merely parrot some elements of Plaintiffs' cause of action.

### 1. Mere participation in trade associations is insufficient.

Plaintiffs assert that their additional allegations regarding "information sharing through trade associations" should be enough to state a claim against each Surety Defendant. (Opp. at 48.) But the SCAC fails to actually allege that the Surety Defendants shared specific incriminating information through trade associations, much less that they entered into agreements at trade association meetings. As in *CRT*, Plaintiffs have failed to plead the estimated number of meetings each defendant participated in, what sorts of agreements were reached, or what types of employees had represented defendants at those meetings. (*See* Order at 24 (citing *CRT*, 738 F. Supp. 2d at 1019-22).) Plaintiffs allege nothing more than membership in trade associations, and indeed, the Opposition neglects to mention that some Surety Defendants, including Danielson National Insurance Co. and Philadelphia Reinsurance Corp., *are not even alleged to be members of trade associations*. Others, such as American Contractors Indemnity Insurance Co., are not alleged to be members of the trade associations that involve bail agents. Moreover, Plaintiffs fail to identify allegations in the SCAC that even allege attendance, which even on its own, is not sufficient to raise an inference that a defendant was part of a conspiracy.[4] (Order at 25 ("A firm cannot enter a conspiracy merely by selling a bail bond, and the law is well settled that attending a trade association meeting, without more, is not evidence of participation in a conspiracy.") (collecting cases).) As Plaintiffs have not added any specific factual allegations that so much as a single Surety Defendant had any collusive communications through trade associations, or at any trade association meeting, there is no reason for the Court to revisit its prior Order on this issue.

---

[4] Plaintiffs identify SCAC ¶¶ 132, 157, 167, 192, 317, and 325, which they claim show that they "have alleged not only the meetings but also the attendees." (Opp. at 55.) But as Defendants point out in their opening brief, Paragraph 132 notably does not actually say that any Defendants actually attended the conference, only that they provided funding to ABC. (Mot. at 30.) The remaining paragraphs Plaintiffs cite do not plead anything about attendance at trade conferences.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

5.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

## 2. The SCAC's conclusory allegations regarding rebating are insufficient.

The SCAC's anti-rebating theory now focuses exclusively on an ill-defined agreement "to discourage and suppress rebating." (*See* Mot. at 10 (describing the shift in Plaintiffs' approach to the anti-rebating allegations).) In the Opposition, Plaintiffs contend that the SCAC's allegation that "all the sureties discouraged their agents from rebating and asked them to report violations" is sufficient to support that theory. (Opp. at 48.) It is not. Plaintiffs do not (and cannot) point to *any* well-pled facts to support these allegations. They cite only to a single paragraph (SCAC ¶ 162) as support. But this paragraph is simply a bare assertion unsupported by any factual allegation. Corresponding paragraphs for other Surety Defendants are frequently even more threadbare.[5] Plaintiffs allege in broad and conclusory terms that each Surety agreed to abide by the understanding between and among "other bail bond sureties" to discourage rebating or advertising rebates to customers. Plaintiffs then assert—without factual support—that the Surety Defendants worked with "rival sureties" to monitor rebating practices. These are mere conclusory statements, wholly lacking in any factual predicate as to each Surety Defendant, as Defendants' Appendix A demonstrates. As such, the Court should not credit them as true. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).[6]

## 3. Newly added Defendant AIA Holdings, Inc.

In apparent recognition of the SCAC's deficient allegations against AIA, Plaintiffs try to supplement their allegations with extraneous documents outside of the pleadings and a belated request for judicial notice. (*See* ECF No. 115.) However, as explained in Defendants' concurrently filed response to Plaintiffs' request for judicial notice, the Court cannot accept the statements contained in these documents for their truth, and these statements certainly cannot be used to supplement Plaintiffs' deficient allegations.

---

[5] For example, there are no allegations that many of the Surety Defendants "instructed" their agents "to report any rebating observed by agents, or that Surety Defendants "communicated with . . . rival sureties" through trade associations "to eliminate" rebating. *See, e.g.*, ¶ 185. Paragraph 162, in other words, is flawed on its own terms, but is also not representative of the allegations against all Surety Defendants, and Plaintiffs cannot escape their obligation to plead specifics as to each Surety Defendant by reference to this paragraph.

[6] Plaintiffs again try to avoid their pleading burden by pivoting to an irrelevant issue about how an alleged agreement is "effectuated." (Opp. at 48.) This issue has nothing to do with whether Plaintiffs have met their burden of alleging sufficient factual allegations as to each Surety Defendant's role in the alleged conspiracy. In any event, the SCAC does not sufficiently allege that each surety Defendant actually agreed to "restrain advertisement."

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

6.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

Plaintiffs do not even try to explain what they mean by calling AIA an "alliance" or an "umbrella organization," instead simply stating that these are terms AIA uses on its own website. (Opp. at 49.)  No matter where Plaintiffs found the language, they still have failed to explain the legal significance of these terms and/or the legal relationship between AIA, International Fidelity, and Allegheny.  Plaintiffs also claim that "AIA has a common executive team that coordinates the bail bond business across the three component companies" and then leaps to the conclusion that "AIA is in charge of and runs Defendants' Allegheny and International Fidelity's bail bond business, and therefore was a direct participant in the latter's conspiratorial activities."  (*Id*.) Plaintiffs never allege that AIA had the right to control, bind, or take any action on behalf of International Fidelity and Allegheny, or that any conduct by AIA, to the extent that any is alleged in the SCAC, was performed as an agent of International Fidelity and Allegheny.

Plaintiffs also fail to establish any participation by AIA in any purported conspiracy to set premiums or to suppress rebating. Plaintiffs rely entirely on a single statement by Jerry Watson on the blog portion of the AIA website, where he suggested that AIA agents might benefit more from competing on service rather than on price.  (Opp. at 49-50.) This isolated statement is insufficient on its own.  There is not a single allegation in the SCAC (i) that AIA ever met with or communicated with any other Defendant regarding premiums or rebating; (ii) that AIA agreed with any other Surety Defendants or Bail Agent Defendants to do anything; or (iii) that AIA prohibited its bail agents from offering rebates, or instructed them not to discuss or disclose the possibility of rebates to customers.

### C. The Bail Agency Defendants

#### 1. Two Jinn, Inc.

Plaintiffs do not allege that Two Jinn (1) was involved in decisions to set premium rates; (2) failed to offer its customers rebates; or (3) reached any agreement with another Defendant not to offer rebates.  Plaintiffs are left with statements on Two Jinn's website and the lone allegation that Two Jinn did not offer Plaintiff Monterrey a rebate.  (*See* Opp. at 50-51 (attempting to defend "new" allegations against Two Jinn as sufficient).)   For the same reasons that the Court previously found, these allegations fail to state a claim against Two Jinn.  (*See* Mot. at 36-37; Order at 25-26.)

Despite the lack of sufficient particularized allegations, Plaintiffs nonetheless contend that

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

7.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

Two Jinn's "overall behavior is at odds with its economic incentives absent a conspiracy." (Opp. at 51.) In support, the Opposition points to statements on Two Jinn's website from 2006, in which it describes 10% premium rates as "standard" and warns against rates that may not comply with CDI regulations. (*See id.* at 50-51 (citing SCAC ¶¶ 373-74).) Plaintiffs claim these statements prove Two Jinn was part of a conspiracy because it would have been "incentivized to meet competition at 5%" if it were not a co-conspirator. (*Id.* at 50.) But this argument once again ignores the fact that, under California law, bail agents *must* charge the premium rates submitted by sureties and approved by the CDI—*i.e.*, agents are not free to charge any premium rate percentage they see fit. (*See* Mot. at 33-34, 37.) There is no evidence the CDI has ever approved a 5% premium rate, and the SCAC does not allege otherwise. (*See* Defs.' Appendix B.) This is precisely why Two Jinn would have warned about other agencies that advertised "5% bail or less." (*See* SCAC ¶ 374 (alleged 2006 FAQ on Two Jinn website noted that 5% *premium rates* could amount to "misleading advertising" on behalf of other agencies).) Thus, not only are these statements not evidence of "behavior at odds with [Two Jinn's] economic incentives absent a conspiracy," they cannot even be considered evidence of "potentially" misleading advertising.

Finally, Plaintiffs' allegation that unspecified Two Jinn representatives once attended a trade conference—which no other Defendant is alleged to have attended—is insufficient. (*See* SCAC ¶ 378.) Attending a trade show, without more, is not indicative of a conspiracy, especially as Plaintiffs do not (and cannot) contend that any illegal agreement was discussed or reached at that meeting. (*See* Order at 25 ("[M]ere participation in trade-organization meetings . . . does not suggest an illegal agreement.").)

### 2. All-Pro Bail Bonds, Inc.

As explained in the Motion, the allegations against All Pro in the SCAC are even thinner than those Plaintiffs previously directed at Defendant Two Jinn—allegations that this Court already rejected as insufficient. (*See* Order at 25-26.) Plaintiffs' Opposition offers no basis for this Court to reach a different conclusion this time around. (*See* Opp. at 51-52.)

For example, while Plaintiffs suggest that All-Pro's website misled consumers into believing that "even trying to get a rate below 10%" is illegal (Opp. at 52), the website says no such thing.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

Rather, it says that failure by All-Pro to "*charge* the proper rate" is unlawful, not that a consumer violates the law by asking for a lower rate. (*Id.* (emphasis added).) The quoted statement is just a different formulation of what the CDI itself says and the law reflects: a bail agent cannot lawfully charge anything but the approved premium rate. (*See* Mot. at 33-34.) And while Plaintiff Crain makes the conclusory allegation that All-Pro "misled" her into believing that a lower price for her bail bond was impossible (SAC ¶ 379), she does not say whether she saw or relied on the website statement she now claims is misleading, or if she contends she was misled in some other way. This "bare allegation" does "not satisfy *Twombly*" and must be disregarded. *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1217 (N.D. Cal. 2015). In any event, Plaintiffs are trying to plead an antitrust claim, "not a . . . claim for misleading advertising" (Opp. at 4), and, as this Court already held, allegedly misleading website statements, combined with not offering an individual purchaser a rebate, do not add up to a plausible claim of participation in an anti-rebating conspiracy. (*See* Order at 25-26.)

Similarly, Plaintiffs do not allege facts tying All-Pro to the associations that supposedly played "critical roles" in the conspiracy or to any meetings where an agreement was supposedly reached. (SCAC ¶ 126; Mot. at 38.) Plaintiffs quibble that All-Pro "did not join certain [trade association] meetings." (Opp. at 52.) But Plaintiffs do not allege that All-Pro attended *any* meetings, or that All-Pro was even a member of the associations in question. (Mot. at 38.) It is also undisputed that All-Pro did not exist when the conspiracy was allegedly formed or when the only alleged invitations to collude were made. (*Id.*) While Plaintiffs argue that All-Pro could have joined the conspiracy at some later point (Opp. at 52), that speculation, particularly without any factual allegation connecting All-Pro to an opportunity to conspire, is insufficient to state a plausible claim. *See In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1066 (N.D. Cal. 2015) (dismissing complaint against defendant where it was "not alleged to have participated in or even been informed of the 'cartel's regular meetings'").

### D. The Trade Association Defendants

#### 1. American Bail Coalition

Plaintiffs' allegations as to ABC reduce to (1) that ABC held meetings and conferences; (2) that ABC was part of the non-defendant California Bail Coalition along with CBAA and GSBAA; and

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

(3) that Carmichael and Watson extended invitations to collude. (*See* Opp. at 53.) The first two allegations constitute nothing more than the normal operation of a trade association and do not support any inference that ABC participated in a conspiracy. *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) ("If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action."); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) (same).

Moreover, not only does the SCAC not support Plaintiffs' attempt to impute statements allegedly made by Carmichael and Watson to any Defendant including ABC, the statements are not "invitations to collude" but are taken out of context. (*See infra* Section III.E; *see also* Mot. at Section IX.) The various statements attributed to Carmichael for instance, were all posted in the blog of another party's website. (*See* SCAC ¶ 128.) Watson's statements similarly did not appear on ABC's website. (*See id.* ¶ 368.) Plaintiffs cannot leverage these statements ***not*** made on behalf of ABC, into participation in a conspiracy. *See Precision Assoc., Inc. v. Panalpina World Transp. (Holding) Ltd.*, No. 08-CV-42 (JG)(VVP), 2011 WL 7053807, at *19 (E.D.N.Y. Jan. 4, 2011) ("group pleading" was inadequate to state a claim where plaintiffs alleged that 65 defendants were members of multiple conspiracies to fix freight forwarding prices).

### 2. Golden State Bail Agents Association

Plaintiffs' allegations regarding GSBAA are equally inadequate. Notwithstanding Plaintiffs' efforts to distinguish *International Healthcare Management v. Hawaii Coalition for Health*, 332 F.3d 600, 608 (9th Cir. 2003) (*see* Opp. at 57), allegations of information sharing do not add up to price-fixing. Indeed, despite the SCAC's conclusory allegations, Plaintiffs have not pled facts showing that "Defendants were not simply disseminating legitimate business information" through the associations. (Opp. at 57.) As explained above, mere allegations that GSBAA hosted meetings or otherwise behaved as a trade association are insufficient, especially as Plaintiffs have not alleged which, if any, Defendants attended the annual conference or quarterly phone calls, nor what was discussed. (SCAC ¶ 144.)

Plaintiffs' effort to tie GSBAA to a conspiracy through an alleged invitation to agree— supposedly made on websites run by non-defendant bail agent companies operated by GSBAA's

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

president and co-founder Topo Padilla and board member Jeff Stanley—is yet another stretch. Plaintiffs cite no authority permitting a court to attribute statements by a third-party to a defendant, where there are no allegations that the defendant ratified or adopted the statement. (*See* Opp. at 57.) Plaintiffs' argument that they need not tie the third parties' statements to GSBAA demonstrates the hollowness of their claims, and their lack of plausibility. By contrast, in *In re TFT-LCD (Flat Panel) Antitrust Litigation (TFT-LCD I)*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008), it was defendants' own statements, not someone else's, that were sufficient. And, in all events, the allegation that only two of twenty sureties are linked does not support a claim of conspiracy.

Finally, the fact that GSBAA linked to the websites of Defendants Lexington National and Financial Casualty, does not suggest participation in a cartel. (*See* Opp. at 57.) Not only is this a far cry from actually adopting or ratifying any statements on those linked websites, linking to member's pages is precisely the kind of routine conduct one would expect of a trade association.

### 3. California Bail Agents Association

Although the Court previously found that the allegations against CBAA in the CAC were sufficient to withstand a motion to dismiss, the allegations are deficient in the context of the SCAC. Indeed, Plaintiffs barely address CBAA in their Opposition, arguing that the Court's order on the prior motion to dismiss found that they had stated a claim where they alleged that CBAA "(1) maintained information regarding the premiums Defendants charged in order to prevent discounting, (2) asserted on its webpage that bail agents must charge the same rate, and (3) referenced a book that explained the standard rate in California is 10%." Opp. at 8 (citing MTD Order, ECF No. 91, at 26-27). But just as with ABC and GSBAA, allegations of the mere facilitation of the exchange of information does not create an inference of a conspiracy. *In re Citric Acid*, 191 F.3d at 1098 ("Gathering information about pricing and competition in the industry is standard fare for trade associations"). That is particularly so here, where rate filings are publicly available. Plaintiffs' reference to a book refers to an article by the third party who was a CBAA board member, and Plaintiffs do not allege that CBAA ever adopted or ratified this statement. *See* SCAC ¶¶ 140-41.

Plaintiffs' Opposition also mischaracterize their own allegations. For instance, they contend that 'Defendant CBAA trained its agents that 'the only time you might lower the fee to 8%, which is

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET No. 19-CV-00717-JST

1  2% less than the standard 10%, is if you are working with a referral from an attorney'" (Opp. at 24

2  (citing SCAC ¶¶ 140-41).)  Yet the SCAC alleges that CBAA's supposed "training" was actually

3  offered by a non-defendant third party, and Plaintiffs have not alleged that CBAA had any control

4  over the content of that third-party's bail courses.  (*See* SCAC ¶¶ 140-41.)

5      For the reasons detailed in Defendants' Motion, the SCAC alleges a less plausible conspiracy

6  than the predecessor complaint.  This backsliding, coupled with the lack of specific allegations against

7  CBAA, justify revisiting the Court's prior ruling and dismissing CBAA.

8      **E.      Plaintiffs Cannot Impute A Handful of Statements to All Defendants
              Particularly Where the Statements are Ambiguous and Made Years Ago**

9

10      To conceal the fact that they have virtually no specific allegations as to each Defendant,

11  Plaintiffs repeatedly refer to a handful of statements as admissions by "Defendants."  (*See, e.g.*, Opp.

12  at 11, 12.)  The allegations that Defendants Carmichael and Watson invited or orchestrated a price-

13  fixing conspiracy are completely meritless and based on Plaintiffs twisting a handful of lines out of

14  context.  But in any event, the Court should reject Plaintiffs' attempt to turn statements by two

15  individuals into a wide-ranging conspiracy by nearly two dozen other entities.  First, as a basic

16  principle of law, an antitrust plaintiff cannot impute the actions of one defendant to another through

17  "collective pleading," or in this case, collective briefing.  *In re Suboxone Antitrust Litig.*, MDL No.

18  2445, 2017 WL 4642285, at *11 (E.D. Penn. Oct. 17, 2017) (plaintiffs could not "group" multiple

19  defendants together to create liability as "such collective pleading is insufficient to impute the actions

20  of Indivior to RBH"); *Zheng-Lawson v. Toyota Motor Corp.*, No. 17-cv-06591-BLF, 2018 WL

21  2298963, at *2 (N.D. Cal. May 21, 2018) ("Allegations which lump multiple defendants together are

22  insufficient to put any one defendant on notice of the conduct upon which the claims against it are

23  based."); *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988) ("[A]ll defendants are

24  lumped together . . . . Plaintiff must allege the basis of his claim against each defendant the basis of

25  his claim against each defendant to satisfy Federal Rule of Civil Procedure 8(a)(2)"). This is especially

26  true here where Plaintiffs do not and cannot allege that other Defendants were aware of these

27  statements, much less that they adopted them.  Moreover, ***over half*** of the Defendants are alleged to

28  have joined the conspiracy ***years*** after the statements were made.  (*See* SCAC ¶ 7.)  Even if these

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

12.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

Defendants had somehow been aware of the individual statements (and there are no allegations they were), the Court cannot assume the statements somehow apply to every Defendant. *See In re Graphics Processing Units*, 527 F. Supp. 2d at 1023 ("even where some competitors have admitted to meeting to fix prices at or near trade shows and conferences, it is not reasonable to infer that another competitor in attendance at the same meeting had done likewise").

Furthermore, the alleged statements are far from sufficient, on their own, to make a conspiracy plausible. While Plaintiffs claim that the statements from Carmichael and Watson constitute *invitations* to collude, the cases they rely on involved direct *admissions*. For instance, Plaintiffs claim that *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002) demonstrates the statements "are prototypical examples of statements that support a reasonable inference of collective . . . action." (Opp. at 27.) But in that case, one defendant said that "[w]e have an understanding within the industry not to undercut each other's prices," while another was quoted as saying "our competitors are our friends. Our customers are the enemy." *High Fructose Corn Syrup*, 295 F.3d at 662. Similarly, *In re Titanium Dioxide Antitrust Litigation*, 959 F. Supp. 2d 799, 829 (D. Md. 2013) involved numerous statements which spoke to express, ongoing coordination. Here, Plaintiffs provide two statements, isolated in time and long ago, that do not indicate collusion was taking place then, much less that it continued for another 15 years. Nor can Plaintiffs point to any action by any Defendant in the wake of the alleged "invitations" that reflect "responsive assurances or conduct." *See TFT-LCD I*, 586 F. Supp. 2d at 1116.

Plaintiffs overreach when they claim that the statements from Carmichael and Watson coupled with the allegations of parallel conduct are enough on their own to infer a conspiracy. (*See* Opp. at 13, 14.) As discussed in Part IV below, there was significant and active price competition between Defendants and therefore, even assuming the individuals' statements were invitations to collude— which they are not—the cited statements are insufficient on their own. Accordingly, the Court must consider more than just the statements of two individuals and examine whether Plaintiffs have adequately tied each individual Defendant to the alleged conspiracy. They have not even come close to doing so.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

13.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

## IV. THE SCAC'S ALLEGATIONS AND JUDICIALLY NOTICEABLE FACTS UNDERMINE THE PLAUSIBILITY OF THE PURPORTED CONSPIRACY

Because, as Plaintiffs' Opposition concedes, the SCAC attempts to allege "a single price-fixing conspiracy" (Opp. at 21), both forms of parallel conduct allegedly evidencing the conspiracy must hold water. Neither does. The SCAC's allegations of parallel conduct concerning premium rate filings are undermined by variability evidenced in the rate filings themselves. The anti-rebating aspect of the purported conspiracy is fundamentally unsound.

### A. Plaintiffs Have No Answer for the Variation in the Surety Defendants' Premium Rate Filings

Defendants' Motion explained how Plaintiffs' story of lockstep premium rate filings is belied by the Surety Defendants CDI filings. (*See* Mot. at 15-21, Appendix B.) Indeed, the relevant filings not only show significant variation between the Surety Defendants' filed rates, they show that premium rates declined over the very period that the SCAC alleges a conspiracy to keep premium rates constant and artificially high. (Mot. at 18-20.) Crucially, variations among the rate filings submitted to the CDI show that the "standard" rate for each Surety Defendant does not exist in isolation and can only be understood by how it relates to other rates that the surety offers the purchaser and who qualifies for those rates. (Mot. at 16-17.) This renders Plaintiffs' theory of parallel conduct essentially meaningless because (1) it shows that the 10% "benchmark" rate alleged in the SCAC does not apply uniformly across the Surety Defendants, and (2) the 10% rate has applied differently over time depending on the types of lower "preferred" rates the Surety Defendants offered. As shown, the SCAC takes a single data point out of context to create an appearance of "uniform" conduct when in fact, Defendants premium rates varied significantly.

Plaintiffs do not substantively challenge these facts. (*See* ECF No. 114 (Pls' Resp. to Defs' Req. for Judicial Notice).) Instead, the Opposition characterizes the premium rate variations—which were conveniently omitted from the SCAC—as "minor differences" and conclude that the rate filings still "reflect a surprising degree of consistency suggestive of collusion." (Opp. at 16, 21.) But the differences are significant and contradict any argument that the alleged parallel conduct suggests a conspiracy.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

14.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

**1.** **Premium rate variations are not "minor" differences.**

There are two primary components to the premium rates that the Surety Defendants file with the CDI: (1) the premium rates themselves, and (2) who the different approved premium rates apply to. One aspect of the rate means little without consideration of the other. Though there is clearly wide variation between the Surety Defendants regarding who is eligible for preferred rates (Mot. Appx. B), Plaintiffs' characterize these differences as "minor." (Opp. at 21.) Yet one of the ***named Plaintiffs*** would have received materially different rates from different defendants when she was arrested. Ms. Monterrey was charged an 8% premium rate by Seaview Insurance Co., but nearly half of the other named Surety Defendants, who did not offer discounts for veterans when Ms. Monterrey purchased her bond in 2016, would have charged her a 10% premium rate—or 25% higher. (*See* Mot. at 16-17.) Plaintiffs' Opposition makes no effort to address this glaring issue or to defend the SCAC's demonstrably inaccurate assertion that all of the Surety Defendants had "agreed" to a "standard veterans' discount." (SCAC ¶ 371.) In fact, of the fourteen criteria used to establish eligibility for preferred vs. standard rates, only two have been adopted by all of the Surety Defendants who currently offer preferred rates. (*See* Mot. Appx. B.) Though Plaintiffs "attempt[] to gloss over the differences in conduct between defendants," they cannot avoid the fact that underneath the "standard" label is significant "non-parallel conduct [that] undercut[s] the very theory asserted by the complaint." *Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1146 (N.D. Cal. 2017).

Plaintiffs also attempt to hand-wave away the variations in non-"standard" rates by asserting that "for half of the Class Period (2004-2012), there were uniform 8% and 10% preferred and standard rates across the board." (Opp. at 21.) Once again, calling these rates "uniform" obscures the fact that these Surety Defendants applied the standard and preferred rates based on different eligibility criteria. (*See* Mot. at 17-18.) Additionally, Plaintiffs ignore the fact that three Surety Defendants broke from this "uniform" structure and charged 15% rates for certain categories of bonds.[7] Likewise, Plaintiffs' attempt to deal with the fact that many Surety Defendants charge varying rates below 8% is even weaker, claiming that "only eight" Surety Defendants have added rates lower than 8%, and "only one"

---

[7] Plaintiffs claim, without citation to the SCAC or explanation, that these offerings did "not relate to the 'standard' rate category." (Opp. at 15 n.2.) Even if true, this does not change the fact that there were rate filings beyond the supposedly universal 8 and 10% rates.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET No. 19-CV-00717-JST

Surety Defendant has started offering a 6% rate. (Opp. at 21.) The fact that "only" **40%** of the Surety Defendants offer rates below 8% demonstrates a high level of variation inconsistent with any conclusion of "uniform" conduct.

Plaintiffs also fail to meaningfully contend with the fact that rate filings fluctuated significantly **over time**. (*See* Mot. at 17-18; Appx. B.) Indeed, Plaintiffs' concede that it took six years for lower preferred rates to become widely adopted. (*See* Opp. at 21, n.3 (describing how Surety Defendants' adopted 7% premium rates between 2012 and 2018).) As the Ninth Circuit held in *In re Musical Instruments & Equip. Antitrust Litig.*, "[a]llegations of such slow adoption of similar [pricing structure] policies does not raise the specter of collusion." 798 F.3d 1186, 1195-96 (9th Cir. 2015) (dismissing alleged price-fixing conspiracy where "the manufacturer defendants adopted the [similar] policies over a period of several years, not simultaneously" because "[e]ven assuming that the progressive adoption of similar policies across an industry constitutes simultaneity, that fact does not reveal anything more than similar reaction to similar pressures within an interdependent market, or conscious parallelism"). And while the general trend over time was for the Surety Defendants to adopt lower rates, a few moved in the opposite direction. In 2009 and 2018 respectively, Lexington National and Financial Casualty & Surety Co. each abandoned (at least for a time) a two-tiered 10% and 8% rate structure and adopted a single 10% rate for all bonds. (*See* Mot. Appx. B.)

Plaintiffs' unsuccessfully attempt to distinguish this case from those cited in Defendants' Motion. (*See* Mot. at 21; Opp. at 18.) Like in *Kelsey K.*, where the plaintiff claimed that "difference in [relevant] [price] ranges" were "de minimis," a closer examination reveals that variations in premium rates are significant and render Plaintiffs' theory implausible. 254 F. Supp. 3d at 1146 (Plaintiffs' argument that 20-25% variation was minimal was "counterfeit logic"). Plaintiffs do not challenge that the Surety Defendants offer premium prices ranging from 15% to 6%, a wider variation than the "20 or 25%" differential that the court cited in *Kelsey K.* to establish the **insufficiency** of the alleged parallel conduct. *Id.*; *see also Lubic v. Fidelity Nat'l Fin., Inc.*, No. C08-0401 MJP, 2009 WL 2160777, at *3-4 (W.D. Wa. July 20, 2009) (finding insurance rate differentials between competitors at 5-20% represented "material margin" and noting absence of other allegations concerning "unaccountable changes" in pricing or "coordinated shifts in rate[s]"); *In re Graphics Processing*

*Units*, 527 F. Supp. 2d at 1022 (noting that allegations of not-quite parallel conduct "fall short of unusual, lockstep pricing behavior" and can just as likely be indicative of "competitive market forces"). In sum, the Opposition's efforts to downplay the significance of the premium rate variations fail.

### 2. The "benchmark" theory concerning the "standard" vs. "preferred" premium rates also fails.

Unable to avoid the fact that the premium rates are far from "uniform," Plaintiffs shift tactics and claim that the variation simply does not matter. Specifically, Plaintiffs claim that "even assuming Defendants do compete with respect to 'preferred' rate categories, that would not negate Plaintiffs' allegations of a conspiracy to fix the baseline 'standard' rate that commonly impacted the price of all transactions." (Opp. at 15.) There are at least three problems with this argument.

*First,* this argument presumes the existence of a uniform "standard" rate that could, in turn, drive preferred rates upwards. As explained above, the "standard" rates are not in fact the same because each Surety Defendant has a different definition of standard. (*See also* Mot. at 20-21.)

*Second*, this argument is fundamentally speculative. Plaintiffs support their "benchmark" (or now, "baseline") theory by pointing to the unexplained assertion in the SCAC that "the standard premium rate is a reference price for any preferred premium rates." (Opp. at 16 (quoting SCAC ¶ 103).) But the SCAC contains no allegations concerning the relationship or supposed price structure associated with "standard" vs. "preferred" rates offered by the various Surety Defendants and never explains why a drop in the "standard" rate would necessitate a drop in the "preferred" rate. The Court should not credit these conclusory assertions. *Twombly*, 550 U.S. at 555.

*Third,* the wide variation in preferred rates fundamentally undermines the overall plausibility of *any* conspiracy. Plaintiffs are simply wrong to assert that clear and unmistakable competition on premium rates is "irrelevant" (Opp. at 17) to whether it is plausible that the same Defendants conspired to fix premium rates. *Workman v. State Farm Mut. Auto. Ins. Co.,* 520 F. Supp. 610, 621 (N.D. Cal. 1981) (lack of uniformity of rates across defendants "detracts significantly from any theory that defendants' parallel activity raises an inference of conspiracy to fix prices"); *see also Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 884 (9th Cir. 1982) (price fixing claim could not survive where

defendants demonstrated "considerable variation in the distributors' account classification system as well as variance in prices offered to retailers by distributors" and "each distributor offered its own package of promotional offers and discounts which, in fact, substantially encouraged competition in the record business").

Plaintiffs cite no case standing for the nonsensical proposition that price competition among defendants is "irrelevant" to judging whether an alleged price-fixing conspiracy is plausible. In *Plymouth Dealers Ass'n of Northern California v. Unites States*, 279 F.2d 128 (9th Cir. 1960), the court held that, where the jury found that the defendant had in fact conspired to fix prices, continuing to compete in other areas of the market was not an affirmative defense to ultimate liability. *Id.* at 132. The question before the Court is not whether variation in rates constitutes a defense to an antitrust claim, but whether it renders a price fixing conspiracy, alleged solely on circumstantial evidence, implausible. Similarly, the issue in *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940) was whether, despite the "abundant evidence that the [collusive] combination had the purpose to raise prices" and resulted in price increases, defendants' justification for the agreement—the "elimination of so-called competitive evils"—was a legally cognizable defense to the Sherman Act violations. *Id.* at 219-20. *Socony-Vacuum* does not support the argument that Plaintiffs can plead a plausible claim where Defendants have not acted in unison. In *In re Industrial Diamonds Antitrust Litigation*, 167 F.R.D. 374 (S.D.N.Y. 1996), the question was whether the prevalence of individually negotiated prices defeated class certification, and plaintiffs had proffered expert testimony concerning the relationship between "list prices" and individually negotiated prices. *Id.* at 383-84. Here, the class certification analysis is irrelevant, and Plaintiffs have only conclusory allegations for their "baseline" theory. *In re Rubber Chemicals Antitrust Litigation*, 232 F.R.D. 346 (N.D. Cal. 2005) is similarly unhelpful for Plaintiffs because it also involved class certification, specifically whether plaintiffs could show common proof of class-wide impact. *Id.* at 353-54. None of these cases deal with key question here— whether the SCAC's allegations of parallel conduct are even plausible given the wide variations in pricing demonstrated by the Surety Defendants' rate filings.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

### 3. Plaintiffs are wrong that it is "irrelevant" that overall premium rates declined over time.

Plaintiffs have alleged a conspiracy to fix premium rates, which is entirely implausible if average premium rates actually declined over the course of the conspiracy. Plaintiffs argue that Defendants cannot establish that average premium rates declined over the class period. (Opp. at 19.) Plaintiffs argue that this conclusion is unfounded because it is "based solely on the fact that, over time, more Defendants created or expanded 'preferred' rate categories." (*Id*.) As an initial matter, that characterization is not true because Defendants also based their claim on the fact that multiple Surety Defendants have lowered their "standard" rates. (*See* Mot. at 19 (Defendants Allegheny Casualty Co. and International Fidelity now charge 9% "standard" premium rates).) Moreover, Plaintiffs do not, and cannot, contest that over the class period (1) the percentage of Surety Defendants offering premiums below 10% grew significantly; and (2) the Surety Defendants greatly expanded eligibility for their sub-10% rates. (Mot. at 18-20.) In 2019, a far greater share of the public would be offered premium rates below 10% (in some cases as low as 6%) than the share of the public who qualified for those rates in 2004. (*See* Mot. Appx. B.) Given these (undisputed) judicially noticeable facts there is no plausible scenario whereby the average rate could *not* have gone down over time.

Plaintiffs argue (again) that evidence of "falling prices" is somehow "irrelevant." (Opp. at 19.) But (again) the cases Plaintiffs rely on do not support this illogical position. *High Fructose Corn Syrup* rejected the argument that an agreement to fix list prices would not be a Sherman Act violation if there was competition below the list figures; the court did not say that falling prices have no bearing on the overall plausibility of a conspiracy. *See* 295 F.3d at 656. And far from holding that declining prices are irrelevant, *In re Flat Glass Antitrust Litigation* found that "***declining transaction prices will tend to support a conclusion that competitors did not enter into an agreement to fix prices***." 385 F.3d 350, 362 n.13 (3d Cir. 2004) (emphasis added).

*In re Flash Memory Antitrust Litigation*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009) also does not help Plaintiffs' cause. There, while the court did not dismiss the price-fixing claims even though defendants argued that prices had fallen, that was only because the plaintiffs could point to an extremely high level of specificity in the complaint's other allegations, including (a) "extensive,

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

detailed allegations as to when, where and who engaged in at least some of the meetings that gave rise to the alleged conspiracy," (b) numerous specific "intracompetitor communications directed at coordinating flash memory pricing," and (c) "companion antitrust investigations in [two related] flash memory market[s]." *Id.* at 1146-47. **None** of those distinguishing factors are present in the SCAC. Plaintiffs allege no relevant "intracompetitor communications," no government antitrust investigations into the bail industry, and certainly no "extensive, detailed allegations" concerning meetings that allegedly gave rise to the conspiracy. (*See supra* Part III; Mot. at 12-14.)

## B. The "Parallel Anti-Rebating Practices" Allegations Remain Insufficient

The Opposition shows Plaintiffs have given up on their initial theory that Defendants conspired to "suppress" rebates (SCAC ¶ 6), and now only advances a theory that Defendants conspired not to advertise the availability of rebates. (*See* Opp. at 21-25 (containing no rebating discussion other than of alleged notices and advertising statements).) This theory relies completely on the supposedly "misleading" statements by the Surety and Bail Agency Defendants regarding the premium rates they are authorized to charge bond purchasers.[8] Yet Plaintiffs fail to confront the fact that the majority of the supposedly "misleading" statements have been submitted to, and received approval from the CDI, ***which explicitly ensures that notices regarding bail bond prices are not misleading.*** *See* 10 CCR §§ 2095(k), 2096 (all forms must be submitted for approval to the CDI, which "shall" reject any form found to be misleading). The CDI's determination not only weighs heavily against any argument that the notices were misleading, it also undermines the overall plausibility of the conspiracy. It is simply not plausible that the CDI mistakenly or accidentally approved dozens of forms that were as misleading as Plaintiffs claim.

Additionally, courts repeatedly hold that it is not misleading for a company to not disclose the availability of discounts. Therefore, as a matter of law, the various rate postings the SCAC relies on could not constitute a misleading advertisement. *E.g., Levine v. Blue Shield of Cal.,* 189 Cal. App. 4th

---

[8] Plaintiffs' argument in this regard once again attempts to lump all Defendants together in ways that their own pleading does not support. In fact, for a number of the Surety Defendants, Plaintiffs do not allege that they made any statements at all to customers, either directly or by requiring bail agents to post language in their offices regarding pricing; they simply cite statements by bail agents which they hope the Court will attribute to the Surety Defendants. (*See, e.g.*, SCAC at ¶¶ 185-87, 196-98, 219-21, 312.)

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1117, 1129 (2010) ("we can conceive of no principled basis for concluding that Blue Shield owed the Levines a duty to disclose how the Levines could obtain the same health care coverage for a lower price"). Plaintiffs fall back on the notion that an advertisement can be literally true but nevertheless misleading, citing several authorities. (Opp. at 23.) But Plaintiffs' authorities turned on how true statements could obscure material facts or create false impressions, *see Donaldson v. Read Magazine,* 333 U.S. 178, 188 (1948); *People v. Wahl*, 39 Cal. App. 2d Supp. 771, 773-74 (1940) (advertisement created impression that the product was a "first line" tire when in fact it was a "third line" tire), whereas rebates are discretionary discounts which bail agents are under no obligation to offer in the first place.

Plaintiffs also subtly shift gears to a theory that there would have been greater industry-wide advertising of the availability of rebates but for the alleged conspiracy. (*See* Opp. at 23.) To support this, Plaintiffs repeatedly claim that they conducted a "thorough investigation" and could not identify "a single example of a California bail agent advertising a rebate," and that "there is essentially zero advertising" of rebates. (Opp. at 14; *see also* Opp. at 21.) While Defendants cannot know what this "thorough" investigation entailed, *one Google search for "California bail rebates" identifies multiple examples in a matter of seconds.* (*See, e.g.,* http://www.luckybail.com/ ("Ask About Our 20% Rebate Program"); https://www.allamericanbailbonds.com/ ("Rebates Available"); https://affordablyeasybailbonds.com/ ("With payment plans, zero-down options, and rebate opportunities, we will find a way to quickly post bail and begin the release process."); http://chickiesbailbonds.com/2013/05/01/scoop-from-the-coop-issue-3/ (bail agent blog post dated May 1, 2013: "In recognition of the increasingly competitive nature of the bail bond industry . . . we will now not only offer your clients the most professional and caring bail bond service available but also premiums and rebates commensurate with the changing industry").)[9] Once again, Plaintiffs'

---

[9] As Plaintiffs note in their request for judicial notice in support of the Opposition (ECF No. 115 at 2-3 (requesting the court take notice of statements on non-Defendant bail agent's website)), the existence of material on third-party websites *may* be appropriate for judicial notice. *See, e.g.*, *Datel Holdings Ltd. Microsoft Corp.*, 712 F. Supp. 2d 974, 985 (N.D. Cal. 2010) (taking judicial notice of third-party web pages); *Optivus Tech., Inc. v. Ion Beam Applications S.A.*, No. CV 03-2052 SJO (VBKX), 2004 WL 5700631, at *18 n.15 (C.D. Cal. Aug. 31 2004) (same). To the extent the Court finds Plaintiffs' claims about the non-existence of advertisements for rebates relevant in deciding this Motion, Defendants request the Court take notice of the existence of these publicly available webpages that offer rebates on bail bonds—not for their truth, but to demonstrate that even a cursory search yields examples of advertisements that Plaintiffs claim do not exist in the marketplace.

characterization of the state of the California bail bond market is demonstrably false.

Furthermore, Plaintiffs effectively concede that it makes no sense for the Surety Defendants to lead or take part in this aspect of the conspiracy. The Surety Defendants have no motivation to advertise the availability of rebates since the rebate comes entirely out of bail agents' commissions and does not affect their revenues. (*See* SCAC ¶ 62 ("Any rebate to a consumer initially comes out of the bail agent's commission").) "Where the facts alleged in the complaint demonstrate that an alleged conspiracy makes no economic sense, the claim must be dismissed," and Plaintiffs fail to articulate any motivation or other plausible reason for Surety Defendants to limit rebates. *Cascades Computer Innovation LLC*, 2013 WL 316023, at *11.

Finally, Plaintiffs never explain how truthful, CDI-approved rate notices could create an inference of an anti-rebating conspiracy. The cases Plaintiffs cite on this issue concern whether an anti-advertising conspiracy could constitute an antitrust violation, not whether a supposed failure to advertise rebates makes a price-fixing conspiracy plausible. *See, e.g., Bates v. State Bar of Ariz.*, 433 U.S. 350, 353 (1977) (analyzing whether state regulation banning certain attorney advertisements could violate Sherman Act); *Morales v. Trans World Airline, Inc.*, 504 U.S. 374, 375 (1992) (analyzing whether guidelines regarding airline fare advertising were pre-empted by federal law).

## V.  THE PLUS FACTORS, CONSIDERED TOGETHER, WEIGH AGAINST PLAINTIFFS' THEORY

To put their allegations "in a context that raises a suggestion of preceding agreement," Plaintiffs must allege "plus factors [which] are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments*, 798 F.3d at 1194. The plus factors "must be examined together, not in isolation" (Opp. at 25). Yet Plaintiffs analyze each plus factor they allege on a stand-alone basis, and do not consider how different plus factors work in combination. This is a fatal error because several of Plaintiffs' alleged plus factors are market features that ***collectively*** would incentivize parallel conduct (to the minimal extent it has been alleged) even absent a cartel. The Court must weigh Plaintiffs' allegations of collusion against the alternative scenario: ***what would the California bail bond market look like if there were no cartel***. Because three key market features alleged by Plaintiffs as plus factors—high concentration and a price inelastic, fungible product—would collectively drive firms

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

toward parallel pricing and away from attempts to undercut one another, they weigh against inferring a conspiracy since they suggest that the alleged parallel conduct Plaintiffs rely on is not suspicious in and of itself and would occur with or without a conspiracy. The remaining plus factors cannot save the SCAC because they do nothing to suggest misconduct. In short, because "the complaint itself provides an alternative explanation" for the parallel conduct alleged, the Court must dismiss the SCAC. *In re Late Fee and Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962-63 (N.D. Cal. 2007).

### A. Alleged Key Market Features Weigh Against Plaintiffs

#### 1. Plaintiffs fail to meaningfully contest that, absent collusion, certain market features produce parallel pricing.

Numerous courts have recognized that while parallel pricing decisions may be indicative of an antitrust conspiracy in some contexts, this is not the case in a concentrated market for a price-inelastic, fungible good. *See, e.g., In re LTL Shipping Servs. Antitrust Litig.*, No. 08-MD-01865_WSD, 2009 WL323219, at *17 (N.D. Ga. Jan. 28, 2009); *Jones v. Micron Tech, Inc.* 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019); *Kleen Prods. LLC v. Int'l Paper (Kleen)*, 276 F. Supp. 3d 811, 823-24 (N.D. Ill. 2017). The reason for this is straightforward: concentrated markets naturally tend toward parallel, interdependent pricing. *See Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F. 2d 37, 54 (7th Cir. 1992) (noting parallel pricing is a well-recognized phenomena in concentrated markets). Firms are also less likely to try to compete on price where demand for the product is price inelastic since cutting prices may not lead to greater sales. *Kleen*, 276 F. Supp. 3d at 823 ("the inelasticity of demand is exactly the reason that a price cut would not much help a Defendant's bottom line, and may in fact hurt it"). This is especially true in commodity markets: because competitors cannot easily differentiate their product, they "are likely to monitor and mimic the behavior of competitors carefully." *Jones*, 400 F. Supp. 3d at 917.

Plaintiffs fail to cite a ***single case*** disputing these basic principles and the authorities they do rely on did not address the combination of market features alleged here. For instance, Plaintiffs point to the decision made at the pleading stage in *Kleen Products, LLC v. Packaging Corporation of America*, (Opp. at 39), but at that point in the litigation the court only considered the possible effects of market concentration since, unlike here, the plaintiffs had not alleged that the products were price

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

inelastic or fungible. 775 F. Supp. 2d 1071, 1079 (N.D. Ill. 2011). Similarly, *In re Titanium Dioxide* examined a concentrated commodity market—but not a market for price inelastic products. 959 F. Supp. 2d at 828 (D. Md. 2013). Plaintiffs' only authority where all three features came together is *United States v. Container Corp. of America.* Unlike here, the *Container Corp.* plaintiffs had **direct** evidence of a conspiracy and the only question was whether the conduct alleged amounted to a Sherman Act violation (it did). 393 U.S. 333, 334-35 (1969).

Plaintiffs' only other contention is that even if the supposed parallel conduct could be innocently explained by the very market features they allege, the SCAC should still survive so long as their explanation and Defendants' are equally plausible. (Opp. at 24, 44 (citing *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).) This is an invitation into error. *Starr* was not an antitrust case, and accordingly, does not speak to the pleading requirements under *Twombly* and its progeny. The correct standard is the **exact opposite**: "Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a [Sherman Act] violation." *Musical Instruments*, 798 F.3d at 1194; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 51-52 (2nd Cir. 2007) (affirming dismissal of antitrust claims where the allegations "can suggest competition at least as plausibly as [they] can suggest anticompetitive conspiracy").

### 2. Plaintiffs' attempts to distinguish the alleged plus factors fail.

Unable to contest the basic dynamics of a market with the features they allege as plus factors, Plaintiffs instead analyze them one by one. Besides violating the rule that the Court must consider market features together (*see* Opp. at 25), their attempts fail individually as well.

**Market Concentration.** Plaintiffs first argue that the existence of the OPEC cartel proves that "coordination is usually needed to maintain prices at supra-competitive levels." (Opp. at 38.) The Supreme Court rejected this position decades ago. A market can experience stable, supra-competitive prices absent any illegal conduct through "conscious parallelism," which is "the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interest." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET No. 19-CV-00717-JST

Though never spelled out, Plaintiffs' implicit argument seems to be that the California bail bond market has too many participants for conscious parallelism to apply. But this is undermined by their repeated contention that the California bail bond market is a "tightly knit" and "concentrated" industry. (Opp. at 27, 41.) Plaintiffs cannot have it both ways: if the market is concentrated enough to facilitate coordination, it is also small enough to create incentives toward interdependent pricing.

Moreover, while conscious parallelism is most often associated with oligopolies, the phenomenon can occur among larger numbers of competing firms—especially where, as alleged here, other market features also drive convergent pricing. In *Kleen*, the court found that that a price-inelastic commodity market naturally explained the lockstep pricing of eight different defendants. 276 F. Supp. 3d at 816, 823-24. Similarly, the *LTL Shipping* court found that conscious parallelism explained near-simultaneous price hikes by ***thirteen*** defendants, because "in a market of fungible services and inelastic demand" each individual defendant "would generally not have a financial incentive to charge less." *LTL Shipping*, 2009 WL323219, at *17.

**Inelastic Commodity Goods.** Plaintiffs argue that while the market as a whole for bail bonds may be price inelastic, the demand for any individual surety's bonds would respond to a price decrease. (Opp. at 37.) But Plaintiffs rely exclusively on paragraph 77 of the SCAC, which is conclusory and need not be accepted as true. *Twombly*, 550 U.S. at 555. More importantly, this argument is contradicted by other allegations that consistently state, due to the pressure to secure release from jail, arrestees do not consider price or shop for alternatives before purchasing a bail bond. (*See, e.g.*, SCAC ¶ 66 ("consumers are not situated to conduct detailed market research before making a bail bond transaction").) A surety that lowers its rate can hardly expect to do more business if its customers do not compare prices and simply buy from whomever is closest and most convenient. (*See id.* ¶ 75.)

Separately, Plaintiffs contend that the usual market features that drive interdependent pricing in commodity markets do not apply here because (1) the market is larger with up to twenty sureties competing with one another; and (2) new market entrants would have had an incentive to undercut the existing price structure. (Opp. at 35-36.) But this theory fails to account for regulatory barriers to entry (discussed below), nor for what happens when inelastic demand ***combines*** with a commodity market as alleged. According to Plaintiffs, overall demand for bail bonds is fixed, and bail bonds are

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

fungible goods. Taking these allegations as true, it would be impossible for sureties to compete with one another on anything *other* than price, ***meaning they are virtually certain to match any price cut***, resulting in a market reset at lower prices and profit margins. *U.S. v. FMC Corp.*, 306 F. Supp. 1106, 1139 (E.D. Pa. 1969) (if a firm tries to cut prices for a price-inelastic commodity "its competitors will be given the opportunity to meet its lower price, thereby resulting in uniform prices again, but at a lower level; and without any increase in the original seller's net share of the market"); *Kleen*, 276 F. Supp. 3d at 823 ("in a market with a homogeneous product, the competitors will be pressured to match the price cut, thus resulting in static market shares and reduced profit margins for all") (citations omitted). For this reason, Plaintiffs' argument that new market entrants would have been incentivized to undercut existing companies fails—even a new participant would "not have a financial incentive to charge less for [bonds] than all other carriers when the market will by its structure bear whatever [premiums] are assessed by other carriers in a market of fungible services and inelastic demand." *LTL Shipping*, 2009 WL 323219, at *17.

Plaintiffs' only other argument on this point is that in cases like *Reserve Supply*, 971 F.2d 37, it was possible for the market participants to rapidly cut costs to match prices, whereas the Surety Defendants "must first prepare, submit, and receive approval for a rate application from CDI before they may change their bail bond rates." (Opp. at 39.) The difficulty of obtaining a change in rate would, if anything, count as another reason why the bail bond market would not see much price fluctuation even absent collusion. And whether it takes a day or a month for the competitors to match a price cut, the long run incentives driven by the alleged market features remain unaffected.

### B.    Plaintiffs' Remaining Plus Factors Cannot Be Used to Infer Any Conspiracy

The remaining plus factors alleged do not change this analysis because they do not directly suggest that a conspiracy exists, and therefore do not give the Court a reason to believe that a conspiracy, rather than innocent conduct, drives the alleged parallel behavior. *Musical Instruments*, 798 F.3d at 1194 ("Allegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a [Sherman Act] violation.").

**Loss Ratios**. Plaintiffs do not dispute that loss ratios do not measure profit margins. Instead,

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

they fall back to the position that low loss ratios, on their own, are indicative of a conspiracy. (Opp. at 30.) As a threshold matter, this tacit admission that Plaintiffs have not actually alleged high profits means that the Court must disregard all of Plaintiffs' arguments premised on high profit margins. (*E.g.,* Opp. at 40 (arguing that high profit margins create incentives to try to compete on price).) More fundamentally, Plaintiffs allege that low loss ratios exist both in and outside of California. (*E.g., compare* SCAC ¶159 (California loss ratios), *with* ¶ 170 (national loss ratios).) This logically suggests that low loss ratios are simply a feature of the surety business since they are present both where Plaintiffs allege a conspiracy (California) and where they do not (the rest of the country).

Plaintiffs' only response is to argue that the similarity between the California and national figures suggests that there may be a nation-wide conspiracy. (Opp. at 32.) This is not only unsupported by the SCAC, it is deeply implausible given the number of markets and companies that would be involved. *Oliver v. SD-3C LLC*, No. 11-cv-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016), is on point. In that case, the court found that parallel pricing weighed against a conspiracy when both the alleged conspirators and those outside the conspiracy priced the same way. *Id.* at *6. Plaintiffs cannot simply speculate as to *another* vast, unalleged conspiracy to differentiate from *Oliver*.

**Transparent Pricing and Identical Production Costs.** As explained in *LTL Shipping,* firms with identical production costs using the same market information would naturally be expected to charge the same prices—indeed it would be strange if they did anything else. 2009 WL 323219, at *15. Plaintiffs attempt to distinguish *LTL Shipping* by arguing that they have alleged that there is an incentive to cut prices. (Opp. at 41, 43.) Once again, Plaintiffs fail to consider their own alleged market features in combination; as explained above, firms selling a price-inelastic commodity have no incentives to cut prices.

**Barriers to Entry.** The allegations of the SCAC simply contradict Plaintiffs' arguments regarding high barriers to entry. As demonstrated in the Motion, SCAC ¶ 7 shows that the number of sureties in the alleged bail bond market more than doubled over the relevant timeframe—going from nine in 2004 to twenty in 2019. Plaintiffs argument that *CDC Technologies, Inc. v. IDEXX Laboratories, Inc,* 7 F. Supp. 2d 119, 130-31 (D. Conn. 1998), doesn't apply because that decision was a monopoly case is a distinction without a difference.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

27.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET No. 19-CV-00717-JST

Plaintiffs' allegations that regulatory barriers make it difficult to receive approval to enter the bail bond market—to the point that one company was rejected at least four times (Opp. at 33-34)—explains why new entrants would do so with rates that had already been approved by the CDI.

At bottom, Plaintiffs fail to rebut Defendants' argument that the overall growth in the market undermines the plausibility of the conspiracy.  (Mot. at 29-30.)

**Regularity of Bail Bond Sales.**  Plaintiffs contend that since bail bond sales are small and regular, the incentive to cheat on the conspiracy is minimal on every transaction, which in turn makes a cartel easier to sustain.  (Opp. at 40.)  But this argument conflates the Surety's rate filings with actual bail bond transactions.  Rate filings with the CDI—the place where the Surety sets its price and accordingly, is the point where it would cheat on the alleged conspiracy—are not only infrequent, Plaintiffs allege that they are a barrier to entry to the market or to cutting prices.  (Opp. at 33.)  Pricing on individual bail bond sales are opaque, meaning that an individual agent could easily cheat on the alleged anti-rebating conspiracy.

**Lack of Technological Change.**  This plus factor is merely a rehashed version of Plaintiffs' argument that all the Surety defendants face similar costs structures.  This weighs against a conspiracy since if all firms are using the same technology, they would naturally tend toward parallel pricing (especially in a market for a price inelastic commodity).  (*See supra* Section V.A.)

**Alleged Retaliation.**  Plaintiffs' allegation that a single bail agent claims he was targeted for offering rebates does not implicate any of the Defendants.  The 2014 blog post refers generally to a "good ol boys club" and does not implicate a single specific individual or company.  (SCAC ¶ 92.) The Opposition claims that Plaintiffs cite numerous examples of industry actors defaming bail agents who "offer rebates and discounts as law-breakers."  (Opp. at 43.)  But Plaintiffs cite only one paragraph of the SCAC in support, which refers only to true statements that the law requires a bail agent to charge the approved rate.  (*See supra* Section IV.B.)  This is neither "defamation," nor "retaliation" that could support an inference of a conspiracy.  (*See* Mot. at 33-36 (explaining how bail agents must charge the CDI-approved premium rates under California regulations).)

**Trade Associations and "Opportunities to Agree."**  As explained in Section III.D above, the allegations regarding the trade associations show nothing more than the normal operation of an

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

28.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

industry group and are insufficient to infer a conspiracy. The mere existence of trade associations as a plus factor fails for the same reasons. While trade conferences might provide opportunities to agree, they cannot do so if none of the relevant members actually show up. Given that the SCAC alleges only *two* industry conferences—one of which was attended by a *single defendant* and the other by *none at all*, the allegations do not even suggest that the trade associations provided any meaningful opportunity to agree. (*See* Mot. at 30.) And having conceded through silence that they cannot link the Defendants to basic allegations about where and when collusion occurred, this plus factor cannot be applied to any of them. *In re Cal. Title Ins. Antitrust Litig.,* No. C 08-01341 JSW, 2009 WL 1458025, at *5-6 (N.D. Cal. May 21, 2009) (allegations regarding opportunities to collude failed where plaintiffs failed to "allege facts setting forth, at a basic level, which Defendants may have attended meetings of the rate setting organizations, the types of employees that may have attended such meetings, or whether those employees reported back to their parent organizations"). And Plaintiffs' argument that the nonparty Surety and Fidelity Association of America ("SFAA") "devised and promulgated the 'standard rate' of 10%" (Opp. at 26) is contradicted by the fact that, as early as 1953, California courts recognized that 10% was the customary rate for bail bond premiums. *Groves v. City of Los Angeles*, 40 Cal. 2d 751, 754 (1953). Moreover, the idea that Defendants needed SFAA to "monitor compliance" (Opp. at 26.) is not credible given that the Surety Defendants' rate filings are all publicly available.

**"Invitations to Collude."** Plaintiffs cannot impute the statements by Carmichael and Watson to any other Defendants for the reasons explained above in Section III.D. Nor do these "invitations to collude" constitute an actual plus factor, given that Plaintiffs fail to allege that any other Defendant who was even in the market at the time was aware of these statements, much less acted on them. *See TFT-LCD*, 586 F. Supp. 2d at 1116 (holding that "a conspiracy to fix prices can be inferred from an invitation, *followed by responsive assurances and conduct*") (emphasis added). And crucially, over half of the Defendants joined the market after the statements were made (in some cases years later)— and Plaintiffs do not allege any mechanism whereby they became aware of the supposed "invitations." Especially because the statements were allegedly made at the very beginning of the alleged conspiracy, at a time when over half the Defendants were not in the market, they are not enough to plausibly

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

29.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

suggest participation by over twenty Defendants for over a decade thereafter.[10]

\*     \*     \*

To extent Plaintiffs have sufficiently alleged parallel conduct, that parallel conduct would be entirely expected given the market features they allege. Because these allegations "suggest competition at least as plausibly as [they] can suggest anticompetitive conspiracy," Plaintiffs' plus factors likewise fail to support any inference of collusion. *See In re Elevator Antitrust Litig.*, 502 F.3d at 51-52. The SCAC's antitrust claims must fail accordingly.

## VI. PLAINTIFFS' UCL CLAIM FAILS

The Opposition confirms that Plaintiffs are not pursuing a claim under the UCL's "fraudulent" prong (a telling admission that Plaintiffs do not believe the statements regarding rebating are in fact deceptive or misleading). (*See* Opp. at 59-60.) Therefore, because the UCL cause of action is predicated solely on the SCAC's antitrust claims, the failure of the antitrust claims compels dismissal of the UCL claim. (*See* Mot. at 46 (citing, *inter alia*, *SC Mfr. Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 93 (2008).) The Court should dismiss Plaintiffs' UCL claim with prejudice.

## VII. THE SCAC SHOULD BE DISMISSED WITH PREJUDICE

As the new allegations in the SCAC and the facts subject to judicial notice now establish that there was no parallel conduct consistent with any conspiracy, and the SCAC's new allegations in fact undercut Plaintiffs' theory of the case. Because no allegations could be pled that could save Plaintiffs' claims, the Court should dismiss this matter in its entirety and with prejudice. *See Powell v. GMAC Mortg. LLC*, 2010 WL 4502705, at \*2 (N.D. Cal. Nov. 1, 2020) (if "it is clear that the complaint's deficiencies cannot be cured by amendment," leave to amend should not be granted).

## VIII. CONCLUSION

For the foregoing reasons, the Court should dismiss the SCAC in its entirety with prejudice.

---

[10] The argument that "numerous Defendants signaled they would accept these invitations to conspire by expressly adopting their competitors' fixed rates" (Opp. at 28) misapprehends established antitrust law that follow the leader pricing is not unlawful or anticompetitive. *See, e.g., In re German Auto. Mfrs. Antitrust Litig.*, MDL No. 2796 CRB, 2020 WL 1542373, at \*12 (N.D. Cal. Mar. 31, 2020) (stating that a firm's observation of a competitor's pricing decision and subsequent decision to adjust prices in response "is a well-recognized form of lawful conscious parallelism."); *In re Citric Acid*, 191 F.3d at 1102 (Section 1 violation cannot be inferred "from an industry's follow-the-leader pricing strategy").

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

| 1 | Dated: August 3, 2020 | COOLEY LLP |
| | | MICHAEL A. ATTANASIO (151529) |
| 2 | | BEATRIZ MEJIA (190948) |
| | | DAVID HOUSKA (295918) |
| 3 | | MAX SLADEK DE LA CAL (324961) |

Dated: August 3, 2020

COOLEY LLP
MICHAEL A. ATTANASIO (151529)
BEATRIZ MEJIA (190948)
DAVID HOUSKA (295918)
MAX SLADEK DE LA CAL (324961)

*/s/ Beatriz Mejia*
Beatriz Mejia (190948)

*Attorneys for Defendants Seaview*
*Insurance Company and Two Jinn, Inc.*

Dated: August 3, 2020

By: */s/ Julie A. Gryce*

Julie A. Gryce (319530)
DLA Piper LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone: (619) 699-2700
Facsimile: (619) 699-2701
julie.gryce@dlapiper.com

Michael P. Murphy (*pro hac vice*)
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020-1104
Telephone: (212) 335-4500
Facsimile: (212) 335-4501
michael.murphy@dlapiper.com

John Hamill
DLA Piper LLP (US)
444 West Lake Street, Suite 900
Chicago, IL 60606-0089
Telephone: 312.368.7036
Facsimile: 312.251.5809
John.hamill@us.dlapiper.com

*Attorneys for Defendants Danielson*
*National Insurance Company*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET No. 19-CV-00717-JST

| | |
|---|---|
| 1 | Dated:  August 3, 2020 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | Dated:  August 3, 2020 |

Dated:  August 3, 2020

By: /s/ Blake Zollar

Drew Koning (263082)
Blake Zollar (268913)
Shaun Paisley (244377)
KONING ZOLLAR LLP
2210 Encinitas Blvd., Suite S
Encinitas, CA 92024
Telephone:  (858) 252-3234
Facsimile:  (858) 252-3238
drew@kzllp.com
blake@kzllp.com
shaun@kzllp.com

*Attorneys for Defendant All-Pro Bail Bonds, Inc.*

Dated:  August 3, 2020

By: /s/ Gerard G. Pecht

Gerard G. Pecht (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
1301 McKinney, Suite 5100
Houston, Texas  77010
Telephone:  (713) 651-5151
Facsimile:  (713) 651-5246
gerard.pecht@nortonrosefulbright.com

Joshua D. Lichtman (SBN 176143)
NORTON ROSE FULBRIGHT US LLP
555 South Flower Street, Forty-First Floor
Los Angeles, California  90071
Telephone:  (213) 892-9200
Facsimile:  (213) 892-9494
joshua.lichtman@nortonrosefulbright.com

*Attorneys for Defendant American Contractors Indemnity Company*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

| | |
|---|---|
| Dated: August 3, 2020 | By: /s/ Anne K. Edwards |
| | |
| | Anne K. Edwards (110424) |
| | SMITH, GAMBRELL & RUSSELL, LLP |
| | 444 South Flower Street, Suite 1700 |
| | Los Angeles, CA 90071 |
| | Telephone: (213) 358-7210 |
| | Facsimile: (213) 358-7310 |
| | aedwards@sgrlaw.com |
| | |
| | *Attorneys for Defendant Williamsburg* |
| | *National Insurance Company* |
| | |
| Dated: August 3, 2020 | By: /s/ Nicole S. Healy |
| | |
| | Todd A. Roberts |
| | Nicole S. Healy |
| | Edwin B. Barnes |
| | ROPERS, MAJESKI, KOHN & BENTLEY |
| | |
| | *Attorneys for Defendants American Bail* |
| | *Coalition, Inc. and William B. Carmichael* |
| | |
| Dated: August 3, 2020 | By: /s/ David F. Hauge |
| | |
| | David F. Hauge (128294) |
| | Todd H. Stitt (179694) |
| | Vincent S. Loh (238410) |
| | MICHELMAN & ROBINSON, LLP |
| | |
| | *Attorneys for Defendants United States* |
| | *Fire Insurance Company, The North River* |
| | *Insurance Company, and Seneca* |
| | *Insurance Company* |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

33.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

| | |
|---|---|
| 1 | Dated:  August 3, 2020 |

Dated:  August 3, 2020     By: */s/ Renee Choy Ohlendorf* _____

Renee Choy Ohlendorf
Hinshaw & Culbertson LLP
One California Street, 18th Floor
San Francisco, CA 94111
Main: (415) 362-6000
Direct: (415) 393-0122
RChoy@hinshawlaw.com

Christie A. Moore (*pro hac vice*)
W. Scott Croft (*pro hac vice*)
BINGHAM GREENEBAUM DOLL LLP
101 S. Fifth Street
3500 PNC Tower
Louisville, KY 40202
Telephone:  502.587.3758
Facsimile:  502.540.2276
cmoore@bgdlegal.com
wcroft@bgdlegal.com

*Attorneys for Lexon Insurance Company*

Dated:  August 3, 2020     By: */s/ Travis Wall* _____

Travis Wall (191662)
Spencer Kook (205304)
HINSHAW & CULBERTSON LLP
One California Street, 18th Floor
San Francisco, CA 94111
Tel: (415) 362-6000
twall@hinshawlaw.com

*Attorneys for Defendant Philadelphia
Reinsurance Corporation*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

| | |
|---|---|
| Dated: August 3, 2020 | By: */s/ Gregory S. Day* |
| | Gregory S. Day<br>LAW OFFICES OF GREGORY S. DAY<br>120 Birmingham Drive, Suite 200<br>Cardiff, CA 92007<br>Telephone: (760) 436-2827<br>attygsd@gmail.com |
| | *Attorneys for Defendants California Bail Agents Association, Universal Fire & Insurance Company, Sun Surety Insurance Company* |
| Dated: August 3, 2020 | By: */s/ Howard Holderness* |
| | John A. Sebastinelli (127859)<br>Howard Holderness (169814)<br>GREENBERG TRAURIG, LLP<br>4 Embarcadero Ctr, Ste. 3000<br>San Francisco, CA 94111-5983<br>Telephone: (415) 655-1289<br>Facsimile: (415) 358-4796<br>sebastinellij@gtlaw.com<br>holdernessh@gtlaw.com |
| | *Attorneys for Defendants American Surety Company and Indiana Lumbermens Mutual Insurance Company* |
| Dated: August 3, 2020 | By: */s/ Gary A. Nye* |
| | Gary A. Nye (126104)<br>ROXBOROUGH, POMERANCE, NYE & ADREANI, LLP |
| | *Attorneys for Defendants Allegheny Casualty Company, Associated Bond and Insurance Agency, Inc., Bankers Insurance Company, Harco National Insurance Company, International Fidelity Insurance Company, Lexington National Insurance Corporation, and Jerry Watson* |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

35.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

| | |
|---|---|
| 1 | Dated: August 3, 2020 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | Dated: August 3, 2020 |
| 11 | |

Dated: August 3, 2020      By: */s/ Brendan Pegg*

Brendan Pegg (174159)
Lindsay Cooper-Greene, of Counsel
(295180)
LAW OFFICES OF BRENDAN PEGG
201 E. Ojai Avenue #1505
Ojai, CA 93024
Telephone: (805) 3024151
Facsimile: (877) 719-7298
brendan@bpegglaw.com

*Attorneys for Defendant Financial
Casualty & Surety, Inc.*

Dated: August 3, 2020      By: */s/ Erik K. Swanholt*

Erik K. Swanholt
FOLEY & LARDNER
555 South Flower St., 33rd Floor
Los Angeles, CA 90071
Telephone: (213) 972-4500
Facsimile: (213) 486-0065

*Attorneys for Defendants Continental
Heritage Insurance Company*

Dated: August 3, 2020      By: */s/ John M. Rorabaugh*

John M. Rorabaugh (178366)

*Attorney for Defendant Golden State Bail
Association*

Dated: August 3, 2020      By: */s/ Paul J. Riehle*

Paul J. Riehle (115199)
FAEGRE DRINKER BIDDLE & REATH LLP
4 Embarcadero Center, 27th Floor
San Francisco, California 94111
Telephone: (415) 551-7521
Facsimile: (415) 551- 7510
paul.riehle@faegedrinker.com

*Attorneys for Defendant Accredited Surety
and Casualty Company, Inc.*

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

36.

DEFENDANTS' REPLY ISO
MOTION TO DISMISS
MASTER DOCKET No. 19-CV-00717-JST

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(i)(3)

I, Beatriz Mejia, attest that concurrence in the filing of this document has been obtained from the other signatories.  Executed on August 3, 2020, in San Francisco, California.


*/s/ Beatriz Mejia*

Beatriz Mejia

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO