UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

```
                              )
                              )
In re California Bail Bond    )    NO. CV 19-00717-JST
Antitrust Litigation          )
                              )
_____  )
```

Oakland, California
Wednesday, August 26, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
            LIEFF CABRASER HEIMANN & BERNSTEIN LLP
            275 Battery Street - 29th Floor
            San Francisco, CA 94111
        BY: **DEAN M. HARVEY, ESQUIRE**
            **KATHERINE LUBIN, ESQUIRE**
            **YAMAN SALAHI, ESQUIRE**
            **JALLÉ DAFA, ESQUIRE**

For Defendant Seaview Insurance Company and Two Jinn, Inc.:
            COOLEY LLP
            101 California Street - 5th Floor
            San Francisco, CA 94111
        BY: **BEATRIZ MEJIA, ESQUIRE**
            **DAVID HOUSKA, ESQUIRE**
            **MAX SLADEK DE LA CAL, ESQUIRE**

For Defendant Danielson National Insurance Company:
            DLA PIPER LLP (US)
            444 West Lake Street  - Suite 900
            Chicago, IL 60606
        BY: **JOHN HAMILL, ESQUIRE**

Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

**APPEARANCES CONTINUED:**

For Defendant Continental Heritage Insurance Company:
> FOLEY & LARDNER LLP
> 555 South Flower Street - Suite 3300
> Los Angeles, CA 90071
> **BY: ERIK C. SWANHOLT, ESQUIRE**

For Defendants Allegheny Casualty Company; AIA Holdings, Inc.; Bankers Insurance Company; International Fidelity Insurance Company; Lexington National Insurance Company; and Jerry Watson:
> ROXBOROUGH POMERANCE NYE & ADREANI LLP
> 5820 Canoga Avenue - Suite 250
> Woodland Hills, CA 91367
> **BY: GARY A. NYE, ESQUIRE**

For Defendants American Bail Coalition and William B. Carmichael:
> ROPERS MAJESKI KOHN & BENTLEY
> 1001 Marshall Street - Suite 500
> Redwood City, CA 94063
> **BY: NICOLE S. HEALY, ESQUIRE**

For Accredited Surety and Casualty Company, Inc.:
> FAEGRE DRINKER BIDDLE & REATH LLP
> Four Embarcadero Center - 27th Floor
> San Francisco, CA 94111
> **BY: PAUL J. RIEHLE, ESQUIRE**

For Defendant California Bail Agents Association; Universal Fire & Insurance Company; and Sun Surety Insurance Company:
> LAW OFFFICES OF GREGORY S. DAY
> 120 Birmingham Drive - Suite 200
> Cardiff-by-the-Sea, CA 92007
> **BY: GREGORY S. DAY, ESQUIRE**

For Defendant American Contractors Indemnity Company:
> NORTON ROSE FULBRIGHT US LLP
> 1301 McKinney Street - Suite 5100
> Houston, TX 77010
> **BY: GERARD G. PECHT, ESQUIRE**

**APPEARANCES CONTINUED:**

For Defendants American Surety Company; Indiana Lumbermens
Mutual Insurance Company:

                          GREENBERG TRAURIG, LLP
                          4 Embarcadero Center - Suite 3000
                          San Francisco, CA 94111
               **BY:  HOWARD HOLDERNESS, ESQUIRE**

For Defendant Golden State Bail Association:

                          LAW OFFICES OF JOHN RORABAUGH
                          801 Parkcenter Drive - Suite 205
                          Santa Ana, CA 92705
               **BY:  JOHN M. RORABAUGH, ESQUIRE**

For Defendant Lexon Insurance Company:

                          DENTONS BINGHAM GREENEBAUM LLP
                          3500 PNC Tower
                          101 South Fifth Street
                          Louisville, KY 40202
               **BY:  CHRISTIE A. MOORE, ESQUIRE**

For Defendant Financial Casualty & Surety, Inc.:

                          LAW OFFICES OF BRENDAN PEGG
                          201 E. Ojai Avenue - Suite 1505
                          Ojai, CA 93024
               **BY:  BRENDAN PEGG, ESQUIRE**
                          **LINDSAY COOPER-GREENE, ESQUIRE**

For Defendant Philadelphia Reinsurance Corporation:

                          HINSHAW & CULBERTSON LLP
                          One California Street - 18th Floor
                          San Francisco, CA 94111
               **BY:  TRAVIS WALL, ESQUIRE**

For Defendant United States Fire Insurance Company; The North
River Insurance Company; and Seneca Insurance Company:

                          MICHELMAN & ROBINSON, LLP
                          17901 Von Karman Avenue - Suite 1000
                          Irvine, CA 92614
               **BY:  VINCENT LOH, ESQUIRE**

For All-Pro Bail Bonds, Inc.:

                          KONING ZOLLAR LLP
                          169 Saxony Road  - Suite 115
                          Encinitas, CA 92024
               **BY:  BLAKE ZOLLAR, ESQUIRE**

**APPEARANCES CONTINUED:**

For Defendant All-Pro Bail Bonds, Inc.:
                    KONING ZOLLAR LLP
                    2210 Encinitas Boulevard - Suite S
                    Encinitas, CA 92024
          **BY:  SHAUN PAISLEY, ESQUIRE**

For Williamsburg National Insurance Company:
                    SMITH GAMBRELL & RUSSELL, LLP
                    444 South Flower Street - Suite 1700
                    Los Angeles, CA 90071
          **BY:  ANNE K. EDWARDS, ESQUIRE**
              **KRISTEN L. WENGER, ESQUIRE**

<u>**Wednesday - August 26, 2020**</u>                          **2:00 p.m.**

#### P R O C E E D I N G S

---oOo---

   **THE CLERK:**  Your Honor, now calling Civil Matter
19-00717, In re California Bail Bond Antitrust Litigation.

   Would you like for me to have counsel identify themselves,
considering we have so many people?

   **THE COURT:**  No.  I don't think so.  You have a record
of who is appearing today, don't you?

   **THE CLERK:**  I do, sir.

   **THE COURT:**  Okay.  We can just let that be reflected
in the minutes.

   **THE CLERK:**  Yes, sir.

   **THE COURT:**  The matter is on calendar for a Motion to
Dismiss the Second Consolidated Amended Class Action Complaint.
I look forward to hearing the parties' arguments.

   Who will be taking the laboring oar for defendants today?

   **MS. MEJIA:**  Good afternoon, Your Honor.  This is
Beatriz Mejia from Cooley on behalf of Two Jinn and Seaview.

   The defendants have organized themselves and selected a
number of speakers to address the various issues.  I will be
acting in the capacity of a conductor of sorts to ensure a
smooth presentation.

   My colleague, David Houska, is going to address the
implausibility of the conspiracy in light of the Second Amended

1  Complaint.

2    John Hamill of DLA Piper is going to address the

3  insufficiency of the allegations against the surety defendants.

4    Blake Zollar from Koning Zollar is going to address the

5  insufficiency of the allegations as to the bail agency

6  defendants.

7    And Nicole Healy of Ropers Majeski is going to address the

8  insufficiency of the allegations as to the trade associations

9  and the individual defendants.

10   And to the extent that the Court has any questions about

11  the request for judicial notice that was filed in conjunction

12  with the motion to dismiss, my colleague, Max Sladek de la Cal,

13  will address those questions.

14   **THE COURT:**  Very good.

15   Who will be taking the laboring oar for the plaintiffs

16  today?

17   **MR. HARVEY:**  Good afternoon, Your Honor.  This is Dean

18  Harvey of Lieff Cabraser.  Two of my colleagues are planning to

19  split the argument for us, and they are Jalle Dafa and Yaman

20  Salahi.

21   And Ms. Dafa is prepared to address issues regarding the

22  trade associations, the individual defendants, and the bail

23  agency defendants.

24   And Mr. Salahi is prepared to respond to the remainder.

25   **THE COURT:**  Okay.

Well, I don't know whether we are going to be able to address all those topics in the depth that the lawyers probably have prepared to do. I don't know that my attention span for oral argument will allow that.

I'm going to limit arguments to 40 minutes each side. I'm not going to stop you. Each side will get two turns at the plate, so the defendants will argue, then the plaintiffs, then the defendants, and then the plaintiffs. If you want to save time for your second argument, stop talking.

I don't have a tentative ruling. I do have a few questions and observations. Don't put too much weight on those, and by that I mean this. Obviously put some weight on them because I ask them and so these are questions and comments that are in my mind as I consider the ruling in your case, but don't focus only on those. These are just things you need to address at least a little bit, and there are lots of other questions that are presented by the briefs. And you should argue the things that seem most important to you.

Don't run away from your weaknesses. That's the biggest mistake people make in oral argument, is they have something that is just really good for them, and they just want to talk about it for a long time. I read the briefs. If there is something that is really good for you, I probably already know about it. What you should be doing is try to make sure that I'm not latching on to the other side's favorite thing. So it

1   doesn't mean you have to be in a defensive posture in your

2   whole argument.  It just means that you probably ought to try

3   to figure out what are your potential Achilles' heels and then

4   really lean into those during your argument.

5       My comments and questions, in no particular order, are:

6       As you would expect in an antitrust case like this, there

7   is a great deal of back and forth in the briefs about whether

8   the SCAC pleads enough specificity in terms of specific

9   meetings or specific communications and that sort of thing.

10  And the plaintiffs say in their opposition that the *TFT-LCD* --

11  Madame Reporter, there is a hyphen in between thing those two

12  things -- and *CRT* cases that the defendants rely on do not

13  purport to set a floor for what must be alleged to meet the

14  *Twombly* standard.

15      My question for the plaintiffs is what case does set the

16  floor?  I find that's a very difficult question to answer.

17  I've spent some time on my own.  You think those cases set the

18  bar too high?  Okay.  What case do you think is good for you

19  that doesn't set the bar too high that either explicitly or in

20  so many words says, "Well, you need at least this."  I haven't

21  found that case, so if you have it, you would be helping me.

22      I will just say it is possible that the Court will -- I

23  don't say "reconsider" because this is a different pleading,

24  but "walk away from," maybe would be a good word -- walk away

25  from its prior rulings regarding California Bail Agents

1    Association and Jerry Watson.  The plaintiffs should not assume

2    that those rulings will hold.  They might, but don't make that

3    assumption today, please.

4        I recently granted a motion to open discovery, and I'm

5    sure that if I dismiss some of the claims in this case, the

6    plaintiffs will ask me to do that without prejudice.  I haven't

7    been in this situation before, so if I grant that request, and

8    that is, I grant the defendants' request to dismiss the claims

9    but the plaintiffs' request to do that without prejudice, what

10   do I do about the fact that I just reopened discovery?

11       I know what you're going to say you want, so you don't

12   have to belabor that point.  I know what I think -- I think I

13   know what each of you is going to say.  Give me some authority

14   or something or tell me that you need a very, very short period

15   of time and that you can brief it in just a very few pages

16   because you were surprised by the question and you don't have

17   the authority at your fingertips.

18       Of course you can, in fact, tell me what you want.  That

19   would be good.  But I just don't think that a lot of argument

20   on that point without any authority is going to be all that

21   helpful to me.

22       So those are my opening comments.

23       Defendants get to go first.

24       **MS. MEJIA:**  With that, Your Honor, I think I'll hand

25   it over to my colleague, David Houska.

1    **THE COURT:**  Very good.

2    **MR. HOUSKA:**  Thank you, Your Honor.

3    So the plaintiffs in this case have alleged a conspiracy

4    to fix the price of bail bonds in California, and they contend

5    that over the time period at issue, from 2004 until the case

6    was filed in 2019, that there was a conspiracy whereby the

7    surety defendants submitted uniform premium rates to the

8    California Department of Insurance.

9    When you look at the actual rates and the actual filings

10   with the CDI, you do not see uniformity, and, in fact, over the

11   exact same period that plaintiffs contend that there was a

12   conspiracy to fix rates, you see an enormous expansion both in

13   the number of rates that are offered and a gradual lowering of

14   the rates overall.

15   In 2004 when plaintiffs allege the conspiracy began, there

16   were nine surety defendants operating in California.  Of those,

17   five only offered a single tier ten percent rate.  Only four

18   offered a rate below ten percent, and those four imposed very

19   strict criteria for receiving that eight percent rate.  Two

20   companies only allowed an eight percent rate if the purchaser

21   was able to post the full amount of collateral to cover the

22   bond while the other two imposed a different standard.  They

23   allowed an eight percent rate for union members and those with

24   qualified defense counsel.

25   Now, fast forward to 2019.  By that point, the number of

surety defendants in California had more than doubled.  There

were 18 operating.  Only three in 2019 still only had a single

ten percent tier.  Six offered two tears of rates, eight

offered three tears, and one actually had a four-tier rate

structure.  Not only that, but those tiers included many rates

that were below the eight percent floor that existed in 2004.

In fact, in 2019, there were twice as many surety defendants

offering a seven percent preferred rate as existed with an

eight percent rate back in 2004.

    **THE COURT:**  Mr. Houska, there is nothing in the

Complaint or that's within the judicially-noticeable record, is

there, that tells me the percentage of bail bonds that were

issued at one pricing tier versus another?

    **MR. HOUSKA:**  That's correct, Your Honor.  There is two

important points, however, that aren't impacted by that.  The

first is that there is over the exact same time period that the

plaintiffs are alleging uniform rates actually significant

diversification and overall lowering of rates.

    The second is that it's definitely true that we cannot at

this time put an exact figure on how much bail bond prices

declined, but given the significant expansion both in the

number of rates below ten percent --

    **THE COURT:**  Stop, stop.  You keep saying "significant,

significant, significant."  How am I to draw the conclusion

that rates -- that there is a significant diversity in rates if

1    I don't know what the percentage is of premiums that were

2    actually sold at lower -- you know, at the various preferred

3    rates?

4         MR. HOUSKA:  So it's fair to say that in 2004, there

5    were only three very narrow categories by which one could

6    obtain a preferred rate whereas in 2019, there were 14

7    different categories.  One of those categories is particularly

8    important because it includes one of the named plaintiffs,

9    specifically active duty or veteran status.  Other categories

10   include very significant -- excuse me -- what are objectively

11   large percentages of the population, whether it's government

12   employees, veterans, senior citizens, law enforcement officers

13   and other categories.  It would be impossible for the amount of

14   the overall rates to not have declined.

15       What plaintiffs are essentially hoping the Court does is

16   that because we can't put an exact figure on it at this time

17   say that it couldn't have happened.  But what that loses sight

18   of is that there is really no plausible scenario whereby with

19   the number of new companies that are offering lowering rates

20   and the expansion of eligibility of lower rates that it

21   couldn't have gone down.

22       The other issue that's important here is that, as I noted

23   a second ago, this has a very material impact on one of the

24   named plaintiffs in this case.  You know, Ms. Monterrey

25   purchased her bail bond in 2017.  At that time, there were --

excuse me -- in 2016.  And there were 17 surety defendants

operating in the market at the time.

Now, notably if Ms. Monterrey had purchased her bail bond

in 2004, she would not have been eligible for a preferred rate

of any kind.  She would have received a ten percent from all

nine of the surety defendants that were operating in the market

at the time.  But in 2016, nine did not -- nine of the 17

sureties in the market did not offer a preferential rate either

to active duty or military -- or veteran -- veterans of the

U.S. Armed Forces.  That means over half of the sureties'

defendants would have charged Ms. Monterrey a rate that was 25

percent higher than what she actually received.

Notably to this day when there are 18 surety defendants

currently operating in California, seven of them, which is 40

percent of the total, do not offer preferential rates to

veterans.  So if we just look at the named plaintiff in this

lawsuit or one of the two named plaintiffs in the lawsuit, you

see that she would have received materially different rates

depending upon where she purchased her bail bond from and when

she purchased it.  So it's very hard to say that these are

minor or insignificant differences.

I'd specifically refer to the Court to a couple of cases

that examined the level of distinction that actually matters;

in particular, the *Lubic vs. Financial Services* case and the

*Kelsey vs. NFL Enterprises* case.  In both of those decisions,

1    the Court found that variance in rates -- and *Lubic* actually

2    didn't quote insurance rates.  It was a title insurance case --

3    of five to 25 percent were material, and they were enough on

4    their own to defeat any finding of parallel conduct much less

5    parallel conduct that gives an overall -- gives inference to

6    some kind of overall conspiracy.

7        So that's the fundamental problem that the plaintiffs

8    have.  In context, there is very little parallel conduct, and,

9    in fact, there is a great deal of conduct that is fundamentally

10    inconsistent with a conspiracy to fix bail bond prices.

11        The other major problem the plaintiffs have created for

12    themselves in this pleading is that the pleading now provides

13    an innocent explanation for the very conduct that they've

14    alleged.  Specifically, the plaintiffs have alleged that the

15    market for bail bonds in California is highly concentrated and

16    for a pricing inelastic fungible product.  I should note that

17    if this case goes forward, the defendants intend to dispute

18    many aspects of plaintiffs' allegations, but for now, we'll

19    accept those allegations as true.  And if that's the case, then

20    a large number of decisions have recognized that a market with

21    those factors is going to naturally produce very high levels of

22    parallel pricing and do not incentivize the participants to

23    actually undercut one another's prices, which means that if the

24    Court approaches this from a different angle, which is what

25    would the California bail bond look like, what kind of rates

1   and filings would the Court expect to see even if there was no

2   conspiracy, the answer is the Court would expect to see largely

3   many of the same things that plaintiffs complain have existed.

4       Probably the clearest case on that point is the *LTL*

5   *Shipping Services* case in which the court in the Northern

6   District of Georgia examined many of the exact same market --

7   features of a market that the plaintiffs have alleged here.

8   Specifically, the court looked at a concentrated market for a

9   price inelastic good in which, like here, many of the

10  defendants had similar price and cost structures and that also

11  were operating off of similar products and similar market

12  information.  The court found that that very naturally produced

13  the exact same or -- the exact same kind of conduct that

14  plaintiffs allege could only have resulted from competition --

15  from a conspiracy.

16      Now, plaintiffs seem to contend, without ever actually

17  saying so, that this kind of behavior, which generally gets

18  referred to as conscious parallelism -- could it result here

19  because of the number of surety defendants in the market.  I

20  think this is a pretty good example of how the plaintiffs in

21  many cases want to have their cake and eat it too with many of

22  the plus factors that they've alleged.  They want the market to

23  be concentrated enough that it can facilitate collusion, but

24  then they don't want to confront the fact that concentrated

25  markets naturally produce parallel pricing.

1    There is another examples of this.  They want, for

2 instance, the regulatory barriers to entry in the surety

3 business in California -- it to provide another plus factor

4 that makes the cartel easier to sustain.  But regulatory

5 barriers are exactly the kind of thing that would prevent

6 companies from lowering their prices, especially in a market

7 like this one where if you lower your price for a price

8 inelastic product, which is an intrinsically risky thing to do,

9 you might have difficulty raising it again because of the

10 regulatory barriers to price changes.

11    So overall --

12    **THE COURT:**  I want to ask you about something that is

13 not totally to your point.  It's related.  It comes up in the

14 briefs.  And that is plaintiffs' point that the only way this

15 market could absorb essentially a one-hundred-percent increase

16 in the number of surety defendants and not see a fairly

17 dramatic reduction in price is if there's already a lot of

18 above-market price profit just sitting on the supplier side and

19 that that can only be -- the presence of that much profit can

20 only be explained by collusion.  If there weren't -- if there

21 weren't that, they say then -- well, anyway.  You're familiar

22 with that part of the brief.

23    **MR. HOUSKA:**  I am, Your Honor.  And there's a couple

24 of problems with it.  The first is that the plaintiffs haven't

25 actually alleged high profits.  What they've alleged is low

1    loss ratios.  And the problem with that, in turn, is that

2    plaintiffs have alleged that there are low loss ratios for

3    sureties operating in California, but they've also alleged that

4    the loss ratios for the sureties when they're operating outside

5    California are substantially the same.  In particular, in

6    paragraphs 149 and 271 of the Complaint, plaintiffs cite to

7    national loss ratio figures for a number of the sureties.  And

8    what you see is that the loss ratios are substantially

9    identical.  They're either zero or very close to it, both in

10    and outside of the conspiracy.

11        Now, logically if something is true where you're alleging

12    a conspiracy exists and it's also true where something -- where

13    you don't allege a conspiracy exists, that can't be indicative

14    of a conspiracy.  In scientific terms, the control and

15    treatment groups are identical on that factor.  So that's not

16    something that you can possibly allege as a plus factor.

17        The other issue is that it does ignore the long-run trends

18    in the market in the fact that with a price inelastic market,

19    to quote the *E.I. Department of Motors* case, if you reduce

20    prices, the long-run result is only to undercut the overall

21    profits of the industry.

22        So that's the reason why that -- why the allegations

23    regarding market entry don't work, leaving aside the fact that

24    it also undermines some of their arguments about barriers to

25    entry.

The other problem is that plaintiffs rely very heavily on trade associations as the way in which this conspiracy supposedly came together, but the allegations around trade associations are far too thin to support a plausible conspiracy.  The problem with that the Ninth Circuit identified in *Citric Acid* is that you need to have trade associations and meetings of those associations that are not just the normal operation of an industry.  There has to be some extra factor that leads to you believe that at some meeting, anticompetitive conduct took place.

That doesn't exist here.  Plaintiffs only allege two specific meetings, one of which was only attended by a single one of the surety defendants, and it's impossible to collude with yourself.  And the second, it's not even clear whether it was attended by anybody.

I would also cite the Court to the *In re Cal Title Insurance* case which makes a number of points about how where you just have allegations about meetings and you don't have allegations about who was there, in what capacity, what information was exchanged, it goes a bridge too far -- in fact, several bridges too far for that to be the backbone of a conspiracy allegation.

The last thing that I would like to address, before I turn it over to some of my colleagues because I'm cognizant of the Court's limits on our time, is the rebating element of the

1    conspiracy.  The plaintiffs' allegations around rebates center

2    on a series of notices which were all submitted to the CDI for

3    approval.  Now, under 10 California Code of Regulations Section

4    2595(k), all of those regulations had to be submitted to the

5    CDI for approval, and the CDI shall, to use the words of this

6    regulation, reject anything that it finds to be misleading.

7    And so to the extent that they are arguing that these

8    advertisements are the core of the conspiracy, they also

9    implicitly need the CDI to either be asleep at the switch or in

10   on it.  Those aren't alleged in the Complaint, and they're not

11   even plausible allegations.

12       Again, cognizant of the Court's limits on our time, the

13   only final point that I'll make is that a conspiracy needs

14   conspirators, and so even to the extent the Court might believe

15   that there is some overall inference of a conspiracy, it still

16   needs to look at each individual defendant to see what exactly

17   the allegations against them are and whether they've actually

18   participated in the conspiracy.

19       So I believe John Hamill from DLA Piper will address that,

20   unless the Court has any more questions for me on this section.

21           **THE COURT:**  I do not, Mr. Houska.  Thank you.

22        **MR. HAMILL:**  Thanks, Your Honor.  This is John Hamill

23   here from DLA Piper.

24       I'm going to try to tackle your question about the floor

25   and the ceiling under the pleading standards.  I am going to

focus a bit on the allegations regarding the surety defendants.

So three -- three overarching, I think, points in response to your question about the floor and the ceiling. The first, in answering your question as to what is the requirement, where is the floor, where is the ceiling, how do you -- how do you gauge that spectrum is well, we'd like to look back to what you yourself said on your read of this case before you on the first round. That's similar to what the court did in the *TFT* case. You gave a roadmap here on what you said these plaintiffs had to do to plead to state a claim, and they didn't follow it. That's directly applicable to what happened in *TFT*. *Cathode Ray* had a bit of a different circumstance, but in *TFT* because there was a dismissal and then instructions from the court as to what needed to put in the Complaint for the amendment and then the amendment.

**THE COURT:** You probably know this and all the other counsel at the hearing probably also do, but just in case, it's true that I have the *CRT* case now, but I got it, I think, in 2015, and so all the rulings in that case that relate to the questions we're discussing today were made by a different judge. I just thought people ought to be aware of that.

Mr. Hamill.

**MR. HAMILL:** Understood, Your Honor.

And then if I were to answer your specific question, is there a case out there that sets the floor, I think it's

probably *Kendall*.  I think that's the one in this circuit that does the best job, at least as directly applicable here.

So I don't think it's much of, I guess, sort of a Potter Stewart standard maybe, is what you're asking.  That's not what it is.  There is some pretty clear guidance, and that first point is you told them what to do.

The second thing in answering your question is as much a policy issue for the courts in your gatekeeper role, and that is that that role has to have, respectfully, some substantive bite to it.  There's a reason why we move beyond pure notice pleading for antitrust claims, and that reason is to avoid the extraordinary sums in discovery that would have to be spent just to see if anything specific could be alleged.

So what *Twombly* does not permit, what we look to that floor, what it's not going to permit is a plaintiff can't just take lines read in court decisions, trump them up as though they were factual allegations without actually saying something factually specific to each defendant.  Group-wide platitude aren't going to work.

And then third, in trying to find that line, I think there is some helpful guidance we can offer to this Court essentially as a matter of policy in applying *Twombly*, and that's this. We're acutely aware of your rulings last time on the regulatory defenses.  I'm not going to go there.  But I do think something that comes into play with respect to your *Twombly* question is

what you said at the last hearing, which is that you're not
going to go and tell the Department of Insurance what rate they
should post.  Those are your words.  I know it's always a risk
to quote a court back to itself, but here is why that matters
to your question today.  Because there is no way around it,
that ultimately the remedy that the plaintiffs are seeking are
going to ask you to do just that and to decide on each bail --
each issuance of bail whether there should have been a rebate.

And so in the context of trying to decide where that floor
should be, it's hard to imagine a case where there should be a
floor and that should be thrown out than one more strongly
invoking that principal than this one.  Really this case goes
to the heart of what *Twombly* should be about.

Let me go a little bit into some granularity here, also
conscious of the time restrictions.  What these plaintiffs do
is to plead for all the sureties through essentially a rote and
generic formula.  They have maybe a half dozen different things
they say that is then cut and pasted across the brief.  That
leads to an impermissible lack of factual specificity.

I'm sure Your Honor saw that in the brief we put a table
that said that there were no allegations that a specific
defendant agreed with any other defendant, no factual
allegations to do anything.  No factual allegations that any
defendant participated in even a single discussion.  No
communications.  No meetings, the opposite of what was required

in *TFT*; the opposite, before Your Honor took the case, of what was required in the *CRT* case. Lots of acronyms in this world.

There is no allegations that any defendant was even present at a single meeting. None. No allegations that they communicated with each other. Nothing that says anything factually specific. So what we have here is essentially that you're being asked to draw inferences from the existence of this market and then a number of platitudes that are put out.

And that's exactly what failed in *Kendall*, and that's why when you asked what's the case that sets that floor, it's *Kendall*. And I'll just drop a marker for you here to look later. It's page 1048. 1048 of *Kendall*. And that's a 2008 case. Which sets out this essential base framework that the court said did not work in *Kendall*.

**THE COURT:** I'm enjoying this. That question was really directed at the plaintiffs because they're the ones -- they didn't like your cases so the question to them was, "Fine, you don't like the defendants' cases. Give me something that I will find more useful."

But this invitation was extended so strongly, I'm going to read *Kendall*, and I'm going to focus on that page.

**MR. HAMILL:** Thank you, Your Honor. And maybe I'm doing what you said, which is don't take the strong point and run with it. But I think this is the strong point and I think it's the key point because we're here on round two. We're not

1     here on round one.

2          And if you look at that page in *Kendall*, at 1048, the

3     court summarizes this rote generic framework that is put in

4     place for the pleading in that case, and if you compare that to

5     what's done here in this case, I think you'll see a direct

6     parallel.

7          We gave you this part in the appendix, our Appendix A,

8     that goes defendant by defendant, surety by surety, and shows

9     how it's essentially a rote formula.  Oh, sure, there is a

10    tweak here and there and maybe something slightly said

11    differently from one to the other and there are a little bit of

12    variations but not much.

13         So *Kendall* is the case that this -- that this draws

14    specifically back to.  It's essentially a cut-and-paste job for

15    the gist of that framework, and that's not permitted.

16         So, Your Honor, beyond that, let me just hit a couple of

17    other quick things, and I'll yield the podium to my colleagues.

18         It is the case, as you've seen, that the premium rates

19    submitted by the sureties were not uniform, and I heard your

20    question about what sort of percentages and so forth.  But the

21    bottom line is that the premium rates were not uniform.

22         The claims about rebating also follow that same rote

23    formula.  You can just look at paragraph 174 by way of example

24    of the Complaint or page 17 of our opening motion.  And it's

25    just the same rote formula again and again and again.

Now, one of the things that really stands out for us -- and this goes right again to your question about *Twombly* -- is there are not even any factual allegations as to how someone joined the conspiracy.  None.  So if you look at Appendix B-1 of our motion, there's a table there, and you will see that the number of sureties ends up being about two times by the end of the supposed conspiracy as it was at the beginning.  So the implication to that is that the defendants automatically entered a conspiracy just by selling bonds.  There is no statement of when there was some kind of indoctrination ceremony or agreement or some formal thumbs-up or even a word said.  It's, *You sell bonds*.  *You must be a member of the conspiracy*, and that doesn't work under the cases that you've asked about.

Ms. Healy, in a few minutes, is going to touch on the trade associations, and so I will defer to that, other than I will point out that there is nothing that was supposedly done or said by any of the sureties in the context of a trade association.  By way of example, there is a couple of defendants -- my client Danielson is one.  Philadelphia, others.  They're not even alleged to be members of those associations.  So that won't work either.  It's a constant team of nothing specific and everything purely general.

So, Your Honor, the two things that I did hear them say, to go to your point about what do we think the other side is

going to say, one thing I hear is, *Well, we'll just get this in discovery, we'll get it in discovery*, but that can't work as a matter of policy because if that were the case, then any Complaint would be excused from *Twombly* on that excuse.  So that doesn't work.  That's the very purpose of the gatekeeper role.

     And, in fact, I think some of their excuses make the arguments worse for them.  And here is what I mean by that.

     This Complaint -- when we lay out in our briefs why the Complaint fails, they respond citing cases like *TFT* and *CRT*, and they say, "Well,in those cases, there were guilty pleas or government investigations, and so they were able to plead more."  Well, let's think about that.  This Complaint here shouldn't be held to a lower standard because there weren't government investigations in this industry.  Far to the contrary, this is a heavily-regulated industry, so if anything, given the knowledge out there, the pleading standards should be more stringent.

     So beyond that, Your Honor, I think the last words I would say are these.  There's got to be a reason for *Twombly*.  It has to have a bite.  This is the case where it has that bite.

     With that, Your Honor, I would like to pass the podium over, I believe, to Ms. Healy or maybe it's Mr. Zollar.  I apologize if I got the order wrong.

          **THE COURT:**  Well, the conductor will straighten us out

1    if you got the order wrong.  Who.

2        Who is next?

3            **MS. MEJIA:**  That is Ms. Healy, Your Honor.

4            **MS. HEALY:**  Thank you very much, Your Honor.  I'm

5    Nicole Healy.  I'm speaking on behalf of the trade associations

6    and the individuals.

7        And I think the Court already recognized that this is a

8    new Complaint, and we ask that you look with fresh eyes at the

9    defendants who previously you found plaintiffs had stated a

10   claim against, that the allegations are entirely different in

11   this Complaint than they were in the last Complaint.

12       And now significantly the Court admonished the plaintiffs

13   in the past that they should plead facts providing each

14   individual defendant how they joined the conspiracy and how

15   they played some role in it, and they haven't done this here.

16       Now, it's significant to note that the trade associations

17   and the individuals do not write or underwrite bail bonds.

18   Unlike the surety defendants and the bail agent defendants,

19   they are, to some degree, on the periphery of this industry.

20   And because of that, plaintiffs have to find a way to slot them

21   into this alleged conspiracy.  And what they've done is they

22   have said the trade associations are part of the social

23   structure of the industry, and they assert these plus factors.

24   Well, you will see in a moment there are no plus factors here

25   to be derived from the trade associations.

With respect to the individuals, they claim that they made statements many years ago, in some cases up to 15 years ago, at the inception of the conspiracy at a time when half of the surety defendants hadn't even started underwriting bail bonds or writing bonds in California. And time it's hard to have a conspiracy without conspirators. That's what we see here.

They also allege that the individuals effectively are offering invitations to collude, yet the statements that they made are not collusive. They may be supportive of the industry and enthusiastic about the industry's health, but not the kind of statements like we see in other cases where they're effectively admissions that people are quoting, cooperating and conspiring in an illegitimate way.

With respect to the trade association defendants, what we see is mere participation, and that's what the Court said isn't sufficient. And that was in the Court's prior order citing *In re Musical Instruments*. Here we have allegations that there are two named meetings, two identified meetings, over a 16-year period, one of which was in 2011. That was attended by Two Jinn, one of the bail agent defendants. It was sponsored by ABC. And it was also attended by representatives from CBAA and GSBAA, the two other trade associations. So now we have three of twenty-six entities at a meeting. No discussion about what was said, no discussion about any collusive activity or illegal activity.

The second was sponsored by ABC in Nevada in 2019 which is nine months after this lawsuit was filed. There are no allegations of who attended that very recent meeting. There are four surety defendants who identified as sustaining member companies. Well, so what? So trade associations have members. Trade associations raise money from their members. Trade associations promote the industry. That's true of trade associations generally. That's not an allegation, a factual allegation, that supports a conspiracy.

CBAA and GSBAA are alleged to have held annual meetings and periodic phone calls in some cases. No allegations about what was discussed or who attended or any detail whatsoever. So the meeting allegations are completely inadequate.

The allegations that the trade associations have members, seek donations, provide their members with information, it's publicly-available information. The rate filings can be found on the CDI website. Nothing illegitimate about that. In fact, the parties in this case went to the CDI website and found rate-filing information.

There are also allegations that CBAA and GSBAA maintained links to third-party websites on their own websites. No allegations that they adopted any statements, no allegations that they did more than link to other websites. That's simply not sufficient.

Now, there's also some allegations about a non-party,

SFAA, which allegedly promulgated and developed the ten-percent premium rate, yet they're not a defendant.  And if that allegation was sufficient to bring them into the conspiracy, surely the plaintiffs would have brought them in, and yet they have not.  It is simply not sufficient to say that they maintain information, make it available to members, when there are no allegations that that information was used to set prices in any anticompetitive manner or otherwise in any way it would violate the antitrust laws.

So I would just leave the Court with this thought about the trade associations, which is the mere fact that they can be misused by antitrust conspirators, in other words, that it could happen doesn't mean that it did happen.  And the failure to plead facts showing that it did happen demonstrates the inadequacy of the plaintiffs' allegations.

Now, with respect to the individuals, the Court said last time that individuals may be liable for the antitrust violations of their employers if they have directly participated in or knowingly approved or ratified inherently wrongful conduct, and that was citing *Murphy Tugboat Company*. However that -- in the last order, the Court did not find that plaintiffs had stated a claim against the employers of the individuals, and that's significant because it's only the employers of the individuals who are even alleged to have heard the supposedly invitations-to-collude statements.  In other

words, those statements were posted on the websites of the

employers, AIA and ASC, and yet there is no allegations that

anybody else ever heard them, saw them, acted on them.  Well,

an invitation that no one acts on is really not an invitation

to do anything, and so I would note that that's a significant

hole, gap, in the Complaint.

In addition, some of the statements that are made, for

example, Mr. Carmichael's statements saying that why -- you

know, "who do the associations serve" is supposedly collusive,

but when you look at the statement, it's completely anodyne.

It just says associations are here to support the industry.

Mr. Watson's statement about price cutting being a cancer

was made 11 years ago at a time when price cutting was already

rampant, and, again, there are no allegations that anybody ever

acted on that statement in any way.

So I would just have the Court compare this case to

something like *In re High Fructose Corn Syrup* in which

defendants were admitting that they had an agreement not to

undercut one another's prices, and *Our competitors are our

friends; our customers are the enemy*.  We don't have those

kinds of statements here.

The statements here are simply the kinds of statements

that people might make in the circumstances in which they did

where they have concerns about the way their industry was

going, and they reflected those concerns, and yet there are no

allegations that anyone ever acted on those concerns in any way that was inappropriate, improper, or illegal.

And with that, I will turn it over to my colleagues.

**THE COURT:** Very good.

**MR. ZOLLAR:** Blake Zollar. My remarks will focus on the bail agent defendants, Two Jinn and All-Pro.

I am cognizant of the time limitations, so I'm going to try to move through this quickly.

The Second Amended Complaint is notable, as many of my colleagues mentioned, for what it does not allege, in particular here with respect to the bail agent defendants. There is no allegation that the bail agents refused to provide rebates to consumers. In fact, in the opposition brief, the plaintiffs concede that rebates are provided.

There is no allegation that the bail agents agreed among themselves not to provide rebates. There is no allegation that the bail agents agreed with the surety defendants not to provide rebates. And there is no allegation that the bail agents agreed not to advertise rebates. Instead, plaintiffs ask the Court to infer vague agreements among all the defendants to, quote, "discourage and suppress rebate."

And in support of that allegation, the Second Amended Complaint makes four basic points. One, that the bail agents did not offer rebates to the two named plaintiffs here and somehow misled them into believing no rebates were available.

Second, that the bail agents advertise on their websites that they are required to charge the rates approved by the CDI. Third, that the bail agents, quote, "generally do not advertise rebates."  And, fourth, that one of the bail agents, Two Jinn, attended a single industry event in 2011, but there is no corresponding allegations about who else was there, in what capacity, what was said, or any agreements that were reached.

So with respect to the first claim, even assuming the bail agents did not offer rebates to the two named plaintiffs here, that does not plausibly suggest the existence of an industry-wide price fixing conspiracy, particularly given plaintiffs' concession that rebating does, in fact, occur.

In addition, plaintiffs plead no facts whatsoever to support their bare assertion that the bail agent defendants somehow misled plaintiffs into believing that rebates were not available.  There are no facts as to how that supposedly happened, what the misrepresentations were, whether plaintiffs relied on them, or even if plaintiffs looked at or could even access the website that plaintiffs point out in the Second Amended Complaint.

With respect to the challenge statements on the bail agents' websites, the bail agents statements about the rates that they were required to charge are not only not misleading, they're an accurate statement of the law.

**THE COURT:**  Well, hang on just a second.  I don't know

that this is -- very much is going to turn on this, but the brief keeps saying that, and I'm not sure that it accurately reflects the experience of the largely unsophisticated consumer who walks into a bail bondsman to purchase a bond. What you mean is that they are required to charge the rates set by the CDI and that they have the flexibility to offer a rebate in the appropriate circumstance if they want to. But I don't know that the consumer who walks in the door would see it that way. They would just, I think, think about price, whatever "price" means. And "price" means what they pay the bail agent to get the bail bond. And so when they hear -- it just seems very artful to me. When they read or they hear that we are required to charge the rate set by the CDI, I think the reasonable person would think *well, the price is fixed*, even though you and I both know that's not true.

So I don't want to have a big argument with you. It's just that you make this point so strenuously in the brief, and I just think as a matter of consumer common sense there is not too much carbonation in it. Do you know what I mean?

**MR. ZOLLAR:** Zollar I understand, Your Honor. So two responses to that. One is the courts have already --

**THE COURT:** I beg your pardon. Could I just say gently to those of you who are appearing by Zoom that when you're eating in a Zoom hearing, the judge can see you eating, and it's as though you were eating in the courtroom.

1    I'm sorry, Mr. Zollar.  For the sake of the record, you

2    are not the person eating.  Go ahead.

3         **MR. ZOLLAR:**  Thank you, Your Honor.

4    So two responses to that.  One is I think the Court did

5    sort of, at least, briefly touch on this in the original order

6    in which the Court held that even if some of those statements,

7    for example, on the Aladdin's website were potentially

8    misleading -- and this is at page 26 of the prior order --

9    well, that may be potentially somewhat misleading as to the

10   rates that the bail agents are authorized to charge.  It's not

11   evidence of an agreement.  And I think that's the case here.

12       Plaintiffs are not pleading a false advertising claim, for

13   example.  In fact, they make that point in their opposition

14   brief.  They are alleging the existence of a conspiracy.  So

15   even if an unsophisticated end consumer may be somewhat

16   confused by the fine distinctions between those two things,

17   that's not evidence of an agreement on behalf of the bail

18   agents.

19       Plaintiffs also focus on the fact that they found no

20   evidence that the bail agents advertised rebates, and they make

21   the point that defendants, quote, "do not provide any plausible

22   alternative explanation for the lack of advertising of

23   rebates," and therefore they claim the only plausible

24   explanation is that the bail agents are part of an

25   anti-rebating conspiracy, and they cite the *Starr* case for that

1     at page 24 of their opposition brief.

2          So implicit in that argument is the acknowledgement that

3     if it were consistent with the bail agents' interest not to

4     advertise rebates, then doing so would not be evidence of an

5     anticompetitive agreement.  And I think plaintiffs' own plus

6     factor allegations here show why it is very much in the

7     economic interests of each of the individual bail agents not to

8     advertise rebates, and that's because plaintiffs allege that

9     bails bonds, as was mentioned previously, are fungible and

10    commodities-like, and that the market for bail bonds is price

11    inelastic and concentrated.  And given these allegations, a

12    bail agent's decisions not to advertise rebates is just as

13    consistent with innocent as it is with unlawful behavior, and

14    both the *Twombly* court and the *In re Insurance Brokerage*

15    *Antitrust Litigation* case in the Third Circuit said that if

16    that's the case, that is a basis for dismissing the Complaint.

17         So here if plaintiffs are correct that bail bonds are

18    fungible and that they are price inelastic, meaning that the

19    demand for them does not go up when the price goes down, then

20    there is no incentive for individual bail agents to advertise

21    rebates.  While plaintiffs claim that that may cause an

22    individual bail agent to capture some of the market share,

23    that's only temporary, and it's not in the long-term interests

24    of any bail agent because all that is going to happen is that

25    the other bail agents will then have to be forced to advertise

rebates of their own.  That is not going to increase the demand for bail bonds.  Folks don't commit more crimes because bail bonds are less expensive.

So the long-term effect of that is that prices go down industry-wide without any corresponding increase in demand, which makes it not in the interests both of the overall market for bail bonds to advertise rebates but also not in the economic interests for any of the individual bail bond agents to advertise that.

And because of that --

**THE COURT:**  Mr. Zollar --

**MR. ZOLLAR:**  Yes, Your Honor?

**THE COURT:**  -- defendants' time has expired.

**MR. ZOLLAR:**  Thank you, Your Honor.

**THE COURT:**  Who will argue first for the plaintiffs?

**MR. SALAHI:**  Good afternoon, Your Honor.  Yaman Salahi for the plaintiffs.

**THE COURT:**  Mr. Salahi, go ahead.

**MR. SALAHI:**  Thank you.

What I would first like to start with is the question of the legal standard and what sets the floor.  I'm afraid that my answer is not going to provide an easy explanation for how to deal with this, and the reason is that what the Supreme Court has provided and what the Ninth Circuit has provided is a flexible legal standard that needs to apply to different

scenarios and different situations.

What we do know from *Twombly* itself in the concluding paragraph is the Supreme Court's affirmation that the decision does not require heightened fact pleading of specifics; that only enough facts to state a claim for relief. So that helps us set aside any claim that specificity is the requirement here.

Then from the series of antitrust cases that we've cited are an enumeration of various plus factors that are considered by the courts.

And with respect to the issue of meetings between surety defendants and what was said at particular meetings, I think that the fair answer there is that the amount of specificity or the substance of what happened at a trade association, the weight that that takes in the analysis really depends on what other factors are at issue in the particular case.

So here it is correct that unlike *CRT* and unlike *TFT*, we don't have as much information about these closed-door meetings as the plaintiffs in those cases had, and so therefore we can't put as much weight on the existence of the trade association meetings and those opportunities to conspire.

Standing alone, unquestionably that would not be enough, but we're not standing on that alone. In fact, our strongest plus factors are issues related to the public statements by the defendants, specifically Mr. Carmichael and Mr. Watson,

inviting the industry to collude and inviting the industry to refrain from price competition.

We also have the issue of the loss ratios, and I would like to get into that a little bit, but I want to stick on the legal standard for a little bit -- a little bit longer.

*Kendall* is instructive because it does give us a floor in the sense of we do need to allege a "who." We do need to allege what did they do. We do need to allege who they did it to or with whom they did it to, and we need to allege where and when they did it. And the Amended Complaint does all of that.

We've alleged market entry dates. We've alleged that the joining of the conspiracy happened coincident with market entry. We have alleged what they did, which was the charging of the standard rates, failure to seek more competitive rates from CDI, as well as refraining from rebating, suppression of rebating. All of those answers are there.

What *Kendall* is not so helpful with is the facts. There the plaintiffs did not allege any plus factors, so the Court specifically said in that case that the appellants failed to plead any evidentiary facts beyond parallel conduct to prove their allegation of the conspiracy.

So while *Kendall* does provide some guidance on the types of questions that a plaintiff needs to answer in order to give a defendant a starting point to figure out how to respond on the merits in the case, it doesn't tell us much with respect to

the facts of this case.

    We do have cases, Your Honor -- we anticipated that you might ask this question -- where courts have held that specific substance of meetings and the specific attendees at a meeting were not required at the pleading stage.  My one flag on that is we did not, unfortunately, cite those in our opposition, so before introducing those, I would just like to flag that and make sure that it's okay with the Court, or if the Court would prefer that to come in a subsequent brief filing, we would be happy to do that as well so that the defendants could have a fair opportunity to respond.

    **THE COURT:**  Well, you know, there is no -- there's no -- I don't have one rule for all hearings on this.

    I think I want those cases.  I want those cases.  So I think you should -- I think the fairest thing -- I want the cases, and I want you to tell me why they're good for you.

    So I think the fairest thing is for you to make the argument you came to make; immediately following the hearing, to file something with the Court that says, "These are the cases that I referenced," and a couple days from now, the defendants can put in a few pages about why those cases aren't very good.  Let's do that.  We can work out the details of that at the end of the hearing.

    Go ahead.

    **MR. SALAHI:**  Thank you, Your Honor.

1      So I'll highlight two cases now.  There may be more cited

2  in our subsequent submission, but the two --

3      THE COURT:  No, no, no.  You are not going to have a

4  subsequent submission.  You are being allowed by the grace of

5  the Court to spring some cases on everybody that you didn't

6  have in your brief.  That's good.  But then the defendants will

7  get a chance to respond, but they will get to do it in writing

8  because they ran out of time.  Also they didn't know you were

9  going to talk about the cases.

10      Go ahead.

11      MR. SALAHI:  I apologize.  I misunderstood the Court.

12      So the first case is *In re Delta/Airtran Baggage Fee*

13  *Antitrust Litigation*, 733 F.Supp.2d. 1348 in the Northern

14  District of Georgia.  There the court talks about how the

15  Eleventh Circuit has recognized that plaintiffs need not allege

16  the existence of collusive communications in, quote,

17  "smoke-filled rooms in order to state a Section 1 Sherman Act

18  claim.  Rather, such collusive communications can be based upon

19  circumstantial evidence and can occur in speeches at industry

20  conferences, announcements of future prices, statements on

21  earning calls, and in other public ways."

22      And in this case, I would suggest that the other public

23  ways that we have referred to are precisely those invitations

24  by Mr. Carmichael and Mr. Watson, the signaling that occurred

25  in various rate filings where the defendants that subsequently

joined the bail bond market explicitly referred to other rate

submissions by their competitors and stated that they would

abide by those same plans.

And similar case citing the same legal standard, *In re*

*Domestic Airline Travel Antitrust Litigation*, 221 F.Supp.3d 46

in the District of D.C, and there it says, "While it is true

that plaintiffs do not in their Complaint point to one specific

meeting where the purported agreement was finalized, they are

not required to make such an assertion."

So both of those cases -- if I recall correctly, one of

those does cite a string of additional cases that goes to the

same point -- support the proposition that considering as a

whole what is alleged in the Complaint, the strength of various

plus factors, there are situations in which the existence of

opportunities to conspire and membership in trade associations

where we do not know, by the way, in the Complaint that in two

of those trade associations, the defendants did exchange price

information.  So that -- that does bolster the strength of the

inference here.  It's not just that they had meetings; we have

no idea what was going on.  They had meetings in organizations

whose explicit purpose included the sharing of pricing

information.

Both of those cases go to the point that at this stage, at

least, we can cite those, and it can be a relevant, pertinent

plus factor, even though we don't submit that our case rises or

falls on the trade association membership.  It's just one
factor to be considered alongside many others.

One more point on the legal standard.  There was an issue
that came up with respect to the continuing vitality, I guess
you could say, or the applicability of the *Starr vs. Baca*
standard to antitrust litigation.  The way that I would
synthesize *Starr vs. Baca* with *In re Musical Instruments*, the
subsequent Ninth Circuit case, is that *Starr vs. Baca* just
talks about what the Court does on a 12(b)(6) motion when the
plaintiff has submitted a plausible claim and the defendant has
also submitted a plausible explanation for its conduct on the
pleadings.  And there the rule is that the plaintiff proceeds
with the case.

*In re Musical Instruments* does not address that question.
It addresses only whether the plaintiffs have made a plausible
allegation of conspiracy in the first place.

And so it is a somewhat difficult needle to thread because
the test in antitrust litigation goes -- is not about
plausibility.  It's about whether the conduct is just as
consistent with lawful and unlawful conduct.  Then you don't
have a plausible claim to begin with.  But it does not change
the rule of law in terms of what happens when two alternative
explanations are plausible.

The final point I'd make on that is that there is no
pleading standard that requires plaintiffs to do the

1   impossible.

2        **THE COURT:** I was grabbing my notes. Could you repeat

3   that sentence, please? I didn't hear you.

4        **MR. SALAHI:** Yes.

5      There is no pleading standard that requires plaintiffs to

6   do the impossible. We don't have access to those internal

7   company meetings. We don't have access to the closed-door

8   trade association meetings. If we had had that information, we

9   would have gone out of our way to investigate that. In fact,

10   far from being a copy-and-paste, our Amended Complaint reflects

11   a very detailed review of every single public rate filing by

12   every single surety defendant at issue in this case. And we

13   have pulled the relevant data points and information and put

14   that in our Complaint related to financial data that was

15   available, related to several admissions that the defendants

16   make regarding their profitability there.

17      If the Court has no questions further about the legal

18   standard that is governing, I'm happy to move on to the other

19   issues that were raised.

20        **THE COURT:** You are the captain of your own ship,

21   Mr. Salahi.

22        **MR. SALAHI:** Thank you, Your Honor.

23      I would like to move on to the plausibility issue. A very

24   big theme in the briefs of the parties is is all that is going

25   on here natural interdependence, and on that issue, the

1    defendants arguments are at war with themselves.

2         On the one hand, they argue that this is an industry in

3    which perfect parallel behavior would be expected as the

4    logical outcome of natural interdependence, and on the other

5    hand, they are arguing that there has been, in fact, vigorous

6    price competition in variation throughout the class period.

7    Those two positions are mutually exclusive, and, in fact, they

8    fail to provide a coherent account of the economic structure of

9    this industry.

10        Of course, Rule 12(b)(6), the inferences have to be drawn

11   in our favor, but we have clear allegations here that this is

12   not a naturally interdependent market.  And the clearest

13   example of that in the Complaint is that one of the industry

14   veterans and leaders, Mr. Carmichael, conceded as much in 2005.

15   He said the industry couldn't sit by passively while

16   competitive forces encroached on the market.  He said if

17   economic forces were to take -- were to obtain in this market,

18   what we would be left with is competition where the current

19   business would be replaced by a new model that properly

20   reflects the balance of risk and reward.  He said simple

21   economics dictates that.

22        If this were a natural interdependent market, simple

23   economics would dictate a different conclusion in that context.

24   And so how did he propose that the forces of simple economics

25   could be stopped?  He said that the industry must work

1   collectively.  Again, that is not the kind of statement that is

2   addressed to internal employees, to respond to Ms. Healy's

3   comment.  He exhorted in one of his publications if only -- if

4   only our competitors would -- would agree -- I didn't get that

5   exact quotation right, but he did exhort his competitors to act

6   in the same way that his -- his surety would be acting.

7        And so, in our view, these concessions from

8   Mr. Carmichael, who had been in the industry long enough, who

9   had headed one of the most important sureties at the time, and

10  who was active and led several of the larger trade

11  associations, he would be the one to know how that industry --

12  how economics -- how the world's economics would apply in that

13  industry, but he said that collective action was needed to stop

14  price competition.  And that precludes the plausibility at this

15  stage of natural interdependence fully explaining the

16  defendants' conduct here.

17       A couple other factors there is that, you know, defendants

18  have pointed to what they call vigorous price competition, and

19  I will explain in a moment why I don't think that is the case.

20  But even with respect to those examples, there are examples

21  that they cite where -- for example, two of the AIA affiliates

22  pushed their standard rate down from ten percent to nine

23  percent at the very end of the class period in 2018.  If this

24  were a naturally interdependent market, the other sureties

25  would have followed suit.  That didn't happen.

1    They identify a few sureties who went below the eight

2    percent price point for preferred tiers and began offering

3    additional parallel -- excuse me -- preferred rates at six and

4    seven percent, but there was not an immediate response by the

5    other competitors to do the same.

6         So that also belies the notion that this is a naturally --

7    at least -- or at least the notion that the Court can take it

8    for granted at this stage that this is a naturally

9    interdependent market.

10        Given these competing accounts of the market and I think a

11   dispute about facts that would inform whether this is a

12   naturally interdependent market, this is not a question that

13   can be resolved without expert testimony and without discovery.

14        With respect to the issue of the standard and preferred

15   rates, what is still undisputed is that the standard rate price

16   point, with the exception that I just noted, was ten percent

17   across the board.  From 2004 to 2018, no surety defendant

18   offered a standard price point below ten percent.  The one

19   exception is in 2019 -- I'm sorry -- in 2018 by the two

20   defendants.  I just mentioned that.

21        So what defendants do instead is they start looking at the

22   preferred rate categories, but that is problematic for a couple

23   of reasons.  It's looking at an object of -- it's looking at a

24   level of conduct that plaintiffs have not alleged is an example

25   of parallel conduct.  So plaintiffs' allegations are not that

defendants' parallel conduct includes identical preferred rate tiers. It's focused on the standard rate tiers.

What we have with respect to the preferred rates is that all of those apply to subsets of consumers who meet a numeric criteria, and as we've explained, some of the more common preferred categories do involve overlapping price categories. So, for example, people who have retained private counsel, people who are veterans, people who are union members, people who post collateral, all of those are at the eight percent price point, which, you know, as we've said, is often characterized as a discount off of the standard rate. So there is a relationship there between the fixed standard rate and what the level of the preferred rate ends up being, particularly in light of the admissions that we've cited in the Complaint, several of them, that there is no actuarial basis for the eight percent versus the ten percent versus the seven percent versus the six percent.

The other important factor to note is that those preferred tiers apply to -- particularly once you leave those common categories, they apply to more and more idiosyncratic and small categories of consumers. And so the fact that there might be some effort by some defendants to obtain an advantage with respect to law enforcement officers who end up as criminal defendants, which, as we all know, is a very rare occurrence, that does not really inform the preferred -- whether there is

1    competition at the standard level at the same rate --

2         **THE COURT:**  Mr. Salahi, I want to ask you about

3    something, and, again, this is, as was true with some of my

4    questions with the defendants, it's not a matter of the

5    greatest moment in the briefing, but it's something I'm curious

6    about, and that is the question of barriers to entry.

7         Now, you have a market that on the supply side doubles

8    over the course of the class period, so a little hard for me to

9    conclude that the barriers to entry are actually all that

10   substantial.  And I'm not saying that I will make that finding

11   or I won't.  I'm just saying as a person talking to you right

12   now, it sure doesn't look to me like the barriers to entry are

13   all that significant.

14        So let's assume that the reason that these additional

15   players came into the market was that they observed that the

16   existing players were making above-market profits, and I am

17   sure that's what you would want me to assume.  And let's

18   further assume that they were able to sustain their position as

19   members of the market because there continued to be robust

20   profits available to everybody, even with all these additional

21   players.

22        What would stop other people from just coming into this

23   market and driving these prices down to the point that they

24   were whatever?  We could pick what we wanted the metric to be,

25   actuarially justified, the price at which supply meets demand,

1   whatever that is.  What would stop that, or do I care?

2          MR. SALAHI:  Well, our simple answer to that is what

3   stopped that is the existence of a conspiracy.  I think that

4   the Court has hit on an important issue there.  I --

5          THE COURT:  That can't be the answer, though, because

6   they decided, *Well, we'll let in ten more people, but then at*

7   *that point, we're going to assert the conspiracy, and no one is*

8   *going to come in.*  A conspiracy didn't stop anyone from coming

9   in, if there was a conspiracy; right?

10          MR. SALAHI:  Yes.  And to clarify, Your Honor, the

11   conspiracy is what would have stopped the price cutting.  It

12   doesn't stop the entry of new competitors into the field.

13       I take Your Honor's point.  I think that this case

14   presents modest barriers to entry.  They're not so high as to

15   preclude entry, and they're not so seamless as to make the

16   possibility of competition a strong enough threat to defeat any

17   conspiracy in the market.  I think that's the best that we can

18   say about that at this stage.

19          THE COURT:  Thank you.

20          MR. SALAHI:  One thing that I would note is that the

21   capital reserve requirements are not something that any old

22   person can satisfy in order to get the license from CDI.  You

23   do have to be able to have enough of a -- of a -- enough

24   sophistication and enough financial security to be able to

25   even --

THE COURT: That's a balance sheet item. There are plenty of entities in the United States that have that money just sitting on their balance sheets somewhere and they're wondering what to do with it. I mean, I don't want to opine about this industry, which all of you know a lot about and I don't, but what the briefs say is, for example, you're making -- you have sureties bragging they have never suffered a loss; right? Because the losses are all being absorbed by the bail agents. They've never suffered a loss. I don't care if you're only getting one percent on the face amount of the bond; if you never suffer a loss, that's just easy money. And I don't -- anyway, I don't regard the capital requirements as being much of an impediment.

MR. SALAHI: Another impediment, Your Honor, is the network effects associated with then establishing and recruiting bail agents who are authorized by the State of California to sell bail bonds to consumers and to contract with one underwriter versus another.

There are certainly factors there. We did cite one example of a surety defendant that applied several times to get regulatory approval and ran into encounters there, so there are certainly barriers. Whether they are extreme barriers or modest barriers is a different issue.

THE COURT: I don't want to take too much of your time just on that point.

1          **MR. SALAHI:** Thanks, Your Honor.

2          Going back to the parallel conduct, we do respond to these

3      in the briefs, but the two cases cited by the defendants on

4      this hearing, I think that they are different in important

5      respects from this situation.

6          With respect to *Kelsey K.* on the issue of whether the

7      variation defeats parallel conduct, the first distinction is

8      that that -- you know, that might be relevant if we were

9      talking about variation at the level of the standard rate price

10     point, but we don't have that variation here, as I've

11     mentioned.  The problem in *Kelsey K.* is that they alleged wage

12     fixing between NFL teams.  They gave allegations about the

13     wages paid by four NFL teams to cheerleaders, and none of them

14     were the same.  They ranged from zero dollars to one $25.

15         So that kind of variation doesn't exist here.  We have a

16     lot more consistency at the standard rate level and even at the

17     preferred rate level than we do inconsistency.

18         The same can be said about *Lubic* with respect to the

19     variations.  Again, we're not seeing five to twenty percent

20     rate differences at the level of the standard rate level.  The

21     one exception to that is the 2019 rate filing by AIA.  That

22     reduced from ten to nine percent, which is a ten percent

23     reduction.

24         *LTL Shipping* also does not really help in this case

25     because the problem there was that the plaintiffs had basically

given the exact explanation why the defendant freight companies had all raised their prices at the same level, which is that they all faced identical increases in the cost of diesel fuel at the same time, and there was an allegation that there were very slim profit margins.  That issue is completely at odds with our Complaint, and we have alleged the low loss ratios.  We've gone beyond that.  We have actually alleged profitability, and we have cited a number of defendants admitting not just that loss ratios were low, but that profits were uncharacteristically high.  And as the Court has already noted, the entry of several market participants suggests those profits were not assumed by additional competition.

I would like to move on to the issue of rebates.  The factual support that we have alleged for the rebating component of the conspiracy, anti-rebating component of the conspiracy, I think one of the strongest points here is the conspicuous absence of advertisements for rebates.  We allege in the Complaint that after scouring, we were able to locate two acknowledgments by bail agents that they could even rebate.  Those acknowledgments, as the Court has already seen, I'm sure, are not --

THE COURT:  Mr. Salahi, the other side is not going to get a chance to respond to this, but I just read the reply brief recently, and one of the things they do is they say, "Well, we don't know what their investigation was on this

point.  You shouldn't consider it," etc., and, "by the way, we

went on Google, and in four seconds, we found six million

things advertising rebates."  And I don't know what to do with

all of that.  I don't like considering new things on reply.

I'm certainly not going to go on Google.  I just don't know how

much weight to give what either side is doing here.  You can

help me?

     **MR. SALAHI:**  Yes, Your Honor.

    With respect to that claim, we did file an objection to

the reply under the local rules to the evidence submitted in

the reply.

     **THE COURT:**  Yeah.  I won't tell you whether I like or

don't like dealing with those kinds of issues.  They just come

up ordinarily in the course of resolving motions.

    I want to ask you a more real-world question.  If I did

that Google search, would I find what they said?  I want to

know what's real.  I have a lot riding on this.  What's

reality?

     **MR. SALAHI:**  Yeah.  And I'm prepared to address that

on the merits.

    So one of the examples that they cite, that relates to

Chickie's Bail Bonds.  That is, in fact, one of the public

acknowledgments we reference in paragraph 91 of our Complaint.

So that is the sole example, other than Chad The Bail Guy,

where -- of a bail agent that we could locate.

1    The other examples turn out to be ambiguous enough that

2    what it seems to be a reference to is the difference between

3    the standard rate and the preferred rate.  It's not talking

4    about rebates that come out of the bail commission -- bail

5    agent's commission, but, rather, the discounts that are offered

6    by the sureties to veterans or AARP members, for example.

7    So that is what we have found.  That is what I expect

8    Your Honor would find if the Court were to perform that search,

9    but, you know, coming back away from the substance of the issue

10   to the allegations of the Complaint, that goes well beyond

11   what's alleged in the Complaint.

12   **THE COURT:**  Yeah.  And you're -- look, at this stage,

13   you are entitled to rest on the allegations of your Complaint.

14   I just don't want to get led down some garden path where it

15   turns out later the allegations were 180 degrees in the other

16   direction.

17   One of your plaintiffs got an eight percent rate; correct?

18   **MR. SALAHI:**  Correct, Your Honor.

19   **THE COURT:**  That was not a rebate.  That was a

20   preferred rate.

21   **MR. SALAHI:**  Correct.

22   **THE COURT:**  All right.

23   **MR. SALAHI:**  All right.

24   Speaking more to the point of the conspicuous absence of

25   advertisements, I think it is helpful to talk a little bit

about why we would expect advertisements here.  One important

fact about the regulatory framework in California is that

solicitation by bail agents is prohibited so they cannot simply

approach arrestees or criminal defendants to sell them bail

bonds.  The only way --

**THE COURT:**  I'm going to give you 30 extra seconds,

and I will tell you a story.

My very first year as a judge -- I was on the state court

at that time -- I had a misdemeanor pretrial assignment in

Wiley Manuel Courthouse at Seventh and Washington in the city

of Oakland, California.  There was guys standing outside giving

away lanyards that said "Bad Boys Bail Bonds" on it.

So I don't know if everyone understands that regulation

the say same way, but, anyway, go ahead.

**MR. SALAHI:**  Well, so what we would expect is that

for, you know -- perhaps -- unless you are the sole bail agent

around, which is not the case, the way that bail agents can

distinguish themselves to people who are looking for bail bonds

is by letting them know what price they're going to offer them.

And so if they are going to offer rebates that are going to

reduce the prices and attract customers, we'd expect that to be

conspicuously placed.  It could be in the windows of the bail

offices.  It could be on printed material that they distribute.

It could be on their websites.

**THE COURT:**  Where is this in the Complaint if I wanted

1    to cite a paragraph?

2          **MR. SALAHI:**  Paragraph 91, Your Honor, is where we

3    talk about the absence of rebates and why advertising is

4    particularly important in this context because of the

5    prohibition on solicitation.

6          **THE COURT:**  Good.

7          **MR. SALAHI:**  And then paragraph 92 is the second

8    relevant one that talks about bail agent Chad Conley's

9    experience with retaliation and the indirect reference to the

10   Chickie's Bail Bonds submission made by the defendants on

11   reply.

12         So the absence of advertisements.  The retaliation against

13   rebaters is another indicia of a conspiracy here, so

14   Mr. Conley's post about the good old boys club coming after him

15   when he offered rebates.  And then the lockstep use of language

16   that either defames bail agents who offer discounts or uses the

17   same misleading tricky kind of incomplete statements that

18   reasonable bail bond consumers would not understand the nuances

19   of between what is a rate, what is a discount, what is a

20   rebate.

21         And as the Court recognized in the prior order, despite

22   the lack of information that the plaintiffs have at this point

23   about the actual rebating practices --

24         **THE COURT:**  What am I to do -- I haven't read the

25   cases, but I read the brief that cites the cases.  It says you

1   are not required to tell people that you have discounts

2   available.  What am I to do with that?  Do you know what I'm

3   talking about?

4         **MR. SALAHI:**  Yes, Your Honor.

5      You know, those cases are completely irrelevant because

6   they address a different issue.  They address whether a

7   defendant has engaged -- has violated the false advertising

8   laws or has engaged in some other fraudulent advertising.

9      What we have here is different.  What we're looking at is

10  whether the uniformity of their behavior, the parallel, I guess

11  you could say, lack of advertising or parallel lack of -- or

12  parallel misleading statements about the rebates suggests that

13  that's pursuant to some sort of cross-defendant understanding

14  or agreement.

15        **THE COURT:**  Okay.

16        **MR. SALAHI:**  So if this were a consumer case, then

17  this would be a different issue, but it's not.

18        **THE COURT:**  Okay.

19        **MR. SALAHI:**  Okay, Your Honor.

20      I would like to talk a little bit about the loss ratios

21  now, and then I also want to give my colleague, Ms. Dafa, a

22  chance to address the issues arising with respect to the other

23  groups of defendants.

24      With respect to the loss ratios, there was a point made by

25  the defendants earlier with respect to the relevance of low

loss ratios nationwide versus in California, and I think the --
the -- what distinguishes this case from the cases that they've
relied on is that those cases are looking at situations where
a -- where the parallel conduct occurred in places beyond those
where the conspiracy was alleged -- or, I'm sorry, let me
rephrase that.  Where -- where competitors who were not
defendants had engaged in precisely the same parallel conduct
that the defendants' competitors had been alleged to do.  And
so that defeated the -- or undermined the plausibility of a
conspiracy between the defendants because other industry
competitors were engaging in the same behavior.

That's not quite what's at issue here.  The fact that loss
ratios are low across the country does not preclude the
possibility that there is a conspiracy in California.  And
certainly we don't allege that the conspiracy is limited to
California.  That just is the only claim that the plaintiffs
are suing on.

And as we put -- as we mention in the footnote, an
important feature of this landscape is that in many other
states, rebating by bail agents is not permitted or by any
insurance agents is not permitted, and they are not necessarily
state law causes of action where the various immunity defenses
that sometimes arise in the insurance industry are absent as
they are in California as the Court has ruled.

Regarding the point that the defendants make about --

well, and of course we have Proposition 103, which completely changed the landscape of the insurance industry here by enabling and encouraging competition.

Regarding the point the defendants make in their brief about whether you look at benefit expense ratios or loss ratios, we have actually alleged a nexus between loss ratios and profitability which renders the question of benefit expense ratios obsolete. We have alleged that the loss ratios in this industry are basically near zero, and several of the defendants acknowledge as much in their rate filings.

We have alleged that the loss ratios are far below what they are in other industries, so paragraph 10, for example, says loss ratios in other insurance industries are 72 to 78 percent, whereas here we are much closer to zero percent.

We have also got allegations about defendants' remarking specifically about profitability, so Credit & Surety, for example, talks in one of its financial disclosures about expanding its program because it is, quote/unquote, "very profitable." Paragraph 206.

So the Court doesn't even need to reach -- based on those allegations, the Court doesn't even need to reach the relevance of the benefit expense ratio issue.

With respect to the surety defendants, you know, there is not much more I can add on that other than that we have now a separate section which answers the key questions about each of

the defendants:  The who, what, where, when.

     With respect to AIA.

          THE COURT:  What is your best one?

          MR. SALAHI:  I'm sorry?

          THE COURT:  What's your best one?  Pick your best

surety defendant, the one that is a slam dunk for you in terms

of pleading the liability of that individual surety.

          MR. SALAHI:  Well, I would start with ASC, the

American Surety Company, which is the one that Defendant

Carmichael was an executive of.  You know, that's the one

where, you know, we have direct admissions by one of the

executives that tie them in, but I don't think that that

distinguishes in any meaningful way ASC from the other

defendants because we have the same parallel conduct for all of

them.  We have the same action against self-interest by all of

them.  We have the subsequent market entrants who would be

expected to try to gain a foothold in the market price

competition, refrain from price competition, and we have

allegations about rebate suppression by several of them.  And

for several of them that we've noted in the briefing and in the

Complaint, there are also comments about the lack of an

actuarial basis, the extreme profitability of their

participation in this market.  So, you know, it's hard for me

to say "the allegations are."  They may be more specific

against some defendants than others, but they are not stronger

1  on a Rule 12(b)(6) than the others.

2       **THE COURT:** Okay.

3       **MR. SALAHI:** At this point, I would actually like to

4  give my colleague, Ms. Dafa, a chance to address her categories

5  of defendants, and Mr. Harvey is also going to speak a little

6  bit to the question of what to do with the discovery stay.

7       **THE COURT:** Ms. Dafa, you have the floor. I think

8  your side has got about six minutes left.

9       **MS. DAFA:** Okay. Good to know. I will try to hit the

10  high points then.

11      So I think I will start with the trade associations, and I

12  will start with rebutting some of the points that opposing

13  counsel made, and then I will move into why the allegations in

14  the new Complaint are sufficient.

15      So as you probably noticed, opposing counsel went through

16  one by one the different issues and allegations regarding trade

17  associations and discussed -- discussing why those are

18  insufficient, but that's not how the Supreme Court and the

19  Ninth Circuit have instructed us to evaluate whether the

20  Complaint plausibly suggests a conspiracy. And I direct the

21  Court to *Continental Ore Co.* where it stated, quote, "It is

22  apparent from the foregoing that the Court of Appeals

23  approached the claims as if they were five completely different

24  and separate lawsuits. We think this is improper. In cases

25  such as this, plaintiffs should be given the full benefit of

1    their proof without tightly compartmentalizing the various

2    factual components and wiping the slate clean after scrutiny of

3    each.  The character and effect of a conspiracy are not to be

4    judged by dismembering it and viewing it in its separate parts

5    but only by looking at it as a whole."

6         So I encourage the Court to disregard the way the

7    defendants have approached the analysis as to the trade

8    associations.

9         That being said, I will touch on some points that were

10   made.  First, that the statements by Carmichael are 15 years

11   old and therefore should be disregarded, but as we've noted in

12   our opposition brief, the conspiracy started around that time,

13   and so it makes sense that Carmichael's statements are 15 years

14   old.  And further as the Court noted earlier, it's okay for

15   parties to join the conspiracy later.  And, therefore, you

16   know, a conspiracy does -- the conspiracy doesn't stop others

17   from entering the field.

18        As regards to the meetings that -- opposing counsel

19   mentioned that there were two meetings where no discussions

20   were described, but as my colleague, Mr. Salahi, mentioned,

21   there is no law that requires plaintiffs to do the impossible.

22   We are -- which is to allege the contents of private

23   communications in meetings, and that's not what the law should

24   be either.

25        What we are able to allege are the public statements, and

1  that -- and that is important here, and I will get to that in a

2  moment in regards to our new allegations.

3      Opposing counsel also mentioned that Carmichael's

4  invitations were only to their own -- Carmichael and Watson's

5  invitations were only to their own companies, and that's wrong.

6  They were on public websites, and they were on their company

7  websites, and it was clearly meant for others if it was on a

8  public website.

9      As to the allegations in the new Complaint, Your Honor, in

10  your last order, previously held that the allegations as to

11  both ABC and Golden State were insufficient because the only

12  allegation as to ABC related to a statement by a former and not

13  current executive and that there were no allegations as to

14  Golden State.

15      We have remedied both of these deficiencies by including

16  statements from the current leadership of both trade

17  associations.  I highlight the important ones.  Carmichael

18  states, quote, "Rampant premium discounting will result in the

19  end of bail bond business as we know it."  He tethers this to

20  trade associations by stating, quote, "National, state, and

21  local associations must be well-versed in the vital rules they

22  play in the protection and bettering of our markets."

23      Watson, who serves as the general counsel, is more blunt.

24  He refers to price cutting as a cancer in the bail industry.

25      And then in regards to Golden State or GSBAA, the

founder --

   **THE COURT:** I'm sorry. Ms. Dafa, hold on a second.

 Somebody is doing something with their line that is making it difficult for me to hear Ms. Dafa. Please stop.

   **THE CLERK:** Your Honor, I believe it might be Ms. Dafa. The paper may be rubbing against the microphone of her computer.

   **THE COURT:** There you go. Ms. Dafa. It's Ms. Dafa interrupting Ms. Dafa.

   **MS. DAFA:** Sorry.

   **THE COURT:** Go ahead.

   **MS. DAFA:** I was just saying that the founder of Golden State, Topo Padilla, asserts in a public video --

   **THE COURT:** Ms. Dafa, it's happening again. It's very distracting.

   **MS. DAFA:** I apologize.

   **THE COURT:** Thank you.

   **MS. DAFA:** Is that better? Can you hear me?

   **THE COURT:** It is. Yeah.

   **MS. DAFA:** Okay. Good.

 I was just saying the founder, Topo Padilla, of Golden State asserts in a public video on his website and also on YouTube that, quote, "The premium of ten percent is regulated by the California Department of Insurance. That rate cannot legally be discounted."

1    And so, Your Honor, we have to look at these public

2    statements by current executives that price fixing is a cancer,

3    that discounting will end bail business as we know it, and that

4    rebates are illegal, and we have to tether these allegations to

5    the other allegations regarding the trade associations'

6    activities.  These together lead to the plausible inference

7    that ABC and Golden State participated in the conspiracy.

8    And I can address some of the cases that were discussed

9    earlier as well.

10   So I think the best case on this issue is *LCD*, which is

11   the decision by Judge Illston in 2018.  There there were public

12   statements that included a keynote address by a president and

13   CEO of one of the defendants and statements by another

14   executive.  And those statements were regarding whether -- were

15   regarding how the manufacturers in the industry were trying to

16   limit the production or capacity of their products.

17   So here, like in *LCD*, plaintiffs make public statements in

18   an effort to get other entities in the industry to limit

19   rebates.

20   I believe opposing counsel also mentioned -- let's see.

21   Let me find it.

22       **THE COURT:**  I'd say the greatest hits, according to

23   the other side, are *LCD*, *CRT*, *Kendall*.

24       **MS. DAFA:**  Right.  I was going to mention the *Citric*

25   *Acid* litigation where in that case -- it was a summary

judgment, actually, case so it's procedurally different than

here. The defendant at issue there didn't even attend the

meetings where the allegedly illegal activities took place, and

also the -- that case didn't have the sort of damning

statements that we have here in regards to the leadership of

the trade associations.

I was planning on now turning to the bail agents, unless

Your Honor had any other things you want me to address.

**THE COURT:** I don't. I think you might be out of

time, though.

**MS. DAFA:** Is that right?

**THE COURT:** Ms. Lee says that's true. There it is.

**MS. DAFA:** Okay.

**THE COURT:** So I have the -- unfortunately, I have to

interrupt you just like I interrupted Mr. Zollar earlier.

**MS. DAFA:** No worries.

**THE COURT:** Well, we have come to the end of our time.

Obviously we could have spent a lot more time if we had it.

There are a couple of administrative things I want to

figure out.

First, I did make a good note of the cases that

Mr. Salahi -- the new cases he wants me to read, but

nonetheless, I would like Lieff Cabraser just to put something

on the docket today that says, "Today at the hearing on the

motion to dismiss, the plaintiffs cited the following cases,"

just to make sure that we are all focused on the same thing.
And then by the 28th, the defendants can assign one of their
number just to file something that's not longer than three
pages, excluding the caption page, that tells me why those
cases aren't really very good.  That seems like about the right
amount of space given the amount of argument that Mr. Salahi
made.

     I don't know that I would have gone down that path
ordinarily except that I did start the hearing by asking
essentially for those cases, so he was nice enough to give them
to me.

     I don't know that I want to take argument now.  No one
addressed it in their argument.  You might want to think about
it.  You might even want to meet and confer.  What would
happen, for example, if I were to find that the existence of a
conspiracy was adequately pled, but as to some number of --
some not insignificant number of defendants, allegations were
not specific enough after I just issued an order opening
discovery?

     The one thing I can't do anything about is however I
resolve that question, one side will feel that what I have done
is deeply unfair.  I know that.  But I would like you to talk
to each other about that so that if that's what happens, I know
what the last couple of sentences of the order say right there
at the conclusion where it says, "these allegations are

1    dismissed with leave to amend," then what?

2          So, for example, just so I'm not trying to hide the ball,

3    normally I would say you have until X date to file an Amended

4    Complaint, and to be clear, I'm not attempting to forecast a

5    result.  I might deny the motion.  I might grant it with

6    prejudice as to all the defendants.  I might do something in

7    the middle.  It's the middle that I'm focused on because I,

8    getting ready for the hearing, anticipated if I do the thing

9    that I just said, which is give the plaintiffs one more shot,

10   but I set a timeline, I thought the next day Lieff Cabraser is

11   going to file a brief saying, "What are you doing?  You just

12   gave us discovery.  That's not fair," etc., etc., etc.  Let's

13   tee it up now.

14         Mr. Harvey, go ahead.

15         **MR. HARVEY:**  I would love to address that.

16         In the scenario where I think -- sort of another version

17   of what happened the last time around, which is the motion was

18   granted with respect to some without prejudice but not with

19   respect to others, what I would propose is that discovery would

20   proceed in the normal course against the defendants that remain

21   in the case, and the others would be treated as any third

22   party.  We would serve subpoenas rather than RFPs.

23         **THE COURT:**  Right.  But you don't want me to dismiss

24   those defendants with prejudice.

25         **MR. HARVEY:**  No.  But I would suggest -- and perhaps

1    the parties could discuss this because we haven't to date -- is

2    in a case schedule, which we are due, I think, to provide to

3    the Court by September 18th -- typically in a case schedule,

4    there is a deadline to amend the pleadings.  And if in the

5    course of discovery we determine that a group of defendants who

6    were dismissed -- you know, it turns out that we think they

7    really belong in the case --

8            THE COURT:  Can I interrupt you?

9        MR. HARVEY:  Yep.

10          THE COURT:  Because I do think the parties need to

11   meet and confer.  I think where you are going is, "Judge, just

12   don't set a time for us to file an Amended Complaint, our next

13   Amended Complaint.  Just set a deadline by which it has to be

14   done off in the future."  Is that right.

15       MR. HARVEY:  Yes.  Basically a deadline to amend the

16   pleadings.  That would occur in the normal course of the case.

17          THE COURT:  Let's do this.  Since I did get to hear

18   from you and since I'm sure if I was representing a defendant,

19   I would definitely want to put my oar in the water, why don't

20   the parties just meet and confer, and then by Friday, file

21   something short setting forth your competing positions.  Try to

22   go for something that I would think is short as opposed to what

23   you think is short.

24       Before we wrap this up, I just want to say one more thing.

25   At the beginning of this case, I expressed from the bench some

1    thoughts about the importance of the diversity of the lawyers

2    that appeared in front of me.  That is not something that I had

3    ever done before, at least in that way, and I thank you for

4    listening to me say that.

5        One of the kinds of diversity that I don't think I

6    addressed at that time was age in the profession, how long has

7    someone been practicing law, and today I had the pleasure of

8    hearing from at least two associates.  I know that because --

9    you can't see my hands -- I went and looked on the websites

10   while people were arguing.  And it's not every day in one of

11   the major antitrust cases that is pending in the Northern

12   District where we have a lot of big cases that you're going to

13   see associates arguing a dispositive motion like this, so I

14   know some of the partners at their firms had to make some

15   decisions for that to happen, and I just want to let you know I

16   noticed and I appreciate it.  I think the only way you're ever

17   going to get to -- you know, you want to hit a fast ball, you

18   got to swing at fast balls.  So if you want your associates to

19   turn into good partners, you have to give them a lot of leash

20   sometimes in court.  So anyway, thank you for that.

21       Is there anything else administratively we need to do

22   before I take this under submission, subject to these filings I

23   will be getting this week?

24       **MR. HARVEY:**  I don't believe so, Your Honor.  Thank

25   you.

1    THE COURT:  Ms. Mejia, anything further?

2    MS. MEJIA:  Not from the defendants, Your Honor.

3  Thank you.

4    THE COURT:  Okay.  Very good.  Very good arguments

5  today.  Thank you, everybody.

6    (Proceedings adjourned at 3:35 p.m.)

```
 1

 2

 3                    CERTIFICATE OF REPORTER

 4          I certify that the foregoing is a correct transcript

 5    from the record of proceedings in the above-entitled matter.

 6

 7    DATE:    Thursday, August 27, 2020

 8

 9    Pamela Batalo Hebel

10    _____
      Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
11    U.S. Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```