1  COOLEY LLP
   MICHAEL A. ATTANASIO (151529)
2  (mattanasio@cooley.com)
   4401 Eastgate Mall
3  San Diego, CA 92121-1909
   Telephone: (858) 550-6000
4  Facsimile: (858) 550-6420

5  BEATRIZ MEJIA (190948)
   (mejiab@cooley.com)
6  TIMOTHY W. COOK (Mass. Bar No. 688688)
   (*Admitted Pro Hac Vice*)
7  (tcook@cooley.com)
   MAX SLADEK DE LA CAL (324961)
8  (msladekdelacal@cooley.com)
   3 Embarcadero Center, 20th Floor
9  San Francisco, CA 94111-4004
   Telephone: (415) 693-2000
10 Facsimile: (415) 693-2222

11 *Attorneys for Defendant Seaview Insurance Co.*

12 [Additional Moving Defendants and Counsel
   Listed on Signature Pages]

13

14             UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16                  OAKLAND DIVISION

17

18 | IN RE CALIFORNIA BAIL BOND | Master Docket No. 19-cv-00717-JST
   | ANTITRUST LITIGATION |
19 |  | CLASS ACTION
20 | THIS DOCUMENT RELATES TO: | **DEFENDANTS' NOTICE OF MOTION AND**
   |  | **JOINT MOTION TO DISMISS THE THIRD**
21 | ALL ACTIONS | **CONSOLIDATED AMENDED CLASS ACTION**
   |  | **COMPLAINT; MEMORANDUM OF POINTS**
22 |  | **AND AUTHORITIES**
23 |  | Judge:        Hon. Jon S. Tigar
   |  | Hearing Date: September 1, 2022
24 |  | Location:     Courtroom 2, 4th Floor
   |  | Time:         2:00 p.m.
25 |  | Trial Date:   Not Set
26

27

28

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION ............................................................................................. 1

STATEMENT OF RELIEF SOUGHT ............................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED ............................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... 2

I.      INTRODUCTION ................................................................................................................ 2

II.     BACKGROUND .................................................................................................................. 3

    A.      April 2020 – January 2021: The Court Twice Dismisses Plaintiffs' Similar Allegations. ............................................................................................................ 3

    B.      January 2021 – December 2021: Defendants Produce Over 170,000 Documents in Post-Dismissal Discovery................................................................ 4

    C.      April 2022: Plaintiffs File the Repackaged SCAC as the TCAC. ....................... 4

        1.      The TCAC drops multiple previously named defendants, further undermining the plausibility of any supposed industry-wide agreement. ................................................................................................ 5

        2.      The TCAC's "new" allegations fail to allege each Defendant's agreement to fix a 10% standard premium rate. ................................... 6

        3.      The TCAC's "new" allegations fail to allege each Defendant's agreement to suppress bail agents' rebating. ............................................ 8

III.    LEGAL STANDARD ......................................................................................................... 9

IV.     ARGUMENT ...................................................................................................................... 9

    A.      The TCAC Fails to Cure the Deficiencies the Court Identified in the SCAC. ........... 9

        1.      The TCAC does not sufficiently allege any agreement—even *after* extensive discovery. .................................................................... 10

        2.      The TCAC does not sufficiently allege how each Defendant joined and participated in a conspiracy to charge a standard 10% premium rate............ 10

            a.      Allegations about SFAA pricing merely show parallel conduct. ...... 12

            b.      Allegations about the exchange of publicly available pricing information—required to be filed by the CDI—are likewise insufficient. .................................................................. 13

            c.      Allegations about trade association membership and mere attendance at meetings remain insufficient.................................... 14

        3.      The TCAC does not sufficiently allege that each Defendant joined and participated in a conspiracy to prevent rebates. ............................... 16

    B.      The *Noerr-Pennington* Doctrine Also Bars Plaintiffs' Amended Claims. ............... 18

    C.      The Cartwright Act Claim Fails with the Sherman Act Claim.................................. 20

    D.      The UCL Claim Falls with the Antitrust Claims. .................................................... 21

    E.      Dismissal Should be with Prejudice. ...................................................................... 22

V.      CONCLUSION................................................................................................................... 22

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A White & Yellow Cab, Inc. v. Uber Techs., Inc.*,
  No. 15-cv-5163-JSW, 2017 WL 1208384 (N.D. Cal. Mar. 31, 2017) ...................................21

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
  486 U.S. 492 (1988)..........................................................................................................18, 19

*In re Animation Workers Antitrust Litig.*,
  123 F. Supp. 3d 1175 (N.D. Cal. 2015) .................................................................................12

*Blank v. Kirwan*,
  39 Cal. 3d 311 (1985) ..............................................................................................................18

*Boone v. Redevelopment Agency of City of San Jose*,
  841 F.2d 886 (9th Cir. 1988) .............................................................................................18, 20

*Brazil v. Dole Food Co.*,
  935 F. Supp. 2d 947 (N.D. Cal. 2013) ....................................................................................21

*Brown v. 140 NM LLC*,
  No. 17-cv-05782-JSW, 2019 WL 118425 (N.D. Cal. Jan. 7, 2019)........................................20

*In re Citric Acid Litig.*,
  191 F.3d 1090 (9th Cir. 1999) .................................................................................................14

*Coronavirus Rep. v. Apple Inc.*,
  No. 21-cv-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .................................18

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*,
  28 F.4th 42 (9th Cir. 2022) ......................................................................................................15

*Evans Hotels, LLC v. Unite Here Loc. 30*,
  433 F. Supp. 3d 1130 (S.D. Cal. 2020).....................................................................................20

*F.T.C. v. Ticor Title Ins. Co.*,
  504 U.S. 621 (1992)..................................................................................................................18

*In re Graphics Processing Units Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...................................................................................15

*Hartmann v. Cal. Dep't. of Corr. & Rehab.*,
  707 F.3d 1114 (9th Cir. 2013) ..................................................................................................22

1

**TABLE OF AUTHORITIES**
(continued)

2

3

*Jones v. Micron Tech. Inc.*,

4

    400 F. Supp. 3d 897 (N.D. Cal. 2019) ...................................................................15

5

*Kendall v. Visa U.S.A., Inc.*,

    518 F.3d 1042 (9th Cir. 2008) .............................................................................10

6

7

*Knievel v. ESPN*,

    393 F.3d 1068 (9th Cir. 2005) ................................................................................6

8

*Kottle v. Nw. Kidney Ctrs.*,

9

    146 F.3d 1056 (9th Cir. 1998) ..............................................................................18

10

*Lesnik v. Eisenmann SE*,

    374 F. Supp. 3d 923 (N.D. Cal. 2019) ....................................................................6

11

*In re Musical Instruments and Equip. Antitrust Litig.*,

12

    798 F.3d 1186 (9th Cir. 2015) .......................................................................10, 14

13

*In re Nat'l Ass'n of Music Merchs., Musical Instruments and Equip. Antitrust Litig.*,

    MDL No. 2121, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012) ..................... *passim*

14

*Oregon Nat. Res. Council v. Mohla*,

15

    944 F.2d 531 (9th Cir. 1991) ................................................................................18

16

*Parrino v. FHP, Inc.*,

17

    146 F.3d 699 (9th Cir. 1998), *superseded by statute on other grounds as stated in*

    *Lacey v. Mariacopa Cty.*, 693 F.3d 896 (9th Cir. 2012)..........................................6

18

*Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*,

19

    No. 11-CV-02652 JLS (RBB), 2012 WL 3778348 (S.D. Cal. Aug. 30, 2012) ......20

20

*Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,

21

    508 U.S. 49 (1993).................................................................................................18

22

*SC Manufactured Homes, Inc. v. Liebert*,

    162 Cal. App. 4th 68 (2008), *as modified on denial of reh'g* (May 19, 2008) .......21

23

*Sosa v. DIRECTV, Inc.*,

24

    437 F.3d 923 (9th Cir. 2006) ................................................................................18

25

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,

26

    580 F. Supp. 2d 896 (N.D. Cal. 2008) ..................................................................12

27

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,

    586 F. Supp. 2d 1109 (N.D. Cal. 2008) ................................................................11

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

iii.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

**TABLE OF AUTHORITIES**
(continued)

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  599 F. Supp. 2d 1179 (N.D. Cal. 2009) ...................................................................15

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
  546 F.3d 991 (9th Cir. 2008) ...................................................................................18

*In re Transpac. Passenger Air Transp. Antirust Litig.*,
  No. C 07-05634 CRB, 2011 WL 1753738 (N.D. Cal. May 9, 2011) .......................12

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) .................................................................................21

**Statutes**

California Insurance Code
  § 900.........................................................................................................................14
  § 931.........................................................................................................................14
  § 934.........................................................................................................................14

Cartwright Act ...............................................................................................................18, 20

Sherman Act ...................................................................................................................20

**Other Authorities**

Federal Rule of Civil Procedure
  9(b)...........................................................................................................................21
  12(b).........................................................................................................................1
  12(b)(6).....................................................................................................................6

Cooley LLP
Attorneys At Law
San Diego

iv.

Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **ABC** | American Bail Coalition |
| **Accredited** | Accredited Surety and Casualty Company, Inc. |
| **ACIC** | American Contractors Indemnity Company |
| **AIA** | AIA Holdings, Inc. |
| **Allegheny** | Allegheny Casualty Company |
| **ASC** | American Surety Company |
| **Bankers** | Bankers Insurance Company |
| **CAC** | Consolidated Amended Class Action Complaint (ECF 46) |
| **CalBIG** | California Bail Insurance Group |
| **CBAA** | California Bail Agents Association |
| **CDI** | California Department of Insurance |
| **Continental** | Continental Heritage Insurance Company |
| **Danielson** | Danielson National Insurance Company |
| **Defendants** | *Unless noted otherwise, all references to "Defendant(s)" refer exclusively to the previously dismissed "Surety Defendants" (the undersigned moving parties below)* |
| **FCS** | Financial Casualty & Surety, Inc |
| **GSBAA** | Golden State Bail Agents Association |
| **Indiana Lumbermens** | Indiana Lumbermens Mutual Insurance Company |
| **International Fidelity** | International Fidelity Insurance Company |

**TABLE OF AUTHORITIES**
(continued)

| | |
|---|---|
| **Lexington** | Lexington National Insurance Corporation |
| **Lexon** | Lexon Insurance Company |
| **NABIC** | National Association of Bail Insurance Companies |
| **NAIC** | National Association of Insurance Commissioners |
| **North River** | The North River Insurance Company |
| **SAA** | Surety Association of America |
| **SCAC** | Second Consolidated Amended Class Action Complaint (ECF 94) |
| **Seaview** | Seaview Insurance Company |
| **Seneca** | Seneca Insurance Company |
| **SFAA** | Surety and Fidelity Association of America |
| **Sun Surety** | Sun Surety Insurance Company |
| **TCAC** | Corrected Third Consolidated Amended Class Action Complaint (ECF 281-01) |
| | *Unless noted otherwise, all references to the TCAC noted as ¶* |
| **USFIC** | United States Fire Insurance Company |
| **Universal** | Universal Fire & Casualty Company |
| **Williamsburg** | Williamsburg National Insurance Company |

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

vi.

**DEFENDANTS' JOINT MOTION TO DISMISS**
**MASTER DOCKET NO. 19-CV-00717-JST**

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on September 1, 2022 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom of Honorable Jon S. Tigar, United States District Judge, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Courtroom 2, 4th floor, the undersigned Defendants will, and hereby do, move the Court for an order dismissing Plaintiffs' Corrected Third Consolidated Amended Class Action Complaint (ECF No. 281-1) (the "TCAC") with prejudice.

This motion is made pursuant to Federal Rule of Civil Procedure 12(b) and is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the accompanying Declaration of Darryl W. Anderson and exhibits attached thereto, the accompanying Request for Judicial Notice and exhibits attached thereto, the pleadings and evidence on file in this matter, oral argument of counsel, and such other materials and argument as may be presented in connection with the hearing of the motion.

## STATEMENT OF RELIEF SOUGHT

Defendants seek an order dismissing the TCAC in its entirety with prejudice.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether the TCAC's federal and state antitrust claims should be dismissed for failing to allege an illegal agreement between and/or among Defendants.

2.      Whether the TCAC alleges facts sufficient to plead each Defendant's role and participation in the alleged conspiracy.

3.      Whether the TCAC's Unfair Competition Law should be dismissed for failure to state a claim upon which relief can be granted.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.     INTRODUCTION

The TCAC is Plaintiffs' latest attempt to allege facts sufficient to show that Defendants inflated the price of bail bonds in California through a purported conspiracy to fix premium rates and suppress bail agent rebating.  Plaintiffs have failed to fix the deficiencies in their complaint for a third time despite the extraordinary benefit of extensive discovery against every named Defendant.  Plaintiffs received ***over 170,000 documents***—spanning the entirety of the alleged conspiracy, including all relevant communications between and among Defendants.  Yet the holes in Plaintiffs' theory remain clear and gaping.

***First***, the TCAC still does not plead specific facts that demonstrate each Defendants' role in the alleged conspiracy.  Plaintiffs simply recycle or re-package the same conclusory allegations the Court found deficient in its prior orders granting Defendants' motions to dismiss.  The TCAC pleads no factual support for any price-fixing agreement among Defendants, and again fails to allege how each Defendant joined and participated in the supposed agreement.  Crucially, aside from conclusory statements, the TCAC adds no new allegations regarding specific trade association meetings where the conspiracy was supposedly hatched or maintained.  In other words, the TCAC does not allege that any Surety Defendant communicated anything specific to another Surety Defendant that would demonstrate an intent to illegally conspire on price—even with the benefit of expansive discovery.  Plaintiffs instead rely on allegations regarding "information sharing" among industry trade associations—even after deciding to drop those associations from the lawsuit altogether.  These few "new" allegations are woefully insufficient for multiple reasons, namely because they pertain to publicly available information about California sureties' pricing data.

***<u>Second</u>***, the TCAC's allegations regarding the rebating prong of the conspiracy remain as deficient as before.  Indeed, the amorphous alleged agreement among the Surety Defendants to "suppress" rebating practices is even more far-fetched now that Plaintiffs ***no longer name a single California bail agent***.  It is bail agents that actually interact with bail bond purchasers (the proposed class members) and negotiate on rebates.  Without bail agents—formerly described by Plaintiffs as at the "center" of the conspiracy—the rebating aspect of the theory is even more implausible.

***Third***, where the TCAC does rely on documents from discovery, it is clear on their face that those documents evidence petitioning activity protected by the *Noerr-Pennington* doctrine.  As just one example, the TCAC relies on comments about a "legislative proposal" made during a ***CDI-initiated*** bail industry task force.  Defendants have the First Amendment-protected right to jointly petition on behalf of industry participants through lobbying of government agencies and the broader public.  In short, the few "new" facts that Plaintiffs allege do not show a nefarious conspiracy—they show members in a highly regulated industry working to lobby the government for legislative change.  As a matter of black-letter Ninth Circuit law, that activity cannot form the basis of an antitrust claim.

Like the two complaints prior, the allegations in the TCAC boil down to either conclusory statements or facts that cannot support any inference of wrongdoing.  The difference this time around is that Plaintiffs had the unprecedented benefit of ***fifteen months*** of wide-ranging discovery before amending.  The Court should therefore dismiss the TCAC with prejudice.

## II.   BACKGROUND[1]

### A.   April 2020 – January 2021: The Court Twice Dismisses Plaintiffs' Similar Allegations.

The TCAC alleges a conspiracy by Defendants "(1) to maintain the 'standard' premium rate [for commercial bail bonds] at 10%; and (2) to discourage and suppress rebating."  ¶ 6.  The Court has twice dismissed substantially similar complaints against Defendants.  *See* ECF 91; ECF 159.

In April 2020, the Court dismissed the CAC because Plaintiffs failed to allege facts sufficient to infer that any of the Surety Defendants or named bail agents had individually joined and participated in a conspiracy to fix bail prices.  ECF 91 at 23, 25-26 (holding that Plaintiffs did not allege how "each individual defendant joined the conspiracy and played some role in it").

Plaintiffs filed the SCAC in May 2020.  ECF 94.  Plaintiffs again broadly alleged a two-pronged conspiracy between twenty sureties, certain individual defendants, two bail agents, and several trade associations to fix premium rates and prevent rebating.  But the complaint again failed to allege when or how each Defendant joined the conspiracy.  Aside from allegations about when

---

[1] Because the Court is familiar with basic mechanics of the California bail bond market as covered in the parties' prior briefing, *see* ECF 91 at 1-4, Defendants do not repeat that background herein.

individual Defendants entered the California bail market, Plaintiffs merely alleged that the Surety Defendants filed similar premium rates, exchanged pricing data through the SFAA, and attended various trade association meetings.  The Court dismissed the SCAC in January 2021 as to all Surety Defendants because it failed to allege specific facts regarding each Surety Defendant's role, participation, and agreement to join the alleged conspiracy.  ECF 159 at 20-21.  The Court likewise dismissed both named bail agencies—Two Jinn, Inc. and All-Pro Bail Bonds, Inc.—and each of the named trade associations.  *Id.* at 10-11.

**B.**    **January 2021 – December 2021: Defendants Produce Over 170,000 Documents in Post-Dismissal Discovery.**

In their opposition to the previous motion to dismiss, Plaintiffs bemoaned their inability to meet the necessary pleading standard because they did not have access to Defendants' "internal communications."  ECF 117 at 47.  The Court thereafter permitted "tailored" discovery of the dismissed Defendants, "to allow Plaintiffs to gather the facts necessary to correct any perceived deficiencies in the pleading of their complaint," namely, the failure to allege an agreement among the Defendants.  ECF 151 at 2.  This post-dismissal discovery also included broader document discovery against the alleged ringleaders of the conspiracy, Defendants ASC and Bill Carmichael.

During pre-amendment discovery, Defendants, including ASC and Mr. Carmichael, produced over 170,000 documents—spanning 15 years—regarding their premium pricing and rebating practices in the bail bond industry, both in California and in other states.  Declaration of Darryl Anderson in Support of Defendants' Joint Motion to Dismiss ("Anderson Declaration") at ¶ 13.  Plaintiffs also issued at least five subpoenas to third-parties, resulting in over 6,900 pages of additional discovery.  *See id.*  Plaintiffs thus possess the "internal communications" they once claimed were critical to sufficiently allege a conspiracy, and have had months to review and analyze those documents and others.  But the TCAC remains remarkably silent as to any specific communications suggesting an illegal agreement.

**C.**    **April 2022: Plaintiffs File the Repackaged SCAC as the TCAC.**

After the fifteen-month discovery period, Plaintiffs filed the TCAC, again alleging in broad strokes that the Surety Defendants participated in a two-pronged conspiracy to fix premium rates and

prevent bail agents from rebating. *See* ¶¶ 6, 117, 130. But the amended complaint only confirms that the Court's previous dismissal orders were appropriate.

The TCAC: (1) drops several defendants who were twice alleged to be co-conspirators, including all bail agents, trade associations, and a surety that operated in the California bail market during the period of the alleged conspiracy; (2) still fails to allege specific facts regarding each Surety Defendant's agreement, participation, and/or role in the alleged conspiracy; and (3) repackages the same, insufficient allegations regarding uniform rates, "information sharing," and trade association meeting attendance. The TCAC is thirteen pages longer, but with virtually all the same deficient copy-and-paste allegations. It fails to attach a single communication reflecting any agreement between Defendants to conspire. Instead, Plaintiffs seek to mask their conclusory claims with trade association meeting dates and stray references to lobbying-related documents.

### 1. The TCAC drops multiple previously named defendants, further undermining the plausibility of any supposed industry-wide agreement.

Plaintiffs previously claimed that the dismissed bail agency defendants were at the "center" of the alleged conspiracy. *See* ECF 91 at 26; ECF 46 ¶ 72. But Plaintiffs now drop bail agents from the TCAC altogether. That omission leaves a gaping plausibility hole.

Plaintiffs are the bail bond customers who interact with bail agents to negotiate prices and secure the bonds. The alleged price-fixing conspiracy is thus premised on the prevention of bail agents' ability to provide discounts or rebates to customers. But Plaintiffs now propose a conspiracy where agents are somehow not part of the conspiracy at all. The TCAC fails to plausibly allege how each Surety Defendant could prevent rebates without coordinating with, communicating, or acting in concert with any California bail agencies or thousands of individual bail agents. The TCAC nowhere alleges facts that would demonstrate the necessary vertical agreements to enforce and police a conspiracy to fix prices in the two-tiered supply chain for commercial bail. *See* ECF 159 at 9-10.

The TCAC also asserts that SFAA was at the center of the conspiracy, yet tellingly fails to name SFAA as a defendant. *See* ¶¶ 117-123. Moreover, the SFAA—founded in 1908 (¶ 117)—promulgated antitrust guidelines read at the outset of every meeting, and the minutes of meetings referenced in the TCAC reveal standard trade association discussions and lobbying activities.

*See infra* Section IV.A.2.c; Anderson Decl., Exs. 9, 11.[2]

Finally, despite purporting to allege an industry-wide conspiracy, the TCAC does not rename Philadelphia Reinsurance Corporation, a surety that Plaintiffs twice claimed was part of the multi-decade price-fixing agreement in California. *See* SCAC ¶¶ 308-315. Plaintiffs' decision to drop the bail agents, not name SFAA as a defendant, and not rename all the market participants—after receiving significant discovery from all three—is telling.

### 2. The TCAC's "new" allegations fail to allege each Defendant's agreement to fix a 10% standard premium rate.

With regard to the premium-fixing claim, the TCAC's "new" allegations are limited to (1) a list of trade associations meetings attended by some, but not all, of the Surety Defendants; (2) the same repackaged allegations of uniform rate filing and "data sharing"; and (3) references to legislative proposals more than a decade stale. *See* ¶¶ 117-129.

First, the TCAC asserts that nine Surety Defendants attended an SFAA—a national trade association—meeting at least once during an eight-year period between 2003 to 2011, and that agreement to set a standard rate (for years to come) must have taken place at one or more of these meetings. *See* ¶¶ 117-118. But the TCAC's factual allegations do not otherwise support that conclusory pronouncement. Despite having tens of thousands of produced documents, the TCAC does not point to any specific facts concerning the alleged agreement. It does not allege who on behalf of sureties specifically attended each of these SFAA meetings, what communications or documents

---

[2] Defendants request that documents attached to the concurrently filed Anderson Declaration be incorporated by reference. The Ninth Circuit has recognized it is appropriate to incorporate by reference documents that are not specifically referenced or quoted in the complaint where they form the basis of a plaintiff's claims. *Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005). It has also held that a court may consider a document extrinsic to the complaint on a Rule 12 motion if the document is "integral to the plaintiff's claims and its authenticity is not disputed." *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 n. 4 (9th Cir. 1998), *superseded by statute on other grounds as stated in Lacey v. Mariacopa Cty.*, 693 F.3d 896 (9th Cir. 2012). In considering such a document, the Court need not convert the Rule 12 motion to a motion for summary judgment. *Parrino*, 146 F.3d at 706. The rationale behind this doctrine is simple: a plaintiff's failure to incorporate an extrinsic document "rais[es] the spectre that plaintiff failed to incorporate [the document] by reference in the complaint as a means of avoiding Rule 12(b)(6) dismissal." *Lesnik v. Eisenmann SE*, 374 F. Supp. 3d 923, 936 (N.D. Cal. 2019). Furthermore, "the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated [w]here the plaintiff has actual notice." *Id.*

signaled the alleged agreement, or how it was maintained over time.  The TCAC instead concludes that all Defendants reached an agreement to file a standard 10% rate based on *some* Defendants' attendance at these trade association meetings.  ¶ 119.  Like its predecessors, the TCAC does not even attempt to identify at which of these meetings the conspiracy to fix premium rates was hatched.

Plaintiffs also allege that eight Surety Defendants attended at least one of four national trade association meetings hosted by the NABIC between 2011 and 2016.  ¶¶ 125-126.  And they allege that four Surety Defendants were members of CalBIG, which according to Plaintiffs, provided another opportunity to reach agreement.  ¶ 127.  But as to these meetings (alleged to only have been attended by some Defendants), Plaintiffs again reference no relevant documents, nor make any specific allegation that indicates an agreement was reached before, during, or after.

Second, like the dismissed complaints, the TCAC includes copy-and-pasted assertions against each Surety Defendant that claim filing 10% premium rates indicates an agreement to conspire.  *Compare* ¶ 120 (alleging that conspiracy agreement based on Surety Defendants "express[ly] refer[red]" to a "10% premium rate . . . based upon 'Surety Association of America (SAA) pricing'"), *with* SCAC ¶ 153 (same).  The TCAC also repeats allegations that "dues-paying Defendants" supplied and received "competitive" data.  *Compare* ¶ 121 (alleging Defendants shared "detailed data concerning premiums charged and losses incurred"), *with* SCAC ¶ 154 (alleging Defendants shared "detailed data concerning all premiums charged and all losses incurred").  And while Plaintiffs now allege further crooked intent as to the SFAA's pricing reports, they ignore that the SFAA—like many other trade associations—legitimately compiles publicly available data, filed with the CDI in the "Bail Bond Supplement" attached to sureties' annual reports.  *See infra* Section IV.A.2.b.

Third, Plaintiffs cite two legislative petitioning initiatives as evidence of industry-wide price-fixing.  The TCAC quotes from a 2005 email about CalBIG's three "proposed legislative ideas for 2006."  *See* ¶ 128; Anderson Decl., Ex. 1.  And it cites an April 2010 attempt to "persuade CDI to require a 'fixed 10% bond rate,'" reflected in the meeting minutes of a CDI-initiated industry task force.  *See* ¶ 129; Anderson Decl., Ex. 10.  These are legitimate, First Amendment-protected petitioning activities, not conspiratorial communications; they also do not evidence an agreement among Defendants to fix prices.  *See infra* Section IV.B.

**3.      The TCAC's "new" allegations fail to allege each Defendant's agreement to suppress bail agents' rebating.**

The TCAC alleges that Defendants also conspired to prevent premium rebating in California, "which required coordinating bail agent sales practices to serve the surety conspiracy."  ¶ 130.  This supposed conspiracy would require preventing the rebating practices of "thousands of . . . bail agents." ¶ 81; *see* CAC ¶ 112 (acknowledging that as of 2009 there were 3,400 bail agents "one on top of the other . . . fighting for that slice of the pie").  But this prong of the conspiracy is implausible from the start.  Nowhere does the TCAC allege how that rebating agreement among the sureties came to be, or how it could be carried out and enforced in an industry with thousands of bail agents—who Plaintiffs now apparently concede are not part of the conspiracy.  *See supra* Section II.C.1.  The TCAC's "new" allegations regarding a "common understanding to suppress rebates" do not even contain facts about each Defendant, as it must to state a claim against each.  *See* ¶¶ 130-164 (mentioning only thirteen of the Surety Defendants).  In short, the majority of the Defendant-specific allegations about rebating are verbatim to the SCAC, with the exception of one surety, for which Plaintiffs' new complaint actually ***deletes*** some prior allegations.  *Compare* ¶ 191, *with* SCAC ¶ 174.

Plaintiffs therefore again ask the Court to assume the existence of a sprawling conspiratorial agreement among thousands of constituents based on public comments attributed to a few individuals and generic statements on trade association websites.  *Compare* ¶¶ 131-132 (Mr. Carmichael statements), *with* SCAC ¶¶ 361, 363 (same); *compare* ¶¶ 135-136 (GSBAA statements), *with* SCAC ¶¶ 143-144 (same); *compare* ¶¶ 137, 156-160 (alleging, without identifying members, that CBAA was the "primary industry association of bail agents in California" and identifying statements from CBAA's website), *with* SCAC ¶¶ 136, 138-142 (same); *compare* ¶¶ 146-151 (American Bail Coalition statements), *with* SCAC ¶¶ 127-134 (same).  The TCAC also points to the same insufficient handful of alleged statements by third-party bail agents.  *Compare* ¶¶ 152-155 (attributing statements to Bad Boys Bail Bonds, Liberty Bail Bonds, GSBAA's website, and "industry-sponsored, privately-run bail agent training courses"), *with* SCAC ¶¶ 147-150 (same).

The only "new" allegations mustered by Plaintiffs concerning rebating relate to legislative proposals and lobbying statements (made by only some Defendants) from more than a decade ago.

Plaintiffs contend, for example, that "ASC's participation in trade associations had nothing to do with legitimate goals such as 'pre-licensing education,'" which Plaintiffs allege Mr. Carmichael derided as having "no value."  ¶ 133.  But the underlying document, which bears the heading "Legislation Recommended Change," clarifies that Mr. Carmichael's statement was about "no value in incurring the expense to pass" a "legislative package" that "consists solely of pre-licensing education," and "seriously question[ing] the need for a lobbyist in 2006."  *See* Anderson Decl., Ex. 2.  The TCAC itself also notes that these comments were in furtherance of "codify[ing]" bail premium reform "into law," not coordinating a price-fixing conspiracy.  *See* ¶ 139.  Plaintiffs' allegations about a GSBAA committee's communications with three Surety Defendants (¶¶ 143-144) also clearly concerned a legislative proposal.  *See* Anderson Decl., Exs. 4, 5.  Furthermore, the complaint's bald assertion that "Defendants' efforts paid off" (¶ 140) ignores the cited documents themselves, in which a Surety Defendant states that "[w]e cannot and will not pass this legislation unless we can create broad based support for it," and that "[w]e have completely ignored them [GSBAA]."  *See, e.g.*, Anderson Decl., Ex. 3.  In other words, the underlying documents do not suggest agreement (if anything, the opposite).  And more fundamentally, Plaintiffs otherwise fail to allege specific facts as to each Surety Defendant regarding the circumstances of their supposed agreement to prevent independent California bail agents from offering rebates.

## III.    LEGAL STANDARD

The Court's prior two orders on Defendants' motions to dismiss state the pleading standards applicable to the TCAC.  *See* ECF 91 at 7-8; ECF 159 at 7.

## IV.    ARGUMENT

### A.    The TCAC Fails to Cure the Deficiencies the Court Identified in the SCAC.

The Court provided clear guidance that Plaintiffs must plead facts specific to ***each*** Defendant to "demonstrate each surety Defendants' 'role in the alleged conspiracy.'"  ECF 159 at 20.  Missing from the SCAC were, among other things, "allegations as to how most [S]urety Defendants joined the conspiracy."  *Id.* at 19.  But the TCAC has not cured these basic deficiencies.  It has added immaterial allegations that (at most) provide gloss upon points the Court already accepted as true when granting Defendants' prior motions to dismiss.

1.     **The TCAC does not sufficiently allege any agreement—even _after_ extensive discovery.**

Only by alleging "***evidentiary facts***," not "ultimate facts (such as conspiracy)," can Plaintiffs satisfy antitrust pleading requirements.  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (emphasis added).  Here, the TCAC does not plead facts evidencing an agreement among any of the Defendants.  This fundamental flaw remains even with the Court-ordered pre-amendment discovery—spanning the entire class period and specifically focused on "evidence of agreement, if there is any."  1/5/2021 CMC Hrg. Tr. at 11:1-3.

As demonstrated below, the TCAC lacks evidentiary facts that Defendants agreed to a standard 10% premium rate or to suppress bail agents' premium rebating.  Allegations, like those in the TCAC, are "inadequate" where it is not clear "who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out."  *In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1190 (9th Cir. 2015).  Furthermore, "where [as here] discovery concerning possible [illegal] agreements [between defendants] has already taken place, the complaint should contain factual allegations of those agreements."  *In re Nat'l Ass'n of Music Merchs., Musical Instruments and Equip. Antitrust Litig.*, MDL No. 2121, 2012 WL 3637291, at *1 (S.D. Cal. Aug. 20, 2012) ("*Music Merchs.*").  "Unless the factual allegations [of agreement] are adequate now, there is no reasonable expectation they will ever be adequate to support a claim."  *Id*. at *1-2 (dismissing Section 1 claim with prejudice following discovery).

2.     **The TCAC does not sufficiently allege how each Defendant joined and participated in a conspiracy to charge a standard 10% premium rate.**

Still missing from the TCAC are required "allegations as to how most surety Defendants joined the conspiracy," and "how or when the surety Defendants agreed to seek approval for a uniform premium rate . . ."  ECF 159 at 19-20.  Plaintiffs must allege ***each*** Defendant's participation in the conspiracy with underlying facts evidencing illicit communications and/or meetings with other Defendants.[3]  As the Court stated in its prior dismissal order:

---

[3] Further argument pertaining to the TCAC's allegations against specific Surety Defendants is contained in concurrently filed memoranda in support of Defendants' motion to dismiss.

Cooley LLP
Attorneys At Law
San Diego

10.

**Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST**

> Plaintiffs cite no alternative authority upholding antitrust conspiracy allegations against defendants whose participation was not described in terms of communications and/or meetings with other defendants, and the Court has located no such case.

*Id.* at 20.  Plaintiffs have failed again to meet this required standard.

The TCAC only musters conclusory allegations that are neither new nor actionable.  The TCAC generically alleges that during unspecified SFAA Bail Bond Advisory Committee meetings, "Defendants agreed to seek default premium rates of 10%" and "reach[ed] common understandings regarding standard premium rates."  ¶¶ 117-118.  It also alleges that certain Defendants (but not all) were members of ABC, and there "discussed and reaffirmed the [alleged] conspiracy."  ¶ 125.

These allegations fail to set forth any evidentiary facts about who actually agreed with whom to do anything (because no one did, as discovery has confirmed).  Not all sureties are alleged to have attended each of the meetings (and some are not alleged to have attended any); and not all Surety Defendants were even members of SFAA when they supposedly joined the conspiracy by submitting a rate filing with the CDI.  With few exceptions (*see, e.g.*, ¶ 128), statements in the TCAC that supposedly show a common understanding to maintain a standard 10% premium rate are not attributed to any particular surety.  *See, e.g.*, ¶¶ 117-118, 125.  Nor is every Defendant alleged to have been a recipient of communications referenced in the TCAC.  Some Defendants are not even alleged to have had any collusive communications with anyone to do anything.

The TCAC simply alleges in conclusory strokes—with impermissible group pleading—that "[t]hrough emails, phone calls, and in-person meetings, [Defendants] reached a common understanding to: (1) maintain the default, 'standard' premium rate at 10%; and (2) minimize downward departures from that rate, in particular by discouraging or eliminating rebating that would decrease the effective price paid by consumers."  ¶ 116.  But Plaintiffs point to no specific facts to substantiate those conclusions.  Unlike *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1116 (N.D. Cal. 2008), the TCAC fails to allege "illicit conspiratorial communications between and among defendants," or "specific information about the group and bilateral meetings by which the alleged price-fixing conspiracy was effectuated."  *See* ECF 159 at 20.  Even with significant discovery from ***every alleged member*** of the conspiracy and multiple third-parties, the TCAC still lacks concrete

Cooley LLP
Attorneys At Law
San Diego

11.

Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST

allegations that any Defendant participated in a specific communication or meeting with another Defendant about fixing premiums (or preventing rebates).

Not only does the TCAC fail to allege requisite facts as to each Defendant's agreement to join the alleged conspiracy, Plaintiffs also fail to allege each Defendant's role and continued participation in the conspiracy. The TCAC's allegations are thus in stark contrast to cases where Section 1 claims have survived motions to dismiss, even in cases where there had been no pre-amendment discovery. *See* ECF 159 at 20 (citing *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1209-11 (N.D. Cal. 2015) (alleging specific conversations and meetings between studio executives); *In re Transpac. Passenger Air Transp. Antirust Litig.*, No. C 07-05634 CRB, 2011 WL 1753738, at *15 (N.D. Cal. May 9, 2011) (alleging that each airline had "participated in a July 2003 meeting in Geneva at which they indicated their support in principle of a collective fuel surcharge" and describing "specific, suspicious emails involving [the airlines]," including some emails that explicitly agreed to the alleged conspiracy); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (quoting emails exchanging information about revenue and prices). As explained below, Plaintiffs' attempts to plead around these underlying deficiencies again fall short.

### a.    Allegations about SFAA pricing merely show parallel conduct.

"Parallel action, even conscious parallel action, is not illegal." *Music Merchs.*, 2012 WL 3637291, at *5. The allegation that Defendants' premium rates filed with the CDI were "based upon [SFAA] pricing" is not new and remains insufficient. *Compare* SCAC ¶¶ 153, *with* ¶ 120; *see also* ECF 159 at 3 (referring to SFAA pricing allegations). The Court has twice considered allegations that Defendants were charging premium rates "based on [SFAA] pricing," and already found that Plaintiffs merely alleged the sureties "engaged in parallel conduct," not that Defendants had joined a conspiracy. *See* ECF 159 at 12-14, 18-20. The TCAC adds no facts to move the needle, including no example of where anyone "agreed" with anyone else to use SFAA pricing. Without more, the adoption of SFAA pricing, *i.e.*, a common market rate, is not an "agreement" to conspire.[4]

---

[4] Some Defendants, such as Seaview and Danielson, are not even alleged to have done anything, communicated with anyone, or attended a single trade association meeting until ***after*** they filed for a 10% premium rate with the CDI. While others, such as Continental, are not alleged to have done any such activity—even after they entered the market.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO
12.
DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1

**b.      Allegations about the exchange of publicly available pricing information—required to be filed by the CDI—are likewise insufficient.**

2

3      The TCAC purports to set forth new allegations regarding the sharing of so-called

4  "competitively sensitive information," facilitated by the SFAA.  ¶¶ 121-123.  But these allegations are

5  also not new or sufficient to state a claim.  The SCAC alleged that "the Surety Defendants provide the

6  SFAA with detailed data concerning all premiums charged and all losses incurred."  SCAC ¶ 154.

7  "[T]he SFAA [then] creates and disseminates reports to the Surety Defendants that describe the prices

8  charged by their potential rivals [and] [t]he Surety Defendants use these reports to determine whether,

9  and to what extent, their potential rivals are deviating from the Conspiracy."  *Id*.

10      To give the appearance of "new" facts, Plaintiffs repackage these prior insufficient allegations

11 by inserting antitrust buzzwords, claiming that the SFAA's "pricing reports" were "confidential," and

12 "violated well-known antitrust safeguards regarding the exchange of competitively sensitive

13 information."  ¶ 122.  But this rhetoric is empty.

14      All the TCAC adds are the category names of ***publicly available*** data contained in the "Bail

15 Bond Supplement"—what the TCAC refers to as "pricing reports."  *See* ¶ 123 (alleging that through

16 the "pricing reports," Defendants shared "competitively sensitive information," including each other's

17 price, volume, and costs, such as: (1) "Face Amount of Bail Bonds Written"; (2) "Direct Premiums

18 Written"; (3) "Comm[ission] and Broker Expenses"; (4) "Prem Writ Net of Agent Comm & Broker

19 Expenses"; (5) "Direct Premium Earned (Gross)"; (6) "Prem Earned Net of Agent Comm & Broker

20 Expense"; (7) "Direct Losses Paid" (8) "Direct Losses Incurred"; and (9) "Direct Losses Unpaid").

21 As explained in Defendants' concurrently filed request, it is judicially noticeable that these ***exact***

22 ***categories*** of information contained in the SFAA's Bail Bond Supplements—or what Plaintiffs

23 misleadingly refer to as confidential "pricing reports"—are publicly available on a surety-by-surety

24 basis.  *See* ECF 270 (Plaintiffs indicating reliance on "SFAA 000389"); Defendants' Request for

25 Judicial Notice ("RJN") in Support of Defendants' Motion (ECF 283); Declaration of Gary A. Nye in

26 Support of RJN ("Nye Declaration") at ¶¶ 4-6, Exs. 1-3.  In other words, the categories of purportedly

27 "competitively sensitive information" alleged in paragraph 123 of the TCAC are verbatim to the

28 categories of data in the Surety Defendants' annual Bail Bond Supplement.

Cooley LLP
Attorneys At Law
San Diego

13.

**Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST**

Furthermore, pursuant to California Insurance Code (§§ 900, 931, and 934), information in these Bail Bond Supplements are **required** to be filed with CDI, monitored by the state agency, and are publicly available through its website.  *See* Nye Decl. ¶ 4.  Bail bond supplements prior to 2019 are similarly publicly available—and judicially noticeable—through the NAIC.  *See id.* at ¶ 5.

The TCAC's other conclusory allegations about information sharing—to give the appearance of specific allegations as to each Defendant—should similarly be rejected.  These allegations each assert that "[Defendant] self-reported . . . to the SFAA/SAA Bail Bond Advisory Committee, in part for the purpose of establishing its own participation in the conspiracy to the satisfaction of other Defendants, and to receive Defendant-specific sales data from other Defendants, in part for the purpose of policing their participation in the conspiracy."  *See, e.g.,* ¶¶ 170, 186, 199, 217, 232, 246, 258, 269. But the Court has already rightly found that this conclusory copy-paste pleading is insufficient to show each Defendant's role and participation in the alleged conspiracy.  *See* ECF 159 at 19-20.

Far from improperly exchanging "competitively sensitive information" as the TCAC alleges, the sureties lawfully share publicly available data through the SFAA.  Plaintiffs' information-sharing allegations therefore cannot establish that any Defendant joined or participated in a conspiracy. "Gathering information about pricing and competition in the industry is standard fare for trade associations.  If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999).  In short, the exchange of premium pricing information that the CDI requires to be publicly filed cannot form the basis of an antitrust claim.

### c.   Allegations about trade association membership and mere attendance at meetings remain insufficient.

"[M]ere participation in trade-organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement."  *In re Musical Instruments*, 798 F.3d at 1196.  The TCAC's familiar allegations regarding the Defendants' membership in various trade associations again fail to address the deficiencies the Court identified.  *See* ECF 159 at 18-20. Plaintiffs only allege in general terms that "[t]he industry also relies on trade association meetings, which provide opportunities to conspire . . . opportunities for sureties and bail agents to collude."  ¶ 89.

Cooley LLP
Attorneys At Law
San Diego

14.

Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST

This is also not a new allegation. *See* ECF 159 at 2-3 (citing SCAC ¶¶ 126-155, *i.e.*, allegations that "Defendants enforced the conspiracy through trade associations").

As before, the TCAC does not allege that the supposed conspiracy was hatched at any particular meeting. Additionally, "Plaintiffs do not allege facts demonstrating that Defendants actually communicated or exchanged information at these trade association meetings, much less that they entered an agreement to coordinate supply decisions while there." *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 52 (9th Cir. 2022) (finding allegations insufficient that "Defendants each sent leadership teams to trade organization meetings several times a year, which 'provided an ideal setting for Defendants to discuss future business plans'").

Instead, the TCAC lists meetings for SFAA, ABC, and CalBIG, adds some allegations around who attended, and provides boilerplate conclusions that "Defendants agreed" and "reach[ed] common understandings" at these meetings. ¶ 117-119; ¶¶ 125-126. But merely listing meeting dates, naming who attended, and a conclusion of conspiracy is insufficient. The TCAC's own allegations make clear that not every Surety Defendant was a member of each trade association, nor did most sureties attend every alleged meeting. In fact, there are many sureties for which Plaintiffs ***do not allege they attended any meetings*** at all. An antitrust conspiracy cannot be imputed to those Defendants based on meetings they did not attend; and more fundamentally, "[a]ttendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more." *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007); *see also Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 918 (N.D. Cal. 2019) ("Membership in associations and attendance at trade meetings presents nothing more than an opportunity to collude, and an opportunity, without more, is insufficient to state a claim under § 1.") (footnote and citation omitted). There is simply no "more" here—even after multiple attempts to amend and broad discovery into every named Surety Defendant and the relevant trade associations.

Ultimately, the TCAC continues to lack any "***specific information*** about the group and bilateral meetings by which the alleged price-fixing conspiracy was effectuated." ECF 159 at 20 (citing *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1184 (N.D. Cal. 2009))

Cooley LLP
Attorneys At Law
San Diego

15.

Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST

(emphasis added).  It does not identify a single communication among Defendants leading into, during, or after the nine identified SFAA meetings.  It only makes the conclusory allegations that "[f]rom its inception, the Committee discussed and coordinated state-specific sales practices of its members," and those who may not have attended "were kept abreast of its activities and discussions."  ¶¶ 118-119. Plaintiffs also fail to disclose any relevant information about the SFAA Committee meetings where the conspiracy to charge 10% premium was allegedly effectuated, despite obtaining documents concerning those meetings in discovery.  Indeed, the TCAC's conclusory allegations concerning the SFAA meetings are belied by the association's meeting minutes—which should be incorporated by reference and evidence legitimate trade association conduct.  *See* Anderson Decl. ¶ 12, Ex. 11.  Even still, given the lack of ***any*** Defendant-specific factual allegations around the meeting discussions, dismissal is warranted without incorporating the documents by reference.

Finally, as for ABC, the TCAC concludes—without any evidentiary facts alleged in support— that certain Defendants were members of ABC where they "discussed and reaffirmed the conspiracy." ¶ 125; *see also* ¶ 127 (alleging only that "CalBIG provided another forum whereby Defendants reached and maintained an understanding").  The TCAC's conclusory allegations surrounding trade association membership remain insufficient to plead an antitrust claim.

### 3.    The TCAC does not sufficiently allege that each Defendant joined and participated in a conspiracy to prevent rebates.

The TCAC's allegations regarding a conspiracy to prevent rebates do not cure the deficiencies this Court identified.  Plaintiffs ***do not add a single nonconclusory allegation*** to the Defendant-specific sections of the TCAC regarding "Rebate Suppression."  For all but one Surety Defendant, the exact same copy-and-paste language from the SCAC that the Court said was insufficient remains the same.[5]  The SCAC had included "the same generic language regarding each [S]urety Defendant's agreement not to rebate . . . [and] these allegations [were] insufficient to demonstrate each [S]urety Defendants' 'role in the alleged conspiracy.'"  ECF 159 at 19-20.  In fact, unlike the prior complaints, the TCAC now ***drops*** as defendants the two bail agents that Plaintiffs all but conceded would be

---

[5] For the one Surety Defendant for which there is any difference (Allegheny (*see* ¶ 191)), the TCAC deletes an allegation from the SCAC and adds nothing else new.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

16.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

necessary parties to effectuate any rebating conspiracy.  *See supra* Section II.C.1.  Because these allegations have not changed from the SCAC, the TCAC again fails to allege each Defendant joined and participated in any conspiracy to prevent rebating.

Absent requisite defendant-specific facts, the TCAC now alleges that the non-party trade associations GSBAA and CBAA are the mechanism through which the supposed rebating conspiracy was effectuated.[6]  But not all Defendants are alleged to have been members of GSBAA or CBAA; not all Defendants are alleged to have received communications before or after such meetings; and indeed, not all Defendants are alleged to have attended any of the bail agent association meetings whatsoever. As with the SFAA meetings, the TCAC also does not allege any evidentiary facts about the GSBAA or CBAA meetings that would indicate a plausible rebating conspiracy, despite Plaintiffs receiving meeting minutes from these former defendants in post-dismissal discovery.  Therefore, for the same reasons discussed above concerning the premium-prong of the alleged conspiracy, the TCAC's "new" allegations concerning trade associations are insufficient.  *See supra* Section IV.A.2.c.

As with prior complaints, the TCAC quotes certain statements from Mr. Carmichael in 2005. ¶¶ 131-132.  It also cites to 2005 email correspondence involving limited recipients.  ¶¶ 133, 138-139. But no other Defendant is referenced in or copied on these communications, nor otherwise alleged to have received such communications.  Therefore, TCAC again relies on the insufficient conclusory allegations that (1) "Defendants infiltrated and influenced bail agent trade associations that could help them achieve their common purpose of maintaining bail bond prices above competitive levels" (¶ 134); and (2) "Defendants used their trade associations to agree and maintain the default rate of 10%, and they looked to the bail agent trade associations to make sure that their rate conspiracy succeeded" (¶ 132).  These boilerplate allegations certainly do not allege facts to infer ***each*** Defendant joined in and participated in the alleged conspiracy to prevent rebates.

In sum, what was inadequate pleading before remains so still.  There are no new factual allegations material to the "[alleged] common understanding to suppress rebates," let alone applicable

---

[6] Plaintiffs also notably do not reference a single SFAA meeting at which Defendants allegedly agreed to suppress rebates.  The SFAA meetings alleged relate solely to the alleged agreement to seek approval for a uniform premium rate.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

17.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1   to each Defendant.  Plaintiffs' conclusory pronouncement that every Surety Defendant agreed to

2   "prevent its bail bond agents from advertising rebates to consumers" (*see, e.g.,* ¶¶ 191, 207, 221, 236)

3   is simply not substantiated by the TCAC's deficient allegations.  This aspect of the alleged conspiracy

4   therefore fails yet again.

5            **B.     The *Noerr-Pennington* Doctrine Also Bars Plaintiffs' Amended Claims.**

6            Under the *Noerr-Pennington* doctrine, "[t]hose who petition government for redress are

7   generally immune from antitrust liability." *Pro Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*,

8   508 U.S. 49, 56 (1993).  Simply put, "the *Noerr-Pennington* doctrine . . . places certain '[j]oint efforts

9   to influence public officials' beyond the reach of the antitrust laws." *F.T.C. v. Ticor Title Ins. Co.*,

10  504 U.S. 621, 627 (1992) (citation omitted).  Moreover, to avoid chilling legitimate lobbying activities,

11  the Ninth Circuit requires a plaintiff to allege specific facts, under "a heightened pleading standard,"

12  demonstrating that *Noerr-Pennington* does not apply.   *Boone v. Redevelopment Agency of City of San*

13  *Jose*, 841 F.2d 886, 894 (9th Cir. 1988); *see also Oregon Nat. Res. Council v. Mohla*, 944 F.2d 531,

14  533 (9th Cir. 1991).

15           *Noerr-Pennington* protection is also not limited only to direct petitioning conduct.

16  "[C]ommunications between private parties are sufficiently within the protection of the Petition Clause

17  to trigger the *Noerr-Pennington* doctrine, so long as they are sufficiently related to petitioning

18  activity." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006); *see also Allied Tube & Conduit*

19  *Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988).[7]

20           The handful of new documents that Plaintiffs rely on in the TCAC (involving only some Surety

21  Defendants) reveal that their claims are based on protected petitioning activity immune from antitrust

---

[7] The *Noerr-Pennington* doctrine applies to every cause of action alleged in the TCAC.  *See, e.g.*, *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1007 (9th Cir. 2008); *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998) ("[T]he *Noerr–Pennington* doctrine sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government."); *Coronavirus Rep. v. Apple Inc.*, No. 21-cv-05567-EMC, 2021 WL 5936910, at *19 (N.D. Cal. Nov. 30, 2021) (dismissing Sherman Act and UCL claims on *Noerr-Pennington* grounds); *Blank v. Kirwan*, 39 Cal. 3d 311, 320-21 (1985) (applying *Noerr-Pennington* to Cartwright Act claim).

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

18.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

liability.[8]  As an initial matter, the TCAC devotes numerous paragraphs to quote from documents noting that trade associations are formed and act based on the common interests of their members, seemingly ascribing nefarious anticompetitive motives to such statements.  *See* ¶¶ 85, 88, 135-136, 146, 148-150.  But the existence of these trade associations and the Surety Defendants' involvement identified in the TCAC merely suggests protected "petitioning conduct" that includes "concerted efforts to influence . . . government[ ] through direct lobbying, publicity campaigns, and other traditional avenues of political expression." *Allied Tube*, 486 U.S. at 510.  In other words, Plaintiffs have alleged that Defendants were pursuing what the First Amendment's Petition Clause affords—the right to jointly petition for protections on behalf of industry participants through lobbying of the government and the broader public.

The specific internal communications and activities that Plaintiffs quote from or reference also fit squarely within the activities protected by *Noerr-Pennington*.  For example, Plaintiffs focus on a July 2005 CalBIG email group discussion about a "Mandatory 10% Premium Concept." ¶ 128.  But that email exchange clearly shows that the participants were discussing proposed legislative initiatives, not agreeing to any conspiracy.  *See* Anderson Decl., Ex. 1.  The combination of some sureties to discuss a future legislative proposal is precisely the type of conduct incidental to petitioning activity that is protected under *Noerr-Pennington*.

The same is true for the other trade association communications Plaintiffs identify in the TCAC. *See* ¶ 129 (referencing communications about joint efforts for a "fixed 10% bond rate," which Plaintiffs concede was directed towards "persuad[ing] CDI"), ¶ 133 (referencing ASC016706, which pertains to trade-association discussions about a policy initiative for the upcoming legislative session), ¶¶ 138-139 (referencing ASC016712, which pertains to garnering support for the "proposed CalBIG legislative initiative."), ¶¶ 143-144 (referencing GSBA000002210, which pertains to the sureties

---

[8] Defendants recognize the Court's order on the motion to dismiss the CAC found that the doctrine did not apply because "Plaintiffs do not allege that Defendants jointly lobbied the California legislature to set certain premium rates."  ECF 91 at 17.  The TCAC, however, reflects that Plaintiffs indeed seek to impose antitrust liability for such petitioning activity (*see* ¶ 139 (alleging Defendants' plan was to "mak[e] it unlawful to rebate")); as explained herein, the few "new" documents the TCAC quotes from or references involve activity protected under *Noerr-Pennington*.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

19.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

serving on GSBAA committees to lobby for surety interests), ¶ 145 (referencing CBAA000003150, which are minutes from the June 2009 meeting of the CBAA and GSBAA's "Joint Legislative Committee," showing that the participants were discussing premium/rebates in relation to legislative action and evaluating proposed laws in other states, such as Connecticut), ¶ 161 (referencing CBAA000008537, which are non-state-specific forms drafted for potential use in the bail industry),[9] ¶¶ 162-163 (referencing ACIC_000010108 and ACIC_000011890, which pertain to a debate among members of the CBAA and GSBAA that Plaintiffs concede involve discussion of "working together" to petition for change in the "law"); Anderson Decl., Exs. 2, 3, 4, 5, 6, 7 (attaching documents referenced in the TCAC and cited above).

The few "new" facts that Plaintiffs invoke in the TCAC thus reveal classic petitioning conduct and communications incidental to that conduct.  Furthermore, as the Ninth Circuit has held, "[c]onclusory allegations are insufficient to strip [] *Noerr-Pennington* protection." *Boone*, 841 F.2d at 894; *see Evans Hotels, LLC v. Unite Here Loc. 30*, 433 F. Supp. 3d 1130, 1154 (S.D. Cal. 2020) (granting motion to dismiss Sherman Act claim on *Noerr-Pennington* grounds); *Prime Healthcare Servs., Inc. v. Serv. Emps. Int'l Union*, No. 11-CV-02652 JLS (RBB), 2012 WL 3778348, at *13 (S.D. Cal. Aug. 30, 2012) (same).  For this additional reason, Plaintiffs' claims should be dismissed.

## C.     The Cartwright Act Claim Fails with the Sherman Act Claim.

As this Court previously ruled, a Cartwright Act claim is subject to the same analysis as a Sherman Act Claim (ECF 91 at 18), and if the Sherman Act claim fails, the Cartwright Act claim also fails.  *See Brown v. 140 NM LLC*, No. 17-cv-05782-JSW, 2019 WL 118425, at *10 (N.D. Cal. Jan. 7, 2019) (citations omitted).  Thus, for the reasons stated above, Plaintiffs' Cartwright Act claim fails.

---

[9] Defendants additionally note Congress recently affirmed that creating standard insurance forms is procompetitive.  The Competitive Health Insurance Reform Act of 2020 (CHIRA) provides that health insurance companies are exempt from antitrust liability for agreements related to "develop[ing] or disseminat[ing] a standard insurance policy form," provided they do not require adherence to the form. 15 U.S.C. § 1013(c)(2)(D).  The bill was meant to bar anticompetitive conduct while permitting "procompetitive collaboration that benefits customers," such as the creation of standard insurance forms. 166 Cong. Rec. H4572 (2020) (Rep. Scanlon).  Here, the TCAC alleges that the CBAA forms are "recommended," not required.

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

20.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

### D.      The UCL Claim Falls with the Antitrust Claims.

The TCAC alleges a claim under the UCL's unlawful, unfair, and fraudulent prongs based on the same conduct underlying the alleged antitrust claims.  *See* ¶¶ 415-423.  "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason . . . the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers."  *SC Manufactured Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 93 (2008), *as modified on denial of reh'g* (May 19, 2008) (citation omitted).  The failure of the antitrust claim thus compels dismissal of the UCL claim.

Furthermore, Plaintiffs' opposition to Defendants' second motion to dismiss confirmed that Plaintiffs are not pursuing a claim under the UCL's "fraudulent" prong.  ECF 117 at 59-60 ("Plaintiffs are not pursuing a claim under the UCL's 'fraudulent' prong based on Defendants' misleading statements, ECF No. 112. at 46, as the Court already recognized, MTD Order at 28-29.")  Rightly so. However, to the extent Plaintiffs do attempt to claim a violation of the UCL's fraudulent prong this time around, the TCAC fares no better.  Claims under the UCL's fraudulent prong are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *See Brazil v. Dole Food Co.*, 935 F. Supp. 2d 947, 963 (N.D. Cal. 2013) (citation omitted).  Rule 9(b) requires plaintiffs to plead "the who, what, when, where, and how of the misconduct charged."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotations and citation omitted).  Additionally, "a plaintiff proceeding on a claim of misrepresentation as the basis of his or her UCL action must demonstrate actual reliance on the allegedly deceptive or misleading statements."  *A White & Yellow Cab, Inc. v. Uber Techs., Inc.*, No. 15-cv-5163-JSW, 2017 WL 1208384, at *7 (N.D. Cal. Mar. 31, 2017) (internal quotations omitted).

The TCAC does not meet the particularity or standing requirements for a "fraudulent" prong claim. As with the prior dismissed complaints, the named Plaintiffs do not allege that they encountered any false statements before making their bond purchasing decisions, much less that they relied on the statements.  *See* ¶ 36 (no allegation that Plaintiff Crain relied on any false or misleading statements from bail agents); ¶ 37 (no allegation that Plaintiff Monterrey relied on any false or misleading statements from bail agents).  The only two California bail agents that Plaintiffs previously filed suit

Cooley LLP
Attorneys At Law
San Diego

21.

Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST

against—All-Pro and Two Jinn—are no longer even named defendants.  And the TCAC fails to explain how any allegedly false statements made by these third-parties could be imputed to individual Surety Defendants.  The UCL claim should be dismissed.

### E.     Dismissal Should be with Prejudice.

Plaintiffs have again failed to cure the pleading deficiencies this Court identified, even with the benefit of significant discovery from each named Defendant and multiple third-parties.  "Unless the factual allegations [of agreement] are adequate now, there is no reasonable expectation they will ever be adequate to support a claim." *Music Merchs.*, 2012 WL 3637291, at *1-2 (dismissing Section 1 claim with prejudice following pre-amendment discovery).  Further amendments to the complaint "would be futile" and dismissal with prejudice is therefore warranted.  *Hartmann v. Cal. Dep't. of Corr. & Rehab.*, 707 F.3d 1114, 1130 (9th Cir. 2013).

## V.     CONCLUSION

For these reasons, and the reasons stated in Defendants' concurrently filed individual briefs, the TCAC should be dismissed with prejudice.

//

//

//

Cooley LLP
Attorneys At Law
San Diego

22.

Defendants' Joint Motion to Dismiss
Master Docket No. 19-CV-00717-JST

1   Dated:  May 26, 2022                          Respectfully submitted,

2

3                                                 By: */s/ Beatriz Mejia*
                                                  Beatriz Mejia (190948)
4
                                                  COOLEY LLP
5                                                 MICHAEL A. ATTANASIO (151529)
                                                  BEATRIZ MEJIA (190948)
6                                                 TIMOTHY W. COOK (688688)(*Pro Hac Vice*)
                                                  MAX SLADEK DE LA CAL (324961)
7
                                                  *Attorneys for Defendant*
8                                                 *Seaview Insurance Company*

9

10  Dated:  May 26, 2022                          By: */s/ Michael Pullos*

11

12                                                Julie A. Gryce (319530)
                                                  DLA PIPER LLP (US)
13                                                401 B Street, Suite 1700
                                                  San Diego, CA 92101-4297
14                                                Telephone:  (619) 699-2700
                                                  Facsimile:  (619) 699-2701
15                                                julie.gryce@dlapiper.com

16                                                Michael P. Murphy (*pro hac vice*)
                                                  DLA PIPER LLP (US)
17                                                1251 Avenue of the Americas
                                                  New York, NY 10020-1104
18                                                Telephone:  (212) 335-4500
                                                  Facsimile:  (212) 335-4501
19                                                michael.murphy@dlapiper.com

20                                                John Hamill (*pro hac vice*)
                                                  Michael Pullos (*pro hac vice*)
21                                                DLA Piper LLP (US)
                                                  444 West Lake Street, Suite 900
22                                                Chicago, IL 60606-0089
                                                  Telephone: 312.368.4000
23                                                Facsimile: 312.236.7516
                                                  John.hamill@us.dlapiper.com
24                                                Michael.pullos@us.dlapiper.com

25                                                *Attorneys for Defendant Danielson National*
                                                  *Insurance Company*
26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

23.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1    Dated:  May 26, 2022                    By: */s/ Darryl Anderson*

2                                            Darryl Anderson (*pro hac vice*)
3                                            NORTON ROSE FULBRIGHT US LLP
                                             1301 McKinney, Suite 5100
4                                            Houston, Texas 77010
                                             Telephone:  (713) 651-5562
5                                            Facsimile:  (713) 651-5246
                                             darryl.anderson@nortonrosefulbright.com
6
7                                            Joshua D. Lichtman (SBN 176143)
                                             NORTON ROSE FULBRIGHT US LLP
8                                            555 South Flower Street, Forty-First Floor
                                             Los Angeles, California  90071
9                                            Telephone:  (213) 892-9200
                                             Facsimile:  (213) 892-9494
10                                           joshua.lichtman@nortonrosefulbright.com

11                                           *Attorneys for Defendant American Contractors*
12                                           *Indemnity Company*

13   Dated:  May 26, 2022                    By: */s/ Anne K. Edwards*

14                                           Anne K. Edwards (110424)
15                                           SMITH, GAMBRELL & RUSSELL, LLP
                                             444 South Flower Street, Suite 1700
16                                           Los Angeles, CA 90071
                                             Telephone:  (213) 358-7210
17                                           Facsimile:  (213) 358-7310
                                             aedwards@sgrlaw.com
18
19                                           *Attorneys for Defendant Williamsburg National*
                                             *Insurance Company*
20
     Dated:  May 26, 2022                    By: */s/ Vincent S. Loh*
21
22                                           David F. Hauge (128294)
                                             Todd H. Stitt (179694)
23                                           Vincent S. Loh (238410)
                                             MICHELMAN & ROBINSON, LLP
24
25                                           *Attorneys for Defendants United States Fire*
                                             *Insurance Company, The North River Insurance*
26                                           *Company, and Seneca Insurance Company*

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

24.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1  Dated:  May 26, 2022                    By: _/s/ Christie A. Moore_____

2                                          Christie A. Moore (*pro hac vice*)
3                                          W. Scott Croft (*pro hac vice*)
                                           Dentons Bingham Greenebaum LLP
4                                          101 S. Fifth Street
                                           3500 PNC Tower
5                                          Louisville, KY 40202
                                           Telephone: (502) 587-3758
6                                          Facsimile: (502) 540-2276
                                           christie.moore@dentons.com
7                                          scott.croft@dentons.com

8                                          *Attorneys for Lexon Insurance Company*
9
   Dated:  May 26, 2022                    By: _/s/ Gregory S. Day_____
10

11                                         Gregory S. Day
                                           LAW OFFICES OF GREGORY S. DAY
12                                         6947 Blue Orchid Lane
                                           Carlsbad, CA 92011
13                                         Telephone: (760) 505-2844
                                           attygsd@gmail.com
14
                                           *Attorneys for Defendants Universal Fire &*
15                                         *Insurance Company, Sun Surety Insurance*
                                           *Company*
16

17 Dated:  May 26, 2022                    By: _/s/ Howard Holderness_____

18                                         John A. Sebastinelli (127859)
                                           Howard Holderness (169814)
19                                         GREENBERG TRAURIG, LLP
                                           4 Embarcadero Ctr, Ste. 3000
20                                         San Francisco, CA 94111-5983
                                           Telephone: (415) 655-1289
21                                         Facsimile: (415) 358-4796
                                           sebastinellij@gtlaw.com
22                                         holdernessh@gtlaw.com
23
                                           *Attorneys for Defendant Indiana Lumbermens*
24                                         *Mutual Insurance Company*

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

25.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1  Dated:  May 26, 2022                    By: /s/ Gary A. Nye

2                                          Gary A. Nye (126104)
3                                          ROXBOROUGH, POMERANCE, NYE & ADREANI,
                                           LLP
4
                                           Attorneys for Defendants Allegheny Casualty
5                                          Company, AIA Holdings, Inc., Bankers Insurance
                                           Company, International Fidelity Insurance
6                                          Company, and Lexington National Insurance
                                           Corporation
7

8  Dated:  May 26, 2022                    By: /s/ Lindsay Cooper-Greene

9                                          Brendan Pegg (174159)
                                           Lindsay Cooper-Greene, of Counsel (295180)
10                                         LAW OFFICES OF BRENDAN PEGG CORPORATION
                                           201 E. Ojai Avenue #1505
11                                         Ojai, CA 93024
                                           Telephone:  (805) 302-4151
12                                         Facsimile:  (877) 719-7298
                                           brendan@bpegglaw.com
13
14                                         Attorneys for Defendant Financial Casualty &
                                           Surety, Inc.
15

16 Dated:  May 26, 2022                    By: /s/ Erik K. Swanholt

17                                         Erik K. Swanholt
                                           FOLEY & LARDNER
18                                         555 South Flower St., 33rd Floor
                                           Los Angeles, CA 90071
19                                         Telephone:  (213) 972-4500
                                           Facsimile:  (213) 486-0065
20
21                                         Attorneys for Defendants Continental Heritage
                                           Insurance Company
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO

26.

DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

1   Dated:  May 26, 2022                        By: /s/ Paul J. Riehle

2
3                                               Paul J. Riehle (115199)
                                                FAEGRE DRINKER BIDDLE & REATH LLP
4                                               4 Embarcadero Center, 27th Floor
                                                San  Francisco, California 94111
                                                Telephone: (415) 551-7521
5                                               Facsimile: (415) 551- 7510
                                                paul.riehle@faegredrinker.com
6
                                                *Attorneys for Defendant Accredited Surety and
7                                                Casualty Company, Inc.*

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN DIEGO
27.
DEFENDANTS' JOINT MOTION TO DISMISS
MASTER DOCKET NO. 19-CV-00717-JST

**ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1(h)(3)**

I, Beatriz Mejia, attest that that each of the other Signatories has concurred in the filing of this document.  Executed on May 26, 2022, in San Francisco, California.


*/s/ Beatriz Mejia*
Beatriz Mejia

Cooley LLP
Attorneys At Law
San Diego

28.

Defendants' Joint Motion to Dismiss
Master Docket No. 19-cv-00717-JST