Dean M. Harvey (State Bar No. 250298)
dharvey@lchb.com
Katherine C. Lubin (State Bar No. 259826)
kbenson@lchb.com
Michelle A. Lamy (State Bar No. 308174)
mlamy@lchb.com
Miriam E. Marks (State Bar No. 332351)
mmarks@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Interim Co-Lead Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 4:19-CV-00717-JST<br><br>**NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES ISO PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENTS WITH DEFENDANTS LEXON INSURANCE COMPANY AND DANIELSON NATIONAL INSURANCE COMPANY**<br><br>Date: July 18, 2024<br>Time: 2:00 pm |

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................ vi

MEMORANDUM OF POINTS AND AUTHORITIES ............................................... 1

I.    INTRODUCTION .......................................................................................... 1

II.   LITIGATION HISTORY ............................................................................... 2

    A.   Pleadings ............................................................................................. 2

    B.   Discovery ............................................................................................ 2

    C.   Settlements .......................................................................................... 3

III.  PROPOSED SETTLEMENT TERMS ........................................................... 3

    A.   Class Definition .................................................................................. 3

    B.   Consideration ...................................................................................... 3

    C.   Settlement Administrator .................................................................... 4

    D.   Notice and Administration .................................................................. 4

    E.   Plan of Allocation .............................................................................. 6

    F.   Attorneys' Fees, Expenses, and Service Awards ............................... 6

IV.   LEGAL STANDARDS .................................................................................. 7

V.    ARGUMENT ................................................................................................. 8

    A.   The Settlement Class Meets the Criteria for Certification .................... 8

        1.   The Requirements of Rule 23(a) Are Satisfied ......................... 8

        2.   Class Certification Is Appropriate Under Rule 23(b)(3) ........... 10

        3.   The Court Should Appoint Settlement Counsel Under Rule 23(g)(3) ...... 13

    B.   The Settlements Are Fundamentally Fair, Reasonable, and Adequate ............... 13

        1.   The *Churchill* Factors Are Satisfied ........................................ 13

        2.   The Rule 23(e)(2) Requirements Are Met ................................. 18

        3.   The Northern District Guidance Supports Approval ................. 22

VI.   CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997) ................................................................................................. 11

*Briseño v. Henderson,*
998 F.3d 1014 (9th Cir. 2021) .................................................................................. 18

*Carlotti v. ASUS Comput. Int'l,*
No. 18-cv-3369-DMR, 2019 WL 6134910 (N.D. Cal. Nov. 19, 2019) ................... 18

*Celano v. Marriott Int'l, Inc.,*
242 F.R.D. 544 (N.D. Cal. 2007) ............................................................................... 8

*Churchill Village, L.L.C. v. General Electric,*
361 F.3d 566 (9th Cir. 2004) ............................................................................. *passim*

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992) .................................................................................... 7

*Cottle v. Plaid Inc.,*
340 F.R.D. 356 (N.D. Cal. 2021) ...................................................................... *passim*

*Delagarza v. Tesoro Refin. & Mktg. Co.,*
No. C-09-5803 EMC, 2011 WL 4017967 (N.D. Cal. Sept. 8, 2011) ...................... 11

*Gen. Tel. Co. of the Sw. v. Falcon,*
457 U.S. 147 (1982) .................................................................................................... 9

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998) .................................................................................. 19

*Hernandez v. Dutton Ranch Corp.,*
No. 19-cv-00817-EMC, 2021 WL 5053476 (N.D. Cal. Sept. 10, 2021) ................. 21

*In re Anthem, Inc. Data Breach Litig.,*
327 F.R.D. 299 (N.D. Cal. 2018) ........................................................................ 17, 22

*In re Apple Inc. Device Performance Litig.,*
50 F.4th 769 (9th Cir. 2022) ..................................................................................... 24

*In re Bluetooth Headset Prods. Liab. Litig.,*
654 F.3d 935 (9th Cir. 2011) .................................................................................... 18

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
No. 07-cv-05944-JST, 2020 WL 1873554 (N.D. Cal. Mar. 11, 2020) (Tigar, J.) ............... 8, 9

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 07-cv-05944-JST, 2022 WL 4596621 (N.D. Cal. Aug. 1, 2022) (Tigar, J.)............. 11, 12

4

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   No. 14-cv-2058-JST, 2017 WL 565003 (N.D. Cal. Feb. 13, 2017) (Tigar, J.)................... 7, 8

5

6

*In re Citric Acid Antitrust Litig.*,
   Nos. 95-1092, C-95-2963, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996)................................. 12

7

8

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
   270 F.R.D. 521 (N.D. Cal. 2010) ...................................................................................... 10

9

*In re Domestic Airline Travel Antitrust Litig.*,
   MDL No. 2656 (D.D.C. May 9, 2019), ECF No. 374 ......................................................... 19

10

11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
   No. M 02-1486 PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006)....................................... 12

12

13

*In re Google Referrer Header Priv. Litig.*,
   No. 5:10-cv-04809-EJD, 2023 WL 6812545 (N.D. Cal. Oct. 16, 2023) ............................... 20

14

15

*In re High-Tech Emp. Antitrust Litig.*,
   985 F. Supp. 2d 1167 (N.D. Cal. 2013) ................................................................. 9, 11, 13

16

17

*In re High-Tech Emp. Antitrust Litig.*,
   No. 11-CV-02509-LHK, 2014 WL 3917126 (N.D. Cal. Aug. 8, 2014) ................................. 14

18

*In re Hyundai & Kia Fuel Econ. Litig.*,
   926 F.3d 539 (9th Cir. 2019).............................................................................................. 8

19

20

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000)............................................................................................ 17

21

22

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015)............................................................................................ 10

23

*In re Packaged Seafood Prods. Antitrust Litig.*,
   No. 3:15-md-02670-DMS-MDD, 2022 WL 4283551 (S.D. Cal. Jan. 26, 2022) .............. 8, 10

24

25

*In re Rubber Chems. Antitrust Litig.*,
   232 F.R.D. 346 (N.D. Cal. 2005) ...................................................................................... 12

26

27

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
   264 F.R.D 603 (N.D. Cal. 2009) ....................................................................................... 11

28

*In re Tableware Antitrust Litig.*,
   484 F. Supp. 2d 1078 (N.D. Cal. 2007) ............................................................................... 7

**TABLE OF AUTHORITIES**
(continued)

Page

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) ............................................... 9

*In re TracFone Unlimited Serv. Plan Litig.*,
  112 F. Supp. 3d 993 (N.D. Cal. 2015) ...................................... 14

*In re Volkswagen "Clean Diesel" Litig.*,
  229 F. Supp. 3d 1052 (N.D. Cal. 2017) .................................... 14

*In re Volkswagen "Clean Diesel" Litig.*,
  MDL No. 2672 CRB, 2017 WL 672727 (N.D. Cal. Feb. 16, 2017)................ 12, 13

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*,
  527 F. Supp. 2d 1053 (N.D. Cal. 2007) ..................................... 9

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012).............................................. 14, 25

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ......................................... 14, 17

*Nitsch v. Dreamworks Animation SKG Inc.*,
  315 F.R.D 270 (N.D. Cal. 2016) ........................................... 13

*Officers for Just. v. Civ. Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ............................................. 14

*Rabin v. PricewaterhouseCoopers LLP*,
  No. 16-cv-02276-JST, 2021 WL 837626 (N.D. Cal. Feb. 4, 2021) (Tigar, J.)...... 25

*Rannis v. Recchia*,
  380 F. App'x 646 (9th Cir. 2010) .......................................... 8

*Rodriguez v. W. Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009)............................................... 24

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003)............................................... 7

*Valentino v. Carter-Wallace, Inc.*,
  97 F. 3d 1227 (9th Cir. 1996)............................................. 12

*Vinole v. Countrywide Home Loans, Inc.*,
  571 F.3d 935 (9th Cir. 2009).............................................. 11

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002)............................................. 21

2859039.13

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

4

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ............................................................................................. 9

5

*Ward v. United Airlines, Inc.*,
    No. C 15-02309 WHA, 2024 WL 269149 (N.D. Cal. Jan. 24, 2024)........................ 13, 20, 21

6

**Statutes**

7

Class Action Fairness Act, 28 U.S.C. § 1715 ............................................................... 25

8

Sherman Act, 15 U.S.C. §§ 1-38.................................................................... 9, 11, 12, 15

9

10

**Federal Rules**

11

Fed. R. Civ. P. 23(a).................................................................................................. 8, 19

12

Fed. R. Civ. P. 23(a)(1) ................................................................................................... 8

13

Fed. R. Civ. P. 23(a)(2) ................................................................................................... 9

14

Fed. R. Civ. P. 23(a)(3) ................................................................................................... 9

15

Fed. R. Civ. P. 23(a)(4) ................................................................................................. 10

16

Fed. R. Civ. P. 23(b) ....................................................................................................... 8

17

Fed. R. Civ. P. 23(b)(3).................................................................................... 8, 10, 11

18

Fed. R. Civ. P. 23(e)...................................................................................................... 24

19

Fed. R. Civ. P. 23(e)(2) ........................................................................................ 18, 19

20

Fed. R. Civ. P. 23(e)(2)(C)(ii) ...................................................................................... 22

21

Fed. R. Civ. P. 23(e)(2)(C)(iii) ..................................................................................... 24

22

Fed. R. Civ. P. 23(e)(3) ................................................................................................. 19

23

Fed. R. Civ. P. 23(g) ....................................................................................................... 2

24

Fed. R. Civ. P. 23(g)(3)................................................................................................. 13

25

**Treatises**

26

4 William B. Rubenstein et al., *Newberg on Class Actions* § 13:49 (5th ed. 2012) ..................... 17

27

28

# NOTICE OF MOTION

PLEASE TAKE NOTICE that on July 18, 2024, in the United States District Court for the Northern District of California, before the Honorable Jon S. Tigar presiding, Plaintiffs Shonetta Crain and Kira Monterrey will and hereby do move for an Order pursuant to Rule 23 of the Federal Rules of Civil Procedure: (i) preliminarily approving the proposed Class Action Settlement Agreements and Releases dated April 25, 2024 between Plaintiffs and Defendant Lexon Insurance Company ("Lexon") (attached as Exhibit 1 to the concurrently filed Declaration of Dean M. Harvey, the "Lexon SA") and between Plaintiffs and Defendant Danielson National Insurance Company ("DNIC") (attached as Exhibit 2 to the Harvey Declaration, the "DNIC SA"); (ii) finding that, for purposes of effectuating the proposed Settlements, the prerequisites for class certification under Rule 23 are likely to be satisfied; (iii) approving the form and manner of Notice to the Settlement Class; (iv) approving the selection of the Settlement Administrator; and (v) scheduling a Final Approval Hearing. Plaintiffs' motion is based upon this Notice of Motion, the Memorandum of Points and Authorities set forth below, the Declarations of Dean M. Harvey, Hugh McCreery, and Eric Schachter, and all exhibits thereto, the Settlement Agreements and all exhibits thereto, the pleadings and records on file in this Action, and other such matters and argument as the Court may consider at the hearing of this Motion.

1

### MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.     INTRODUCTION

3      After over four years of litigation and several months of settlement negotiations,

4  Plaintiffs, on behalf of themselves and the proposed Settlement Class, reached a first "icebreaker"

5  Settlement with Lexon.  Thereafter, Plaintiffs reached a second Settlement with DNIC on behalf

6  of the same Settlement Class.  The Settlements include two components, which taken together

7  represent a fair, reasonable, and adequate settlement that warrants preliminary approval.

8      First, the Settlements create a non-reversionary Settlement Fund of $1 million (Lexon)

9  and $2 million (DNIC), for a total of $3 million.[1]  These amounts are an excellent recovery in

10 light of (i) Lexon's minimal share of overall Class transactions, and (ii) DNIC's inability to pay

11 more.  Lexon is one of the smallest surety Defendants by share of relevant bail bond transactions,

12 underwriting only 4,493 (approximately a tenth of one percent) of the over three million bail bond

13 transactions subject to Plaintiffs' antitrust claims.  Lexon last underwrote a bail bond in California

14 in 2014.  DNIC has provided a declaration confirming that $2 million is the most that DNIC is

15 able to pay given its financial circumstances, as DNIC's entire business was put in "run-off" in

16 2012, winding down since then, and anything above $2 million would render DNIC's former

17 parent company (the entity that retained certain liabilities as it relates to this litigation) non-

18 compliant with minimum statutory requirements for insurance companies.  Moreover, because of

19 joint and several liability under the antitrust laws, the Class will continue to pursue their full

20 damages against the remaining 18 surety Defendants.  Further, given the size of these first two

21 Settlements compared to the costs of a distribution, Plaintiffs and their counsel propose to delay

22 payments to themselves and to the Class until additional settlements are reached, or until the case

23 is otherwise resolved.  In the meantime, the $3 million Settlement Fund would remain in escrow

24 and earn interest while the case proceeds against the remaining Defendants.

25     Second, Lexon and DNIC both agreed to injunctive relief designed to remedy the alleged

26 antitrust violations.  If either re-enters the California bail bond market, they agree they will: (a)

27 not coordinate with competitors regarding any aspect of bail bond prices in California; (b) require

28

---

[1] Unless otherwise indicated, capitalized terms have the same definition as in the Settlements.

1    their bail agents in California to communicate that rebating is allowed under California law; and

2    (c) require that the communication in (b) be given equal prominence and visibility as any

3    representation by their bail agents that they must charge filed rates.  Further, the proposed

4    publication notice will itself push back against Defendants' alleged efforts to mislead customers

5    into believing that there is no way to lawfully pay below the applicable rate.

6          Plaintiffs respectfully request that this motion be granted.

7    **II.    LITIGATION HISTORY**

8          **A.    Pleadings**

9          On January 29, 2019, Plaintiffs commenced the action *Crain, et al. v. Accredited Surety*

10   *and Casualty Co.*, *et al.* (the "Crain Action").  On May 1, 2019, the Court consolidated the Crain

11   Action with a subsequently-filed related action, and appointed the undersigned Interim Class

12   Counsel under Federal Rule of Civil Procedure 23(g).  ECF No. 29.  Plaintiffs filed the

13   Consolidated Class Action Complaint on June 13, 2019.  ECF No. 46.

14         On July 15, 2019, certain Defendants filed a motion to dismiss the CAC. ECF No. 58.

15   Thereafter, Plaintiffs filed the Second Consolidated Amended Class Action Complaint ("SCAC")

16   on May 13, 2020. ECF No. 94.  Again, certain Defendants filed a motion to dismiss the SCAC.

17   ECF No. 112.  On January 5, 2021, the Court granted in part the motion to dismiss, but also

18   permitted targeted discovery to proceed, "to allow Plaintiffs to gather the facts necessary to

19   correct any perceived deficiencies in the pleading of their complaint."  ECF No. 151.  Following

20   that discovery, on April 11, 2022, Plaintiffs filed the Third Consolidated Amended Class Action

21   Complaint ("TCAC").  ECF No. 269.  On May 26, 2022, certain Defendants filed a motion to

22   dismiss the TCAC.  ECF No. 284.  On November 7, 2022, the Court denied the motion to dismiss

23   the TCAC.  ECF No. 330.  Following the denial of the motion to dismiss the TCAC, the parties

24   engaged in full discovery.  Defendants have substantially completed producing documents and

25   data, and Plaintiffs have started noticing depositions.  Harvey Decl. ¶¶ 2-4, 6.

26         **B.    Discovery**

27         In response to Plaintiffs' discovery requests, Lexon produced 3,781 pages of documents,

28   DNIC produced 23,301 pages, and both produced all of their data regarding bail bond

1   transactions subject to Plaintiffs' claims.  Harvey Decl. ¶ 5.  Other Defendants produced an

2   additional 1,841,538 pages of documents, and their transactional data.  *Id.*  Interim Class Counsel

3   reviewed this discovery and used it as the basis for the settlement discussions.  *Id.* ¶ 13.

4   **C.**   **Settlements**

5   Between December 2022 and June 2023, Plaintiffs and Lexon engaged in numerous

6   settlement discussions, and reached agreement in principle on June 22, 2023.  Harvey Decl. ¶ 8.

7   Between June 2023 and February 2024, Plaintiffs and DNIC separately engaged in numerous

8   settlement discussions, and reached agreement in principle on February 29, 2024.  *Id.* ¶ 9.

9   Plaintiffs and the Settling Defendants also negotiated and signed the Settlement Agreements,

10  dated April 25, 2024.  *Id.*, Exs. 1-2.

11  **III.**   **PROPOSED SETTLEMENT TERMS**

12  **A.**   **Class Definition**

13  The Settlement Class is all persons who, between February 20, 2004 and April 25, 2024

14  (the "Settlement Class Period"), paid for part or all of a commercial bail bond premium in

15  connection with a California state court criminal proceeding.  Lexon SA ¶ 21; DNIC SA ¶ 21.

16  Specifically excluded from this Settlement Class are Defendants in the Action; the officers,

17  directors or employees of any Defendant; any entity in which any Defendant has a controlling

18  interest; any affiliate, legal representative, heir or assign of any Defendant and any person acting

19  on their behalf; any person who acted as a bail agent during the Settlement Class Period; any

20  judicial officer presiding over this Action and the members of his/her immediate family and

21  judicial staff; and any juror assigned to this Action.  *Id.*

22  **B.**   **Consideration**

23  **Monetary Relief.**  Lexon agreed to pay $1 million and DNIC agreed to pay $2 million, to

24  create a $3 million non-revisionary Settlement Fund for the benefit of Settlement Class Members,

25  who will receive a claims-made pro rata payment after the deduction of expenses of the

26  Settlement Administrator, any Service Awards for the Settlement Class Representatives,

27  Settlement Class Counsel Attorneys' Fees and Litigation Expenses, and any other costs approved

28  by the Court.  Lexon SA ¶ 28; DNIC SA ¶ 28.

**Injunctive Relief.**  First, Lexon and DNIC both agreed that they will not coordinate with competitors regarding any aspect of bail bond prices in California, including premium rates submitted to the California Department of Insurance, premium rates charged to customers, or rebating practices by bail bond agents.  Lexon SA ¶ 30(a); DNIC SA ¶ 30(a).  Second, they will require their agents in California to communicate the following to potential customers:  "A bail agent may choose to negotiate a lower fee by rebating, as allowed by Proposition 103."  *Id.* ¶ 30(b); ¶ 30(b).  They will require that the aforementioned communication will be included along with any representation by their bail bond agents that they must charge filed rates, and will be provided to potential customers with equal prominence and visibility.  *Id.* ¶ 30(c); ¶ 30(c).[2]

### C.    Settlement Administrator

The Parties propose that A.B. Data, an experienced and reputable national class action administrator, serve as Settlement Administrator to provide Notice to the Class and all other services necessary to implement the Settlements.  Harvey Decl. ¶ 28.  Plaintiffs selected A.B. Data after a competitive bidding process.  *Id.* ¶ 29; *see also infra* at p. 23 (detailing bidding).

### D.    Notice and Administration

The proposed Notice is attached as Exhibit 1 to the Settlement Agreements, and is the same for both Agreements (i.e., providing a single Notice of both Agreements).  Notice will be effectuated in two phases (the "Notice Plan").

Within 30 days after the Settlements are preliminarily approved (the "Notice Date"), the Settlement Administrator will commence Phase 1 of the Notice Plan.  Notice for Phase 1 will include publication of the Notice via online platforms (e.g., Google and YouTube), social media (e.g., Facebook and Instagram), and a press release distributed via *PR Newswire*'s US1 newswire in California (collectively, the "Media Notice").  Lexon SA ¶ 39; DNIC SA ¶ 41.  A mockup of that publication is attached as Exhibit C to the Schachter Declaration.  The Settlement Administrator estimates that this publication will create approximately 32.6 million impressions and reach 70.6% of prospective Settlement Class Members.  Schachter Decl. ¶ 11.  As part of

---

[2] Lexon last underwrote a bail bond in California in 2014, and DNIC in 2012.  Harvey Decl. ¶ 26. These injunctive relief provisions would apply in the event that Lexon or DNIC reenters the California market.

Phase 1, the Settlement Administrator will also design, build, and maintain a case-specific website through which prospective Settlement Class Members and others can obtain information about the Action, view relevant Court documents, and register their contact information to receive future updates and notifications. *Id.* ¶ 14. A mockup of that website is attached as Exhibit D to the Schachter Declaration. The Settlement Administrator will also host an automated telephone and email contact center to address questions from prospective Settlement Class Members and others. *Id.* ¶ 17. Finally, as part of Phase 1, the Settlement Administrator will receive and process any Opt-Out Statements or Notices of Objection, and will promptly inform the parties of all that are received. Lexon SA ¶ 39; DNIC SA ¶ 41.

After either sufficient additional settlements are reached or the case is otherwise resolved, the Settlement Administrator will commence Phase 2. Notice for Phase 2 will be effectuated with another round of Media Notice, as well as direct mailing of 4.25" x 6" postcards to be approved by the Court at a later date (the "Notice Postcards"). Lexon SA ¶ 51; DNIC SA ¶ 53. Notice Postcards will be mailed to all Participating Settlement Class Members for whom the parties possess mailing addresses. *Id.* Before the initial mailing of the Notice Postcards, the Settlement Administrator will run the addresses of all known intended recipients through the United States Postal Service ("USPS") National Change of Address ("NCOA") database. *Id.* Notice Postcards that are returned Undeliverable as Addressed ("UAA") with forwarding addresses provided by USPS will be processed, updated in a case-specific database, and re-mailed. *Id.* For Notice Postcards returned UAA by USPS without any forwarding addresses, the Settlement Administrator will attempt to obtain updated addresses using proprietary database resources to which it subscribes and, in instances where updated addresses are found, re-mail the Notice Postcards. *Id.* As part of Phase 2, the Settlement Administrator will continue to provide the above-noted case-specific website through which prospective Settlement Class Members and others can obtain information about the Action and view relevant Court documents. *Id.* At Phase 2, the website will be upgraded to allow submission of claims online. *Id.* The Settlement Administrator will also continue to provide the above-noted contact center, and to process all correspondence from prospective Settlement Class Members, including exclusion requests and

other inquiries concerning the Action.  *Id.*

**E.**     **Plan of Allocation**

After the Objection and Opt-Out Deadline for Phase 2 has passed, and all timely claims have been processed, the Settlement Administrator will distribute checks to Participating Settlement Class Members according to their share of the Net Settlement Fund in proportion to their share of the overall premiums charged to Participating Settlement Class Members who submitted valid claims.  Lexon SA ¶ 53; DNIC SA ¶ 55.

In advance of any distribution, Participating Settlement Class Members will receive a new settlement notice, to be approved by the Court, that will include:

1. All information in the Notice attached as Exhibit 1 to the Settlement Agreements;

2. The current size of the Net Settlement Fund, including any interest accrued;

3. An estimate of individual Settlement Class Member payments;

4. Information about any request for (i) Settlement Class Counsel Attorneys' Fees and Litigation Expenses, or (ii) Service Awards;

5. Details regarding a renewed opportunity to submit Opt-Out Statements or Notices of Objection, including the deadlines for each; and

6. Instructions for submitting a claim on the Net Settlement Fund, including the deadline for same.

Lexon SA ¶ 52; DNIC SA ¶ 54.  The Settlement Administrator will also provide Participating Settlement Class Members with the option of a mailed check, or a digital distribution payment utilizing 2-3 options, such as a virtual debit card and/or popular retail gift cards such as Target or Amazon.  Schachter Decl. ¶ 21.

In the event that distribution of the Net Settlement Fund is not economically feasible, and will not become economically feasible through future settlements or judgments, Plaintiffs propose that the funds be distributed *cy pres* to organizations whose work accounts for the nature of Plaintiffs' lawsuit and the interests of the Settlement Class.  Harvey Decl. ¶ 27; Lexon SA ¶ 56; DNIC SA ¶ 58.

**F.**     **Attorneys' Fees, Expenses, and Service Awards**

Any approved service awards, attorneys' fees, and expenses will be paid out of the Total Settlement Amount.  Lexon SA ¶ 61; DNIC SA ¶ 63.  Settlement Class Counsel will not seek

1    attorneys' fees and costs or service awards at this time, but will wait until after either (i) the entire

2    Action has been resolved through litigation; or (ii) sufficient additional funds have been added to

3    the Total Settlement Amount, through future settlements with Non-Settling Defendants, to

4    warrant a distribution of Settlement Funds.  *Id.* ¶ 50; ¶ 52.  At this later date, at a time approved

5    by the Court, Settlement Class Counsel may petition the Court for: (1) an award of Settlement

6    Class Counsel Attorneys' Fees in a total amount not to exceed one-third of the Total Settlement

7    Amount; (2) an award of Settlement Class Counsel Litigation Expenses reflecting their

8    unreimbursed litigation costs to date; and (3) approval of Service Awards to each of the

9    Settlement Class Representatives.  *Id.* ¶¶ 58-59; ¶¶ 60-61.

10   **IV.   LEGAL STANDARDS**

11          The Ninth Circuit maintains a "strong judicial policy" that favors the settlement of class

12   action lawsuits.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).  When

13   parties settle a class action prior to class certification, courts must "ratify both the propriety of the

14   certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir.

15   2003).  This requires courts to "assess whether a class exists," and if so, to assess "whether the

16   proposed settlement is fundamentally fair, adequate, and reasonable."  *Cottle v. Plaid Inc.*, 340

17   F.R.D. 356, 370 (N.D. Cal. 2021) (citations omitted).

18          For the latter inquiry—into the settlement's fairness—courts generally employ a two-step

19   process.  First, courts make a "preliminary determination" concerning the "merits of the

20   settlement."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-cv-2058-JST, 2017 WL

21   565003, at *3 (N.D. Cal. Feb. 13, 2017) (Tigar, J.) ("*CRT I*").  At this phase, also known as the

22   preliminary approval stage, the Court is tasked with determining whether the settlement falls

23   "within the range of possible approval."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078,

24   1080 (N.D. Cal. 2007) (citation omitted).  Courts in the Ninth Circuit examine two authorities in

25   deciding whether to grant preliminary approval: "(1) the fairness factors set forth in *Churchill

26   Village, L.L.C. v. General Electric*, 361 F.3d 566, 575 (9th Cir. 2004); and (2) the factors in Rule

27   23(e)(2)."  *Cottle*, 340 F.R.D. at 372.  Courts in the Northern District of California also consider

28   the District's Procedural Guidance for Class Action Settlements.  *Id.*  Following any finding of

NOTICE OF MOTION & MPA ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
LEAD CASE NO. 4:19-CV-00717-JST

preliminary approval, the second step in the fairness determination is for courts to "hold a hearing pursuant to Rule 23(e)(2) to make a final determination of whether the settlement is 'fair, reasonable, and adequate.'"  *CRT I*, 2017 WL 565003, at *3.

## V.   ARGUMENT

All of the relevant factors strongly support both certification of the Settlement Class, and preliminary approval of the Settlement Agreements.

### A.   The Settlement Class Meets the Criteria for Certification

Class certification is a two-step process: first, a plaintiff must establish numerosity, commonality, typicality, and adequacy under Rule 23(a); and second, a plaintiff must establish that the action meets one of the bases for certification under Rule 23(b).  However, "[t]he criteria for class certification are applied differently in litigation classes and settlement classes."  *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556 (9th Cir. 2019).  Specifically, the manageability requirement inherent in Rule 23(b)(3) does not apply to settlement classes.  *In re Packaged Seafood Prods. Antitrust Litig.*, No. 3:15-md-02670-DMS-MDD, 2022 WL 4283551, at *4 (S.D. Cal. Jan. 26, 2022); *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-05944-JST, 2020 WL 1873554, at *5 (N.D. Cal. Mar. 11, 2020) (Tigar, J.) ("*CRT II*") (adopting the special master's previous finding that class certification in the settlement context does not include difficulties found in the litigation context).

Plaintiffs contend, and Lexon and DNIC do not dispute for settlement purposes, that the Settlement Class meets the requirements for class certification under Rule 23(a) and 23(b)(3).

### 1.   The Requirements of Rule 23(a) Are Satisfied

**Numerosity**.  Under Rule 23(a)(1), the numerosity requirement is satisfied if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  While numerosity does not depend on a specific number of proposed class members, it is generally presumed that the requirement is satisfied when the potential class contains at least forty members.  *Celano v. Marriott Int'l, Inc.*, 242 F.R.D. 544, 549 (N.D. Cal. 2007); *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010).  Here, there are millions of Class transactions, which easily satisfies the numerosity requirement.  Harvey Decl. ¶ 18.

**Commonality**. Rule 23(a)(2) requires that "there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). The common question "must be of such a nature that it is capable of class wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, many significant common questions of law and fact exist, including whether Defendants entered into the alleged conspiracy to inflate the prices of bail bonds in California; whether that conspiracy violated the Sherman Act and California law; whether that conspiracy succeeded in inflating bail bond prices; and what those prices would have been in the absence of the alleged conspiracy. *See CRT II*, 2020 WL 1873554, at *5 (finding that commonality was satisfied where there were "questions of law and fact common to the Class, including whether the Defendants engaged in a price-fixing conspiracy that injured Plaintiffs"); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 593 (N.D. Cal. 2010) ("Where an antitrust conspiracy has been alleged, courts have consistently held that 'the very nature of a conspiracy antitrust action compels a finding that common questions of law and fact exists.'" (citations omitted)).

**Typicality**. The typicality requirement is met when the claims of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). The named plaintiffs need not have suffered an identical wrong; rather, the claims of the proposed settlement class must be "fairly encompassed by the named plaintiff's claims." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 527 F. Supp. 2d 1053, 1063 (N.D. Cal. 2007) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "In antitrust cases, typicality usually will be established by plaintiffs and all class members alleging the same antitrust violations by defendants." *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1181 (N.D. Cal. 2013).

Here, Plaintiffs' claims and alleged injuries all stem from the same challenged conspiracy as other members of the Settlement Class. Both Plaintiffs assert that they paid more for their bail bonds than they would have in the absence of the alleged conspiracy—allegations identical to (and therefore typical of) the Settlement Class they seek to represent. *See CRT II*, 2020 WL 1873554, at *6 (finding typicality satisfied because both class representatives and class members

purchased the product at supra-competitive levels due to a conspiracy); *In re Packaged Seafood*, 2022 WL 4283551, at *4 (finding typicality satisfied because the claims of the proposed settlement class and of plaintiffs were based on the same conspiracy and antitrust injuries).

**Adequacy**.  Under Rule 23(a)(4), the adequacy of a representative is satisfied if "the representative parties . . . fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This factor is a dual inquiry that examines (1) whether the proposed representative plaintiffs have any conflicts of interests with the proposed class, and (2) whether the plaintiffs were represented by qualified and competent counsel.  *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*, 270 F.R.D. 521, 531 (N.D. Cal. 2010).  Both requirements are satisfied here.

First, Plaintiffs' interests are aligned with, and are not antagonistic to, the interests of other Settlement Class Members.  Plaintiffs and the Settlement Class share a common interest in maximizing the total monetary recovery and implementing meaningful injunctive relief that will prevent the alleged misconduct from continuing or reoccurring.  Harvey Decl. ¶ 16.

Second, Settlement Class Counsel have extensive experience litigating, trying, and settling class actions, including antitrust cases, around the country.  Harvey Decl ¶ 11; Ex. 3 (Lieff, Cabraser, Heimann & Bernstein LLP Firm Resume).  Settlement Class Counsel have vigorously pursued this litigation on behalf of Plaintiffs and the Settlement Class over the prior five years, and will continue to do so against the remaining Non-Settling Defendants.  *Id*. ¶ 16.  Settlement Class Counsel have fairly and adequately protected the interests of the Settlement Class.

The Court should therefore appoint the named Plaintiffs as Settlement Class Representatives because they have no conflicts with the Settlement Class and are represented by qualified counsel who will vigorously prosecute the interests of the Settlement Class.  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 943 (9th Cir. 2015).

## 2.    Class Certification Is Appropriate Under Rule 23(b)(3)

Rule 23(b)(3) requires the Court find that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

NOTICE OF MOTION & MPA ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
LEAD CASE NO. 4:19-CV-00717-JST

**Predominance.**  The predominance inquiry focuses on the relationship between the common and individual issues.  *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009).  Specifically, the requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 594 (1997).  When common questions "present a significant aspect of the case [that] can be resolved for all members of the class in a single adjudication," there is justification for "handling the dispute on representative rather than on an individual basis."  *Delagarza v. Tesoro Refin. & Mktg. Co.*, No. C-09-5803 EMC, 2011 WL 4017967, at *10 (N.D. Cal. Sept. 8, 2011) (citations omitted).  Predominance is established for an antitrust claim when plaintiffs are able to prove (1) violation of antitrust laws, (2) an injury suffered as result of that violation, and (3) an estimated measure of damages.  *In re High-Tech*, 985 F. Supp. 2d at 1183.  Here, common questions of both law and fact predominate over individual issues as to all three elements.

First, Plaintiffs allege a price-fixing conspiracy in violation of the Sherman Act and the Cartwright Act.  The predominant issue is the existence of the Surety Defendants' alleged conspiracy to fix bail bond prices.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-cv-05944-JST, 2022 WL 4596621, at *4 (N.D. Cal. Aug. 1, 2022) (Tigar, J.) ("*CRT III*") (finding "that the existence of the conspiracy and [defendant's] role in it, if any, are subject to common proof," and noting that "[i]n price-fixing cases, like this one, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present" (citations omitted)); *In re High-Tech*, 985 F. Supp. 2d at 1187 ("Accordingly, Plaintiffs contend that, at trial, proving Defendants' conspiracy will be the overriding common issue for every Class Member."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D 603, 611 (N.D. Cal. 2009) (finding that if the Court finds common proof of defendants' antitrust conspiracy, class certification is warranted on that basis alone).  Here, too, the alleged conspiracy either happened or it did not, and this question will be answered with the same common evidence for all.

Second, Plaintiffs will use common evidence to show antitrust impact.  "Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that results from a violation

of the antitrust laws." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006); *see also In re Rubber Chems. Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) ("[T]he great weight of authority suggests that the dominant issues in [price fixing] cases . . . are whether the charged conspiracy existed and whether price-fixing occurred." (citation omitted)).  Here, the conspiracy inflated the price of bail bonds for all Class Members in the same way:  Plaintiffs allege Defendants "collusively-set" the "prices for the product at issue." *Id*.  This represents common, classwide impact because the conspiracy is the overriding issue that impacts the entire Settlement Class. *In re Citric Acid Antitrust Litig.*, Nos. 95-1092, C-95-2963, 1996 WL 655791, at *7-8 (N.D. Cal. Oct. 2, 1996).[3]

Third, Plaintiffs' estimate of potential damages and the methodology used in calculating damages will be common to the Settlement Class.  A more detailed description of Plaintiffs' class damages is included below in Section V.B, which concerns the amount of this Settlement Fund as compared to the available damages at trial (under the discussion of *Churchill* Factor 4).  In brief: the Class will provide the jury with a reasonable estimate of the difference between what the Class in fact paid for bail bonds, and what the Class would have paid in a competitive market free of the collusion Plaintiffs challenge (the "but for" prices).  Any damages award—for all Class Members—will be subject to mandatory trebling.  15 U.S.C. § 15(a).  Because Lexon's and DNIC's alleged conduct applies to all Settlement Class Members' claims and Plaintiffs allege "a common and unifying injury" as a result of Lexon's and DNIC's alleged illegal conduct, the predominance requirement is met. *In re Volkswagen "Clean Diesel" Litig.*, MDL No. 2672 CRB, 2017 WL 672727, at *14 (N.D. Cal. Feb. 16, 2017); *CRT III*, 2022 WL 4596621, at *4.

**Superiority.**  A class action is a superior means of adjudicating a dispute if no realistic alternative exists, and class litigation of common issues "reduce[s] litigation costs and promote[s] greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F. 3d 1227, 1234-35 (9th Cir. 1996).  Here, there is no realistic alternative to a class action due to the size of the Settlement Class and the prohibitive cost of litigating an individual case.  Individual lawsuits could also result in

---

[3] As the court in *Citric Acid* explained, "[e]ven if common impact cannot be proven, the Court may certify the class" where "even without proof of class-wide impact, common issues predominate." 1996 WL 655791, at *8.

NOTICE OF MOTION & MPA ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
LEAD CASE NO. 4:19-CV-00717-JST

1    inconsistent rulings and results for the same misconduct. *Volkswagen*, 2017 WL 672727, at *14.

2    Furthermore, each Settlement Class Member would be required to prove the same misconduct

3    and would offer the same evidence. As such, class treatment is the superior method of

4    adjudication. *See, e.g.*, *In re High-Tech*, 985 F. Supp. 2d at 1228 (finding that a class action was

5    the superior form of adjudication because of the nature of the defendants' conspiracy and the

6    desirability of concentrating litigation in one proceeding); *Nitsch v. Dreamworks Animation SKG*

7    *Inc.*, 315 F.R.D 270, 316 (N.D. Cal. 2016) (same).

8              **3.      The Court Should Appoint Settlement Counsel Under Rule 23(g)(3)**

9         Rule 23(g)(3) requires the appointment of counsel to represent the Settlement Class. At

10   the outset of the Action, the Court appointed Lieff, Cabraser, Heimann & Bernstein LLP ("Lieff

11   Cabraser") as Interim Class Counsel. ECF No. 44. In so doing, the Court explicitly considered

12   the Rule 23(g)(3) criteria. *Id.* at 2-3. Since then, Interim Class Counsel have zealously litigated

13   this action on behalf of the Settlement Class. Harvey Decl. ¶¶ 2-4, 16. Plaintiffs respectfully

14   request that the Court appoint Lieff Cabraser as Settlement Class Counsel.

15        **B.      The Settlements Are Fundamentally Fair, Reasonable, and Adequate**

16        Because Plaintiffs have established the propriety of certifying the Settlement Class, the

17   Court should next assess whether preliminary approval of the Settlements is warranted in light of

18   (1) the *Churchill* factors, (2) the Rule 23(e)(2) requirements, and (3) the Northern District's

19   guidance.[4] As set forth below, all relevant factors support preliminary approval.

20              **1.      The *Churchill* Factors Are Satisfied**

21        According to *Churchill*, the Court should balance the following factors in deciding

22   whether to grant preliminary approval: "(1) the strength of the plaintiffs' case; (2) the risk,

23   expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class

24   action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery

25   completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the

26

27   _____

[4] Because the "Rule 23(e)(2) analysis is guided by the eight *Churchill* factors," but "requires the
district court to go beyond the *Churchill* factors," Courts in this District often address *Churchill*
28   before Rule 23(e)(2). *Ward v. United Airlines, Inc.*, No. C 15-02309 WHA, 2024 WL 269149, at
*2-4 (N.D. Cal. Jan. 24, 2024).

1  presence of a governmental participant; and (8) the reaction of the class members to the proposed

2  settlement." *Cottle*, 340 F.R.D. at 373 (quoting *Churchill*, 361 F.3d at 575).

3      **Churchill Factors 1-3.**  "The first three factors are addressed together and require the

4  court to assess the plaintiff's 'likelihood of success on the merits and the range of possible

5  recovery' versus the risks of continued litigation and maintaining class action status through the

6  duration of trial." *Cottle*, 340 F.R.D. at 373 (citation omitted).  These factors weigh in favor of

7  approving settlement when the defendant has "plausible defenses that could have ultimately left

8  class members with a reduced or non-existent recovery."  *In re TracFone Unlimited Serv. Plan*

9  *Litig.*, 112 F. Supp. 3d 993, 999 (N.D. Cal. 2015).

10      Plaintiffs are confident in the strength of their claims and their ability to prevail at trial,

11  but also recognize the inherent risks of any trial.  Due to the large number of Defendants and the

12  issues Plaintiffs have faced in the litigation to this point, settlement with Lexon and DNIC is an

13  important step in moving the case forward and beginning to guarantee relief to the Settlement

14  Class.  *Cf. In re Volkswagen "Clean Diesel" Litig.*, 229 F. Supp. 3d 1052, 1065 (N.D. Cal. 2017)

15  ("Settlement is favored in cases that are complex, expensive, and lengthy to try.").

16      **Churchill Factor 4.**  The fourth *Churchill* factor, concerning the amount offered in the

17  settlement, further supports approval.  In determining whether a settlement is fair and adequate,

18  "the complete package [is] taken as a whole, rather than the individual component parts."

19  *Officers for Just. v. Civ. Serv. Comm'n*, 688 F.2d 615, 628 (9th Cir. 1982).  Furthermore, "it is

20  well-settled law that a proposed settlement may be acceptable even though it amounts to only a

21  fraction of the potential recovery that might be available to the class members at trial."  *Nat'l*

22  *Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).  A court is not

23  required "to find a specific monetary value corresponding to each of the plaintiff class's statutory

24  claims and compare the value of those claims to the proffered settlement award."  *Lane v.*

25  *Facebook, Inc.*, 696 F.3d 811, 823 (9th Cir. 2012).  Finally, courts have approved settlements as

26  to one defendant while litigation (and discovery) proceeds against non-settling defendants.  *In re*

27  *High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2014 WL 3917126, at *6 (N.D. Cal.

28  Aug. 8, 2014).  As such, it is not unusual for courts to approve a settlement despite other

- 14 -

NOTICE OF MOTION & MPA ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
LEAD CASE NO. 4:19-CV-00717-JST

1    defendants remaining in the case, with the possibility of additional settlements to follow.

2           The $3 million in monetary relief represents an excellent resolution of the Settlement

3    Class's claims against Lexon and DNIC. To assess the fairness of that amount for settlement

4    purposes, Plaintiffs looked first to the total bail bond premiums charged to Class members

5    throughout the Class period, based upon the transactional data that all Defendants produced in

6    this case.  That total is approximately $7.3 billion in premiums charged, with an average premium

7    rate of 9.2% on bonds with a total face value of about $79.4 billion. Harvey Decl. ¶ 22. A certain

8    amount of rebating occurred during the Class period, notwithstanding the alleged conspiracy. *Id.*

9    ¶ 23. To take that into account, Plaintiffs applied a 2014 study from the California Department of

10   Insurance, which estimated the total average consumer cost to purchase a bail bond collected by

11   bail agents: 8% of total bond values.  *Id.* Applied to the Class period, Plaintiffs estimated that the

12   total amount Class members paid was approximately $6.4 billion (8% of $79.4 billion).  *Id.* ¶ 24.

13   Plaintiffs next estimated an average but-for price of 6% of bond values, as this is the competitive

14   price that bail agents themselves discussed among each other in discovery Defendants produced

15   in this case. ECF No. 285-7 at 3.  Damages would be the difference between an estimate of the

16   actual total amount paid ($6.4 billion) and an estimate of the total but-for amount ($4.8 billion,

17   which is 6% of $79.4 billion): $1.6 billion.  Harvey Decl. ¶ 24.  Trebled, Defendants' total

18   liability at trial would be about $4.8 billion, excluding attorney's fees and costs (to which the

19   Class would also be entitled under 15 U.S.C. § 15(a)).[5]

20          As to Lexon: $1 million reflects Lexon's very small proportion of relevant transactions.

21   Harvey Decl. ¶ 20.  Lexon issued approximately a tenth of one percent of all Class bail bonds.

22   *Id.*  Further, $1 million is nearly equal to Lexon's total gross revenue of $1,083,893 regarding all

23   of its Class sales.[6]  Thus, the monetary component of this settlement represents 92% of Lexon's

24

25   [5] These damages estimates were for settlement purposes.  Plaintiffs have retained economic
     experts who are performing much more detailed analyses that Plaintiffs will submit with their
26   forthcoming motion to certify a litigation class.

27   [6] While this would not be relevant to Defendants' liability at trial, for settlement purposes only,
     Plaintiffs took into account that Settlement Class fees were split between the Surety Defendants
28   and bail agents.  On average, Surety Defendants received approximately 7% of premium rates
     charged to Class members.  For example, Lexon's agents charged an average premium rate of Lexon's

- 15 -

gross revenue from the challenged transactions.  As to DNIC: the Chief Financial Officer of

Catalina U.S. Insurance Services LLC—the company that administers the operations of National

American Insurance Company of California ("NAICC"), which is the former parent of DNIC and

the entity that retained all obligations as it relates to this Litigation—submits herewith a sworn

declaration confirming that DNIC's entire business was placed into "run-off" in 2012, and ceased

accepting new policy applications.  McCreery Decl. ¶ 5.  As a result, DNIC stopped generating

revenue from new policy applications as of that date.  *Id.* ¶ 6.  As of today, $2 million is the

maximum DNIC is able to pay given its former parent's current financial state, as any settlement

beyond $2 million would result in that company being non-compliant with minimum statutory

requirements applicable to insurance companies.  *Id.* ¶¶ 15-16.  And, as to both Lexon and DNIC:

these Settlements are without prejudice to the Class recovering the full amount of any judgment

from the remaining 18 surety Defendants, on a joint and several basis. At trial, the Class will also

seek injunctive relief to end the misconduct that prompted this case.  If the Settlements are

approved, Lexon and DNIC agree to implement the same injunctive relief that Plaintiffs

anticipate seeking at trial.  They agree not to engage in the misconduct challenged in this case,

and also to issue corrective communications to bail bond purchasers going forward, remedying

the misleading statements and omissions to consumers that Plaintiffs allege were part of the

unlawful conspiracy.  Lexon SA ¶ 30; DNIC SA ¶ 30.  Their agents will not be able to make any

representation to potential California customers regarding required rates without also

disclosing—with equal visibility and prominence—that they "may choose to negotiate a lower fee

by rebating, as allowed by proposition 103."  *Id.* ¶ 30(b); ¶ 30(b).  This corrective communication

is also explained in the Notice, which itself will help correct the competitive deficiencies in this

market.  Notice ¶ 10.

 The Settlements therefore provide a successful first step in resolving this Action.  The

monetary component reflects the realities of Lexon's small share of Class transactions and

DNIC's ability to pay, without prejudicing the Class's ability to pursue their full damages from

---

9.6% of the total bond values, and provided an average of 8.8% of the premiums to Lexon, while
DNIC's agents charged an average of 9.3% of total bond values, and provided an average of 3%
of the premiums to DNIC.  Harvey Decl. ¶ 20.

NOTICE OF MOTION & MPA ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
LEAD CASE NO. 4:19-CV-00717-JST

1    the Non-Settling Defendants.  The injunctive relief is also what Plaintiffs would have pursued

2    from Lexon and DNIC at trial.

3        *Churchill* **Factor 5.**  Under the fifth *Churchill* factor, courts examine the extent of

4    discovery completed and the stage of the proceedings.  "Class settlements are presumed fair when

5    they are reached 'following sufficient discovery and genuine arms-length negotiation.'"  *Cottle*,

6    340 F.R.D. at 375 (quoting *DIRECTV*, 221 F.R.D. at 528).

7        *First*, with respect to the extent of discovery, courts credit both efforts that are "relevant in

8    determining the adequacy of the parties' knowledge of the case" and any "substantial

9    investigation prior to the filing."  *Id.*  Where extensive information has been exchanged, "[a]

10   court may assume that the parties have a good understanding of the strengths and weaknesses of

11   their respective cases and hence that the settlement's value is based upon such adequate

12   information."  4 William B. Rubenstein et al., *Newberg on Class Actions* § 13:49 (5th ed. 2012);

13   *cf. In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 320 (N.D. Cal. 2018) (concluding that

14   the "extent of discovery" and investigation undertaken by the parties gave "a good sense of the

15   strength and weaknesses of their respective cases in order to 'make an informed decision about

16   settlement'" (quoting *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000))).

17       Here, the parties litigated for over four years prior to reaching the Settlements, and

18   Defendants (including Lexon and DNIC) produced significant discovery, including 473,076

19   documents (1,868,620 pages), and transactional data for all Class sales.  Harvey Decl. ¶ 5.  This

20   discovery and transactional data was critical to reaching agreement regarding the monetary

21   component of the Settlements.  *Id.* ¶ 13.  Furthermore, a substantial portion of the investigation

22   pertinent to the Action took place before the initial complaint was filed: Class Counsel spent

23   months investigating the alleged misconduct before filing the original complaint, and continued to

24   do so as they filed two amended complaints.  *Id.*  Plaintiffs therefore had the necessary

25   information to properly assess the value of the Settlements, enabling Settlement Class Counsel to

26   reasonably conclude that the Settlements are in the best interest of the Settlement Class.

27       *Second*, with respect to arm's-length negotiation, courts "scrutinize agreements for 'subtle

28   signs that class counsel have allowed pursuit of their own self-interests . . . to infect

- 17 -

NOTICE OF MOTION & MPA ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
LEAD CASE NO. 4:19-CV-00717-JST

negotiations.'" *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011)).  Specifically, courts consider: "(1) when counsel receive a disproportionate distribution of the settlement or when the class receives no monetary distribution but class counsel are amply rewarded; (2) when the payment of attorneys' fees is separate and apart from class funds; and (3) when the parties arrange for benefits that are not awarded to revert to the defendants rather than being added to the class fund." *Cottle*, 340 F.R.D. at 376 (citation omitted).

Here, none of those "subtle signs" is present.  The Settlements were the result of arm's-length negotiations between experienced counsel that extended over many months.  Harvey Decl. ¶ 7.  There will be no reversion to Lexon or DNIC, and Settlement Class Counsel do not seek a distribution of the Settlement at this time (and in no event will they seek any more than one-third of the final Total Settlement Fund).  Lexon SA ¶ 58; DNIC SA ¶ 60.

***Churchill* Factor 6.**  The sixth *Churchill* factor (experience and views of counsel) supports preliminary approval of the Settlements.  As discussed in Section V.A.1, Settlement Class Counsel have extensive experience litigating and settling antitrust class actions throughout the country, and have committed significant time, expense, and resources to vigorously litigating this action.  Based on their collective experience, Settlement Class Counsel believe the Settlements provide an excellent resolution of the Class's claims against Lexon and DNIC.

***Churchill* Factors 7-8.**  *Churchill* factor seven (presence of government) is irrelevant to this action, and eight (reaction of class members) should be left to final approval.  *Carlotti v. ASUS Comput. Int'l*, No. 18-cv-3369-DMR, 2019 WL 6134910, at *7 (N.D. Cal. Nov. 19, 2019).

## 2.     The Rule 23(e)(2) Requirements Are Met

Rule 23(e)(2) requires courts to consider whether: "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified

1   under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

2   Fed. R. Civ. P. 23(e)(2).  Here, all are requirements met.

3        Several of the Rule 23(e)(2) requirements are addressed—and satisfied—through the Rule

4   23(a)-(b) and *Churchill* analyses above.  *See supra* Section V.A.1 (addressing (e)(2)(A),

5   regarding adequacy of representation, under Rule 23(a)); Section V.B.1 (addressing (e)(2)(B),

6   regarding negotiations, under *Churchill* factor 5); *id*. (addressing (e)(2)(C)(i), regarding adequacy

7   of relief, under *Churchill* factor 4); *see also Cottle*, 340 F.R.D. at 376 (noting the overlap in these

8   analyses).  The remaining requirements are addressed—and satisfied—below.

9        **Requirement (e)(2)(C)(ii)** requires the court to consider the effectiveness of distribution,

10  which concerns both the notice and distribution plan.  *Cottle*, 340 F.R.D. at 377.  *See also Hanlon*

11  *v. Chrysler Corp.*, 150 F.3d 1011, 1025 (9th Cir. 1998) ("Adequate notice is critical to court

12  approval of a class settlement under Rule 23(e).").  Here, the proposed two-phased program is the

13  best available method of providing notice and relief to the Settlement Class.

14       Beginning with the Phase 1 Media Notice, while deferring direct mailed Notice to Phase

15  2, is the best practicable notice under the circumstances.  In light of the size of the class, the cost

16  of mailed notice is currently estimated at more than $525,000.  Schachter Decl. ¶ 13.  An attempt

17  at mailed notice now would therefore eat substantially into the $3 million Settlement Fund,

18  leaving approximately $2,475,000.  The Class is approximately 2 million people, and the

19  Settlement Administrator estimates a claims rate between 5% and 20%.  *Id*. ¶ 22.  This means that

20  the maximum recovery to Settlement Class Members would be between $6.19 and $24.75 before

21  accounting for anything other than mailed notice.  Harvey Decl. ¶ 31.  Deferring mailed notice to

22  Phase 2—when there may be more funds to cover these expenses—is reasonable and appropriate.

23  Indeed, other courts have endorsed a two-phased notice in cases (like this one) where an early

24  settlement is not sufficiently large to justify an immediate distribution.  *See id*., Ex. 4, *In re*

25  *Domestic Airline Travel Antitrust Litig.*, MDL No. 2656 (D.D.C. May 9, 2019), ECF No. 374 at

26  20 ("*Airlines* Final Approval Order").

27       Beginning with the Phase 1 Media Notice is also reasonable in light of the facts

28  underlying the Settlements.  This case alleges misconduct over the span of more than two

2859039.13

decades, affecting millions of potential class members.  Given the likelihood of a change in address or phone number over these many years, the parties likely lack current contact information for many Settlement Class Members; for many more, the parties lack direct contact information.  Harvey Decl. ¶ 34.  The Media Notice addresses this reality and is anticipated to reach approximately 70.6% of prospective Settlement Class Members.  Schachter Decl. ¶ 11.  *See also, e.g.*, *In re Google Referrer Header Priv. Litig.*, No. 5:10-cv-04809-EJD, 2023 WL 6812545, at *3 (N.D. Cal. Oct. 16, 2023) (approving a media-based publication notice plan).  Through the Settlement website made available during Phase 1, Settlement Class Members will also have an opportunity to provide their updated contact information (to receive a Notice Postcard) during Phase 2.  Schachter Decl. ¶ 15.

Delaying mailed notice and distribution until Phase 2 is therefore the fairest and best method of delivering relief.  In an analogous case—involving early settlement of a large antitrust class action with many defendants—another federal district court endorsed this approach:

> In a case such as this, involving a large number of Class Members and two Non-Settling Defendants, it would be inefficient to distribute and process claims until the entire case has been resolved through litigation or otherwise and the Total Funds Available for Distribution are known. The Court finds that Settlement Class Counsel has demonstrated the adequacy of the Settlements with regard to their proposed means of distributing and processing claims, which will be done through a second notice to Class Members, followed by a right to object and/or file a claim.

*Airlines* Final Approval Order at 20.  The Court should endorse the approach here as well.

**Requirement (e)(2)(C)(iii)** concerns attorneys' fees, and specifically requires courts to determine whether "the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded."  *Cottle*, 340 F.R.D. at 378 (citation omitted).

Here, there is no indication that the Settlements were driven by fees.  In fact, Settlement Class Counsel do not seek any fees at this time, but instead propose that any application for fees and costs come later—once the Total Settlement Fund is large enough to warrant a distribution to the Settlement Class, or the case is otherwise resolved.  Lexon SA ¶ 50; DNIC SA ¶ 52.  Plaintiffs respectfully submit that deferring consideration of fees, costs, and service awards is warranted in

1   light of the current size of the Settlement Fund.  For example: given the size of the Class and

2   estimated claims rate, if fees, costs, and service awards were deducted before a distribution, then

3   the maximum recovery to Settlement Class Members would be between $4.40 and $17.60 before

4   accounting for any settlement administration costs.  Harvey Decl. ¶ 31.  Other courts have

5   therefore endorsed deferral of a motion for fees, costs, and service awards in cases (like this one)

6   where an early settlement is not sufficiently large to justify an immediate award.  *See Airlines*

7   Final Approval Order at 20.

8          When a motion for fees is held in abeyance pending future settlements "the issue of

9   attorneys' fees is not under consideration in connection with approval" of the class action

10  settlement, and "[a]ccordingly, this factor of attorneys' fees does not weigh into any adequacy

11  determination by the Court."  *Id.* at 20-21.  In any event, an eventual award of up to one-third of

12  the Total Settlement Amount—which is the maximum Settlement Class Counsel would seek

13  here—is within the range regularly approved in common fund settlements in this Circuit.  *See,*

14  *e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (observing Ninth Circuit

15  case law that between 20 and 30 percent of the settlement common fund in attorneys' fees is

16  within the "usual range"); *Hernandez v. Dutton Ranch Corp*., No. 19-cv-00817-EMC, 2021 WL

17  5053476, at *6 (N.D. Cal. Sept. 10, 2021) (collecting cases and finding that"[d]istrict courts

18  within this circuit, including this Court, routinely award attorneys' fees that are one-third of the

19  total settlement fund . . . [s]uch awards are routinely upheld by the Ninth Circuit").

20         **Requirement (e)(2)(C)(iv)** is satisfied, as there is no agreement between Plaintiffs and

21  Lexon or DNIC other than the Agreements described herein.  Harvey Decl. ¶ 12.

22         **Requirement (e)(2)(D)** is satisfied because the Agreements treat all Settlement Class

23  Members equitably.  Specifically, distributions form the Total Settlement Amount will be made to

24  Participating Settlement Class Members according to their share of the Net Settlement Fund in

25  proportion to their share of the overall premiums charged to Participating Settlement Class

26  Members who submit valid claims.  Lexon SA ¶ 53; DNIC SA ¶ 55; *see also, e.g.*, *Cottle*, 340

27  F.R.D. at 378 (approving settlement where distribution plan provided "equal access to the

28  Settlement Fund for all Class Members who submit Approved Claims").

2859039.13

3.     **The Northern District Guidance Supports Approval**

**Guidance 1(a)—Class Definition.**  Here, a class has not yet been certified, and the TCAC and the Settlement Agreements define the Class in a nearly identical way.  *Compare* TCAC ¶ 38, *with* Lexon SA ¶ 21 and DNIC SA ¶ 21.  The only difference between the definitions is that the end date in the TCAC is the "present" while the end date in the Settlements is the "Execution Date of this Settlement Agreement."  *Id.*  There are no other differences between the Settlement Class and the class proposed in the TCAC.  As such, this guideline supports preliminary approval.

**Guidance 1(b)—Released Claims.**  The Settlement Agreements define the "Released Claims" to include "all claims, demands, judgments, actions, suits, and/or causes of action, whether federal or state, known or unknown, asserted or unasserted, regardless of the legal theory, arising in any way from or in any way related to the facts, activities, or circumstances alleged in the complaints in the Action, up to the Effective Date."  Lexon SA ¶ 16; DNIC SA ¶ 16.  This is consistent with the scope of releases permitted in the Ninth Circuit.  *In re Anthem*, 327 F.R.D. at 327.  Courts in this District regularly approve releases similar to the one here.  *See id.* (collecting cases).

**Guidance 1(c)—Value.**  The value of the Settlements—including complete injunctive relief and fair monetary relief from Lexon and DNIC—is described above in Section V.B.1, in connection with *Churchill* Factor 4.

**Guidance 1(d)—Other Cases.**  No other cases will be affected by the Settlements. Harvey Decl. ¶ 12.

**Guidance 1(e)—Allocation.**  This guideline is addressed in Section V.B.2 above, in connection with the Rule 23(e)(2)(C)(ii) analysis.

**Guidance 1(f)—Claims Rate.**  This guideline considers the claims rate "[i]f there is a claim form."  Here, because the Parties propose deferring distribution until later in the case, no claim form yet exists.  Lexon SA ¶ 50; DNIC SA ¶ 52.  However, the Settlement Administrator estimates that the claims rate will be between 5% and 20% of the proposed Settlement Class. Schachter Decl. ¶ 22.  This estimate is rooted in the Settlement Administrator's experience with similar matters, and the range reflects uncertainty regarding the size of potential additional

NOTICE OF MOTION & MPA ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
LEAD CASE NO. 4:19-CV-00717-JST

settlements or monetary judgment.  *Id.*  Settlement Class Counsel and the Settlement

Administrator will work to maximize claims, and may propose additional efforts in light of

additional settlements or a monetary judgment.  *Id.*

**Guidance 1(g)—Reversion.**  Here, under no circumstance will any portion of the

Settlement Fund revert to Lexon or DNIC, other than denial of the Settlements.  Lexon SA ¶ 28;

DNIC SA ¶ 28.

**Guidance 2—Administrator.**  The Parties request that the Court appoint A.B. Data as

Settlement Administrator for the Settlements.  A.B. Data is an experienced and reputable national

class action administrator.  Harvey Decl. ¶ 28.  Settlement Class Counsel requested bids from

both A.B. Data and a second reputable national class action administrator.  *Id.* ¶ 29.  Specifically,

Settlement Class Counsel requested bids from both competitors for (1) a notice and claims

administration with an immediate distribution; and (2) a notice and claims administration with a

deferred distribution (i.e., the two-phased process described herein).  *Id.*  Settlement Class

Counsel selected A.B. Data because it provided both a more comprehensive proposal and a better

rate for each scenario.  *Id.*  The accompanying Schachter Declaration sets forth A.B. Data's

procedures for securely handling class member data (including technical, administrative, and

physical controls; retention; destruction; audits; and crisis response), as well as confirmation of

A.B. Data's acceptance of responsibility for and maintenance of insurance in case of errors.

Schachter Decl. ¶¶ 5-8.

In the past two years, Settlement Class Counsel has worked with A.B. Data in the

following six cases: *Cleary v. American Airlines, Inc.*, No. 4:21-cv-00184-O (N.D. Tex.); *In re

Restasis Antitrust Litig.*, No. 18-md-2819 (E.D.N.Y.*); Hospital Authority of Metropolitan

Government of Nashville & Davidson County v. Momenta Pharmaceuticals, Inc.*, No. 15-CV-

01100 (M.D. Tenn.); *Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's*, No.

2:08-CV00235-CCC-ESK (D.N.J.); *In re McKinsey & Co., Inc. National Prescription Opiate

Consultant Litigation*, No. 21-md-02996 (N.D. Cal.); and *In re Papa John's Employee and

Franchisee Employee Antitrust Litigation*, No. 3:18-cv-00825 (W.D. Ky.).  *Id.* ¶ 4.

The administrative costs for A.B. Data's services will be paid out of the Settlement Fund.

1  Lexon SA ¶ 41; DNIC SA ¶ 43.  These costs are anticipated to be approximately $120,000 for

2  Phase 1 of the Notice Plan, and $995,000 for Phase 2 of the Notice Plan.  Schachter Decl. ¶ 23.

3       **Guidance 3—Notice.**  As set forth above, the Notice satisfies Rule 23(e).  The Notice

4  also satisfies Guidance 3 because it contains all elements set forth in this Guidance: (a) contact

5  information for Settlement Class Counsel; (b) the address for the Settlement website, which in

6  turn will contain all required information; (c) instructions for how to access case documents; (d)

7  details regarding the final approval hearing; and (e) notice that the final approval date may

8  change.  Notice ¶¶ 23-25.

9       **Guidance 4-5—Opt-Out & Objection.**  Pursuant to Guidance 4 and 5, the proposed

10  Notice includes information on Settlement Class Members' rights to: (1) request exclusion,

11  including the manner for submitting such a request (requiring no extraneous information or

12  hurdles) and deadline to do so; (2) comment on or object to the Settlement, or any aspect thereof,

13  and the manner and deadline for submitting an objection; and (3) participate in the Settlement.

14  Notice ¶ 2.  The Proposed Notice also provides contact information for Settlement Class Counsel

15  and the Settlement Administrator, and includes the URL for a Settlement website where Members

16  can seek additional information or pose questions to the Administrator.  *Id.* ¶ 13.

17       **Guidance 6—Fees.**  This Guidance is addressed above, under Rule (e)(2)(C)(iii).

18       **Guidance 7—Service Awards.**  The Ninth Circuit has "repeatedly held that reasonable

19  incentive awards to class representatives are permitted."  *In re Apple Inc. Device Performance*

20  *Litig.*, 50 F.4th 769, 785 (9th Cir. 2022) (internal quotation marks omitted).  Service awards are

21  "fairly typical in class action cases."  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir.

22  2009).  Plaintiffs do not seek service awards at this time, but will do so if there are sufficient

23  additional settlements to merit a distribution and award, or when this case is otherwise resolved.

24  Lexon SA ¶ 59; DNIC SA ¶ 61.  In the event there are no additional funds available through

25  settlement or judgment, Plaintiffs anticipate seeking service awards of up to $10,000 in

26  connection with the Lexon and DNIC Settlements for each Settlement Class Representative.  *Id.*

27  This possible future request is disclosed in the Notice, Notice ¶ 15, and would be in-line with or

28  less than awards granted in this District.  *See, e.g.*, *Rabin v. PricewaterhouseCoopers LLP*, No.

16-cv-02276-JST, 2021 WL 837626, at *10 (N.D. Cal. Feb. 4, 2021) (Tigar, J.) (granting a $20,000 service award to each named plaintiff).

**Guidance 8—Cy Pres.**  At this time, Settlement Class Counsel does not intend to distribute the Settlement Funds.  As such, it is premature to designate *cy pres* recipients. Plaintiffs anticipate requesting that Settlement Funds that remain after exhausting distribution attempts go to organizations whose work account for the nature of this lawsuit and the interests of the Settlement Class.  Harvey Decl. ¶ 27.  *Cf. Lane*, 696 F.3d at 819-20 (noting any *cy pres* should "account for the nature of the plaintiffs lawsuit, the objectives of the underlying statutes, and the interests of the silent class members") (internal alterations and quotations omitted).

**Guidance 9—Schedule.**  The Parties propose the following schedule:

| Event/Deadline | Proposed Time for Compliance |
| --- | --- |
| Notice Date | 30 days after the Court's entry of the Preliminary Approval Order |
| Objection Deadline | 45 days after the Notice Date |
| Opt-Out Deadline | 45 days after the Notice Date |
| Motion for Final Approval | 21 days after the Objection and Opt-Out Deadlines |
| Oppositions to Motion for Final Approval | 14 days after Motion for Final Approval |
| Reply in Support of Motion for Final Approval | 14 days after any Opposition to Motion for Final Approval |
| Final Approval Hearing | At least 96 days after Preliminary Approval Order if no Opposition filed, and 124 days after Preliminary Approval Order if an Opposition is filed |

**Guidance 10—CAFA Notice.**  Lexon and DNIC will serve the notice required by the Class Action Fairness Act, 28 U.S.C. § 1715, no later than 10 days after this filing.

**Guidance 11—Comparable Outcomes.**  Settlement Class Counsel are seasoned antitrust litigators who have successfully negotiated settlement funds similar to those anticipated in this case, including in cases involving complex antitrust claims.  Harvey Decl. ¶ 15.

## VI.   <u>CONCLUSION</u>

Plaintiffs respectfully request that the Court grant this motion.

1    Dated:        April 25, 2024              Respectfully submitted,

2                                             /s/ *Dean M. Harvey*

3                                             Dean M. Harvey (State Bar No. 250298)
                                              dharvey@lchb.com
4                                             Katherine C. Lubin (State Bar No. 259826)
                                              kbenson@lchb.com
5                                             Michelle A. Lamy (State Bar No. 308174)
                                              mlamy@lchb.com
6                                             Miriam E. Marks (State Bar No. 332351)
                                              mmarks@lchb.com
7                                             LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                              275 Battery Street, 29th Floor
8                                             San Francisco, CA  94111-3339
                                              Telephone:  415.956.1000
9                                             Facsimile:  415.956.1008

10                                            *Interim Lead Class Counsel and Proposed Interim*
                                              *Settlement Class Counsel*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28