Dean M. Harvey (SBN 250298)
Katherine Lubin Benson (SBN 259826)
Michelle A. Lamy (SBN 308174)
Miriam E. Marks (SBN 332351)
Emily N. Harwell (*pro hac vice*)
Nicole M. Rubin (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
dharvey@lchb.com
kbenson@lchb.com
mlamy@lchb.com
mmarks@lchb.com
eharwell@lchb.com
nrubin@lchb.com

*Interim Class Counsel*

*(Additional counsel listed on signature page)*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 4:19-cv-00717-JST<br><br>CLASS ACTION<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: TBD<br>Time: TBD<br>Judge: The Honorable Jon S. Tigar<br>Courtroom: 6, 2nd Floor |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION ........................................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................... 2

I.     INTRODUCTION ............................................................................................................. 2

II.    SUMMARY OF DEFENDANTS' CONSPIRACY .......................................................... 3

       A.     The Conspiracy Begins in 1953 ............................................................................ 3

       B.     Proposition 103 Threatens the Fixed 10% Price .................................................. 4

       C.     The Industry Protects the Conspiracy and Prevents California's Largest
              Bail Agency—Aladdin—from Offering Competitive Prices................................. 5

       D.     Douglass's Own Lawyer—Robert Hayes—Purchases Aladdin and Upholds
              the Conspiracy ...................................................................................................... 8

       E.     Defendants Collude to Maintain the Fixed 10% Standard Rate and
              Suppress Rebating ................................................................................................. 9

       F.     Defendants Circle the Wagons and Defend Their Conspiracy from CDI's
              Excessive Rate Inquiry ....................................................................................... 19

III.   LEGAL STANDARDS ................................................................................................... 22

IV.    ARGUMENT .................................................................................................................. 22

       A.     Plaintiffs Satisfy All Four Requirements of Rule 23(a)...................................... 22

              1.     The Class Is Numerous ............................................................................ 23

              2.     There Is at Least One Common Question with a Common Answer.......... 23

              3.     Plaintiffs' Claims Are Typical of the Class ............................................. 24

              4.     Plaintiffs and Counsel Adequately Represent the Class .......................... 25

       B.     Plaintiffs Satisfy the Requirements for a Rule 23(b)(2) Injunctive Class.......... 25

       C.     Plaintiffs Satisfy the Requirements for a Rule 23(b)(3) Damages Class ............ 26

              1.     Common Issues Predominate.................................................................... 26

                     a.     Defendants Engaged in a Common Conspiracy........................... 27

                     b.     Class Members Were Commonly Impacted by Defendants'
                            Conspiracy Because They Paid Higher Prices for Bail
                            Bonds ........................................................................................... 30

                     c.     Damages Will Be Established by Common Proof ........................ 33

              2.     A Class Action Is Superior to Millions of Individual Actions.................. 34

V.     CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
 731 F.3d 952 (9th Cir. 2013)................................................................................... 23

*Aberin v. Am. Honda Motor Co.*,
 No. 16-CV-04384-JST, 2021 WL 1320773 (N.D. Cal. Mar. 23, 2021) ................................. 33

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
 No. 06-MD-1175 JG VVP, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014) ........................... 34

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997)................................................................................................. 27

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
 568 U.S. 455 (2013)................................................................................................. 23

*In re Apple IPhone Antitrust Litigation*,
 No. 4:11-cv-06714-YGR (N.D. Cal. Mar. 29, 2022) ............................................................. 30

*In re Auction Houses Antitrust Litig.*,
 193 F.R.D. 162 (S.D.N.Y. 2000) ........................................................................... 32

*In re Broiler Chicken Grower Antitrust Litig. (No. II)*,
 No. 6:20-MD-02977-RJS-CMR, 2024 WL 2117359 (E.D. Okla., May 8, 2024) ................. 31

*In re Capacitors Antitrust Litig. (No. III)*,
 No. 14-CV-03264-JD, 2018 WL 5980139 (N.D. Cal., Nov. 14, 2018)................................. 31

*In re Cathode Ray Tube Antitrust Litig. ("CRT III")*,
 No. 07-CV-05944-JST, 2022 WL 4596621 (N.D. Cal. Aug. 1, 2022) ........................... *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
 No. 07-cv-05944-JST, 2020 WL 1873554 (N.D. Cal. Mar. 11, 2020) ................................. 24

*In re Citric Acid Antitrust Litig.*,
 Nos. 95-1092, No. 95-cv-02963, 1996 WL 655791 (N.D. Cal. Oct. 2, 1996)....................... 33

*In re College Athlete NIL Litig.*,
 No. 20-cv-03919 CW, 2023 WL 7106483 (N.D. Cal. Sept. 22, 2023)................................. 26

*In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,
 270 F.R.D. 521 (N.D. Cal. 2010) ............................................................................ 25

*Cung Le v. Zuffa, LLC*,
 No. 2:15-cv-01045-RFB-BNW (D. Nev. Aug. 9, 2023)....................................................... 32

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Disposable Contact Lens Antitrust*,
329 F.R.D. 336 (M.D. Fla. 2018) ...................................................................... 31, 32

*Donabedian v. Mercury Ins. Co.*,
116 Cal. App. 4th 968, 982-83 (2004), *as modified on denial of reh'g* (Cal.
App. Mar. 30, 2004) ................................................................................................ 5

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. 02-md-1486-PJH, 2006 WL 1530166 (N.D. Cal. June 5, 2006) ...................... 30

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
No. C 06-4333 PJH, 2013 WL 12333442 (N.D. Cal. Jan. 8, 2013), *report and
recommendation adopted sub nom. In re Dynamic Random Access Memory
Antitrust Litig.*, No. C 06-4333 PJH, 2014 WL 12879520 (N.D. Cal. June 27,
2014) ...................................................................................................................... 27

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ................................................................................ 23

*Fears v. Wilhelmina Model Agency, Inc.*,
No. 02 Civ-4911 HB, 2003 WL 21659373 (S.D.N.Y. 2003) ............................... 32

*In re Flat Glass Antitrust Litig.*,
191 F.R.D. 472 (W.D. Pa. 1999) .......................................................................... 32

*In re Glumetza Antitrust Litig.*,
336 F.R.D. 468 (N.D. Cal. 2020) ......................................................................... 27

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) .............................................................................................. 34

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .............................................................................. 24

*In re High-Tech Emp. Antitrust Litig.*,
985 F. Supp. 2d 1167 (N.D. Cal. 2013) ........................................................ *passim*

*Hyland v. Homeservices of America, Inc.*,
No. 3:05-CV-612-R., 2008 WL 4858202 (W.D. Ky. Nov. 7, 2008) ................... 33

*In re Indus. Diamonds Antitrust Litig.*,
167 F.R.D. 374 (S.D.N.Y. 1996) .......................................................................... 32

*Johnson v. Ariz. Hosp. & Healthcare Assoc.*,
No. 07-CV-1292-PHX-SRB, 2009 WL 5031334 (D. Ariz. Jul. 14, 2009) ........... 32

**TABLE OF AUTHORITIES**
(continued)

Page

*Leyva v. Medline Indus. Inc.*,
    716 F.3d 510 (9th Cir. 2013)................................................................. 34

*In re License & Licensing Rights of Chad Joseph Conley*,
    No. PLBS 12388-A (Cal. Ins. Comm'r Apr. 18, 2019) .................................. 18, 19

*Moshier v. Safeco Ins. Co. of Am.*,
    No. 23-CV-00225-PHX-DLR, 2024 WL 4503901 (D. Ariz. Oct. 16, 2024) ........................ 31

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) ........................................................... 32

*Nitsch v. Dreamworks Animation SKG Inc.*,
    315 F.R.D 270 (N.D. Cal. 2016)............................................................ 35

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    31 F.4th 651, 663 (9th Cir. 2022) ..................................................... *passim*

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
    993 F.3d 774 (9th Cir. 2021)......................................................... 26, 27, 32

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015)............................................................... 25

*Pac. Bonding Corp. v. Cal. Bail Agents Ass'n*,
    No. CIV 439663 (Cal. Super. Ct. June 1, 2004) ...................................... 6, 8

*Pac. Bonding Corp. v. Garamendi*,
    No. GIC 815786 (Cal. Super. Ct. Aug. 8, 2003)....................................... *passim*

*Pac. Bonding Corp. v. Garamendi*,
    No. GIC 815786 (Cal. Super. Ct. Feb. 4, 2004)........................................... 6

*In re Packaged Seafood Prods. Antitrust Litig.*,
    No. 3:15-md-02670-DMS-MDD, 2022 WL 4283551 (S.D. Cal. Jan. 26, 2022) .................. 24

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014)............................................................... 26

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    582 F.3d 156 (1st Cir. 2009) .............................................................. 31

*In re Polyurethane Foam Antitrust Litig.*,
    314 F.R.D. 226 (N.D. Ohio 2014) .......................................................... 32

*In re Pork Antitrust Litig.*,
    665 F. Supp. 3d 967 (D. Minn. 2023) ...................................................... 32

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Qualcomm Antitrust Litig.*,
    328 F.R.D. 280 (N.D. Cal. 2018) ........................................................................ 24

*Rosack v. Volvo of Am. Corp.*,
    131 Cal. App. 3d 741 (1982) ............................................................................... 32

*In re Rubber Chems. Antitrust Litig.*,
    232 F.R.D. 346 (N.D. Cal. 2005) ........................................................................ 33

*Ruiz Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ................................................................ 23, 30, 34

*Smith v. City of Oakland*,
    339 F.R.D. 131 (N.D. Cal. 2021) ........................................................................ 23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    264 F.R.D 603 (N.D. Cal. 2009) ......................................................................... 27

*Stromberg v. Qualcomm Inc.*,
    14 F.4th 1059 (9th Cir. 2021) .............................................................................. 22

*In re Tableware Antitrust Litig.*,
    241 F.R.D. 644 (N.D. Cal. 2007) ........................................................................ 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 291 (N.D. Cal. 2010) ........................................................................ 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    267 F.R.D. 583 (N.D. Cal. 2010) ........................................................................ 24

*In re Titanium Dioxide Antitrust Litig.*,
    284 F.R.D. 328 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013) ..................... 33

*In re Urethane Antitrust Litig.*,
    768 F.3d 1245 (10th Cir. 2014) ........................................................................... 32

*Valentino v. Carter-Wallace, Inc.*,
    97 F. 3d 1227 (9th Cir. 1996) .............................................................................. 34

*In re Volkswagen "Clean Diesel" Litig.*,
    MDL No. 2672 CRB, 2017 WL 672727 (N.D. Cal. Feb. 16, 2017) ................................ 34, 35

*Wal–Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................... 23

*Wortman v. Air New Zealand*,
    326 F.R.D. 549 (N.D. Cal. 2018) ........................................................................ 23

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Xyrem Antitrust Litig.*,
No. 20-md-02966-RS, 2023 WL 3440399 (N.D. Cal. May 12, 2023) ................................... 30

**Statutes**

Cal. Ins. Code § 1861.05(a) ............................................................................................. 5

**Court Rules**

Fed. R. Civ. P. Rule 23 ........................................................................................... 1, 3, 22

Rule 23(a) ...................................................................................................................... 22, 23

Rule 23(a)(2) ....................................................................................................................... 23

Rule 23(b) ...................................................................................................................... 22, 33

Rule 23(b)(2) ..................................................................................................... 3, 22, 25, 26

Rule 23(b)(3) ..................................................................................................... 3, 22, 24, 26

Rule 23(g) ............................................................................................................................. 1

Rule 23(g)(3) ...................................................................................................................... 25

**Other Authorities**

12 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
Antitrust Principles and Their Application* ¶ 2002 (4th ed.)................................... 13

Cal. Dep't Ins., *Prop 103 Consumer Intervenor Process*,
https://www.insurance.ca.gov/01-consumers/150-other-prog/01-intervenor
(last visited Dec. 10, 2024) ........................................................................................ 4

L.A. Times, *Bail Bond Chief Takes Plea Deal* (June 26, 2004),
https://www.latimes.com/archives/la-xpm-2004-jun-26-me-bailplea26-
story.html ................................................................................................................... 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## NOTICE OF MOTION AND MOTION

**TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on a date and time to be decided, before the Honorable Jon S. Tigar, District Judge of the United States District Court, Northern District of California, Oakland Courthouse, Courtroom 6, 2nd Floor, 1301 Clay Street, Oakland, California, individual and representative plaintiffs Shonetta Crain and Kira Monterrey ("Plaintiffs") will and hereby do move the Court for an order certifying a class (the "Class") pursuant to Rule 23 of the Federal Rules of Civil Procedure, defined as follows:

> All persons who, between February 24, 2004, and August 14, 2023 (the "Class Period"), paid for part or all of a commercial bail bond premium in connection with a California state court criminal proceeding. Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, and any person acting on their behalf; any person who acted as a bail agent during the Class Period; any judicial officer presiding over this action and members of their immediate family and judicial staff; and any juror assigned to this action.

Plaintiffs also hereby move the Court, pursuant to Rule 23(g), to appoint them as Class representatives and to confirm as final the Court's prior interim appointment (*see* ECF No. 44) of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") as Class Counsel.

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Declaration of Dean M. Harvey, filed herewith, and the exhibits thereto, including the Expert Report of Hal J. Singer, Ph.D., the Declarations of Shonetta Crain and Kira Monterrey, the pleadings and papers on file in this action, and any such other matters as may be properly presented to the Court at the time of or after hearing on this matter.

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3

"I can safely predict that if left unchecked, rampant premium discounting will result in the end of the bail bond business as we know it, to be replaced by a new model that properly reflects the proper balance of risk and reward.  Simple economics dictate it."

4

5

- Defendant William B. Carmichael, President and CEO of Defendant American Surety Company (Harvey Decl. Ex. 35 at 3)

6

7



8

9

10

11

12

- California Bail Agents Association Area Director Sean Cook (Harvey Decl. Ex. 58 at 1)

13

14

15    I.    **INTRODUCTION**

16         Plaintiffs Shonetta Crain and Kira Monterrey seek redress for themselves and a proposed

17    Class of California consumers who overpaid for bail bonds because of an unlawful conspiracy

18    among 20 bail bond surety companies (the "Surety Defendants") and conspiracy ringleader

19    Defendant William B. Carmichael, the long-time President and CEO of Surety Defendant ASC.[1]

20

21    _____

[1] The Surety Defendants are: Accredited Surety and Casualty Company, Inc. ("Accredited"); AIA Holdings, Inc., Allegheny Casualty Company ("Allegheny"), and International Fidelity Insurance Company ("IFIC") (collectively, "AIA Defendants"); American Contractors Indemnity Company ("ACIC"); American Surety Company ("ASC"); Bankers Insurance Company ("Bankers"); Continental Heritage Insurance Company ("Continental"); Danielson National Insurance Company ("Danielson"); Financial Casualty & Surety, Inc. ("FCS"); Indiana Lumbermens Mutual Insurance Company ("ILM"); Lexington National Insurance Company ("Lexington"); Lexon Insurance Company ("Lexon"); The North River Insurance Company ("North River"), Seneca Insurance Company ("Seneca"), and United States Fire Insurance Company ("U.S. Fire") (collectively, "C&F Defendants"); Seaview Insurance Company ("Seaview"); Sun Surety Insurance Company ("Sun Surety"); Universal Fire & Casualty Company ("Universal"); and Williamsburg National Insurance Company ("Williamsburg").  Two Surety Defendants— Danielson and Lexon—reached settlement agreements with Plaintiffs, for which the Court granted Plaintiffs' preliminary approval motion.  *See* ECF No. 512.

22

23

24

25

26

27

28

1    Plaintiffs allege Defendants conspired to fix prices for bail bonds through two methods:  first,

2    Defendants conspired to maintain an artificially high "standard" bail bond premium rate of 10%;

3    second, Defendants conspired to suppress rebating by bail bond agents, which is (and was

4    throughout the Class Period) a lawful method of making bail bonds more affordable to customers.

5    Defendants' conspiracy violated the Cartwright Act, California Business and Professions Code

6    section 16720; Unfair Competition Law, California Business and Professions Code section

7    17200; and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.  Plaintiffs allege this

8    conspiracy began no later than 2004 and continued throughout the Class Period.

9         Plaintiffs seek to certify a damages class under Rule 23(b)(3) and an injunctive relief class

10   under Rule 23(b)(2).  Plaintiffs seek to represent other California bail bond purchasers—a

11   particularly vulnerable population who (like them) paid inflated prices for bails bonds as a result

12   of Defendants' conspiracy, and for whom (like them) those extra dollars were critical sums.  The

13   proposed Class satisfies each required element of Rule 23.  The Class consists of over two million

14   members for whom common questions—such as the existence of Defendants' conspiracy—

15   predominate over individual questions.  Plaintiffs are typical and adequate Class representatives

16   who have secured adequate proposed Class Counsel.  Finally, a class action is vastly superior to

17   over two million individual actions for fairly and efficiently adjudicating these claims.

18   **II.**    **SUMMARY OF DEFENDANTS' CONSPIRACY**

19        **A.**    **The Conspiracy Begins in 1953**

20        Throughout the Class Period, all Surety Defendants submitted the same "standard rate" to

21   CDI: 10% of the total bail amount.  Harvey Decl. ¶ 17.  They admit this 10% standard price was

22   not the result of any actuarial analysis, and did not reflect any financial consideration such as risk

23   of loss.  Indeed, several Surety Defendants proudly boasted they never sent a penny to a

24   California Court in connection with a bail forfeiture.  Harvey Decl. Ex. 3 at -282; Ex. 4 at -577;

25   Ex. 5 at -370; Ex. 6 (Blackwell Dep.) at 80:20-25; Ex. 7 (Lauricella Dep.) at 125:21-126:1.  The

26   10% standard price results from a price-fixing conspiracy, not independent assessments of risk.

27        Defendants' conspiracy dates back to 1953, when California sureties "that specialize in

28   bail" used their trade association (then called the Surety Association of America, or "SAA," now

1   known as the Surety and Fidelity Association of America, or "SFAA") to ███████████

2   ███████████████████████████████████████████████████[2]  Harvey Decl. Ex. 8 at

3   -573, -582 (copy of original letter dated 1953).  SFAA did so.  Over the following *four decades*,

4   ███████████████████████████████████████████████████████████████████████████████

5   ██████████.  *Id.* at -573.  All Surety Defendants have been dues-paying members of the

6   SFAA, and nearly all still are.  *See* Harvey Decl. Ex. 9 (SFAA members).  And nearly all Surety

7   Defendants have been members of SFAA's Bail Bond Advisory Committee since 2003.  *See*

8   Harvey Decl. Exs. 10-12.  ████████████████████████████████████████████████

9   ██████████ (Harvey Decl. Ex. 8), Surety Defendants maintained and expanded the conspiracy.

10  All Defendants joined the conspiracy when they submitted the same 10% fixed standard price to

11  CDI.  For instance, when Defendant Seaview Insurance Company ("Seaview") entered the

12  California market in 2011, Seaview admitted its 10% "standard rate" was "based on Surety

13  Association of America (SAA) pricing.  SAA pricing up to the time they ceased promulgating

14  rates was based on 2% of liability plus 8% service fee."  Harvey Decl. Ex. 13 at 5.  This was a

15  classic, naked price-fixing agreement among horizontal competitors.

16  **B.    Proposition 103 Threatens the Fixed 10% Price**

17      A major threat to Defendants' conspiracy arose in 1988, when California voters passed the

18  Insurance Rate Reduction and Reform Act ("Proposition 103").  Proposition 103 allowed bail

19  agents to charge prices below Defendants' fixed rates.  The express purpose of Proposition 103

20  was, among other things, "to protect consumers from arbitrary insurance rates and practices [and]

21  to encourage a competitive insurance marketplace."[3]  In 1990, the California Attorney General

22  issued guidance stating that Proposition 103 allowed for rebating and discounts, and made clear

23  that CDI did not have authority to regulate the competitiveness of filed rates.  ECF No. 67-7.  As

24  the Attorney General explained, "Proposition 103 . . . divest[s] the commissioner of earlier

[2] It bears noting that California bail sureties did not simply fix the standard price charged to consumers, they also █████████████████████████████████.  *See* Harvey Decl. Ex. 8 at -582.  This split is not subject to CDI review, and is purely a matter of private contracting between a surety and its agents.  Bail surety-agent contracts are not public and highly confidential.

[3] Cal. Dep't Ins., *Prop 103 Consumer Intervenor Process*, https://www.insurance.ca.gov/01-consumers/150-other-prog/01-intervenor (last visited Dec. 10, 2024).

1    authority over the competitiveness of rates." *Id.* at 35.  The California Insurance Code similarly

2    explains that while the CDI reviews and approves premium rates that sureties submit, it is

3    prohibited from—and does not—assess whether premiums submitted to it result from unlawful

4    coordination among competing sureties:  "In considering whether a rate is excessive, inadequate

5    or unfairly discriminatory, *no consideration shall be given to the degree of competition.*"  Cal.

6    Ins. Code § 1861.05(a) (emphasis added).  The only way for California consumers to enforce the

7    competition that Proposition 103 was designed to create is through private antitrust actions like

8    this one.  *See Donabedian v. Mercury Ins. Co.*, 116 Cal. App. 4th 968, 982–83 (2004), *as*

9    *modified on denial of reh'g* (Cal. App. Mar. 30, 2004) (describing "use of private attorneys

10    general" for enforcement of § 1861).

11         **C.**     **The Industry Protects the Conspiracy and Prevents California's Largest Bail**

12                   **Agency—Aladdin—from Offering Competitive Prices**

13         At the time (and continuing to today), the largest bail agency in California by far was

14    Pacific Bonding Corporation, Harvey Decl. Ex. 14 (Hayes Dep.) at 36:5-8; Ex. 15 ¶ 1, which did

15    business as "Aladdin."  Aladdin accounts for ▮▮▮ of all bail bond sales during the Class Period.

16    Harvey Decl. Ex. 16 (Singer Rep., Ex. 2 at p. 23).  When California passed Proposition 103,

17    Aladdin was owned and operated by Robert Spencer Douglass.  Under Douglass's leadership,

18    Aladdin took advantage of the competition that Proposition 103 permitted and offered bail bond

19    prices below filed rates.  *See* Harvey Decl. Ex. 17.  This alarmed Aladdin's competitors, who

20    disparaged Douglass publicly and privately.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at -923. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25    ▮▮.  Harvey Decl. Ex. 18.  Others in the industry shared the sentiment.  *See* Harvey Decl. Ex. 19

26    at -249 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27    ▮▮▮.

28         Douglass sought to make clear that Proposition 103 applied to bail bonds and permitted

charging consumers prices below filed rates.  On August 8, 2003, Douglass filed a lawsuit on behalf of his company (Pacific Bonding) against John Garamendi, who was then California's Insurance Commissioner, seeking declaratory relief to invalidate a regulation created before Proposition 103 that prohibited rebates, and a permanent injunction prohibiting enforcement of the anti-rebating regulation.  Harvey Decl. Ex. 20 (Complaint, *Pac. Bonding Corp. v. Garamendi*, No. GIC 815786 (Cal. Super. Ct. Aug. 8, 2003)).  As part of the lawsuit, Pacific Bonding filed a declaration from its President, Steffan Gibbs, explaining that rebates "allow bail agents to return money to insureds in consideration of the business transacted, thereby lowering costs for insureds and increasing competition."  Harvey Decl. Ex. 15 ¶ 3.  Gibbs also explained that confusion over the legality of rebating commonly impacts bail bond consumers: "the general public pays increased premiums for bail bonds due to the inability of bail agencies to offer rebate programs and due to reduced competition."  *Id.* ¶ 6.  The case went to trial, and Pacific Bonding prevailed. On February 24, 2004, Judge Styn of San Diego County Superior Court held that Proposition 103 repealed the anti-rebating regulation, and he enjoined the California Insurance Commissioner from enforcing it.  Harvey Decl. Ex. 21 (Statement of Decision, *Pac. Bonding Corp. v. Garamendi*, No. GIC 815786 (Cal. Super. Ct. Feb. 4, 2004)).  The outcome removed any doubt that charging bail bond prices below filed rates through rebating is lawful in California.  *See* Harvey Decl. Ex. 2 (Carmichael Dep.) at 79:3-9; Ex. 22 (Nairin Dep.) at 92:4-16; Ex. 23 (Mehr Dep.) at 36:1-14.

While Douglass won the battle, he lost the war.  The bail industry retaliated against him with a concerted campaign to boycott and defame him.  This forced Douglass to fight on two fronts: establishing the right to rebate, while litigating a defamation, tort, and unfair competition case against the trade association for California bail agents (the California Bail Agents Association, or "CBAA"), and several other leading members of the bail industry.  *See* Harvey Decl. Ex. 24 (First Amended Complaint, *Pac. Bonding Corp. v. CBAA*, No. CIV 439663 (Cal. Super. Ct. Mar. 26, 2004)).  Douglass provided a copy of the following letter purportedly sent to "every attorney" in six California counties, *one month* after he filed his case seeking to establish

- 6 -

1   the right to rebate:

2

3   TO WHOM IT MAY CONCERN.

4   TO EVERY ATTORNEY:        SAN FRANCISCO COUNTY
                              SAN MATEO COUNTY
5                             SANTA CLARA COUNTY
                              MARIN COUNTY
6                             ALAMEDA COUNTY
                              NORTH COUNTY
7

8   PLEASE SEE THE FOLLOWING INFORMATION ON THE ILLEGAL ACTIVITY
    REGARDING  ROBERT SPENCER DOUGLAS
9   A.K.A. ALADDIN BAIL BONDS.

10  OUR ASSOCIATION IS PUTTING ALL ATTORNEYS ON NOTICE. WE ARE MAKING
    A LIST AND CHECKING IT TWICE.  IF WE HEAR OF ANY ATTORNEYS REFER-
11  RING ALADDIN BAIL BONDS, YOU WILL BE LISTED ON OUR BLACK LIST AND
    NEVER REFER ANOTHER CLIENT FROM ANY OTHER BAIL BONDS OFFICE.
12
    WE AS A STATE WIDE ASSOCIATION ARE SICK OF CUSTOMERS BEING LIED
13  TO AND QUOTED ILLEGAL RATES. HOW CAN YOU SEND YOUR CLIENTS TO
    SUCH A PLACE.
14
    WE ARE TRULY SORRY IT HAD TO COME TO THIS.
15

16  *Id.* ¶¶ 34-46; Harvey Decl. Ex. 25 (First Am. Compl. Ex. B).  Douglass also provided detailed

17  allegations regarding a concerted effort to hire a free-lance "investigative reporter" to write what

18  would appear to be an objective investigation of the bail industry, but was in fact a "hit-piece" on

19  Douglass, with the intent of driving him out of business.  Harvey Decl. Ex. 24 ¶¶ 21-33.

20  Douglass also filed a copy of the report.  Harvey Decl. Ex. 26 (First Am. Compl. Ex. A).

21        The industry's retaliation succeeded.  The Riverside County District Attorney's office

22  prosecuted Douglass for illegal solicitation of bail business (a crime unrelated to rebating) and, on

23  June 26, 2004, Douglass accepted a plea deal requiring him to give up his license and sell

24  Aladdin.[4]  The bail industry drove Douglass out of the market, only four months after he

25  established the right to rebate.  The industry sent a powerful message to every agent in the State:

26  if you rebate, we will come after you and put you out of business.

27

28  [4] *See* L.A. Times, *Bail Bond Chief Takes Plea Deal* (June 26, 2004),
    https://www.latimes.com/archives/la-xpm-2004-jun-26-me-bailplea26-story.html.

1

**D.    Douglass's Own Lawyer—Robert Hayes—Purchases Aladdin and Upholds the Conspiracy**

2

3    Douglass sold Aladdin to Robert Hayes, who owns and runs Aladdin to this day.[5]    Hayes

4    is the largest investor in both Aladdin and Defendant Seaview Insurance Company, which

5    provides powers for Aladdin's bail bonds.  *See* Harvey Decl. Ex. 27 at 4.  Hayes was also a

6    member of Seaview's board of directors, who "manage the business and affairs of [Seaview]."

7    *Id.*; Harvey Decl. Ex. 14 (Hayes Dep.) at 51:17-21.  Hayes recognized a good business

8    opportunity when he saw it, and believed he could run Aladdin more profitably than Douglass.

9    Harvey Decl. Ex. 14 (Hayes Dep.) at 22:21-23:4, 24:25-25:2.

10

11    " *Id.* at 27:14-19.

12    (*id.* at 17:24-18:

13    *Id.* at 47:16-20.  Hayes has no credibility.  Before buying Aladdin,

14    Hayes was a practicing lawyer and the first named partner of a law firm: Hayes Simpson Greene

15    LLP.  *Id.* at 12:13-15.

16

17    Hayes and his firm represented Pacific Bonding in *both cases*; in

18    fact, *Hayes was the lead attorney on both complaints.*  Harvey Decl. Ex. 28 (Compl. at 1, 9, *Pac.*

19    *Bonding Corp. v. CBAA*, No. CIV 439663 (Cal. Super Ct. Nov. 3, 2003)); Ex. 20 (Compl. at 1, 8,

20    *Pac. Bonding v. Garamendi*).  In purchasing Aladdin from Douglass, Hayes knew exactly what

21    he was doing.  He gave up his law practice to maintain and profit from a price-fixing conspiracy

22    that his own client had sought to disrupt.

23    After his purchase of Aladdin but before the creation of Seaview, Hayes sold bail bonds

24    on behalf of                                         Harvey Decl.

25    Ex. 14 (Hayes Dep.) at 50:12-21.  While Hayes profited from the ongoing conspiracy from the

26    agency side, he wanted to also profit from the conspiracy from the surety side and commenced

27    steps to acquire Seaview in 2011.  Harvey Decl. Ex. 27 at 2.  On August 15, 2012, the CDI

28    ---
[5] Since Hayes's purchase, Aladdin also does business as "Two Jinn, Inc."  Harvey Decl. Ex.14 (Hayes Dep.) at 94:6-19.

1     approved his acquisition of Seaview, which had already sought and obtained approval for the

2     same fixed rates that other Defendants charged, admitting that the basis for it was the fixed rate

3     that SFAA promulgated.  *See id.*; Harvey Decl. Ex. 13 at 5.  Soon after obtaining CDI approval,

4     Seaview underwrote all of Aladdin's bail bonds, through what was essentially a single, vertically

5     integrated enterprise.  *E.g.*, *id.* at 73.

6

7     .  *See* Harvey Decl. Ex. 29.

8

9     .  *Id.* at -632.  In other words, Hayes

10     directed Aladdin to mislead its customers into believing that only the fixed rates were available

11     by law, and to only offer a rebate if needed to get the business, from the very limited subset of

12     customers who had the wherewithal to know to ask.

13     .  Singer Rep., Ex. 30 at

14     p. 90.  Everyone else, including Plaintiff Monterrey, was misled into paying the full fixed rates.

15     Monterrey Decl. ¶¶ 4-5.  Hayes is unrepentant about misleading his customers:

16     Harvey Decl. Ex. 14

17     (Hayes Dep.) at 212:2-9; *see also id.* at 212:11-213:21.

18          **E.**     **Defendants Collude to Maintain the Fixed 10% Standard Rate and Suppress**

19              **Rebating**

20         How did Hayes eliminate rebating at Aladdin without losing customers to competing bail

21     agencies?  The reason is that bail agency rebating was essentially nonexistent until many years

22     later, Singer Rep. ¶¶ 140-148, and even then bail agencies did not advertise their ability to rebate,

23     or market effective prices below fixed filed rates, *e.g.*, Harvey Decl. Exs. 30-31.  There was no

24     reasonable way for a typical consumer of bail bonds to see through Defendants' collusive

25     misrepresentations like: "The cost of the bail bond itself is regulated by the State of California

26     and is 10% of the bail amount."  Harvey Decl. Ex. 30 (Greg Padilla Bail Bonds website).  This

27     was no remarkable coincidence across thousands of individual bail agents.  Nor was it the result

28     of independent decision-making or conscious parallelism.  Bail bonds are commodity products.

1   A purchaser of a bail bond does not care if the bond is underwritten by ASC or Lexington, or if it

2   is sold to them by Aladdin or All-Pro.  Consumers only care how fast they can get their relatives

3   or themselves out of jail, and at what price.  *E.g.*, Harvey Decl. Ex 32 (Stahlman Dep.) at 69:13-

4   18; Ex. 33 (Cook Dep.) at 20:4-12.  These are otherwise textbook conditions for competition to

5   bring prices down to near marginal costs.  This did not happen because of a concerted effort

6   among Defendants.

7          Before Proposition 103, the price of a bail bond was dictated only by the filed rate,

8   namely the standard 10% rate fixed by California sureties in 1953 and then adopted and

9   implemented by their trade association SFAA.  By 2003, Defendants' conspiracy was under

10  attack, with Douglass leading the charge via rebating.  Three months before Douglass filed

11  *Pacific Bonding v. Garamendi*,

12                              . Harvey Decl. Ex. 10 at -041.

13

14         . *Id.*

15

16

17                              . Harvey Decl. Ex. 2 (Carmichael Dep.) at 80:22-81:3.

18  The PBUS convention is the biggest event of the year in the bail bond world (Harvey Decl. Ex.

19  22 (Nairin Dep.) at 159:23-160:4; ECF No. 67-2 at 1), and provided opportunities for sureties and

20  bail agents to socialize and converse.

21

22                    . *See* Harvey Decl. Ex. 2 (Carmichael Dep.) at 82:6-25; Ex. 34 (Bench Dep.) at

23  151:13-23 ("We smoked cigars and went to Vegas, we had a good time. . . . it's all a personal

24  business.").

25         In addition to the industry's frequent in-person and off-the-record meetings, mailed

26  publications also maintained the conspiracy.  Carmichael communicated his thoughts in writing to

27  senior executives of other Surety Defendants and with the bail agents who worked for them, by

28  mailing them copies of ASC's newsletters,

1   [REDACTED].  Harvey Decl. Ex. 2 (Carmichael Dep.) at 83:1-84:23.  In February 2005, about a

2   year after the *Garamendi* decision, Carmichael sounded an alarm: "2005 will not be a year when

3   we, as an industry, can sit passively by while competitive forces continue to encroach upon our

4   markets.  This coming year also yields a continuing trend by our agent partners in many parts of

5   the U.S. to provide premium credit or rate discounting in order to be perceived as competitive.  I

6   certainly don't know which is more damaging or troublesome for our industry."  Harvey Decl.

7   Ex. 35 at 3.  "Agents must be our industry's eyes, ears and mouths in recognizing and alerting all

8   to the impending attack.  When you become aware of a situation, please contact us so that we

9   may work alongside of you to craft an appropriate response."  *Id.*  "Advocates argue that the

10  market dictates that they charge and collect less than the filed rate.  Regrettably, this naïve

11  assumption fails to fully grasp all the variables that have been used to determine the original rate

12  filing."  *Id.*  This was a lie.  [REDACTED]

13  [REDACTED]

14  [REDACTED].  *See* Harvey Decl. Ex. 2 (Carmichael Dep.) at 71:10-17; Ex. 36 (Schneider Dep.) at 27:12-

15  18.  Surety Defendants' public rate filings admitted the same.  Harvey Decl. Ex. 37 at -062; Ex.

16  38 at 17 ("**There is no actuarial justification for bail bond rates filed by any insurance**

17  **company writing bail bond surety**.") (emphasis in original).

18          Throughout this case, Surety Defendants have argued that rebating was irrelevant to them

19  because agent rebating did not lower the surety share of the premiums.  This, too, is false.

20  Carmichael explained in writing to other Surety Defendants and their agents why it was critical to

21  suppress rebating: "Surety companies have continued to accept less and less as their share of the

22  premium in the form of higher and higher commission rates to the agents."  Harvey Decl. Ex. 35

23  at 3.  This is consistent with other contemporaneous written admissions, [REDACTED]

24  [REDACTED]

25  [REDACTED]

26  [REDACTED]

27  [REDACTED]

28

1   ████  Harvey Decl. Ex. 39  at -171 (emphasis added).[6]  Carmichael further explained in a

2   written communication to his competitors: "I can safely predict that if left unchecked, rampant

3   premium discounting will result in the end of the bail bond business as we know it, to be replaced

4   by a new model that properly reflects the proper balance of risk and reward.  Simple economics

5   dictate it."  Harvey Decl. Ex. 35 at 3.  It is difficult to imagine a more telling admission regarding

6   the common impact of a price-fixing conspiracy.

7       Of course, Carmichael had no intention of leaving competition "unchecked."  *Id.*  He

8   understood that Defendants' price-fixing conspiracy required active maintenance and

9   enforcement to survive.  He invited Defendants and their agents to join this effort: "I urge all of

10  us to recognize the serious nature of the threat to our industry and work collectively to repel them.

11  Leaving profits on the table, in the form of discounts or uncollected accounts receivable, is a

12  fool's game.  It reminds me of stripping the wood off the walls for a fire to stay warm.  It works

13  briefly but eventually you have no fire <u>and</u> no building."  *Id.* (emphasis in original).  ████

14  ████████████████████████

15  ████████████████████████

16  ███  Harvey Decl. Ex. 11.  ████

17  ████████  *Id.* at -881.  ████████

18  ████████████████████████

19  ████████  *Id.* at -882.  ████████

20  ████████████████████████

21  ████████████████████████

22  ████  Harvey Decl. Ex. 43 at -278.

23  _____

24  [6] Indeed, holding the line on their █████████████

25  ████████████████████████

26  ████████████████████████.  *See* Harvey

27  Decl. Ex. 2 (Carmichael Dep.) at 98:1-11, 240:4-24; Ex. 40 (Francis Dep.) at 59:6-61:5; Ex. 41 (Holtschneider Dep.) at 22:18-23:7; Ex. 42 (Thompson Dep.) at 68:1-69:2; Ex. 33 (Cook Dep.) at 21:1-10; Ex. 23 (Mehr Dep.) at 47:13-48:6.

1
2 .
3 *See* Harvey Decl. Ex. 41 (Holtschneider Dep.) at 188:2-23 (discussing Harvey Decl. Ex. 44); Ex.
4 45.  There is no way to understand this omission other than a concerted effort to prevent agents
5 from rebating.
6 .[7] *See* Harvey Decl. Ex. 41
7 (Holtschneider Dep.) at 138:1-15; Ex. 46.
8
9
10
11
12
13 . *Id.*
14        Only three months after Carmichael asked his competitors to "work collectively to repel"
15 competition, he and other Defendants created a new trade association to do just that: the
16 California Bail Insurance Group ("CalBIG").  Harvey Decl. Ex. 47.
17
18
19
20
21
22
23
24                                                              Harvey
25 Decl. Ex. 47 at -614.
26        One month later, Carmichael sent another written communication to the Surety

---

[7] "Individual members of a cartel always have an incentive to cheat and will do so when cheating
seems profitable." 12 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of
Antitrust Principles and Their Application* ¶ 2002 (4th ed.).

1    Defendants and their agents.  Harvey Decl. Ex. 48 at 3.  In it, he warned that "premium

2    discounting" threatened to be the main source of trouble for the industry.  *Id.*  "I don't know who

3    the math wiz was who thought this was a good idea but they get my vote for a lifetime vacation in

4    Guantanamo."  *Id.*  He again exhorted his competitors to join his efforts to maintain their ongoing

5    conspiracy: "My point in that we attempt to be actively involved in every facet of our industry.

6    We're not content to simply write bail.  We recognize the important role a surety must play in

7    protecting our markets.  If only every competitor we have would do the same."  *Id.*

8           At the same time as this message, members of CalBIG continued to discuss how best to

9    enforce the 10% fixed price.  Harvey Decl. Ex. 49.  From the start, they all understood there was

10   no legitimate legislative or regulatory solution: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id.* at -482 (emphases added).

14   They knew they had to maintain the conspiracy themselves, but they also knew that such an effort

15   was illegal.  So they used the appearance of government petitioning as a pretext to accomplish

16   privately what they knew they could not accomplish through government action. ▮▮▮▮▮

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮  *Id.*  As testimony makes

22   clear, such a proposal would have effectively made rebating impossible, and put anyone who

23   rebated out of business for a single violation.  *Id.*; Harvey Decl. Ex. 2 (Carmichael Dep.) at

24   136:21-137:6; Ex. 22 (Nairin Dep.) at 71:1-11.

25           Lexington was the only member of CalBIG who had reservations. ▮▮▮▮▮▮▮

26   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28   ▮▮▮▮▮▮▮▮▮▮▮▮▮  Harvey Decl. Ex.

1   51. ██████████████████████████████████ *Id.* Parton later

2   communicated his reservations to CalBIG as follows: ████████████████

3   ███████████████████████ Harvey Decl. Ex. 52 at -310.

4       Lexington's reservation infuriated Carmichael: ██████████████

5   ██████████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████████

9   ██████████████████████████████████████

10  ██████████████████████████████████

11  ████████████████████████████████████████

12  █████████████████████████████████ *Id.*

13      Carmichael's browbeating worked. ██████████████████████

14  ████████████████████████████████████████

15  ████████████████████████████████████

16  ████████████████████████████████████

17  ██████████████████████████████████████

18  ████████████████████████████████████

19  ███████████████████ Harvey Decl. Ex. 53.  Parton also endorsed their collective plan to

20  leverage their agents to get California's two bail agent trade associations on board. ████

21  ████████████████████████████████████████

22  ████████████████████████████████████████

23  ████████████████████████████████████

24  ██████████████████████████████████

25  ██████████████████ *Id.* (emphasis in original).  Parton added:

26  ████████████████████████████████████████

27  ████████████ *Id.*

28      In the ensuing years, the Surety Defendants actively maintained their price-fixing

conspiracy in a variety of ways, colluding to fend off competition when necessary.  These efforts

fell into two categories: keeping the benchmark standard price at 10%, and discouraging price

competition below filed rates.  As Parton colorfully explained, these efforts sometimes required

collusion with bail agents and their trade associations.

*Id.*; Harvey Decl. Ex. 24 (First

Am. Compl. at 2, *Pacific Bonding v. CBAA*).

Harvey Decl. Ex. 54 at -817.

Lexington's Mark Holtschneider was a lead player from the Surety Defendants (*id.* at -818),

Harvey Decl. Ex. 41 (Holtschneider

Dep.) at 156:2-16.

Harvey Decl. Ex. 55 at -957.  In other words, to agree on how and whether to price

below fixed rates.  And that is what they did.  They agreed to spread at least three pernicious and

related lies: rebating under any circumstances was improper and could land you in trouble with

CDI; agents cannot lawfully advertise bail bond prices below filed rates; and agents should

charge full filed rates because the rates result from financial risk analysis (when they were

actually set arbitrarily by a price-fixing agreement).

In the year following the creation of the Rebate/Discount Committee, CDI created its own

committee regarding the bail industry (the "CDI Bail Ad Hoc Committee"), and a variety of co-

conspirators attended, including AIA's Brian Nairin, the Presidents of both CBAA and GSBAA,

and Aladdin's Hayes.  Harvey Decl. Ex. 56.  Hayes proposed a "fixed 10% rate," but CDI told

1   him that would be contrary to Prop 103. *Id.* at -262-63.[8]  With respect to rebating, Hayes testified

2   ███████████████████████████████████████████████████████████████████████████

3   ███████████████████.  Harvey Decl. Ex. 14 (Hayes Dep.) at 29:18-23.  This is another of Hayes'

4   falsehoods.  ███████████████████████████████████████████

5   █████████████████████ *Id.* at 28:19-20.  Nairin of AIA testified:  █████████████

6   █████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ██████████████████  Harvey Decl. Ex. 22 (Nairin Dep.) at 188:5-11.  Nairin elaborated:  ███

10  ████████████████████████████████████████████████████████████████

11  ███████████████████████████████████████████████████████ *Id.*

12  at 189:1-5.  There was absolutely no confusion from CDI about the legality of rebating, and the

13  industry representatives who attended that 2010 meeting (Harvey Decl. Ex. 56) lied to the

14  industry when they reported out that there was.  *See* Harvey Decl. Ex. 57 (Padilla Dep.) at 53:14-

15  17.  *That* was the "general consensus."  Harvey Decl. Ex. 56 at -303.

16      In 2012, one bail agent (Chad Conley) dared to buck this collusion and correctly explained

17  on his website that consumers can obtain a ███████████████ through the use of a █████████

18  ████████████████  Harvey Decl. Ex. 58 at -078-79.  This truthful disclosure to the

19  public alarmed the industry.  █████████████████████████████

20  ██████████████████████████████████████████████████████████████████████

21  ██████████████████ *Id.* at -078.  ███████████████████

22  ████████████████████████████████  Harvey Decl.

23  Ex. 59.  The response by the industry was very similar to what happened to Douglass years

24  earlier.  ████████████████████████████████████  Harvey Decl.

25  Ex. 58 at -077.  ████████████████████████████████

26  ███████████████████████████████████████████

27  ─────────────────────

8   ████████████████████████████████████████████████████████████████████████

28  Harvey Decl. Ex. 14 (Hayes Dep.) at 124:5-126:23.

1

2

3

4                  *Id.* at -075, -077.  (There were no risk managers.  Surety loss ratios were

5 essentially zero.  There were no loss mitigation analysts.)

6

7

8

9

10

11

12

13 *Id.*  In other words, we do not talk about price-fixing in writing.

14          Another agent reached out to Conley's surety—Accredited—in 2013 to complain further:

15

16

17

18

19

20                .  *See* Harvey Decl. Ex. 62; Exs. 63-65.  Of course, these efforts had nothing to do

21 with his advertising, which Accredited knew was completely accurate.  This was about enforcing

22 the conspiracy.  Throughout these attacks, Conley continued to educate the bail industry and bail

23 customers on the accurate facts regarding rebating.  Harvey Decl. Ex. 66 at 1.  He explained:

24 "Trust me after the good ol boys club came after my license for trying to save clients money I was

25 forced to study this!  Most people don't want you to know!  *They prefer price fixing and would*

26 *prefer to have it back to only one rate of 10% period*."  *Id.* at 2 (emphasis added).  After

27 Accredited's investigation, a "complainant, acting through Colleen Calia, Background Analyst for

28 [CDI], brought the Accusation."  Harvey Decl. Ex. 67 (*In re License & Licensing Rights of Chad*

1    *Joseph Conley*, No. PLBS 12388-A (Cal. Ins. Comm'r Apr. 18, 2019)).  Conley's license was

2    ultimately revoked for reasons having nothing to do with offering competitive prices, *id.*, just as

3    Douglass's license was.

### F.    Defendants Circle the Wagons and Defend Their Conspiracy from CDI's Excessive Rate Inquiry

6         Defendants' conspiracy continued in this fashion until the fall of 2016, when their fixed

7    prices faced an unprecedented threat.  CDI became concerned that Defendants' standard rate of

8    10% was excessive, and launched an investigation into whether CDI should force Defendants to

9    lower their rates.  CDI sent an identical letter to all Surety Defendants individually, except CHIC.

10   Harvey Decl. Ex. 68.  CDI explained: "If it is determined your company's rates are excessive

11   your company must make an appropriate rate adjustment as soon as possible and in no event later

12   than May 1, 2017.  If the rate adjustment is not implemented until after May 1, 2017, your

13   company will be required to refund excess premiums charged to all affected policyholders." *Id.*

14   at -955-56.  Defendants had to either lower their rates, or risk being forced to refund excessive

15   premiums to all injured customers. *Id.*; *see also* Harvey Decl. Ex. 69 at -779 (████████████

16   ████████████████████████████████████████████████████████████████████).

17        Defendants sprung into action.  They immediately reached out to each other, and

18   determined they received the same letter.  They assembled a chart demonstrating this.  Harvey

19   Decl. Ex. 68 at -958.  They all had the same unlawful purpose: to make sure no one filed lower

20   rates, and to prevent CDI from forcing them to lower rates to a competitive level.  They put the

21   matter at the top of the agenda for trade association meetings, ████████████████████████

22   ████████████████████████████████████████████.  Harvey Decl. Ex. 70.

23   ABC was yet another trade association of Defendants dominated by Carmichael. *Id.*  ABC had an

24   appropriate set of Antitrust Guidelines, but gave enforcement responsibility to its Chairman:

25   Carmichael.  Harvey Decl. Ex. 71.  Comparing this situation to a fox guarding a henhouse would

26   be an insult to foxes.  Carmichael and his co-conspirators demonstrated contemptuous disregard

27   for their own Antitrust Guidelines.  Among other things, the Guidelines prohibited any discussion

28   or activity that included "any discussion or action, for any purposes or in any fashion, of pricing

1    methods," or any "other discussion or action which tend to restrict competition in any manner

2    between members or within the industry." *Id.* at -431-32.  To Carmichael and his co-conspirators,

3    the *entire purpose* of these trade associations was to restrict competition.

4           To cover their tracks, Defendants had ABC's Executive Director, Jeff Clayton, read the

5    Guidelines at the start of every meeting, ████████████████████████████████████████.

6    Harvey Decl. Ex. 70 at -782.  Emails exchanged among Defendants immediately preceding that

7    meeting make clear that the CDI excessive rate inquiry, and their coordinated response to it, was

8    the only topic Defendants wanted to discuss.  Harvey Decl. Ex. 72; Ex. 68 at -957; Ex. 22 (Nairin

9    Dep.) at 209:1-210:6.  Defendants discussed the CDI inquiry, and how to best collude to ensure

10   that no one would lower their standard 10% rate, but the official agenda of the meeting simply

11   referred to ████████████████████████  Harvey Decl. Ex. 70 at -782.  And, while ABC's

12   Antitrust Guidelines require that the minutes "accurately record what actions were taken at the

13   meeting," Harvey Decl. Ex. 71 at -431, the official minutes make no mention of what Defendants

14   actually discussed or decided to do.  ████████████████████████████████████████████

15   ████████████████████  Harvey Decl. Ex. 73 at -507.  At his deposition, Carmichael explained

16   the fraudulent minutes as follows: ████████████████████████████████████████████████

17   ████████████████████████████████████  Harvey Decl. Ex. 2 (Carmichael

18   Dep.) at 216:18-20.  *See also id.* at 216:5-218:14. ████████████████████████

19   ████████████████████████████████████  Harvey Decl. Ex. 73 at -506.

20   *See also* Harvey Decl. Ex. 2 (Carmichael Dep.) at 218:15-220:13.

21          Defendants communicated in two modes.  In one mode, their emails appear relatively

22   innocuous, often copying Clayton (who had the thankless task of reading the Antitrust Guidelines

23   at the start of ABC meetings), in which Defendants made comments like "We are mindful of

24   antitrust rules and understand there will be no discussion of rates during the call."  Harvey Decl.

25   Ex. 68 at -955.  In other communications that do *not* copy Clayton, Carmichael and other

26   Defendants collude regarding their rates.  Plaintiffs cannot provide these emails to the Court,

27   however, because ASC and Lexington are attempting to claw them back on the basis of meritless

28   assertions of privilege.  Plaintiffs are challenging these clawback requests, and filed a joint letter

1    brief with ASC and Lexington regarding them, asking the Court to review the emails at issue in

2    camera.  *See* ECF No. 510.

3         Carmichael's ASC, Lexington, and Bankers led the response to the CDI excessive rate

4    inquiry.  Calling themselves the "Bail Coalition Working Group," they submitted a "White

5    Paper" to CDI reflecting their collusion.  Harvey Decl. Ex. 74.  In it, they admit that the 10% rate

6    was created in 1953, but say falsely that the California Supreme Court established it.  *Id.* at -765.

7    ███████████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████████████

9    ████████████    Harvey Decl. Ex. 8 at -573, -582.  The White Paper also defends the 10% rate

10   on the basis of an opaque formula, but Defendants' executives, including Carmichael, admitted

11   there was no actuarial calculation or formula that resulted in the 10% rate.  Harvey Decl. Ex. 2

12   (Carmichael Dep.) at 71:10-17; Ex. 36 (Schneider Dep.) at 27:12-18; Ex. 6 (Blackwell Dep.) at

13   108:11-25 (discussing Ex. 37); Ex. 75 (Shields Dep.) at 90:5-21 (discussing Ex. 1).  Finally, the

14   White Paper asserts that the standard 10% rate doesn't really matter, because: "For more than the

15   past 10 years, retail bail agents in California have been exercising their right to rebate

16   commissions to consumers at a substantial percentage.  These rebates have reduced premium

17   costs to consumers."  Harvey Decl. Ex. 74 at -765.  This was the height of chutzpah.  After

18   colluding to discourage rebating during that exact period of time, Defendants now justified their

19   fixed 10% rate on the basis of the very rebates they demonized and prevented.  ████████████

20   ███████████████████████████████████████████████████████████████

21   ███████████████████████████████████████████████████████████████████

22   ██████████    Harvey Decl. Ex. 2 (Carmichael Dep.) at 238:16-240:2; Ex. 41 (Holtschneider Dep.)

23   at 259:1-7 ███████████████████████████████.

24        Defendants' gambit worked, in part: CDI did not require most Defendants to lower their

25   fixed 10% rate.[9]  However, Defendants paid a price for their misrepresentations regarding the

26   _____

27   [9] With two exceptions: the CDI required the two AIA sureties—Defendants Allegheny and
     International Fidelity (IFIC)—to lower their standard 10% rate to 9%.  *See* Harvey Decl. Ex. 76 at
28   -580 (███████████████████████████████████████████████████████████████
     ██████████████████████████████████████████████████████████.

extent of rebating.  On January 31, 2017, CDI held an Informational Hearing about the bail

industry, ahead of which Defendants were forced to take the industry-wide stance that rebating

was legal and widespread.  *See* Harvey Decl. Exs. 69, 77.  CDI soon thereafter took limited steps

to educate bail agents on the legality of rebating, including by posting on its website for the first

time in July 2017 a webpage explaining that rebating is legal under Proposition 103.[10]

## III.   LEGAL STANDARDS

To certify a class under Rule 23, plaintiffs must satisfy all four requirements of Rule

23(a)—numerosity, commonality, typicality, and adequacy—and at least one of three sections of

Rule 23(b).  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 663

(9th Cir. 2022) (*en banc*).  Certification of a Rule 23(b)(2) injunctive relief class requires that,

"final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a

whole."  Fed. R. Civ. P. 23(b)(2).  For certification of a Rule 23(b)(3) damages class, the

"questions of law or fact common to class members" must "predominate over any questions

affecting only individual members," and a class action must be "superior to other available

methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Because "class actions play a particularly vital role in the private enforcement of antitrust

actions," "in antitrust cases, courts tend to favor class certification when in doubt."  *In re

Tableware Antitrust Litig.*, 241 F.R.D. 644, 648 (N.D. Cal. 2007) (collecting cases).  The Court

may "treat[] Plaintiffs' federal and state law claims together when certifying the class," including

because "Plaintiffs' UCL claim is premised at least in part upon the Sherman and Cartwight Act

violations."  *Stromberg v. Qualcomm Inc.*, 14 F.4th 1059, 1065 (9th Cir. 2021).  *But see Cipro

Cases I & II*, 61 Cal. 4th 116, 160-61 (2015) ("The Cartwright Act is broader in range and deeper

in reach than the Sherman Act.") (citation omitted).

## IV.   ARGUMENT

### A.   Plaintiffs Satisfy All Four Requirements of Rule 23(a)

Rule 23(a) is satisfied if: "(1) the class is so numerous that joinder of all members is

impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

[10] *See* Harvey Decl. Ex. 78, also available via the Internet Archive at https://web.archive.org/web/2017070 1232156/ http://www.insurance.ca.gov/01-consumers/170-bail-bonds.

1    defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

2    representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P.

3    23(a).  Plaintiffs readily satisfy these threshold requirements.

4                              **1.    The Class Is Numerous**

5            Generally, courts find "a presumption of impracticability of joinder" for classes above 40

6    members.  *See, e.g.*, *Smith v. City of Oakland*, 339 F.R.D. 131, 138 (N.D. Cal. 2021) (citation

7    omitted).  Here, there are over two million Class Members.  Singer Rep. ¶ 2.  As the Court noted

8    in its December 11, 2024 Order, "the joinder of two million Plaintiffs would be impracticable,"

9    and "the numerosity requirement is met."  ECF No. 512 at 6.

10                   **2.    There Is at Least One Common Question with a Common Answer**

11           Certification is appropriate where "a classwide proceeding [can] generate common

12   *answers* apt to drive the resolution of the litigation."  *Ruiz Torres v. Mercer Canyons Inc.*, 835

13   F.3d 1125, 1133 (9th Cir. 2016) (quoting *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350

14   (2011) (emphasis in original).  Not "*every* question of law or fact must be common to the class;

15   all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'"  *Abdullah v. U.S.*

16   *Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (citation omitted) (emphasis in original).

17   That common question need not be one that "will be answered, on the merits, in favor of the

18   class."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).  It must only "be

19   of such a nature that it is capable of classwide resolution."  *Dukes*, 564 U.S. at 350.

20           The Ninth Circuit construes the commonality requirement "permissively."  *Ellis v. Costco*

21   *Wholesale Corp.*, 657 F.3d 970, 981 (9th Cir. 2011).  In this District, "courts have consistently

22   held that the very nature of a conspiracy antitrust action compels a finding that common questions

23   of law and fact exist."  *In re Cathode Ray Tube Antitrust Litig.* (*"CRT III"*), No. 07-CV-05944-

24   JST, 2022 WL 4596621, at *3 (N.D. Cal. Aug. 1, 2022) (Tigar, J.) (quoting *Wortman v. Air New*

25   *Zealand*, 326 F.R.D. 549, 556 (N.D. Cal. 2018)); *see also In re High-Tech Emp. Antitrust Litig.*,

26   985 F. Supp. 2d 1167, 1180 (N.D. Cal. 2013) ("Antitrust liability alone constitutes a common

27   question that will resolve an issue that is central to the validity of each class member's claim in

28   one stroke.") (citation omitted).

1    Here, commonality is established by questions related to Defendants' antitrust liability:

2    (1) whether Defendants entered into the alleged price-fixing conspiracy; (2) whether the

3    conspiracy violated the Sherman Act and California law; (3) whether the conspiracy inflated bail

4    bond prices; and (4) what those prices would have been in the absence of the alleged conspiracy.

5    *See In re Cathode Ray Tube (CRT) Antitrust Litig.* ("*CRT II*"), No. 07-cv-05944-JST, 2020 WL

6    1873554, at *5 (N.D. Cal. Mar. 11, 2020) (Tigar, J.) (common questions included "whether the

7    Defendants engaged in a price-fixing conspiracy that injured Plaintiffs"); *In re TFT-LCD (Flat*

8    *Panel) Antitrust Litig.*, 267 F.R.D. 583, 593 (N.D. Cal. 2010) (common questions included

9    "whether defendants' agreements resulted in an unlawful overcharge" to class members).  The

10   common questions of law concerning Defendants' conspiracy here establish commonality and

11   also, as discussed *infra*, predominance under Rule 23(b)(3).

12                      **3.    Plaintiffs' Claims Are Typical of the Class**

13   Typicality "requires only that the representative's claims are reasonably co-extensive with

14   those of the absent class members; they need not be substantially identical."  *In re Qualcomm*

15   *Antitrust Litig.*, 328 F.R.D. 280, 295 (N.D. Cal. 2018) (quoting *Hanlon v. Chrysler Corp.*, 150

16   F.3d 1011, 1029 (9th Cir. 1998)).  "In antitrust cases, typicality usually will be established by

17   plaintiffs and all class members alleging the same antitrust violations by defendants."  *In re High-*

18   *Tech*, 985 F. Supp. 2d at 1181 (citations omitted).

19   Here, Plaintiffs' claims and alleged injuries stem from the same challenged conspiracy as

20   do other members of the Class.  Both Plaintiffs assert they paid more for their bail bonds than

21   they would have in the absence of Defendants' alleged conspiracy—allegations identical to (and

22   therefore typical of) the Class they seek to represent.  *See CRT II*, 2020 WL 1873554, at *6

23   (typicality satisfied because class representatives and class members purchased the product at

24   supra-competitive levels due to the alleged conspiracy); *In re Packaged Seafood Prods. Antitrust*

25   *Litig.*, No. 3:15-md-02670-DMS-MDD, 2022 WL 4283551, at *4 (S.D. Cal. Jan. 26, 2022)

26   (typicality satisfied where the claims of both the proposed settlement class and of plaintiffs were

27   based on the same conspiracy and antitrust injuries).

28   It is immaterial that Plaintiffs purchased their bail bonds at different times and in different

1    transactions from different bail agents, as typicality does *not* depend on the manner in which a

2    product was purchased.  *See CRT III*, 2022 WL 4596621, at *4 ("In cases involving an alleged

3    price-fixing conspiracy, the representative plaintiff's claim is often considered typical even where

4    the plaintiff followed different purchasing procedures[.]" (citation omitted)).

5                    **4.        Plaintiffs and Counsel Adequately Represent the Class**

6           The adequacy requirement examines whether the proposed representatives have any

7    conflicts of interests with the proposed Class, and whether the plaintiffs are represented by

8    qualified and competent counsel.  *In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig.*,

9    270 F.R.D. 521, 531 (N.D. Cal. 2010).  Only conflicts that are "fundamental to the suit and that

10   go to the heart of the litigation" inform adequacy.  *In re Online DVD-Rental Antitrust Litig.*, 779

11   F.3d 934, 942 (9th Cir. 2015) (citation omitted).  Plaintiffs and their counsel satisfy this prong.

12          Plaintiffs' interests are aligned with, and are not antagonistic to, the interests of other

13   members of the proposed Class.  Crain Decl. ¶ 9; Monterrey Decl. ¶ 9.  Plaintiffs and the Class

14   share a common interest in: (1) maximizing the total monetary recovery to address their economic

15   injuries caused by the conspiracy; and (2) implementing injunctive relief to prevent the alleged

16   misconduct from continuing or reoccurring.  Plaintiffs are well-represented by proposed Class

17   Counsel, who have extensive experience litigating, trying, and settling antitrust class actions.

18   Harvey Decl. ¶¶ 2-10.  Indeed, at the outset of the Action, the Court appointed Lieff Cabraser as

19   Interim Class Counsel.  ECF No. 44.  In so doing, the Court considered the Rule 23(g)(3) criteria.

20   *Id.* at 2-3.  In the nearly six years since, Interim Class Counsel have zealously litigated this action

21   on behalf of the Class.  Harvey Decl. ¶¶ 11-15.  They will continue to do so.  *Id.* ¶ 16.  Further,

22   the Court has deemed Plaintiffs and their counsel as adequate with respect to preliminary

23   approval, noting that "Plaintiffs and their counsel have vigorously prosecuted this action over the

24   past five years."  ECF No. 512 at 11.

25          **B.        Plaintiffs Satisfy the Requirements for a Rule 23(b)(2) Injunctive Class**

26          Class certification is appropriate under Rule 23(b)(2) where "the party opposing the class

27   has acted or refused to act on grounds that apply generally to the class, so that final injunctive

28   relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R.

1  Civ. P. 23(b)(2).  "[T]he Rule 23(b)(2) requirements 'are unquestionably satisfied when members

2  of a putative class seek uniform injunctive or declaratory relief from policies or practices that are

3  generally applicable to the class as a whole.'"  *In re College Athlete NIL Litig.*, No. 20-cv-03919

4  CW, 2023 WL 7106483, at *6 (N.D. Cal. Sept. 22, 2023) (quoting *Parsons v. Ryan*, 754 F.3d

5  657, 688 (9th Cir. 2014)).  "That inquiry does not require an examination of the viability or bases

6  of the class members' claims for relief, does not require that the issues common to the class

7  satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of

8  the class have suffered identical injuries."  *Id.*  "Rather, as the text of the rule makes clear, this

9  inquiry asks only whether 'the party opposing the class has acted or refused to act on grounds that

10  apply generally to the class.'"  *Id.* (quoting Fed. R. Civ. P. 23(b)(2)).

11      Here, Defendants' alleged conspiracy makes final injunctive relief appropriate.  If

12  Plaintiffs prevail on any of their claims, injunctive relief would inure to the benefit of all Class

13  Members.  Defendants' conduct has "applied in the past, in a uniform manner to all members,"

14  and Plaintiffs' requested relief to increase competition in Defendants' collusive market "would

15  enjoin the enforcement of the challenged [conduct]," thereby "provid[ing] uniform relief to all

16  members of the proposed class."  *In re College Athlete*, 2023 WL 7106483, at *6.

17      **C.      Plaintiffs Satisfy the Requirements for a Rule 23(b)(3) Damages Class**

18      To certify a class under Rule 23(b)(3), courts must find that (1) "questions of law or fact

19  common to class members predominate over any questions affecting only individual members"—

20  predominance—and (2) "that a class action is superior to other available methods for fairly and

21  efficiently adjudicating the controversy"—superiority.  Fed. R. Civ. P. 23(b)(3).

22      **1.      Common Issues Predominate**

23      The predominance inquiry focuses on the relationship between common and individual

24  issues.  "To carry their burden of proving that a common question predominates, plaintiffs must

25  show that the common question relates to a central issue in the plaintiffs' claim."  *CRT III*, 2022

26  WL 4596621, at *4 (quoting *Olean*, 31 F.4th at 665).  In antitrust class actions, Plaintiffs must

27  show: "(i) the existence of an antitrust violation; (ii) 'antitrust injury' or 'impact' flowing from

28  that violation (i.e., the conspiracy); and (iii) measurable damages."  *Id.* (quoting *Olean*, 31 F.4th

1   at 665–66).  Specifically, "Plaintiffs must show that 'essential elements of the cause of action,

2   such as the existence of an antitrust violation or antitrust impact, are capable of being established

3   through a common body of evidence, applicable to the whole class,' and that such common

4   questions predominate over individual issues."  *Id.* (quoting *Olean*, 31 F. 4th at 666).

5            "The Supreme Court has observed that antitrust cases readily meet the predominance

6   requirement. . . . The violation turns on *defendants'* conduct and intent along with the effect on

7   the market, *not* on individual class members."  *In re Glumetza Antitrust Litig.*, 336 F.R.D. 468,

8   475 (N.D. Cal. 2020) (citations omitted) (emphasis in original).  Indeed, "[i]t has long been

9   accepted that the predominance test is 'readily met' in horizontal price-fixing antitrust cases."  *In*

10  *re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. C 06-4333 PJH, 2013 WL

11  12333442, at *44 (N.D. Cal. Jan. 8, 2013) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S.

12  591, 625 (1997)), *report and recommendation adopted sub nom. In re Dynamic Random Access*

13  *Memory Antitrust Litig.*, No. C 06-4333 PJH, 2014 WL 12879520 (N.D. Cal. June 27, 2014).  As

14  set forth below, here, too, the common evidence establishing the elements of the Class's antitrust

15  claims predominate over any individual issues.

16                    **a.       Defendants Engaged in a Common Conspiracy**

17           Plaintiffs allege an illegal price-fixing conspiracy with two components that are common

18  to the Class:  a common standard rate of 10%, and suppressing rebating below filed rates.  Such

19  antitrust violations can only be proved on a class-wide basis.  *See CRT III*, 2022 WL 4596621, at

20  *4 ("In price-fixing cases, like this one, courts repeatedly have held that the existence of the

21  conspiracy is the predominant issue and warrants certification even where significant individual

22  issues are present") (citations omitted); *In re High-Tech*, 985 F. Supp. 2d at 1187 (defendants'

23  conspiracy was the overriding, common issue for every class member); *In re Static Random*

24  *Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D 603, 611 (N.D. Cal. 2009) (finding that, if the

25  court finds common proof of defendants' antitrust conspiracy, class certification is warranted on

26  that basis alone).  Here, too, the alleged conspiracy either happened or it did not; this question

27  will be answered, affirmatively or negatively, with the same common evidence for all.  *See supra*

28

1    Section II (summarizing evidence).[11]

2         Further, Plaintiffs retained Dr. Hal Singer, a well-qualified antitrust economist, to

3    determine whether there is additional economic evidence, common to the Class, capable of

4    evidencing the alleged conspiracy.  Singer Rep. ¶¶ 3, 7-11, and Appendix 1.  Dr. Singer first

5    investigated the important economic actors and terms used in the bail bond industry.  *Id.* ¶¶ 13-

6    20.  He then reviews the relevant details of bail bond transactions in California, including the

7    roles of filed rates and rebates.  *Id.* ¶¶ 21-41.  Dr. Singer summarizes the bond forfeiture process,

8    and estimates actual forfeiture rates during the Class Period.  *Id.* ¶¶ 42-46.  He next summarizes

9    Defendants' filed rates during the Class Period, including their universal filing of the same 10%

10   standard rate.  *Id.* ¶¶ 47-51.  Dr. Singer defines the relevant antitrust market, and examines

11   whether Defendants had collective market power sufficient to inflate bail bond prices above

12   competitive levels.  *Id.* ¶¶ 52-65.  He concludes, through both direct and indirect proof common

13   to the Class, that Defendants possessed sufficient market power to conspire profitably.  *Id*.  Dr.

14   Singer investigates the challenged misconduct, and explains how both components of the

15   conspiracy—naked price-fixing of the standard rate and collusive efforts to suppress rebating—

16   could effectively inflate prices of bail bonds across the Class.  *Id.* ¶¶ 66-86.

17        Dr. Singer also assesses economic evidence of the conspiracy itself, using standard

18   econometric and economic theory models.  Singer ¶¶ 87-148.  He first assembles a Classwide

19   dataset of all Class transactions, with estimated prices charged to all Class Members.  *Id.* ¶¶ 94-

20   107.  Dr. Singer begins with Class data produced by Defendants, which identify all Class bail

21   bond purchases: over 3 million transactions.  *Id.* ¶ 95.  The purchase price of all Class

22   transactions followed the same simple formula: Purchase Price = Bond Amount x (Filed Rate –

23   Rebate).  *Id.* ¶ 89.  For example, if a court sets the Bond Amount at $100,000, the applied Filed

24   Rate is 10%, and the agent offers a Rebate of 1%, then the purchase price is $9,000.  Defendants'

25   data provide the Bond Amounts and charged Filed Rates for all Class transactions.  *Id.* ¶¶ 94-98.

26

---

27   [11] In the settlement context, the Court found that the "predominance requirement is satisfied,"
     noting that, "[i]n this case, the predominant issue is 'the existence of the Surety Defendants'
     alleged conspiracy to fix bail bond prices,'" citing Plaintiffs' contention that "the conspiracy
28   inflated the price of bail bonds for all Class Members in the same way."  ECF No. 512 at 12
     (quoting ECF No. 465 at 18-19).

1    Defendants' data did not contain information regarding rebates.  *Id.* ¶ 99.  For rebate information,

2    Dr. Singer directed Plaintiffs to obtain data from bail agencies directly.  *Id.* ¶ 100.  He designed a

3    two-prong census and sampling approach, seeking rebate data from the top bail agencies by

4    volume (census) and a random sample of the rest (sampling).  *Id.*  Dr. Singer used this data to

5    estimate rebates provided to Class Members, which allowed him to estimate prices charged to

6    Class Members net of rebates.  *Id.* ¶¶ 101-107.  Across the Class Period, Dr. Singer estimates that

7    Class Members were charged an average Filed Rate of ▮▮▮ and received an average Rebate of

8    ▮▮▮, resulting in an average Effective Rate of ▮▮▮ (i.e., purchase price).  *Id.* ¶ 90 and Ex. 11.

9        Dr. Singer then turned to estimating what competitive prices for bail bonds would have

10   been in the absence of a conspiracy (prices "but-for" the conspiracy).  He employs two

11   independent but reinforcing analytical methods.  First, Dr. Singer directly models the but-for

12   Effective Rate, using both a theoretical risk-pricing model as well as a marginal cost analysis.  *Id.*

13   ¶¶ 91.  The theoretical model examines bond risk type, probabilities of forfeiture, and

14   administrative costs, and produces a range of competitive Effective Rates: a minimum of ▮▮▮, a

15   maximum of ▮▮▮, and an average across all scenarios of ▮▮▮.  *Id.* ¶¶ 116-117 and Ex. 22.  Dr.

16   Singer also looks at revealed marginal costs, based upon common evidence of bail agents

17   charging certain Effective Rates profitably, and demonstrates a range of between ▮▮▮▮▮

18   which provides independent confirmation and support for the theoretical model.  *Id.* ¶¶ 120-125.

19   Second, Dr. Singer uses a benchmarking method, applying competitive benchmarks from within

20   the data.  To estimate competitive Filed Rates, he uses Filed Rates applied by bail agents located

21   on North Vignes Street in Central Los Angeles, where a dozen bail agencies have offices on the

22   same block across from the county jail.  *Id.* ¶¶ 127-139.  Despite being subject to the conspiracy

23   and Defendants' fixed rates, this group of bail agencies charged Filed Rates at least ▮▮▮ less

24   than the rest of the State, controlling for relevant factors.  *Id.* ¶¶ 139.  For a rebating benchmark,

25   Dr. Singer looks to agency rebate data from the end of the Class Period (2023), because the

26   evidence shows that Defendants' efforts to suppress rebating became less effective over time,

27   such as after the filing of this lawsuit in 2019.  *Id.* ¶¶ 140-148.  This evidence shows that rebating

28   at the end of the Class Period ranged from ▮▮▮▮▮  *Id.* ¶ 148.

1    Dr. Singer compares these competitive prices against actual prices charged and determines

2    that the conspiracy succeeded in inflating prices well above competitive levels, by ████████

3    ████.  *Id.* ¶ 92 and Ex. 13.  "As only a firm with market power (or a collection of firms acting

4    as a monopolist) is capable of rising prices above competitive levels for a commodity product like

5    Bail Bonds, the evidence of price inflation is consistent with a conspiracy."  *Id.* ¶ 92.

6            **b.**    **Class Members Were Commonly Impacted by Defendants'**
7                      **Conspiracy Because They Paid Higher Prices for Bail Bonds**

8    "Antitrust 'impact'—also referred to as antitrust injury—is the 'fact of damage' that

9    results from a violation of the antitrust laws."  *In re Dynamic Random Access Memory (DRAM)*

10   *Antitrust Litig.*, No. 02-md-1486-PJH, 2006 WL 1530166, at *7 (N.D. Cal. June 5, 2006).  With

11   regard to an expert modelling of impact, "[f]or the purpose[] of the predominance analysis, the

12   question is not whether [the expert's] projection is correct.  The question is only whether

13   individualized inquiries will predominate over common ones."  *In re Xyrem Antitrust Litig.*, No.

14   20-md-02966-RS, 2023 WL 3440399, at *8 (N.D. Cal. May 12, 2023) (noting there that the

15   particularities of the model posed "a question for the jury to decide," and "Plaintiffs have clearly

16   not relied on such extreme data that the Class must fail for lack of predominance"); *see also In re*

17   *TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 313 (N.D. Cal. 2010) ("[O]n a motion for

18   class certification, the Court only evaluates whether the method by which plaintiffs propose to

19   prove class-wide impact could prove such impact, not whether plaintiffs in fact can prove class-

20   wide impact." (citation omitted)).

21           Dr. Singer's analysis regarding the extent by which Defendants' conspiracy inflated bail

22   bond prices generally is important evidence of common impact.  This "generalized evidence" is

23   "capable of showing that all class members suffered antitrust impact on a classwide basis."  *In re*

24   *Apple IPhone Antitrust Litigation*, No. 4:11-cv-06714-YGR (N.D. Cal. Mar. 29, 2022), ECF No.

25   789 at 26 (quoting *Olean*, 31 F.4th at 669).  Indeed, the very sort of aggregate overcharge

26   calculations Dr. Singer conducts here are accepted by courts to also show common impact.  *See*

27   *Ruiz Torres*, 835 F.3d at 1140 (proof of an aggregate overcharge "is not a matter of probability—

28   it is a matter of logic that an aggregate underpayment means that [defendant] underpaid some,

possibly all, subclass members"); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 424

(M.D. Fla. 2018) ("[A] large overcharge makes it more likely than not that classwide impact

occurred."); *Moshier v. Safeco Ins. Co. of Am.*, No. 23-CV-00225-PHX-DLR, 2024 WL 4503901,

at *2 (D. Ariz. Oct. 16, 2024) ("The use of aggregate damages calculations is well established in

federal court and implied by the very existence of the class action mechanism itself.") (quoting *In

re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197 (1st Cir. 2009).

      Dr. Singer also investigates whether Defendants' conspiracy injured all or nearly all Class

Members specifically.  He uses two independent, mutually reinforcing methods.  First, Dr. Singer

uses in-sample prediction, comparing the price that each Class Member actually paid to the price

each Class Member would have paid without the Conspiracy, on a transaction-by-transaction

basis.  Singer Rep. ¶¶ 152-156.  Dr. Singer finds that in-sample prediction yields an impact

percentage of ▮▮▮▮  *Id.* ¶ 154.  *See In re Broiler Chicken Grower Antitrust Litig. (No. II)*, No.

6:20-MD-02977-RJS-CMR, 2024 WL 2117359, at *19 (E.D. Okla., May 8, 2024) ("The in-

sample prediction method is a standard technique used to test whether the impact of an antitrust

conspiracy is widespread."); *In re Capacitors Antitrust Litig. (No. III)*, No. 14-CV-03264-JD,

2018 WL 5980139, at *7-9 (N.D. Cal., Nov. 14, 2018).  Second, Dr. Singer examines evidence of

a price structure that would transmit price inflation Classwide.  *Id.* ¶¶ 157-170.  He observes

common evidence showing that all prices charged were either equal to the fixed 10% standard

rate, or negotiated from it.  *Id.* ¶¶ 160-166.  Indeed, documents and testimony on this point

provide substantial common evidence of a price structure whereby all transactions were anchored

to the fixed 10% standard rate.  Harvey Decl. Ex. 79 (Lexington CDI rate filing No. 15-10267 at

39-40, 43-52); Exs. 80-82; Ex. 34 (Bench Dep.) at 118:4-13; Ex. 75 (Shields Dep.) at 118:8-16;

Ex. 83 (Stanley Dep.) at 95:3-8; Ex. 33 (Cook Dep.) at 254:2-10, 254:21-24.  Dr. Singer also

conducts a separate price structure regression, demonstrating that an increase in average Filed

Rates across the Class is associated with an approximately equal increase in the Filed Rate for an

individual Class Member.  Singer Rep. ¶¶ 167-170.  Thus, "Filed Rates charged to Class

Members move together across agencies, sureties, rate types, and the industry at large."  *Id.* "This

result is strong evidence of a price structure."  *Id.* ¶ 170.  *See Olean*, 31 F.4th at 671-73; *Broiler*

1   *Chicken*, 2024 WL 2117359, at \*7-9; *Cung Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW (D.

2   Nev. Aug. 9, 2023), ECF No. 839 (order granting class certification); *In re Polyurethane Foam*

3   *Antitrust Litig.*, 314 F.R.D. 226, 286 (N.D. Ohio 2014); *In re High-Tech Emp.*, 985 F. Supp. 2d at

4   1206; *Johnson v. Ariz. Hosp. & Healthcare Assoc.*, No. 07-CV-1292-PHX-SRB, 2009 WL

5   5031334, at \*8, 11 (D. Ariz. Jul. 14, 2009).

6          The existence of individual negotiations in some bail bond transactions does not negate

7   the common impact of Defendants' conspiracy.  Instead, "the prevailing [economic] view" is that

8   "price-fixing affects all market participants, creating an inference of class-wide impact even when

9   prices are individually negotiated."  *Olean*, 31 F.4th at 671 (quoting *In re Urethane Antitrust*

10  *Litig.*, 768 F.3d 1245, 1254 (10th Cir. 2014)).  As the Ninth Circuit concluded in *Olean*, "even

11  assuming the existence of these individualized differences, a higher initial list price as a result of

12  Defendants' price-fixing scheme could have raised the baseline price at the start of negotiations

13  and could have affected the range of prices that resulted from negotiation." *Olean Wholesale*

14  *Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 993 F.3d 774, 790 (9th Cir. 2021).[12]  An inflated

15  baseline price is itself common proof as to the antitrust impact resulting from the Defendants'

16  conspiracy.  *See In re Urethane*, 768 F.3d at 1254 ("The inference of class-wide impact is

17  _____

18  [12] *See also In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 1006 (D. Minn. 2023) ("Individual differences between negotiations and transactions do not disrupt the fact that the Defendants'

19  conspiracy, if true, would cause all prices to increase.") (citing *Olean*, 31 F.4th at 681);  *In re Disposable Contact Lens*, 329 F.R.D. at 420–21 ("The fact that a plaintiff may have successfully

20  employed bargaining power to fend off the *effect* of the conspiratorial practices does not mean that it has not been put in a worse position but-for the conspiracy.") (citation omitted); *In re*

21  *Auction Houses Antitrust Litig.*, 193 F.R.D. 162, 166 (S.D.N.Y. 2000) ("Price fixing conspiracies, at least to the extent they succeed in fixing prices, almost invariably injure everyone who

22  purchases the relevant goods or services."); *Fears v. Wilhelmina Model Agency, Inc.*, No. 02 Civ-4911 HB, 2003 WL 21659373, at \*6 (S.D.N.Y. 2003) (noting that even if plaintiffs negotiated for

23  a lower rate, the negotiations began at the "artificially elevated rate," thereby showing common impact); *In re Flat Glass Antitrust Litig.*, 191 F.R.D. 472, 486 (W.D. Pa. 1999) ("[E]ven though

24  some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated this would establish at least the fact of damage, even if the

25  extent of damage by each plaintiff varied."); *In re Indus. Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y. 1996) ("[I]f a plaintiff proves that the alleged conspiracy resulted in

26  artificially inflated list prices, a jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury."); *In re NASDAQ Market-Makers Antitrust*

27  *Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that . .

28  . the price range was affected generally."); *Rosack v. Volvo of Am. Corp.*, 131 Cal. App. 3d 741, 759-60 (1982) ("The good negotiator in the fixed market would presumably have gotten an even better 'deal' in a competitive market.").

1    especially strong where, as here, there is evidence that the conspiracy artificially inflated the

2    baseline for price negotiations.").  Plaintiffs' allegations to this effect are highly similar to *Hyland*

3    *v. Homeservices of America, Inc.*, No. 3:05-CV-612-R., 2008 WL 4858202 (W.D. Ky. Nov. 7,

4    2008).  There, plaintiffs alleged that defendants "engaged in a conspiracy to inflate the price of

5    commissions charged by real estate brokers for the purchase of real estate in Kentucky," and

6    further that the defendants "worked to avoid, suppress, or eliminate price competition from

7    discount brokerage companies."  *Id.* at *1.  In concluding that the predominance inquiry was

8    satisfied, the district court explained, "To the extent that Plaintiffs are successful in proving that

9    [the standard rate] is a conspiratorially established standard, any proof that a Defendants' agents

10   followed the rate would be proof that the class members who hired that particular agent was

11   harmed by the conspiracy."  *Id.* at *7.  Here, Plaintiffs possess exactly this sort of proof.  *See*

12   *supra* Section II.  *All* California bail agents used the same fixed 10% "standard" rate.

13          In sum, common impact will be established because Defendants' alleged conspiracy

14   inflated the price of bail bonds for all Class Members in the same way.  *See*, *e.g.*, *In re Rubber*

15   *Chems. Antitrust Litig.*, 232 F.R.D. 346, 352 (N.D. Cal. 2005) ("[C]lass-wide impact is usually

16   found to exist where the defendants are shown to have used collusively-set list prices for the

17   product at issue.").  The class-wide impact of the conspiracy is an overriding common issue.  *In*

18   *re Citric Acid Antitrust Litig.*, Nos. 95-1092, No. 95-cv-02963, 1996 WL 655791, at *7-8 (N.D.

19   Cal. Oct. 2, 1996).

20                    **c.    Damages Will Be Established by Common Proof**

21          "In contrast to the 'impact' prong of the Rule 23(b) analysis, which asks only '*whether* the

22   plaintiffs were harmed,' the damages prong asks 'by how much.'"  *In re Titanium Dioxide*

23   *Antitrust Litig.*, 284 F.R.D. 328, 348 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md.

24   2013) (citations omitted).  At the class certification stage, "Plaintiffs must show, using evidence

25   common to the class, that class members paid a higher price for [bail bonds] from Defendants

26   than they would have absent the alleged conspiracy."  *Id.* at 345; *see also Aberin v. Am. Honda*

27   *Motor Co.,* No. 16-CV-04384-JST, 2021 WL 1320773, at *11 (N.D. Cal. Mar. 23, 2021) (Tigar,

28   J.) (plaintiffs must show damages "can 'feasibly and efficiently be calculated once the common

liability questions are adjudicated'" (quoting *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013)); *Olean*, 31 F.4th at 668 ("That the defendant might attempt to pick off the occasional class member here or there through individualized rebuttal does not cause individual questions to predominate.") (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014); *Ruiz Torres*, 835 F.3d at 1136–37 (explaining that "even a well-defined class may inevitably contain some individuals who have suffered no harm as a result of a defendant's unlawful conduct," but "such fortuitous non-injury to a subset of class members does not defeat certification as to the entire class"). Any concerns Defendants may have as to the accuracy of a common damages analysis "go purely to the merits, and present no overlap with the predominance requirement." *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175 JG VVP, 2014 WL 7882100, at *63 (E.D.N.Y. Oct. 15, 2014).

Here, Plaintiffs' estimate of damages, and the methodology used in calculating aggregate damages, are rooted in widely accepted methods that are common to the Class. Singer Rep. ¶¶ 175-179.

In sum, because Defendants' alleged conduct applies to all Class Members' claims, and because Plaintiffs allege "a common and unifying injury" as a result of Defendants' alleged illegal conduct, the predominance requirement is met. *In re Volkswagen "Clean Diesel" Litig.*, MDL No. 2672 CRB, 2017 WL 672727, at *14 (N.D. Cal. Feb. 16, 2017); *CRT III*, 2022 WL 4596621, at *4.

### 2.    A Class Action Is Superior to Millions of Individual Actions

A class action is a superior means of adjudicating a dispute if no realistic alternative exists and class litigation of common issues "reduce[s] litigation costs and promote[s] greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F. 3d 1227, 1234-35 (9th Cir. 1996).

Here, there is no realistic alternative to a class action due to the size of the Class and the prohibitive cost of litigating individual cases. *See Levya v. Medline Indus. Inc.*, 716 F.3d 510, 515 (9th Cir. 2013) (reversing where the "district court concluded that class certification is not the superior method of adjudication but did not suggest any other means for putative class members to adjudicate their claims"). Individual lawsuits could also result in inconsistent rulings and

1    results for the same misconduct.  *Volkswagen*, 2017 WL 672727, at \*14.  Furthermore, each Class

2    Member would be required to prove the same misconduct and would offer the same evidence.  As

3    such, class treatment is the superior method of adjudication.  *See In re High-Tech*, 985 F. Supp.

4    2d at 1228 (finding that a class action was the superior form of adjudication because of the nature

5    of the defendants' conspiracy and the desirability of concentrating litigation in one proceeding);

6    *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D 270, 316 (N.D. Cal. 2016) (same).

7    Moreover, in granting preliminary approval of settlements with Defendants Lexon Insurance

8    Company and Danielson National Insurance Company, the Court explained that, here, "the

9    judicial economy achieved through common adjudication undoubtedly makes a class action

10   superior to any alternative procedures for resolving the claims of approximately two million class

11   members."  ECF No. 512 at 12.

12   **V.    CONCLUSION**

13        For the aforementioned reasons, Plaintiffs respectfully request that the motion be granted

14   and that the Court certify the Class.

15

16   Dated: December 11, 2024          Respectfully submitted,

17                                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

18                                     By:  */s/ Dean M. Harvey*

19

20                                     Dean M. Harvey (SBN 250298)
                                       Katherine Lubin Benson (SBN 259826)
21                                     Michelle A. Lamy (SBN 308174)
                                       Miriam E. Marks (SBN 332351)
22                                     Emily N. Harwell (*pro hac vice*)
                                       Nicole M. Rubin (*pro hac vice*)
23                                     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                       275 Battery Street, 29th Floor
24                                     San Francisco, CA 94111
                                       Telephone:  (415) 956-1000
25                                     dharvey@lchb.com
                                       kbenson@lchb.com
26                                     mlamy@lchb.com
                                       mmarks@lchb.com
27                                     eharwell@lchb.com
                                       nrubin@lchb.com
28

1

2
*Interim Class Counsel*

3
Benjamin David Elga (*pro hac vice*)
Brian James Shearer (*pro hac vice*)

4
JUSTICE CATALYST LAW
25 Broadway, 9th Floor

5
New York, NY
Telephone:  (518) 732-6703

6
belga@justicecatalyst.org

7
brianshearer@justicecatalyst.org

8
David Seligman (*pro hac vice*)
TOWARDS JUSTICE

9
1410 High Street, Suite 300
Denver, CO 80218

10
Telephone:  (720) 441-2236

11
Facsimile:  (303) 957-2289
david@towardsjustice.org

12

13
Shennan Kavanagh (*pro hac vice*)
Jennifer Wagner (*pro hac vice*)

14
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor

15
Boston, MA 02110-1245
Telephone:  (617) 542-8010

16
Facsimile:  (617) 542-8028
skavanagh@nclc.org

17
jwagner@nclc.org

18

19
Stephanie Carroll (SBN 263698)
Ghirlandi Guidetti (SBN 307342)

20
PUBLIC COUNSEL
610 South Ardmore Avenue

21
Los Angeles, California, 90005
Telephone:  (213) 385-2977

22
Facsimile:  (213) 201-4722
scarroll@publiccounsel.org

23
gguidetti@publiccounsel.org

24
*Counsel for Plaintiffs and the Proposed Class*

25

26

27

28