UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE CALIFORNIA BAIL BOND
ANTITRUST LITIGATION

This Document Relates To:

ALL ACTIONS

Case No. 19-cv-00717-JST   (DMR)

**UNREDACTED ORDER ON CLAWBACK MOTION**

Re: Dkt. No. 520

Defendants Lexington National Insurance Corporation ("Lexington") and American Surety Company ("ASC") ("Moving Defendants") move to confirm that 29 documents they inadvertently produced in discovery and later clawed back are protected by the attorney-client privilege. [Docket Nos. 520 (Mot.); 522 (Reply).] Plaintiffs Shonetta Crain and Kira Monterrey challenge the assertion of privilege. [Docket No. 521 (Opp'n).] On December 13, 2024, the court ordered Moving Defendants to lodge the clawed back documents for in camera review. [Docket No. 517.] Moving Defendants timely lodged the documents. The court held a hearing on February 13, 2025. Having reviewed the documents in camera, the court denies Moving Defendants' clawback motion.[1]

## I. BACKGROUND

### A. Factual Background

This is a putative antitrust class action brought by Plaintiffs against 20 bail bond surety companies (including the Moving Defendants) and William B. Carmichael, the President and CEO

---

[1] The court filed a redacted version of this order on March 11, 2025 to allow Moving Defendants an opportunity to appeal the order to the Honorable Jon S. Tigar. [Docket No. 533.] Judge Tigar denied Moving Defendants' motion for relief from the order on April 11, 2025. [Docket No. 555.] The court now files an unredacted version of this order which supersedes and replaces the March 11, 2025 order.

of ASC, asserting a decades-long conspiracy to fix prices for bail bonds. [Docket No. 513 (Class Cert. Mot.) at 2-3.] The factual background is set out in the Honorable Jon S. Tigar's order denying Defendants' Motion to Dismiss the Third Consolidated Amended Class Action Complaint (TCAC) and is briefly summarized here. [Docket No. 330 at 1-2.] Many criminal arrestees in California may post money bail for their release, and as long as they appear for scheduled court dates, the money will be returned to them in full. *Id.* Arrestees who cannot afford to pay bail often purchase a bail bond sold by agents and underwritten by sureties. *Id.* Sureties set the price of a bail bond as a percentage of the total bail amount, called the "premium rate." *Id.* Even if a purchaser attends all court dates, they do not receive back any portion of the premium. *Id.* But agents have the option to reduce the premium charged an arrestee through rebates. *Id.* To set a premium rate, a surety must file a rate application with the California Department of Insurance ("CDI"), and CDI must approve the application. *Id.*

The alleged conspiracy has two parts: "first, Defendants conspired to maintain an artificially high 'standard' bail bond premium rate of 10%; second, Defendants conspired to suppress rebating by bail bond agents." Class Cert. Mot. at 3. Plaintiffs allege violations of the Cartwright Act, California Business and Professions Code section 16720; Unfair Competition Law, California Business and Professions Code section 17200; and Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

### B.      Facts Relevant to the Present Dispute

In November 2016, CDI sent a letter to multiple bail bond surety companies, including Moving Defendants, expressing concern that their surety rate levels may be excessive and requesting "supporting information and data" to demonstrate that the rates were not excessive. [Docket No. 520-2 (William B. Carmichael Decl., Jan. 3, 2025) ¶ 5, Ex. A.] CDI explained: "If it is determined your company's rates are excessive your company must make an appropriate rate adjustment as soon as possible and in no event later than May 1, 2017. If the rate adjustment is not implemented until after May 1, 2017, your company will be required to refund excess premiums charged to all affected policyholders." *Id*. Plaintiffs allege that Defendants, including Moving Defendants, colluded to respond to the CDI excessive rate inquiry. Class Cert. Mot. 19-21. On

2

December 12,[2] 2016, representatives of ASC, Lexington, Bankers Insurance Company ("Bankers")[3], and CDI met to discuss the CDI letter. Carmichael Decl. ¶ 11. On December 15, 2016, Lexington, ASC, and Bankers (collectively "Joint Group") submitted a "Bail Coalition Working Group White Paper" to CDI, which provided "background information relative to the long time use of the 10% bail rate, and information on how the CDI regulations and template do not produce an accurate indicated rate for bail and immigration rating programs." [Docket No. 513-76.] Moving Defendants then each independently submitted their company's data to CDI to support their rates. Carmichael Decl. ¶ 12; [Docket No. 520-1 (Mark Holtschneider Decl., Jan. 2, 2025) ¶ 18)]. CDI ultimately did not require Moving Defendants to lower their rates. Carmichael Decl. ¶ 12; Holtschneider Decl. ¶ 18. However, on January 31, 2017, CDI held an Informational Hearing about the bail industry, and afterwards took some steps to educate bail agents on the legality of rebating. Class Cert. Mot. 21-22.

### C. Procedural Background

Moving Defendants produced the 29 documents in full, but later clawed back portions of them as permitted by the parties' stipulated ESI agreement. [Docket No. 154.] Pursuant to that agreement, Plaintiffs have not disclosed the substance of any of the at-issue communications, but did reference the existence of this pending clawback dispute in their motion for class certification. Class Cert. Mot. 20-21. Plaintiffs also planned to introduce the at-issue communications during their depositions of Carmichael and Holtschneider but were unable to do so because of the clawback dispute; the depositions remain open pending the outcome of this motion. Opp'n 5-6. On December 9, 2024, Plaintiffs challenged the assertion of privilege over the clawback documents in a joint discovery letter. [Docket No. 510.] The court denied the discovery letter without prejudice and granted Moving Defendants leave to file a regularly noticed motion to

---

[2] The clawback emails clearly indicate the meeting was on 12/12/2016. In their declarations, Carmichael and Holtschneider incorrectly state that the meeting was on 12/16/2016 and 12/16/2024, respectively. Carmichael Decl. ¶ 11; [Docket No. 520-1 (Mark Holtschneider Decl., Jan. 2, 2025) ¶ 17)].

[3] Bankers is another bail bond surety Defendant. Bankers did not join in this motion.

3

1  support their claims of privilege and non-waiver with evidence, and to lodge the clawed back

2  documents for in camera review. [Docket No. 517.] This motion followed. The 29 documents

3  are labeled as Lexington Exhibits 1-22,[4] and ASC Exhibits 1-8.

## II. LEGAL STANDARD

This court exercises federal question jurisdiction over Plaintiffs' Sherman Antitrust claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' state law claims. "Where there are federal question claims and pendent state law claims present, the federal law of privilege applies." *Agster v. Maricopa Cty.*, 422 F.3d 836, 839 (9th Cir. 2005); *see also* Fed. R. Evid. 501, Advisory Committee Notes ("In nondiversity jurisdiction civil cases, federal privilege law will generally apply.").

The attorney-client privilege protects from discovery "confidential communications between attorneys and clients, which are made for the purpose of giving legal advice." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011) (citation omitted). The Ninth Circuit describes the elements of the privilege as follows: where "(1) legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *Id.* (cleaned up).

The privilege is "narrowly and strictly construed," *United States v. Gray*, 876 F.2d 1411, 1415 (9th Cir. 1989) (citing *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 24 (9th Cir. 1981)), and the party asserting it bears the burden of proving that it applies. *Richey*, 632 F.3d at 566; *accord In re Grand Jury Investigation*, 974 F.2d at 1071 (party asserting privilege "must make a *prima facie* showing" that privilege protects information the party intends to withhold). The privilege protects only communications, and not underlying facts, *Upjohn v. United States*, 449 U.S. 383, 396 (1981), and the fact "[t]hat a person is a lawyer does not, *ipso facto*, make all communications with that person privileged." *United States v. Chen*, 99 F.3d 1495, 1501 (9th Cir.

---

[4] Plaintiffs state that Lexington's Exhibit 14 is not at issue and Moving Defendants do not dispute this. [Docket No. 521-1 (Dean M. Harvey Decl., Jan. 17, 2025) ¶ 3.]

1    1996). Rather, in order for the privilege to apply, "the communication must be between the client
2    and lawyer for the purpose of obtaining legal advice." *United States v. Martin*, 278 F.3d 988,
3    1000 (9th Cir. 2002); *see also Richey*, 632 F.3d at 566 n.3 ("What is vital to the privilege is that
4    the communication be made in confidence for the purpose of obtaining *legal* advice *from the*
5    *lawyer.*" (quotation and citation omitted; emphasis in original)).

## III.   DISCUSSION

Plaintiffs argue that the at-issue communications are not protected by the attorney-client privilege. They contend that the privilege does not apply in the first instance because the primary purpose of the communications was to give business rather than legal advice, and because the communications were not intended to be kept confidential. Opp'n 6-8. If the privilege does apply, Plaintiffs argue it was waived because advice was shared to third parties, and because Moving Defendants put the content of the communications at issue. *Id.* at 8-11. Plaintiffs also assert that the crime-fraud exception applies. *Id.* at 12. Moving Defendants argue that the communications are protected by the privilege because their primary purpose was to give and receive legal advice, and because they were intended to be kept confidential. Reply 2-3. They contend that privilege was not waived because advice was only shared pursuant to the common interest doctrine, and because Moving Defendants did not put the communications at issue. *Id.* at 3-4. Finally, they argue the crime-fraud exception does not apply.

### A.   Primary Purpose Test

First, to determine if the attorney-client privilege applies, the court must evaluate the context and purpose of the communications. The Ninth Circuit has recognized that "some communications [between attorneys and clients] might have more than one purpose." *In re Grand Jury*, 23 F.4th 1088, 1091 (9th Cir. 2021). In that circumstance, courts in this circuit apply the "primary purpose" test to determine whether the communications are privileged. *Id.* at 1092. Under that test, the privilege only applies if "the primary purpose of the communication is to give or receive legal advice, as opposed to business . . . advice." *Id.* at 1091 (citation omitted). Where there was "a clear business purpose in the environment in which the communications occurred," the party asserting the privilege bears the burden of establishing that "*each* communication in

5

question was made *primarily* for the purpose of generating legal advice." *McCaugherty v. Siffermann*, 132 F.R.D. 234, 238 (N.D. Cal. 1990) (emphasis in original). "The natural implication of this inquiry is that a dual-purpose communication can only have a single 'primary' purpose." *In re Grand Jury*, 23 F.4th at 1091.

The Ninth Circuit has explicitly rejected the "because of" test, which looks at whether a dual-purpose communication was made in anticipation of litigation. *Id.* at 1093-94. The Ninth Circuit explained that the "because of" test is too broad for the principles behind the attorney-client privilege and is more suited for the work-product doctrine. *Id.*

Communications with general counsel "warrant[] heightened scrutiny" because "[i]n-house counsel may act as integral players in a company's business decisions or activities, as well as its legal matters." *Oracle Am., Inc. v. Google, Inc.*, No. C-10-03561-WHA (DMR), 2011 WL 3794892, at *4 (N.D. Cal. Aug. 26, 2011). Thus, "[w]hen attempting to demonstrate that an internal communication involving in-house counsel deserves privileged status, a party . . . 'must make a clear showing that the speaker made the communication[ ] for the purpose of obtaining or providing *legal* advice.'" *Id.* (emphasis in original) (quoting *United States v. ChevronTexaco Corp.*, 241 F. Supp. 2d 1065, 1076 (N.D. Cal. 2002)); *accord City of Roseville Employees' Ret. Sys. v. Apple Inc.*, No. 19CV02033YGRJCS, 2022 WL 3083000, at *17 (N.D. Cal. Aug. 3, 2022) (applying "clear showing" standard where examining claim of attorney-client privilege over "internal communications involving in-house counsel").

In addition, one of the essential elements of the attorney-client privilege is confidentiality. *Richey*, 632 F.3d at 566. "Whether or not a given communication is 'confidential' within the meaning of the privilege is determined from the perspective of the client." *Zetz v. Bos. Sci. Corp.*, No. 119CV00451AWISAB, 2022 WL 605356, at *7 (E.D. Cal. Mar. 1, 2022). "Courts have consistently refused to apply the privilege to information that the client intends or understands may be conveyed to others." *Id.* The client's expectation of confidentiality must be reasonable. *Id.* "Determining the client's intent hinges on the circumstances of the communication, such as whether disclosure to third parties was intended or considered." *Eastman v. Thompson*, 594 F. Supp. 3d 1156, 1177 (C.D. Cal. 2022). The party asserting the privilege bears the burden of

6

proving confidentiality. *Richey*, 632 F.3d at 566.

Here, the communications at issue are a series of emails involving Mark Holtschneider, who at the time of the communications was Executive Vice President and General Counsel of Lexington; and Robert W. Hogeboom, a regulatory lawyer jointly retained by Lexington, ASC, and Bankers as outside counsel.[5]  Holtschneider Decl. ¶¶ 3-4, 9.  Other key individuals include William B. Carmichael, President and CEO of ASC; and Robert G. Southey, Vice President and Counsel of Bankers.  Carmichael Decl. ¶ 1; [Docket No. 523 (Robert G. Southey Decl., Jan. 23, 2025) ¶ 3].  Most of the emails relate to the 2016 CDI excessive rate inquiry,[6] and largely pertain to advice given by Hogeboom to Lexington, ASC, and Bankers.

Defendants argue that the primary purpose of the communications with Hogeboom was for Lexington, ASC, and Bankers to "seek advice as to how to respond to the CDI's regulatory demands for information and to allow outside counsel to represent the Moving Defendants in their dealings with the CDI related to the Rate Inquiry."  Mot. 6.[7]  They assert that Hogeboom's advice was legal in nature because CDI had made a "specific threat of litigation," and "the development of a strategy to address [the CDI] inquiry is a sufficient legal purpose to protect the privilege."  Reply 2.  Plaintiffs respond that the primary purpose of these communications was to seek business advice from Hogeboom, not legal advice.  They argue that the "true, primary purpose" of the communications was "to coordinate an industry response that would protect the Surety

---

[5] Plaintiffs argue that Moving Defendants have not shown that Hogeboom was retained by the three sureties.  For reasons explained below, the court finds the evidence sufficient to demonstrate that Hogeboom was retained as outside counsel by all three companies.

[6] Lexington Ex. 22 relates to a 2014 questionnaire submitted by CDI.  Holtschneider Decl. ¶ 20.

[7] Moving Defendants' declarations describe the communications in a generalized way as involving legal advice.  Holtschneider characterizes Lexington Exhibits 3-6, 8-9, 13, and 19 as communications between himself as representative of Lexington and Hogeboom as outside counsel, where Hogeboom was retained to advise Lexington about "(i) the legal consequences of the CDI Rate Inquiry, (ii) how to approach the CDI given a common concern that the data requests were unduly burdensome . . . and (iii) how to respond to the CDI's request."  Holtschneider Decl. ¶¶ 10.  Similarly, Carmichael asserts that ASC Exhibits 1-6 are communications between the three jointly represented sureties and Hogeboom "to determine the impetus, origin, and legal consequences of the CDI's inquiry; to prepare potential legal responses of the inquiry; to communicate directly with the CDI regarding its inquiry and how the bail bond business works; and to determine whether the inquiry could be resolved without further adverse action by CDI."  Carmichael Decl. ¶¶ 8-9.

7

1    Defendants' price-fixed rate of 10%." Opp'n 7. Plaintiffs contend that some emails explicitly
2    state that the "thrust of this unlawful effort concerned not legal advice but *strategy*." *Id.* Moving
3    Defendants counter that "the context is clear" that the emails referencing "strategy" questions
4    "relate to *legal strategy*, not commercial." Reply 1.

5    Plaintiffs also argue that the communications were not intended to be kept confidential, as
6    many of them refer to an "ongoing dialogue" among Moving Defendants and various other
7    sureties in the bail bond industry about Hogeboom's advice. Opp'n 8. Defendants respond that
8    the emails only reflected "the development of a strategy for the Moving Defendants to address the
9    legal issues arising from the CDI's inquiries," and that there is no evidence that attorney-client
10   communications were conveyed or intended to be conveyed to unrepresented parties. Reply 3.

11   After thorough and careful in camera review of the communications, the court finds that
12   Hogeboom's advice was primarily and explicitly to "rally the industry" and coordinate an
13   industry-wide response to the CDI excessive rate inquiry. Lexington Ex. 3. Moving Defendants
14   apparently acted on that advice, as the record contains evidence that they communicated
15   frequently with multiple other sureties during the same time period about how to respond to the
16   CDI inquiry.

17   Lexington received the rate inquiry letter from CDI on October 17, 2016 and retained
18   Hogeboom almost immediately. Lexington Ex. 1. Lexington then reached out to ASC and
19   Bankers before either of them had received the CDI letter. Lexington Ex. 5. On November 2,
20   Southey emailed Jeff Clayton, Executive Director of the American Bail Coalition ("ABC") (a
21   trade association for bail sureties), stating that ASC and Lexington wanted to organize a call with
22   ABC members doing business in California to discuss the CDI rate inquiry. [Docket Nos. 528
23   (Hearing Transcript) 38-39; 513-74; 514-51.] An ABC board meeting was held on November 9
24   where the CDI rate inquiry was "on the agenda as the first item." *Id.* Right before the meeting,
25   Holtschneider emailed Clayton informing him that Lexington had hired Hogeboom who had
26   "preliminary discussions" with CDI department head Ken Allen. [Docket No. 513-70.]
27   Holtschneider also attached a list, acquired by Hogeboom, of all the sureties that CDI was
28   investigating for the rate inquiry. *Id.* On November 14, Holtschneider explicitly asked Hogeboom

8

for advice on "what exactly the industry can do jointly in response to the CDI inquiry" so he could prepare for a discussion with other surety executives. Lexington Ex. 8.

On November 16, Holtschneider emailed Southey and Carmichael and stated: "Bob Hogeboom suggests that a letter be sent to the CDI explaining the bail bond business and requesting a conference call. The goal of the letter and the call would be to convince the CDI that bail is not worth reviewing and they should move on to other lines. . . . Are you guys interested in working on this together with Hogeboom?" Lexington Ex. 10. Southey agreed. *Id.* Carmichael suggested that the letter should be "an ABC backed approach," before agreeing to write the letter as a group of three sureties (Lexington, ASC, and Bankers) "in the interest of a timely response." *Id.* On December 2, Southey sent an email stating that he had spoken with an executive from another surety, Tokyo Marine HCC ("HCC"), and that HCC had "already provided a response to the CDI, basically along the same lines of argument that we identified . . . which will hopefully augment the industry position." ASC Ex. 3. On December 6, Carmichael sent a non-privileged email to an outside party stating: "We (the industry) are planning on resisting the [CDI's] data call based upon the unique nature of the bail bond transaction." Lexington Ex. 20. Lexington, ASC, and Bankers met with CDI representatives on December 12. The next day, the three sureties had a call with Hogeboom to discuss the meeting, and the agenda for the call included: "How do we reach out to other sureties to make sure they don't make a rate filing and to make sure they also state that they have no ability to provide financial information from agents?" Lexington Ex. 19. Lexington, ASC, and Bankers ultimately submitted a letter about the bail industry to CDI on December 15, which they styled as the "Bail Coalition Working Group White Paper." [Docket No. 513-76 (White Paper).] The White Paper did not contain any information specific to the three sureties and was only about the bail industry as a whole. *Id.*

Moving Defendants do not refute that the purpose of these communications was to coordinate an industry response to the CDI rate inquiry. They argue, instead, that such a purpose was still legal in nature because it was part of Hogeboom's strategy to address CDI's threatened regulatory action, and Moving Defendants had hired Hogeboom as outside counsel for that purpose. Reply 1-2. At the hearing on this motion, counsel for Lexington took the position that

9

when an attorney's advice is part of a client's overall legal strategy, it is legal advice even if the specific methods being advocated do not appear legal on their face. Hearing Transcript 24-25. Counsel also stated that Moving Defendants hired Hogeboom not only because of his expertise as an insurance regulatory lawyer in California, "but also because he has a good relationship [with CDI] and the Department respects him." *Id.* at 23-24.

The court finds that Moving Defendants have stretched the definition of "legal" advice too far. An attorney's advice does not constitute legal advice simply because it relates to regulatory activity. "[T]here is no bright-line rule that communications related to regulatory compliance are per se business or legal communications. Rather, the content and context of such communications must be considered in order to determine the primary purpose of the communication." *City of Roseville Employees' Ret. Sys. v. Apple Inc.*, No. 19CV02033YGRJCS, 2022 WL 3083000, at *11 (N.D. Cal. Aug. 3, 2022). Moving Defendants' position boils down to a "because of" argument—that because of the context of the CDI rate inquiry and the threat that CDI could take regulatory action against them, it became necessary for them to seek advice from a lawyer on how to respond to the inquiry. Mot. 6-7. Therefore, according to Moving Defendants, the lawyer's advice was all legal, including his advice to coordinate an industry response. The Ninth Circuit has expressly rejected this "because of" approach. *See In re Grand Jury*, 23 F.4th at 1093 (citing *In re Grand Jury Subpoena (Mark Torf/Torf Env't Mgmt.)*, 357 F.3d 900, 908 (9th Cir. 2004)) (rejecting the argument that the privilege applies to dual-purpose communications "when it can be fairly said that the document was created because of anticipated litigation and would not have been created in substantially similar form but for the prospect of that litigation"). The attorney-client privilege "is not necessarily tied to any adversarial process." *Id*. Instead, to meet the primary purpose test, Moving Defendants must show that each communication was made primarily for the purpose of obtaining "informed legal advice which might not have been made absent the privilege." *Id.* at 1092 (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)). Moving Defendants have not met that burden here.

Hogeboom's advice to "rally the industry" is primarily lobbying advice, not legal advice. *See* Lexington Ex. 3. He recommended that the bail bond industry coordinate to exert pressure on

10

1   CDI to change its approach, using non-legal channels such as informational letters and personal
2   meetings with CDI department heads.  Holtschneider himself stated that the purpose of these
3   efforts was to "convince the CDI that bail is not worth reviewing and they should move on to
4   other lines"—not to help Moving Defendants meet the legal requirements set out by statute or
5   regulations, or to challenge CDI in a regulatory proceeding.  *See* Lexington Ex. 10.  Counsel for
6   Lexington conceded that Moving Defendants hired Hogeboom partly because of his close
7   connections with CDI and ability to influence the agency, which went beyond his legal expertise.
8   Hearing Transcript 23-24.  Moving Defendants also suggest that the CDI rate inquiry was closely
9   tied with activity in the California Legislature at the time, emphasizing the political nature of their
10  attempts to persuade CDI to change its approach.  *See* Mot. 6; *see also* Lexington Ex. 17 ("this
11  rate inquiry is being spurred on by legislative motives").

12  "[I]f a lawyer happens to act as a lobbyist, matters conveyed to the attorney for the purpose
13  of having the attorney fulfill the lobbyist role do not become privileged by virtue of the fact that
14  the lobbyist has a law degree or may under other circumstances give legal advice to the client,
15  including advice on matters that may also be the subject of the lobbying efforts."  *In re Grand*
16  *Jury Subpoenas dated Mar. 9, 2001*, 179 F. Supp. 2d 270, 285 (S.D.N.Y. 2001) (citing Edna Selan
17  Epstein, *The Attorney–Client Privilege & the Work Product Doctrine* 239 (2001)).  For example,
18  in a case in the Southern District of New York related to a presidential pardon, the court
19  distinguished between communications about "the technical legal requirements of petitioning for
20  executive clemency"—which were privileged—from communications "about non-legal issues
21  such as public relations, the solicitation of prominent individuals or persons with access to the
22  White House . . . to support [an executive clemency petition], and strategies for persuading the
23  President to grant the petition"—which were not privileged.  *Id.* at 281, 291.  Even though the
24  attorney's lobbying to obtain a presidential pardon turned out to be the most effective strategy to
25  obtain a legal benefit in his clients' criminal case, that did not turn the attorney's lobbying advice
26  into legal advice.  *See id.*  Here, Hogeboom's recommendations to use non-legal channels to
27  persuade CDI to change its position was lobbying advice, not legal advice.  Such communications
28  are not privileged.  *See also United States v. Duke Energy Corp.*, 214 F.R.D. 383, 390 (M.D.N.C.

11

2003), *aff'd*, No. 1:00CV1262, 2012 WL 1565228 (M.D.N.C. Apr. 30, 2012) ("In effect, Duke Energy argues that whenever a business group bands together for a common purpose of making their will known to government regulators, all attorney communication to the group is privileged and/or work product. This appears to be a drastic expansion of the law of privilege and work product protection.").

In addition, there is evidence that Moving Defendants intended to share Hogeboom's advice about coordinating an industry response with other sureties. For example, Holtschneider and Southey shared the substance of Hogeboom's advice ahead of the November 9 ABC board meeting, and also indicated an intent to discuss his advice with third parties at the board meeting itself. Hearing Transcript 38-39; [Docket Nos. 513-70; 513-74; 514-51]. There is no privilege if there was an intent to share Hogeboom's advice to third parties, even if the advice was not ultimately shared. "[I]f the client intended the matter to be made public, the requisite confidentiality is lacking." *United States v. Moscony*, 927 F.2d 742, 752 (3d Cir. 1991) (citing *Weinstein's Evidence* ¶ 5039(a)(4)[01] at 503–39–40 (footnotes omitted)); *see also In re Grand Jury Proceedings,* 727 F.2d 1352 (4th Cir. 1984) (information given to attorney to prepare prospectus to be published to others not privileged even though prospectus was never issued). Given that Hogeboom's advice was primarily to coordinate an industry response, it is difficult to imagine how Moving Defendants could have implemented that advice without also sharing it with others in the industry.

The court finds that almost all of the communications at issue are not privileged because their primary purpose was to convey lobbying advice rather than legal advice. There are a few possible exceptions where some legal advice was sought or shared (specifically in Lexington Exhibits 11, 19, and 21 and ASC Exhibit 7); however, as explained below, any privilege as to these communications has been waived.

B.   **Common Interest Doctrine**

With respect to the few potentially privileged communications, the court now analyzes whether the privilege was waived, or whether, as argued by Moving Defendants, the common interest exception to waiver applies here.

1    "Under the attorney-client privilege, it is a general rule that attorney-client
2    communications made in the presence of, or shared with, third-parties destroys the confidentiality
3    of the communications and the privilege protection that is dependent upon that confidentiality."
4    *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (citation and quotation
5    omitted).  Plaintiffs argue that any privilege was waived when Hogeboom's advice was shared
6    among the three involved sureties: Lexington, ASC, and Bankers.  Defendants respond that even
7    though advice was shared, confidentiality was not destroyed because the three sureties agreed to
8    be jointly represented by Hogeboom for a common interest.

9    The common interest doctrine, also known as the joint defense doctrine or privilege, "is a
10   doctrine that prevents waiver of a pre-existing privilege if the privileged information is shared
11   only with those with a common legal interest."  *Waymo LLC v. Uber Techs., Inc.*, No.
12   17CV00939-WHA (JSC), 2017 WL 2485382, at *7 (N.D. Cal. June 8, 2017).  The common
13   interest doctrine applies where (1) a communication is made by separate parties in the course of a
14   matter of common interest; (2) the communication is designed to further that effort; and (3) the
15   privilege has not been waived.  *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003).
16   The common interest doctrine is not limited to parties to litigation, but can extend to "interested
17   third parties who have a community of interests with respect to the subject matter of the
18   communications," and "is applicable whenever parties with common interests join[ ] forces for the
19   purpose of obtaining more effective legal assistance."  *Nidec Corp.,* 249 F.R.D. at 578 (citations
20   omitted).

21   The common interest doctrine is construed more narrowly in the context of the attorney-
22   client privilege than in the context of the work product doctrine.  *Crosby v. California Physicians'*
23   *Serv.,* No. 817CV01970CJCJDE, 2020 WL 2510651, at *3 (C.D. Cal. Feb. 26, 2020).  In the work
24   product context, the common interest can be financial or commercial in nature.  *Id.*  But in the
25   context of the attorney-client privilege, "the parties must have 'a common legal, as opposed to
26   commercial, interest.'"  *Nidec Corp.,* 249 F.R.D. at 579 (citing *Bank Brussels Lambert v. Credit*
27   *Lyonnais*, 160 F.R.D. 437, 447 (S.D.N.Y.1995)).  Furthermore, the attorney's legal assistance
28   "must pertain to the matter in which the parties have a joint legal interest, and the communication

13

1    must be designed to further that specific legal interest." *Id.* at 578.

2    As a threshold matter, Plaintiffs argue that Moving Defendants fail to demonstrate the existence of an agreement for joint representation. Opp'n 9. Moving Defendants bear the burden to prove the existence of a common interest agreement, which requires "some evidence of an agreement to share information for the specific purpose of coordinating a common legal defense." *Ayers v. Lee*, No. 14CV542-BGS (NLS), 2018 WL 6589834, at *4 (S.D. Cal. Dec. 14, 2018) (citing *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA*, No. 14-MD-02521-WHO, 2016 WL 5906590, at *5 (N.D. Cal. Oct. 11, 2016)). Plaintiffs point out that Moving Defendants did not produce any engagement letter or retention agreement reflecting Hogeboom's joint representation. Opp'n 9. However, a common interest agreement "need not be in writing." *Teikoku Pharma USA*, 2016 WL 5906590, at *5. There is evidence in Lexington Exhibit 10 and ASC Exhibit 1 that the three sureties agreed to jointly engage Hogeboom as their attorney for the purposes of responding to the CDI rate inquiry, which is consistent with Moving Defendants' declarations. *See* Holtschneider Decl. ¶ 12; Carmichael Decl. ¶ 8; Southey Decl. ¶ 6. This is sufficient to demonstrate that a joint agreement existed between the three sureties and Hogeboom.

The key question here is whether the three sureties retained Hogeboom based on a common legal, as opposed to non-legal, interest. *See Nidec Corp.*, 249 F.R.D. at 579. Moving Defendants argue that their common interest was "to determine the impetus, origin, and legal consequences of the CDI's inquiry; the potential legal responses to such inquiry; to communicate directly with the CDI regarding its inquiry; and determine whether this inquiry could be resolved without further adverse action by the CDI." Mot. 9. As discussed above, however, the primary purpose of the three sureties' retention of Hogeboom was to coordinate an industry advocacy campaign to persuade CDI to change its approach. *See* Lexington Ex. 10. This more closely resembles a commercial lobbying effort than a legal defense strategy. Moving Defendants have not met their burden to demonstrate that the three sureties had a common legal interest.

The cases cited by Moving Defendants do not support their argument that Hogeboom's advice pertained to a common legal interest. In *Schaeffler v. United States*, the court found there

1    was a common legal interest between a consortium of banks and an accounting firm because all
2    parties were involved in a complex corporate restructuring and were pursuing a joint legal strategy
3    to secure a certain tax treatment from the IRS.  806 F.3d 34, 41 (2d Cir. 2015).  The court
4    characterized the common interest of the parties as "a legal problem albeit with commercial
5    consequences."  *Id.*  But *Schaeffler* is distinguishable because the parties in that case had a
6    common interest in the same corporate restructuring and the same IRS legal proceeding.  Here,
7    Moving Defendants have not demonstrated that the three sureties would have a common interest
8    in any legal proceeding brought by CDI related to the rate inquiry.  CDI sent the rate inquiry letter
9    to each surety separately.  Each surety ultimately provided data supporting its rates to CDI
10   "separately and independently of any other surety companies."  Holtschneider Decl. ¶ 18;
11   Carmichael Decl. ¶ 12.  There is no indication that CDI could bring legal proceedings against the
12   sureties as co-defendants, or that any one surety would have a legal interest in the outcome of a
13   rate inquiry involving another surety.  The sureties simply had similar factual situations (since
14   they all had the same 10% rate), faced the same type of CDI inquiry, and anticipated making
15   similar legal arguments in their separate proceedings before CDI.  This is not enough to
16   demonstrate a common legal interest.  *See In re Premera Blue Cross Customer Data Sec. Breach*
17   *Litig.*, 296 F. Supp. 3d 1230, 1248 (D. Or. 2017) (finding that the common interest doctrine did
18   not apply where communications were shared with third parties facing similar lawsuits, because
19   although such lawsuits "may involve similar legal theories, claims, and defenses," they would
20   "arise from different facts"); *see also Crosby*, 2020 WL 2510651, at *3 (citing *Shenwick v.*
21   *Twitter, Inc.*, 2019 WL 3815717, at *2 (N.D. Cal. Apr. 1, 2019)) ("While the common interest
22   does not need to be identical, 'the overall interests of the parties who assert the common interest
23   doctrine must be aligned to the extent that they are maintaining substantially the same cause.'").
24            Moving Defendants also cite *In re Regents of Univ. of California*, where the court found
25   there was a common legal interest between a patent-holder and an exclusive licensee with respect
26   to proceedings before the PTO because "[b]oth parties had the same interest in obtaining strong
27   and enforceable patents."  101 F.3d 1386, 1390 (Fed. Cir. 1996).  But again, in that case, the
28   patent-holder and the licensee shared a legal interest in the same patents and the same PTO

United States District Court
Northern District of California

proceedings. Here, Lexington, ASC, and Bankers have no shared legal interest in each other's rates and would have separate CDI proceedings regarding those rates. Their common interest in each other's rates and CDI proceedings is purely commercial—to influence how CDI regulates the bail bond industry as a whole.

Plaintiffs cite *In re Lidoderm Antitrust Litig.*, No. 14-MD-02521-WHO, 2016 WL 861019, at *4-5 (N.D. Cal. Mar. 7, 2016). In that case, the parties had a shared legal interest in the FDA's approval of the drug Lidoderm (as its patent holder and distributor) and had submitted a Citizen Petition to the FDA regarding the agency's approval of generic drugs based on Lidoderm. *Id.* They argued they had a common interest in FDA's approval procedures in general. *Id.* However, the court found that the parties did not have a legal interest in the FDA's approval of drugs other than Lidoderm—their interest in the approval of generic drugs was solely commercial. *Id.* Therefore, legal advice exchanged by the parties that went toward the Citizen Petition was not protected by the common interest doctrine. *Id.* Similarly, here there is no shared legal interest in CDI's approval of the three sureties' rates. Lexington has no legal interest in ASC's or Bankers's rates, and vice versa. The sureties shared only a common interest in how CDI's regulatory procedures generally affect the bail bond industry. This is a commercial interest. The court's finding is consistent with the note in *Lidoderm* that, "[i]n light of the accepted approach that privileges should be construed narrowly . . . many courts have refused to extend the common interest doctrine to joint regulatory or lobbying efforts." *Id.* at 5 (collecting cases).

Hogeboom gave advice to the three sureties pertaining to a joint advocacy campaign. A small portion of those communications contain some legal advice. However, no privilege attaches to those few communications because they were shared between the three sureties, and there is no common legal interest between the sureties. The sharing of information between the sureties waived any privilege.

## IV. CONCLUSION

The primary purpose of the vast majority of the at-issue communications was not legal in nature. To the extent there are a few privileged communications, the privilege was waived when they were shared between Lexington, ASC, and Bankers, as the three sureties do not share a

16

common legal interest.[8]

Moving Defendants must produce the documents in full.

**IT IS SO ORDERED.**

Dated: April 14, 2025

_____
Donna M. Ryu
Chief Magistrate Judge

---

[8] The court does not reach the remaining arguments because they are moot.