Dean M. Harvey (SBN 250298)
Katherine Lubin Benson (SBN 259826)
Michelle A. Lamy (SBN 308174)
Nicole M. Rubin (SBN 361232)
Emily N. Harwell (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
dharvey@lchb.com
kbenson@lchb.com
mlamy@lchb.com
nrubin@lchb.com
eharwell@lchb.com

*Interim Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No.  4:19-cv-00717-JST<br><br>**DECLARATION OF DEAN M. HARVEY IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENTS WITH DEFENDANTS ACCREDITED SURETY AND CASUALTY COMPANY, INC.; AMERICAN CONTRACTORS INDEMNITY COMPANY; AMERICAN SURETY COMPANY; BANKERS INSURANCE COMPANY; INDIANA LUMBERMENS MUTUAL INSURANCE COMPANY; THE NORTH RIVER INSURANCE COMPANY; SEAVIEW INSURANCE COMPANY; SENECA INSURANCE COMPANY; SUN SURETY INSURANCE COMPANY; UNITED STATES FIRE INSURANCE COMPANY; UNIVERSAL FIRE & CASUALTY COMPANY; WILLIAMSBURG NATIONAL INSURANCE COMPANY; AND WILLIAM B. CARMICHAEL** |

3481549.6

I, Dean M. Harvey, declare as follows:

1.      I am a partner at the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), which was appointed Interim Co-Lead Counsel in the above-captioned proceeding.  I am a member of the State Bar of California.  I have personal knowledge of the facts herein and, if called upon to testify to those facts, I could and would do so competently.

## PROCEDURAL HISTORY AND DISCOVERY

2.      On January 29, 2019, Plaintiffs commenced the action *Crain et al. v. Accredited Surety and Casualty Co. et al.* (the "Crain Action").  On May 1, 2019, the Court consolidated the Crain Action with a subsequently-filed related action (ECF No. 29), and appointed the undersigned Interim Class Counsel under Federal Rule of Civil Procedure 23(g) (ECF No. 44).  Plaintiffs filed the Consolidated Class Action Complaint ("CAC") on June 13, 2019.  ECF No. 46.

3.      On July 15, 2019, certain Defendants filed motions to dismiss the CAC.  ECF Nos. 56, 58.  The Court granted in part and denied in part those motions.  ECF No. 91.  Plaintiffs filed the Second Consolidated Amended Class Action Complaint ("SCAC") on May 13, 2020.  ECF No. 94.  Again, certain Defendants filed a motion to dismiss the SCAC.  ECF No. 112.  On January 5, 2021, the Court denied in part and granted in part the motion to dismiss (ECF No. 159), but also permitted targeted discovery to proceed, "to allow Plaintiffs to gather the facts necessary to correct any perceived deficiencies in the pleading of their complaint" (ECF No. 151).

4.      Following that discovery, on April 11, 2022, Plaintiffs filed the Third Consolidated Amended Class Action Complaint ("TCAC").  ECF No. 269; *see* ECF No. 281-1.  On May 26, 2022, certain Defendants filed a motion to dismiss the TCAC.  ECF No. 284.  On November 7, 2022, the Court denied the motion to dismiss the TCAC.  ECF No. 330.  Following the denial of the motion to dismiss the TCAC, the Parties have been engaging in full discovery.

5.      On December 11, 2024, Plaintiffs moved to certify a Class of "persons who between February 24, 2004, and August 14, 2023 (the 'Class Period'), paid for part or all of a commercial bail bond premium in connection with a California state court criminal proceeding," with certain exceptions.  ECF No. 513 at 1.  Defendants opposed the motion on March 26, 2025, and Plaintiffs replied on May 21, 2025.  ECF Nos. 551, 563.  The Parties briefed motions to exclude the opinions of Dr. Hal Singer and Dr. Bruce

3481549.6

HARVEY DECL. ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
4:19-CV-00717-JST

Strombom, respectively.  ECF Nos. 538, 559.  The Court held a hearing on Plaintiffs' motion for class certification and the Parties' respective motions to exclude on December 17, 2025.  ECF No. 644.  The motions are under submission.  On March 26, 2026, Defendants AIA Holdings, Inc., Allegheny Casualty Company, International Fidelity Insurance Company, and Lexington National Insurance Corporation filed a motion seeking to supplement the briefing.  ECF No. 664.  Four days later, Plaintiffs opposed (ECF No. 665) and the Court denied the motion (ECF No. 666).

6.     On April 25, 2024, Plaintiffs moved for preliminary approval of class action settlements with Defendants Lexon and DNIC, which provided for a $3 million non-reversionary settlement fund and injunctive relief.  ECF No. 465.  On December 11, 2024, the Court granted preliminary approval of the Lexon and DNIC settlements, provisionally certified the Settlement Class, appointed Lieff Cabraser as Settlement Class Counsel, and approved the proposed Notice procedure.  ECF No. 512.  Plaintiffs moved for final approval of the Lexon and DNIC settlements on March 20, 2025.  ECF No. 535.  The Court held a Final Approval Hearing on May 22, 2025 (ECF No. 564), and granted final approval of the Lexon and DNIC settlements on June 6, 2025 (ECF No. 568).

7.     Plaintiffs' discovery requests included six sets of requests for production of documents, six sets of interrogatories, 99 third-party subpoenas, and countless meet and confer meetings and confirmatory letters.

8.     The Parties litigated many discovery disputes, beginning with Defendants' requests for a stay on discovery pending resolution of their motion to dismiss (ECF Nos. 59, 61) and Plaintiffs' subsequent motion to lift the stay of discovery (ECF Nos. 95, 106).

9.     Discovery disputes required Plaintiffs to file seven motions to compel and letter briefs (ECF Nos. 179, 204, 208, 382, 393, 411, 510), all of which Plaintiffs won in whole or in part (ECF Nos. 191, 206, 230, 372, 394, 414, 480, 533, 558).

10.    Defendants ASC, Bankers, and Lexington objected to one of those discovery orders that rejected their attempt to claw back certain communications based upon claims of privilege (ECF No. 536), and the Court overruled the objection (ECF No. 555).

11.    Third-party bail agents and agencies resisted discovery, requiring three motions to compel (ECF Nos. 478, 482, 492), and months of negotiations regarding document productions.

12.     In response to Plaintiffs' discovery requests, Defendants produced 970,152 documents (3,946,312 pages) and transactional data regarding the bail bond transactions subject to Plaintiffs' claims.

13.     Plaintiffs took twenty-eight depositions of Defendants and third-party bail agents, defended depositions of the two Named Plaintiffs, defended two depositions of Plaintiffs' expert witness, Dr. Hal J. Singer, and took the deposition of Defendants' expert witness, Dr. Bruce Strombom.

14.     Plaintiffs spent eight months locating, subpoenaing, contacting, and conferring with 43 third-party bail agents.

15.     Settlement Class Counsel reviewed this discovery and used it as the basis for the settlement discussions.

## SETTLEMENT NEGOTIATIONS

16.     The Parties litigated for over seven years prior to reaching the Settlements detailed herein. The Settlements were the result of arm's length negotiations between experienced counsel that extended over many years.

17.     In the Spring of 2025, the Parties engaged mediator Michelle Yoshida of Phillips ADR, and exchanged mediation statements.  The Parties held an in-person mediation session with Ms. Yoshida on June 4, 2025 in San Francisco, attended by counsel for all Parties as well as senior executives from many of the Settling Defendants.

18.     Following that session, between June 2025 and March 2026, Plaintiffs and each of the Settling Defendants engaged in numerous settlement discussions, both separately and collectively, both with the assistance of Ms. Yoshida and through direct negotiations.  The negotiations with each Settling Defendant entailed considerable back-and-forth demands and offers.

19.     Those extensive discussions and negotiations resulted in agreements in principle with each of the Settling Defendants: Sun Surety on September 30, 2025; Universal on September 30, 2025; Williamsburg on October 23, 2025; C&F on November 11, 2025; Accredited on November 12, 2025; ACIC on November 12, 2025; Seaview on November 12, 2025; ASC on February 27, 2026; and Bankers on March 18, 2026.

20.     Plaintiffs and each Settling Defendant also separately negotiated and signed the Settlement Agreements attached hereto as Exhibits 1 to 9, which are dated between April 14 and June 9, 2026.

HARVEY DECL. ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
4:19-CV-00717-JST

21.     In each Settlement, all parties were represented by experienced and highly-skilled antitrust class action counsel acting in the interests of their respective clients. *See infra* ¶¶ 25-26 (discussing Lieff Cabraser's experience).  The Parties had sufficient information to value the case and to appreciate the strengths and weaknesses of their claims and defenses with respect to liability and damages.  All sides were also cognizant of the substantial risks, delays, burdens, and expense of ongoing class action litigation.  Attorney's fees were not discussed or negotiated.

22.     There is no agreement between Plaintiffs and any Settling Defendant other than the Settlements described herein.  The C&F Settlement Agreement and ASC Settlement Agreement each incorporate a Supplemental Agreement that provides termination rights for each if the portion of Settlement Class Members who submit timely and valid requests for exclusion exceeds a particular threshold of the Settlement Class, as calculated by the Settlement Administrator.  At the time of execution, Plaintiffs and each of ASC and C&F agreed to keep those Supplemental Agreements confidential and file them under seal.  However, since that time, ASC and C&F have each consented to Plaintiffs filing the respective agreements on the public docket.  No other cases will be affected by the Settlements.

23.     Plaintiffs' counsel, referred to herein as Settlement Class Counsel, reviewed the discovery in this matter, and used it as the basis for the settlement discussions.  This discovery (including transactional data) was critical to reaching agreement regarding the monetary component of the Settlements.  *See supra* ¶¶ 7-15 (discussing counsel's evaluation of the evidence).  Furthermore, a substantial portion of the investigation pertinent to this case and the Settlements took place before the initial complaint was filed: Settlement Class Counsel spent months investigating the alleged misconduct before filing the original complaint, and continued to do so as they filed two amended complaints.

24.     Given the ongoing litigation, I firmly believe that the Settlements are in the best interests of the Class.  I believe the Settlements are fair, reasonable, and adequate.

### SETTLEMENT CLASS COUNSEL

25.     Lieff Cabraser has extensive experience litigating, trying, and settling class actions, including antitrust cases, around the country.  It is one of the few firms to successfully try such a case to verdict:  Lieff Cabraser served as co-lead class counsel *In re TFT-LCD Antitrust Litigation ("LCDs")*, MDL No. 1827 (N.D. Cal.), which concerned a criminal conspiracy to fix LCD prices.  After reaching settlements with all

- 5 -

but one defendant, Lieff and its co-counsel tried the case. Following a six-week trial, the jury found for the plaintiffs, eventually leading to global settlements totaling $470 million. Additional examples of the firm's extensive experience are detailed in the firm resume, attached hereto as Exhibit 10.

26.     I and other members of my firm have been actively and personally involved in every aspect of this litigation since its inception, and have zealously litigated the claims of the proposed Settlement Class in consultation with experts. We have undertaken a substantial amount of work, effort, and expense in litigating Plaintiffs' claims over many years, and ultimately achieved an excellent result for the Settlement Class. At the time the Settlements were reached, we had a firm understanding of the risks and benefits of further litigation with the Settling Defendants. Plaintiffs, their counsel, and the Settlement Class share a common interest in maximizing the total monetary recovery and implementing meaningful injunctive relief that will prevent the alleged misconduct from continuing or reoccurring.

## SUMMARY OF SETTLEMENT TERMS

27.     The Settlement Class is all persons who, between February 24, 2004 and March 18, 2026 (the "Settlement Class Period"), paid for part or all of a commercial bail bond premium in connection with a California state court criminal proceeding. Specifically excluded from this Settlement Class are: Defendants in the Action; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir or assign of any Defendant and any person acting on their behalf; any person who acted as a bail agent during the Settlement Class Period; any judicial officer presiding over this Action and the members of his/her immediate family and judicial staff; and any juror assigned to this Action.

28.     These Settlements therefore concern alleged misconduct over a period of more than two decades, affecting approximately 2 million Settlement Class Members. There are millions of Settlement Class transactions at issue.

29.     **Monetary Relief.** If approved, the Settlements will establish a non-reversionary cash Settlement Fund of $66,292,574. Since Lexon and DNIC funded the settlements, the initial balance of $3 million has earned interest of $95,303.49. With the settlement funds from the settlements with Lexon and DNIC, and the interest accrued by each, the Total Settlement Fund will be $69,387,877. Accredited agreed to pay $9,437,500; ACIC agreed to pay $9,437,500; ASC agreed to pay $15,200,000; Bankers agreed to pay

HARVEY DECL. ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
4:19-CV-00717-JST

$4,817,916; C&F agreed to pay $18,875,000; Seaview agreed to pay $5,600,000; Sun Surety agreed to pay $1,000,000; Universal agreed to pay $835,000; and Williamsburg agreed to pay $1,089,658. All of these amounts will be placed into a non-reversionary Settlement Fund, and Settlement Class Members will be eligible to receive a claims-made pro rata payment after the deduction of expenses of the Settlement Administrator, any Service Awards for the Settlement Class Representatives, Settlement Class Counsel Attorneys' Fees and Litigation Expenses, and any other costs approved by the Court. The $66,292,574 Settlement Fund represents an excellent recovery. An important fact in evaluating this monetary consideration is that the Settling Defendants did not receive the entire transaction price as revenue because the large majority of each sale went to the bail agents who directly interacted with Settlement Class Members. This creates a large asymmetry between the Settling Defendants' potential liability for all Settlement Class damages, on the one hand, and the alleged benefit Settling Defendants received as revenue after bail agents retained their share, on the other. Thus, while Plaintiffs estimate total damages to the Settlement Class of between approximately $1.6 billion and $2.3 billion (when using the same methods used to allocate the Settlements), Singer Decl. ¶ 20, these amounts are vastly larger than Settling Defendants' total revenue from those same transactions, which was less than $350 million. *See* Singer Rep., Ex. 14, ECF No. 513-18. Further, the Settling Defendants are all private companies with limited available capital, and would not be capable of satisfying a judgment in full if Plaintiffs prevailed at trial.

30. The Settling Defendants' potential liability is over seventeen times their total gross revenue regarding the same transactions. Further, the Settling Defendants are all private companies with limited available capital, and cannot come close to satisfying a judgment, if Plaintiffs prevailed on anything close to their full damages at trial. To square this circle, Plaintiffs instead judged potential settlement against each Settling Defendant's revenue from Settlement Class transactions.

31. The Settlements fall into three buckets: (1) Settlements with Defendants who had very small market shares and very small revenue; (2) Settlements with Defendants who had meaningful market shares and meaningful revenue; and (3) Settlements with Defendants with significant ability to pay issues.

32. In the first bucket, three Settling Defendants had very small market shares: Williamsburg, Sun Surety, and Universal. Each had an approximately 0.2% share of Settlement Class Transactions, and each agreed to pay settlements that are nearly equal to their total gross revenue. Williamsburg will pay

$1,089,658, which is approximately 92% of its gross revenue from Class transactions; Sun Surety will pay $1,000,000, which is approximately 91% of its gross revenue from Class transactions; and Universal will pay $835,000, which is approximately 92% of its gross revenue from Class transactions. While these are small nominal amounts, they vastly exceed the percentage of revenue recovery in other antitrust cases.

33. In the second bucket: the C&F Defendants had the largest share at approximately 9.8% of Class transactions and agreed to pay $18,875,000, which is approximately 31% of their gross revenue from Class transactions; Accredited had an approximate market share of 4.7% and agreed to pay $9,437,500, which is approximately 30% of its gross revenue; ACIC had an approximate market share of 5.2%, and agreed to pay $9,437,500, which is approximately 22% of its gross revenue; and ASC had an approximate market share of 7.9% and agreed to pay $15,200,000, which is approximately 27% of its gross revenue. Again, these amounts vastly exceed many other antitrust cases, when viewed in relation to the gross revenue received from Class transactions.

34. In the third bucket are Seaview, with an approximate market share of 18.2%, and Bankers, with an approximate market share of 14.4%. Plaintiffs negotiated these Settlements based on a detailed analysis of how much each could pay without a substantial impact on their ability to remain in business and comply with statutory and regulatory capital reserve requirements. The DNIC settlement approved by the Court was derived from a similar ability-to-pay analysis. ECF No. 512 at 17.

35. **Injunctive Relief.** If approved, the Settlements will also yield significant injunctive relief, substantially the same injunctive relief approved by the Court for the Lexon and DNIC settlements. *See* ECF Nos. 512, 568. They all agree that—to the extent that they participate in the California bail bond market or choose to re-enter the market within five (5) years of executing the Settlement—they will not coordinate with competitors regarding any aspect of bail bond prices in California, including premium rates submitted to the California Department of Insurance, premium rates charged to customers, or rebating practices by bail bond agents. ASC, Bankers, C&F, Seaview, Sun Surety, and Universal—which currently participate in the California bail bond market—agreed that for a period of two years, they will issue written guidance to their active California bail agency owners advising them that rebating is legal under California law, and will do so every four months. They will direct that the aforementioned guidance be communicated to customers and potential customers with equal prominence and visibility as any representation by their

3481549.6

HARVEY DECL. ISO PLTFS' MOTION FOR PRELIM. APPROVAL OF SETTLEMENTS
4:19-CV-00717-JST

bail agents that they must charge filed rates.  Accredited, ACIC, and Williamsburg—which do not currently participate in the California bail bond market—agreed that should they choose to re-enter the California bail bond market within five years of executing the Settlements, they will include a provision in their contracts with California bail agents requiring them to communicate to customers that rebating is legal under California law and that the communication be given equal prominence and visibility as any representation by their bail agents that they must charge filed rates.

36.    *Cy Pres*.  As detailed above, after all timely and valid claims are paid, the Settlements provide for redistribution of any funds remaining to Settlement Class Members, up to a cap of three times their damages, until it is economically infeasible to do so.  In the event that there remain undistributed funds thereafter, Settlement Class Counsel propose Project Avary, Healing Urban Barrios, and Defy Ventures (NorCal and SoCal) as *cy pres* recipients.  The proposed *cy pres* recipients serve the interests of the Settlement Class by addressing the needs of Settlement Class Members and their families by supporting children of incarcerated parents, assisting formerly incarcerated individuals with re-entry services, and promoting economic empowerment for those who have experienced incarceration.  Settlement Class Counsel is aware of no relationships between these proposed *cy pres* recipients and Plaintiffs, Settling Defendants, or Settlement Class Counsel.

### SETTLEMENT ADMINISTRATION AND NOTICE PLAN

37.    The Parties propose that A.B. Data, an experienced and reputable national class action administrator, serve as Settlement Administrator to provide Notice to the Settlement Class and all other services necessary to implement the Settlements.

38.    Settlement Class Counsel selected A.B. Data after a competitive bidding process involving both A.B. Data and a second reputable national class action administrator.  Specifically, Settlement Class Counsel requested bids from both competitors for (1) a notice and claims administration with an immediate distribution; and (2) a notice and claims administration with a deferred distribution (i.e., the two-phased process described herein).  Settlement Class Counsel selected A.B. Data because it provided both a more comprehensive proposal and a better rate for each scenario.  A.B. Data successfully administered the Lexon and DNIC notice process, including collecting contact information.

- 9 -

39. In the past two years, my firm has worked with A.B. Data in the following four cases: *In re Papa John's Employee and Franchisee Employee Antitrust Litigation*, Case No. 3:18-CV-00825-BJB-RSE (W.D. Ky.); *In re Restasis Antitrust Litig.*, Case No. 1:18-md-02819-NG-LB (E.D.N.Y.); *In re National Prescription Opiate Litigation*, Case No. CIV-18-994-G (W.D. Okla.); and *In re McKinsey & Co., Inc. National Prescription Opiate Consultant Litigation*, Case No. 1321-md-02996-CRB (N.D. Cal.).

40. The proposed Notice is attached as Exhibit C to the Pang Declaration, and is the same for all the Settlement Agreements (i.e., providing a single Notice of all Agreements).

### PROPOSED ATTORNEYS' FEES AND SERVICE AWARDS

41. Approved service awards, attorneys' fees, and expenses will be paid out of the Gross Settlement Fund. Settlement Class Counsel anticipates petitioning the Court for (1) an award of Settlement Class Counsel Attorneys' Fees in a total amount not to exceed one-third of the monetary consideration of the Total Settlement Amount (approximately $23.1 million), which does not include the estimated future benefits of the injunctive relief (Singer Decl. ¶¶ 14-21); (2) an award of Settlement Class Counsel Litigation Expenses reflecting their unreimbursed litigation costs to date (no more than $2 million); and (3) approval of service awards of up to $50,000 to each of the Settlement Class Representatives.

42. Over more than seven years of litigation, Settlement Class Counsel have devoted over 48,400 hours and over $27.4 million in attorney and staff time using historical billing rates, and over $32.6 million in attorney and staff time when applying the most recent billing rate for each time keeper. This is in addition to the attorney and staff time provided by co-counsel. Settlement Class Counsel will provide additional information regarding their lodestar with their forthcoming fee and cost application.

43. During the course of this litigation, Settlement Class Counsel has also expended approximately $2 million in out-of-pocket costs. Settlement Class Counsel will provide additional information regarding their costs with their forthcoming fee and cost application, and in no event will seek more than $2 million.

### COMPARABLE OUTCOMES

44. Comparable settlements are summarized in the chart attached hereto as Appendix A.

**EXHIBITS**

45.    Attached hereto as **Exhibit 1** is a true and correct copy of the Settlement Agreement and Release dated June 9, 2026 between Plaintiffs and Accredited.

46.    Attached hereto as **Exhibit 2** is a true and correct copy of the Settlement Agreement and Release dated May 8, 2026, between Plaintiffs and ACIC.

47.    Attached hereto as **Exhibit 3** is a true and correct copy of the Settlement Agreement and Release dated June 1, 2026 between Plaintiffs and ASC.

48.    Attached hereto as **Exhibit 4** is a true and correct copy of the Settlement Agreement and Release dated May 29, 2026 between Plaintiffs and Bankers.

49.    Attached hereto as **Exhibit 5** is a true and correct copy of the Settlement Agreement and Release dated May 29, 2026 between Plaintiffs and C&F.

50.    Attached hereto as **Exhibit 6** is a true and correct copy of the Settlement Agreement and Release dated May 11, 2026 between Plaintiffs and Seaview.

51.    Attached hereto as **Exhibit 7** is a true and correct copy of the Settlement Agreement and Release dated May 19, 2026 between Plaintiffs and Sun Surety.

52.    Attached hereto as **Exhibit 8** is a true and correct copy of the Settlement Agreement and Release dated May 20, 2026 between Plaintiffs and Universal.

53.    Attached hereto as **Exhibit 9** is a true and correct copy of the Settlement Agreement and Release dated April 14, 2026 between Plaintiffs and Williamsburg.

54.    Attached hereto as **Exhibit 10** is a true and correct copy of the Lieff, Cabraser, Heimann & Bernstein LLP Firm Resume.

*    *    *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 25th day of June 2026, in San Francisco, California.

/s/ Dean M. Harvey
Dean M. Harvey

HARVEY DECL. ISO PLTFS' MOTION FOR
PRELIM. APPROVAL OF SETTLEMENTS
4:19-CV-00717-JST

# APPENDIX A

## Chart of Comparable Class Action Settlement Outcomes (N.D. Cal. Procedural Guidance 11)

| Case | Claims | Total Settlement Fund | Total Number of Class Members | Total Number of Class Members to Whom Notice Was Sent | Method(s) of Notice | Number & Percentage of Claim Forms Submitted | Average Recovery Per Class Member / Claimant | Amounts Distributed to Cy Pres | Administrative Costs | Attorneys' Fees and Costs | Total Exposure | Injunctive Relief or Other Non-Monetary Relief |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Antitrust Settlements** | | | | | | | | | | | | |
| *In re Packaged Seafood Products Antitrust Litigation*, No. 3:15-md-02670-DMS-MSB (S.D. Cal. 2024) (End Payer Plaintiffs) | State antitrust, unfair competition, and consumer protection laws on behalf of the Cartwright Act Class and the State Classes. | $152,200,000 | Not Reported. | 265,926 received mailed notice; digital efforts reached more than 70% of class members; press release reached potential audience of 179.5 million. | Email; first-class U.S. Mail; settlement website; digital publication (Google Display Network, Facebook); print publication (People Magazine); national press release via PR Newswire (English and Spanish). | Not Reported. | Not Reported. | Not Reported. | $726,702.30 in costs incurred; remaining claims processing estimated between $2.1 million and $5.8 million. | $48,320,739.40 | Approximately $224,000,000 (single damages); approximately $672,000,000 (trebled). | n/a |
| *In re Packaged Ice Antitrust Litigation*, No. 08-MDL-01952 (E.D. Mich. 2011) | Sherman Antitrust Act, 15 U.S.C. § 1, and related state law. | $26,750,000 | Not Reported. | Direct notice mailed to 208,862 class members. | First class U.S. Mail; publication in the National Edition of the Wall Street Journal; settlement website. | 2,760 (just under 1% of the 208,862 notices sent). | Not Reported. | Not Reported. | $117,840.41 | $6,478,731.50 in attorneys' fees (26.5%– 29% of settlement fund); $117,909.00 in litigation expenses. | Not Reported; Defendants' relevant sales during the class period totaled approximately $3.1 billion. | n/a |
| *In re Automotive Refinishing Paint Antitrust Litigation*, MDL No. 1426 (E.D. Pa. 2007) | Sherman Antitrust Act, 15 U.S.C. § 1, and related state law. | $105,750,000 | Not Reported. | Over 60,000 copies of Notice mailed to potential class members. | Individual notice by first class mail to all identifiable class members; publication in the National Edition of the Wall Street Journal; publication in automotive refinishing trade publication. | For first settlement 57,963 notices were mailed with 2,199 claims submitted (3.8%) | Not Reported. | $91,689.61 | $444,977.01 | $34,538,000 in fees; $1,204,720.63 in costs; and $120,000 in service awards. | Not Reported; PPG/Sherwin-Williams settlement represents approximately 1.5% of those defendants' sales during the four highest-sales years of the Class Period. | n/a |
| **Settlements Involving Large Class Sizes, Media Notice, and/or Modest Claims Rates** | | | | | | | | | | | | |
| *Schneider v. Chipotle Mexican Grill, Inc.*, Case No. 16-cv-02200-HSG (N.D. Cal. 2020) | California, Florida, Maryland, and New York state laws regarding consumer protection, false advertising, unfair competition, unjust enrichment, misrepresentation, and declaratory relief. | $6,500,000 | Approximately 30 million. | Notice program reached an estimated 72.64% of class members. | Digital media campaign (internet advertising); publication in People magazine and the East Bay Times newspaper; settlement website; toll-free hotline. | Approximately 0.83%. | $4.00 per valid claim with ability to submit multiple claims. | Not Reported. | Not separately quantified. | $1,950,000 in attorneys' fees (30% of settlement fund); $636,556.28 in costs; service awards denied by court in light of small recovery per claimant. | Approximately $87.5 million. | n/a |

| Case | Claims | Total Settlement Fund | Total Number of Class Members | Total Number of Class Members to Whom Notice Was Sent | Method(s) of Notice | Number & Percentage of Claim Forms Submitted | Average Recovery Per Class Member / Claimant | Amounts Distributed to Cy Pres | Administrative Costs | Attorneys' Fees and Costs | Total Exposure | Injunctive Relief or Other Non-Monetary Relief |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 13: **Settlements Involving Large Class Sizes, Media Notice, and/or Modest Claims Rates** |
| *Abante Rooter and Plumbing, Inc. v. Pivotal Payments Inc.,* No. 3:16-cv-05486-JCS (N.D. Cal. 2018) | Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, and related state laws. | $9,000,000 | Approximately 1.9 million. | Direct notice sent to 1,750,564 class members. | First class mail postcard notice; settlement website; toll-free 24-hour automated phone system; separate toll-free number. | 37,970 valid claims, (approximately 2.17% of class members to whom notice was sent). | $161.32 | n/a | $1,071,575 | $1,800,000 in attorneys' fees (20% of settlement fund); $50,874.04 in litigation costs (included within fee award); and $2,000 service award. | Approximately $5,796,836,000 (single damages); 17.4+ billion (trebled). | Not Reported. |
| *In re Carrier IQ, Inc., Consumer Privacy Litigation,* No. 12-md-02330-EMC (N.D. Cal. 2016) | Federal Wiretap Act as amended by the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510; The Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, and related state privacy acts; State consumer protection acts; and The implied warranty of merchantability. | $9,000,000 | Approximately 30 million unique individuals. | 81.3% of the class reached. | Publication notice (USA Today and People magazine); banner advertisement notice; paid social media advertising; search-based advertising on Google; display network advertising on Google; staff outreach through social media; and a press release appearing on 195 websites. | 42,577 valid claims (0.14% response rate). | $149.28 | n/a | $655,500 | $2,250,000 in attorneys' fees (25% of the gross settlement fund); $108,933.72 in litigation costs; incentive awards of $3,000-5,000 each for 17 named plaintiffs. | Not Reported. | Defendant required to change its software. |
| *In re Toys "R" Us-Delaware, Inc. — Fair and Accurate Credit Transactions Act (FACTA) Litig.,* MDL No. CV 08–01980 MMM (FMOx) (C.D. Cal. 2014) | Fair and Accurate Credit Transactions Act (FACTA), 15 U.S.C. § 1681c(g). | Non-monetary common fund. Aggregate estimated value of relief ranges from $65.25 million (if all class members receive $5 vouchers) to $391.5 million (if all receive $30 vouchers). | Approximately 13.05 million. | Not Reported. | Publication notice in USA Today; dedicated settlement website No direct individual notice was provided because identities of class members were unknown. | Not Reported; court estimated that a claims rate of 2–3% was likely based on nature relief and publication-only notice. | $5 to $30 in transferable vouchers valid for six months at Toys "R" Us stores. | n/a | Not separately quantified. | $458,602.54 in attorneys' fees and $66,397.46 in expenses; incentive awards of $5,000 to each of three named plaintiffs. | $1.305 billion – $13.05 billion; approximately 2,500% of Defendant's net worth. | Transferable vouchers of $5 to $30, valid for six months, for use at Toys "R" Us stores. |

| Case | Claims | Total Settlement Fund | Total Number of Class Members | Total Number of Class Members to Whom Notice Was Sent | Method(s) of Notice | Number & Percentage of Claim Forms Submitted | Average Recovery Per Class Member / Claimant | Amounts Distributed to Cy Pres | Administrative Costs | Attorneys' Fees and Costs | Total Exposure | Injunctive Relief or Other Non-Monetary Relief |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Settlements Involving Defendant's Inability to Pay More | | | | | | | |
| *Plumbers & Pipefitters Local Union #295 Pension Fund v. CareDx, Inc.*, No. 22-cv-03023-TLT (N.D. Cal. 2025) | Section 10(b) of the Exchange Act and Rule 10b-5 and Section 20(a) of the Exchange Act. | $20,250,000 | Unknown. | Direct notice sent to 31,210 class members; notice submitted to DTC for posting on the DTC Legal Notice System (LENS). | Postcard Notices mailed or emailed to known class members; DTC's LENS posting; publication in The Wall Street Journal and PR Newswire; settlement website; toll-free telephone helpline; dedicated email address. | 25,863 claims (83% submission rate). | Approximately $1,868.08. | Not Reported. | $192,289.81 | $5,062,500.00 in attorneys' fees (25% of the Settlement Fund); $368,880.02 in litigation expenses; $20,640 in aggregate Lead Plaintiffs' service awards. | Approximately $400 million. | n/a |
| *Rinky Dink, Inc. v. World Bus. Lenders, LLC*, No. C14-0268-JCC (W.D. Wash. 2016) | Telephone Consumer Protection Act, 47 U.S.C. § 227; The Washington Automatic Dialing and Announcing Device statute, RCW 80.36.400; and The Washington Consumer Protection Act, RCW 19.86. | $1,000,000 | 238,263 | Direct notice provided to approximately 86% of class members. | Mailed notice packets and postcards to identifiable Settlement Class Members; dedicated settlement website; toll-free phone number. | 2,708 claims (approximately 1.14% of the Class). | Approximately $150 per claimant per sub-class. | n/a | $200,000 | $250,000 in attorneys' fees (25% of the common fund); $60,939.74 in litigation costs; and service awards of $10,000 (2 plaintiffs) and $5,000 (1 plaintiff). | Not separately quantified. | Reasonable efforts to ensure Defendant and its vendors do not use automatic dialing and announcing device for commercial solicitation to numbers with Washington area codes and without obtaining customers' prior express consent. |