HORVITZ & LEVY LLP
JEREMY B. ROSEN (Bar No. 192473)
jrosen@horvitzlevy.com
505 Sansome Street, Suite 1550
San Francisco, California 94111
(415) 462-5600 • FAX (844) 497-6592

HORVITZ & LEVY LLP
JUSTIN R. SARNO (Bar No. 229803)
jsarno@horvitzlevy.com
3601 West Olive Avenue, 8th Floor
Burbank, California 91505
(818) 995-0800 • FAX (844) 497-6592

Attorneys for Defendants
AIA Holdings, Inc., Allegheny Casualty Company, International Fidelity Insurance, and Lexington National Insurance Corporation

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION,<br><br>This Document Relates To:<br><br>ALL ACTIONS | Case No. 4:19-cv-00717-JST<br><br><u>CLASS ACTION</u><br><br>**NON-SETTLING DEFENDANTS' STATEMENT ON PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENTS WITH SETTLING DEFENDANTS[1]** |

[1] Defendants Accredited Surety and Casualty Company, Inc.; American Contractors Indemnity Company; American Surety Company; Bankers Insurance Company; Indiana Lumbermens Mutual Insurance Company; The North River Insurance Company; Seaview Insurance Company; Seneca Insurance Company; Sun Surety Insurance Company; United States Fire Insurance Company; Universal Fire & Casualty Company; Williamsburg National Insurance Company; and William B. Carmichael.

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ... ii

I. CONCERNS WITH THE SETTLEMENT PLAN THAT SHOULD BE ADDRESSED IMMEDIATELY. ... 1

A. The Settlements Fail to Filter Out Uninjured Class Members. ... 1

B. The Settlements Create Intra-Class Conflicts ... 5

II. CONCERNS REGARDING THE IMPACT OF THE SETTLEMENTS ON THE PENDING CONTESTED CLASS-CERTIFICATION AND *DAUBERT* MOTIONS. ... 6

A. The Motion Presents Sequencing Problems. ... 7

1. Findings on this preliminary approval motion cannot be binding for the contested, pending class certification motion. ... 7

2. The contested class certification motion should not be resolved until the settlement administration is complete. ... 7

B. The Motion Materially Affects the Court's *Daubert* Analysis. ... 10

III. CONCLUSION ... 12

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) ....................8

*Brady v. AutoZone Stores, Inc.*,
960 F.3d 1172 (9th Cir. 2020) ....................8

*In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*,
No. 02-6030, 2006 WL 891362 (D.N.J. Apr. 4, 2006) ....................9

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) ....................8

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
2016 WL 8669891 (N.D. Cal. Aug. 22, 2016) ....................5

*Chen v. Allstate Ins. Co.*,
819 F.3d 1136 (9th Cir. 2016) ....................8

*Flintkote Co. v. Lysfjord*,
246 F.2d 368 (9th Cir. 1957) ....................10

*In re Graphics Processing Units Antitrust Litigation*,
253 F.R.D. 478 (N.D. Cal. 2008) ....................8, 9

*In re Hyundai & Kia Fuel Econ. Litig.*,
926 F.3d 539 (9th Cir. 2019) ....................7

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ....................12

*La Mar v. H & B Novelty & Loan Co.*,
489 F.2d 461 (9th Cir. 1973) ....................9

*Lewis v. Continental Bank Corp.*,
494 U.S. 472 (1990) ....................8

*In re Milk Prods. Antitrust Litig.*,
195 F.3d 430 (8th Cir. 1999) ....................9

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) ....................9, 10

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .......... 6

*Steel Co. v. Citizens for Better Environment*,
523 U.S. 83 (1998) .......... 8

*Texas Indus., Inc. v. Radcliff Materials, Inc.*,
451 U.S. 630 (1981) .......... 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
267 F.R.D. 583 (N.D. Cal. 2010) .......... 9

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*,
2021 WL 409982 (E.D. Pa. Feb. 5, 2021) .......... 5, 6, 7, 8

**Rules**

Federal Rule of Civil Procedure Rule 23 .......... 1, 6, 8

Federal Rule of Evidence 702 .......... 11

Local Rule 7-3(b) .......... 1

Pursuant to Civil Local Rule 7-3(b), Defendants AIA Holdings, Inc. ("AIA"), Allegheny Casualty Company, International Fidelity Insurance Company ("AIA Defendants"), and Defendant Lexington National Insurance Corporation ("Lexington") (collectively, "Non-Settling Defendants") neither oppose nor support Plaintiffs' Motion for Preliminary Approval of Class Action Settlements with Settling Defendants,[2] ECF 669. Non-Settling Defendants, however, make clear that their non-opposition should not be construed as agreement with the statements in the motion or its supporting documents. The Court previously considered a similar statement on a motion for preliminary approval in this case; Non-Settling Defendants respectfully request the same consideration here. *See* ECF 467; ECF 512 at 4–5, 8–10, 12 n.3, 19–20.

Non-Settling Defendants have multiple concerns with the motion. First, the proposed distribution and notice plans have significant problems.[3] Second, the proposed settlements impact the timing and substance of the Court's decisions on the pending, contested class-certification motion and the pending *Daubert* motion seeking to exclude the Singer declaration filed in connection with the class certification motion.

## I. CONCERNS WITH THE SETTLEMENT PLAN THAT SHOULD BE ADDRESSED IMMEDIATELY.

### A. The Settlements Fail to Filter Out Uninjured Class Members.

The motion worsens problems Non-Settling Defendants raised in their opposition to class certification, *see generally* ECF 551, and creates untenable inequities between class members in violation of Rule 23(e)(2)(D). Most critically, the distribution plan's flawed but-for rate and unrealistic rebating assumptions would sweep enormous numbers of uninjured persons into the settlement class.

The proposed distribution plan works as follows. Class members who submit claims "will self-identify as Participating Settlement Class Members;" no documentation of payment need be

---

[2] Defined as the persons and entities listed in note 1, *supra*.

[3] The proposed class notice requires correction before dissemination because it reintroduces the "premiums (or fees)" language previously flagged as problematic in the Lexon and Danielson settlement round. *See* ECF 669-15 at 8. This language was corrected in the previous round of settlements. *See* ECF 467 at 3; ECF 477 at 3–4; 512 at 19. A similar correction is warranted here.

provided, and the claimant does not sign under penalty of perjury. ECF 669 at 9. For claimants without documentation, the settlement administrator will estimate the price using a blanket, undifferentiated formula: the premium rate recorded in Defendants' transaction data, reduced by a flat rebate of 1.5%, multiplied by the bail amount. *Id.* The Administrator will then estimate a "but-for" competitive price by multiplying the bail amount by a flat effective rate of 6.05% and treat the difference between the two figures as the claimant's "estimated damages." *Id.* The claimant's "estimated damages" would then be tripled, purportedly to account for antitrust trebling of damages. *Id.* Payments from the settlement fund are then distributed *pro rata* in proportion to each claimant's share of the aggregate estimated damages. *Id.*

This formula treats nearly every claimant who provides no documentation as injured. By Plaintiffs' own account, a "standard" 10% rate applied in 83.4% of class transactions, with an 8% rate in another 12.6%—together, 96% of all transactions. ECF 669 at 17. Apply the formula to those recorded rates and the result is preordained: a recorded 10% rate less the assumed 1.5% rebate yields an estimated price of 8.5%, and a recorded 8% rate yields 6.5%—both above the 6.05% but-for rate. The formula thus treats ***96%*** of all undocumented claimants as injured.

This is both nonsensical and inequitable. As Non-Settling Defendants demonstrated in their opposition to class certification and supporting papers, actual rebating practices varied enormously—from bail agents who almost never rebated to agents who rebated on the overwhelming majority of their transactions—with rebates commonly exceeding Singer's flat 1.5% assumption. *See* ECF 551 at 12–13 (citing examples). A class member who negotiated a substantial rebate—paying an effective rate of, say, 5%—suffered no injury under Plaintiffs' own theory, yet the formula deems her injured at an estimated 8.5% and pays her accordingly. Meanwhile, a class member who paid the full 10% with no rebate—the person actually injured under Plaintiffs' theory—has his recovery computed from the same deflated 8.5% baseline, understating his damages to fund payments to the uninjured.

The named Plaintiffs' own experience illustrates the problem. Plaintiff Monterrey was the indemnitor on at least two bonds during the class period. *See* ECF 551 at 11. On one of the bonds, she received unsolicited rebates resulting in a charged rate of 4.7%, below Singer's 6.05% cutoff.

*See id.* Under the proposed distribution formula, a claimant with this transaction profile but no documentation would be treated as having paid 8.5%. That represents a windfall for an uninjured class member. The incentives are perverse: a plaintiff who can document paying a higher rate than the formula would produce will do so, while one who paid a lower effective rate is incentivized to eschew documentation. This is likely a widespread problem because substantial evidence (that Singer discounted or ignored) indicates that effective rates below 6.05% were common during the class period. *See, e.g.*, *id.* at 9, 14, 27, 31 (citing examples).

Other issues compound the problem. The motion concedes that the parties "do not have contact information for the substantial majority of Settlement Class Members." ECF 669 at 7.[4] Consequently, for undocumented class members, class membership will be established solely by self-identification, with the Administrator evaluating claims against transaction data that—for a substantial share of transactions—identifies no customer at all. See ECF 551 at 28 (citing supporting declaration from Rachel Brass, Ex. 3, 213:15–214:7) ("Over 525,000 of the transactions in Singer's dataset contain no customer information."). Further, as Plaintiffs will readily admit, this data, rarely, if ever, identifies the name of the indemnitor that may have paid a portion or all of the premium. Plaintiffs could have obtained from the bail bond agents the amount charged and paid for each bond, but failed to do so. It is entirely unclear how the settlement administrator can evaluate the legitimacy of self-identifying indemnitors when the transaction data collected by Plaintiffs contains no relevant identifying information and claimants are not required to submit proof as to what payments were made by whom at what time.

Moreover, the motion's formula does not account for credit bail—the reduction of an on-paper premium rate resulting from payment plans, missed payments, and written-off accounts. *See id.* at 9-10 (explaining significance of credit bail); ECF 556-1 at 1, 6-9 (explaining this greatly reduces the actual amount paid in most cases). That widens the gap between the formula's cutoff

---

[4] This is in contrast to the earlier settlements in this case with Defendants Lexon Insurance Company and Danielson National Insurance Company, where Plaintiffs relied on having contact information for more than half the plaintiffs in the settlement class in responding to similar criticisms. *See* ECF 477 at 5. Plaintiffs failed to seek such information through discovery here

for damages and real-world payments even further.

Finally, the damages analysis does not account for the possibility that indemnitors may have made all or part of the payments on a debtor's behalf. Consider the following hypothetical, but realistic scenario: Three brothers purchase a $100,000 bail bond for their sister. The premium is 10% of the bond amount, or $10,000. The bondsman accepts a small down payment of $300, which the brothers agree to share (i.e., $100 each). The sister is then released from custody, and she, not her brothers, makes the remaining premium payment of $9,700 to the bondsman.

Under the proposed plan, each sibling can submit a claim because they are Settlement Class Members—that is, they "paid for part or all of a commercial bail bond premium" during the class period. ECF 669 at 1 n.1. Each sibling could do so without submitting documentation. Even though each brother only paid $100 toward the premium, they would ***each*** have a claim for $7,350, calculated as follows: $10,000 charged premium - $1,500 presumed rebate - $6,050 "but for" rate = $2,450 assumed damages x 3 for treble damages = $7,350. The three brothers' separate submissions would total $22,050 in claims based on a total of $300 in premium paid. These "estimated damage" amounts would be increased if the siblings happened to have documentation showing the premium charged for the bond was 10%.

The ability of Plaintiffs to weed out uninjured claimants was raised at the hearing on the Motion for Class Certification, and Plaintiffs asserted that they could do so—for example:

- "Claims administration will be able to screen out any few uninjured class members using entirely common methods and procedures," ECF 651 (transcript for December 17, 2025, hearing on class certification and *Daubert* motions) at 42:2–5 (quoting from Plaintiffs' class certification reply brief);
- If the Court is concerned about "uninjured" class members, "the claims process for ***every*** class member" will have to involve a weed-out mechanism, *id.* at 43:13–17 (emphasis added);
- "I don't think it's an unreasonable thing -- you know, this would not be my preference, but it's conceivable that, during a payment administration process, we would require actual records of what the price was charged," *id.* at 43:5–8; and

- "We can reliably confirm that there isn't a great number of uninjured people in the class, and that, at the individual level, that is a matter for claims administration, and we can have whatever level of scrutiny, however aggressive we want to be," *id.* at 71:12–16.

Consequently, to further guard against fraudulent claims, the claim form should require meaningful identifying information (copy of government-issued ID, last four digits of Social Security number). Additionally, claimants should be required to identify the amount of premium they actually paid and any other indemnitors on that bond, and the settlement administrator should be required to investigate multiple submissions for the same bond. Finally, the claim form should be sworn to under penalty of perjury, not merely "to the best of my knowledge."

**B. The Settlements Create Intra-Class Conflicts**

The proposed distribution plan also fails to grapple with three Settling Defendants having exited the bail bonds market before the close of the Settlement Class Period.

As this Court has recognized, an intra-class conflict may arise when a subset of class members purchased bonds within the class period but after some defendants who were part of the alleged price-fixing conspiracy withdrew from that conspiracy by exiting the market. *See* ECF 512 at 8–10; *see also In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891, at *2 (N.D. Cal. Aug. 22, 2016) ("Once a corporation has joined a price-fixing conspiracy, it is jointly and severally liable for any actions taken in furtherance of the conspiracy until the objectives of the conspiracy are completed or the defendant withdraws"); *Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop.*, 2021 WL 409982, at *6 (E.D. Pa. Feb. 5, 2021) ("Even in a continuing conspiracy, a defendant should not be liable for damages attributable only to new acts of the conspiracy, which were taken after that defendant's withdrawal.").

Defendant Williamsburg exited the California bond market in 2017, Defendant ACIC in 2019, and Defendant Accredited in 2020. ECF 669-15 at 5. The Settlement Class Period, however, runs through March 18, 2026. ECF 669 at 5. "[T]his raises the possibility that [certain] Settling Defendants' contributions to the Settlement Fund might ultimately benefit persons who were not harmed by [those] Settling Defendants' conduct, at the expense of those who were." ECF 512 at

10.

In approving the earlier settlements with Lexon and Danielson, the Court confronted the same issue: Danielson had exited the California bail business in 2012, and Lexon in 2014. *Id.* at 8. There, after chiding Plaintiffs for "giv[ing] the issue of withdrawal short shrift," the Court found the issue tolerable only because "the Plaintiffs ha[d] not yet put forward a plan of distribution," adding that "[o]nce that plan is developed, it can accommodate differences in class members' harms or rights of recovery if such differences are large enough to be material." *Id.* at 9-10. It also observed that "if the common fund grows through the receipt of additional settlements from Defendants who participated in the conspiracy over a longer period, the differences between individual class members' rights of recovery are likely to decrease." *Id.* at 10.

The distribution plan (which also governs Lexon and Danielson) has now arrived but makes no such accommodation. It provides every claimant a share of the fund in proportion to estimated damages, computed identically regardless of when the claimant purchased. *See* ECF 669 at 8-9. A person who purchased a bond in 2025—after Williamsburg, ACIC, Accredited, Lexon, and DNIC had all exited—shares in those defendants' contributions on equal terms with a person who purchased in 2010, when all were active.

Nor can the Court's second rationale—dilution through fund growth—carry the weight alone. Accredited, ACIC, and Williamsburg's combined contributions account for nearly a third of the $66.3 million from the Settling Defendants other than Lexon and Danielson; the percentage exceeds a third when Lexon's and Danielson's (who also exited the market) additional $3 million are included in the numerator and denominator. *See* ECF 669-15 at 7.

Because the Court must "ensur[e] fairness to all members of the class," *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003), and because Rule 23(e)(2)(D) requires that a settlement "treat[] class members equitably relative to each other," the Court should require Plaintiffs to modify the plan—for example, by weighting or sub-allocating the exited defendants' contributions to the periods of their market participation—before granting preliminary approval.

## II. CONCERNS REGARDING THE IMPACT OF THE SETTLEMENTS ON THE PENDING CONTESTED CLASS-CERTIFICATION AND *DAUBERT* MOTIONS.

### A. The Motion Presents Sequencing Problems.

#### 1. Findings on this preliminary approval motion cannot be binding for the contested, pending class certification motion.

At the threshold, the motion unavoidably reargues issues raised in the contested, undecided class certification and *Daubert* briefings—such as the significance of Defendants' transaction-rate statistics, the "list price" theory of common impact, and the overall reliability of Dr. Singer's methods. *See, e.g.*, ECF 669 at 15–19. It also inappropriately imports this Court's prior rulings on approval of the Lexon and Danielson settlements—relying, for example, on a prior order to say that "predominance [is] satisfied here." *Id.* at 17 (citing ECF 512 at 12). Notably, those findings were made for settlement purposes only, before the contested certification motion was filed. *See* ECF 512 at 12 n.3 (declining to address Non-Settling Defendants' certification arguments because they "invite[d] the Court to speculate about problems that Plaintiffs might face in a future motion for class certification that has not yet been filed"). Finally, the distribution plan relies heavily on Dr. Singer's contested opinions even as the reliability of his methods remains disputed in a pending *Daubert* motion. *See* ECF 556-1.

This Court should therefore make clear that any findings here are made solely for settlement purposes and are not binding in—and carry no weight toward—resolution of the contested motions. Settlement-class certification proceeds under standards that differ materially from litigation-class certification. *See, e.g.*, *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 556–57 (9th Cir. 2019) (upholding settlement class certification and distinguishing case indicating certification was inappropriate because it applied to a litigation class, where trial manageability was a concern). To speak of one is not to speak of the other, and Non-Settling Defendants cannot be bound by a ruling here preliminarily approving a settlement class.

#### 2. The contested class certification motion should not be resolved until the settlement administration is complete.

The named Plaintiffs' compensable interest in this case may be fully resolved by these settlements. Bankers and Seaview—the only sureties the named Plaintiffs ever purchased from—are both settling, and under *the pro-rata* plan their recovery is determined by a generous formula,

*see supra*, § I.A; ECF 669 at 8–9, that does not depend on the resolution of any contested issue against the Non-Settling Defendants. Each also seeks a $50,000 service award, *id.* at 33, that is likely many multiples of their actual damages, *see, e.g.*, *id.* at 17 (giving example of $245 in damages on a $10,000 bond). If named Plaintiffs (or others in the settlement class) are fully compensated for their injuries, that could impact their ability under Article III or Rule 23 to represent a litigation class against Non-Settling Defendants. This presents another sequencing issue, and Non-Settling Defendants respectfully submit that the Court should defer ruling on the contested certification motion rather than risk having to decertify a litigation class later.

On Article III, a plaintiff's ***personal*** stake in the litigation must persist "at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016) (citation modified). Accordingly, "a lawsuit—or an individual claim—becomes moot when a plaintiff actually receives all of the relief he or she could receive on the claim through further litigation." *Chen v. Allstate Ins. Co.*, 819 F.3d 1136, 1144 (9th Cir. 2016). Where the satisfaction results from the representative's own voluntary settlement, she "must also retain—as evidenced by an agreement—a financial stake in the outcome of the class claims." *Brady v. AutoZone Stores, Inc.*, 960 F.3d 1172, 1175 (9th Cir. 2020). Ancillary interests like a claim to attorney's fees do not change this result. *See Lewis v. Continental Bank Corp.*, 494 U.S. 472, 480 (1990) (fee interest "insufficient to create an Article III case or controversy where none exists on the merits"); *see also Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 107 (1998) ("By the mere bringing of his suit, every plaintiff demonstrates his belief that a favorable judgment will make him happier. But . . . psychic satisfaction is not an acceptable Article III remedy . . . .").

As for Rule 23, even a representative whose claims survive that test presents a problem if her only remaining financial connection to the class claims is, in effect, a fee for serving as other class members' representative—her own recovery already obtained regardless of what the class recovers. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997) (adequacy inquiry uncovers divergent interests between representatives and the class); *In re Graphics Processing Units Antitrust Litigation*, 253 F.R.D. 478, 490 (N.D. Cal. 2008) (lack of sufficient personal

incentive is a typicality problem).

Here—through no tender, litigation tactic, or other act by Non-Settling Defendants—the named Plaintiffs are on a path to exactly that complete recovery: the settlement distributions will be actual, unconditional payments under a formula that may well equal or exceed their entire trebled entitlement, while their $50,000 service award requests ride on approval of these settlements, not on any contested issue against the Non-Settling Defendants. That raises doubts as to whether they will be able to serve as litigation class representatives throughout this case.

It is also worth noting that certifying a settlement class here would cement the atypicality of Plaintiffs' claims with respect to Non-Settling Defendants, whose bonds they never purchased. Plaintiff Crain purchased a bond underwritten by Bankers; Plaintiff Monterrey purchased bonds underwritten by Seaview. ECF 513-86 ¶ 4; ECF 513-87 ¶ 4. Both are Settling Defendants in the present motion. Upon approval, neither named Plaintiff will have purchased a single bond backed by any Non-Settling Defendant remaining in the case.

This circumstance implicates typicality, which "is lacking when the representative plaintiff's cause of action is against a defendant unrelated to the defendants against whom the cause of action of the members of the class lies." *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 465 (9th Cir. 1973). It also implicates adequacy because class representatives who have already secured recovery from every Defendant that transacted with them may lack "the appropriate incentive to establish antitrust violations with respect to all of the absent class members." *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. at 490; *cf. In re Milk Prods. Antitrust Litig.*, 195 F.3d 430, 437 (8th Cir. 1999).

Plaintiffs are likely to respond that courts in antitrust conspiracy cases find these requirements satisfied where all class members allege the same overarching violation. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 593 (N.D. Cal. 2010). But that rule does not apply where the named plaintiffs' "individual circumstances are markedly different" from those of absent class members. *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 317-18 (N.D. Cal. 2014) (quoting *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.*, No. 02-6030, 2006 WL 891362, *5 (D.N.J. Apr. 4, 2006)).

The settlements do not create typicality and adequacy problems so much as underscore them. *See generally* ECF 551 at 31–34 (discussing adequacy and typicality concerns). Everything the named plaintiffs can prove from their own experiences—two 2016 purchases of Bankers and Seaview bonds—concerns rebating, collection, notice, and other practices by ***settling*** defendants. Each Non-Settling Defendant's membership *vel non* in the alleged conspiracy remains an element of its own liability, and there is defendant-specific evidence pointing the other way. For example, Non-Settling Defendant AIA is the ***only*** Defendant that lowered its standard premium rate during the class period, from 10% to 9%, and its average filed rates fell below those of other Defendants in many years. *See, e.g.*, Dkt. 537-2 ¶ 98 & Exh. 17; *cf. Optical Disk*, 303 F.R.D. at 317-18. So, while the question of the conspiracy's scope may be common,[5] there is still a meaningful mismatch between what named plaintiffs bring to the table and what must be established to hold Non-Settling Defendants liable.

In any event, the point is that the settlements and their administration will have downstream effects on whether named Plaintiffs may represent a litigation class against Non-Settling Defendants. If a settlement class is certified, those effects should be observed and considered before ruling on the contested certification motion.

**B. The Motion Materially Affects the Court's *Daubert* Analysis.**

Plaintiffs' fairness showing rests on a new declaration from Dr. Singer, ECF 669-22 ("Settlement Decl."), submitted without an opposing expert or cross-examination. This declaration is inconsistent in key respects with Dr. Singer's prior submissions, resulting in Plaintiffs now running two damages theories at once (one here, one in the contested litigation certification motion). That underscores the malleability and unreliability of Dr. Singer's methodology, as Non-

[5] On the conspiracy point, approval of the settlements would arguably leave Non-Settling Defendants—whom Plaintiffs' own expert places at roughly one-third of the alleged market, Dkt. 537-2, Exh. 14—to bear alone the burden of contesting a nineteen-surety conspiracy narrative, while potentially facing joint and several liability for the entire trebled conspiracy award, with no right of contribution from the Settling Defendants, *see, e.g.*, *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981), and with settlement offsets applied only after trebling, *Flintkote Co. v. Lysfjord*, 246 F.2d 368, 398 (9th Cir. 1957). That poses potential due process concerns Non-Settling Defendants intend to raise if and when necessary.

Settling Defendants previously raised in their *Daubert* motion.

In the contested certification proceeding, Dr. Singer's operative opinion puts class-wide overcharges at $2.05-$2.73 billion, based on a 0.80% average rebate rate. *E.g.*, ECF 537-2 ¶¶ 4(d), 90, 107. The rebate rate changed to 0.98% in his reply report. Settlement Decl. ¶ 19. Here, Dr. Singer offers the Court a materially smaller number—approximately $1.57-$2.28 billion, built on a 1.50% rebate rate—as the benchmark for finding the settlements adequate. Settlement Decl. ¶ 20, Exhs. 3-4. The smaller number appears where needed to make the settlements look reasonable; the larger numbers remain as leverage against the Non-Settling Defendants.

Similarly, Dr. Singer previously declined to incorporate into his rebate calculation certain agent declarations proposed by Defendants' expert, Dr. Strombom, because the declarations were "non-randomly selected" and their use "biases the results of the Sample data." Singer Reply Report ¶ 73. But his new 1.50% rate is generated by "incorporat[ing] ***all*** of Dr. Strombom's changes"—including the one he identified as biasing—and then "aggressively remov[ing] all Agents who signed declarations that they did not offer any Rebates." Settlement Decl. ¶ 20 & n.47 (emphasis added). It would seem, then, that Dr. Strombom's work is acceptable when offered in support of the settlements but not when offered in support of Non-Settling Defendants' opposition to certifying a litigation class.

At bottom, Dr. Singer has failed to offer a neutral, principled criterion for when the "best estimate" rate should govern versus when an admittedly inflated "conservative" rate should govern, other than the procedural posture of the filing in which the number appears.[6] Federal Rule of Evidence 702 requires an expert to apply "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," which presupposes principles applied consistently. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That is not the case here. The Court

---

[6] It is also worth noting that Singer's Theoretical Effective Rate Model derives its probability-of-forfeiture input from four sureties—"ACIC, Lexington, Sun, and Universal," Dkt. 537-2 Exhs. 9 & 22—three of which are settling in the present motion. In this vein, Dr. Singer's analyses all end on August 14, 2023—"the end of the available data." Dkt. 537-2 ¶ 2. There is also no surety transaction data for any Non-Settling Defendant after 2022. Settlement Decl. ¶ 2 n.40. Such issues raise additional questions as to the reliability of Singer's methods as to what role—if any—Non-Settling Defendants played in the alleged price-fixing conspiracy.

should consider Dr. Singer's adjustments to his prior analyses in ruling on the *Daubert* motion.

## III. CONCLUSION

Non-Settling Defendants respectfully request that the Court take the foregoing concerns into account when ruling on the preliminary approval motion.

July 9, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
JUSTIN R. SARNO

By: ______________________
Justin R. Sarno

Attorneys for Defendants
**AIA Holdings, Inc., Allegheny Casualty Company, International Fidelity Insurance, and Lexington National Insurance Corporation**