ROXBOROUGH POMERANCE NYE & ADREANI LLP
GARY A. NYE (Bar No. 126104)
gan@rpnalaw.com
5900 Canoga Avenue, Suite 450
Woodland Hills, California 91367
(818) 992-9999 • FAX (818) 992-9991

HORVITZ & LEVY LLP
JEREMY B. ROSEN (Bar No. 192473)
jrosen@horvitzlevy.com
505 Sansome Street, Suite 1550
San Francisco, California 94111
(415) 462-5600 • FAX (844) 497-6592

HORVITZ & LEVY LLP
JUSTIN R. SARNO (Bar No. 229803)
jsarno@horvitzlevy.com
3601 West Olive Avenue, 8th Floor
Burbank, California 91505
(818) 995-0800 • FAX (844) 497-6592

Attorneys for Defendants
AIA Holdings, Inc., Alleghany Casualty Company, International Fidelity Insurance Company, and Lexington National Insurance Corporation

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | Lead Case No. 4:19-cv-00717-JST-DMR<br><br><u>CLASS ACTION</u><br><br>**NOTICE OF SUPPLEMENTAL AUTHORITY** |

Pursuant to Civil Local Rule 7-3(d)(2), the undersigned Defendants wish to call the Court's attention to two recent decisions bearing on the pending class certification proceedings.

First, in *Rusoff v. Happy Group, Inc.*, --- F.4th ----, 2026 WL 2387098 (9th Cir. Aug. 17, 2026) (slip op.), attached hereto as Exhibit A, the Ninth Circuit granted a Rule 23(f) petition and reversed. Specifically, the court (1) upheld the trial court's ruling excluding unreliable expert

testimony; (2) held that the plaintiffs could not satisfy Rule 23(b)'s predominance requirement without common proof on a "central element" of their claims; and (3) held that the trial court erred by certifying a class based on common questions related to materiality and damages, given the absence of common proof going to a central element of liability.

Second, in *Nichols v. State Farm*, 2026 WL 2581605 (S.D. Ohio Sept. 1, 2026), attached hereto as Exhibit B, the Southern District of Ohio denied a class certification motion that relied on evidence of a common methodology the defendant insurer used to allegedly underpay insured class members for totaled vehicles. The court held that even though the same methodology was applied to every class member, the court had to determine whether each member was actually harmed, and that inquiry was inherently individual.

Respectfully submitted,

September 11, 2026

**HORVITZ & LEVY LLP**
JEREMY B. ROSEN
JUSTIN R. SARNO
**ROXBOROUGH POMERANCE NYE & ADREANI LLP**
GARY A. NYE

By: ______________________
Justin R. Sarno

Attorneys for Defendants
**AIA Holdings, Inc., Alleghany Casualty Company, International Fidelity Insurance Company, and Lexington National Insurance Corporation**

# EXHIBIT A

2026 WL 2387098
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

Jonathan RUSOFF; Joseph Gambino, Plaintiffs - Appellees,
v.
The HAPPY GROUP, INC., Defendant - Appellant.

No. 24-7706
|
Argued and Submitted November 18, 2025 San Francisco, California
|
Filed August 17, 2026

Appeal from the United States District Court for the Northern District of California, Araceli Martínez-Olguín, District Judge, Presiding, D.C. No. 4:21-cv-08084-AMO

**Attorneys and Law Firms**

Aubry Wand (argued), Wand Law Firm PC, Long Beach, California; Robert Abiri, Abiri Law PC, Rancho Santa Margarita, California; for Plaintiffs-Appellees.

Nicholas M. DePalma (argued) and Christian Schreiber, Venable LLP, Tysons, Virginia; Amit Rana and Antonia I. Stabile, Venable LLP, San Francisco, California; Rita Mansuryan, Venable LLP, Los Angeles, California; for Defendant-Appellant.

Before: Danny J. Boggs, Daniel A. Bress, and Salvador Mendoza, Jr., Circuit Judges. *

**OPINION**

BRESS, Circuit Judge:

This is a deceptive advertising class action concerning "pasture raised" labels on egg cartons. After excluding the opinion of plaintiffs' expert on egg industry standards, the district court found that plaintiffs' inability to demonstrate consumer deception on a class-wide basis "precludes a finding of predominance" under Federal Rule of Civil Procedure 23(b)(3). The court nonetheless certified the classes based on assertedly common questions of materiality and damages. Because plaintiffs did not meet the requirements of Rule 23(b)(3), we reverse the grant of class certification.

# I

## A

***2** In grocery stores, eggs are often advertised based on the living conditions of the laying hens. For instance, eggs might be described as "organic," "cage free," "free range," or "pasture raised." The U.S. Department of Agriculture ("USDA") verifies egg producers' use of some of these terms. USDA distinguishes between eggs produced by caged hens and those produced by cage free hens. Within the "cage free" category, USDA defines two further subcategories: organic and free range. USDA considers the terms "free range," "pasture raised," and certain other similar terms to be synonymous for labeling purposes.

But USDA's standards are not the only standards out there. Nonprofits and private organizations, such as the American Humane Association ("AHA"), Humane Farm Animal Care ("HFAC"), and the Global Animal Partnership ("GAP"), issue their own standards for egg-producing conditions. Certain retailers, such as Whole Foods, do too. These standards are often accompanied by voluntary certification programs, which egg producers pay to participate in. Unlike the USDA, these certifying organizations differentiate between free-range and pasture-raised eggs. "Pasture raised" is considered the more stringent standard, so certified pasture-raised eggs tend to command a price premium in the market.

However, standards of the various certifying organizations—even in the same category—can differ. For instance, record evidence in this case indicates that HFAC's free range certification requires egg producers to provide at least 2 square feet of uncovered outdoor area per hen. AHA's free range certification, by contrast, requires producers to make approximately 22 square feet per hen available for potential use. If the pasture is rotated, however, only a quarter of that space (approximately 5.5 square feet) needs to be accessible to the hens at any one time.

The organizations' "pasture raised" standards also differ. AHA's pasture raised standard requires approximately 27 square feet of space per hen at a time with pasture rotation, while HFAC requires approximately 22 square feet per hen with rotation. GAP requires 5 square feet of space per hen

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

with rotation, and 10 square feet without. Whole Foods's standards require only that the "outdoor area to which birds have access ... be large enough to be sustained as grassland or rangeland." Requirements for other hen welfare metrics, such as shelter and vegetative cover, also vary between organizations.

B

The defendant in this case, The Happy Group ("Happy Egg"), produces and distributes eggs under the "Happy Egg" brand. Happy Egg's egg cartons advertise that its hens are "free range" and "pasture raised on over 8 acres." Happy Egg represents that these characterizations are accurate because its hens do have access to more than 8 acres of pasture. Still, plaintiffs Jonathan Rusoff and Joseph Gambino sued Happy Egg on behalf of two classes of consumers in California and New York, alleging that Happy Egg violated various false advertising and deceptive advertising laws. [1]

***3** Plaintiffs do not allege that Happy Egg's hens were kept in cages. Instead, they claim that when Happy Egg represented that its laying hens were "pasture raised on over 8 acres," the company was deceptively representing that its eggs met the AHA and HFAC pasture raised certification requirements, which plaintiffs call the "Hen Welfare Standards."

Specifically, plaintiffs' theory is that AHA and HFAC's "pasture raised" standards are the dominant industry standards, and that consumers paid a price premium for Happy Egg products based on the company's implied compliance with these standards (even though Happy Egg did not identify either standard on its cartons). As plaintiffs explained to the district court,

> Plaintiffs' theory of liability is that pasture raised eggs have an objective definition under the Hen Welfare Standards (i.e., the industry standards), and accordingly, the Pasture Raised claim deceived consumers. Therefore, the salient analysis is whether the Hen Welfare Standards are the industry standard, and whether the reasonable consumer believes the Class Products are pasture raised eggs.

*Rusoff v. Happy Grp., Inc.*, 2024 WL 5339463, at *12 (N.D. Cal. Sept. 27, 2024) (footnote omitted). Plaintiffs' expert, Dr. Craig Morris, accordingly opined that "the prevailing consumer expectation is that an egg producer making a free-range or pasture-raised claim is adhering to the commonly accepted standards pertaining to such claims as set by the AHA or HFAC."

Plaintiffs sought class certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). To obtain certification under this provision, plaintiffs not only must demonstrate that their suit meets the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), but must also show predominance and superiority under Rule 23(b)(3). *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). Under the relevant California and New York deceptive advertising laws, the test for deception is an objective one that asks whether a "reasonable consumer" would likely be deceived by the conduct at issue. *See Noohi v. Johnson & Johnson Consumer Inc.*, 146 F.4th 854, 868 (9th Cir. 2025); *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1028 (9th Cir. 2024).

The parties conducted fact and expert discovery in connection with plaintiffs' class certification motion. Both lead plaintiffs were deposed. Plaintiff Rusoff testified that he did not know about the AHA or HFAC standards. He believed that "pasture raised" meant that hens would be raised using "traditional farming" methods and would be "able to roam the land and have a good diet," with "no pesticides, no hormones, ... [and] no antibiotics." Rusoff also testified that if a product's packaging did not have a certified logo, he would not think that it was certified by AHA or HFAC.

Plaintiff Gambino testified that he thought "pasture raised" meant "fully raised outside" unless there is bad weather. He believed that "pasture" meant a "big, open field," and did not know how many hens per acre were required under the AHA standard. Nothing on Happy Egg's cartons made Gambino think that the eggs were AHA-certified, and he had not heard of HFAC.

***4** Plaintiffs also offered the expert opinions of Dr. Craig Morris and Dr. J. Michael Dennis to establish that a reasonable consumer would understand "pasture raised" to mean pasture raised in accordance with the AHA and HFAC standards. Dr. Morris opined that the "free-range and pasture-raised standards promulgated by the AHA and HFAC ... are the industry standard"—that is, "[t]he predominant standards for free-range and pasture-raised eggs." Dr. Morris further opined that the "prevailing consumer expectation is that an egg producer using the free-range or pasture-raised claim is adhering to the commonly accepted standards pertaining to such claims." Dr. Dennis served as plaintiffs' survey expert. He sought to measure "the extent to which consumers understand" Happy Egg's "pasture raised on over 8 acres" labeling "to convey that the Products either are or are not pasture raised eggs."

Discovery raised questions about the reliability of Dr. Morris and Dr. Dennis's methods and resulting conclusions. Although Dr. Morris has experience in food and agriculture marketing, he testified that he is "not an expert in egg standards" and "not an expert in the development of pasture-raised standards." In his report, Dr. Morris nevertheless opined that "the free-range and pasture-raised standards promulgated by the AHA and HFAC are predominantly used and followed in the egg industry. In the absence of federal regulation, they are the industry standard." In Dr. Morris's opinion, "if an egg producer makes a free-range or pasture-raised claim, it should be consistent with at least one of these standards."

To support his opinions, Dr. Morris's report first discussed internal Happy Group documents and the testimony of Happy Group's CEO, Dan Arnsberger. According to Dr. Morris, "Happy Egg has followed and benefitted from the AHA standard" and "has been a beneficiary of the AHA and HFAC standards." To support his further opinion that "the prevailing consumer expectation is that an egg producer making a free-range or pasture-raised claim is adhering to" these standards, Dr. Morris "conducted online research, visited grocery stores 'in or around [his] neighborhood,' and took pictures of different egg products bearing a pasture raised label." *Rusoff*, 2024 WL 5339463, at *5. However, Dr. Morris performed this investigation in Seattle, rather than California or New York (where the class members resided), and he testified that he did not intend for his work to be representative of those two states. Further, as the district court noted, "there was no methodology for taking pictures of cartons in stores, no scientific basis for the days he chose to visit those stores, and [Dr. Morris] only selected cartons if they made a pasture-raised claim." *Id.* Dr. Morris emphasized that "this [was] not intended to be a comprehensive survey of all egg brands in the market," but rather, "a survey for my own personal purposes." *Id.*

Dr. Dennis's consumer survey had two parts—a consumer perception survey and a materiality survey. The consumer perception survey presented prospective consumers in California and New York with one of two options: a carton of Happy Egg's eggs with the label "pasture raised on over 8 acres" alongside a label saying "free range," and one without the label "pasture raised on over 8 acres." The survey then asked consumers whether the packaging communicated that the eggs inside were "pasture-raised eggs," "free-range eggs," "none of these," or "don't know."

The results indicated that when survey respondents saw the first carton with both the "pasture raised" and "free range" labels, they concluded that the eggs were both pasture-raised and free-range. In contrast, when they saw the second carton with only a "free range" label, they concluded that the eggs were free-range, but not pasture-raised. As the district court observed, Dr. Dennis's survey did not address whether a reasonable consumer understood "pasture raised" as aligned with either the AHA or HFAC standards. Dr. Dennis's materiality survey presented consumers with the same two options and asked how likely they were to purchase each product. Survey respondents were 8.1 times more likely to state a preference for the eggs that included the "pasture raised on over 8 acres" representation.

***5** Plaintiffs' theory of class-wide deception required both experts' opinions to work in tandem. Dr. Morris would show that "pasture raised" had a commonly understood meaning tied to the AHA and HFAC standards, while Dr. Dennis (through his consumer perception survey) would show that a reasonable consumer would understand Happy Egg's "pasture raised on over 8 acres" claim to mean that its eggs were pasture-raised.

### C

Although the district court rejected key aspects of plaintiffs' showing, it still granted their motion for class certification. The court found that most of the necessary requirements for class certification under Rule 23 were met —namely, numerosity, adequacy, superiority, typicality, and

commonality. But the court excluded Dr. Morris's opinions under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). It concluded that even though Dr. Morris was qualified, his methods for assessing what a reasonable consumer would understand—such as photographing egg cartons in stores near his home for his own "personal purposes"—were unreliable, as Dr. Morris's analysis "[did] not pass the standards that he would expect of his own survey consultant." *Rusoff*, 2024 WL 5339463 at *5.

As for Dr. Dennis's consumer-survey-based opinions, the district court found that because "Plaintiffs' theory depends on the existence of an industry standard[,] ... even if Dr. Dennis's survey was properly designed to measure deception, it lacks the needed component from Dr. Morris, whose opinion as to industry standards has been stricken." *Id.* at *12. Consequently, the court concluded that "[b]ecause that industry standard anchors [plaintiffs'] theory of deception, the failure to provide survey evidence measuring deception by reference to that industry standard precludes a finding of predominance" under Rule 23(b)(3). *Id.*

However, the district court still certified the class under Rule 23(b)(3) after finding that materiality and damages were common questions that predominated. The district court noted that both California's and New York's deceptive advertising laws require an objective showing of materiality—whether "a reasonable [consumer] would attach importance" to the misrepresentation. *Id.* at *13. The court concluded that because "the record is sufficiently developed with ample common evidence of materiality," such as Dr. Dennis's materiality survey and internal statements by Happy Egg, "materiality is a common question that predominates." *Id.* The district court further found that common questions of damages predominated, as the plaintiffs demonstrated that class-wide "damages can be determined without excessive difficulty [under] their theory of liability." *Id.* at *15. Thus, the court certified California and New York classes under Rule 23(b)(3).

We granted Happy Egg's petition for leave to file an interlocutory appeal under Federal Rule of Civil Procedure 23(f). We also have jurisdiction to review the district court's *Daubert* ruling excluding Dr. Morris's opinions, because it "formed part of the class certification decision and affected whether [the classes] could be certified." *Moser v. Benefytt, Inc.*, 8 F.4th 872, 876 (9th Cir. 2021).

## II

We review the "decision to certify a class and 'any particular underlying Rule 23 determination involving a discretionary determination' for an abuse of discretion." *Olean Wholesale Grocery Coop. v. Bumble Bee Foods*, 31 F.4th 651, 663 (9th Cir. 2022) (en banc) (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010)). "[T]he district court abuses its discretion if it 'applies an incorrect legal rule or if its application of the correct legal rule is based on a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record.' " *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191 (9th Cir. 2024) (brackets omitted) (quoting *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1164 (9th Cir. 2014)). We review the exclusion of expert testimony for abuse of discretion. *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014).

### A

***6** We first conclude that the district court did not abuse its discretion in excluding Dr. Morris's expert opinion. "[B]efore certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1004 (9th Cir. 2018), *as amended* (Nov. 27, 2018) (citation omitted). As part of this rigorous inquiry, when "evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*." *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 984 (9th Cir. 2020) (quoting *Sali*, 909 F.3d at 1006); *see also Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1023 (9th Cir. 2024); *Olean*, 31 F.4th at 665 n.7 (explaining that "[i]n a class proceeding, defendants may challenge the reliability of an expert's evidence under [*Daubert*]"); *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). This *Daubert* analysis reflects an assessment of "the weight that evidence is given at the class certification stage," rather than operating as a strict bar to admissibility. *Sali*, 909 F.3d at 1006.

When applying the *Daubert* standard, "the district court judge must ensure that all admitted expert testimony is both relevant and reliable." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citing *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). *Daubert*'s gatekeeping requirement is

meant to ensure that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Daubert*'s gatekeeping requirement plays a central role in the class certification process: plaintiffs may not obtain class certification—nor may defendants block it—through the presentation of expert witnesses who lack reliability. To the extent plaintiffs argue that *Daubert* has no role to play at class certification, our precedents say otherwise.

In this case, the district court correctly excluded Dr. Morris's opinions as unreliable. Dr. Morris did not conduct a rigorous evaluation of how a reasonable consumer understands the term "pasture raised." Instead, his methodology consisted of online research and taking pictures of egg cartons in grocery stores near his home. Dr. Morris opined that his visits to nearby grocery stores (not in California or New York) "present[ ] a telling snapshot of the market, particularly from the perspective of a typical consumer shopping for eggs at the grocery store."

This analysis left much to be desired. As the district court observed, "Dr. Morris testified that there was no methodology for taking pictures of cartons in stores, no scientific basis for the days he chose to visit those stores, and [that he] only selected cartons if they made a pasture-raised claim." *Rusoff*, 2024 WL 5339463, at *5. In his report, Dr. Morris emphasized: "[t]o be clear, this is not intended to be a comprehensive survey of all egg brands in the market, although I could conduct such a survey or retain someone to do one for me." When he was asked at his deposition how he would run a survey to determine what "pasture raised" meant, Dr. Morris answered: "I'm confident that I could identify an agency to help do that work on my behalf. I know what I'm looking for in the survey. I'm not a survey expert." Indeed, Dr. Morris admitted that the informal survey he took "was intended to be a survey for my own personal purposes."

This methodology did not meet the standards expected of an expert witness evaluating consumer understanding of egg industry standards. While plaintiffs argue that Dr. Morris's opinion was primarily based on his industry experience and that the grocery store survey was only an "additional step" to bolster that opinion, Dr. Morris's report indicated that his conclusions about consumer expectations were based on his online research and grocery store visits, which he used to demonstrate consumer understanding of the alleged industry standards. Dr. Morris did not cite his professional experience in his discussion of egg standards—rather, he did so only when discussing commodity standard-setting more generally. Indeed, at his deposition, Dr. Morris admitted that he is "not an expert in egg standards." And Dr. Morris's review of internal Happy Egg documents and testimony only supported his conclusions with respect to how Happy Egg may have used the AHA and HFAC standards internally, not how consumers perceived or interacted with those standards.

***7** Because "the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on 'the particular circumstances of the particular case,' " we decline to disturb the district court's exclusion of Dr. Morris's opinions. *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010), *as amended* (Apr. 27, 2010) (quoting *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167).

B

Without Dr. Morris's excluded opinion, we agree with the district court that plaintiffs did not show that common questions of deception predominate.

The predominance inquiry under Rule 23(b)(3) "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453, 136 S.Ct. 1036, 194 L.Ed.2d 124 (2016) (citation omitted). "This requirement presupposes satisfaction of the commonality requirement of FRCP 23(a)(2), which itself tests the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Lytle*, 114 F.4th at 1023 (quotation omitted). Because class actions are "onerous and costly for defendants, who may feel 'pressured into settling questionable claims' to avoid even a 'small chance of a devastating loss,' " *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024) (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350, 131 S.Ct. 1740, 179 L.Ed.2d 742 (2011)), the predominance inquiry is a "demanding" one, requiring district courts to conduct a "rigorous analysis" to determine whether the claims are suitable for class treatment under Rule 23(b)(3). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33–34, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'

” *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011)).

By the time a lawsuit gets to the class certification stage, the inquiry does not turn on mere allegations, but rather on the “persuasiveness” of the classwide proof that plaintiffs bring to bear to show that common issues predominate and can be adjudged through classwide resolution. *Ellis*, 657 F.3d at 982. As the Supreme Court has emphasized, Rule 23 “does not set forth a mere pleading standard,” because “a party must not only ‘be prepared to prove that there are *in fact*’ ” aggregation-enabling factors under Rule 23(a), but must also “satisfy through evidentiary proof at least one of the provisions of Rule 23(b).” *Comcast*, 569 U.S. at 33, 133 S.Ct. 1426 (quoting *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541). “[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23.” *Halliburton Co. v. Erica P. John Fund*, 573 U.S. 258, 275, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014). This must be done “by a preponderance of actual evidence.” *Black Lives Matter*, 113 F.4th at 1258 (citing *White*, 104 F.4th at 1192). As a result, “[w]ith respect to the predominance inquiry specifically, a district court must evaluate ‘the method or methods by which plaintiffs propose to use the class-wide evidence to prove’ the common question in one stroke.” *Lytle*, 114 F.4th at 1023 (quoting *Olean*, 31 F.4th at 666) (brackets omitted).

The district court correctly concluded that on the foundational issue of deception, plaintiffs failed to make the required showing. Under plaintiffs' theory of deception, reasonable consumers are deceived by Happy Egg's “pasture raised on over 8 acres” claim because it is inaccurate in light of the supposedly dominant AHA and HFAC industry standards. Plaintiffs' theory therefore requires two components: (1) proof that there is an industry standard for the term “pasture raised,” and (2) proof “that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled” by the term “pasture raised,” believing it to mean the relevant industry standards. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016) (quoting *Lavie v. Procter & Gamble Co.*, 105 Cal.App.4th 496, 129 Cal. Rptr. 2d 486, 495 (2003)).

***8** But without Dr. Morris's (excluded) opinion, plaintiffs lack common proof connecting the allegedly dominant industry standards to consumer perceptions. Dr. Dennis's survey study by itself is insufficient, as it merely measured whether consumers think that “pasture raised on over 8 acres” means pasture raised—with no indication of what “pasture raised” means or how consumers understand the phrase. The district court properly recognized that “[b]ecause th[e] industry standard anchors [plaintiffs'] theory of deception, the failure to provide survey evidence measuring deception by reference to that industry standard precludes a finding of predominance.” *Rusoff*, 2024 WL 5339463, at *12.

C

Plaintiffs appeared to assert at oral argument that it was not necessary for them to show that a reasonable consumer would have knowledge of the AHA and HFAC standards. That is contrary to how plaintiffs have consistently advanced their claims. Plaintiffs repeatedly defined their proposed class with reference to the industry standards. As Dr. Morris opined in his expert report, “the prevailing consumer expectation is that an egg producer making a free-range or pasture-raised claim is adhering to the commonly accepted standards pertaining to such claims as set by the AHA or HFAC.”

But even if we accept plaintiffs' belated effort to clarify their theory, nothing changes. Their allegation here is not that the statement “pasture raised on over 8 acres” is factually false, but that it is deceptively misleading because Happy Egg failed to comply with the dominant industry standards for pasture-raised eggs. At minimum, given their theory of liability, plaintiffs must show that “pasture raised,” to a reasonable consumer, not only signifies hen welfare conditions that would support a price premium, but also, conditions that are materially inconsistent with Happy Egg's practices. The problem is that without Dr. Morris's opinion, plaintiffs had no common proof on this point. To the extent plaintiffs claim they can obtain class certification merely by demonstrating that certain industry standards are dominant ones, they do not explain how that showing, standing alone, could support a cognizable theory of *consumer* deception.

Plaintiffs also respond that even if they may be unable to show on the merits that any individual consumer would have been deceived by the “pasture raised on over 8 acres” claim, the deception issue is governed by an objective “reasonable consumer” standard, which means that all claims by any plaintiff will necessarily rise and fall together. *See Noohi*, 146 F.4th at 868; *Montera*, 111 F.4th at 1028. Claims brought under consumer protection statutes like those of California and New York are indeed governed by a reasonable consumer standard. But in order to reach the reasonable consumer

analysis, a plaintiff must first show, on a classwide basis, what deceptive marketing or false advertising a reasonable consumer could have been misled by. *See Williams v. Gerber Prods., Co.*, 552 F.3d 934, 936, 939 (9th Cir. 2008) (holding that a reasonable consumer could be deceived by packaging features that contained false suggestions about product content). Here, plaintiffs lack common proof as to what the deception was. Again, without Dr. Morris's opinion, plaintiffs have no classwide proof that "pasture raised" is materially inconsistent with Happy Egg's practices. We cannot say whether a reasonable consumer would have been deceived by false advertising or marketing if there is no common proof that something was misleading.

It is true that for purposes of Rule 23, "a district court is limited to resolving whether the evidence establishes that a common question is capable of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666–67 (emphasis omitted). And it is also true that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466, 133 S.Ct. 1184. But even though the question here is "not whether plaintiffs have put forward evidence capable of sustaining a jury verdict," the plaintiffs must still have "shown enough to satisfy [Rule] 23." *Lytle*, 114 F.4th at 1028.

***9** As a result, although we do not consider whether the evidence, taken as a whole, might persuade a reasonable jury that Happy Egg's representations are deceptive by some metric, we must assess whether the plaintiffs here could show, through classwide proof, a sufficient connection between their alleged industry standard and a reasonable consumer's expectations. It remains the case that "[u]nder California law, 'when the same material misrepresentations have actually been communicated to each member of a class, an inference of reliance arises as to the entire class.' " *DZ Reserve v. Meta Platforms, Inc.*, 96 F.4th 1223, 1237 (9th Cir. 2024) (quoting *Mirkin v. Wasserman*, 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568, 575 (1993) (italics omitted)). The issue here, however, is an antecedent one: namely, whether the "pasture raised" labeling is at odds with the industry standard, and whether a reasonable consumer would be deceived into thinking that "pasture raised" conveyed adherence to such a standard.

In that situation, the fact that the applicable legal standard for consumer deception is based on a "reasonable consumer" test does not mean that class action plaintiffs can avoid their obligation to demonstrate that "they will be able to prove their case through common proof at trial" under their industry-standards-based theory of the case. *Lytle*, 114 F.4th at 1024 (emphasis omitted). That would be at odds with the Supreme Court's direction that plaintiffs must present "evidentiary proof" of predominance to satisfy Rule 23. *Comcast*, 569 U.S. at 33, 133 S.Ct. 1426. Where the theory of deception is tied to an industry standard, evidence must be brought forward showing that there is a commonly understood industry standard, and that a reasonable consumer would associate a given representation with that standard. *See Am. Honda Motor Co., Inc. v. Superior Ct.*, 199 Cal. App. 4th 1367, 1379, 132 Cal.Rptr.3d 91 (2011). Here, because the plaintiffs did not demonstrate that there was a single or dominant industry standard for "pasture raised," and that a reasonable consumer would perceive that representation in those terms, plaintiffs lacked common proof of deception. *See Ebner*, 838 F.3d at 965 ("[T]he reasonable consumer standard requires a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." (citation modified)).

D

Plaintiffs raise several other counterarguments, but we do not find them persuasive. First, plaintiffs argue that even if Dr. Morris's opinion was properly excluded, it should have been considered at the class certification stage regardless, as "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification." *Sali*, 909 F.3d at 1004. But again, our cases clearly state that "in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*." *Id.* at 1006. That is what the district court did here.

And in this case, the exclusion of Dr. Morris's opinion on reliability grounds leaves a fundamental gap in plaintiffs' Rule 23 showing; it is not merely a "formalistic evidentiary objection" that could be regarded as immaterial at the Rule 23 stage. *Id.* While plaintiffs argue that they "may be able to get Dr. Morris's opinion admitted" by "arguing for reconsideration" or having Dr. Morris "revise his opinion to be based on acceptable method[s] and data," these unelaborated ideas for future expert work do not permit us to affirm class certification on the present record. [2]

***10** Second, plaintiffs argue that even without Dr. Morris's opinions, the district court should have found classwide proof of deception based on the testimony and report of Happy Egg's expert, Dr. Mench, as well as various documents in the record. But Dr. Mench's role was to criticize Dr. Morris's methodologies and findings. She did not opine that consumers associate "pasture raised" with any certification. To the contrary, her report states, among other things, that "there is no agreed-upon definition/characterization of terms like 'pastured' or 'pasture-raised.' "

Plaintiffs also cite statements from two trade organizations stating that "[e]gg producers commonly differentiate free-range and pasture-raised ... through established non-governmental certification schemes." But while both documents indicate that the egg industry uses these terms, neither establishes what the industry standard is or what a reasonable consumer would understand the terms to mean. And before the district court, plaintiffs did not cite any other consumer survey, study, or internal document from Happy Egg that evaluates what the term "pasture raised" means across the egg industry. The only other evidence is the deposition of named plaintiffs Rusoff and Gambino. But their testimony undermined plaintiffs' theory of liability, given that neither plaintiff had much idea about the AHA and HFAC standards.[3]

Finally, plaintiffs argue that even without survey evidence from Dr. Morris, they can still prevail on the merits, as California courts have rejected the idea that "a plaintiff must produce a consumer survey or similar extrinsic evidence to prevail on a claim that the public is likely to be misled by a representation." *See Colgan v. Leatherman Tool Grp.*, 135 Cal.App.4th 663, 38 Cal. Rptr. 3d 36, 48 (2006), *as modified* (Jan. 31, 2006), *superseded by statute on other grounds.* But again, the issue is a narrower one—whether plaintiffs have presented enough evidence to demonstrate through classwide proof, "by a preponderance of actual evidence," *Black Lives Matter*, 113 F.4th at 1258, that "pasture raised" has some generally accepted meaning. With their key expert sidelined, plaintiffs could not satisfy this critical element.

III

Although the district court correctly concluded that plaintiffs failed to present enough common evidence to show that deception is capable of class-wide resolution, the court erred in granting class certification based on the supposedly common issues of materiality and damages.

The Supreme Court has emphasized that "[t]he predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453, 136 S.Ct. 1036 (internal quotation marks omitted). This depends, in turn, on the role each issue plays in the case. As we have noted, "more important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Ruiz Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016), *abrogated on other grounds by Healy v. Milliman, Inc.*, 164 F.4th 701 (9th Cir. 2026). In other words, the district court must weigh the common issues against the individualized issues and determine whether the common issues are, on balance, important enough to justify class-wide treatment despite the existence of individualized issues. *See id.*

***11** Here, the district court did not undertake this analysis. Had the court done so, it should have declined to certify the class—even assuming that its materiality and damages analyses were correct. As the plaintiffs concede, deception is a "central element" of their deceptive advertising claims under both California and New York law. That would appear self-evident. *See, e.g., Whiteside v. Kimberly Clark Corp.*, 108 F.4th 771, 777–78 (9th Cir. 2024); *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015); *Montera*, 111 F.4th at 1028. Indeed, the logic of a *deceptive* advertising claim indicates that deception is a vital element: if Happy Egg's representations were material, but not deceptive, plaintiffs would have no viable case at all. Nor would there be damages in that event. This does not mean that a classwide showing of deception will always predominate over individualized issues of materiality and damages, which is not the situation here. Instead, on this record, the *lack* of a classwide showing on deception cannot be overcome by supposedly common issues of materiality and damages that are unmoored from any classwide showing of actionable wrongdoing.

As we have explained, "even if plaintiffs demonstrate that there are common questions of law or fact with respect to ... other elements, this does not perforce establish that these questions predominate over individualized questions" more important to their claim. *White*, 104 F.4th at 1193–94. That is the situation here. Therefore, the district court erred in

certifying the classes based on its materiality and damages findings alone.

The grant of class certification is

**REVERSED.**

**All Citations**

--- F.4th ----, 2026 WL 2387098

## Footnotes

* The Honorable Danny J. Boggs, United States Circuit Judge for the Court of Appeals, Sixth Circuit, sitting by designation.

1 Plaintiffs' California claims were brought under California's Consumer Legal Remedies Act (“CLRA”), Cal. Civil Code § 1750, *et seq.*, Unfair Competition Law (“UCL”), Cal. Bus. & Prof. Code § 17200, *et seq.*, False Advertising Law (“FAL”), Cal. Bus. & Prof. Code § 17500, *et seq.*, and California's Commercial Code (specifically, breach of express warranty and intentional misrepresentation), Cal. Com. Code §§ 2313– 14. The New York claims were brought under New York's General Business Law (“GBL”), N.Y. Gen. Bus. Law §§ 349–50. The district court declined to certify plaintiffs' New York breach of warranty and intentional misrepresentation claims, so they are not at issue in this appeal.

2 After the district court granted class certification, the plaintiffs filed a motion for reconsideration as to the court's exclusion of Dr. Morris. The district court denied that motion without prejudice after staying proceedings pending this appeal. Regardless, there is no indication that plaintiffs sought to remedy the issues with Dr. Morris's opinions, nor have they explained to us how they would do so.

3 In their answering brief, plaintiffs advance an alternative theory that the AHA seal was used on Happy Egg's cartons for a period of approximately one year. However, this argument was not raised in plaintiffs' motion for class certification, so it is waived. *See* *White v. Martel*, 601 F.3d 882, 885 (9th Cir. 2010) (per curiam) (noting that “arguments not raised before the district court are waived on appeal”).

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

2026 WL 2581605
Only the Westlaw citation is currently available.
United States District Court, S.D. Ohio, Eastern Division.

CARLLYNN NICHOLS, Plaintiff,
v.
STATE FARM MUTUAL AUTOMOBILE INS. CO., Defendant.

Case No. 2:22-cv-16
|
09/01/2026

**Attorneys and Law Firms**

Matthew Ryan Wilson, Jared William Connors, Meyer Wilson Werning Co., LPA, Columbus, OH, Edward Allan Baker, Pro Hac Vice, Jonathan David Selbin, Pro Hac Vice, Lieff, Cabraser, Heimann & Bernstein LLP, New York, NY, Michael J. Boyle, Jr., Bronstein Gewirtz & Grossman, Columbus, OH, Nicholas Wing-Hong Lee, Pro Hac Vice, Roger Norton Heller, Pro Hac Vice, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA, Sydney S. McLafferty, Cecil and Geiser, LLP, Columbus, OH, for Plaintiff.

James Richard Gallagher, Gallagher, Gams, Tallan, Barnes & Littrell L.L.P., Columbus, OH, Eric L. Robertson, Pro Hac Vice, Denver, CO, Peter W. Herzog, III, Pro Hac Vice, Thomas Carl Dec, Pro Hac Vice, Wheeler Trigg O'Donnell LLP, Denver, CO, for Defendant.

SARAH D. MORRISON, CHIEF JUDGE, UNITED STATES DISTRICT COURT

**OPINION AND ORDER**

***1** Carllynn Nichols brought this putative class action to challenge the way that State Farm Mutual Automobile Insurance Company calculated and paid its insureds the "actual cash value" ("ACV") of destroyed vehicles. When an insured's vehicle was declared a total loss, State Farm paid its insured the destroyed car's ACV less any applicable deductible. To calculate that ACV during the relevant time period, State Farm used the Audatex "Autosource" valuation methodology, which used advertised prices for comparable vehicles, then imposed a "typical negotiation" adjustment that reduced the estimated value of the comparators to account for negotiations that would lower the final sales prices. Ms. Nichols claims that this "typical negotiation" adjustment undervalued the comparator vehicles and breached State Farm's contracts with its insureds.

This matter is now before the Court on Plaintiff's Motions for Class Certification (ECF No. 114) and to Exclude Philip M. Fernbach, Ph.D (ECF No. 144) and Defendant's Motion to Exclude Jason Merritt (ECF No. 128). Those motions are fully briefed and ripe for decision. [1]

## I. BACKGROUND

Ms. Nichols had a car insurance policy issued by State Farm. State Farm used a form contract that stated that, in the event of a total loss of a covered car, it would "[p]ay the actual cash value of the covered [total loss] vehicle minus any applicable deductible." (Policy & Declarations, ECF No. 71–1, PAGEID # 1237.) "Actual cash value" is not defined in the policy. Rather, the Policy provides that the ACV will be determined by agreement of the parties or by appraisal: "The owner of the covered vehicle and [State Farm] must agree upon the actual cash value of the covered vehicle. If there is disagreement as to the actual cash value of the covered vehicle, then the disagreement will be resolved by appraisal…" (*Id*. (emphasis omitted).)

State Farm contracted with third parties to perform valuations of its total loss claims in Ohio (State Farm Dep., ECF No. 114-7, 91:25–93:7); Ms. Nichols's claims address State Farm's use of Audatex. Audatex determined the ACV of an insured's lost vehicle by starting with the advertised sales prices of comparable vehicles in Audatex's database. Those advertised prices were then adjusted based on several factors, including distinctions between the comparators and the lost vehicle (such as condition and mileage differences), and applying a typical-negotiation discount. [2] The adjusted prices of the comparable vehicles were then averaged. From the average adjusted price, sales tax and any deductible were applied to arrive at State Farm's ACV for a lost vehicle.

State Farm uses the typical-negotiation deduction to reflect "the typical negotiation between an ask or advertised price and a sold price." (State Farm Dep., ECF No. 101-2 (sealed), 160:20–22). According to State Farm, the deduction reflects experience – "[e]xperience instructs that the price a used car dealer advertises for a car is just the starting point for bargaining, not the final price. That fact is reflected in the data: By analyzing millions of transactions over time, Audatex found that used cars typically sell for less than

advertised." (ECF No. 136, PAGEID # 9611 (citing Graff Decl., ECF No. 136-1, ¶ 20).). According to Ms. Nichols, the deduction is "arbitrary, unsupported, and divorced from the realities of the marketplace[.]" (ECF No. 114, PAGEID # 7223.)

***2** Once it had an ACV for a lost vehicle, State Farm would provide that figure to its insured. (Graff Dec. ¶¶ 12–13.) The insured then had three options: she could agree to that ACV, she could negotiate a new ACV, or she could demand an appraisal. (*Id.*, ¶ 27; ECF No. 71-1, PAGEID # 1237.) State Farm could also demand an appraisal if the parties did not agree on an ACV. (ECF No. 71-1, PAGEID # 1237.) If either side demanded an appraisal, each side selected an appraiser, and the two selected appraisers picked a third (or a court appointed one). (Graff Decl. ¶ 5; ECF No. 71-1, PAGEID # 2371.) If two of the three appraisers agreed on a value, that value was binding on the parties. (*Id.*)

For Ms. Nichols, whose vehicle was declared a total loss following an accident, Audatex reached an ACV of $5,518 for her car. When she accepted that ACV, State Farm added taxes and subtracted Ms. Nichols's deductible before paying her $5,431.85. She then brought this case, claiming that State Farm's use of the typical-negotiation adjustment resulted in an underpayment to her of $512.78.[3] (ECF No. 114, PAGEID # 7228.)

Ms. Nichols now seeks certification of the following class of individuals:

> All State Farm insureds (1) with first party personal line policies issued in Ohio, (2) who received compensation, from January 4, 2021 through November 15, 2021, for the total loss of their own vehicles under their First Party (Comprehensive, Collision, and UMPD) coverages, and (3) whose claim was settled using the amount determined by an Audatex total loss valuation which included a TNA deduction.

(*Id.* at PAGEID # 7221.)

## II. MOTION FOR CLASS CERTIFICATION

### A. Standard of Review

Class certification is appropriate if the court finds, after conducting a "rigorous analysis," that the requirements of Rule 23 have been met. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 250–51 (2011); *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 246 (6th Cir. 2024) (citing *Dukes*, at 351–52). As the Sixth Circuit has emphasized, plaintiffs seeking class certification "must 'affirmatively demonstrate' the four threshold imperatives of certification" in Rule 23(a): numerosity, commonality, typicality, and adequacy. *See In re Nissan*, 122 F.4th at 246 (quoting *Dukes*, 564 U.S. at 350). Plaintiffs must also show that the proposed class satisfies one of the types of class actions permitted under Rule 23(b): (1) actions where separate lawsuits would risk inconsistent verdicts or impede third-party interests; (2) actions where injunctive or declaratory relief is appropriate; or (3) actions where common questions predominate over issues affecting individual plaintiffs. *Id.* (citing Fed. R. Civ. P. 23(b)(1)–(3); *Pilgrim v. Univ. Health Card, LLC*, 660 F.3d 943, 945–46 (6th Cir. 2011)).

In addition, although not expressly required by Rule 23, the proposed class must satisfy an implied ascertainability requirement, which requires the "class description [to be] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016); *see also Bowles v. Sabree*, 121 F.4th 539, 550 (6th Cir. 2024) ("Class actions come with an 'implied requirement' of ascertainability ('that the putative class members can be readily identified based on the class definition')."') (quoting *Tarrify Props., LLC v. Cuyahoga Cty., Ohio*, 37 F.4th 1101, 1106 (6th Cir. 2022)).

***3** Inquiry into the merits of the plaintiffs' claims at the class certification stage is limited: a court may consider merits questions "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). But where appropriate, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982), and "rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims." *Dukes*, 564 U.S. at 350–51.

**B. Analysis**

The Sixth Circuit recently issued an *en banc* decision in *Clippinger v. State Farm Auto. Ins. Co.*, 173 F.4th 817 (6th Cir. 2026), which is on all fours with Ms. Nichols's Motion for Class Certification. In *Clippinger*, the Sixth Circuit concluded that claims like Ms. Nichols's cannot be pursued on a class-wide basis because, to determine whether State Farm paid the ACV for the lost vehicles owned by class members, a jury would have to consider unique evidence about each vehicle's value. *Id.* at 831–32. Specifically, the Sixth Circuit recognized that determining the ACV of each class member's vehicle would predominate over any common issues, and "a jury would have to identify this value for each class member before it could resolve the breach and damages elements of that member's claim." *Id.* at 832. This is because State Farm's policies "show[ ] that State Farm promised just one thing: to pay each class member the 'actual cash value' of the class member's totaled vehicle." *Id*. Nothing in the policy prevented State Farm from using a typical-negotiation adjustment, so the question of breach necessarily turned on "comparing what State Farm paid a class member to the fair market value of the class member's car." *Id*. Such a "fact-intensive review" requires an individualized assessment of each class member's car, so a jury (or juries) would have to weigh "individual proof" on a "plaintiff-by-plaintiff" basis. *Id*. at 832–33. There is no way to determine whether each policyholder was paid less than "actual cash value" without individualized vehicle-by-vehicle evidence. *Id*. Accordingly, individual valuations "predominate" over all other questions under Federal Rule of Civil Procedure 23(b)(3), making class treatment inappropriate. *Id*.

Ms. Nichols makes three arguments to distinguish her case from *Clippinger*, primarily focusing on the fact that *Clippinger's* claims were brought under Tennessee law while her claims are brought under Ohio law. But the Court finds that *Clippinger's* analysis of Rule 23 of the Federal Rules of Civil Procedure applies with equal force to her claims and she cannot bring her claims as a class action. The Court will address each of Ms. Nichols's arguments in turn.

**1. *Clippinger* applies to Ms. Nichols's breach of contract claim brought under Ohio law.**

Ms. Nichols first argues that *Clippinger* is not applicable because her claims are brought under Ohio law. However, her attempts to distinguish Ohio contract law from Tennessee law are unavailing. As the Sixth Circuit has recognized, the overarching principles of insurance contract interpretation under Tennessee and Ohio law "are the same." *United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 451 (6th Cir. 1999) (comparing *Advance Watch Co., Ltd. v. Kemper Nat'l Ins. Co.*, 99 F.3d 795, 799–800 (terms in a contract are given their common and ordinary meaning; ambiguities are to be construed in favor of insured; and courts should give effect to all words and phrases in a contract) and *ShoLodge, Inc. v. Travelers Indem. Co. of Illinois*, 163 F.3d 256, 259 (same) with *Gomoka v. State Auto. Mut. Ins. Co.*, 436 N.E.2d 1347, 1348–49 (1982) (same) and 57 Ohio Jur.3d §§ 274–292 (same)). Because Ms. Nichols has not argued that State Farm's insurance contracts in Tennessee are any different than its contracts in Ohio, the contracts will be interpreted the same under Ohio law as in *Clippinger*.

***4** Even though both state laws interpret insurance contracts in the same manner, Ms. Nichols argues that, unlike under Tennessee law, State Farm is not entitled to an offset for any overestimations of ACV under Ohio law. (ECF No. 160, PAGEID # 11508.) But no Ohio court has found that such an offset is prohibited. Instead, Ms. Nichols cites three federal cases, none of which support her argument. First, she relies on *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 461 (6th Cir. 2020), but that case involved homeowner's insurance, was decided under Kentucky law, and involved the refunding of an illegal labor deduction from payments made to insureds. Second, she relies on *Perry v. Allstate Indem. Co.*, 953 F.3d 417, 421 (6th Cir. 2020); while *Perry* was based on Ohio law, that case also involved homeowner's insurance and whether the term "depreciation" was ambiguous in the insurance policies or relevant Ohio Administrative Code provisions. Third, she relies on *Davis v. GEICO Cas. Co.*, 659 F. Supp. 3d 843, 855 (S.D. Ohio 2023) (Sargus, J.), but in that case, the value of the vehicle was irrelevant to any recovery by class members because the *Davis* plaintiffs sought recovery of certain taxes and fees that should have been paid as part of the "replacement cost" of lost vehicles.

But even if State Farm were not entitled to an offset for any overestimations of ACV under Ohio law, the result would be the same. The issue here, as in *Clippinger*, is that the individual valuations of each potential class members' lost cars predominate over all other questions. So even if there is no offset to consider, a jury must weigh plaintiff-by-plaintiff proof of each class member's car to determine whether each has been damaged.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Ms. Nichols's cannot certify a class on her breach of contract claim.

**2. Ms. Nichols cannot certify a claim for breach of the implied covenant of good faith and fair dealing.**

Ohio does not recognize a standalone cause of action for breach of implied covenant of good faith and fair dealing. *Patrick v. CitiMortgage, Inc.*, 676 F. App'x 573, 577 (6th Cir. 2017) (collecting cases). Neither does Tennessee law. *Clippinger*, at 827–28. Ms. Nichols cannot certify a class asserting an independent Ohio law claim for breach of the implied covenant of good faith and fair dealing.

**3. Ms. Nichols cannot certify a claim for unjust enrichment.**

Ms. Nichols's unjust enrichment claim is not certifiable as a class action for the same reason that her contract claim is not certifiable: if State Farm paid the ACV (or more) to an insured, it is not unjust for State Farm to have retained the additional amount a plaintiff says it should have paid when that amount is not in fact owed. Determining the ACV of each class member's vehicle (and thus whether State Farm retained more than the policy allowed it to retain) would require an independent and individualized assessment as to each car, so individualized issues will predominate.

**III. MOTIONS TO EXCLUDE EXPERT TESTIMONY**

During the briefing on the Motion for Class Certification, State Farm submitted a report from Philip M. Fernbach, Ph.D. in support of its opposition to the Motion. (ECF No. 136-16.) Ms. Nichols filed a Motion to Exclude Dr. Fernbach's testimony. (ECF No. 144.) Considering the Court's ruling above, the Motion to Exclude is **DENIED as moot**.

State Farm also moved to exclude Ms. Nichols's appraiser Jason Merritt as an expert witness in this case. (ECF No. 128.) Ms. Nichols submitted Mr. Merritt's expert report as part of her Motion for Class Certification to support the alleged impropriety of typical-negotiation adjustment deductions. (ECF No. 114, PAGEID ## 7223.) And Mr. Merritt provided his report specifically in connection with the class-certification issue. (Merritt Report, ECF No. 114-1, PAGEID # 7255.) Accordingly, State Farms's Motion to Exclude is **DENIED as moot**, **without prejudice**.

**IV. CONCLUSION**

Plaintiff's Motion for Class Certification (ECF No. 114) is **DENIED**. Her Motion to Exclude Philip M. Fernbach, Ph.D. (ECF No. 144) is **DENIED as moot**. Defendant's Motion to Exclude Jason Merritt (ECF No. 128) is **DENIED as moot, without prejudice.**

***5 IT IS SO ORDERED.**

/s/ Sarah D. Morrison

**SARAH D. MORRISON, CHIEF JUDGE**

**UNITED STATES DISTRICT COURT**

**All Citations**

Slip Copy, 2026 WL 2581605

## Footnotes

1 Both parties have requested oral argument. Because the Court does not believe that oral argument is necessary, that request is **DENIED**.

2 When the advertised prices of the comparators come from “no-haggle” dealerships for which the advertised price is the sale price, Audatex did not apply a typical negotiation adjustment. (Graff Decl. ¶ 22.)

3 After suit was filed, State Farm demanded an appraisal. After the appraisal process was complete, the binding appraisal award was $6,542. (Graff Decl. ¶¶ 35– 39; Walker Appraisal Report/Award, ECF No. 136, PAGEID # 10082.) State Farm has paid Ms. Nichols the difference between its previous payment and the appraisal award. (Graff Decl. ¶ 39; ECF No. 136-9; ECF No. 136-10.)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.