UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE CALIFORNIA BAIL BOND ANTITRUST LITIGATION<br><br>This order relates to:<br><br>ALL ACTIONS | Case No. 19-cv-00717-JST<br><br>**ORDER GRANTING MOTION TO EXCLUDE SINGER TESTIMONY, DENYING MOTION FOR CLASS CERTIFICATION, AND DENYING AS MOOT MOTION TO EXCLUDE STROMBOM TESTIMONY**<br><br>Re: ECF Nos. 513, 538, 559 |

Before the Court are three motions: (1) Plaintiffs' motion for class certification, ECF No. 513; (2) Defendants' motion to exclude the testimony of Dr. Hal J. Singer, ECF No. 538; and (3) Plaintiffs' Motion to exclude the testimony of Dr. Bruce A. Strombom, ECF No. 559. The Court will grant Defendants' motion to exclude Singer's testimony, deny Plaintiffs' motion for class certification, and deny as moot Plaintiffs' motion to exclude Strombom's testimony.

## I. BACKGROUND

The Court has previously summarized the factual background and procedural history of this case in some detail. ECF No. 330 at 1–12. In brief, Plaintiffs Shonetta Crain and Kira Monterrey allege that Defendants have conspired to inflate the price of bail bonds in California. Defendants are several bail bond surety companies operating in California and one individual Defendant, William B. Carmichael, the president and CEO of Defendant American Surety Company and chairperson of the American Bail Coalition. Plaintiffs allege that Defendants' conspiracy had two components: (1) fixing bail bond premium rates at 10 percent of the face amount of the bail bond, even though there is no actuarial justification for that rate, and (2) suppressing the advertisement and offering of rebates by bail agents.

Plaintiffs bring claims under the Sherman Act, 15 U.S.C. § 1; the Cartwright Act, Cal. Bus.

United States District Court
Northern District of California

United States District Court
Northern District of California

& Prof. Code § 16720; and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq*. They seek to certify the following class:

> All persons who, between February 24, 2004, and August 14, 2023 (the "Class Period"), paid for part or all of a commercial bail bond premium in connection with a California state court criminal proceeding. Specifically excluded from this Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant, and any person acting on their behalf; any person who acted as a bail agent during the Class Period; any judicial officer presiding over this action and members of their immediate family and judicial staff; and any juror assigned to this action.

ECF No. 513 at 8.

Defendants oppose Plaintiffs' motion for class certification and move to exclude the testimony of Plaintiffs' expert economist, Dr. Hal J. Singer. ECF Nos. 538, 551. Plaintiffs seek to exclude the testimony of Defendants' rebuttal expert, Dr. Bruce A. Strombom. ECF No. 559. The Court heard argument on all three motions on December 17, 2025.

After briefing had been completed but prior to the date of the hearing, Plaintiffs reached settlement agreements with multiple Defendants. Plaintiffs' motion for preliminary approval of these class action settlements, ECF No. 669, has been fully briefed but not yet decided. The Court previously granted final approval of class settlements with Defendants Lexon Insurance Company and Danielson National Insurance Company. ECF No. 568. Plaintiffs have not reached settlement agreements with Defendants AIA Holdings, Inc.; Allegheny Casualty Company; International Fidelity Insurance Company; or Lexington National Insurance Corporation. ECF No. 672 at 5.

## II. MOTION TO EXCLUDE SINGER TESTIMONY

Plaintiffs rely on Singer's testimony to establish a damages model, using "but-for prices from . . . various impact models," for the proposed class. ECF No. 537-2 ¶ 4(d). Defendants do not challenge Singer's qualifications as an expert, but they argue that several of his opinions do not meet the admissibility criteria of Rule 702 of the Federal Rules of Evidence.

### A. Legal Standard

Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill,

> experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. Following *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), trial courts serve a "gatekeeping" role "to ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010)). The question "is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Thus, courts should "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. Nonetheless, the "proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025). "[T]here is no presumption in favor of admission." *Id.*

### B. Discussion

For the reasons set forth below, the Court concludes that Singer's calculation of pricing in the but-for world does not satisfy the requirements of Rule 702. Because this is a sufficient basis for excluding Singer's testimony, the Court does not reach Defendants' remaining critiques. *E.g.*,

*Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 962–67 (N.D. Cal. 2025) (excluding expert testimony based on unreliable but-for model); *In re: NFL "Sunday Ticket" Antitrust Litig.*, No. ML 15-02668 PSG (SKx), 2024 WL 3628118, at *4–8 (C.D. Cal. Aug. 1, 2024) (same).

First, a central premise underlying Singer's analysis is that bail bonds are "fungible commodity products" that, in a competitive market, would be sold at their marginal cost of sale, with no surety or agent "be[ing] able to [charge] a price above competitive levels for the services of underwriting a bond." ECF No. 537-2 ¶ 41. He explains, "In a commodity market, there is no differentiation in the underlying product itself, and price is the determining factor in consumer preference." ECF No. 562-6 ¶ 172. To support this conclusion, Singer relies on an undated document from the Golden State Bail Agents Association addressing the potential regulation of credit bail, which contains this stray sentence: "However, in the bail industry, just like all other commodities, services and other lines of insurance, financing is available." ECF No. 537-2 ¶ 41 n.170; ECF No. 551-61 at 3. The document compares bail bonds to "commodities," "services," and "other lines of insurance"; it does not say that bail bonds *are* a "commodity" or a "commodity product." There is no testimony regarding the document, so the intended meaning of any of these comparators is unknown. But even Singer recognizes that, despite the document's comparison of bail bonds to "other lines of insurance," bail bonds are "economically distinct" from other insurance products. ECF No. 537-2 ¶ 35. This undermines his reliance on the cited document to conclude that bail bonds are commodities.

Other than the cited document, "Singer did not conduct any empirical analysis to test this premise," rendering his methodology unreliable. *In re Fla. Cement & Concrete Antitrust Litig.*, 278 F.R.D. 674, 686 (S.D. Fla. 2012). Moreover, Singer also ignored evidence that price did not drive either Named Plaintiff's choice of bail bond agency. One Named Plaintiff testified that she did not compare prices at other bail agencies because her focus was "to get [her] sister out as soon as possible." ECF No. 539-38 at 102:2–16. Similarly, the other Named Plaintiff told her husband, who was purchasing a bail bond for her, "You need to get me out of here as soon as you can." ECF No. 539-42 at 128:6–9. She does not recall "ask[ing] him to get . . . the cheapest bail bond possible" and believed she "needed a bail agency that was close to the detention facility." *Id.* at



United States District Court
Northern District of California

United States District Court
Northern District of California

128:10–23. In short, Singer's treatment of bail bonds as commodities lacks any factual basis. The Court therefore excludes his theoretical effective rate model and his marginal cost model for calculating aggregate but-for rates, both of which depend on analyzing bail bonds as "commodity products." ECF No. 537-2 ¶ 108.

Second, the Court rejects the theoretical effective rate model for the additional reason that it assumes, again without any factual basis, that sureties "have essentially no variable costs for doing business." *Id.* ¶ 116. For support, Singer cites the deposition of an agent who agreed that it would be "fair to say" that "there weren't any particular costs incurred by the surety, generally speaking, in relation to this line of business." *Id.* ¶ 116 n.322. This is far "too thin a reed on which to base the sweeping extrapolation" that sureties have no variable costs to providing a bond. *Klein*, 766 F. Supp. 3d at 966. Moreover, it fails to consider the same deponent's testimony—cited elsewhere in Singer's report—that sureties "must pay the premium tax on the gross premium to the various states," *id.* ¶ 35 n.155, and thereby incur at least one variable cost.

Third, Singer assumes that the only change in the but-for world would be the premium charged by sureties to agents, and that the discounts from that premium—rebating, credit bail, and qualified rates—would remain the same. But there is no support for that assumption either. When the price of bail bonds changes, the risk calculus for each specific bond, including for arrestees who pose a greater flight risk, also changes. Singer recognized these market realities in his report, but he failed to account for them in his analysis. *See, e.g.*, *id.* ¶ 24 & n.132 (citing testimony that "writing a bond itself is a two-step underwriting process, fiscal and flight risk. You wouldn't always want to rebate, you know, if the financial risk or the flight risk were high. You may not want to write the bond at all."). As authority cited by Plaintiffs recognizes, Singer "must presume the existence of rational economic behavior in the hypothetical free market" that is the basis for his but-for world. *Dolphin Tours, Inc. v. Pacifico Creative Serv., Inc.*, 773 F.2d 1506, 1511 (9th Cir. 1985). Failure to consider market participants' reaction to different market circumstances fails to meet this requirement and is grounds for excluding Singer's testimony. *See Murphy Tugboat Co. v. Crowley*, 658 F.2d 1256, 1261–62 (9th Cir. 1981).

Fourth, Singer assumes that, in the but-for world, every bail-bond purchaser would have

"greater, if not perfect, knowledge of the market price for a commodity service like a Bail Bond and would negotiate down the Effective Rate they would be charged to the competitive level." ECF No. 537-2 ¶ 173. However, no evidence supports Singer's assumption that consumers would negotiate prices downward; in fact, the evidence contradicts that assumption. For example, one of the Named Plaintiffs bought two bail bonds—after filing this lawsuit and thus being aware that prices could be negotiated—without negotiating the price; she "just paid the fee." ECF No. 539-42 at 187:17–189:2. She "wasn't thinking about options or money at that point. It was like this is just what has to get done, like, just get it done." *Id.* at 196:6–13. Neither Singer nor Plaintiffs have presented any basis for assuming such behavior would change in the but-for world.

Fifth, Singer's benchmarking model uses as a control group North Vignes Street in Los Angeles, which he contends has a high concentration of agent storefronts that more likely resulted in increased competition. ECF No. 537-2 ¶ 131. But examining the behavior of agents in a more competitive California local bond market, with rates that have already been filed by sureties, does not provide any insight into the rates that sureties, who sit at a different level of the supply chain, would have filed with the California Department of Insurance in a but-for world. In other words, as Strombom correctly observes in his rebuttal report, Singer's model does not address the issue in this case: "lack of competition among the *sureties* on filed rates." ECF No. 537-3 ¶ 241 (emphasis in original). Additionally, Singer's theory behind choosing North Vignes Street as a benchmark is that, in a place with ten storefronts, "agents would start to compete most likely by offering rebates. And they would realize that . . . why are we the ones who are bearing 100 percent of the burden of this enhanced competition. Why don't we ask our partners, the sureties, to bear some portion of the burden" by asking them "to give us a lower filed rate." ECF No. 537-4 at 368:10–369:13. This theory has several problems. First, the assumption that agencies competed by offering rebates is at odds with Plaintiffs' theory that Defendants' conspiracy prevented rebating. Second, Singer again fails to consider market realities by assuming that agents would choose to offer lower rates due to competition regardless of the risk presented by particular consumers. Third, Singer presumes that agents would put pressure on sureties to lower rates, but there is no evidence in the record to support the idea that agents have any control over the rates filed by sureties. To the

contrary, as Singer himself testified, "a conspiracy involving filed rates among sureties . . . doesn't really require the participation of agents. The agents can't change the filed rate. That's a decision made by the sureties." *Id.* at 103:6–11. Plaintiffs have presented no evidence that agents have any effect on filed rates. For all of these reasons, Singer's benchmarking model is unreliable.

The cumulative effect of these deficiencies is that Singer's report does not reliably model what consumers would pay in the absence of a conspiracy. Because his common-impact damages analysis depends on these unreliable estimations of but-for rates, that analysis must also be excluded as lacking a sufficient factual basis.

## III. MOTION FOR CLASS CERTIFICATION

### A. Legal Standard

To certify a class, a court must be satisfied, "after a rigorous analysis," that the plaintiffs meet the requirements of Rule 23 of the Federal Rules of Civil Procedure by a preponderance of the evidence. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664–65 (9th Cir. 2022) (en banc) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs must make two showings." *Id.* at 663. First, they must satisfy the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a):

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Second, they "must show that the class fits into one of three categories" under Rule 23(b). *Olean*, 31 F.4th at 663.

Plaintiffs seek to certify classes under both Rules 23(b)(2) and 23(b)(3). Under the former, a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available

United States District Court
Northern District of California

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Thus, for example, "[i]n determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial." *Olean*, 31 F.4th at 666–67 (emphasis in original).

**B. Discussion**

Even assuming Plaintiffs can satisfy the requirements of Rule 23(a), the Court denies class certification because Plaintiffs have failed to show that either the requirements of Rule 23(b)(2) or 23(b)(3) are satisfied.

**1. Rule 23(b)(2)**

A Rule 23(b)(2) class cannot be certified because the Named Plaintiffs lack Article III standing to seek injunctive relief and may therefore "not represent a class seeking that relief." *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999). To establish such standing, "the threat of injury must be actual and imminent, not conjectural or hypothetical. In other words, the threatened injury must be *certainly impending* to constitute injury in fact and allegations of *possible* future injury are not sufficient." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018) (emphasis in original) (citation modified); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 105–10 (1983) (holding that a plaintiff who was previously held in an illegal chokehold lacked standing to seek injunctive relief where "[t]here was no finding that [he] faced a real and immediate threat of again being illegally choked").

Plaintiffs argue, "Because Defendants' conspiracy persists, Plaintiffs therefore face an ongoing risk of harm. That is all the law requires." ECF No. 562-2 at 27 (citing *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969)). However, although *Zenith* states that a plaintiff "need only demonstrate a significant threat of injury from an impending violation of the

United States District Court
Northern District of California

antitrust laws or from a contemporary violation likely to continue or recur" to be entitled to injunctive relief, 395 U.S. at 130, *Lyons* and other intervening authority make clear that the injury must be impending as to the individual plaintiff before the court. In this case, one Named Plaintiff testified that, although "you never know what's going to happen," she did not "have any present plans . . . to purchase a bail bond in the future." ECF No. 560-2 at 43:17–44:9. The other Named Plaintiff similarly testified that she had no "plans to purchase a bail bond in the future" or any "reason to believe that [she] might need to purchase a bail bond in the future." ECF No. 539-38 at 28:24–29:21. Consequently, neither Named Plaintiff has Article III standing to seek injunctive relief. *E.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (holding that "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" required for standing (emphasis in original)); *Kamahaki v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 195–96 (N.D. Cal. 2015) (finding lack of standing in antitrust case concerning donated eggs through fertility clinics where one plaintiff testified that she did not plan to donate eggs in the future and another plaintiff testified that doing so was "not at the forefront of [her] mind" but it was "possible" she might donate again in the future).

**2. Rule 23(b)(3)**

To certify such a Rule 23(b)(3) class, plaintiffs must present a model "establishing that damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). If they fail to do so, they "cannot show Rule 23(b)(3) predominance" because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.*

In this case, the unreliability of Singer's damages analysis—the only methodology on which Plaintiffs rely—means that a Rule 23(b)(3) class cannot be certified. This is true whether Singer's damages are excluded as inadmissible under Rule 702 of the Federal Rules of Evidence, or if the unreliability is considered only as to the weight of the evidence. *See Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018) ("[I]n evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set

forth in *Daubert*. But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." (citation omitted)). Where, as here, a "damages model fails and the moving party presents no alternative method for calculating damages on a classwide basis, individual issues predominate the damages inquiry, and class certification is properly denied." *Pro Water Sols., Inc. v. Angie's List, Inc.*, No. 2:19-cv-08704-ODW(PLAx), 2022 WL 9992458, at *15 (C.D. Cal. Oct. 17, 2022) (citing *Comcast*, 569 U.S. at 34).

## IV. MOTION TO EXCLUDE STROMBOM TESTIMONY

The Court did not rely on any of the challenged portions of Strombom's testimony in reaching the above rulings. Accordingly, Plaintiffs' motion to exclude such testimony is denied as moot.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to exclude Dr. Singer's testimony, denies Plaintiffs' motion for class certification, and denies as moot Plaintiffs' motion to exclude Dr. Strombom's testimony.

**IT IS SO ORDERED.**

Dated: October 13, 2026

JON S. TIGAR
United States District Judge

United States District Court
Northern District of California